# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **MICHAEL O'NEIL** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **Vs.** | ) | **C.A. 23-cv-70** |
| | ) | |
| **PETER F. NERONHA, in his official capacity as** | ) | |
| **Attorney General of the State of Rhode Island, and** | ) | |
| **THE STATE OF RHODE ISLAND** | ) | |
| **Defendants** | ) | |

### PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION TO DISMISS

Defendants have made a variety of arguments in support of their Rule 12(b)(6) motion, none of which have merit. As an initial matter, the thrusts of Defendants' arguments are directed against O'Neil's Second Amendment claim set forth in Count I of the Verified Complaint. There is little mention of his procedural due process claim set forth in Count II in the bulk of Defendants' arguments. Regardless, Defendants' attacks on the Second Amendment claim are futile. However, as a clarification, O'Neil is not stating a claim for violation of substantive due process.

### FACTUAL ALLEGATIONS[1]

O'Neil is over the age of 21, he has not been convicted of any felony, he is not a fugitive from justice, he is not in community confinement or otherwise subject to electronic surveillance, he is not mentally incompetent, a drug addict or a drunkard, he is not an immigrant who entered or remained in the country illegally, and he has obtained a so-called "blue card" from the Rhode Island Department of Environmental Management. (Verified Complaint, ¶ 1). In other words, O'Neil meets all the statutory requirements under the Rhode Island Firearms Act, R.I.Gen.L. § 11-47-1, et seq., to possess firearms, including handguns. (Id.).

---

[1] For the sake of consistency, O'Neil's Objection includes some verbatim portions from his Memorandum in Support of his Motion for Preliminary Injunction, including the Factual Allegations, as that Motion and this Objection overlap to some extent.

Under the Firearms Act, both the Rhode Island Attorney General and municipalities may issue CCW permits, §§ 11-47-18 and 11-47-11, respectively. (Id., ¶ 2). The provision by which municipalities may issue CCW permits states, in part:

> The licensing authorities of any city or town **shall**, upon application of any person twenty-one (21) years of age or over having a bona fide residence or place of business within the city or town, or of any person twenty-one (21) years of age or over having a bona fide residence within the United States and a license or permit to carry a pistol or revolver concealed upon his or her person issued by the authorities of any other state or subdivision of the United States, issue a license or permit to the person to carry concealed upon his or her person a pistol or revolver everywhere within this state for four (4) years from date of issue, if it appears that the applicant has good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, and that he or she is a suitable person to be so licensed."  (emphasis added).

R.I.Gen.L. § 11-47-11(a). The Section under which the Attorney General issues such permits ("State permit") states, in part:

> The attorney general **may** issue a license or permit to any person twenty-one (21) years of age or over to carry a pistol or revolver, whether concealed or not, upon his or her person **upon a proper showing of need**, subject to the provisions of §§ 11-47-12 and 11-47-15; that license or permit may be issued notwithstanding the provisions of § 11-47-7." (emphasis added).

R.I.Gen.L. §11-47-18(a). The Firearms Act does not define "proper showing" or "need."

The Attorney General has created a set of factors in his "Weapons Carry Permit Packet" (Exhibit A to Plaintiff's Complaint) which his Department purportedly uses to determine whether an applicant has made "a proper showing of need."  These factors include:

(1) Has the applicant demonstrated a specific articulable risk to life, limb or property? If so, has the applicant demonstrated how a pistol permit will decrease the risk?

(2) Can the applicant readily alter his or her conduct, or undertake reasonable measures other than carrying a loaded firearm, to decrease the danger to life, limb or property?

(3) Are there means of protection available to the applicant other than the possession of a loaded firearm that will alleviate the risk to his or her person or property?

(4) Has the applicant demonstrated the skill, training and ability to properly use a firearm in accordance with Rhode Island laws?

(5) Has the applicant presented a plan to properly secure the firearm so that it does not fall into unauthorized hands?

(6) How greatly will the possession of a loaded firearm by the applicant increase the risk of harm to the applicant or to the public?

(7) Has the applicant demonstrated that he or she will not use the firearm for an unlawful or improper purpose, and that he or she has not used a firearm for an unlawful or improper purpose in the past?

(8) Does past unlawful, dangerous, or violent conduct of the applicant justify denial at the Attorney General's discretion even if it is not sufficient to disqualify the applicant as a matter of law from possessing a firearm?

(9) Has the applicant been issued a protective order pursuant to chapter 15-5, chapter 15-15, or chapter 8-8.1 of the general laws?

(10) Any and all other factors deemed lawful and appropriate by the Attorney General to demonstrate that the applicant is or is not a person suitable to possess a loaded firearm in public.

(Id., ¶ 11, Exhibit A). However, the information packet also states there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue or deny a pistol permit." (Id.).

O'Neil had applied for and had been granted a State CCW permit every four years since 2013. (Id., ¶ 13). He has in the past also been granted CCW permits by the Town of Johnston and the City of Warwick. (Id., ¶ 14).

On October 25, 2020, O'Neil filed an application with the Rhode Island Department of the Attorney General to renew his State CCW permit. (Id., ¶ 15, Exhibit B). On January 25, 2021, the Attorney General's office denied his application, stating the Attorney General had "broad discretion to issue a permit to carry a pistol or revolver,"[2] and "you have not provided a proper showing of need for a permit to be issued" because O'Neil already had a concealed carry permit from the City of Warwick which "provides you with the ability to lawfully carry a pistol or revolver in the State of Rhode Island."  (Id., ¶ 16, Exhibit C). However, the denial otherwise failed to articulate any reason set forth in the Defendants' factors for denial.

On March 10, 2021, O'Neil, along with counsel, met via telephone, with representatives from the Attorney General on his appeal and requested reconsideration of the denial. During that meeting, O'Neil's counsel articulated reasons for having the State permit as well as the municipal permit, including self-defense, the State permit allows the holder to obtain concealed carry permits in other states, and having a second permit provides a "backup" in case the municipal permit expires prior to renewal. (Id., ¶ 17).This avoid significant exposure to criminal punishment.[3] On

---

[2] The letter cited Mosby v. Devine, 851 A.2d 1031 (R.I. 2004), for this position. Notably, however, that decision found that the constitutional right to "bear arms" relates exclusively to military service." Id. at 1041. That is an interpretation the Supreme Court has squarely rejected in District of Columbia v. Heller, 554 U.S. 570 (2008); and Bruen, 142 S.Ct at 2134. Accordingly, the decision is of limited precedential value in this case.

[3] The 2020 amendments to the Firearms Act provide that "every person [engaging in open or concealed carry without a CCW permit] shall, upon conviction, be punished by imprisonment for not less than one nor more than ten (10) years, or by a fine of up to ten thousand dollars ($10,000), or both, and except for a first time conviction under this section, shall not be afforded the provision of a suspension or deferment of sentence nor a probation."  R.I.Gen.L. § 11-47-8.

April 1, 2021, the Attorney General indicated that while O'Neil had cited self-defense as a reason for the permit, as well as the other reasons, the "need" was insufficient, and decided "in its broad discretion to issue a permit…to deny your application due to the fact you have not provided a proper showing of need…" (Id., ¶ 18, Exhibit D).

On July 8, 2021, O'Neil filed a motion for reconsideration of this denial. (Id., ¶ 19, Exhibit E). On July 21, 2021, Defendants denied reconsideration of the denial for substantially the same reasons as stated previously.  (Id., ¶ 20, Exhibit F). The letter referenced the factors set forth in the Weapons Carry Permit Packet and said "[t]hese factors clearly articulate this Office's general authority to issue a permit only upon a proper showing of need."  However, the basis of the denial was not a factor set forth in the Packet.

On August 9, 2021, O'Neil filed a petition for writ of certiorari with the Rhode Island Supreme Court seeking review of the Defendants' denial. (Id., ¶ 21, Exhibit G). On December 17, 2021, the Supreme Court issued a one-sentence order denying O'Neil's petition. (Id., ¶ 22, Exhibit H).

O'Neil has a CCW permit from other states. He is reasonably concerned that the denial of his application by Defendants will prejudice his ability to renew those other permits or obtain others as concealed carry permit applications typically ask whether the applicant has ever had an application denied elsewhere. (Id., ¶ 23).

## STANDARD OF REVIEW

Defendants have moved to dismiss under F.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. The Tenth Circuit recently set forth the applicable standard of review as follows:

> A complaint must contain "only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is plausible when the complaint contains

"factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Waller v. City & Cnty. of Denver, 932 F.3d 1277, 1282 (10th Cir. 2019) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). When assessing plausibility, a plaintiff's allegations are "read in the context of the entire complaint." Ullery v. Bradley, 949 F.3d 1282, 1288 (10th Cir. 2020). Well-pleaded factual allegations are accepted as true and considered in the light most favorable to the plaintiff. *See* Tomlinson v. El Paso Corp., 653 F.3d 1281, 1285-86 (10th Cir. 2011). "[W]e will uphold the dismissal only if it appears beyond doubt that [plaintiff] can prove no set of facts which would entitle them to relief." Mink v. Suthers, 482 F.3d 1244, 1251 (10th Cir. 2007).

Chilcoat v. San Juan County, 41 F.4th 1196, 1207-08 (10th Cir. 2022).

## ARGUMENT

### I.   PLAINTIFF HAS STANDING

Defendants' argument that Plaintiff lacks standing is totally without merit. Plaintiff has alleged "specific [constitutional] injuries with concrete allegations," the "specific harms" imposed on Plaintiff, and a connection between Defendants' actions in committing those injuries and the specific harms inflicted on Plaintiff. See, Lombardi v. McKee, 529 F.Supp.3d 1, 6-8 (D.R.I. 2021); A.C. v. Raimondo, 494 F.Supp.3d 170, 183 (D.R.I. 2020), citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) ("Lujan"). In Lombardi, two plaintiffs who had been sentenced to life without parole in the Adult Correctional Institutions brought suit challenging the constitutionality of the State's so-called "Civil Death Act," R.I.Gen.L. § 13-6-1, et seq., which they alleged barred them from filing suits in state courts for medical negligence.

The State moved to dismiss for lack of standing. This Court said to have Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) this is likely to be redressed by a favorable judicial decision." Id. at 7, quoting Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016) (citing Lujan, 504 U.S. at 560-61). The Court added: "'While a declaratory judgment should not be granted in speculative situations,…a litigant does not have to await the consummation of threatened injury to

obtain preventive relief. If the injury is certainly impending that is enough.'" Id. at 8, quoting Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 693 (1ˢᵗ Cir. 1994) (quoting Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941)). This Court agreed that plaintiffs had alleged that their claims would be futile if brought in state court and that declaring the statute unconstitutional would put the controversy at rest. Id.

In A.C. v. Raimondo, several public school students, through their parents, filed suit alleging violation of their constitutional rights because the State was not providing them with adequate civics education. The State moved to dismiss for lack of standing. This Court denied the motion, for the most part, commenting that the plaintiffs had pled specific injuries with respect to the denial of civics education; the harms imposed on them by this denial; and a connection between the State's failure to adopt statutes and regulations requiring civics education and their injuries. Moreover, the Court found plaintiffs had sufficiently alleged that declaratory and injunctive relief would "likely" provide redress for their injury. 494 F.Supp.3d at 183.

Here, O'Neil has alleged that Defendants have denied him a concealed carry permit to which he is constitutionally entitled under New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022) ("Bruen"), because he failed to make a showing of "need" which satisfied the regulator's discretion. Bruen says the State cannot require this. Id. at 2156. Further, he has alleged that Defendants have denied him his due process rights under the Fourth Amendment and Art. 1, Sec. 2 of the Rhode Island Constitution by their application of a vague and overbroad standard to his renewal application and Defendants' arbitrary and capricious denial of his application.

Moreover, O'Neil has identified in his verified complaint and in his preliminary injunction memorandum various harms which have occurred, or which will occur, as a result. In particular,

he has been deprived of a constitutional right, which is itself an irreparable injury. Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."); Harris v. Wall, 217 F.Supp.3d at 560 ("[T]he loss of religious freedom…standing alone—is sufficient to show irreparable harm and…the protection of religious practice is an important public interest.");[4] Boland v. Banta, SACV 22-01421, 2023 WL 2588565 at *9 (C.D.Cal. Mar. 20, 2023) (holding that a violation of Second Amendment rights is an irreparable injury and enjoining a California statute which requires certain safety features on handguns); Spencer v. Nigrelli, No. 22-CV-6486, 2022 WL 17985966 at *13 (W.D.N.Y. Dec. 29, 2022) (holding that an infringement of Second Amendment rights is an irreparable injury and enjoining a New York statute that makes it a felony for any CCW license holder to possess a firearm in a place of worship).

There are several reasons why it is advantageous for a person to have both the State permit and the municipal permit. Rhode Island does not allow any open carry of firearms unless the person has a State-issued permit. R.I.Gen.L. § 11-47-18. The municipal carry permit only allows for concealed carry. R.I.Gen.L. § 11-47-11. There is a "waiting period" for the sale of concealable weapons under R.I.Gen.L. § 11-47-35.1 which applies to individuals who possess a municipal permit but not those who have a State permit.[5] Having a CCW permit issued by the State means he can get a CCW permit in other states. (Verified Complaint, ¶ 17). These states include Oklahoma, Mississippi, and Arkansas, just to name a few. See, 21 Okla.St.Ann. § 1290.26; 22

---

[4] O'Neil cites to First Amendment precedent because in Bruen and in District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court analogized Second Amendment analysis to First Amendment analysis numerous times. See, Bruen, 142 S.Ct. at 2130, 2132, 2138, 2156; Heller, 554 U.S. at 582, 595, 606, 618, 634-35.
[5] Although not specifically pled, O'Neil's counsel recalls telling the RIAG staff of these advantages of having the State CCW permit.

Miss.Admin.Code Pt. 19, R.09; Office of the Attorney General, Ark.Op.Atty.Gen. No. 98-083, 1998 WL 293270 (Ark.A.G. May 20, 1998), respectively.

Further, O'Neil is reasonably concerned that the denial of his renewal application will prejudice his renewal applications in other states because they routinely ask whether the applicant has had an application denied. (Verified Complaint, ¶ 23). O'Neil has CCW permits from New Hampshire, Massachusetts, and Connecticut. (Id., Exhibit B, p. 8). The CCW permit applications from those states have sections asking the applicants whether they have ever been denied a permit and the reason why, and the responses are subject to criminal action or denial of their application. (See forms attached as Exhibits J, L, and L, respectively[6]).

Finally, as O'Neil also told the Attorney General's staff, if one permit expires before it is renewed, a person who holds both permits is protected from potential criminal liability of up to ten years in prison and a $10,000 fine. R.I.Gen.L. § 11-47-8. Presumably, Defendants will seek to enforce this provision since these criminal penalties were enhanced by legislative amendments in 2020, and the Attorney General supported the gun control legislation of which this amendment was a package.[7] Accordingly, O'Neil has a reasonable apprehension of criminal prosecution.

Moreover, Plaintiff has requested that this Court provide declaratory and injunctive relief that will "likely" provide redress for his injury. A.C. v. Raimondo, 494 F.Supp.3d at 183, quoting Lujan, 504 U.S. at 561 "(noting that 'on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim.')."

---

[6] O'Neil is lettering these exhibits consecutively from those attached to his complaint and his motion for preliminary injunction.

[7] See, "R.I. Governor and attorney general call for new gun control laws, " Associated Press article published in the Newport Daily News, Feb. 13, 2020. https://www.newportri.com/story/news/state/2020/02/13/ri-governor-and-attorney-general-call-for-new-gun-control-laws/1714215007/.

Other federal courts have readily found standing in comparable cases. See, e.g., <u>Jackson v. City and County of San Francisco</u>, 746 F.3d 953, 967 (9th Cir. 2014) (gun owner had standing to challenge city's ban on hollow point ammunition even though he could purchase such ammunition outside the city); <u>Peterson v. Martinez</u>, 707 F.3d 1197, 1209 n.3 (10th Cir. 2013) (out-of-state resident had standing to challenge state statute banning concealed carry by non-residents even though he could engage in open carry); <u>Grace v. District of Columbia</u>, 187 F.Supp.3d 124, 134 n.4 (D.D.C. 2016), quoting <u>Grace v. District of Columbia</u>, 478 F.3d 370, 376 (D.C.Cir. 2007), *aff'd sub nom.*, <u>Heller v. District of Columbia</u>, 554 U.S. 570 (2008); <u>Duberry v. District of Columbia</u>, 106 F.Supp.3d 245, 253-57 (D.D.C. 2015), reversed on other grounds, 824 F.3d 1046 (D.C.Cir. 2015) (holding that retired correctional officers had standing to bring action to compel the District of Columbia Department of Corrections to classify them as "retired law enforcement officers" so they could obtain a firearm certification to carry concealed weapons across state lines); <u>Siegel v. Platkin</u>, C.A. No. 22-7464, 2023 WL 1103676, at **6-7 (D.N.J. Jan. 30, 2023) (holding that CCW permit holders had standing to challenge provisions of New Jersey legislation limiting locations where they could engage in concealed carry); <u>Koons v. Reynolds</u>, C.A. No. 22-7464, 2023 WL 12882 at **9-12 (D.N.J. Jan. 9, 2023), quoting <u>Davis v. Federal Election Comm.</u>, 554 U.S. 724, 734 (2008) ("[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct.").

Defendants' memorandum falsely argues that O'Neil's standing is based exclusively on speculation that Defendants' denial of his renewal application will prejudice his ability to renew CCW permits with other states. (Defendants' Memorandum, p. 6). First, Defendants ignore the undisputed fact that they premised their denial on O'Neil's failure to meet their standard of "need" for the State CCW permit. (Verified Complaint, ¶¶ 16-20). This failure occurred because the RIAG

created a new "factor" not set forth in the statute or even his own published set of factors but instead based on an assertion that there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue a deny a pistol permit."  Bruen forecloses this kind of discretion.

Moreover, even if some showing of "need" was required, Plaintiff's Verified Complaint and accompanying exhibits, as well as his preliminary injunction memorandum, identified several reasons why it is advantageous to have both the State and municipal CCW permits. First, it is advantageous to have both in case one permit lapses for whatever reason. (Verified Complaint, ¶ 17). This is particularly important where carrying a concealed weapon without a permit is a criminal violation now punishable by up to ten years in prison and a $10,000 fine. R.I.Gen.L. § 11-47-8.

Second, O'Neil told Defendants that having the State permit helped him get CCW permits from other states. (Verified Complaint, ¶ 17). Indeed, O'Neil carries CCW permits from several states. (Id., Ex. B). O'Neil specifically raised this point with the RIAG staff who rejected it as a reason for the State CCW permit. (Verified Complaint, ¶¶ 17-18).

Third, with respect to whether Defendants' denial of his renewal application will prejudice the renewal of his permits from other states, O'Neil submits that is at least a reasonable inference based on the other states' application requirements and that, as a matter of law, he is entitled to the benefit of all reasonable inferences with respect to Defendants' motion.  DeCotis v. Whittemore, 635 F.3d 22, 27 (1st Cir. 2011). Finally, there are other advantages to having the State permit, including open carry and no waiting period for handgun purchases.

Defendants' reliance on Clapper v. Amnesty, Intern. USA, 508 U.S. 398 (2013), is mistaken.  (Objection, pp. 4-5).  In that case, plaintiffs were United States residents who alleged they engaged in sensitive communications with foreign individuals whom they believed were

targets of surveillance under § 1881a of the Foreign Intelligence Surveillance Act, as codified, which they argued was unconstitutional.  They asserted that because of their communications with these unidentified foreign persons, their communications were likely to be acquired at some point in the future and therefore they had standing to challenge the constitutionality of the section.

      The Supreme Court disagreed for several reasons including that plaintiffs' purported injury was based on a "highly attenuated chain of possibilities."  <u>Id.</u> at 410.  Further, plaintiffs themselves could not be targeted for surveillance under § 1881a.  "Accordingly, respondents' theory necessarily rests on their assertion that the Government will target *other individuals*-namely their foreign contacts."  (emphasis original).  <u>Id.</u> Also, the Court said it was speculative that the Government would use §1881a to surveil plaintiff's foreign contacts.  <u>Id.</u> at 412-13. In addition, it was unclear whether the Foreign Intelligence Surveillance Court would authorize such surveillance.  <u>Id.</u> at 413-14.

      Just last year, the Court itself narrowed <u>Clapper</u>'s scope by saying "an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application…"  <u>Federal Election Comm. v. Cruz</u>, 142 S.Ct. 1638, 1647 (2022).  The Court specifically distinguished <u>Clapper</u> by commenting that the plaintiffs in that case had "attempted to manufacture standing by voluntarily taking costly and burdensome measures they said were necessary to protect the confidentiality of their communications in light of the Government surveillance policy they sought to challenge. [citation omitted].  Their problem, however, was that they could not show hey had been or were likely to be subjected to that policy in any event."  <u>Id.</u>

      Here, by contrast, O'Neil has not "manufactured" standing by alleging the violation of other's rights resulting in possible harm to himself.  Rather, Defendants have directly violated his Second and Fourteenth Amendment rights and that has directly caused him harm.  For example,

he cannot open carry and he is subject to a waiting period when he purchases a concealable weapon. There is nothing speculative about this harm. Further, he is subject to potential criminal prosecution if he engages in open carry without the CCW permit or concealed carry if his municipal permit lapses. The potential for criminal prosecution is sufficient to confer standing. "'[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.'" Miller v. Becerra, 488 F.Supp.3d 949, 953 (S.D.Cal. 2020), quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974). This is particularly true where Defendants themselves amended or supported the amendment in 2020 of the Firearms Act to enhance those criminal penalties and are likely to enforce them.

Defendants also argue wrongly that O'Neil lacks standing because his theory of injury rests on the unknown future acts of third parties. (Defendants' Memorandum, p. 7). This is false. First, it is Defendants who have denied O'Neil's renewal application to which he is constitutionally entitled under Bruen without a showing of need. Second, Defendants' denial of the State permit exposes him to potential criminal prosecution by Defendants if his municipal permit expires. Third, having the State permit means O'Neil is not subject to the Defendants' statutory waiting period. Accordingly, O'Neil's standing does not rely on a "highly attenuated chain of possibilities."

For this reason, Defendants' other legal authority is distinguishable. In Dantzler, Inc. v. Empresas Berrios Inventory and Operations, Inc., 958 F.3d 38 (1st Cir. 2020), plaintiffs were Puerto Rican shipping companies who alleged that increased security measures which a Puerto Rican governmental agency negligently imposed on ocean freight carriers would cause them increased expenses because the carriers would pass the costs of compliance to them. Notably, the plaintiff did not allege any injury directly caused to them by the agency's program. The First

Circuit held that plaintiffs had not alleged a causal nexus between defendants' actions towards the carriers and harm to plaintiffs. Further, the court said there was no indication that enjoining defendants' allegedly negligent actions would prevent the carriers from raising their fees. Accordingly, plaintiffs' claims lacked redressability.

Here, O'Neil alleges direct injury, i.e., the denial of his rights under the Second and Fourteenth Amendments by Defendants. That alone distinguishes Dantzler. This injury may cause additional harm when, for example, other states reconsider the renewal of the CCW permits they have issued because of Defendants' constitutional violations. This will certainly occur because those states routinely include in their application forms a question of whether the applicant's request for a permit has ever been denied. In addition, O'Neil has set forth various other ways in which Defendants' constitutional violations harm him. Moreover, enjoining Defendants' constitutional violations will mean that O'Neil can report that his CCW permit has been reinstated by the Court, not to mention avoiding the other harms. This is altogether different than Dantzler.

Similarly, in Katz v. Pershing, LLC, 672 F.3d 64 (1st Cir. 2012), plaintiff did not allege defendants caused any actual injury to her. Rather, she filed a class action alleging that an investment clearing broker was charging fees to her investment broker to maintain the security of investors' personal information and had failed to do so, at least with respect to other investors' information, and that the charge for fees was being passed along to her and the other investors. The First Circuit found she was not a third-party beneficiary of the contract between her investment broker and the clearing broker. Id. at 74. Further, with respect to her claims under consumer protection laws, she had not alleged defendants caused any direct injury to her. Id. at 77-80 Accordingly, she had no standing. Id. at 80-81.

<u>Katz</u> case is easily distinguishable for the same reasons as <u>Dantzler</u>. There was no allegation that the defendant had directly harmed the plaintiff. Instead, the plaintiff alleged she might incur various costs as a result of a non-party's actions or omissions. Here, O'Neil alleges Defendants have violated his Second Amendment and Fourteenth rights, which are direct and irreparable harms, by themselves. Further, Defendants have caused him additional harm in various other ways. <u>Supra</u>, pp. 8-9. O'Neil clearly has standing.

## II.    PLAINTIFF'S CLAIMS ARE RIPE

Plaintiff's claims are ripe. They became ripe when Defendants denied his application to renew his CCW permit. See, <u>Palazzolo v. Rhode Island</u>, 533 U.S. 606, 625-26 (2001); <u>Ramos v. Puerto Rico Medical Examining Bd.</u>, 491 F.Supp.2d 238, 242 (D.P.R. 2007) (holding that plaintiffs' claims that Puerto Rico's six-month residency requirement for medical licenses was unconstitutional were ripe where it was clear that defendants would deny plaintiffs' applications even when plaintiffs met all the other applicable application requirements).

In <u>Palazzolo</u>, plaintiffs asserted that the State had committed a Fifth Amendment taking when the Coastal Resources Management Council denied their application to fill 18 acres of coastal wetlands and construct a beach club. The State argued that plaintiffs' claim was not ripe because they had not applied for and received other governmental approvals such as zoning approval from the Town of Westerly and a permit from the Department of Environmental Management for individual sewage disposal systems (which could be necessary for an alternative development of single-family dwellings). The Supreme Court said:

> It is difficult to see how this concern is relevant to the inquiry at issue here. Petitioner was informed by the Council that he could not fill the wetlands; it follows of necessity that he could not fill and then build 74 single-family dwellings upon it. Petitioner's submission of this proposal would not have clarified the extent of development permitted by the wetlands regulations…Where the state agency charged with enforcing a challenged land-use regulation entertains an application from an owner and its denial of the application makes clear the extent of

development permitted…federal ripeness rules do not require the submission of further and futile applications with other agencies.

Id.

Defendants candidly admit that their ripeness argument is a rehash of their standing arguments. (Defendants' Memorandum, p. 10). Nonetheless, they rely on Ernst & Young v. Depositors Economic Protection Corp., 45 F.3d 530 (1st Cir. 1995), which is readily distinguishable. That case arose from the collapse of the private Rhode Island Share and Deposit Insurance Corporation ("RISDIC") which insured numerous small financial institutions in Rhode Island (and which also went into receiverships). The State formed DEPCO to salvage such assets from these institutions as might be had and to pursue claims against alleged wrongdoers responsible for these failures. Ernst & Young (E&Y) had audited many of the institutions and DEPCO asserted claims against it for various torts. DEPCO also went to the General Assembly to lobby for legislation which would change the statutory rights of contribution for defendants in the so-called "RISDIC" litigation. E&Y filed suit in federal court alleging that the changes in the statute violated its constitutional rights. Judge Boyle dismissed the suit, finding that E&Y claims were not ripe. E&Y appealed.

The First Circuit first held that for E&Y to demonstrate ripeness it had to show both that its claim was "fit" for judicial review and that it would suffer hardship if the court did not adjudicate the claim immediately. Id. at 535. Then, the court said that E&Y claim was not fit for review because it depended on eight hypothetical circumstances, none of which might occur. Id. at 538. "Courts should always be hesitant to answer hypothetical questions." Id. Further, there were other potential joint tortfeasors who were not parties to the case but had a real interest in it. Id. at 539. In addition, the court said E&Y had shown little genuine hardship because the amended statute affected only its current position in settlement negotiations, which was highly subjective.

Instead, the court said the issue of whether the legislation was constitutional might be resolved in the extensive state court litigation already pending. Id. at 537 n.10.

Here, O'Neil alleges that Defendants have already violated his constitutional rights when they refused to renew his CCW permit. That action alone is an immediate injury, not a hypothetical one. Moreover, at least some of the harm flowing from that injury is also immediate. For example, without the State permit, O'Neil runs a risk of criminal liability if his municipal permit lapses and he engages in concealed carry. R.I.Gen.L. § 11-47-8. In addition, with the State permit, O'Neil is subject to a waiting period for the purchase of a concealable firearm, R.I.Gen.L. § 11-47-35.1, and he cannot engage in open carry if he so chooses. R.I.Gen.L. § 11-47-18. Further, while O'Neil has not yet had to explain to another state why Defendants rejected his CCW application—which explanation may well be unsuccessful—a declaration that Defendants' actions were unconstitutional and an injunction that they issue the permit would obviate that risk.

Defendants' argument is essentially that O'Neil's claim is not ripe unless and until he has suffered all possible harm he might suffer from their unconstitutional actions. That argument contradicts the law, including that of statutes of limitation. See, Richer v. Parmalee, 388 F.Supp.3d 97, 105 (D.R.I. 20019) (McConnell, J.), quoting Delaware State College v. Ricks, 449 U.S. 250, 258 (1980) (dismissing plaintiff's Fourth Amendment claim as untimely where it accrued at "the time of the alleged unlawful acts, 'not upon the time that which the *consequences* of the act became most painful.'" (emphasis original).

Similarly, Defendants' reliance on Doe v. Bush, 323 F.3d 1333 (1st Cir. 2003), does not help them. That case involved a challenge to the President's authority to conduct the war in Iraq because Congress had allegedly not properly authorized it. The First Circuit said the issue was not fit for judicial review. "In this zone of shared congressional and presidential responsibility, courts

should intervene only when the dispute is clearly framed…The mere fact that the October Resolution grants some discretion to the President fails to raise a sufficiently clear constitutional issue." Id. at 143. Here, the constitutional issue is clear, and it does not require the Court to intrude on the respective authorities of Congress and the President to conduct war.

### III.    THE ROOKER-FELDMAN DOCTRINE DOES NOT APPLY TO PLAINTIFFS' CLAIMS

The Rooker-Feldman doctrine does not apply to Plaintiffs' claims and does not foreclose this Court's jurisdiction. That doctrine prohibits federal courts (other than the Supreme Court) from reviewing state court judgments. Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 283 (2005) (Ginsburg, J.). In that case, the Supreme Court emphasized the narrow scope of the doctrine:

> The Rooker-Feldman doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name:  cases brought by state-court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. (emphasis added).

Id. Justice Ginsburg noted that the Court had applied the doctrine only twice. Id. She added: "If a federal plaintiff 'presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party…then there is jurisdiction…" Id. at 293, quoting GASH Assocs. v. Rosemont, 995 F.2d 726, 728 (7th Cir. 1993).

In Feldman, the plaintiff did not attend law school. Instead, he "read" the law by studying it in the office of a practicing attorney, auditing classes at the University of Virginia School of law, and serving as a law clerk for a federal district court judge. Feldman passed the Virginia bar exam. He applied for admission to the District of Columbia bar and was denied because he had not graduated from an approved law school. Feldman then submitted a petition to the District of Columbia's Court of Appeals for admission to the bar. His attorney followed up with a letter

arguing that the court had the authority to waive the provisions of the rule which required graduation from an approved law school. The court issued an order denying his petition. Feldman then filed suit in federal district court alleging that defendants' refusal to consider his qualifications in lieu of the rule's requirement violated the Fifth Amendment and the Sherman Act. The district court granted defendants' motion to dismiss on the grounds it lacked subject matter jurisdiction over the action.  The D.C. Circuit affirmed. The Supreme Court granted Feldman's petition for writ of certiorari.

The Supreme Court held that to the extent Feldman challenged whether the rule should apply to him on its terms that was a judicial determination by the District of Columbia court of appeals and was not reviewable by the federal district court. 460 U.S. at 479-82. However, Justice Brennan said that did not dispose of the case. "The difference between seeking review in a federal district court of a state court's final judgment in a bar admission matter and challenging the validity of a state bar admission rule has been recognized in the lower courts and, at least implicitly, in the opinions of this Court."  Id. at 483-84. Justice Brennan said that allegations that the D.C. court had acted arbitrarily and capriciously were inextricably intertwined with that court's decision to deny Feldman's petition and the federal district court did not have subject matter jurisdiction over those claims.  Id. at 486-87. However, the issue of whether the rule itself was unconstitutional did not require review of the District of Columbia's court's decision. Accordingly, the federal district court had jurisdiction over those claims.  Id. at 487.

Here, Plaintiffs allege that Defendants' actions violated their constitutional rights. These claims were not presented to or adjudicated by the Supreme Court.  At most, that Court was asked to review the RIAG's decision that O'Neil had not demonstrated a "need" under the Firearms Act

and the RIAG's guidelines. The Court, in the exercise of its discretion, issued a one-sentence order declining to review the decision. Accordingly, the <u>Rooker-Feldman</u> doctrine does not apply.

Similarly, in <u>Sheehan v. Marr</u>, 207 F.3d 35 (1st Cir. 2000), the First Circuit considered whether the <u>Rooker-Feldman</u> doctrine barred the federal district court from hearing plaintiff's Americans with Disabilities Act claim for lack of a reasonable accommodation. The Massachusetts state courts had previously determined under state law that plaintiff was completely disabled from work as a police officer due to his hypertension. The federal district court held that plaintiff's ADA claim was barred by the doctrine. The First Circuit said that while there was some overlap between the state law disability issue and the ADA claim, there were significant differences, including whether plaintiff could perform essential job duties with an accommodation and whether any adverse employment decisions against plaintiff were discrimination based on his disability. The court held that the <u>Rooker-Feldman</u> doctrine did not bar consideration of plaintiff's ADA claims. 207 F.3d at 41; see also <u>Cardi Corp. v. State of Rhode Island Department of Administration</u>, 561 F.Supp.3d. 244, 252 (D.R.I. 2021) (Smith, J.), quoting <u>Davison v. Gov't of Puerto Rico-Puerto Rico Firefighters Corps.</u>, 471 F.3d 220, 222-23 (1st Cir. 2006) ("[I]f the plaintiff alleges a constitutional violation by an adverse party independent of the injury caused by the state court judgment, the doctrine does not apply.").

Here, there are different issues presented that were not addressed by any Rhode Island state court, specifically, whether Defendants' actions constitute violations of O'Neil's right to a CCW permit so as to bear arms and his right to due process under the federal and state constitutions, Plaintiffs' damages, and Defendants' various defenses argued in their Motion such as sovereign immunity. The <u>Rooker-Feldman</u> doctrine certainly does not apply to those issues.

Another reason that the Rooker-Feldman doctrine is inapplicable is that it can only apply when there has been a state court adjudication on the merits. Emigrant Mortgage Co., Inc. v. Bourke, C.A. No. 21-11133, 2022 WL 3566832 at *4 (D.Mass. Aug. 18, 2022); Cardi Corp. v. Rhode Island Department of Administration, 561 F.Supp.3d at 252 (holding the Rooker-Feldman doctrine does not apply to a state court dismissal for lack of jurisdiction). It is universally recognized that a denial of a petition for writ of certiorari does not constitute an adjudication on the merits. Bethley v. Louisiana, 117 S.Ct. 2425 (1997) (Statement of Justice Stevens respecting denial of petition for writ of certiorari) ("It is well settled that our decision to deny a petition for writ of certiorari does not in any sense constitute a ruling on the merits of the case in which the writ is sought."); Stutson v. U.S., 516 U.S. 163, 168 (1996) (Statement of Chief Justice Rehnquist respecting denial of petitions for writ of certiorari); Brown v. Milyard, 373 Fed.Appx. 853 (10th Cir. 2010), citing Bovard v. People, 99 P.3d 585, 593 (Colo. 2009) (holding that the Colorado Supreme Court's denial of a petition for certiorari does not constitute a determination of issues on the merits); Casey-Goldsmith v. Goldsmith, 735 So.2d 610 (Fla.App. 1999) ("[A] denial of a petition for writ of certiorari is not a ruling on the merits and does not establish law of the case.") Accordingly, the Rhode Island Supreme Court's denial of O'Neil petition for writ of certiorari was not on the merits and this case is not the kind of collateral attack on a state court judgment foreclosed by the Rooker-Feldman doctrine.

Finally, a case that Defendants cite, Tyler v. Supreme Judicial Court of Massachusetts, 914 F.3d 47 (1st Cir. 2019), supports O'Neil's position. In that case the First Circuit said: "It is true that the Rooker-Feldman doctrine does not bar a 'general attack on the constitutionality' of a state law that 'do[es] not require review of a judicial decision in a particular case.'" Id. at 51, quoting, Feldman, 460 U.S. at 487. That is precisely this situation. O'Neil is attacking the constitutionality

of R.I.Gen.L. § 11-47-18, which expressly requires the showing of a "need," as well as the RIAG's factors for considering that need, both in contradiction to <u>Bruen</u>. See also, <u>Maymo-Melendez v. Alvarez-Ramirez</u>, 364 F.3d 27, 34 (1st Cir. 2004), citing <u>Van Harken v. City of Chicago</u>, 103 F.3d 1346, 1349 (7th Cir. 1997) (<u>Rooker-Feldman</u> does not insulate from federal challenge *administrative* rulings standing alone.") (emphasis original). The Rhode Island Supreme Court's one-sentence denial of O'Neil's certiorari petition does not address the issue. <u>Rooker-Feldman</u> does not apply.

### IV.    CLAIM PRECLUSION DOES NOT BAR PLAINTIFF'S CLAIMS

Res judicata does not bar Plaintiffs' claims for several reasons. First, res judicata does not apply unless there was a prior adjudication on the merits of the claims or issues before this Court. <u>Weaver's Cove Energy, LLC v. Rhode Island Conservation Resources Management Council</u>, 583 F.Supp.2d 259, 278 (D.R.I. 2008) (Smith, J.). In that case, plaintiff sued the state agency alleging it had failed to grant plaintiff's permit application within the required period so its concurrence should be conclusively presumed. The agency argued that because the Secretary of Commerce and a federal agency, FERC, had failed to rule in plaintiff's favor in administrative proceedings, plaintiff's federal court claims were barred by res judicata and/or collateral estoppel. Judge Smith said:

> The doctrine of res judicata bars "relitigating issues which were raised or could have been raised in a previous action, once a court has entered a final judgment on the merits in the previous action." [citation omitted]. A matter is adjudicated when there is a "decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other ground. [citation omitted].

<u>Id.</u> This Court held that res judicata had no application to the federal case because the Secretary and FERC did not decide the merits of plaintiff's claims. Rather, the Secretary twice held that plaintiff's claims in the federal administrative were premature. "Neither the Secretary nor FERC

rendered a decision on the merits of Weaver's Cove's claims. Instead, the decisions turned on procedural grounds. This is not an appropriate basis on which to apply res judicata." Id. at 278-79.

Here, no state court has adjudicated the merits of O'Neil's claims.  At most, the Rhode Island Supreme Court declined to exercise its discretion to review the RIAG's decision declining to renew O'Neil's permit. It did not address the merits of these claims, at all.

The second reason that res judicata does not apply is the relatively narrow jurisdiction of agencies, generally, and the narrow scope of issues addressed in this matter, specifically. For example, courts have held that res judicata does not apply to an agency decision when the causes of action are different even if the subject matter is the same. See, e.g., Lupo v. Voinovich, 858 F.Supp. 699, 702-03 (S.D.Ohio 1994) (Ohio law); Gutierrez v. Board of County Commissioners, Shawnee County, Kansas, 791 F.Supp. 1529, 1533 (D.Kan. 1992); City of Chicago v. Illinois Workers Compensation Comm'n, 4 N.E.3d 158, 170 (Ill.App. 2014). Put another way, the issue determined in the administrative proceeding must be identical to that raised in the subsequent lawsuit. Graham v. Special School Dist. No. 1, 472 N.W.2d 114, 116 (Minn. 1991); Liller v. West Virginia Human Rights Comm'n, 376 S.E.2d 639 646 (W.Va. 1988). Here, the RIAG only had before it the issue of whether O'Neil's application to renew his CCW permit complied with the RIAG's interpretation of its own guidelines and the Firearms Act. The agency certainly did not adjudicate Plaintiffs' constitutional claims.  Accordingly, those issues were not before the Rhode Island Supreme Court on the administrative appeal by petition for writ of certiorari and claim preclusion does not apply.

## V.    PULLMAN ABSTENTION DOES NOT BAR PLAINTIFF'S CLAIMS

Pullman abstention does not apply here. Under Pullman, federal courts should abstain when substantial uncertainty exists over the meaning of the state law in question and settling the question

of state law will or may well obviate the need to resolve a significant federal constitutional question. Casiano-Montanez v. State Ins. Fund Corp., 707 F.3d 124, 129 (1st Cir. 2013). However, as this Court has noted, "Abstention…is "'an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy before it,'" and should be invoked only in "'exceptional circumstances.'" Southern Union Co. v. Lynch, 321 F.Supp.2d. 328, 335 (D.R.I. 2004), quoting Colorado River Water Conservation Dist. V. United States, 424 U.S. 800, 813 (1976); see also, A.C. v. Raimondo, 494 F.Supp. 3d at 181, n.12 (rejecting application of Pullman abstention).

There are four factors a district court should consider in determining whether to apply Pullman abstention:  (1)  whether there is substantial uncertainty over the meaning of the state law at issue; (2) whether a state court's clarification of the law would obviate the need for a federal constitutional ruling; (3) whether there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim; and (4) whether federalism concerns support abstention.  Lombardi v. McKee, 529 F.Supp. at 15, citing Ford Motor Co. v. Meredith Motor Co., Inc., 257 F.3d 67, 71-73 (1st Cir. 2001).

None of these factors counsel abstention in this case. First, the RIAG's office clearly has no uncertainty about the meaning of the state law. It has since denied a number of other applicants on the same ground. Second, a state court clarification of whether the RIAG's office properly interpreted its own factors, and the Firearms Act respecting "need" would not obviate O'Neil's Second Amendment claim.  Third, there is no action currently pending in state court that will resolve the underlying state law claims. Fourth, no federalism concerns support abstention.

## VI.    RHODE ISLAND HAS WAIVED ITS SOVEREIGN IMMUNITY FOR DAMAGES CLAIMS

Rhode Island's General Assembly has waived Rhode Island's sovereign immunity for actions sounding in tort through its passage of the Governmental Tort Liability Act, R.I.Gen.L. §

9-31-1, et seq. ("the Act"). Actions for violations of constitutional rights sound in tort. <u>Zinerman v. Burch</u>, 494 U.S. 113 (1990) (holding that an action for violation of due process sounds in tort); see also, <u>Marrapese v. State of Rhode Island</u>, 500 F.Supp. 1207, 1222 (D.R.I. 1980), citing <u>Carey v. Piphus</u>, 435 U.S. 247 (1978), among other authorities. Notably, Defendants cite no Rhode Island decision to the contrary.

The Rhode Island Supreme Court has said that the Act is a "broad" waiver of sovereign immunity from tort claims filed in federal court. <u>Laird v. Chrysler Corp.</u>, 460 A.2d 425, 430 (R.I. 1983) (Murray, J.). In <u>Laird</u>, the plaintiff sued in the federal district court in Massachusetts alleging that the State of Rhode Island, along with other defendants, was liable for her injuries resulting from a car accident. Plaintiff voluntarily dismissed her claims against the State and then another defendant filed a third-party claim against the State for contribution and indemnity. The State moved to dismiss asserting that under the Eleventh Amendment it was immune from suit in federal court. The district court certified questions to the Rhode Island Supreme Court whether the Act waived the State's Eleventh Amendment immunity to suit for tort claims in federal court. The Supreme Court did an extensive analysis and concluded:

> [W]e find that the broad language of § 9-31-1, which unambiguously and without restriction holds the state "liable in <u>all actions at tort</u> in the same manner as a private individual or corporation'…manifests by "overwhelming implication," a legislative intent to place the state in the same position as any other private litigant and thus amenable to suit in either state or federal court. (emphasis added).

<u>Id.</u>

For decades, the First Circuit and judges of this federal court have consistently held that the <u>Laird</u> decision means the waiver applies to claims filed in federal court when those claims are considered tort claims. <u>Della Grotta v. State of Rhode Island</u>, 781 F.2d 343, 346-47 (1986) ("[I]n 1983, the Rhode Island Supreme Court ruled unequivocally, in response to questions certified by

the federal district court in another case, that section 9-31-1 'manifests…a legislative intent to waive the State's eleventh amendment immunity to suit in federal court. <u>Laird v. Chrysler Corp.</u>, 460 A.2d 425 (R.I. 1983).");  see, e.g., <u>Rhode Island Dept. of Environmental Management v. U.S.</u>, 304 F.3d 31, 47 n.6 (1st Cir. 2002) ("We have previously held that Rhode Island General Laws § 9-31-1 effects a broad waiver of Rhode Island's sovereign immunity for certain claims in federal court."); <u>Rhode Island v. U.S.</u>, 115 F.Supp.2d 269, 278 (D.R.I. 2000) (Torres, J.); <u>Brown v. Rhode Island</u>, 160 F.Supp.2d 233, 236 (D.R.I. 2001) (Report and Recommendation); <u>Tang v. State of Rhode Island</u>, 904 F.Supp. 55, 63 (D.R.I. 1995) (Pettine, J.) ("As § 1981 is, in essence, a tort action where the wrongdoing is racial discrimination and plaintiff has pleaded such racial discrimination in her Complaint, the State of Rhode Island is properly hailed into federal court.").

Defendants' reliance on <u>Will v. Michigan</u>, 491 U.S. 58 (1989), is misplaced. In that case, plaintiff filed suit in state court against the State of Michigan under 42 U.S.C. § 1982 alleging unlawful employment discrimination. The Michigan Supreme Court held that the State is not a "person" within the meaning of Section 1983. On review, the United States Supreme Court did an extensive analysis of federalism and sovereign immunity and agreed that Congress did not intend to include the States within the "persons" who could be sued under § 1983 because it did not intend to waive the States' sovereign immunity under the Eleventh Amendment. <u>Id</u>. at 71. However, it repeated an important caveat:

> The doctrine of sovereign immunity was a familiar doctrine at common law. "The principle is elementary that a State cannot be sued in its own courts <u>without its consent</u>." [citation omitted]. It is an "established principle of jurisprudence" that the sovereign cannot be sued in its own courts <u>without its consent</u>. [citation omitted]. We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued <u>without its consent</u>. (emphasis added).

Id. at 67. Thus, a state can waive its sovereign immunity and consent to suit in tort actions, including constitutional claims, whether in state court or federal. Rhode Island has clearly consented. Laird v. Chrysler, 460 A.2 at 430. Notably, the Rhode Island Supreme Court reiterated its holding two years after Will v. Michigan. Gagnon v. State, 570 A.2d 656, 658 (R.I. 1990) ("[T]he state has made a 'blanket waiver' of its sovereign immunity by enacting § 9-31-1.").[8] Accordingly, O'Neil can sue the State for damages pursuant to R.I.Gen.L. § 9-31-1, et seq.

## VII.    PLAINTIFF HAS STATED SECOND AMENDMENT CLAIMS

Defendants may not condition the renewal of O'Neil's CCW permit on a showing of "need" as set forth in § 11-47-18(a) and in the Weapons Carry Permit Packet. New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111, 2156 (2022). In Bruen, two residents of New York applied to the New York State Police for CCW permits. Both cited a general desire for self-defense. The state police denied their application stating they had failed to show "proper cause" as required by a state statute. The statute did not define "proper cause," but New York courts had held it means the applicant can "demonstrate a special need for self-protection distinguishable from that of the general community." Id. at 2123, citing, In re Klenosky, 75 App.Div.2d 793, 428 N.Y.S.2d 256, 257 (1980). The Supreme Court characterized the "special need" standard as "demanding." Id. The Court noted that judicial review of a denial of an

---

[8] Plaintiffs acknowledge that Westlaw describes Della Grotta as "abrogated" by Will v. Michigan Department of State Police. However, that is not what the Supreme Court's opinion states. It simply identifies Della Grotta as an example of a ruling that a state a "person" under § 1983. Id. at 60, n. 3. The Will decision does not decide whether by enacting the Governmental Tort Liability Act the State of Rhode Island has consented to suit in federal court. Rather, it is Justice Brennan's dissent which suggests that Della Grotta's holding that Rhode Island has consented to suit in federal court is abrogated. Id. at 86. Plaintiffs submit the decisions of the First Circuit, the Rhode Island Supreme Court, and other judges of this district finding such consent are still good law. Indeed, the First Circuit has continued to cite Della Grotta as authority for this position. See, Rhode Island Dep't of Environmental Management v. U.S., 304 F.3d 21, 47 n.6 (1st Cir. 2002).

application was limited, and the denial would be upheld if there was any "rational basis for it." Id., citing In re Kaplan, 249 App.Div.2d 199, 201, 673 N.Y.S.2d 66, 68 (1998).

The Court commented that New York was among a small minority of states that gave their officials discretion to deny CCW permits even when the applicant meets the statutory criteria, so-called "may issue" states. Id. at 2123-24. The Court said that by its count, forty-three states were "shall issue" jurisdictions "where authorities must issue concealed carry licenses where authorities satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." (emphasis added). Id. at 2123. The Court noted that while Rhode Island and two other states have discretionary criteria, they "appear to operate like 'shall issue' jurisdictions." Id. at 2124, n. 1, citing R.I.Gen.L. § 11-47-11 and Gadomski v. Tavares, 113 A.3d 387, 392 (R.I. 2015). In Gadomski, the Court said: "Demonstration of a proper showing of need, which is a requirement under § 11-47-18, is not a component of § 11-47-11" and it overturned the City of East Providence's denial of a CCW permit. Id.

The Supreme Court described that since its decisions in District of Columbia v. Heller, 554 U.S. 570 (2008), and McDonald v. Chicago, 561 U.S. 742 (2010), the courts of appeal had developed a two-step analysis in which governments could justify their regulations of firearms by showing either that the "regulated activity fall[s] outside the scope of the [Second Amendment] right as originally understand" or that the "regulation is 'substantially related to the achievement of an important governmental interest.'" Id. at 2126. The Court rejected the second step and said "[i]nstead the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 2127.

28

The Court proceeded to review in depth that historical tradition. It began by commenting that "Heller and McDonald expressly rejected the application of any 'judge-empowering' 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" Id. at 2129, quoting Heller, 554 U.S. at 634 (Breyer, J., dissenting). The Court said: "Heller further confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry…upon the person or in the clothing or in a pocket, for the purpose…of being armed and ready for offensive or defensive action in a case of conflict with another person.'" Id. at 2134, quoting Heller, 554 U.S. at 584. After considering various state law limitations on either public carry or concealed carry the Court said:

> The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. [emphasis original]. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statues did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly. [emphasis added].

Id. at 2150. The Court concluded that New York's statutory scheme was unconstitutional because it gave regulatory authorities discretion. Id. at 2156. Notably, Rhode Island requires that a person have the State CCW permit for any open carry of firearms. R.I.Gen.L. § 11-47-18(a). Thus, it does not distinguish between the manner of public carry in its State-issued CCW requirement.

More recently, CCW permit holders and applicants challenged post-Bruen legislation in New Jersey that attempted to limit locations where CCW permit holders could engage in concealed carry. The federal district court said: "[T]he Second Amendment's plain text covers the conduct in question (carrying a firearm in public for self-defense…), so the threshold inquiry in Bruen is met. As a result, Defendants must be able to rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition

of firearm regulation." Siegel v. Platkin, 2023 WL 1103676 at *10. The court went to analyze the various kinds of locations from which defendants wanted to ban concealed carry. Id. at **10-20. The court upheld the legislation with respect to some locations but issued a temporary restraining order with respect to others. Id. at *20.

Accordingly, the Attorney General's denial of O'Neil's application would be unconstitutional unless the statutory scheme by which municipalities "shall issue" CCW permits under § 11-47-11 fulfills the State's constitutional obligation and allows the Attorney General the unbridled discretion he claims to deny permits under § 11-47-18. But, in one sense, no concealed carry applicant under § 11-47-18 can ever show a "need" because he or she always has the option to apply for a permit from a municipality under § 11-47-11. Under the Defendants' logic, then, the Attorney General retains unbridled discretion to deny permits for any reason whatsoever. But such unbridled discretion was precisely what Bruen rejects. Further, this interpretation renders Section 11-47-18 completely unnecessary. However, the Rhode Island Supreme Court has held that a statute should not be interpreted to render it "mere surplusage." See, In re Harrison, 992 A.2d 990, 994 (R.I. 2010), quoting, State v. Clark, 974 A.2d 558, 572 (R.I. 2009) (quoting State v. DeMagistris, 714 A.2d 567, 573 (R.I. 1998) ("no construction of a statute should be adopted that would demote any significant phrase or clause to mere surplusage.").

Moreover, there are several reasons why it is advantageous for a person to have both the State permit and the municipal permit. Rhode Island does not allow any open carry of firearms unless the person has a State-issued permit. R.I.Gen.L. § 11-47-18. The municipal carry permit only allows for concealed carry. R.I.Gen.L. § 11-47-11. There is a "waiting period" for the sale of concealable weapons under R.I.Gen.L. § 11-47-35.1 which applies to individuals who possess a municipal permit but not those who have a State permit. As O'Neil told the Attorney General's

staff during their telephonic meeting on March 10, 2021, having a CCW permit issued by the State means he can get a CCW permit in other states. These would include Oklahoma, Mississippi, and Arkansas, just to name a few. See, 21 Okla.St.Ann. § 1290.26; 22 Miss.Admin.Code Pt. 19, R.09; Office of the Attorney General, Ark.Op.Atty.Gen. No. 98-083, 1998 WL 293270 (Ark.A.G. May 20, 1998), respectively. Finally, if one permit expires before it is renewed, a person who holds both permits is protected from potential criminal liability of up to ten years in prison and a $10,000 fine. R.I.Gen.L. § 11-47-8.

### VIII.   PLAINTIFF HAS STATED A CLAIM FOR VIOLATION OF HIS RIGHTS TO PROCEDURAL DUE PROCESS

Defendants argue that Plaintiffs were not entitled to due process because they did not have a property interest. However, state law can determine whether a person has a property interest protected by due process. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 539 (1985); McLaughlin v. deMedeiros, CA. No. 16-648, 2020 WL 1492991 at *5 (D.R.I. Mar. 27, 2020). The Rhode Island Supreme Court has recognized that the holder of a government-issued license has a property interest in its renewal that entitles him to due process protections. Tillinghast v. Town of Glocester, 456 A.2d 781, 784-85 (R.I. 1983); citing Bell v. Burson, 402 U.S. 535 (1971); Millett v. Hoisting Engineers' Licensing Division, 119 R.I. 285, 377 A.2d 229 (1977). Regardless, Bruen has made clear that O'Neil has a liberty interest in obtaining a CCW permit without a showing of need. 142 S.Ct. at 2156. O'Neil's liberty and property interests in the renewal of his CCW permit entitle him to the protection of due process. Matthews v. Elbridge, 424 U.S. 319 (1976); Fuentes v. Shevin, 407 U.S. 67 (1971); Goldberg v. Kelly, 397 U.S. 254 (1970).

The statutory requirement that a State CCW applicant make a "proper showing of need" as well as the Attorney General's guidelines respecting that showing are vague and overbroad in violation of the Fourteenth Amendment. See Minnesota Voters Alliance v. Mansky, 138 S.Ct.

31

1876 (2018) (holding that Minnesota statute banning people from wearing "political apparel" in polling places on Election Day was unconstitutionally vague and violated the First Amendment); F.C.C. v. Fox Television Stations, Inc., 567 U.S. 239, 258 (2012) (holding that the FCC's regulation on the broadcasting of "fleeting expletives" was unconstitutionally vague and violated the First Amendment); Ashcroft v. Free Speech Coalition, 535 U.S. 234, 256 (2002) (holding the Child Pornography Prevention Act of 1996 was unconstitutionally overbroad and violated the First Amendment).[9] Moreover, Defendants cannot constrain O'Neil's Second Amendment rights by claiming no "set formula or criteria…limit[s] or restrict[s] the Attorney General's decision to issue or deny a pistol permit." Bruen, at 142 S.Ct. at 2156.

Section 11-47-18(a) is unconstitutionally void for vagueness or overbroad. The First Circuit has explained the difference between "vagueness" and "overbreadth":

> While related, [the doctrines of overbreadth and vagueness] derive from somewhat different policies and look to different effects. Overbreadth analysis looks to whether a law "sweeps within its ambit (protected) activities" as well as unprotected ones, while a vagueness inquiry focusses on whether a law states its proscriptions in terms sufficiently indefinite that persons of reasonable intelligence "must necessarily guess at its meaning."

Fantasy Book Shop, Inc. v. City of Boston, 652 F.2d 1115, 1122 n. 9 (1st Cir. 1981).

The "void-for-vagueness" doctrine derives from due process requirements that a law must be written "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). Here, Section 11-47-18(a) is unconstitutionally vague because the General Assembly has not defined "a proper showing of need" and ordinary

---

[9] O'Neil cites to First Amendment jurisprudence in this argument because, as previously stated, the Supreme Court has analogized First and Second Amendment rights and because there is a dearth of post-Bruen decisions applying due process analysis to CCW permit denials.

people could not understand what that phrase means. What is a "proper showing"? Does it require a hearing with admissible evidence or are an applicant's representations sufficient? What constitutes a "need"? Webster's first two definitions for "need" are very different: "1. necessity; compulsion; obligation…" compared to "2. a lack of something useful, required, or desired…" Webster's New World Dictionary, p. 981 (World Pub. Co. 1966). The State Permit is certainly useful and desired even if it is not a compulsion. In addition, the Attorney General says there is no "set formula or criteria to limit or restrict [his] decision to issue or deny a pistol permit." It is difficult to imagine a vaguer standard.

Moreover, it appears it is the particular Attorney General in office at any given time who determines "a proper showing of need" because O'Neil originally received his State-issued CCW permit in 2013 and it was renewed in 2017 when the prior Attorney General was in office.  This situation promotes arbitrary and discriminatory enforcement.

A statute is overbroad and unconstitutional under the First Amendment where "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  United States v. Stevens, 559 U.S. 460, 473 (2010). As previously argued, O'Neil submits that the same standard should apply to a statute restricting Second Amendment rights.  In Stevens, the Supreme Court held that a federal statute criminalizing the commercial creation, sale, or possession of depictions of animal cruelty was substantially overbroad, and thus, it was invalid under the First Amendment.  559 U.S 481-82. Here, Section 11-47-18(a) is substantially overbroad because its critical terms are undefined, and the Attorney General's application of the statute is overbroad,  ill-defined, and subject to "haphazard interpretations." Minnesota Voters, 138 S. Ct. at 1888. Carroll v. Craddock, 494 F.Supp.3d 158, 169 (D.R.I. 2020) (McElroy, J.) ("A statute is overbroad and therefore unconstitutional when it so lacks standards

for application that it 'delegate[s] unlimited discretion to the government officials entrusted to enforce the regulation.'"). In the <u>Minnesota Voters</u> case, the Supreme Court struck down Minnesota's law banning "political apparel" at polls. In attempting to determine examples of what "political apparel" would or would not be permissible, the Court encountered the same kind of arbitrary distinctions that exist with respect to State CCW permits:

> A shirt declaring "All Lives Matter," we are told, could be "perceived" as political. How about a shirt bearing the name of the [NRA]? Definitely out. That said, a shirt displaying a rainbow flag could be worn "*unless* there was an issue on the ballot" that "related somehow ... to gay rights." A shirt simply displaying the text of the Second Amendment? Prohibited. But a shirt with the text of the First Amendment? "It would be allowed."

<u>Minnesota Voters</u>, 138 S. Ct. at 1891. "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity. But the State's difficulties with its restriction go beyond close calls on borderline or fanciful cases. And that is a serious matter..." <u>Id</u>.

Rhode Island has the same problem. The inconsistent application of Section 11-47-18(a)'s requirement of a "proper showing of need" can result in haphazard, arbitrary, and inconsistent decisions. Here, the Attorney General has articulated ten general factors on which to base the grant or denial of a CCW permit with respect to a showing of "need." However, the denial of O'Neil's application to renew the permit he has had since 2013 was founded on none of these. Instead, the Attorney General denied the renewal based on a new, *ad hoc* factor, i.e., that O'Neil did not "need" a State-issued permit because he already had a municipal one. Further, O'Neil was able to demonstrate "need" when his two prior applications for a permit were granted. The only change since then is the individual Attorney General and his assertion of unbounded discretion to grant or deny such applications. Notably, the Attorney General did not decide that O'Neil was any kind of threat or danger if he had a CCW permit, a decision that was presumably foreclosed by the issuance

of the municipal permit which requires that the applicant be a "suitable person to be so licensed." R.I.Gen.L. § 11-47-11(a).

Personalized or "vanity" license plate schemes have faced similar legal challenges.  See Lewis v. Wilson, 253 F.3d 1077, 1080 (8th Cir. 2001) (striking down Missouri regulation as providing unfettered discretion when state had authority to restrict plates bearing messages that  are "contrary to public policy."); Carroll v. Craddock, 494 F.Supp.2d at 169-70 (striking down statute that permitted the Director of the Division of Motor Vehicles to deny the application for a vanity license plate that was "offensive to good taste"); Morgan v. Martinez, No. 3:14-02408, 2015 WL 2233214 at *8 (D.N.J. May 12, 2015) (finding that vehicle owner seeking 8THEIST plate had stated a claim in facial challenge to New Jersey's "offensive to good  taste and decency" plate regulation); Matwyuk v. Johnson, 22 F. Supp. 3d 812, 822–24 (E.D. Mich. 2014) (same, citing Shuttlesworth v. City of Birmingham, Alabama, 394 U.S. 147, 150-51 (1969)). Defendants' "need" guideline that there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue or deny a pistol permit" lacks the "narrow, objective,  and definite standards" necessary for a licensing scheme and is therefore unconstitutional.

The Attorney General's "factors" for denying a CCW permit under Section 11-47-18(a) run afoul of the prohibition  against unbridled discretion. "[A]dministrators may not possess unfettered discretion to burden or ban speech, because without standards governing the exercise of discretion, a government  official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 763-64 (1988). Boundless rules run the risk that the government will use seemingly innocuous standards in pretextual and censorial ways, "hiding the suppression from public scrutiny." Child  Evangelism Fellowship of Maryland, Inc. v. Montgomery Co. Pub.

Sch. Dist., 457 F.3d 376, 386  (4th Cir. 2006). Such a scheme may  not delegate overly  broad discretion to  government officials. Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 130–31 (1992)  (requiring  "narrow, objective, and definite  standards to  guide the  licensing authority").

The  Supreme  Court  in  Shuttlesworth v. City of Birmingham  explained  that  "many decisions of this Court over the last 30 years, [have held] that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow,  objective,  and definite  standards  to  guide  the  licensing  authority,  is  unconstitutional."  394 U.S. at 150–51. Section 11-47-18(a) lacks objective criteria, allowing the Attorney General to deny CCW permits based  on ambiguous, subjective, arbitrary, and discriminatory reasons. Defendant has reserved for himself  the  unfettered  ability  to  deny any  permit  because he has no "set formula or criteria to limit or restrict [his] decision to issue or deny a pistol permit."  Accordingly, the Attorney General can make unpublished and inconsistent decisions respecting CCW permits, and no one will be the wiser. Here, Defendant denied the renewal of a permit O'Neil has had since 2013 because of a supposed  lack  of  need  based  on  a  criterion  he  apparently  invented  for  this  application. Accordingly, Section 11-47-18(a) is unconstitutionally vague and overbroad and Defendant's application and enforcement of it is unconstitutionally arbitrary and capricious.

Defendants rely on Relentless, Inc. v. U.S. Department of Commerce, 561 F.Supp.3d 226, 237 n. 7 (D.R.I. 2021), for the proposition that "deference to an agency statutory interpretation as embodied in the Chevron doctrine" does not violate due process. (Defendants' Memorandum, p. 20). That reliance is misplaced for several reasons. First, this Court referred to plaintiffs' argument in that case as a "throwaway line" and worthy of comment only in the last sentence of footnote. Second, this Court did not say that Chevron deference saved a vague regulation (or Defendants'

factors) from due process review. In fact, the Court noted Supreme Court precedent holding agency interpretations to be unreasonable despite <u>Chevron</u> deference and, instead, reviewing agency interpretations under a more exacting standard. Further, while the Rhode Island Supreme Court has said that a rule or regulation adopted pursuant to legislative authority are entitled to some deference, an agency's "interpretive" rule adopted for the purpose of "guidance and interpretation" is not. <u>Town of Warren v. Bristol Warren School District</u>, 159 A.3d 1029, 1039 (R.I. 2017). The RIAG's factors are clearly the latter. Finally, O'Neil comments that, based on recent Supreme Court comments, the future of <u>Chevron</u> deference appears doubtful.

Defendants also rely on <u>WMS Gaming, Inc. v. Sullivan</u>, 6 A.3d 1004, 1111 (R.I. 2010), for the proposition that "'[a] license to engage in a business, occupation, or activity <u>otherwise prohibited by law</u> is the grant of a privilege' and that it is 'in no sense a contract or property.'" (emphasis added). (Defendant's Memorandum, p. 19). Obviously, <u>Bruen</u> means a CCW permit is a constitutional right, not a license to engage in an activity "otherwise prohibited by law." Moreover, <u>WMS Gaming</u> was not deciding a constitutional right; rather, it was addressing the tax treatment of video lottery terminals.

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

Respectfully submitted,
**MICHAEL O'NEIL**
By his attorneys,

<u>/s/ Thomas W. Lyons</u>
Thomas W. Lyons            #2946
Strauss, Factor, Laing & Lyons
One Davol Square, Suite 305
Providence, RI 02903
(401) 456-0700
tlyons@straussfactor.com

<u>/s/ Frank R. Saccoccio</u>
Frank R. Saccoccio Esq. #5949
Saccoccio Law Office
928 Atwood Avenue
Johnston, Rhode Island 02919
(401) 944-1600 * 942-8921 Fax
Frank.CSLawOffice@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2023, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Thomas W. Lyons