## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| MICHAEL P. O'NEIL, et al.,<br>　　　Plaintiffs,<br><br>v.<br><br>PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island, and THE STATE OF RHODE ISLAND,<br>　　　Defendants. | C.A. No. 1:23-cv-00070 |

### DECLARATION OF PROFESSOR ROBERT SPITZER

I, Dr. Robert Spitzer, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I have been retained by the Office of the Attorney General of the State of Rhode Island to provide expert opinions and testimony in the above-entitled matter regarding the history and tradition of firearms restrictions in the United States. This expert report and declaration ("Declaration") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

### PROFESSIONAL BACKGROUND AND QUALIFICATIONS

2.    I am the author of 16 books on American politics subjects, including six on gun policy. I have been studying and writing about gun policy for nearly forty years. My first publication on the subject appeared in 1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun

---

[1] Robert J. Spitzer, *Shooting Down Gun Myths*, *America* (June 8, 1985) 468–69.

laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control*, has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The ninth edition of the book was recently published (2024) by Routledge Publishers. My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in the national and international media on gun-related matters. For nearly thirty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence). A copy of my current curriculum vitae is attached as Exhibit A to this declaration.

    3.    I have provided written testimony as an expert witness in the following cases (in addition to this case): *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.); *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No.: 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*,

No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951(D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum* No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141, (S.D. Ill.); *Mitchell, et al. v. Atkins, et al*., 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et al*., 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, 22-cv-10989 (S.D.N.Y.)*; Rocky Mountain Gun Owners, et. al. v. The Town of Superior*, 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, Case No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, 23-cv-05364 (W.D. Wash.); *Koppel v. Bonta*, 8:23-cv-00813 (C.D. Cal.); and *Jane Doe v. Bonta*, 8:23-cv-01324 (C.D. Cal.); *Calce v. City of New York*, Case 1:21-cv-08208-ER; *Richey v. Sullivan*, Case No. 1:23CV344 (AMN-DJS) (N.D.N.Y.); *D.B. v. Sullivan* No.: 1:22-cv-00282 (MAD-CFH); *Commonwealth of Pennsylvania v. Tomlinson*; *National Association for Gun Rights et al v. Polis* U.S.D.C. Colo. Case No. 1:2024cv00001; *O'Neil et al. v. Neronha et al*., C.A. No. 1:23-cv-00070-WES-PAS; *State of Washington v. Gator's Custom Guns* (Cowlitz County Superior Court Case No. 23-2-00897-08); *Guardian Arms, LLC, et al. v. State of WA, et al.*, No.: 23-2-01761-34.

    4.   I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S.

742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069 (2012).

5.    I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

## I.    INTRODUCTION

6.    This analysis examines three types of old weapons laws: those pertaining to weapons carrying (spanning concealed weapons carrying, open weapons carrying and laws restricting any weapons carrying), laws against weapons brandishing and display, and weapons licensing laws.

7.    The carrying of weapons of all sorts, but especially guns, fighting knives (long, thin-bladed knives), and various types of clubs has been subject to wide-ranging and varied regulation and restriction from the seventeenth century through the early twentieth century. It is now well known that restrictions on the concealed carrying of these weapons were ubiquitous in America. Less well known, however, is that the open carrying of weapons was often restricted, even extending to long guns. In addition, the states also restricted the public carrying of weapons

through laws criminalizing the brandishing and even simple public display of weapons. Further, a variety of weapons licensing laws were enacted in the nineteenth and early twentieth centuries that allowed for conditional carrying, subject to a valid license or permit issued by the government. The rise of licensing as a regulatory technique as examined later in this report often followed instances where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The governing units enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a more flexible form of government regulation of the activities and weapons in question, though carry restrictions also persisted.

8.    Taken together, these numerous and varied laws make clear that the default in American history was weapons regulation and restriction, especially once individuals left their domiciles. Perhaps most significant (and surprising) is the extensive regulation of open weapons carrying, in that more than half of the states restricted, partially or completely, open weapons carrying or any weapons carrying, as discussed below.

## II.    HISTORICAL RESTRICTIONS ON PISTOL AND GUN CARRYING

### A.  RESTRICTIONS ON CONCEALED CARRY

9.    Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries.  As early as 1686, New Jersey enacted a law

against wearing weapons because they induced "great Fear and Quarrels."[2]  Massachusetts followed in 1751.[3]  In the late 1700s, Virginia and North Carolina passed similar laws.[4]  In the 1800s, as interpersonal violence and gun carrying spread, forty-three states joined the list; four more did so in the early 1900s.[5]  The enactment of laws restricting concealed weapons carrying followed the rise of homicides and interpersonal violence described by historian Randolph Roth who noted that restrictions on firearms from the colonial period to the start of the Revolution were few because homicide rates were low. When homicides did occur, guns were seldom used, in large part because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy.  After the Revolutionary period the spread of violence tied to concealable percussion cap pistols and fighting knives led to the enactment of anti-concealed carry weapons laws.[6]  Concealed carry laws normally targeted pistols as well as the types of fighting knives and various types of clubs discussed here. From the 1600s through the early 1900s, every single state (plus D.C.) enacted laws penalizing concealed weapons carrying (see Exhibits B and C).

---

[2] The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686), An Act Against Wearing Swords, Etc.

[3] 1749-51 Mass. Acts 339, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 12. 1751.

[4] 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays; Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792).

[5] Including D.C. Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017), 63-67; Exhibit C.

[6] Roth, *American Homicide*, 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17; Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

10.     In addition, at least three-fourths of the states enacted laws that penalized public weapons brandishing or display. At least four states did so in the 1600s, two in the 1700s, twenty-eight states in the 1800s, and two more in the early 1900s.[7] As of 1938, "the carrying of concealed pistols is either prohibited absolutely or permitted only with a license in every state but two."[8] Thus, the widespread enactment of concealed carry law restrictions was the public policy remedy to the emergent crime problems of the nineteenth century.

### B. OPEN CARRY WEAPONS RESTRICTIONS

11.     Ubiquitous restrictions on concealed weapons carrying are now well-known. Less well-known, however, is that many of the laws enacted to restrict concealed weapons carrying also extended restrictions to open weapons carrying, or simply barring any weapons carrying. In all, at least 38 states enacted at least 72 laws restricting or extending to the open carrying of weapons (see Exhibits B and C).

12.     From the early 1800s up to 1860, at least 5 states (including D.C.) enacted laws barring or restricting the carrying of named weapons, whether concealed or open. Georgia enacted a law in 1837 restricting both the carrying and sale of named weapons:

> [I]t shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for

---

[7] Spitzer, *The Gun Dilemma*, 77-80; Robert J. Spitzer, "To Brandish or Not to Brandish: The Consequences of Gun Display," *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society*, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, 2024), 97-114.

[8] Sam B. Warner, "The Uniform Pistol Act," *Journal of Criminal Law and Criminology* 29 (Winter 1938): 530.

the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c.[9]

13.    Florida enacted an 1838 law that criminalized the concealed carrying of named weapons, but also added that "all persons carrying said weapons openly shall pay" a then-considerable regulatory tax of "ten dollars per annum."[10]

14.    An 1851 Pennsylvania law for the borough of York defined as a felony the willful and malicious carrying of "any pistol, gun, dirk knife, slung shot, or deadly weapon."[11] (Note that this law applied to any firearm, not just handguns.)

15.    An 1852 Hawaii law criminalized the carrying or "found armed with" any of a list of deadly weapons.[12] An 1858 measure for the District of Columbia made it unlawful "for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles."[13]

16.    In a pattern similar to the enactment of concealed carry laws, open carry restrictions increased in frequency in the latter half of the nineteenth century. From 1860 to

---

[9] The very title of this law proclaims the justification for its enactment: 1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.

[10] 1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838); $10 in the 1830s would equal $327 in 2023 dollars. https://www.officialdata.org/us/inflation/1830?amount=10.

[11] 1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.

[12] 1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons.

[13] 1 William B. Webb The Laws of the Corporation of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.

1900, 24 states enacted anti-open carry laws (see Exhibits B and C), and 9 states did so in the early 1900s (a few states enacted laws in both centuries).

17.    In 1871, Texas enacted this anti-carry law: "any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife" unless for provable self-defense or in service to the government was guilty of a crime.[14] Another typical law was an 1875 Arkansas statute that said "any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor."[15] An 1871 Jersey City, New Jersey law made it unlawful for any person "to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon."[16] Similarly, an 1872 Nebraska City, Nebraska law declared it to be "unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons."[17]

---

[14] 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons; § 1.

[15] Act of Feb. 16, 1875,1874-75 Ark. Acts 156; § 1.

[16] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.

[17] Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources. Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.

### C. Long Gun/Any Gun Carry Restrictions

18.    In addition to anti-concealed weapons carrying laws and open weapons carrying restrictions, at least 22 states enacted 36 laws from the early 1800s to the end of the century specifically restricting the carrying of long guns or any kind of firearm (such as the 1851 Pennsylvania law cited above; see Exhibits B and C). Obviously, this meant that long guns, by their nature, could not be carried in any concealed manner either. Some of these laws were limited by applying, for example, to times and places of elections, other public gatherings, or to any who might be intoxicated. Other laws imposed no such limitations. Some applied only to cities and towns, but others were statewide measures. These laws generally cited exceptions for travelers, law enforcement, the military, or justifiable instances of self-defense. Of the 22 such laws in this category, 19 of them were passed from the 1850s to 1899; another 7 were passed in the early 1900s (a few states passed laws in both periods). Generally speaking, these states and laws also restricted concealed weapons carrying as well (though, as noted earlier, concealed carry was restricted by every state in the country).

19.    An 1868 Florida law subjected to criminal penalties anyone who "shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon."[18] An 1878 Los Angeles, California ordinance said that, "except peace officers, and persons actually traveling, and immediately passing through Los Angeles city," no person "shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate

---

[18] James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]. Offences Against Public Peace, § 13.

limits of said city."[19] An 1881 Kansas state law required cities to "prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise."[20]

20.     An 1890 Oklahoma law made it unlawful for anyone "to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon."[21] Some of the laws did not specifically bar the carrying of every named type of firearm, but included a phrase like "or any other dangerous or deadly weapon of like kind or character."[22] One may reasonably assume that a long gun was and is a "dangerous or deadly weapon."

## III.    WEAPONS BRANDISHING AND DISPLAY LAWS

21.     Weapons brandishing and display laws are common today. Less well known is the fact that discouraging weapons brandishing and display were not only ubiquitous in our history, but date to early law-making in the 1600s.

22.     Two types of historic laws penalized the public appearance of weapons (short of their actual use), including but not limited to firearms, in two circumstances: the *brandishing* of weapons—that is, to display them in the presence of others and to do so in a menacing or threatening manner; and the mere *display* of weapons (i.e. that they simply can be seen) in the

---

[19] William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. Ordinances of the City of Los Angeles, § 36.

[20] 1881 Kan. Sess. Laws 92, c. 37, § 24.

[21] 1890 Okla. Laws 495, art. 47; § 2.

[22] E.g., William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878; Ordinances of the City of Los Angeles, § 36; 1882 W. Va. Acts 421–22.

presence of others. At least three-fourths of the states enacted laws that penalized public weapons brandishing or display. Of these, 21 states enacted brandishing laws, and 19 states enacted weapons display laws (4 states enacted both). Chronologically, at least 3 states (then colonies) did so in the 1600s, 3 in the 1700s, 28 states in the 1800s, and 2 more in the early 1900s.[23]

23.    The penalties for violating these laws generally included some combination of fines and incarceration. Needless to say, those who were incarcerated were deprived of their weapons during the length of their term.

24.    A 1642 provision in the colony of New Netherland (soon to be New York) stated: "No one shall presume to draw a knife much less to wound any person, under . . . penalty."[24] This reference did not mention firearms but allowed for penalties for merely drawing or displaying a weapon, even if no brandishing or wounding occurred. Similarly, a 1786 Massachusetts law prohibited the mere assemblage of "any persons to the number of twelve, or more, being armed with clubs or other weapons." If they did not disperse within an hour of being warned, they could be subject to arrest.[25] That is, the mere appearance of such an armed assemblage in public was sufficient to justify legal action against them, although other provisions of the act also penalized such groups who also behaved in a threatening manner.

25.    Some of these American laws mirrored the British Statute of Northampton, where

---

[23] See below, and also: Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 77-80.

[24] 1642 N.Y. Laws 33, Ordinance Of The Director And Council Of New Netherland Against Drawing A Knife And Inflicting A Wound Therewith. *Young v. Hawaii*, 992 F.3d 765, 794–795 (9th Cir. 2021); Jonathan E. Taylor, "The Surprisingly Strong Originalist Case for Public Carry Laws," *Harvard Journal of Law & Public Policy* 43 (Spring 2020): 353.

[25] 1786 Mass. Sess. Laws, § 1.

"[t]he very fact of carrying a firearm was considered to be in terror of the people and was therefore prohibited by that statute."[26] For example, the 1686 New Jersey "Act against wearing Swords, &c" was adopted as a reaction to "great complaints by the inhabitants of [the] Province, that several persons [were] wearing swords, daggers, pistols, dirks, stilladoes, skeines [small Irish-derived swords], or any other unusual or unlawful weapons."[27] As noted earlier, this law penalized the "private" wearing of weapons but also their open carrying. A 1694 Massachusetts law subjected to arrest any who "shall ride or go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere."[28] Thus, this law encompassed those carrying weapons whether mounted on horseback or on foot. New Hampshire enacted a law in 1701 (and also in 1708 and 1744) that punished anyone who "shall go armed offensively" who "put his Majesty's subjects in fear."[29] Both the 1701 and 1708 laws stipulated as part of the penalty that "the arms or weapons so used by the offender" were "to be taken away. . . ."[30]

---

[26] Jonathan E. Taylor, "The Surprisingly Strong Originalist Case for Public Carry Laws," *Harvard Journal of Law & Public Policy,* 43(Spring 2020): 353. See also Joseph Blocher and Reva B. Siegel, "When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller," *Northwestern University Law Review* 116 (2021): 164–172.

[27] An Act against Swords, &c, 1686 N.J. Laws 289, 289, ch. IX. Quoted in *Young v. Hawaii*, 992 F.3d 765, 794 (9th Cir. 2021).

[28] 1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders.

[29] New Hampshire - Acts and Laws June 1701, 15; available at https://heinonline-org.proxy.wm.edu/HOL/Page?handle=hein.ssl/ssnh0240&id=1&collection=ssl&index=ssl/ssnh; New Hampshire 1708, "Laws of New Hampshire," available at https://heinonline.org/HOL/Page?handle=hein.ssl/ssnh0244&id=68&collection=ssl; N.H. - Acts and Laws, 1744, 9-10, https://heinonline-org.proxy.wm.edu/HOL/Print?collection=ssl&handle=hein.ssl/ssnh0244&id=10.

[30] The 1744 law dialed up the penalty, saying that those convicted were to be "whipt thirty stripes on the naked back at the publick whipping-post, and suffer twelve months imprisonment,

26.    Virginia enacted a measure in 1786 saying that no man was to "go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison."[31] North Carolina enacted a very similar measure in 1792, saying that no man shall "go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere."[32] Massachusetts added to its existing firearms regulations in a 1795 law that authorized justices of the peace to arrest those who "ride or go armed offensively, to the fear or terror of the good citizens."[33] In 1801, Tennessee enacted a law saying that no one was to "go armed to the terror of the people, or privately carry any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person."[34] Maine's 1821 law outlawed "affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens."[35]

27.    Note that Virginia, Massachusetts, Tennessee, and Maine all invoked some version of the old British phrase "to the terror of the people" with New Hampshire's law referencing the similar "fear" of the public. And in the Tennessee law, concealed weapons carrying was also identified as a source of "terror." The continued use of this phrase emphasizes the well established principle that traveling while armed was, per se, a source of "terror" to the

---

and once every three months, during said twelve months, receive the same number of stripes aforesaid."

[31] 1786 Va. Acts 33, ch. 21.

[32] Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60–61 (Newbern 1792).

[33] 1795 Mass. Acts 436, ch. 2. Quoted in *Young v. Hawaii*, 799. See also 1692 Mass. Acts 10, 11–12.

[34] 1801 Tenn. Pub. Acts 260, ch. 22, § 6. Quoted in *Young v. Hawaii*, 798.

[35] 1821 Me. Laws 285, ch. 73 § 1. Quoted in *Young v. Hawaii*, 798–799.

people.

28.      These laws, it turns out, were ubiquitous. Between the late 1600s and the early 1900s, a total of at least 36 states and territories enacted laws that penalized weapons brandishing or display (see Table 1, below). Of these, 21 states criminalized weapons brandishing[36] by combining two elements: the display of the weapon plus the manner of the display. For example, an 1840 Mississippi law said that "any person having or carrying any . . . deadly weapon" who "shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in self-defense" shall be subject to prosecution.[37] Note the two key elements: the "exhibit" or display of the weapon combined with doing so "in a rude, angry and threatening manner," revealing a criminal intent as invoked by the terms "rude, angry, and threatening." Of the 21 states with these laws (see Table 1 below) , 11 used the identical "in a rude, angry and threatening manner" phrase; 5 used the word "threaten," and the others used wording including "for the purpose of frightening or intimidating," "in a manner likely to cause terror," or simply "point."

---

[36] The Statutes of the State of Mississippi, 1840, § 55; 1854 Wash. Sess. Law 80, ch. 2, §30; Digest of the Laws of California, 1858; A Digest of the Laws of Pennsylvania, 1860, page 250; 1867 Ariz. Sess. Laws 21–22, § 1; 1901 Ariz. Acts 1253, Crimes Against the Public Peace, § 392; 1868 Ark. Acts 218, § 12–13; 1864 Id. Sess. Laws 304, An Act Concerning Crimes and Punishments, § 40; 1870 Id. Sess. Laws 21; 1873 Nev. Stat. 118, ch. 62, § 1; A Digest of the Laws of Texas, 1873; 1875 Ind. Acts 62, § 1; The Revised Charter and Ordinances of the City of Boonville, MO., 1881, § 6; Joplin Code of 1917, Art. 67, § 1201; The General Laws of New Mexico, 1882 Page 313; The Revised Statutes of the State of Illinois, 1883; 1884 Wyo. Sess. Laws 114, ch. 67, § 1; 1885 Mont. Laws 74; 1897 Fla. Laws 59, chap. 4532, § 1; Annotated Code of the State of Iowa, 1897, Page 1898, § 4775; 1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32; The Session Laws (Washington) of 1897, Page 1956; Annotated Statutes of the Indian Territory (Oklahoma), 1899; 1925 W.Va. Acts 25–30, ch. 3, § 7, pt. a; 1931 Mich. Pub. Acts 670, ch. 37, § 233.

[37] The Statutes of the State of Mississippi, 1840, § 55.

**TABLE 1**

**COLONIAL, STATE, AND TERRITORIAL WEAPONS BRANDISHING AND DISPLAY LAWS IN 36 STATES, 1642-1931***

| BRANDISHING LAWS IN 21 STATES AND JURISDICTIONS | DISPLAY LAWS IN 19 STATES AND TERRITORIES |
|---|---|
| -The Statutes of the State of Mississippi, 676, 1840, § 55 | -1642 N.Y. Laws 33 |
| -1854 Wash. Sess. Law 80, ch. 2, §30; 1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | -1686 N.J. Laws 289, ch. IX<br><br>-1692 Mass. Acts 10, 11-12; 1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders; 1786 Mass. Sess. Laws (included Maine); 1795 Mass. Acts 436, ch. 2; 1836 Mass. Acts 748, 750, ch. 134 |
| -Digest of the Laws of California, 1858: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858, and Page 34, Image 340 (1855) | -1701 N.H. Acts and Laws 15; N.H. Public Carry Prohibition (1708); N.H. - Acts and Laws, 1744, 9-10 |
| -A Digest of the Laws of Pennsylvania, 1860, page 250 | -1786 Va. Acts 33, ch. 21 |
| -1864 Id. Sess. Laws 304, An Act Concerning Crimes and Punishments, § 40; 1870 Id. Sess. Laws 21; 1909 Id. Sess. Laws 6, § 1 | -Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, 60-61 (Newbern 1792); 1889 N.C. Sess. Laws 502, ch. 527, § 1 |
| -1867 Ariz. Sess. Laws 21-22, § 1; 1901 Ariz. Acts 1253, Crimes Against the Public Peace, § 392 | -1801 Tenn. Pub. Acts 260, ch. 22 § 6 |
| -1868 Ark. Acts 218, § 12-13 | -1821 Me. Laws 285, ch. 73 § 1 |
| -1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32; The Session Laws (Washington) of 1897, Page 1956 | -Revised Statutes of the State of Delaware, 1852, § 3<br><br>-1880 Ga. Laws 151 |
| -1873 Nev. Stat. 118, ch. 62, § 1 | -1883 Ind. Acts 1712, chap. 87, § 6678; 1905 Ind. Acts 687, Weapon--Drawing Dangerous, § 448 |
| -A Digest of the Laws of Texas, 1873, Annotated Page 1321, Image 291 (Vol. 2, | -1886 N.M. Laws 56, ch. 30, § 4<br><br>-1893 Or. Laws 29-30, § 1; 1925 Or. Laws |

| | |
|---|---|
| 1873) | 172-73, ch. 117, § 1 |
| -1875 Ind. Acts 62, § 1 | -The Code of Alabama, 1897, § 4342 |
| -The Revised Charter and Ordinances of the City of Boonville, MO., 1881, § 6; Joplin Code of 1917, Art. 67, § 1201 | -Book of Ordinances of the City of Wichita, Kansas, 1899, § 1 |
| -The General Laws of New Mexico, 1882 Page 313 | -Revised Statutes of Wyoming, 1899, Page 1252-1253, Image 1252-1253 |
| -The Revised Statutes of the State of Illinois, 1883, Page 453, Image 512 (1884) | -1907 Ark. Acts 810, § 1 |
| -1884 Wyo. Sess. Laws 114, ch. 67, § 1 | -1910 S.C. Acts 694 |
| -1885 Mont. Laws 74 | -1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17. |
| -1897 Fla. Laws 59, chap. 4532, § 1 | |
| -Annotated Code of the State of Iowa, 1897, Page 1898, § 4775 | |
| -Annotated Statutes of the Indian Territory (Oklahoma), 1899, Second Session of the Fifty-fifth Congress, Page 228, Image 312 | |
| -1925 W.Va. Acts 25-30, ch. 3, § 7, pt. a | |
| -1931 Mich. Pub. Acts 670, ch. 37, § 233 | |

*Sources: Duke Center for Firearms Law digital archive of gun laws, https://firearmslaw.duke.edu/repository/search-the-repository/; HeinOnline; *Young v. Hawaii,* 992 F.3d 765, 794-95 (9th Cir. 2021); Jonathan E. Taylor, "The Surprisingly Strong Originalist Case for Public Carry Laws," *Harvard Journal of Law & Public Policy,* 43(Spring 2020): 347-56. Note that four states, Arkansas, Indiana, New Mexico, and Wyoming, appear in both lists totaling 40 laws in 36 states.

29.   A total of 19 states enacted laws that penalized the mere display or wearing of firearms and other "deadly weapons."[38] (While 36 states enacted one of these types of laws, at

---

[38] 1642 N.Y. Laws 33; 1686 N.J. Laws 289, ch. IX; 1692 Mass. Acts 10, 11–12; 1786 Mass. Sess. Laws (included Maine); 1795 Mass. Acts 436, ch. 2; 1836 Mass. Acts 748, 750, ch. 134;

least four states—Arkansas, Indiana, New Mexico, and Wyoming—enacted both display and brandishing laws, for a total of 40 laws in 36 states.) Several state laws in this category used the phrase "to point," as was true for a couple of laws in the brandish category, but the laws here had additional language that made clear that the intent of the person was irrelevant. Bearing in mind that the definition of brandishing is "to shake or wave (something, such as a weapon) menacingly,"[39] these latter laws contemplate a violation for the act of pointing without any evidence of malice, and to forestall possible excuses. An 1880 Georgia law, for example, made it a crime to "point or aim" a gun but added "loaded or unloaded,"[40] a distinction not made in the brandishing laws. Another outlawed gun pointing "in jest or otherwise";[41] another added "with or without malice";[42] a fourth said "in fun or otherwise."[43] The thrust of these laws is that intent does not matter. The mere act of display is sufficient to warrant legal action.

---

1699 N.H. Laws 1, 1–2; 1786 Va. Acts 33, ch. 21; Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, 60–61 (Newbern 1792): 1801; 1889 N.C. Sess. Laws 502, ch. 527, § 1; Tenn. Pub. Acts 260, ch. 22 § 6; 1821 Me. Laws 285, ch. 73 § 1; Revised Statutes of the State of Delaware, 1852, § 3; 1880 Ga. Laws 151; 1883 Ind. Acts 1712, chap. 87, § 6678; 1905 Ind. Acts 687, Weapon--Drawing Dangerous, § 448; 1886 N.M. Laws 56, ch. 30, § 4; 1893 Or. Laws 29-30, § 1; The Code of Alabama, 1897, § 4342; Book of Ordinances of the City of Wichita, Kansas, 1899, § 1; Revised Statutes of Wyoming, 1899; 1907 Ark. Acts 810, § 1; 1910 S.C. Acts 694; 1927 Haw. Sess. Laws 209-217.

[39] https://www.merriam-webster.com/dictionary/brandish.

[40] 1880 Ga. Laws 151.

[41] Revised Statutes of Delaware, 1852, § 3.

[42] 1893 Or. Laws 29–30, § 1.

[43] 1889 N.C. Sess. Laws 502, ch. 527, § 1.

## IV.    HISTORICAL WEAPONS LICENSING/PERMITTING LAWS

30.    Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission by competent authority to do an act which, without such permission, would be illegal . . . ."[44] Despite the difference of hundreds of years, licensing in early America functioned similarly to the way it functions today.

31.    Historical weapons licensing and permitting laws were and are predicated on a process whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates some kind of evaluation that resembles what in modern parlance is called a background check.

32.    In addition, like background checks, licensing generally represented a more mature and nuanced form of regulation that in many instances succeeded or supplemented more rigid but less complicated laws. The analysis below demonstrates that licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons, extending to gun ownership as well as to every aspect of sales. With some exceptions, the primary focus was on handguns for the obvious reason that they were the weapons that posed the most significant threat to public safety and good order from the 1700s through the early 1900s.

33.    State and local laws encompassing the licensing, permitting, or registration of dangerous weapons and substances date to the 1700s and became more wide-ranging and widespread in the 1800s and early 1900s. These laws mostly pertained to those weapons that posed a threat to public safety: concealable weapons, including handguns, fighting knives,

---

[44] Henry C. Black, *Black's Law Dictionary*, 6th ed. (St. Paul, MN: West Publishing, 1991), 634.

various types of clubs, and explosives (ranging from firecrackers and gunpowder to nitroglycerine after its invention).

34.     In all, a total of at least 46 states plus the District of Columbia enacted some type of licensing law from the 1700s through the early 1900s. At least 32 states enacted 72 licensing requirement laws for individuals as a pre-requisite for their weapons ownership or carry during this time (see Exhibits D and E for enacting jurisdictions and years of enactment); 16 of those states did so in the 1800s. At least 26 states enacted laws to regulate firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods). At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s. At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries. At least 22 states licensed the possession, handling, or transport of gunpowder and other explosives. And at least 17 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons.

35.     In addition, at least 14 states imposed licensing requirements on specified marginalized groups (variously including Native Americans, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 11 states imposed licensing on enslaved persons or free Blacks. At least 6 states enacted some kind of regulatory tax.

36.     Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were applied at first to populated areas, since misuse of weapons posed a far greater risk to public safety in areas where larger numbers of people lived in close proximity to each other.

37.     With regard to concealed carry of pistols and other dangerous weapons, for example, from the 1700s through the early 1900s, every state in the country restricted or criminalized such carrying.[45] With the spread of licensing requirements in the post-Civil War nineteenth century, however, governing units began to allow legal weapons carrying through licensing, subject to the review criteria as conducted by local officials who were empowered to grant carry licenses. The criteria for the granting of these licenses were generally discretionary for the individuals or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. For example, an 1881 permitting system for New York City said that permits would be issued to "a proper and law abiding person."[46] An 1898 Oregon City law called for carry permits to be issued if the magistrate believed it "necessary or prudent to grant such permission."[47] Permit laws usually set a time limit for permit duration, ranging from a month to a year.

38.     Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[48] The hunting-related laws listed here all allowed hunting as

---

[45] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67; Exhibits B and C.

[46] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority 214-215, Image 214-215 (1881).

[47] *The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order* 259, Image 261 (1898); An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

[48] Spitzer, Gun Law History in the United States and Second Amendment Rights, 73-74.

permitted by a government entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season, or hunting certain types of game). Licensing related to Indigenous people, enslaved persons, and free persons of color are also discussed in more detail below. Each of these categories of laws are detailed in Exhibits D and E.

39.    Many of these licensing laws were enacted where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The jurisdictions enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a new and more mature form of government regulation of the activities in question—by tailoring prohibitions to address public-safety threats posed by firearms-related activities rather than banning those activities outright, and by utilizing regulatory techniques that require more of those involved in the licensing process, including the gathering and keeping of relevant information by governing officials or dealers or both—though traditional laws that simply penalized weapons carrying or use remained in many if not most places. Like licensing, background checks also seek to limit (and not categorically prohibit) those who may engage in certain firearms-related activities.

A.    LICENSING OF WEAPONS CARRYING OR POSSESSION

40.    In 1871, Missouri enacted a measure to license the otherwise illegal practice of concealed carrying of handguns and other named weapons, including "any other dangerous or

deadly weapon" in St. Louis by means of "written permission from the Mayor."[49] Kansas City, Missouri enacted its own municipal version of this law in 1880.[50] A similar measure was enacted in St. Louis in 1892.[51]

41.     Jersey City, New Jersey enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as "any gun, pistol, cannon, or fowling piece or other fire-arms . . . ."[52] As this wording makes clear, this extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting small animals[53]). Jersey City's 1873 law laid out a broadly discretionary set of criteria for granting licenses, described below (as determined by the city's municipal court), that bears great similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper.[54]

---

[49] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City 491-492, Image 499-500 (1871).

[50] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

[51] The Municipal Code of St. Louis (St. Louis: Woodward 1901), 738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

[52] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," passed March 31, 1871, and the Supplements Thereto 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

[53] https://www.thefreedictionary.com/fowling+piece.

[54] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto 86-87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873.

The Jersey City ordinance added that carry permits would not be granted "to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control."[55]

42.    Hyde Park, Illinois enacted a similar licensing law for concealed weapons carrying, including handguns, in 1876. In this instance, the licenses were granted "by written permission of the Captain of Police."[56] Evanston, Illinois's concealed carry licensing law of 1893 granted licensing issuance authority to the city mayor.[57]

43.    New York City criminalized the carrying of "a pistol of any description concealed on his person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description.[58]

This provision also allowed for non-residents who had occasional business in the city to apply for permits as well.

---

[55] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

[56] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876. Misdemeanors, § 39.

[57] George W. Hess, *Revised Ordinances of the City of Evanston: Also Special Laws and Ordinances of General Interest* 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources.

[58] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources.

44.     An 1884 New York state law barred the carrying or possession of named weapons under the state penal code, including fighting knives and types of clubs, from those under eighteen, unless they possessed a license to do so.[59] Licenses could only be granted for up to one year and were subject to revocation "at the pleasure of the mayor."[60] A year later, the minors permitting law was extended to all cities in the state and included "any pistol or other firearms of any kind."[61] This would have included long guns as it did not specify only concealed carry. In 1891, the state amended the city of Buffalo's Charter to extend permitting to all persons in Buffalocovering handguns and other dangerous weapons.[62]

45.     Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any person to carry" various named weapons, including a "colt" revolver, or to "carry about his person, hid from common observation" any pistol or other named weapon without a permit from the mayor.[63]

46.     Under the heading "License," an 1882 law applying to St. Paul, Minnesota criminalized any concealed weapons carrying, absent such licensing.[64]

---

[59] As early as 1866, New York State enacted a law criminalizing the concealed carrying of certain named weapons: 1866 N.Y. Laws 1523, Ch. 716.

[60] George R. Donnan, *Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5* 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884.

[61] George R. Donnan, *Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5.* Fourth Edition 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources.

[62] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

[63] Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206, SEC. 14. 1881.

[64] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 289, Image 295 (1884) available at The Making of Modern Law:

47.     An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed weapon" unless the person obtained a permit from the city mayor.[65]

48.     New Haven, Connecticut enacted a general anti-carry law in 1890, extending to pistols, though it allowed concealed carry if the person first obtained a permit either from the mayor or police superintendent.[66]

49.     Oakland, California enacted a similar law in 1890 making it unlawful "to wear or carry concealed about his person" a pistol or other listed weapon unless the person obtained a permit from the mayor. The permit was good for up to a year, and could be granted to "any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person."[67] The California cities of Stockton (1891)[68] and Fresno (1896)[69] did the same.

50.     A law passed by the U.S. Congress in 1892 for the District of Columbia criminalized the concealed carry of "any deadly or dangerous weapons," including pistols, unless

---

Primary Sources. 1882.

[65] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC. 14.

[66] Charles Stoers Hamilton, *Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City* 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

[67] Fred L. Button, ed., *General Municipal Ordinances of the City of Oakland, California* (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.

[68] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.

[69] L. W. Moultrie, *Charter and Ordinances of the City of Fresno* 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

granted a permit by a judge of the police court "for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof. . . ."[70]

51.    Florida's 1893 law made it "unlawful to carry or own a Winchester or other repeating rifle without first taking out a license from the County Commissioner. . . ."[71] In addition, the law specified that the applicant "shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners," along with "a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same."[72]

52.    Montana enacted a wide-ranging state licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor . . . ."[73]

53.    A state law in Nebraska granted the mayor of Lincoln the authority to issue concealed carry weapons licenses good for a year "at his pleasure" in 1895.[74]

---

[70] Washington D.C. 27 Stat. 116 (1892), ch. 159.

[71] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, ch. 4147, §§ 1-4.

[72] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, ch. 4147, §§ 1-4.

[73] Decius Spear Wade, *The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force* 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.

[74] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

54.     The city of Spokane, Washington criminalized the concealed carrying of "either a revolver, pistol or other fire-arms" unless persons obtained a "special written permit from the Superior Court" to do so.[75]

55.     Milwaukee, Wisconsin enacted a permitting system in 1896 for persons to carry various otherwise barred dangerous weapons including "any pistol or colt." The city police chief granted a license if "it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon." The chief could also "revoke such permit at any time."[76]

56.     In the twentieth century, permitting accelerated, spread, and broadened. In 1905, New Jersey enacted a state law licensing concealed weapons carrying for a year "unless sooner revoked by the officer or body granting the same."[77] Licensing was extended to long guns— machine guns and automatic rifles—in several states including Arkansas (1931, 1935),[78] Connecticut (1935),[79] Illinois (1931),[80] Minnesota (1933),[81] Montana (1935),[82] New Jersey in

---

[75] Rose M. Denny, ed., *The Municipal Code of the City of Spokane, Washington* (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895.

[76] Charles H. Hamilton, ed., *The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix* (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. Chapter XX. Misdemeanors. Section 25.

[77] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

[78] 1931 Ark. Laws 704, 704-6; 1935 Ark. Laws 171, 171-75.

[79] 1935 Conn. 389, 389-94.

[80] 1931 Ill. Laws 452, 453.

[81] 1933 Minn. Laws 231.

[82] 1935 Mont. Laws 57, 57-60.

28

1927[83] and 1934,[84] Ohio (1933),[85] South Carolina (1934),[86] South Dakota (1933),[87] Virginia (1934),[88] West Virginia (1925),[89] and Wisconsin (1933).[90] In 1906, a Massachusetts state law noted that prosecution for carrying "a loaded pistol or revolver" did not apply to those with a license.[91] It extended licensing to a variety of guns in 1927.[92] In 1908, Virginia enacted a dangerous weapons concealed carry permit law, with permits granted for one year "upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon."[93] It extended the permitting process in 1926.[94] Georgia enacted a detailed handgun permitting system in 1910.[95] New York State established comprehensive handgun licensing in 1911.[96]

---

[83] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[84] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

[85] 1933 Ohio Laws 189-90.

[86] !934 S.C. Acts 1288, 1288-89.

[87] 1933 S.D. Sess. Laws 245, 245-47.

[88] 1934 Va. Acts 137, 137-39.

[89] 1925 W.Va. Acts 1st Extraordinary Sess. 24, 30-31.

[90] Uniform Machine Gun Act, ch. 164, Wis. Stat. 164.01 (1933).

[91] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[92] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[93] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

[94] 1926 Va. Acts. 285-87, ch. 158.

[95] Orville Park, Park's *Annotated Code of the State of Georgia 1914*, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910.

[96] 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §§1-2.

57.    A paradigmatic example of a modern permitting system was enacted in Montana

in 1918:

> [E]very person within the State of Montana, who owns or has in his possession any fire arms or weapons shall make a full, true, and complete verified report upon the form hereinafter provided to the sheriff of the County in which such person lives, of all fire arms and weapons which are owned or possessed by him or her or are in his or her control, and on sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered.[97]

---

[97] 1918 Mont. Laws 6-7,9, An Act Entitled "An Act Providing for the Registration of All Fire Arms and Weapons and Regulating the Sale Thereof and Defining the Duties of Certain County Officers and Providing Penalties for a Violation of the Provisions of This Act," ch. 2, §§ 1, 3, 8.

Thereafter, permitting was enacted in states including Hawaii,[98] Indiana,[99] Michigan,[100] New Hampshire,[101] North Carolina,[102] North Dakota,[103] Ohio,[104] Oregon,[105] Pennsylvania,[106] Rhode Island,[107] and South Carolina.[108]

### B.    PERMITS FOR DISCHARGE OF FIREARMS, USE OF EXPLOSIVES, AND LICENSING OF GUNPOWDER

---

[98] 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[99] 1925 Ind. Acts 495, 495-98.

[100] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[101] 1923 N.H. Laws 138.

[102] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[103] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[104] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[105] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-471.

[106] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[107] 1927 (January Session) R.I. Pub. Laws 256.

[108] 1934 S.C. Acts 1288.

58.    Historical laws pertaining to the licensing or permitting of firearm discharges, the use of explosives, and gunpowder are similar to current licensing and background check requirements.

59.    As noted above, at least 26 states enacted licensing mechanisms to allow firearms and like discharges under certain circumstances. Generally speaking, firearms discharge licensing pertained to any firearm, not just handguns. From the 1700s to 1860, at least 13 states enacted discharge licensing authority to local officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various activities in the city including "firing a Gun without license."[109] An act pertaining to the entire colony from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's special license."[110] Another Philadelphia ordinance to prevent "mischief [that] may happen by shooting of guns" or setting off fireworks, criminalized such activities unless individuals first obtained a "governor's special license."[111] A 1750 law did the same for the District of Southwark (Penn.),[112] as did a

---

[109] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

[110] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[111] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

[112] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

colony-wide law also enacted in 1750.[113] In 1824, permission from the president of the board of commissioners was required for anyone seeking to test through firing any gun, cannon, or similar weapons in certain sections of Philadelphia.[114]

60.    Charleston, South Carolina enacted an ordinance in 1802 similar to those of Philadelphia where Commissioners of the Streets would grant a license for gun firing and fireworks "at times of public rejoicing" and at specified locations.[115] New Hampshire enacted a discharge permit system for Portsmouth in 1823.[116] New York State enacted a law in 1824 that allowed the Schenectady mayor or other city officials to grant permission for discharge of any gun or various fireworks.[117] Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that "the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered."[118] New London, Connecticut singled out "some public day of review" in an 1835

---

[113] 1750 Pa. Laws 208.

[114] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

[115] Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802.

[116] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

[117] *Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady* 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

[118] The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823.

law as a permissible reason for issuing a discharge permit,[119] and New Haven enacted a similar law in 1845.[120] The same was enacted for Quincy, Illinois in 1841,[121] Jeffersonville, Indiana in 1855,[122] and Richmond, Virginia in 1859.[123] Another 20 states enacted such laws from the end of the Civil War up to the end of the 1800s (not including states that enacted laws both before and after Civil War: Alabama, Arkansas, California, Colorado, Louisiana, New Jersey, Oregon, Texas, Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states (see Exhibits D and E).

61.    In addition, gunpowder was widely and extensively regulated in the colonies and states. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century.[124] One element of this regulation was gunpowder licensing; at least 22 states enacted such licensing from the 1700s through the early 1900s (see Exhibits D and E).

---

[119] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835.

[120] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, ch. 10.

[121] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841.

[122] W. G. Armstrong, *The Ordinances and Charter of the City of Jeffersonville* 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855.

[123] The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859.

[124] Mark Anthony Frassetto, "Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment," *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society,* Jacob Charles, Joseph Blocher & Darrell Miller, eds. (NY: Oxford University Press, 2023), 195-212; Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510; Adam Winkler, *Gunfight* (NY: W.W. Norton, 2011), 116-17, 286.

### C.    COMMERCIAL LICENSING AND RECORDING

62.    A number of licensing and recording laws demonstrate a tradition of placing requirements on vendors, in addition to the purchasers themselves.

63.    As noted, a total of at least 21 states enacted commercial licensing laws with 16 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (some states enacted laws in both centuries).

64.    The earliest commercial licensing law was an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans unless they obtained a license from the governor.[125] A century later, a Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[126] An 1854 law for San Francisco, California licensed commercial shooting galleries.[127] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements.

### D.    WEAPONS SELLERS RECORDING PURCHASES

65.    Aside from direct licensing of weapons purchasers by a government official or entity, at least 17 states required those who sold or otherwise transferred guns (mostly handguns) or other weapons to others to record information about the buyer, with that information to be

---

[125] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

[126] Samuel A. Ettelson, *Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916* 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[127] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

maintained and subject to possible later examination. This regulatory mechanism put the burden

of information collection and maintenance on the seller or dealer, rather than directly on the

government, though it served the same purpose: to acquire and maintain information about those

who obtained the weapons in question and when, for future reference or inspection by

government officials or others. In some instances, these requirements existed along with direct

governmental licensing.

66.    In 1885, Illinois enacted this registration requirement for weapons dealers:

> All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[128]

With minor variations, this law was typical of such requirements. For example, a 1911 Colorado

law offered this detailed set of instructions:

> Every individual, firm or corporation engaged . . . in the- retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[129]

67.    The 1911 New York law discussed above required every person selling any

handgun to maintain a register "at the time of sale, the date of sale, name, age, occupation and

residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre,

---

[128] Merritt Starr & Russell H. Curtis, *Annotated Statutes of the State of Illinois in Force* (1885), Criminal Code, ch. 38, ¶ 90.

[129] 1911 Colo. Sess. Laws 408, Section 3.

make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm."[130] The purchaser also had to produce a permit at the time of the transaction, with the seller to note the permit information.

### E.    LICENSING PERTAINING TO NAMED GROUPS

68.    The licensing of "Named Groups" referenced in Exhibit D includes the granting of weapons licenses to non-state residents, non-citizens, minors (generally when authorized by the guardian), and Native Americans/Indigenous people. Those found to be intoxicated could lose their license to carry a concealed weapon. These licensing laws often did not list criteria for granting licenses, or if they did, the criteria were very general, leaving local officials great discretion as to the granting of licenses. Licensing the sale of weapons to Native Americans might seem paradoxical, since white leaders fought protracted conflicts with Native tribes from the 1600s through the end of the nineteenth century. But whites also traded arms with Native tribes throughout this entire period, as they sought profitability, access to highly desired goods made available by Native Americans, and security alliances with some Native tribes through the supplying of weapons. This steady and enduring trade revealed "the high degree of interdependence between Indians and Euro-Americans."[131]

69.    As for licensing related to enslaved persons and free African Americans (listed separately in Exhibit D), found in Southern and border states, it is well understood that white racist regimes before the Civil War were frantic to keep weapons out of the hands of enslaved

---

[130] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

[131] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16 and passim.

persons.[132] The laws listed here are all instances when enslaved persons or free persons of color were allowed to have possession of weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners. And as the data presented here demonstrate, of the many weapons permitting laws enacted during this time, only a very small percent pertained to African Americans: of the 280 permitting laws listed in Exhibit D, 17 (6.1%) pertained to African Americans.

70.     The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

F.     THE LESSONS OF LICENSING

71.     The foregoing analysis demonstrates that licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons, extending to gun ownership as well as every aspect of sales. With some exceptions, the primary focus was on handguns for the obvious reason that they were the weapons that posed the most significant threat to public safety and good order from the 1700s through the early 1900s. Long guns posed no similar threat during this time, even though some anti-carry/licensing laws extended to all firearms, not just concealable handguns. (Note that firearm discharge licensing laws generally applied to all guns, not just handguns.)

---

[132] Carl T. Bogus, *Madison's Militia* (NY: Oxford University Press, 2023).

72.    Moreover, when long guns did appear in appreciable numbers in civil society and began to pose a criminal and public safety problem, prohibitions and licensing were rapidly enacted. The long guns in question—the Tommy gun, the BAR, and sawed-off shotguns (i.e. long guns modified after purchase)—were restricted in at least 32 states in the 1920s and early 1930s, and between 8 and 11 states imposed similar restrictions on semi-automatic long guns during this same time (see Exhibit F). Given the wide-ranging and extensive nature of licensing in America in the 1800s and early 1900s, the notion of extending licensing to long guns when the need or demand to do so arose is, in regulatory terms, an incrementally small step.

## V.    CONCLUSION

73.    This report examines three broad types of laws, spanning nearly 300 years of American history: laws that restricted weapons carrying (including concealed carry in 50 states, open carry in at least 30 states, and long gun carry in at least 22 states); laws that criminalized weapons brandishing and display in at least 36 states; and laws providing for the licensing of some of these activities enacted in 47 states. These numerous and varied laws, and types of laws, make clear that the default in American history was weapons regulation and restriction, especially once individuals left their domiciles with a weapon.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 25, 2024, at Williamsburg, Virginia.

*Robert J. Spitzer*

Professor Robert Spitzer