# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **MICHAEL P. O'NEIL, DANIEL** | : | |
| **PATTERSON, DONALD LABRIOLE** | : | |
| **JOSEPH PATTON, RICHARD COOK** | : | |
| **RICHARD LAPORTE and PETER** | : | |
| **TREMEENTOZZI** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **C.A. No. 23-cv-70** |
| | : | |
| **PETER F. NERONHA, in his official** | : | |
| **capacity as Attorney General of the State** | : | |
| **of Rhode Island, and THE STATE OF** | : | |
| **RHODE ISLAND** | : | |
| **Defendants** | : | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiffs seek an injunction compelling Defendants to provide them with concealed carry (CCW) permits issued by the Rhode Island Attorney General. Plaintiffs seek these permits because Rhode Island law requires them for the Plaintiffs to engage in open, public carry of handguns. This case presents a highly ironic situation in that Second Amendment advocates, such as Plaintiffs, often oppose permitting requirements and other restrictions on their gun rights, and gun control advocates, such as Defendant Neronha, often promote such restrictions. Here, however, Plaintiffs—all law-abiding citizens—are attempting to obtain permits and Neronha is fighting them tooth and nail. Moreover, while there has been abundant recent litigation about concealed carry rights, there has been relatively little about open carry and, so far, it is inconclusive.

Defendants wrongfully denied Plaintiffs State-issued CCW permits based on their supposed lack of "need" for one because the Plaintiffs had CCW permits issued by Rhode Island municipalities. However, the municipal permits do not allow the Plaintiffs to engage in open carry.

1

Plaintiffs submit these denials violate the Second Amendment of the United States Constitution as indicated in the Supreme Court's decision in New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022) ("Bruen"), and subsequent case law respecting the historical tradition of firearms regulation. Plaintiffs' historical expert, Clayton Cramer, has set forth in his Declaration how there were very few legislative attempts to limit open carry during the relevant time period, 1791 to 1868. Even then, that legislation was amended or found unconstitutional by state supreme courts.  By contrast, Defendants' experts rely on arguments either expressly rejected in Bruen or based on statutes outside the relevant period.

Moreover, Defendants based their denial on a statute, R.I.Gen.L. 11-47-18(a), and a set of their own guidelines that violate the Due Process Clause of the Fourteenth Amendment because the statute and the guidelines are void for vagueness and overbroad and the Attorney General's application of them is arbitrary and capricious.

## STATEMENT OF FACTS

Plaintiffs are all Rhode Island residents and over the age of 21.  (See Plaintiffs' Statement of Undisputed Facts, Exhibits 1 to 7). Plaintiffs are not felons or fugitives from justice.  They are not in community confinement or otherwise subject to electronic surveillance. They are not mentally incompetent, not a drug addict or a drunkard, and not an immigrant who entered or remained in the country illegally. (Id.) Plaintiffs have all obtained a so-called "blue card" from the Rhode Island Department of Environmental Management that permits them to purchase and possess a handgun and ammunition. (Id.) The Rhode Island Office of the Attorney General has previously issued concealed carry permits (CCW) to plaintiffs.  (Id.). Plaintiffs also had CCW permits issued by various municipalities in Rhode Island.  (Id.) Plaintiffs attempted to renew their RIAG CCW permits but were denied by the current Attorney General because they had municipal

CCW permits and the RIAG's Office said they did not "need" the RIAG permits. For various reasons, Plaintiffs would like the option to engage in open carry of firearms which, under Rhode Island law, they can only do if they have the RIAG permit.

Rhode Island's dual licensing system for public carry of firearms is apparently unique among American jurisdictions.  Under the Firearms Act, a person who wants to engage in concealed carry of a firearm can obtain a permit from either the Rhode Island Attorney General or a municipality, R.I.Gen.L. §§ 11-47-18 and 11-47-11, respectively. However, a person who wants to engage in "open," public carry of a firearm must obtain the RIAG permit:  "<u>The attorney general</u> <u>**may**</u> issue a license or permit to any person twenty-one (21) years of age or over to carry a pistol or revolver, <u>**whether concealed or not**</u>, upon his or her person <u>**upon a proper showing of need**</u>, subject to the provisions of §§ 11-47-12 and 11-47-15; that license or permit may be issued notwithstanding the provisions of § 11-47-7." (emphasis added). R.I.Gen.L. §11-47-18(a). The provision by which municipalities have authority to issue CCW permits states, in part:

> The licensing authorities of any city or town <u>**shall**</u>, upon application of any person twenty-one (21) years of age or over…issue a license or permit to the person <u>**to carry concealed upon his or her person a pistol or revolver everywhere within this state**</u> for four (4) years from date of issue, if it appears that the applicant has good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, and that he or she is a suitable person to be so licensed.  (emphasis added).

R.I.Gen.L. § 11-47-11(a).

The Firearms Act prohibits any person from carrying any pistol or revolver in public, whether concealed or open, unless the person has a permit authorized under the Act.  R.I.Gen.L. § 11-47-8(a). Violation of this prohibition is a felony punishable by up to ten years in prison and a ten thousand dollar fine.  <u>Id.</u>

The Firearms Act does not define "need." The Attorney General has not promulgated regulations that define "need." The Attorney General's Department has created a set of factors in its "Weapons Carry Permit Packet" which the Department purportedly uses to determine whether an applicant has made a proper showing of "need."[1]  These factors include:

(1) Has the applicant demonstrated a specific articulable risk to life, limb, or property? If so, has the applicant demonstrated how a pistol permit will decrease the risk?

(2) Can the applicant readily alter his or her conduct, or undertake reasonable measures other than carrying a loaded firearm, to decrease the danger to life, limb, or property?

(3) Are there means of protection available to the applicant other than the possession of a loaded firearm that will alleviate the risk to his or her person or property?

(4) Has the applicant demonstrated the skill, training, and ability to properly use a firearm in accordance with Rhode Island laws?

(5) Has the applicant presented a plan to properly secure the firearm so that it does not fall into unauthorized hands?

(6) How greatly will the possession of a loaded firearm by the applicant increase the risk of harm to the applicant or to the public?

(7) Has the applicant demonstrated that he or she will not use the firearm for an unlawful or improper purpose, and that he or she has not used a firearm for an unlawful or improper purpose in the past?

---

[1]    The current version of the Packet is available online at: https://riag.ri.gov/sites/g/files/xkgbur496/files/documents/PERMIT-APPLICATION-2020.pdf.

(8) Does past unlawful, dangerous, or violent conduct of the applicant justify denial at the Attorney General's discretion even if it is not sufficient to disqualify the applicant as a matter of law from possessing a firearm?

(9) Has the applicant been issued a protective order pursuant to chapter 15-5, chapter 15-15, or chapter 8- 8.1 of the general laws?

(10) Any and all other factors deemed lawful and appropriate by the Attorney General to demonstrate that the applicant is or is not a person suitable to possess a loaded firearm in public.

However, the information packet also states there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue or deny a pistol permit."

Regulation of open carry of arms is rare in American history.  What few examples are often cited are usually laws that targeted a particular group regarded as dangerous, a particular dangerous action of which carrying arms was only *one* element, or where the laws were short-lived and whose relevance has been explicitly rejected by <u>Bruen</u>. (Plaintiff's SUF Exhibit 8, Cramer Declaration, ¶ 5). State supreme courts in the era before 1868 often upheld concealed carry regulation because bans on concealed carry did not prohibit open carry.  As long as one or the other remained lawful, the right to armed self-defense was preserved.  This understanding persisted after 1868, sometimes with absurd results. (<u>Id.</u>, ¶ 6).

Laws regulating *open* carrying of arms are surprisingly recent.  Even when such laws existed in the Framing Era, they were usually short-lived, atypical, and narrowly focused on particular abuses of carrying arms; particular groups carrying arms; or particular categories of arms; they were not general bans on open carry.  (<u>Id.</u>, ¶ 7).

Laws regulating *concealed* carry of firearms are more common in the era before 1868. State supreme courts were often asked to judge the constitutionality of such laws, usually with respect to state constitutional right to keep and bear arms provisions.   (In the case of Tennessee and Arkansas, these provisions included language that seems to have referred only to "common defence," and were interpreted far more narrowly than the Second Amendment.)  When the courts have upheld such concealed weapon laws, they have usually done so because open carry remained lawful. (Id., ¶ 8).

There are very few laws in the Framing Era that regulated the carrying of arms.  The East New Jersey law of 1686 prohibited dueling and its associated actions ("send any challenge in writing, by word of mouth, or message"), *concealed* carry ("privately to wear any pocket pistol, skeines, stilladers, daggers or dirks") as well as a ban on riding or going "armed with sword, pistol, or dagger."[2]  The latter was certainly a ban on open carry, but as Bruen observed, the law was both short-lived and limited to "planters":

> First, although the "planter" restriction may have prohibited the public carry of pistols, it did not prohibit planters from carrying long guns for self-defense — including the popular musket and carbine. … Second, it does not appear that the statute survived for very long. By 1694, East New Jersey provided that no slave "be permitted to carry any gun or pistol ... into the woods, or plantations" unless their owner accompanied them. Grants and Concessions 341. If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence. Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey. See 1 Nevill, Acts of the General Assembly of the Province of New- Jersey (1752). At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.[3]

---

[2]  An Act Against Wearing Swords, &c., ch. 9, in GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 289-290 (2d ed. 1881).

[3]  New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 2111, 2145 (2022).

(Id., ¶ 9). The law also exempted "all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably."[4]  This was a law aimed at a particular class and not a *general* ban on open carry. (Id., ¶10).

Case law from the early Republic continued to distinguish the carrying of arms from affray (actions that cause terror). Simpson v. State (Tenn. 1833) was a case where the defendant was indicted for "with force and arms,...being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land." Yet when the defendant appealed, alleging "the record does not present any charge that is known to the law, as cognizable in our courts by indictment," the Tennessee Supreme Court ruled in Simpson's favor because, citing Blackstone:

> A phrase, from a affrayer to terrify, are the fighting of two or more persons, in some public place, to the terror of His Majesty subjects; for if the fighting being in private it is no affray, but an assault. It will be observed, that according to this definition of an affray by Blackstone, three things are necessary to constitute it. First: there must be fighting. Second: this fighting must be by or between two or more persons. And, Third: it must be in some public place to cause terror to the people.[5]

(Id., ¶ 12). Whatever fear Simpson caused, he did not fight anyone and his mere "with force and arms, being arrayed in a warlike manner" was not a crime alone. (Id., ¶ 13).

In State v. Huntley (N.C. 1843), the defendant was not simply carrying arms:

---

[4] An Act Against Wearing Swords, &c., op cit. 290.
[5] Simpson v. State, 13 Tenn. (5 Yer.) 356, 357, 358 (1833), https://books.google.com/books?id=RFNI4BifGs8C&newbks=1&newbks_redir=0&dq=%22But%20suppose%20it%20to%20be%20assumed%20on%20any%20ground%2C%20that%20our%20ancestors%20adopted%20and%20brought%20over%20with%20them%2C%20this%20English%20statute%22&pg=PA357#v=onepage&q=%22But%20suppose%20it%20to%20be%20assumed%20on%20any%20ground,%20that%20our%20ancestors%20adopted%20and%20brought%20over%20with%20them,%20this%20English%20statute%22&f=false, last accessed November 27, 2024.

> In the investigation before the jury it appeared, among other things, that the defendant was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff (the person named in the indictment), armed with a double-barreled gun, and on some of those occasions was heard to declare, "that if James H. Ratcliff did not surrender his negroes, he would kill him"; at others, "if James H. Ratcliff did not give him his rights, he would kill him";[6]

(Id., ¶ 14). Even in this case, the North Carolina Supreme Court distinguished the Statute of Northampton's prohibition of "unusual weapons":

> It has been remarked that a double-barrel gun, or any other gun, cannot in this country come under the description of "unusual weapons," for there is scarcely a man in the community who does not own and occasionally use a gun of some sort.[7]

(Id., ¶ 15). While decrying the regular wearing of arms "in our peace-loving and law-abiding State," the Court admitted:

> But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun, per se, constitutes no offense. For any lawful purpose — either of business or amusement — the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people.[8]

(Id., ¶ 16).

There is a 1795 Massachusetts law that directs justices of the peace to have arrested "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go *armed offensively*." [emphasis added]    The law did not prohibit any of these actions but directed that the

---

[6] State v. Huntley, 3 N.C. 418 (1843),
https://www.claytoncramer.com/primary/rkbadecisions/Huntly1843.pdf , last accessed November 27, 2024.
[7] Id. at 422.
[8] Id. at 422, 423.

justice of the peace "shall require of the offender to find sureties for his keeping the peace, and being of the good behaviour." [9] Again, the law is aimed narrowly at those "armed offensively;" a general ban on open carry would be much simpler of a law.  Even then, it does not prohibit being armed; at most it makes such persons at risk of forfeiting the bond for "misbehaviour." (Id. ¶ 17).

An 1801 Tennessee law often cited out of context is "An act for the restraint of idle and disorderly persons."[10]  Section 6 reuses the language of the Statute of Northampton to prohibit "any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person." Even then, it only directs judges to "bind such person or persons to their good behavior, and if he

---

[9] 2 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER, 28, 1780 TO FEBRUARY 28, 1807, WITH THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND OF THE COMMONWEALTH, PREFIXED 652-653 (Boston: printed by J. T. Buckingham for Thomas & Andrews, 1807), https://books.google.com/books?id=Dh8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=LA WS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%20FROM%2 0NOVEMBER%2C%2028%2C%201780%20TO%20FEBRUARY%2028%2C%201807%2C% 20WITH%20THE%20CONSTITUTION%20OF%20THE%20UNITED%20STATES%20OF%2 0AMERICA%2C%20AND%20OF%20THE%20COMMONWEALTH%2C%20PREFIXED&p g=PA652#v=onepage&q=LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASS ACHUSETTS%20FROM%20NOVEMBER,%2028,%201780%20TO%20FEBRUARY%2028, %201807,%20WITH%20THE%20CONSTITUTION%20OF%20THE%20UNITED%20STATE S%20OF%20AMERICA,%20AND%20OF%20THE%20COMMONWEALTH,%20PREFIXED &f=false , last accessed November 27, 2024.  Defendants cited this law with chapter numbers and page numbers that do not show where this law appears in official session laws.  I have attempted to locate the source for the image on which Defendants rely.  That secondary source, HeinOnline, has given several erroneous sources, or sources which cannot be located with their incomplete information.  Traceability seems inadequate for any serious scholarly work.

[10] For an example of this out of context quotation, see Judge Edward Scott, *Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820*, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources, in DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/judge-edward-scott-laws-of-the-state-of-tennessee-including-those-of-north-carolina-now-in-force-in-this-state-from-the-year-1715-to-the-year-1820-inclusive-page-710-image-714-vol-1-1821-the/ , last accessed July 17, 2024.

or they fail to find securities, commit him or them to jail."[11] (Id., ¶ 18). Reading the entire statute gives some context suggesting that the law targeted *one* disreputable group, and was not a general ban:

> Whereas it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons…. That any person or persons who have no apparent means of subsistence or neglect applying themselves to some honest calling for the support of themselves and families every person so offending, who shall be found sauntering about neglecting his business, and endeavoring to maintain himself by gaming or other undue means, it shall and may be lawful any justice of the peace or court of the county wherein such person may be found, on due proof made, to issue his warrant for such offending person, and caused him to be brought before such said justice…[12]

(Id., ¶ 19).  All sections of the law are directed at these "wandering, disorderly and idle persons" and attempts to prevent their wandering without permanent residence or respectable employment. (Id., ¶ 20). The law appears narrowly focused on vagrant gamblers and even then § 6 only requires posting a bond contingent on "their good behaviour," to avoid jail.  This is again, a prohibition on concealed carry and open carry only if "to the terror of the people." (Id., ¶ 21).

Another often misrepresented law is "1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof."  This statute prohibits "if any persons to the number of twelve, or more, being armed with clubs, or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously, or tumultuously assembled."[13]  It was not a crime for an individual to be armed or even eleven to be

---

[11] 1801 Tenn. Acts ch. 22, § 6 at 260-261.  There is no online copy of this law although § 6 appears in 1 STATUTE LAWS OF THE STATE OF TENNESSEE 10 (1831), https://books.google.com/books?id=OhxEAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22 any%20person%20or%20persons%20shall%20publicly%20ride%20or%20%E2%80%9D&pg=P A10#v=onepage&q=%22any%20person%20or%20persons%20shall%20publicly%20ride%20or %20%E2%80%9D&f=false , last accessed November 27, 2024.
[12] 1801 Tenn. Acts ch. 22, § 1 at 259-260.
[13] 1 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 346-7 (1807).,

armed.  There must be at least twelve armed to constitute a crime. (Id., ¶ 22). Why was this law written in such a way that it only applied to bodies of twelve or more armed men or groups of thirty or more even if not armed?  "Whereas the provision already made by law for the preventing routs, riots, and tumultuous assemblies and the evil consequences thereof have been found insufficient."  This law was passed October 28, 1786, shortly after Shays' Rebellion started disrupting courts in western Massachusetts.[14]  (Id., ¶ 23).

In the antebellum period challenges to concealed weapon laws often ended up in state supreme courts.  While these decisions almost always upheld such laws, the way in which the courts resolved the apparent conflict between "right to keep and bear arms" provisions was quite important for open carry. (Cramer Declaration, ¶ 24). State v. Reid (Ala. 1840) upheld a ban on concealed carry.  The decision admitted that a ban on gun carrying had constitutional limits:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion.  A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.  But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.[15]

---

https://books.google.com/books?id=px8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22 LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%22%20clu bs&pg=PA346#v=onepage&q=%22LAWS%20OF%20THE%20COMMONWEALTH%20OF% 20MASSACHUSETTS%22%20clubs&f=false , last accessed November 27, 2024.

[14] John Bach McMaster, 5 A HISTORY OF THE PEOPLE OF THE UNITED STATES, FROM THE REVOLUTION TO THE CIVIL WAR 306 (1884).

[15] State v. Reid, 1 Ala. 612, 615, 616, 617 (1840), https://books.google.com/books?id=yUtNAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22 A%20statute%20which%2C%20under%20the%20pretence%20of%20regulating%2C%20amoun ts%20to%20a%20destruction%20of%20the%20right%2C%20or%20which%20requires%20arm s%20to%20be%20so%20borne%20as%20to%20render%20them%20wholly%20useless%20for %20the%20purpose%20of%20defence%2C%20would%20be%20clearly%20unconstitutional.% 22&pg=PA616#v=onepage&q=%22A%20statute%20which,%20under%20the%20pretence%20

(Id., ¶ 25).

The Georgia Supreme Court in 1846 reviewed a very unclearly written law regulating sale and carrying of arms of many types.  Because the Georgia Constitution had no right to keep and bear arms provision, the Georgia Supreme Court ignored Barron v. Baltimore (1833), and decided the Second Amendment limited state laws:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void...[16].

(Id., ¶ 26).

Several postbellum Southern states attempted to discourage not only the concealed carrying of arms, but open carry as well.  Because the Arkansas and Tennessee state constitutions had right to bear arms provisions that referred to "the common defence," these laws limited the categories of arms that might be openly borne, often allowing only "such as are commonly used in the United States military and naval service."  These could be privately owned as long as they were the same as were used by the U.S. military. (Id., ¶ 27).

The Arkansas Supreme Court heard an appeal involving a man convicted of carrying a "large army size six shooter, a revolving pistol, 44 caliber, eight inches in the barrel, such as is commonly used in warfare" for the purpose of pig hunting.  The trial court refused to allow a statement either by the owner of the pistol or the defendant as to the purpose of having the revolver

---

of%20regulating,%20amounts%20to%20a%20destruction%20of%20the%20right,%20or%20wh ich%20requires%20arms%20to%20be%20so%20borne%20as%20to%20render%20them%20wh olly%20useless%20for%20the%20purpose%20of%20defence,%20would%20be%20clearly%20 unconstitutional.%22&f=false , last accessed November 27, 2024.
[16] Nunn v. State, 1 Ga. 243, 250, 251 (1846).

and refused to charge the jury that carrying "an army size pistol" could not be regulated by Arkansas law. (Id., ¶ 28). The Arkansas Supreme Court overturned the trial judge's instructions:

> But to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.
>
> If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.[17]

(Id., ¶ 29).

The Arkansas Legislature responded to the Wilson and Holland decisions by passing a new weapons law. The Act of April 1, 1881, prohibited "the carrying of army pistols, except uncovered and in the hand."[18] In Haile v. State (1882), the first two sections of this act (which regulated carrying of handguns) were challenged. The defendant, Haile, was convicted in Pope County of carrying "uncovered, and buckled around his waist... a large revolving pistol, known as the Colts army pistol, and such as is used in the army and navy of the United States..." The Arkansas Supreme Court decided:

> The question is, can the Legislature regulate the mode of carrying any arms which the citizens have the constitutional right to keep and bear for their common defense? We have decided that it may, to some extent, which means that it may, in a reasonable manner, so as, in effect, not to nullify the right, nor materially embarrass its exercise.[19]

---

[17] Wilson v. State of Arkansas, 33 Ark. 557, 558, 559, 560 (1878), https://www.claytoncramer.com/primary/rkbadecisions/WilsonHolland1878.pdf , last accessed November 27, 2024..

[18] Quoted in Haile v. State, 28 Ark. 563, 565 (1882), https://books.google.com/books?id=emhcDci6X8QC&newbks=1&newbks_redir=0&dq=%22%E2%80%9Cthe%20carrying%20of%20army%20pistols%2C%20except%20uncovered%20and%20in%20the%20hand.%E2%80%9D%22&pg=PA565#v=onepage&q=%22%E2%80%9Cthe%20carrying%20of%20army%20pistols,%20except%20uncovered%20and%20in%20the%20hand.%E2%80%9D%22&f=false , last accessed November 27, 2024.

[19] Haile v. State, 38 Ark. 564, 565, 566 (1882).

(Id., ¶ 30). Ordinarily, requiring a person to carry a handgun "uncovered and in the hand" might qualify as brandishing. The important point is that the Arkansas Legislature felt so limited by Arkansas' constitutional provision that instead of prohibiting open carry, they required revolvers to be carried in the most dangerous manner imaginable. (Id., ¶ 31).

> State v. Wilburn (Tenn. 1872) made much the same distinction. An 1871 law:
>
> > that it shall not be lawful for any person to publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.[20]

(Id., ¶ 32). The Tennessee Supreme Court upheld this very dangerous method of open carry in the same way as the Arkansas Supreme Court because the Tennessee Constitution's arms provision had the same "common defence" qualifier as Arkansas:

> The Legislature has deemed it a proper prevention of crime to regulate the use of this arm by prohibiting the wearing of it or carrying it about the person, privately or publicly, unless it be carried openly in the hands, or unless it be worn or carried by an officer or policeman engaged in his duties, or by a traveler on a journey.[21]

(Id., ¶ 33). The Court recognized that open carry was protected so strongly that only the most absurd regulation that still allowed open carry in some form was constitutional. (Id., ¶ 34).

---

[20] 1871 Tenn. Acts ch. 90, quoted in State v. Wilburn, 7 Tenn. 57. 61 (1872), https://books.google.com/books?id=3XMEAAAAYAAJ&newbks=1&newbks_redir=0&dq=%2 2State%20v.%20Robert%20Wilburn%22&pg=PA57#v=onepage&q=%22State%20v.%20Robert %20Wilburn%22&f=false , last accessed November 27, 2024..
[21] State v. Wilburn, 7 Tenn. 57. 62, 63 (1872).

Some state supreme courts have ruled that concealed carry of arms could be regulated without violating both state *and* federal guarantees of the right to bear arms as long as open carry remained lawful.  Idaho's Supreme Court struck down a territorial era law:

> The second amendment to the federal constitution is in the following language: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."  The language of section 11, article 1 of the constitution of Idaho is as follows: "the people have the right to bear arms for their security and defense, but the legislature shall regulate the exercise of this right of law."  Under these constitutional provisions, the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages.  The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it.  A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state.  But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages.  We are compelled to hold this statute void.[22]

(Id., ¶ 35).

Defendants have two experts with respect to the historical tradition of firearms regulations, Dr. Brennan Rivas and Dr. Michael Spitzer. Their expert declarations are attached to Plaintiffs' SUF as Exhibits 9 and 10, respectively.   Rivas testified that she has found three states, Massachusetts, West Virginia and Texas, and one territory, Idaho, that passed statutes barring the open carry of firearms.  (Plaintiffs' SUF # 41). Rivas said that she was aware of some municipal restrictions on open carry but added that there was no authoritative, searchable database of such regulations.  (Id. # 42).  Rivas found that licensing requirements for open carrying were "generally local."  (Id. # 43).

Rivas found that in Tennessee and Arkansas, open carry was statutorily less restricted than concealed carry as it was thought that open carry was less dangerous than concealed carry because

---

[22] In Re Brickey, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902).

other people could see who had a weapon and avoid them.  (Id. # 44).  Rivas found that people engaged in public carry "in preparation for an unforeseen potential emergency."  (Id. # 45).

Rivas found in her research that the most common constraint on public carry was social disapproval of the practice.  She cited newspaper articles calling on people to restrain from public carry.  As a result, people more frequently engaged in concealed carry.  (Id. # 46).

Defendants' other expert, Robert Spitzer, testified that he did not specifically address in his expert declaration whether or not Rhode Island's regulatory scheme is consistent with a historical tradition of open carry regulations.  (Id. # 47). Spitzer said he has not been asked to render an opinion on that.  (Id. # 48). Spitzer testified he could not specifically recall a previous case in which he has previously been retained as an expert that involved either concealed carry or open carry.  (Id., p. 49).

For the period from the early 1800s up to 1860, Spitzer's Declaration identifies the District of Columbia and what he says are four states that enacted laws restricting the carrying of named weapons, whether open or concealed, Georgia, Florida, the borough of York, Pennsylvania, and Hawaii.  (Id. # 50). Spitzer acknowledged that the Georgia Supreme Court struck down the statute's restriction on open carry as unconstitutional.  (Id. # 51). Spitzer agrees that the Massachusetts act passed in 1751 did not prohibit an individual from engaging in either open or concealed carry.  (Id. # 52). Most of the statutes that Spitzer identifies as purportedly restricting public carry of firearms were promulgated after 1868. (Id., # 53-55). Some of the statutes Spitzer identifies for the period 1791 to 1868 are surety laws. (Id., # 56).  Some of the statutes Spitzer identifies were promulgated by territories or a foreign country (Hawaii).  (Id. # 55).

## STANDARD OF REVIEW

The Eleventh Circuit has said:

> To obtain a permanent injunction, a party must show:  (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if issued, the injunction would not be adverse to the public interest.

Thomas v. Bryant, 614 F.3d 1288, 1317 (11th Cir. 2010).

## ARGUMENT

I.    **Plaintiffs Have Demonstrated Violations Of Their Second And Fourteenth Amendment Rights.**

   A.  **Under the Second Amendment, Plaintiffs Have A Constitutional Right To Engage In Open Carry.**

Plaintiffs have a constitutional right to engage in open carry of firearms. See, New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 587 U.S. 1, 31-32, 38 n. 9 (2022) ("Bruen") (holding that New York could not condition CCW permit on a showing of "need").  While there has been abundant recent federal litigation about concealed carry and other Second Amendment issues, there has been relatively little about a general right to open carry and what there has been is mostly in the Ninth Circuit and is, as yet, inconclusive.  See, Baird v. Bonta, 81 F.4th 1036 (9th Cir. 2023) (reversing district court denial of preliminary injunction where district court failed to consider plaintiffs' likelihood of success on the merits of claim that California statutory restrictions on open carry violate the Second Amendment); Young v. Hawaii, 992 F.3d 765 (9th Cir. 2021) (upholding Hawaii's statutory restrictions on open carry), vacated and remanded for further proceedings in light of Bruen, 142 S.Ct. 2895 (2022); Nichols v. Harris, 17 F.Supp.3d 989 (C.D.Cal. 2014) (upholding California's statutory restrictions on open carry), vacated and remanded for further proceedings in light of Bruen sub nom., Nichols v. Newsom, No. 14-55873, 2022 WL 4295404 at *1 (9th Cir. Sept. 12, 2022); but see, Koons v. Platkin, 673 F.Supp.3d 515, 653-58 (D.N.J. 2023) (holding that New Jersey statutory restriction on functional firearms in vehicles violates right to

open carry). Most decisions upholding open carry come from state supreme courts during the 1800s. See, Bruen, 597 U.S. at 53-54 (collecting cases).

Plaintiffs will first discuss an anomaly of Rhode Island law that presents a wrinkle in the case and the application of Bruen. Rhode Island has a dual track CCW permitting process that appears to be unique in the United States.  Pursuant to one statute, R.I.Gen.L. §11-47-11, a person seeking a CCW permit to engage in concealed carry of a firearm in Rhode Island can apply to any municipality and, subject to certain conditions not applicable here, the municipality "shall" issue the permit.  However, a person can engage in "open" carry of a firearm only by obtaining the CCW permit issued by the Defendants, specifically, through an application to the Attorney General, and a different statute that specifically requires a showing of "need" for that permit.  R.I.Gen.L. § 47-11-18.  The statute does not define "need," but Defendants have interpreted it to permit them to deny Plaintiffs' applications because they already have municipal CCW permits.  That action denies Plaintiffs the constitutional right to engage in open carry.

The Supreme Court implicitly recognized this statutory anomaly in a footnote in Bruen in which it identified the states that have so-called "shall issue" CCW permitting schemes: "Three states—Connecticut, Delaware, and Rhode Island—have discretionary criteria but appear to operate like "shall issue" jurisdictions…R.I.Gen.Laws § 11-47-11 (2002)…Finally, Rhode Island has a suitability requirement, see R.I.Gen.Laws § 11-47-11, but the Rhode Island Supreme Court has flatly denied that the 'demonstration of a proper showing of need' is a component of that requirement.  Gadomski v. Tavares. 113 A.3d 387, 392 (2015)."  587 U.S. at 13 n.1. Because Bruen dealt with permits for concealed carry, the Court did not expressly discuss the issue presented here, i.e., whether a state could condition open carry on a showing of need.  Nonetheless,

the language of <u>Bruen</u> and the nation's historical tradition of firearms regulation demonstrates that the constitutional right of open carry of firearms is <u>more</u> protected than concealed carry.

First, <u>Bruen</u>'s language.  In beginning its discussion of the historical record, the Court commented:

> Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms.  But apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense.  Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense.

<u>Id.</u> at 38.  Throughout the opinion, the majority often refers to a right of "public" carry without distinguishing between concealed carry and open carry.  Nothing in the opinion hints that the former was somehow more protected than the latter.

Moreover, the historical tradition the Court discussed, and which Plaintiffs will supplement, shows that open carry was <u>more</u> protected than concealed carry.  The Court specifically noted state supreme court decisions that upheld restrictions on concealed carry as constitutional so long as they did not prohibit open carry.  <u>Id.</u> at 53-54, citing <u>State v. Reid</u>, 1 Ala. 612, 616, 619-21 (1840); <u>State v. Chandler</u>, 5 La. 489, 490 (1850); <u>Nunn v. State</u>, 1 Ga. 243 (1846); <u>Andrews v. State</u>, 50 Tenn. 165, 187 (1871). In addition, the Court:

- Cited a 1686 New Jersey law which prohibited concealed carry of pocket pistols but "presumably did not by its terms touch the open carry of larger, more common pistols." (Page 48);

- Commented that the Texas Supreme Court had held the state constitution protected open carry, citing <u>State v. Duke</u>, 42 Tex. 455 (1875). (Page 65);

- Noted other state supreme decisions upholding concealed carry regimes that provided for open carry, citing <u>State v. Speller</u>, 86 N.C. 697 (1882); <u>Chatteux v. State</u>, 52 Ala 388 (1875); <u>State v. Shelby</u>, 90 M0. 302, 2 S.W. 468 (1886); <u>Carroll v. State</u>, 28 Ark. 99 (1872). (Page 68, n. 30).

Further, there is abundant other evidence that open carry is constitutionally protected.

However, as a first step of its analysis, this Court must consider what history is relevant to determining the historical tradition upon which <u>Bruen</u> says the analysis must be based. <u>Bruen</u>, at 26. ("The test we set forth in <u>Heller</u> and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."). The <u>Bruen</u> Court initially determined that "[t]he Second Amendment's plain text…presumptively guarantees Petitioners Koch and Nash a right to 'bear' arms in public for self-defense." <u>Id.</u> at 33. The Court then went on to discuss what historical period could be important:

> The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for courts to "reac[h] back to the 14th Century" for English practices that "prevailed up to the period immediately before and after the framing of the Constitution.'" [citation omitted]. It is quite another to rely on an "ancient" practice that had become "obsolete in England at the time of the adoption of Constitution" and never "was acted upon or accepted in the Colonies." [citation omitted].

<u>Id.</u> at 34-35.

The Court continued: "Similarly, we must guard against giving postenactment history more weight than it can bear." <u>Id.</u> at 35. "[W]e recognize that 'where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." [citation omitted]. <u>Id.</u> at 36. "Thus, 'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." [emphasis original] [citation

omitted]. <u>Id</u>. "As we recognized in <u>Heller</u> itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide much insight into its original meaning as earlier sources." [citation omitted]. <u>Id</u>.

The Court concludes this part of its analysis by "acknowledge[ing] there is an ongoing scholarly debate on whether courts should rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope…" <u>Id</u>. at 37. The Court determined it did not need to decide the issue because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." <u>Id</u>. at 38. Thus, the most relevant history is that from 1791 to 1868.

The majority of subsequent federal court decisions concur. See, e.g., <u>Wolford v. Lopez</u>, 116 F.4th 959, 980 (9th Cir. 2024) ("We thus agree with the Second Circuit that, at least when considering the 'sensitive place' doctrine, we look to the right to bear arms <u>both</u> at the time of the ratification of the Second Amendment in 1791 <u>and</u> at the time of the Second Amendment in 1868.") (emphasis original); <u>Lara v. Commissioner Pennsylvania State Police</u>, 91 F.4th 122, 129 (3rd Cir. 2024), vacated on other grds sub. nom, <u>Paris v. Lara</u>, 2024 WL 4486348 (U.S. Oct. 15, 2024) ("The question is 'whether historical precedent from before, during and even after the founding evinces a comparable tradition of regulation.' [citations omitted]. In considering that precedent, however, we discount '[h]istorical evidence that long predates' 1791 and 'guard against giving postenactment history more weight than it can rightly bear.'"); <u>Antonyuk v. Chirmente</u>, 89 F.4th 271, 304-05 (2nd Cir. 2023), vacated on other grds sub. nom., <u>Antonyuk v. James</u>, 144 S.Ct. 2709 (2024); <u>Bevis v. City of Napierville</u>, 85 F.4th 1175, 1199 (7th Cir. 2023) ("[T]he relevant question is what are the modern analogues to the weapons people used for individual self defense in 1791, and perhaps as late as 1868."). This is important because, as Plaintiffs will discuss later,

21

the laws upon which Defendants largely rely were promulgated after 1868, many after the turn of the Twentieth Century.  With respect to laws Defendants argue during the relevant period, the Bruen Court considered them and rejected their significance.

Earlier this year, the Supreme Court revisited the scope of Second Amendment rights in U.S. v. Rahimi, 144 S.Ct. 1889 (2024).  In that case, Rahimi physically abused his girlfriend, C.M., who was also the mother of his child, shot at her as she attempted to flee, and then threatened to shoot her if she reported the incident.  Nonetheless, C.M. went to Texas state court and obtained a restraining order that found Rahimi had committed "family violence," that this violence was likely to occur again, and that Rahimi posed a credible threat to C.M. and their child.  The order barred Rahimi from threatening or contacting C.M. and her family for two years and suspended Rahimi's gun license for two years.

Rahimi subsequently violated the terms of the restraining order and committed other crimes, including shooting at other people.  Pursuant to a warrant, police searched his apartment and found a pistol, a rifle, ammunition, and a copy of the restraining order.  He was prosecuted for violating 18 U.S.C. § 922(g)(8) which prohibits a person from possessing a firearm while subject to a domestic violence restraining order.  The district court denied Rahimi's challenge  that the statute violated his Second Amendment rights but the Fifth Circuit reversed.  The Supreme Court granted the Government's petition for writ of certiorari.

The Supreme Court revisited the holding of Bruen and said:

> [T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. [citation omitted]. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances."  [citation omitted]. Discerning and developing the law in this way is "a commonplace task for any lawyer or judge." [citation omitted].

Id. at 1868. The Court reviewed the history of firearms regulations first in England and then in the United States at the time of the founding to see whether there were analogous regulations to keep firearms out of the hands of persons who had been found dangerous. It determined there was a historical tradition of such regulations, including surety laws and laws prohibiting persons from going armed to "terrify" other people. Notably, though, it specifically rejected the Government's argument that Rahimi could be disarmed simply because he was not "responsible."

> "Responsible" is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law. In Heller and Bruen we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. [citations omitted]. But those decisions do not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.

Id. at 1903. The Court reversed and remanded. Id. Here, Plaintiffs clearly are responsible, law-abiding citizens who enjoy the Second Amendment right of open carry.

Plaintiffs' historical expert, Clayton Cramer, has examined the laws bearing on open crry during the period 1791 to 1868. The facts he found are set forth in the Statement of Facts. To summarize, regulation of open carry of arms is rare in American history. What few examples are often cited are usually laws that targeted a particular group regarded as dangerous, a particular dangerous action of which carrying arms was only *one* element, or where the laws were short-lived and whose relevance has been explicitly rejected by Bruen. (Plaintiffs' SUF, # 9). State supreme courts in the era before 1868 often upheld concealed carry regulation because bans on concealed carry did not prohibit open carry. As long as one or the other remained lawful, the right to armed self-defense was preserved. This understanding persisted after 1868, sometimes with absurd results. (Id. # 10).

Laws regulating *open* carrying of arms are surprisingly recent. Even when such laws existed in the Framing Era, they were usually short-lived, atypical, and narrowly focused on

particular abuses of carrying arms; particular groups carrying arms; or particular categories of arms; they were not general bans on open carry.  (Id. # 11).

Laws regulating *concealed* carry of firearms are more common in the era before 1868. State supreme courts were often asked to judge the constitutionality of such laws, usually with respect to state constitutional right to keep and bear arms provisions.   (In the case of Tennessee and Arkansas, these provisions included language that seems to have referred only to "common defence," and were interpreted far more narrowly than the Second Amendment.)  When the courts have upheld such concealed weapon laws, they have usually done so because open carry remained lawful. (Id. # 12).

Defendants have two experts with respect to the historical tradition of firearms regulations, Dr. Brennan Rivas and Dr. Michael Spitzer. Their expert declarations are to attached to Plaintiffs' SUF as Exhibits 9 and 10, respectively.    Rivas testified that she has found three states, Massachusetts, West Virginia and Texas, and one territory, Idaho, that passed statutes barring the open carry of firearms.  (Id. # 41). However, the Massachusetts act was not a bar on public carry, but rather, a so-called surety law which required that if a person went armed with a pistol or other dangerous weapon "without reasonable cause to fear an assault or other injury…he may on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace…" (Plaintiffs' SUF, Exhibit 9, Rivas Declaration, ¶ 34).  Bruen specifically rejected the argument that surety laws showed a history of banning public carry:

> [T]he surety statutes *presumed* that individuals had a right to public carry that could
> be burdened only if another could make out a specific showing of "reasonable cause
> to fear an injury or breach of the peace…" [citation omitted]. Thus, even on such a
> showing, the surety laws did not *prohibit* public carry in locations frequented by
> the general community.   Rather, an accused arm-bearer "could go on carrying
> without criminal penalty "so long as he post[ed] money that would be forfeited if

24

he breached the peace or injured others—a requirement from which he was exempt if *he* needed self defense." [citation omitted] (emphasis original).

597 U.S. at 56-57.

Moreover, according to her expert declaration, the West Virginia law was passed in 1882, the Texas law was enacted in 1871, and the Idaho Territory passed its law in 1888.  (Id., ¶ 40). Thus, all three were outside the constitutionally relevant time period. Rivas said that she was aware of some municipal restrictions on open carry but added that there was no authoritative, searchable database of such regulations.  (Id. # 42).  Rivas found that licensing requirements for open carrying were "generally local."  (Id. # 43).

Rivas found that in Tennessee and Arkansas, open carry was statutorily less restricted than concealed carry as it was thought that open carry was less dangerous than concealed carry because other people could see who had a weapon and avoid them.  (Id. # 44).  Rivas found that people engaged in public carry "in preparation for an unforeseen potential emergency."  (Id. # 45).

Rivas found in her research that the most common constraint on public carry was social disapproval of the practice.  She cited newspaper articles calling on people to restrain from public carry.  As a result, people more frequently engaged in concealed carry.  (Id. # 46).

Defendants' other expert, Robert Spitzer, testified that he did not specifically address in his expert declaration whether or not Rhode Island's regulatory scheme is consistent with a historical tradition of open carry regulations.  (Id. # 47). Spitzer said he has not been asked to render an opinion on that.  (Id. # 48). As an initial matter, even assuming Spitzer has a relevant opinion, based on F.R.Civ.P. 56(c)(2), Plaintiffs object to Spitzer's testimony as inadmissible under F.R.E. 702 and 703, and to evidence from the Duke Repository of Historical Gun Laws as inadmissible hearsay, as set forth in Plaintiffs' Motion in Limine.

Even so, Spitzer's proposed testimony does not establish that prohibitions on open, public carry of firearms are within the Nation's historical tradition of firearms regulation. For the period from the early 1800s up to 1860, Spitzer's Declaration identifies the District of Columbia and what he says are four states that enacted laws restricting the carrying of named weapons, whether open or concealed, Georgia, Florida, the borough of York, Pennsylvania, and Hawaii. (Id. # 50). Spitzer acknowledged that the Georgia Supreme Court struck down the Georgia statute's restriction on open carry as unconstitutional. (Id. # 51).

Spitzer created a 137-page memorandum of state (and some local) historical weapons laws based on the Duke Repository and attached it as Exhibit C to his expert declaration. (Plaintiffs' SUF, Exhibit 14). Spitzer then created a "summary" of Exhibit C and attached it to his expert declaration as Exhibit B. (Plaintiffs' SUF, Exhibit 15). Exhibit B includes a column labelled "No Open/Any Carry Laws" with dates for each state when such a law was purportedly promulgated. Plaintiffs would make several points. First, the vast majority of the statutes that Spitzer identifies as purportedly restricting public carry of firearms were promulgated after 1868 and thus, outside of the most relevant time period designated by Bruen. 597 U.S. at 38. Second, Bruen discounted the significance of laws enacted by territories before they became states, 597 U.S. at 66-70, and some of the statutes Spitzer cites were promulgated in territories or, in one case, a foreign country (Hawaii) during the relevant period. Third, some of the statutes are not bans on open carry but so-called surety laws that required certain persons engaged in public carry to post a surety for their safe behavior. Bruen found these statutes not to be bans on public carry, 597 U.S at 55-59, so they are certainly not prohibitions on open carry.

26

Finally, and most importantly, based on Spitzer's descriptions of the laws in Exhibit C, the relevant statutes Spitzer identifies in Exhibit B as "No Open/Any Carry Laws" bans on open carry are <u>not</u> that at all:

- Florida-the 1838 statute that Spitzer lists in Exhibit B, according to Exhibit C, expressly states: "Provided, however, that this law shall <u>not</u> be construed to prevent any person from carrying arms openly, outside of their clothes." (emphasis added) (Plaintiffs' SUF, Exhibit 13, pages 27-28). The 1868 act, according to Spitzer, made it a felony to commit a criminal offense while armed with a firearm or other dangerous weapon. (<u>Id.</u>, p. 29).

- Borough of York, Pennsylvania-According to Exhibit C, the law made it a felony to "willfully <u>and maliciously</u> carry any pistol, gun, dirk, slung shot, or deadly weapons…" (emphasis added) (<u>Id.</u>, pp. 106-07). Clearly, this refers to evil or criminal intent.

- Georgia-As discussed above, the Georgia Supreme Court overturned the 1837 act as unconstitutional.

- Kansas-The 1867 act made it a misdemeanor for any intoxicated person to be in possession of a firearm or other deadly weapon. (<u>Id.</u>, p. 47). The 1868 act extended the same prohibition to any person "not engaged in any legitimate business…[and] any person who has borne arms against the government of the United States." (<u>Id.</u>).

- Kentucky-The 1801 statute barred any person from coming before the justices of any court "with force and arms." (<u>Id.</u>, p. 50).

- Maine-The 1840 act was a surety law modeled after the Massachusetts act. (<u>Id.</u>, p. 54).

- Massachusetts-Spitzer agrees that the Massachusetts act passed in 1751 did not prohibit an individual from engaging in either open or concealed carry. (Plaintiffs' SUF, Exhibit 12,

pp. 79, 81-83). As discussed, the 1836 act was a surety law.  (Plaintiffs' SUF, Exhibit 13, 60).

- Minnesota-The 1851 law was a surety law like Maine and Massachusetts.  (Id., p. 65).

- North Carolina-The supposed 1792 act that Spitzer cites is actually from a book collecting English statutes. (See Cramer's Declaration in Support of Plaintiffs' Motion in Limine, ¶ 34-37).  This is readily apparent because it repeatedly refers to the "King."  (Id., p. 95).

- North and South Dakota-The 1864 and 1865 acts that Spitzer quotes do not ban the open carry of firearms.  (Id., p. 98). Moreover, the Dakotas were still a territory at the time.

- Oregon-The 1853 act is a surety law. (Id., p. 104-05).

- Tennessee-The 1801 act is a surety law.  (Id., p. 113). Regardless, it was narrowly aimed at one group of people.  (Cramer Declaration in support of Motion in Limine, ¶ ☐). The 1821 law did impose a fine for the public carry of a firearm, but the Tennessee Supreme Court subsequently found the Second Amendment protected arming oneself with firearms. Simpson v. State, 13 Tenn. 356, 360 (1833).

Thus, Spitzer does not identify a single act banning the open carry of a firearm that was passed by a state during the period from 1791 to 1868 and not declared unconstitutional.

Further, Spitzer testified that he included in his list statutes that prohibited "brandishing" or "display" of firearms.  (Id. # 58).  He agreed that a person could engage in open carry of a firearm without brandishing it.  (Id. # 59).  He said that whether open carry would violate a display law would depend on the ordinance and the circumstances.  (Spitzer pp. 36-37).  He acknowledged that depending on the specifics of a statute, a person could engage in open carry without violating a display law.  (Id. # 60).

Accordingly, the plain language of the Second Amendment protects the public carry of firearms for self-defense, including open carry. There is no relevant historical tradition of regulation that bars open carry. Defendants have failed to carry their burden of showing there is one.

### B. Under the Second Amendment, Defendants May Not Condition the Renewal of a CCW Permit On An Undefined and Non-Historical Showing of "Need."

Defendants may not condition the renewal of Plaintiffs' CCW permits on a showing of "need" as set forth in § 11-47-18(a) and in the Weapons Carry Permit Packet. New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111, 2156 (2022). In Bruen, two residents of New York applied to the New York State Police for CCW permits. Both cited a general desire for self-defense. The state police denied their application stating they had failed to show "proper cause" as required by a state statute. The statute did not define "proper cause," but New York courts had held it means the applicant can "demonstrate a special need for self-protection distinguishable from that of the general community." Id. at 2123, citing, In re Klenosky, 75 App.Div.2d 793, 428 N.Y.S.2d 256, 257 (1980). The Supreme Court characterized the "special need" standard as "demanding." Id. The Court noted that judicial review of a denial of an application was limited, and the denial would be upheld if there was any "rational basis for it." Id., citing In re Kaplan, 249 App.Div.2d 199, 201, 673 N.Y.S.2d 66, 68 (1998).

The Court commented that New York was among a small minority of states that gave their officials discretion to deny CCW permits even when the applicant meets the statutory criteria, so-called "may issue" states. Id. at 13-14. The Court said that by its count, forty-three states were "shall issue" jurisdictions "where authorities must issue concealed carry licenses where authorities satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." (emphasis added). Id. The Court noted

29

that while Rhode Island and two other states have discretionary criteria, they "appear to operate like 'shall issue' jurisdictions." Id. at 13, n. 1, citing R.I.Gen.L. § 11-47-11 and Gadomski v. Tavares, 113 A.3d 387, 392 (R.I. 2015). In Gadomski, the Court said: "Demonstration of a proper showing of need, which is a requirement under § 11-47-18, is not a component of § 11-47-11" and it overturned the City of East Providence's denial of a CCW permit. Id.

The Supreme Court described that since its decisions in District of Columbia v. Heller, 554 U.S. 570 (2008) and McDonald v. Chicago, 561 U.S. 742 (2010), the courts of appeal had developed a two-step analysis in which governments could justify their regulations of firearms by showing either that the "regulated activity fall[s] outside the scope of the [Second Amendment] right as originally understand" or that the "regulation is 'substantially related to the achievement of an important governmental interest.'" Id. at 18. The Court rejected the second step and said "[i]nstead the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 19.

The Court proceeded to review in depth that historical tradition. It began by commenting that "Heller and McDonald expressly rejected the application of any 'judge-empowering' 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" Id. at 22, quoting Heller, 554 U.S. at 634 (Breyer, J., dissenting). The Court said: "Heller further confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry…upon the person or in the clothing or in a pocket, for the purpose…of being armed and ready for offensive or defensive action in a case of conflict with another person.'" Id. at 32, quoting Heller, 554 U.S. at 584. After considering various state law limitations on either public carry or concealed carry the Court said:

> The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statues did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly. (emphasis original).

Id. at 59. The Court concluded that New York's statutory scheme was unconstitutional because it gave regulatory authorities discretion. Id. at 70-71. Notably, Rhode Island requires that a person have the State CCW permit for any open, public carry of firearms. R.I.Gen.L. § 11-47-18(a). Thus, it does not distinguish between the manner of public carry in its State-issued CCW requirement.

Accordingly, the Attorney General's denial of O'Neil's application would be unconstitutional unless the statutory scheme by which municipalities "shall issue" CCW permits under § 11-47-11 fulfills the State's constitutional obligation and allows the Attorney General the unbridled discretion he claims to deny permits under § 11-47-18. Under the Defendants' logic, then, the Attorney General retains unbridled discretion to deny permits for any reason whatsoever. But, that discretion would deny Plaintiffs their right to open carry, as argued previously. Moreover, such unbridled discretion was precisely what Bruen rejects. Further, this interpretation renders Section 11-47-18 completely unnecessary. However, the Rhode Island Supreme Court has held that a statute should not be interpreted to render it "mere surplusage." See, In re Harrison, 992 A.2d 990, 994 (R.I. 2010), quoting, State v. Clark, 974 A.2d 558, 572 (R.I. 2009) (quoting State v. DeMagistris, 714 A.2d 567, 573 (R.I. 1998) ("no construction of a statute should be adopted that would demote any significant phrase or clause to mere surplusage.").

Finally, while Defendants' requirement of a "proper showing of need" under § 11-47-18(a) is unconstitutional under the plain holding of Bruen, even if Plaintiffs had to make a showing of

need for self-defense, the Rhode Island Attorney General has provided it. In the executive summary of his 2022 Gun Crimes Report, Attorney General Neronha states:

> Any way you look at it, this year's report will again demonstrate that, like so many other parts of the country, our communities continue to be inundated with guns. Law enforcement is seeing it firsthand—we are seeing ghost guns, assault weapons, and high-capacity magazines, and we are seeing them in every corner of the State, both rural and urban.[23]

Clearly, this statement provides ample reason for Plaintiffs to be concerned about their self-defense. The Attorney General adds:

> Our Office has continued our aggressive enforcement of all of our firearms laws. Regardless of how long the laws have been on the books, <u>we are using them to focus our resources on those who are truly driving violent crime in our communities</u> and bringing them to justice, with significant sentences that will keep them off the streets and keep our communities safer for as long as possible.

(Id., p. 8). Notably, the report is devoid of any crimes committed by CCW permit holders or any explanation of how Defendants' denial of the State CCW permits prevents crime. Instead, it may well subject those denied a permit and those near them to a greater threat of crimes.[24] Accordingly, this case is an example of the Attorney General wasting government resources by misusing a gun law to keep a lawful permit useful for self-defense from law-abiding citizens.

### C. The Rhode Island Firearms Act and Defendants' Factors Respecting "Need" Are Unconstitutionally Vague and Overbroad in Violation of the Fourteenth Amendment.

The statutory requirement that a State CCW applicant make a "proper showing of need" as well as the Attorney General's guidelines respecting that showing are vague and overbroad in

---

[23] The Report is online at: https://riag.ri.gov/press-releases/attorney-general-neronha-releases-2022-gun-crime-report-data.

[24] Plaintiff acknowledges that the question of how often a "good guy with a gun" prevents or mitigates gun violence by criminals is strenuously debated. Nonetheless, there are specific examples of it occurring. https://www.heritage.org/firearms/commentary/yes-democrats-sometimes-good-guy-gun-does-stop-the-bad-guys-heres-proof.

violation of the Fourteenth Amendment. See <u>Minnesota Voters Alliance v. Mansky</u>, 138 S.Ct. 1876 (2018) (holding that Minnesota statute banning people from wearing "political apparel" in polling places on Election Day was unconstitutionally vague and violated the First Amendment); <u>F.C.C. v. Fox Television Stations, Inc.</u>, 567 U.S. 239, 258 (2012) (holding that the FCC's regulation on the broadcasting of "fleeting expletives" was unconstitutionally vague and violated the First Amendment); <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. 234, 256 (2002) (holding the Child Pornography Prevention Act of 1996 was unconstitutionally overbroad and violated the First Amendment).[25] Moreover, Defendants cannot constrain O'Neil's Second Amendment rights by claiming no "set formula or criteria…limit[s] or restrict[s] the Attorney General's decision to issue or deny a pistol permit." <u>Bruen</u>, at 142 S.Ct. at 2156.

Section 11-47-18(a) is unconstitutionally void for vagueness or overbroad. The First Circuit has explained the difference between "vagueness" and "overbreadth":

> While related, [the doctrines of overbreadth and vagueness] derive from somewhat different policies and look to different effects. Overbreadth analysis looks to whether a law "sweeps within its ambit (protected) activities" as well as unprotected ones, while a vagueness inquiry focusses on whether a law states its proscriptions in terms sufficiently indefinite that persons of reasonable intelligence "must necessarily guess at its meaning."

<u>Fantasy Book Shop, Inc. v. City of Boston</u>, 652 F.2d 1115, 1122 n. 9 (1st Cir. 1981).

The "void-for-vagueness" doctrine derives from due process requirements that a law must be written "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983). Here, Section 11-47-18(a) is unconstitutionally

---

[25] O'Neil cites to First Amendment jurisprudence in this argument because, as previously stated, the Supreme Court has analogized First and Second Amendment rights and because there is a dearth of post-<u>Bruen</u> decisions applying due process analysis to CCW permit denials. Indeed, Plaintiff's counsel has located no such decisions.

vague because the General Assembly has not defined "a proper showing of need" and ordinary people could not understand what that phrase means. What is a "proper showing"? Does it require a hearing with admissible evidence or are an applicant's representations sufficient? What constitutes a "need"? Webster's first two definitions for "need" are very different: "1. necessity; compulsion; obligation…" compared to "2. a lack of something useful, required, or desired…" Webster's New World Dictionary, p. 981 (World Pub. Co. 1966). It is difficult to imagine a vaguer standard.

Moreover, it appears it is the particular Attorney General in office at any given time who determines "a proper showing of need" because O'Neil originally received his State-issued CCW permit in 2013 and it was renewed in 2017 when the prior Attorney General was in office.  This situation promotes arbitrary and discriminatory enforcement.

A statute is overbroad and unconstitutional under the First Amendment where "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  United States v. Stevens, 559 U.S. 460, 473 (2010).  In Stevens, the Supreme Court held that a federal statute criminalizing the commercial creation, sale, or possession of depictions of animal cruelty was substantially overbroad, and thus, it was invalid under the First Amendment.  559 U.S 481-82.  Here, Section 11-47-18(a) is substantially overbroad because its critical terms are undefined and the Attorney General's application of the statute is overbroad,  ill-defined, and subject to "haphazard interpretations." Minnesota Voters, 138 S. Ct. at 1888. Carroll v. Craddock, 494 F.Supp.3d 158, 169 (D.R.I. 2020) (McElroy, J.) ("A statute is overbroad and therefore unconstitutional when it so lacks standards for application that it 'delegate[s] unlimited discretion to the government officials entrusted to enforce the regulation.'"). In the Minnesota Voters case, the Supreme Court struck down Minnesota's law  banning "political apparel" at

polls.  In attempting to determine examples of what "political apparel" would or would not be permissible, the Court  encountered the same kind of arbitrary distinctions that exist with respect to State CCW permits:

> A shirt declaring "All Lives Matter," we are told, could be "perceived" as political. How  about a shirt bearing the name of the [NRA]? Definitely out. That said, a shirt displaying a rainbow flag could be worn "*unless* there was an issue on the ballot" that "related  somehow ... to gay rights." A shirt simply displaying the text of the Second Amendment?  Prohibited. But a shirt with the text of the First Amendment? "It would be allowed."

Minnesota Voters, 138 S. Ct. at 1891.  "[P]erfect clarity and precise guidance have never been required even of regulations that  restrict expressive activity. But the State's difficulties with its restriction go beyond close calls on  borderline or fanciful cases. And that is a serious matter..." Id.

Rhode Island has the same problem. The inconsistent application of Section 11-47-18(a)'s requirement of a "proper showing of need"  can result  in  haphazard, arbitrary, and inconsistent decisions. Here, the Attorney General has articulated ten general factors on which to base the grant or denial of a CCW permit with respect to a showing of "need."  However, the denials of Plaintiffs' applications to renew their permit were founded on none of these.  Instead, the Attorney General denied the renewal based on a new, *ad hoc* factor, i.e., that Plaintiffs did not "need" a State-issued permit because they already had a municipal one. Notably, the Attorney General did not decide that Plaintiffs were any kind of threat or danger if they had a CCW permit, a decision that was presumably foreclosed by the issuances of the municipal permits which requires that the applicant be a "suitable person to be so licensed."  R.I.Gen.L. § 11-47-11(a).

Personalized or "vanity" license plate schemes have faced similar legal challenges.  See Lewis v. Wilson, 253 F.3d 1077, 1080 (8th Cir. 2001) (striking down Missouri regulation as providing unfettered discretion when state had authority to restrict plates bearing messages that  are "contrary to public policy."); Carroll v. Craddock, 494 F.Supp.2d at 169-70 (striking down statute

that permitted the Director of the Division of Motor Vehicles to deny the application for a vanity license plate that was "offensive to good taste"); Morgan v. Martinez, No. 3:14-02408, 2015 WL 2233214 at *8 (D.N.J. May 12, 2015) (finding that vehicle owner seeking 8THEIST plate had stated a claim in facial challenge to New Jersey's "offensive to good taste and decency" plate regulation); Matwyuk v. Johnson, 22 F. Supp. 3d 812, 822–24 (E.D. Mich. 2014) (same, citing Shuttlesworth v. City of Birmingham, Alabama, 394 U.S. 147, 150-51 (1969)). Defendants' "need" guideline that there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue or deny a pistol permit" lacks the "narrow, objective, and definite standards" necessary for a licensing scheme and is therefore unconstitutional.

The Attorney General's "factors" for denying a CCW permit under Section 11-47-18(a) run afoul of the prohibition against unbridled discretion. "[A]dministrators may not possess unfettered discretion to burden or ban speech, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 763-64 (1988). Boundless rules run the risk that the government will use seemingly innocuous standards in pretextual and censorial ways, "hiding the suppression from public scrutiny." Child Evangelism Fellowship of Maryland, Inc. v. Montgomery Co. Pub. Sch. Dist., 457 F.3d 376, 386 (4th Cir. 2006). Such a scheme may not delegate overly broad discretion to government officials. Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 130–31 (1992) (requiring "narrow, objective, and definite standards to guide the licensing authority").

The Supreme Court in Shuttlesworth v. City of Birmingham explained that "many decisions of this Court over the last 30 years, [have held] that a law subjecting the exercise

of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." 394 U.S. at 150–51. Section 11-47-18(a) lacks objective criteria, allowing the Attorney General to deny CCW permits based on ambiguous, subjective, arbitrary, and discriminatory reasons. Defendant has reserved for himself the unfettered ability to deny any permit because he has no "set formula or criteria to limit or restrict [his] decision to issue or deny a pistol permit." Accordingly, the Attorney General can make unpublished and inconsistent decisions respecting CCW permits, and no one will be the wiser. Here, Defendant denied the renewal of a permit O'Neil has had since 2013 because of a supposed lack of need based on a criterion he essentially invented for this application. Accordingly, Section 11-47-18(a) is unconstitutionally vague and overbroad and Defendant's application and enforcement of it is unconstitutionally arbitrary and capricious.

**II.    Plaintiffs Will Suffer Irreparable Harm.**

The infringement of individual freedoms guaranteed under the Bill of Rights constitutes an irreparable injury. Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."); Harris v. Wall, 217 F.Supp.3d at 560 ("[T]he loss of religious freedom...standing alone—is sufficient to show irreparable harm and...the protection of religious practice is an important public interest.");[26] "[D]istrict courts around the country have found permanent injunctions to constitute appropriate relief for violations of Second Amendment rights stemming from unconstitutional state statutes..." Srour v. New York City, New York, 699 F.Supp.3d 258, 288 (S.D.N.Y. 2023), citing

---

[26] O'Neil cites to First Amendment precedent because in Bruen and in District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court analogized Second Amendment analysis to First Amendment analysis numerous times. See, Bruen, 142 S.Ct. at 2130, 2132, 2138, 2156; Heller, 554 U.S. at 582, 595, 606, 618, 634-35.

Fraser v. Bureau of Alcohol, Tabacco, Firearms & Explosives, 689 F.Supp.3d 2023, 212-13 (E.D.Va. 2023) (collecting cases), vacated on appeal as moot, 117 F.4th 72, 86-87 (2nd Cir. 2023); Boland v. Banta, SACV 22-01421, 2023 WL 2588565 at *9 (C.D.Cal. Mar. 20, 2023) (holding that a violation of Second Amendment rights is an irreparable injury and enjoining a California statute which requires certain safety features on handguns); Spencer v. Nigrelli, No. 22-CV-6486, 2022 WL 17985966 at *13 (W.D.N.Y. Dec. 29, 2022) (holding that an infringement of Second Amendment rights is an irreparable injury and enjoining a New York statute that makes it a felony for any CCW license holder to possess a firearm in a place of worship).

### III.    Plaintiffs Have No Adequate Remedy At Law, The Balance Of Equities Tips In Plaintiffs' Favor, And The Issuance Of A Permanent Injunction Will Serve The Public Interest.

Monetary relief is almost certainly not quantifiable nor recoverable against the Attorney General in these circumstances.  Boland v. Banta, 2023 WL 2588565 at *9. Moreover, "[w]hen, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—'merge.'" Id., quoting Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd of Educ., 46 F.3dth 1075, 1098 (9th Cir. 2022).

It is always in the public interest to enjoin unconstitutional laws.  Id.; see also, Spencer v. Nigrelli, 2022 WL 17985966 at *14, quoting Antonyuk v. Bruen, 2022 WL 3999791 at *36 (N.D.N.Y. 2022) (holding that the public has a significant interest in the sense of safety that a licensed concealed handgun can provide). "[A]ny minimal hardship that may befall the Government from not being able to enforce the unconstitutional statute and regulations must yield to that harm suffered by the individual whose constitutional rights are being denied by the Government's conduct."  Fraser v. Bureau of Alcohol, Tobacco, and Explosives, 689 F.Supp.3d at 214.  The Fraser court continued:

It is no doubt true that the public interest is never disserved by protecting the individual rights conferred by the Constitution. [citations omitted]…In sum, the Second Amendment right that is the subject of the claim in this case is itself a matter of great public interest.

Id. at 215.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment declaring that they have a protected right under the Second Amendment to engage in "open," public carry of firearms and a permanent injunction requiring Defendants to renew their CCW permits.  The Court should also issue declaratory relief that Defendants may not condition the issuance of their CCW permits upon a showing of "need."

Respectfully submitted,
**PLAINTIFFS,**
By their attorneys,

/s/ Thomas W. Lyons
Thomas W. Lyons          #2946
Strauss, Factor, Laing & Lyons
One Davol Square, Suite 305
Providence, RI 02903
(401) 456-0700
tlyons@straussfactor.com

/s/ Frank R. Saccoccio
Frank R. Saccoccio Esq. #5949
Saccoccio Law Office
928 Atwood Avenue
Johnston, Rhode Island 02919
(401) 944-1600 * 942-8921 Fax
Frank.CSLawOffice@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2024, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Thomas W. Lyons