UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **MICHAEL P. O'NEIL, DANIEL PATTERSON, DONALD LABRIOLE JOSEPH PATTON, RICHARD COOK RICHARD LAPORTE and PETER TREMEENTOZZI**<br>　　Plaintiffs<br><br>v.<br><br>**PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island, and THE STATE OF RHODE ISLAND**<br>　　Defendants | C.A. No. 23-cv-70 |

PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

Pursuant to LR 56(a), Plaintiffs hereby set forth the following undisputed facts in support of their motion for summary judgment.

1. Plaintiffs are all Rhode Island residents and over the age of 21. (See Plaintiffs' Declarations attached as Exhibits 1 to 7).

2. Plaintiffs are not felons or fugitives from justice. They are not in community confinement or otherwise subject to electronic surveillance. They are not mentally incompetent, not a drug addict or a drunkard, and not an immigrant who entered or remained in the country illegally. (Id.)

3. Plaintiffs have all obtained a so-called "blue card" from the Rhode Island Department of Environmental Management that permits them to purchase and possess a handgun and ammunition. (Id.)

4. The Rhode Island Office of the Attorney General has previously issued concealed carry permits (CCW) to plaintiffs. (Id.).

1

5.  Plaintiffs also had CCW permits issued by various municipalities in Rhode Island. (Id.)

6.  For various reasons, including self-defense and deterring potential aggression, Plaintiffs would like the option to engage in open carry of firearms which, under Rhode Island law, they can only do if they have the RIAG permit. R.I.Gen.L. § 11-47-18.

7.  Plaintiffs attempted to renew their RIAG CCW permits but were denied because they had municipal CCW permits and the RIAG's Office said they did not need the RIAG permits.

8.  The Rhode Island Firearms Act, R.I.Gen.L. § 11-47-1, et seq., requires a showing of "need" for RIAG CCW permits, § 11-47-18, but does not define "need." The Attorney General has not promulgated regulations that define "need." The Attorney General's Department has created a set of factors in its "Weapons Carry Permit Packet" which the Department purportedly uses to determine whether an applicant has made a proper showing of "need."[1] These factors include:

(1) Has the applicant demonstrated a specific articulable risk to life, limb, or property? If so, has the applicant demonstrated how a pistol permit will decrease the risk?

(2) Can the applicant readily alter his or her conduct, or undertake reasonable measures other than carrying a loaded firearm, to decrease the danger to life, limb, or property?

(3) Are there means of protection available to the applicant other than the possession of a loaded firearm that will alleviate the risk to his or her person or property?

(4) Has the applicant demonstrated the skill, training, and ability to properly use a firearm in accordance with Rhode Island laws?

(5) Has the applicant presented a plan to properly secure the firearm so that it does not fall into unauthorized hands?

---

[1] The current version of the Packet is available online at: file:///C:/Users/tlyons/Downloads/CARRY%20CONCEALED%20Permit%20application%20v230726%20.pdf.

(6) How greatly will the possession of a loaded firearm by the applicant increase the risk of harm to the applicant or to the public?

(7) Has the applicant demonstrated that he or she will not use the firearm for an unlawful or improper purpose, and that he or she has not used a firearm for an unlawful or improper purpose in the past?

(8) Does past unlawful, dangerous, or violent conduct of the applicant justify denial at the Attorney General's discretion even if it is not sufficient to disqualify the applicant as a matter of law from possessing a firearm?

(9) Has the applicant been issued a protective order pursuant to chapter 15-5, chapter 15-15, or chapter 8- 8.1 of the general laws?

(10) Any and all other factors deemed lawful and appropriate by the Attorney General to demonstrate that the applicant is or is not a person suitable to possess a loaded firearm in public.

However, the information packet also states there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue or deny a pistol permit."

9. Regulation of open carry of arms is rare in American history. What few examples are often cited are usually laws that targeted a particular group regarded as dangerous, a particular dangerous action of which carrying arms was only *one* element, or where the laws were short-lived and whose relevance has been explicitly rejected by *Bruen*. (Cramer Declaration, ¶ 5, attached as Exhibit 8).

10. State supreme courts in the era before 1868 often upheld concealed carry regulation because bans on concealed carry did not prohibit open carry. As long as one or the other remained

lawful, the right to armed self-defense was preserved. This understanding persisted after 1868, sometimes with absurd results. (Cramer Declaration, ¶ 6).

11. Laws regulating *open* carrying of arms are surprisingly recent. Even when such laws existed in the Framing Era, they were usually short-lived, atypical, and narrowly focused on particular abuses of carrying arms; particular groups carrying arms; or particular categories of arms; they were not general bans on open carry. (Cramer Declaration, ¶ 7).

12. Laws regulating *concealed* carry of firearms are more common in the era before 1868. State supreme courts were often asked to judge the constitutionality of such laws, usually with respect to state constitution right to keep and bear arms provisions. (In the case of Tennessee and Arkansas, these provisions including language that seems to have referred only to "common defence," and were interpreted far more narrowly than the Second Amendment.) When the courts have upheld such concealed weapon laws, they have usually done so because open carry remained lawful. (Cramer Declaration, ¶ 8).

13. There are very few laws in the Framing Era that regulated the carrying of arms. The East New Jersey law of 1686 prohibited dueling and its associated actions ("send any challenge in writing, by word of mouth, or message"), *concealed* carry ("privately to wear any pocket pistol, skeines, stilladers, daggers or dirks") as well as a ban on riding or going "armed with sword, pistol, or dagger."[2] The latter was certainly a ban on open carry, but as *Bruen* observed, the law was both short-lived and limited to "planters":

> First, although the "planter" restriction may have prohibited the public carry of pistols, it did not prohibit planters from carrying long guns for self-defense — including the popular musket and carbine. … Second, it does not appear that the statute survived for very long. By 1694, East New Jersey provided that no slave "be

---

[2] An Act Against Wearing Swords, &c., ch. 9, in GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 289-290 (2d ed. 1881).

4

> permitted to carry any gun or pistol ... into the woods, or plantations" unless their owner accompanied them. Grants and Concessions 341. If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence. Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey. See 1 Nevill, Acts of the General Assembly of the Province of New- Jersey (1752). At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.[3]

(Cramer Declaration, ¶ 9).

14. The law also exempted "all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably."[4] This was a law aimed at a particular class and not a *general* ban on open carry. (Cramer Declaration, ¶10).

15. Several colonies and states passed laws that punished particular behaviors of which the carrying of arms was only *one* component of the crime. The 1786 Virginia law that ordered that "no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, *in terror of the Country*," [emphasis added] clearly requires that such action must be "in terror of the Country," analogous to, and using some of the language of the Statute of Northampton (1328). This law required not simply the carrying of arms but actions that produced terror. If the law sought to prohibit *all* open carry of arms, there would be no need to specify "in terror of the Country." Finally, the title of the law "An Act Forbidding and Punishing Affrays" establishes that the goal was to avoid causing fear. Blackstone defined "affray" as "the fighting of two or more persons in some public place, to the *terror* of his majesty's subjects."[5] [emphasis added], (Cramer Declaration, ¶ 11).

---

[3] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 2111, 2145 (2022).
[4] An Act Against Wearing Swords, &c., op cit. 290.
[5] William Blackstone, 4 COMMENTARIES ON THE LAWS OF ENGLAND 145 (1769) https://books.google.com/books?id=Wn7PPtzK86kC&newbks=1&newbks_redir=0&dq=%22%E2%80%9Cthe%20fighting%20of%20two%20or%20more%20persons%20in%20some%20public%20place%2C%20to%20the%20terror%20of%20his%20majesty%E2%80%99s%20subjects%22&pg=PA145#v=onepage&q=%22%E2%80%9Cthe%20fighting%20of%20two%20or%20mor

5

16. Case law from the early Republic continued to distinguish the carrying of arms from affray (actions that cause terror). *Simpson* v. *State* (Tenn. 1833) was a case where the defendant was indicted for "with force and arms,...being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land." Yet when the defendant appealed, alleging "the record does not present any charge that is known to the law, as cognizable in our courts by indictment," the Tennessee Supreme Court ruled in Simpson's favor because, citing Blackstone:

> A phrase, from a affrayer to terrify, are the fighting of two or more persons, in some public place, to the terror of His Majesty subjects; for if the fighting being in private it is no affray, but an assault. It will be observed, that according to this definition of an affray by Blackstone, three things are necessary to constitute it. First: there must be fighting. Second: this fighting must be by or between two or more persons. And, Third: it must be in some public place to cause terror to the people.[6]

(Cramer Declaration, ¶ 12).

17. Whatever fear Simpson caused, he did not fight anyone and his mere "with force and arms, being arrayed in a warlike manner" was not a crime alone. (Cramer Declaration, ¶ 13).

18. In *State* v. *Huntley* (N.C. 1843), the defendant was not simply carrying arms:

>  In the investigation before the jury it appeared, among other things, that the defendant was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff (the person named in

---

e%20persons%20in%20some%20public%20place,%20to%20the%20terror%20of%20his%20majesty%E2%80%99s%20subjects%22&f=false, last accessed November 27, 2024.

[6] *Simpson* v. *State*, 13 Tenn. (5 Yer.) 356, 357, 358 (1833), https://books.google.com/books?id=RFNI4BifGs8C&newbks=1&newbks_redir=0&dq=%22But%20suppose%20it%20to%20be%20assumed%20on%20any%20ground%2C%20that%20our%20ancestors%20adopted%20and%20brought%20over%20with%20them%2C%20this%20English%20statute%22&pg=PA357#v=onepage&q=%22But%20suppose%20it%20to%20be%20assumed%20on%20any%20ground,%20that%20our%20ancestors%20adopted%20and%20brought%20over%20with%20them,%20this%20English%20statute%22&f=false, last accessed November 27, 2024.

> the indictment), armed with a double-barreled gun, and on some of those occasions was heard to declare, "that if James H. Ratcliff did not surrender his negroes, he would kill him"; at others, "if James H. Ratcliff did not give him his rights, he would kill him";[7]

(Cramer Declaration, ¶ 14).

19. Even in this case, the North Carolina Supreme Court distinguished the Statute of Northampton's prohibition of "unusual weapons":

> It has been remarked that a double-barrel gun, or any other gun, cannot in this country come under the description of "unusual weapons," for there is scarcely a man in the community who does not own and occasionally use a gun of some sort.[8]

(Cramer Declaration, ¶ 15).

20. While decrying the regular wearing of arms "in our peace-loving and law-abiding State," the Court admitted:

> But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun, per se, constitutes no offense. For any lawful purpose — either of business or amusement — the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people.[9]

(Cramer Declaration, ¶ 16).

21. There is a 1795 Massachusetts law that directs justices of the peace to have arrested "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go *armed offensively*." [emphasis added]   The law did not prohibit any of these actions but directed that the justice of the peace "shall require of the offender to find sureties for his keeping the peace, and being of the good behaviour."[10]  Again, the law is aimed narrowly at those "armed

---

[7] *State* v. *Huntley*, 3 N.C. 418 (1843), https://www.claytoncramer.com/primary/rkbadecisions/Huntly1843.pdf , last accessed November 27, 2024.
[8] Id. at 422.
[9] Id. at 422, 423.
[10] 2 Laws of the Commonwealth of Massachusetts from November, 28, 1780 to

offensively;" a general ban on open carry would be much simpler of a law. Even then, it does not prohibit being armed; at most it makes such persons at risk of forfeiting the bond for "misbehaviour."

(Cramer Declaration, ¶ 17).

22. An 1801 Tennessee law often cited out of context is "An act for the restraint of idle and disorderly persons."[11] Section 6 reuses the language of the Statute of Northampton to prohibit "any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person." Even then, it only directs judges to "bind such person or persons to their good

---

FEBRUARY 28, 1807, WITH THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND OF THE COMMONWEALTH, PREFIXED 652-653 (Boston: printed by J. T. Buckingham for Thomas & Andrews, 1807),
https://books.google.com/books?id=Dh8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%20FROM%20NOVEMBER%2C%2028%2C%201780%20TO%20FEBRUARY%2028%2C%201807%2C%20WITH%20THE%20CONSTITUTION%20OF%20THE%20UNITED%20STATES%20OF%20AMERICA%2C%20AND%20OF%20THE%20COMMONWEALTH%2C%20PREFIXED&pg=PA652#v=onepage&q=LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%20FROM%20NOVEMBER,%2028,%201780%20TO%20FEBRUARY%2028,%201807,%20WITH%20THE%20CONSTITUTION%20OF%20THE%20UNITED%20STATES%20OF%20AMERICA,%20AND%20OF%20THE%20COMMONWEALTH,%20PREFIXED&f=false , last accessed November 27, 2024. Defendants cited this law with chapter numbers and page numbers that do not show where this law appears in official session laws. I have attempted to locate the source for the image on which Defendants rely. That secondary source, HeinOnline, has given several erroneous sources, or sources which cannot be located with their incomplete information. Traceability seems inadequate for any serious scholarly work.

[11] For an example of this out of context quotation, see Judge Edward Scott, *Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820*, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources, in DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/judge-edward-scott-laws-of-the-state-of-tennessee-including-those-of-north-carolina-now-in-force-in-this-state-from-the-year-1715-to-the-year-1820-inclusive-page-710-image-714-vol-1-1821-the/ , last accessed July 17, 2024.

behavior, and if he or they fail to find securities, commit him or them to jail."[12] (Cramer Declaration, ¶ 18).

23. Reading the entire statute gives some context suggesting that the law targeted *one* disreputable group, and was not a general ban:

> Whereas it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons…. That any person or persons who have no apparent means of subsistence or neglect applying themselves to some honest calling for the support of themselves and families every person so offending, who shall be found sauntering about neglecting his business, and endeavoring to maintain himself by gaming or other undue means, it shall and may be lawful any justice of the peace or court of the county wherein such person may be found, on due proof made, to issue his warrant for such offending person, and caused him to be brought before such said justice…[13]

(Cramer Declaration, ¶ 19).

24. All sections of the law are directed at these "wandering, disorderly and idle persons" and attempts to prevent their wandering without permanent residence or respectable employment. (Cramer Declaration, ¶ 20).

25. The law appears narrowly focused on vagrant gamblers and even then § 6 only requires posting a bond contingent on "their good behaviour," to avoid jail. This is again, a prohibition on concealed carry and open carry only if "to the terror of the people." (Cramer Declaration, ¶ 21).

26. Another often misrepresented law is "1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof." This statute prohibits "if

---

[12] 1801 Tenn. Acts ch. 22, § 6 at 260-261. There is no online copy of this law although § 6 appears in 1 STATUTE LAWS OF THE STATE OF TENNESSEE 10 (1831), https://books.google.com/books?id=OhxEAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22any%20person%20or%20persons%20shall%20publicly%20ride%20or%20%E2%80%9D&pg=PA10#v=onepage&q=%22any%20person%20or%20persons%20shall%20publicly%20ride%20or%20%E2%80%9D&f=false , last accessed November 27, 2024.
[13] 1801 Tenn. Acts ch. 22, § 1 at 259-260.

any persons to the number of twelve, or more, being armed with clubs, or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously, or tumultuously assembled."[14] It was not a crime for an individual to be armed or even eleven to be armed. There must be at least twelve armed to constitute a crime. (Cramer Declaration, ¶ 22).

27. Why was this law written in such a way that it only applied to bodies of twelve or more armed men or groups of thirty or more even if not armed? "Whereas the provision already made by law for the preventing routs, riots, and tumultuous assemblies and the evil consequences thereof have been found insufficient." This law was passed October 28, 1786, shortly after Shays' Rebellion started disrupting courts in western Massachusetts.[15] (Cramer Declaration, ¶ 23).

28. In the antebellum period challenges to concealed weapon laws often ended up in state supreme courts. While these decisions almost always upheld such laws, the way in which the courts resolved the apparent conflict between "right to keep and bear arms" provisions was quite important for open carry. (Cramer Declaration, ¶ 24).

29. *State v. Reid* (Ala. 1840) upheld a ban on concealed carry. The decision admitted that a ban on gun carrying had constitutional limits:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them

---

[14] 1 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 346-7 (1807).,
https://books.google.com/books?id=px8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%22%20clubs&pg=PA346#v=onepage&q=%22LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%22%20clubs&f=false , last accessed November 27, 2024.
[15] John Bach McMaster, 5 A HISTORY OF THE PEOPLE OF THE UNITED STATES, FROM THE REVOLUTION TO THE CIVIL WAR 306 (1884).

> wholly useless for the purpose of defence, would be clearly unconstitutional. But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.[16] [emphasis added].

(Cramer Declaration, ¶ 25).

30. The Georgia Supreme Court in 1846 reviewed a very unclearly written law regulating sale and carrying of arms of many types. Because the Georgia Constitution had no right to keep and bear arms provision, the Georgia Supreme Court ignored *Barron v. Baltimore* (1833), and decided the Second Amendment limited state laws:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void...[17] [emphasis in the original].

(Cramer Declaration, ¶ 26).

31. Several postbellum Southern states attempted to discourage not only the concealed carrying of arms, but open carry as well. Because the Arkansas and Tennessee state constitutions had right to bear arms provisions that referred to "the common defence," these laws limited the

---

[16] *State* v. *Reid*, 1 Ala. 612, 615, 616, 617 (1840), https://books.google.com/books?id=yUtNAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22A%20statute%20which%2C%20under%20the%20pretence%20of%20regulating%2C%20amounts%20to%20a%20destruction%20of%20the%20right%2C%20or%20which%20requires%20arms%20to%20be%20so%20borne%20as%20to%20render%20them%20wholly%20useless%20for%20the%20purpose%20of%20defence%2C%20would%20be%20clearly%20unconstitutional.%22&pg=PA616#v=onepage&q=%22A%20statute%20which,%20under%20the%20pretence%20of%20regulating,%20amounts%20to%20a%20destruction%20of%20the%20right,%20or%20which%20requires%20arms%20to%20be%20so%20borne%20as%20to%20render%20them%20wholly%20useless%20for%20the%20purpose%20of%20defence,%20would%20be%20clearly%20unconstitutional.%22&f=false , last accessed November 27, 2024.

[17] *Nunn* v. *State*, 1 Ga. 243, 250, 251 (1846).

categories of arms that might be openly borne, often allowing only "such as are commonly used in the United States military and naval service." These could be privately owned as long as they were the same as were used by the U.S. military.

(Cramer Declaration, ¶ 27).

32. The Arkansas Supreme Court heard an appeal involving a man convicted of carrying a "large army size six shooter, a revolving pistol, 44 caliber, eight inches in the barrel, such as is commonly used in warfare" for the purpose of pig hunting. The trial court refused to allow a statement either by the owner of the pistol or the defendant as to the purpose of having the revolver and refused to charge the jury that carrying "an army size pistol" could not be regulated by Arkansas law. (Cramer Declaration, ¶ 28).

33. The Arkansas Supreme Court overturned the trial judge's instructions:

> But to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.
>
> If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.[18]

(Cramer Declaration, ¶ 29).

34. The Arkansas Legislature responded to the *Wilson* and *Holland* decisions by passing a new weapons law. The Act of April 1, 1881, prohibited "the carrying of army pistols, except uncovered and in the hand."[19] In *Haile* v. *State* (1882), the first two sections of this act (which

---

[18] *Wilson* v. *State of Arkansas*, 33 Ark. 557, 558, 559, 560 (1878), https://www.claytoncramer.com/primary/rkbadecisions/WilsonHolland1878.pdf , last accessed November 27, 2024..

[19] Quoted in *Haile* v. *State*, 28 Ark. 563, 565 (1882), https://books.google.com/books?id=emhcDci6X8QC&newbks=1&newbks_redir=0&dq=%22%E2%80%9Cthe%20carrying%20of%20army%20pistols%2C%20except%20uncovered%20and%20in%20the%20hand.%E2%80%9D%22&pg=PA565#v=onepage&q=%22%E2%80%9Cthe%2

regulated carrying of handguns) were challenged. The defendant, Haile, was convicted in Pope County of carrying "uncovered, and buckled around his waist... a large revolving pistol, known as the Colts army pistol, and such as is used in the army and navy of the United States..." The Arkansas Supreme Court decided:

> The question is, can the Legislature regulate the mode of carrying any arms which the citizens have the constitutional right to keep and bear for their common defense? We have decided that it may, to some extent, which means that it may, in a reasonable manner, so as, in effect, not to nullify the right, nor materially embarrass its exercise.[20]

(Cramer Declaration, ¶ 30).

35. Ordinarily, requiring a person to carry a handgun "uncovered and in the hand" might qualify as brandishing. The important point is that the Arkansas Legislature felt so limited by Arkansas' constitutional provision that instead of prohibiting open carry, they required revolvers to be carried in the most dangerous manner imaginable.

(Cramer Declaration, ¶ 31).

36. *State v. Wilburn* (Tenn. 1872) made much the same distinction. An 1871 law:

> that it shall not be lawful for any person to publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.[21]

(Cramer Declaration, ¶ 32).

---

0carrying%20of%20army%20pistols,%20except%20uncovered%20and%20in%20the%20hand.%E2%80%9D%22&f=false , last accessed November 27, 2024.

[20] *Haile* v. *State*, 38 Ark. 564, 565, 566 (1882).

[21] 1871 Tenn. Acts ch. 90, quoted in *State* v. *Wilburn*, 7 Tenn. 57. 61 (1872), https://books.google.com/books?id=3XMEAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22State%20v.%20Robert%20Wilburn%22&pg=PA57#v=onepage&q=%22State%20v.%20Robert%20Wilburn%22&f=false , last accessed November 27, 2024..

37. The Tennessee Supreme Court upheld this very dangerous method of open carry in the same way as the Arkansas Supreme Court because the Tennessee Constitution's arms provision had the same "common defence" qualifier as Arkansas:

> The Legislature has deemed it a proper prevention of crime to regulate the use of this arm by prohibiting the wearing of it or carrying it about the person, privately or publicly, unless it be carried openly in the hands, or unless it be worn or carried by an officer or policeman engaged in his duties, or by a traveler on a journey.[22]

(Cramer Declaration, ¶ 33).

38. The Court recognized that open carry was protected so strongly that only the most absurd regulation that still allowed open carry in some form was constitutional. (Cramer Declaration, ¶ 34).

39. Some state supreme courts have ruled that concealed carry of arms could be regulated without violating both state *and* federal guarantees of the right to bear arms as long as open carry remained lawful. Idaho's Supreme Court struck down a territorial era law:

> The second amendment to the federal constitution is in the following language: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." The language of section 11, article 1 of the constitution of Idaho is as follows: "the people have the right to bear arms for their security and defense, but the legislature shall regulate the exercise of this right of law." Under these constitutional provisions, the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages. The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it. A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state. But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages. We are compelled to hold this statute void.[23]

(Cramer Declaration, ¶ 35).

---

[22] *State* v. *Wilburn*, 7 Tenn. 57. 62, 63 (1872).
[23] *In Re Brickey*, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902).

40. Defendants have two experts with respect to the historical tradition of firearms regulations, Dr. Brennan Rivas and Dr. Michael Spitzer. Their expert declarations are attached as Exhibits 9 and 10, respectively.

41. Rivas testified that she has found three states, Massachusetts, West Virginia and Texas, and one territory, Idaho, that passed statutes barring the open carry of firearms. (Excerpts of Rivas deposition, pp. 93-94, 102-03, excerpts attached as Exhibit 11).

42. Rivas said that she was aware of some municipal restrictions on open carry but added that there was no authoritative, searchable database of such regulations. (Rivas deposition, pp. 94-95).

43. Rivas found that licensing requirements for open carrying were "generally local." (Rivas deposition, pp. 101-02).

44. Rivas found that in Tennessee and Arkansas, open carry was statutorily less restricted than concealed carry as it was thought that open carry was less dangerous than concealed carry because other people could see who had a weapon and avoid them. (Rivas deposition, pp. 110-11, 112-13).

45. Rivas found that people engaged in public carry "in preparation for an unforeseen potential emergency." (Rivas deposition, pp. 111-12).

46. Rivas found in her research that the most common constraint on public carry was social disapproval of the practice. She cited newspaper articles calling on people to restrain from public carry. As a result, people more frequently engaged in concealed carry. (Rivas deposition, pp. 104-05).

47. Defendants' other expert, Robert Spitzer, testified that he did not specifically address in his expert declaration whether or not Rhode Island's regulatory scheme is consistent with a

15

historical tradition of open carry regulations. (Spitzer deposition, p. 52, excerpts attached as Exhibit 12).

48. Spitzer said he has not been asked to render an opinion on that. (Spitzer deposition, pp. 52-53).

49. Spitzer testified he could not specifically recall a previous case in which he has previously been retained as an expert that involved either concealed carry or open carry. (Spitzer deposition, pp. 53-54).

50. For the period from the early 1800s up to 1860, Spitzer's Declaration identifies the District of Columbia and what he says are four states that enacted laws restricting the carrying of named weapons, whether open or concealed, Georgia, Florida, the borough of York, Pennsylvania, and Hawaii. (Exhibit 5, ¶¶ 12-15).

51. Spitzer acknowledged that the Georgia Supreme Court struck down the statute's restriction on open carry as unconstitutional. (Spitzer deposition, pp. 83-86).

52. Spitzer agrees that the Massachusetts act passed in 1751 did not prohibit an individual from engaging in either open or concealed carry. (Spitzer deposition, pp. 79, 81-83).

53. Spitzer created a 137-page memorandum summarizing historical state statutes purportedly affecting the right to bear arm. Spitzer attached it to his Declaration as Exhibit C. (Exhibit 13).

54. Spitzer created a separate chart listing these statutes by state, year of enactment, and type, including those that purposedly banned "Open Carry/Any Carry." Spitzer attached it to his Declaration as Exhibit B. (Exhibit 14).

55. The majority of the statutes that Spitzer identifies as purportedly restricting open carry of firearms were promulgated after 1868. (Exhibt 14).

56. Some of the statutes Spitzer identifies for the period 1791 to 1868 are surety laws. (Exhibit 13).

57. Some of the statutes Spitzer identifies were promulgated by U.S. Territories or a foreign country (Hawaii). (Exhibits 13 and 14).

58. Spitzer included in his list statutes that prohibited "brandishing" or "display" of firearms. (Exhibit 12, pp. 34-36).

59. Spitzer agreed that a person could engage in open carry without brandishing a weapon. (<u>Id.</u>, p. 60).

60. Spitzer agreed that, depending on the language of a statute and the circumstances, a person could engage in open carry without violating a display law. (<u>Id.</u> pp. 36-37).

Respectfully submitted,
**MICHAEL O'NEIL**
By his attorneys,

<u>/s/ Thomas W. Lyons</u>
Thomas W. Lyons       #2946
Strauss, Factor, Laing & Lyons
One Davol Square, Suite 305
Providence, RI 02903
(401) 456-0700
tlyons@straussfactor.com

<u>/s/ Frank R. Saccoccio</u>
Frank R. Saccoccio Esq. #5949
Saccoccio Law Office
928 Atwood Avenue
Johnston, Rhode Island 02919
(401) 944-1600 * 942-8921 Fax
Frank.CSLawOffice@gmail.com

CERTIFICATE OF SERVICE

   I hereby certify that on November 27, 2024, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

<u>/s/ Thomas W. Lyons</u>