# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

MICHAEL P. O'NEIL, et al.
      Plaintiffs,

v.

PETER F. NERONHA, in his official
capacity as Attorney General of the State
of Rhode Island, and THE STATE OF
RHODE ISLAND,
      Defendants.

C.A. No. 1:23-cv-00070

## **EXPERT REPORT AND DECLARATION OF DR. BRENNAN RIVAS**

I, Brennan Rivas, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

## INTRODUCTION

1.     I have been asked by the Rhode Island Office of the Attorney General to render an opinion about the history of firearms restrictions enacted in the nineteenth century, especially as they relate to the open and concealed carrying of weapons. I have also been asked to provide additional contextual information about the history of deadly weapons and societal attitudes about them. I am being compensated by the Rhode Island Office of the Attorney General at a rate of $225/hour for research and consultation, $250/hour for writing and editing materials, and $325/hour for deposition, testimony, and related activities.

## QUALIFICATIONS

2.     I am a historian and currently work as a Senior Postdoctoral Researcher at the Center for the Study of Guns and Society at Wesleyan University in Middletown, Connecticut. During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of

Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU). My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

3.      My expertise includes historical weapon regulations in the United States. I have authored multiple publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the *UC Davis Law Review*. I am currently completing a book manuscript based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period. This manuscript has undergone the first round of peer-review and is currently under contract with an academic press.

4.      I have provided expert witness testimony in the following cases: *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 1:22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.); *Frey v. Nigrelli*, No. 21 Civ. 5334 (NSR) (S.D.N.Y.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Siegel v. Platkin*, No. 22-cv-7463 (RMB) (AMD) (D.N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Or. Firearms Fed'n, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.); *Chavez v. Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.) (f/k/a *Jones v. Bonta*); *Nguyen v. Bonta*, No. 3:20-cv-02470-WQH-BGS (S.D. Cal.); *Baird v. Bonta*, No. 2:19-

2

cv-00617-KJM-AC (E.D. Cal.); *Nichols v. Bonta*, No. 3:11-cv-09916-SJO-SS (C.D. Cal.); *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Wolford v. Lopez*, No. 1:23-cv-00265-LEK-WRP (D. Haw.); *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-JLK (D. Col.); *Kipke v. Moore*, No. 1:23-cv-01293-GRL (D. Md.); *Ohio v. City of Columbus*, No. 22-cv-00657 (Com. Pleas, Fairfield Cnty., Ohio); *Schoenthal v. Raoul*, No. 3:22-cv-50326 (N.D. Ill.); *May v. Bonta*, No. 8:23-cv-01696 CJC and No. 1:23-cv-01798 CJC (C.D. Cal.); *State of Washington v. Gator's Custom Guns, Inc.*, No. 23-2-00897-08 (Sup. Ct., Cowlitz Cty., Wash.); *California Rifle & Pistol Assoc. v. Bonta*, No. 2:23-cv-10169, C.D. Cal.); *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL (S.D. Cal.); *Hartford v. Ferguson*, No. 3:23-cv-5364 (W.D. Wash.); *Birney v. Delaware Department of Safety and Homeland Security*, C.A. No. K23C-07-019 RLG (Sup. Ct., Del. St.). I am currently working on potential expert witness reports and declarations that may be provided in other jurisdictions. I have been deposed and testified at trial in one matter, *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.), and I have been deposed in *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL (S.D. Cal.).

## METHODOLOGY

5. This declaration is a work of historical scholarship, informed by analysis of primary and secondary sources. Having studied the subject of historical gun regulations for several years now, I have drawn upon knowledge gained from reading numerous peer-reviewed, scholarly books and articles, in addition to law review articles and media such as blogs and news articles. I have supplemented that with additional research into the development of firearms, cartridge, and magazine technologies during the late nineteenth and early twentieth centuries. I have read or consulted many books about the development of firearms and other weapons from the early modern period to the mid-twentieth century. In addition to online repositories like Westlaw, Hein

Online, Hathi Trust, Chronicling America, and the Duke Repository of Historical Gun Laws, I have made use of digital collections housing government documents and rare newspapers.

## SUMMARY OF OPINIONS

6.        Throughout the nineteenth century, Americans defined *deadly weapons* in contradistinction to militia arms, and regulated their presence in public spaces through various policies. These ran the gamut from public carry laws to locational restrictions, sales regulations, personal or occupation taxes, and licensing procedures. Public carry laws enacted during this period were innovations upon a longstanding English tradition—present in the North American colonies—which forbade the general carrying of weapons in public.[1] Other policy measures were similarly rooted in longstanding legal and regulatory practice. Local concerns drove the passage of state and local legislation pertaining to firearms and weapons, but such policies when taken as a whole represent a response by Americans across the country to pressing concerns about public safety, gun violence, and armed criminal activity.

7.        Concerns about public safety were very real to nineteenth-century Americans, who lived through horrifying racial and political violence, and experienced the social dislocations caused by industrialization, rapid urbanization, and family farming in the shadow of a globalizing marketplace. All of these forces drove Americans apart from one another on the basis of factors like race, class, wealth, and region. Where Americans were intractably divided, there too they were more likely to experience violence committed upon them or deploy it in settling conflicts.[2]   At the

---

[1] The Statute of Northampton did not apply to the king's ministers, persons assisting them, or people taking up arms in response to the hue and cry. See 2 Edw. 3, c. 3 (1328).

[2] Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 300 ("Ultimately the increase in homicide in the United States occurred because Americans could not coalesce into a nation. As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and the rise of industrialized cities—the patriotic faith in government that most Americans had felt so strongly after the Revolution was undermined by anger and distrust. Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors.").

same time, nineteenth-century Americans witnessed rapid technological change that transformed transportation, consumer-goods production, medicine and pharmaceuticals, and firearms. At the beginning of the century, pistols were single-shot, hand-made, muzzle-loading devices primarily used by mounted soldiers in conjunction with sabres; but by century's end, dramatic developments in machine production and engineering had turned pistols into mass-produced, repeat-fire weapons available for purchase in such large numbers and in such small sizes that almost anyone with the inclination could acquire one and carry it concealed. Even though rates of homicide and crime fluctuated over time and by locale, they were generally made worse by easier access to inexpensive weapons and widely available weapons that were conducive to (if not designed for) concealment. Nineteenth-century gun and weapon regulations should be interpreted in light of this important contextual landscape.

8.      Like all elements of American life and history, gun regulation has at times been entwined with this country's unenviable heritage of racial slavery and class conflict, but it would be a misreading of the historical record to attribute the entire enterprise to racist or classist intentions. Governmental bodies (tainted as they were by sentiments and beliefs we now find repugnant) embraced weapon regulations as a part of their fundamental obligation to protect the public and preserve the peace.

9.      This declaration and report explores the various approaches to public carry regulation (including those that restricted open- as well as concealed-carry) in detail. The public-carry tradition set the stage for the development of licensing laws that vested local officials with the authority to issue permits for specific individuals. At times they had to follow statutory constraints in evaluating license applications, but in many instances licensing laws depended upon the discretion of local police, boards, marshals, commissioners, and mayors.

10.     This declaration and report also explains that Americans of the nineteenth century who habitually carried deadly weapons (meaning the non-militia weapons discussed below) in public spaces generally did so concealed rather than openly. Sources from nineteenth-century social history show that the open carrying or wearing of deadly weapons in populated areas carried negative connotations—indicating one's rudeness, proclivity toward violence, or embroilment in a potentially deadly conflict. To be *seen* carrying weapons invited suspicion, judgment, or even the intervention of local officials charged with keeping the peace; for this reason, weapon-carriers of the nineteenth century tended to conceal their knives and revolvers in unobtrusive parts of their bodies and clothing (within a pocket, under a coat, tucked inside a boot, etc.). The open carrying of weapons like knives and revolvers was more likely to occur in rural or isolated areas where weapon-wearers were shielded from public view, exposed to significant dangers, or on their own property. Rather than a national or even regional norm, the everyday open carrying of deadly weapons was a divergent behavior, noteworthy according to the travelers, adventurers, and commentators who encountered it. If habitual weapon-carriers usually shared a preference for concealment, they also appear to have shared a motivation of being preemptively armed in case of an unforeseen emergency. In other words, those who regularly carried weapons did so in ways (concealed) and for reasons (preemptive self-defense) that Americans today should find familiar. The difference, though, is that nineteenth-century Americans created regulations that aimed to suppress the everyday, casual carrying of deadly weapons for preemptive self-defense when there was no specific, articulable threat to the weapon-carrier. Moreover, they and their courts understood such weapon regulations to operate in harmony with both the Second Amendment and the right of self-defense. It is important to bear historical context in mind—including information about social attitudes, public opinion, dress, and popular sentiment—when evaluating historical

regulations, because they were not written and enforced in a social vacuum any more than our laws are today.

## DEFINING DEADLY WEAPONS

11.     Americans living in the nineteenth century generally distinguished between two types of weapons: arms suitable for militia service or hunting, and concealable weapons associated with interpersonal violence and known as *deadly weapons*.[3] In the decentralized, agricultural environments that characterized early American life, hunting knives, rifles, muskets, and shotguns were important tools present in most rural homes. Men used these firearms for militia service and for the occasions when they were required to participate in local policing efforts through the *posse comitatus*, but they would have much more frequently used such weapons for hunting. Rifles, muskets, and shotguns were not likely to be used in the commission of crimes, especially crimes of passion that resulted in murder or manslaughter. Those offenses were much more likely to be committed with bare hands, blunt instruments, or other types of weapons such as concealable knives and pistols.[4]

12.     A series of socio-economic and political factors prompted Americans of the nineteenth century to be more likely than their eighteenth-century predecessors to take  deadly weapons such as dirks, bowie knives, and pocket pistols into public settings with them. Rates of

---

[3] There are some exceptions to this tendency, such as sales restrictions that applied to all firearms rather than just pistols, or certain sensitive place laws that prohibited all firearms in addition to deadly weapons. *See* Ohio 1880 at 79–80, establishing a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition for the same." *See also* John A. Hockaday, et al., *Revised Statutes of the State of Missouri* (Jefferson City: Carter & Regan, State Printers, 1879), 224 § 1274, prohibiting the carrying of any "firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon" at "public assemblage[s]." Nonetheless, this distinction between deadly weapons and militia or hunting weapons was foundational to nineteenth-century regulatory policies.

[4] Guns were used in less than half of the murders of unrelated adults, and less than ten percent of marital murders during the seventeenth and eighteenth centuries. The greater availability of handguns after the mid-nineteenth century facilitated, but did not cause, rising numbers of intimate-partner homicides. And gun use in homicides by family members or relatives also rose during the latter 1800s. See Roth, *American Homicide*, 115, 285-286, 294.

homicide, violence, and crime were rising in many parts of the country, while the availability and lethality of weapons rose in tandem.[5] The greater prevalence of deadly weapons in public spaces, and the bloody consequences of it, prompted American people across the country to turn to weapon regulations as a solution. These regulations tended to focus upon readily concealable "deadly weapons" like knives and pistols rather than the firearms used for militia and hunting purposes. Deadly weapons were associated with crime and needless bloodshed, and the people habitually carrying them were presumed to be ruffians, burglars, and assassins—those ready to settle personal difficulties with blood rather than by reason and law. The other feature shared by deadly weapons was their suitability for concealment, and in fact, deadly weapons were often referred to as "concealed weapons" for that very reason.[6] An 1886 law journal synthesized this point by saying:

> A statute making it indictable for one to carry concealed about his person any 'pistol, bowie-knife, razor, or other deadly weapon of the like kind,' embraces a butcher's knife. The words 'other deadly weapon of the like kind' imply similarity in the deadly character of weapons, such as can be conveniently concealed about one's person, to be used as a weapon of offence and defense.[7]

13.     During this time "deadly weapons" primarily included large knives, "pocket pistols," and, later, revolvers ranging from 4-shot to 6-shot. The phrase could also apply to various other small or readily concealable weapons.

---

[5] Darrell A. H. Miller and Jennifer Tucker, "Common Use, Lineage, and Lethality," *UC Davis Law Review* 55 (2022), 2495-2513 (Describing how the Theoretical Lethality Index (TLI) "shows that weapons have increased sharply in lethality from the mid-nineteenth century to the present day," at 2509-2510).

[6] For example, see "What They Think of It: The State Press on the Carrying of Concealed Weapons," *Daily Constitution* (Atlanta, Georgia), April 11, 1879, 4; and "Concealed Weapons: What Is Thought of the Practice by the Press of the State," *Daily Constitution* (Atlanta, Georgia), March 27, 1879, 1. The articles quote numerous other newspapers from Georgia which condemn carrying deadly weapons in terms that associate going armed and carrying deadly weapons with the habit of carrying concealed weapons. See also 1852 New Mexico Territory 67, § 1 (prohibiting the concealed carrying of "short arms, such as pistols, daggers, knives, and other deadly weapons.").

[7] "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 410. This was quoted in *State v. Erwin*, 91 N.C. 545 (1884).

*Large Knives*

14.    Prior to the widespread availability of revolvers near the mid-nineteenth century, large knives were the most problematic deadly weapon. There were so many different styles and names of knives that Americans sometimes struggled to distinguish them from one another. To make matters even more complicated, labels and definitions might vary geographically, change over time, and were not set in stone during the nineteenth century.[8] A case arising in Tennessee during the 1840s revolved around what particular style of knife he had carried (the jury settled on Mexican pirate knife) and whether he had been indicted for carrying a bowie knife, or a knife *resembling* a bowie knife. The abundance of knife names and styles inspired lawmakers to insert catchall language into weapon regulations, like "or any other knife of the like kind," and "or any other deadly weapon."[9]

15.    By far the bowie knife became the style most widely known, used, and discussed by Americans in the nineteenth century. These knives could be easily concealed within a pocket or tucked into a waistband, notwithstanding their length. In 1827, Jim Bowie, for whom the blade is named, used it to great effect in a duel that turned into a melee and became the subject of nationwide news coverage.[10] His death at the Alamo in 1836 cemented the legend of his namesake knife,[11] which became one of the most widely denounced deadly weapons of the antebellum nineteenth century.

---

[8] Worthen, *Arkansas Made*, I:267–268.

[9] 1839 Alabama 67, § 1 ("That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansaw tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon…"). This is just one example; with additional time I can provide more examples of this catchall language, which was quite common.

[10]    "Terrible Recontre," *Niles' Register* (Baltimore, Maryland), November 17, 1827, 182: https://archive.org/details/sim_niles-national-register_1827-11-17_33_844/page/182/mode/1up. The same article was also reprinted here: https://chroniclingamerica.loc.gov/lccn/sn83045110/1827-10-31/ed-1/seq-2/.

[11]    William R. Williamson, "Bowie, James," *Handbook of Texas Online*, accessed February 25, 2023, https://www.tshaonline.org/handbook/entries/bowie-james. Published by the Texas State Historical Association.

16.      Fighting knives were not new in the 1830s, and the exact styling of the original Bowie knife remains unknown, but Bowie's life story became a vehicle for Americans to discuss and address a growing problem of knife-violence. Jim Bowie's use of a fighting knife within the context of a duel exemplified a startling tolerance for brutality among residents of the backcountry and frontier. Across the eighteenth and nineteenth centuries, these pockets of settlement isolated from large population centers and far from the oversight of governing institutions fostered horrifying violence in the form of extrajudicial executions, vendettas, maiming, and more. Early settlements taking advantage of new economic opportunities, like river ports along the Ohio and Mississippi waterways, became magnets for ambitious but rough folk who could easily find themselves in a kill-or-be-killed situation. Natchez, Mississippi (near the site of Bowie's infamous duel) was just such a place—with hard-drinking, violent, illiterate boatmen passing through a bustling town that carried far greater economic significance than its frontier atmosphere would suggest. The cycle of violence prompting knife-carrying, which in turn prompted further violence, was especially notable in southern areas though not exclusive to them. [12]

17.      The response on the part of Americans confronting knife-violence was the regulation of such weapons. Going back to 1801, nineteenth-century weapon restrictions regulated

---

[12] *See* "Another Victim of the Bowie Knife," *Cheraw Gazette* (Cheraw, South Carolina), September 6, 1837, 3: https://chroniclingamerica.loc.gov/lccn/sn88084121/1837-09-06/ed-1/seq-3/. For examples of a southern association with bowie knives, see "Carrying Concealed Weapons," *Daily Picayune* (New Orleans, Louisiana), July 25, 1840 (denouncing those who "go habitually armed, making an arsenal of their persons" and that "where offence is given or injury sustained, even the code of *honor* has laid down other means of redress than an instant appeal to the Bowie knife," and questioning "incessantly carrying concealed weapons."); "The Bowie Knife," *Southern Argus* (Columbus, Mississippi), June 7, 1842 ("The small dagger worn in former times, has given place to this more formidable invention, and the Bowie knife, throughout the West, is now the most common weapon of attack or defence."); and "Bowie Knife," *The Slave's Friend* 3, no. 2 (1838), 17 ("People in slave states often carry such knives about them," and "When they get angry they draw the knife, and sometimes *stab one another!*").

the presence of knives larger than a regular pocket knife in public places.[13] As homicide rates increased and the popularity of bowie knives grew, so did laws restricting bowie knives.[14]

*Pocket Pistols and Revolvers*

18.    Over the course of the nineteenth century, revolvers eclipsed bowie knives as the most  problematic deadly weapon within American communities. During that timeframe, pistols evolved from single-shot devices to revolving repeaters, and they generally became smaller and more readily concealable as well. Not only did the full-sized pistols in use by mounted soldiers decrease in size, but manufacturers produced more models that were purposefully small and concealable.

19.    Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzle-loading devices modeled after designs that appeared in the eighteenth century.[15] After being fired, they were useful only as clubs until they could be reloaded through a process that took upwards of fifteen seconds.[16] The largest of these muzzle-

---

[13] Tenn. 1801 ch. 22 § 6 (prohibiting "privately" carrying "any dirk, large knife, pistol or any other dangerous weapon."). Similar laws existed in numerous states during the antebellum nineteenth century, including: Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife . . . ." *See also* 1838 Vir., ch. 101 ("any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . ."; 1840 Ala., ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun . . ."; 1819 Ind., ch. 23 ("any dirk pistol, sword in cane, or any other unlawful weapon . . ."); 1821 Miss., ch. 49 ("any pistols, dirk or other such offensive weapons . . ."); 1812 Ken., ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane . . ."; 1813 La., ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon,"; Revised Statutes, Wisconsin, 1849, Title XXXI, Ch. 142, "Of Proceedings to Prevent the Commission of Crime," Sec. 18 ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon . . ."); Revised Statutes, Michigan, 1846, Title XXXI, Ch. 162, "Of Proceedings to Prevent the Commission of Crime," Sec. 16 ("a dirk, dagger, sword, pistol, or other offensive and dangerous weapon . . ."). This is not an exhaustive list.

[14] As a general rule, public carry laws included knives within their purview, and some jurisdictions prohibited the sale of bowie knives as well.

[15] Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116.

[16] For example, see the website: https://timothyrjeveland.com/how-to-load-and-fire-a-musket-or-flintlock-pistol-explained-briefly-with-appropriate-jargon/.

loading pistols were called "horse" pistols and had been adapted to cavalry and dragoon[17] service in the early modern era. Horse pistols measured a foot or more in length and were carried in holsters that attached to a saddle; they were not designed to be carried on the person.[18] Mid-sized pistols were designed to be carried either on the belt (sometimes attached by a ring on the firearm), in the pocket of a greatcoat, or in a portable case. One of the main uses of these seven-to-ten-inch pistols prior to the nineteenth century was for defensive purposes while traveling.[19] The smallest size, measuring approximately five or six inches in length, was the pocket pistol. As the name suggests, these firearms were purposefully designed to be carried within the pockets of everyday attire.[20] The most famous of these was the deringer pistol, named for its designer, Henry Deringer, and notorious as the gun used to assassinate Abraham Lincoln. Deringers (often misspelled as "derringers") were capable of firing large calibers, which made them exceedingly lethal at close range—often more lethal than mid-sized navy revolvers.[21]

20.     In the early nineteenth century, popular outrage and concern over bowie knives overshadowed concerns about pocket pistols. Still, pistols lent themselves to the same violent ends as fighting knives, and regulatory strategies attempted to discourage their presence in public spaces. Concern about pistols grew over time as revolvers became more readily available to American consumers. Even though Samuel Colt obtained his first patent in 1836, it took until about midcentury for Colt revolvers be produced in sufficient numbers to begin saturating the American

---

[17] Dragoons emerged in the early modern era as a type of unit that could fight both mounted and dismounted. In many instances, they rode to battle on horseback but fought on foot. Dragoon units within the US Army were organized in 1833 and stationed in the West (initially Fort Smith, Arkansas) where Indian conflicts necessitated mounted warfare. *See* https://www.nps.gov/fosc/learn/education/dragoon5.htm.

[18] Blair, *Pollard's History*, 104, 119.

[19] *Id.* at 117–118.

[20] *Id.* at 116–118; ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire," p. 117).

[21] Lee A. Silva, "Henry Deringer's Popular 'Pocket Cannons' Packed a Wallop from California to Washington, D.C.," *Wild West* (April 2002), 12–13.

market. That process accelerated as a result of two things: 1) the loss of his patent in 1857, which allowed new entrants into the market; and 2) the development of a large manufacturing capacity due to wartime production during the Civil War. These factors caused the Civil War Era, stretching from 1850 to 1870, to see a dramatic rise in the availability of these weapons. Even though it took several decades, the revolver eventually overtook dirks and bowie knives as the weapon considered most problematic in American communities.[22]

21.     The Colt revolver diverged from pistols widely available at the time in two critical ways. First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading). Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.[23] The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process. By about the 1870s, technological developments in the design and functionality of ammunition meant that later-model revolvers could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more efficient—a boon on the battlefield, but a new danger in other contexts.

22.     Revolvers were produced in the three historical sizes or styles: "horse," "belt," and "pocket" models. By Colt's era, "horse" pistols tended to be called "army" or "holster" pistols because they were used by mounted soldiers and kept in saddle holsters. Army pistols became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, and they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and

---

[22] On the life of Samuel Colt and the history of his firearm manufacturing companies, *see* Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020).

[23] Revolvers' firing capacity could range anywhere from four to seven shots depending on the manufacturer and design of the firearm in question.

postbellum eras. The "belt" or midsized pistol would have been worn in a hip holster attached to a belt, or tucked within a belt or sash. Colt's version of it came to be called the "navy"[24] model and may have been the most common type of revolver among civilians around the time of the Civil War. The first pocket pistol produced by Colt was released in 1848 and had five shots.[25] In later decades, pocket revolvers could be purchased in small sizes and calibers and at a relatively low cost. Cheap revolvers, especially imitation brands of a lesser quality, could be had for a few dollars, with used ones selling for even less.[26]

23. The tremendous increase in the number and availability of revolvers had an impact upon Americans and their lives. If people fearful of an unforeseen encounter were more likely to carry pistols concealed, so too were lawmaking bodies becoming increasingly likely to respond with regulations that discouraged or penalized such behavior. The cascade of weapon regulations in the post-Civil War decades is partially a result of ongoing bureaucratization within American government, but it also indicates a regulatory reaction to the growing problems posed by easy access to weapons and widespread public carrying of them in public spaces.[27]

### Slung Shots and Other Deadly Weapons

24. Revolvers and bowie knives were the most notoriously problematic deadly weapons in nineteenth-century American communities, but they were not the only ones. Others included sword-canes and loaded canes, as well as metal knuckles (often referred to as "knucks")

---

[24] The label "navy" may have been derived from the fact that the model featured an engraving of a naval battle. The name may also have been related to its having a smaller size and caliber that were more suited to being used in naval engagements. It is not entirely clear why Colt named the midsized belt pistol the "navy" model.

[25] Haven and Belden, *Colt Revolver*, 63–73.

[26] On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

[27] On the growth of government bureaucracy and administration in the late nineteenth century and later, see Stephen Skowronek, *Building a New American State: The Expansion of National Administrative Capacities, 1877-1920* (New York: Cambridge University Press, 1982).

14

and slung shots. A slung shot was a makeshift weapon associated with organized crime and street gangs. Unlike a sling shot that we might think of today, a slung shot was a weapon in which a weighted ball could be swung from a cord or handle in a striking motion. The Oxford English Dictionary defines it as "[a] shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon," and attributes it to the United States.[28] The phrase could describe various kinds of homemade weapons and did not have a single, nationwide definition. A commenter from the South during the 1870s described a slung shot as being "made by putting stones in woolen stockings."[29] Around the same time, a Native American "war-club" was also referred to as a type of slung-shot with "the stone ball hanging loosely from the handle in a bag of buckskin."[30] Testimony in a Texas trial (1908) offered an explanation of the slung shot's use and deadliness. "The only slung shot I ever saw was by having a ball of shot or metal covered with leather, and a band of elastic or leather, attached to such a ball, and made so that the same could be attached to the wrist or arm of a person[.] . . . [A]nd, when a person using them would strike with his fist, the ball or weight would extend beyond his fist and strike a person, and, by being covered, would cause no sound."[31]

25. Unlike firearms and knives, which required specialized knowledge and equipment to manufacture, a slung shot could be made by just about anyone. Slung shots and other club-like instruments also had no military function and therefore did not receive the constitutional protection which certain types of firearms did (like rifles and muskets conducive to militia service, as well as horse pistols). Beginning in the 1840s, laws prohibiting the carry, use, and manufacture of slung shots began to appear in numerous states. These prohibitions usually existed in addition to public

---

[28] "Slung-shot," *Oxford English Dictionary*.
[29] Quoted in Richard Hopwood Thornton, *An American Glossary: Being an Attempt to Illustrate Certain Americanisms Upon Historical Principles*, 2 vols. (London: Francis & Company, 1912), II: 815.
[30] Otis T. Mason, "American Indian Weapons," *Nature* (June 10, 1875), 107-108, Fig. 2.
[31] *Geary v. State*, 53 Tex.Crim. 38 (1908).

15

carry laws that applied to deadly weapons more broadly. In 1849, Vermont's legislature passed a law saying, "Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose or keep for sale or gift, or part with any instrument or weapon of the kind usually known as slung shot, or of any similar kinds, shall be deemed guilty of a misdemeanor."[32] The law went on to punish carrying, using, attempting to use, and being "found in the possession of" a slung shot as a felony.[33] Similar laws went into effect in New York (1849), Massachusetts (1850), Florida (1868), Dakota Territory (1883), Minnesota (1885), and Oklahoma Territory (1890) among others.[34]

### CONTEXT OF AMERICAN VIOLENCE

26.    Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors. Where Americans failed to unite together based upon common interests and principles, and where they viewed governing institutions with

---

[32] 1849 Vermont ch. 36, 26 § 1.

[33] 1849 Vermont ch. 36, 26 § 2.

[34] 1849 N.Y. ch. 278 § 1 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, or expose, or keep for sale or gift, or part with any instrument or weapon the kind usually known as slung shot, or of any similar kinds,"); 1850 Mass. ch. 194 § 2 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose for sale, any instrument or weapon of the kind usually known as slung shot,"); *Laws of Florida – First Session* (1868), Ch. VII, § 11 ("Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles,"); *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative Assembly* (1883), ch. 38, § 455 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor." Repeated during statehood, *see Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1899), ch. 40, "Crimes against the Public Health and Safety," 1461 § 7311); *Penal Code of the State of Minnesota to Take Effect January 1, A.D. 1886* (St. Paul: Pioneer Press Co., 1885), § 333 ("A person who manufactures or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles,"); *Oklahoma, 1st Regular Session*, (1890), ch. 25, 475–76 § 18 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor."). This is not an exhaustive list. Political scientist Robert J. Spitzer identifies 71 state laws enacted during the nineteenth century related to slung shots, an as-yet undetermined number of which addressed manufacture. Declaration of Robert Spitzer filed in *Chavez v. Bonta*, Case No. 19-cv-1226-L-AHG (S.D. Cal.) (ECF No. 111-3) ¶ 51. Beyond that, municipal ordinances have not been preserved and digitized with the degree of comprehensiveness that state laws have, so there may be additional local regulations pertaining to the manufacture and sale of slung shots.

16

skepticism, violence tended to rise.[35] The southern society predicated upon racial slavery made slaveholding states more violent places than northern counterparts. Across the nineteenth century, pervasive racism, rural poverty, and unrepresentative state and local governments meant that violence remained a staple of southern life. Northern cities and states were not immune from high levels of homicide and crime, either. They saw a sharp uptick in violence and homicide from about 1840 through the end of the Civil War, and then again in the closing decades of the century. Ethnic tension, political conflict, and the effects of industrialization (urbanization, poverty, lack of resources, etc.)—all of which eroded the cohesion of communities and citizens—fueled this trend.[36]

27.    The American Civil War worsened the United States' trajectory toward rising rates of homicide and violence. The war itself claimed many thousands of lives, but the entire era stretching from the road to war in the 1850s through the collapse of southern Reconstruction state governments in the 1870s marked a horrific period of violence, turmoil, and political instability. It coincided with the United States' divergence from the rest of the Western world in terms of homicide rates. When the nations of Western Europe were becoming less violent and homicidal, Americans were becoming more so. The proliferation of revolvers during this same time period exacerbated these problems, rendering armed encounters even more deadly than they had been before. War Department patronage of gun manufacturers grew exponentially during the Civil War. By the time the conflict was over, gun-makers like Colt, Smith & Wesson, and Remington had

---

[35] Historian Randolph Roth has shown that four correlates contribute to rates of homicide: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy. *See* Roth, *American Homicide*, 17–26, 300.

[36] On homicide in American history, particularly as broken down into northern and southern regions, *see* Roth, *American Homicide*, 297–326, 386–88 (for trends in northern areas); at 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); at 184 (complicating data from p. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

achieved a tremendous capacity to manufacture firearms in staggering numbers. Some of their factories were producing thousands of guns per month.[37]

28.    When the armies stopped fighting, the chief buyer of these firearms—the United States military—no longer needed such a large supply. Manufacturers turned to the civilian market, promoting revolvers to potential buyers across the country. Pocket pistols, designed for concealment and portability, were marketed heavily. For instance, Colt produced both a "ladies' model" as well as a "house" pistol.[38] The explosion in production was all the more pronounced by the entry of imitation brands of pocket pistols sold at much lower prices.

29.    But the structural forces driving Americans to be more violent and homicidal did not go away after the Civil War. Northern states experienced a brief reduction in homicide rates immediately following their victory (inspired largely by renewed faith in the American experiment), but socio-economic forces subsequently turned the tide once again toward instability, violence, and homicide. Industrialization, class stratification, urban living conditions, labor unrest, and ethnic division all combined to make American cities and manufacturing centers more dangerous places than in the antebellum era. Poverty begat crime, and the ease with which the criminally inclined could acquire pocket pistols led to more armed robberies and armed assaults.[39] In the southern states, rates of violence and homicide remained high throughout the Reconstruction and the Jim Crow eras.[40]

---

[37] Bridesburg, a smaller company, produced 5,000 muskets per month during a part of the war. *See* Graham Smith, *Warman's Civil War Weapons* (Iola, WI: KP Books, 2005), 128–29. On firearms and revolvers as critical to industrialization and the American System of Manufacture, see Rasenberger, *Revolver*, 113–15, 287–88.

[38] For example, *see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It* (1875), 23 (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of [robber baron Jim] Fisk").

[39] Roth, *American Homicide*, 386–88.

[40] Roth, *American Homicide*, 386–88.

30.     The introduction of pocket revolvers into these political, racial, personal, and criminal conflicts was profound. The causes and kinds of violence were largely the same—racism, classism, desperation, manly honor, etc.—but the ease with which pocket pistols could be acquired made these conflicts more likely to be *armed* conflicts. Low prices, easy access, and concealable sizes also acted to encourage men to carry a revolver in public (often contrary to law) even when they had not done so previously; having it about one's person was a great temptation to use it in a moment of anger, which ruined the lives of the combatants as well as their families.[41] The situation had a significant impact upon the justice system by forcing jurists, lawmakers, and even jurors to reevaluate the law of self-defense and the "heat of passion" defense. Eventually, the idea emerged that having deadly weapons upon one's person "raises [a] presumption of guilt,"[42] regardless of whether they were openly carried or concealed, and regardless of whether the carrier intended to use them in an assault or not.[43]

## NINETEENTH-CENTURY WEAPON REGULATIONS

31.     When Americans of the nineteenth century confronted a scenario where there were more weapons and more instances of homicide and assault related to the use of those weapons,

---

[41] *See* "The Deadly Revolver," *Stephenville Empire* (Stephenville, Texas) April 5, 1884, 2; reprinted from *Houston Post* (Houston, Texas) (that "the law of the land cannot afford to make the distinction" between "a murderer with a malice aforethought, and a homicide, whose hand in an unguarded moment pulls the trigger and discharges the contents of a deadly weapon into an adversary, even before the nature of the act is realized.").

[42] *State v. Reams*, 121 N.C. 556 (1897) ("The offense of carrying a concealed weapon about one's person, and off his own premises, consists in the guilty intent to carry it concealed, and not in the intent to use it; and the possession of the weapon raises the presumption of guilt, which presumption may be rebutted by the defendant.").

[43] Some legal guidebooks asserted that intent or motive for carrying deadly weapons was immaterial, while other commentators advocated inferring malicious intent from the act of carrying weapons in much the same way that carrying lockpicks and other tools of burglary were evidence of intent to burglarize. *See* "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 412; "Entirely Too Many Revolvers," *Albany News* (Albany, Texas), August 22, 1884, 5 ("The man who, while drunk, shoots and kills another may not be hanged, because he was not competent to premeditate. He was, however, competent to premeditate against all mankind when he armed in sober moment with a weapon which could be intended for no other purpose than to kill or seriously injure."); "Toy Pistols and Concealed Weapons," *The Sun* (Baltimore, Maryland), July 19, 1881, 2 ("but the mayor contends that any man carrying a concealed deadly weapon in Philadelphia 'carries it for a purpose not self-defense'."); "War on the Pistol," *Philadelphia Enquirer* (Philadelphia, Pennsylvania), July 25, 1881, 2 (Mayor's proclamation stating, "Whosoever carries *concealed* deadly weapons carries also the *concealed* thought of murder.").

they took action. Americans turned to their governments to establish new rules that would protect the public from the dangers posed by widespread weapon-carrying. The primary mode of regulation was to restrict the ways in which people could lawfully carry weapons in public spaces. Scholars today call these "public carry" regulations. Other laws prohibited the carrying of weapons in public gathering places. Nineteenth-century Americans also taxed the personal possession of deadly weapons and established rules for dealers that ran from minimum-age requirements to sales registries and occupation taxes. Prohibiting the sale of weapons was not unheard-of, with numerous states placing such restrictions upon slung-shots and a handful of other jurisdictions prohibiting the sale of other deadly weapons.

*Public Carry Laws*

32.    In the nineteenth century, state legislatures responded to rising levels of violence by enacting new laws that restricted the carrying of weapons in public spaces. These new statutes built upon a deep tradition within English common law and expressed in the medieval Statute of Northampton. During the nineteenth century, new American public carry statutes generally took two forms. The first approach, textually tied to the Statute of Northampton and broadly prohibiting "going armed," often invoked sureties and peace bonds rather than a criminal fine or imprisonment. In this "going armed" regulatory scheme, justices of the peace had the authority to stop, detain, arrest, and bind to the peace anyone who carried "offensive weapons" outside of normal circumstances, like militia or patrol service, providing assistance to authorities, taking a firearm to a gunsmith for repair, etc.[44] The second regulatory form developed in the Old Southwest and relied upon criminal penalties to restrict the carrying of certain enumerated deadly weapons.

---

[44] On the English origins of this tradition in American history, see Saul Cornell, "The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace," *Law and Contemporary Problems* 80 (2017), 30-43. The phrase "offensive weapons" referred to arms that were not, like armor and shield, strictly defensive; firearms were considered "offensive" weapon in England. Id., 20.

Taken together, the two regulatory strategies tightly restricted the public carrying of deadly weapons by prohibiting "going armed" without proper cause and forcing would-be carriers to wear their weapons in full open view—a way of carrying weapons that was not only inconvenient in light of men's dress at the time, but also reflected poorly upon the wearer as a ruffian or coward pitting himself against social norms. Ultimately, both of these forms of public carry regulation presented enforcement challenges that encouraged Americans to turn to licensing laws as a solution. Licensing policies allowed people with prior approval to carry weapons despite the continuation of broad restrictions that applied to the rest of the population.

33.    In the eighteenth and early nineteenth centuries, some American states passed laws that essentially repeated elements of the Statute of Northampton, reiterating that the rule applied within their jurisdictions.[45] A particularly illuminating example of this process is a Massachusetts law enacted in 1795, which repeated phrasing and clauses from within the Statute of Northampton, and broadly prohibited the carrying of arms into public spaces. It empowered justices of the peace to "cause to be staid and arrested" anyone who disturbed the peace, engaged in assault or affray, or "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[46] The unauthorized carrying of weapons was itself a terrifying act that struck fear or caused "terror to the people."[47] Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety, which was

---

[45] 1786 Virginia ch. 49 "An Act forbidding and punishing Affrays;" 1792 North Carolina ch. 3 "No Man shall come before the Justices, or go or ride armed."

[46] 1795 Mass. Ch. 2, 436.

[47] On the historical significance of the phrase "to the terror of the people" and its inherent association with weapon-carrying, see Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555–56 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Patrick J. Charles, "The Fugazi Second Amendment: *Bruen's* Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (May 2023), 635 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.'").

21

itself part of the common law inheritance.[48] Between 1800 and 1850, Tennessee, Maine, and Delaware emulated this approach.[49]

34.     The 1795 Massachusetts law, which addressed going armed within the context of riot, affray, and disturbing the peace, was translated into a penal code edition published in 1836, and in that process the "going armed" portion was isolated into its own section. It read: "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided."[50] What counted as a "reasonable" cause to carry a weapon was a question for the judicial system to decide, either by a magistrate or (in later decades) a jury.[51] The statute clarified the law by showing that "going armed" was a

---

[48] The peace bond was one of many processes inspired by America's common law heritage. *See* Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 73–74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

[49] 1801 Tennessee ch. 22, § 6 "That if any person…shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice…to bind such person…to their good behavior… ." 1821 Maine ch. 76, "An Act describing the power of Justices of the Peace in Civil and Criminal Cases," 285, §1. "That it shall be within the power, and be the duty of every Justice of the Peace within his county, to punish…all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State… ." *Revised Statutes of the State of Delaware, to the Year of Our Lord 1852* (Dover: S. Kimmey, 1852), Title XV, ch. 97, 333 § 13. "Any justice of the peace may also cause to be arrested and bind to surety of the peace all affrayers, rioters, breakers and disturbers of the peace, and all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous."

[50] *Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835* (Boston: Dutton & Wentworth, 1836), ch. 134, 70 § 16. This section cites "Persons who go armed may be required to find sureties for the peace &c., 1794, 26 § 2," which appears to be a reference to 1795 Mass. ch. 2, 436.

[51] Charles, "The Fugazi Second Amendment," 648 and accompanying notations.

separate offense from disturbing the peace, riot, and affray. And it maintained the previous policy that any carrying of arms in public "without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property" was out of bounds. [52]

35.     The early nineteenth century was a time when many states were drafting legal codes—making the law known and accessible to the people, which was part of the democratic spirit of the age. In undertaking that process, numerous states adopted verbatim the penal code version of the Massachusetts public carry law. [53] It was repeated in Wisconsin (1839), Maine (1840), Michigan (1846), Virginia (1847), Minnesota (1851), and Oregon (1853). [54] In all of these states, the act of "going armed" without a reasonable cause was a violation of the law. In much the same way that Massachusetts had, Maine's preexisting law followed the traditional model of the Statute of Northampton. [55] But for Wisconsin, Michigan, Minnesota, and Oregon, this was their first public carry law.

36.     Maine was not the only adopter of the 1836 Massachusetts statute to be updating their current weapon policy. Virginia had previously enacted a public carry law in 1838, but it diverged from the Statute of Northampton and in fact aligned with a regulatory approach that was gaining traction in the South and Old Southwest. The 1838 Virginia law explicitly prohibited the

---

[52] *Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835* (Boston: Dutton & Wentworth, 1836), ch. 134, 70 § 16.

[53] In addition to the states listed in the following sentence, see John Purdon, et al, comps., *Digest of the Laws of Pennsylvania* (Philadelphia: Kay & Brother, 1862), 250, § 6 and accompanying notation.

[54] 1838-1839, Wisconsin, *Statutes of Wisconsin*, "An Act to Prevent the Commission of Crimes," 381 § 16; *Revised Statutes of the State of Maine, Passed October 22, 1840* (Augusta: W. R. Smith, 1841), ch. 169, "Of Proceedings for the Prevention of Crimes," 709 § 16; *Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846* (Detroit: Bagg & Harmon, 1846), Title 31, ch. 162, "Of Proceedings to Prevent the Commission of Crime," 692 § 16; 1847 Virginia, 1847-1848 Session, Title 3, ch. 14, "Of Proceeding to Prevent the Commission of Crimes," 129, §16; *Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851* (St. Paul: J. M. Goodhue, 1851), ch. 12, "Of Proceedings to Prevent the Commission of Crimes," 528 § 18; 1853 Oregon, General Laws, 5th Regular Session, 220 § 17.

[55] 1821 Maine ch. 76, 285, §1.

23

carrying of concealed weapons and punished such behavior by fine and/or jail time.[56] The extent to which this 1838 statute coexisted and overlapped with the 1847 "going armed" statute remains unknown[57], but the example of Virginia highlights the fact that there were different approaches to public carry legislation during the antebellum nineteenth century. The other approach—which was more common in southern states—also grew out of the Statute of Northampton, but tended to prohibit *concealed* weapons and require criminal penalties for violation rather than sureties to keep the peace.

37.     Tennessee presents an insightful example of the development of this concealed-carry approach. An 1801 public carry law made use of longstanding common law language and phrases providing that anyone who "shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person" would be required to post a bond, go to jail, or "be punished as for a breach of the peace, or riot at common law."[58] This law was quite similar to the Statute of Northampton derivative adopted by Massachusetts and other states, in its prohibition against the kinds of unauthorized weapon-carrying that were intrinsically terrifying.[59] It innovated, however, by prohibiting "privately" carrying certain enumerated weapons, which may refer to concealed-carrying or carrying weapons within private settings as well as public ones. A separate statute from 1821 used the same public-private language, reading: "Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall

---

[56] 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76 § 1. "That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation . . . ."

[57] It is unclear whether the 1847 Virginia penal code section pertaining to going armed effectively repealed the statute put in place in 1838.

[58] 1801 Tennessee ch. 22, § 6.

[59] On the inherently terrifying nature of unauthorized weapon-carrying, see above, n. 47.

24

pay a fine of five dollars for every such offence."[60] As compared to the earliest law from 1801, the language had been simplified substantially, and the list of prohibited weapons formed the basis for this statute rather than phrasing directly inherited from the Statute of Northampton. Still, it broadly prohibited the carrying of certain weapons in unambiguous terms, and (depending upon what lawmakers meant by carrying in "private") may have either prohibited carrying weapons in private settings or carrying them in a concealed manner. About fifteen years later and in response to the emergent fear of assaults and murders with bowie knives, Tennessee lawmakers added yet another law prohibiting the concealed carrying and sale of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansaw [sic] tooth pick."[61] This series of laws does not present with examples of superseding statutes, either. State penal code editions of 1831, 1836, and 1857 included *all* of the weapon laws then in force.[62] Tennessee's laws illustrate changes in regulatory approach over time, and taken together, they provided local officials with a suite of regulatory tools to take both preventive and remedial action to protect the peace and the public from the dangers posed by weapon-carrying.[63]

38.    Tennessee was not the only state to adopt this language to regulate public carry during the antebellum nineteenth century. Similar weapon restrictions had been enacted in Louisiana and Kentucky in 1813, at a time when both states were experiencing dramatic population

---

[60] 1821 Tennessee ch. 13.

[61] 1838 Tennessee ch. 137. It is worth noting that the well-known antebellum public carry case, *Amyette v. State* (1840) concerned this knife-specific 1838 law—not the broader 1801 or 1821 prohibitions upon going armed, which remained in force until substantial policy changes occurred during Reconstruction.

[62] John Haywood, et al, *Statute Laws of the State of Tennessee* (Knoxville: F. S. Heiskell, 1831), 10-11; R. L. Caruthers, et al, *Compilation of the Statutes of Tennessee* (Nashville: Steam Press of James Smith, 1836), 99-101; Return J. Meigs, et al, eds., *Code of Tennessee Enacted by the General Assembly of 1857-8* (Nashville: E. G. Eastman and Co., 1858), 851-853.

[63] See 1825 Tennessee ch. 19, repeated in the arms- and weapon-related sections of the 1831, 1836, and 1857 penal codes.

growth and economic expansion as a result of river transportation.[64] Like Tennessee's 1838 law, their statutes provided a list of prohibited deadly weapons that could not be concealed on the person and penalized violators with a fine and/or jail time.[65] States and territories following this model included: Indiana (1819), Florida Territory (1835), Georgia (1837), Arkansas (1837); Virginia (1838), Alabama (1839), Ohio (1859), New Mexico Territory (1859); Colorado Territory (1862); California (1863); Dakota Territory (1864); Montana Territory (1865); Nebraska (1873); Missouri (1874); Wyoming Territory (1875); Mississippi (1878); North Carolina (1879); South Carolina (1880); Delaware (1881); Illinois (1881); Washington Territory (1881); Maryland (1886); Oklahoma Territory (1890); District of Columbia (1892); Rhode Island (1893); and Alaska Territory (1896).[66]

39.     New York, Texas, West Virginia, and Idaho Territory adopted slightly different policies than either the "going armed" prohibitions modeled on the 1836 Massachusetts code or the concealed-carry restrictions just described. New York's 1866 public carry law prohibited a

---

[64] See 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1 ("any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view . . ."); 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1 (" any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum, not less than one hundred dollars . . . .");.

[65] Kentucky mandated a fine of not less than $100, half of which to go to the informer. Louisiana provided for a fine of $20 to $50, with half to go to the informer; violations occurring before a court received a find of not less than $100 and imprisonment up to six months. See 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1; 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1.

[66] 1819 Indiana ch. 23; 1835 Florida Territory ch. 860; 1837 Georgia, 90; 1838 Virginia ch. 101; William McK. Ball, et al, eds., Revised Statutes of the State of Arkansas (Boston: Weeks, Jordan, 1838), 280, § 13; 1838 Alabama ch. 77; 1859 Ohio 3:56; 1859-1860 New Mexico Territory 94–99 (English and Spanish); 1862 Colorado Territory 56 (applied to "any city, town, or village"); 1863 California ch. 485; 1864 Dakota Territory 128, § 455; 1864 Montana Territory 355; 1873 Nebraska 724, § 25; 1874 Missouri 43; Wyoming Territory ch. 52 (applied to "any city, town or village"); 1878 Mississippi ch. 46; 1879 North Carolina ch. 127; 1880 South Carolina 447-448; 1881 Delaware ch. 548; 1881 Illinois 73-74; Code of Washington (Olympia: C. B. Bagley, 1881), 181, § 929; 1886 Maryland ch. 375; 1890 Oklahoma Territory 476, § 20; Ch. 159, 52 Congress, Public Law 52-159, 27 Stat. 116 (1892), § 1; 1893 Rhode Island ch. 1180; Fred F. Barker, Compilation of the Acts of Congress & Treaties Relating to Alaska (Washington, D. C.: U.S. Gov. Print Off., 1906), Appendix A, 139, § 117.

range of weapon-related activities but included phrasing that required subjective assessments of a weapon-carrier's intent. The law punished anyone who "shall…use, or attempt to use or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess" certain deadly weapons.[67] Moreover, "The having possession of any of the [restricted] weapons…by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of…this act." So, in New York, possession of certain weapons in combination with furtive movements or seemingly suspicious behavior was illegal; and the rules of evidence cast willful or secret concealment as evidence of malintent.[68] This regulatory approach derived from laws about "rogues," in which possession of burglar's tools indicated intent to burglarize and amounted to a punishable offense. Georgia's 1816 penal code included a section along these lines, which applied itself to "rogues and vagabonds." It punished anyone who "shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break into any [enumerated dwelling or structure]…or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person… ."[69]

40.    Idaho, West Virginia, and Texas emulated the structure of concealed-carry restrictions by enumerating weapons that should not be carried, but they (like the "going armed" laws) restricted open-carry as well. West Virginia's 1882 law penalized anyone who were to "carry

---

[67] 1866 New York ch. 716, § 1.
[68] 1866 New York ch. 716, § 2. The list of regulated weapons was: "any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword cane or air gun." Pistols were not included in this list.
[69] Lucius Q. C. Lamar, *Compilation of the Laws of the State of Georgia* (Augusta: T. S. Hannon, 1821), 599, § 19.

about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character."[70] The law did not use the word "concealed" and thereby did not limit its prohibition to weapons concealed within a person's clothing or accoutrements. The Texas public carry law, enacted in 1871, similarly declined to limit its scope to "concealed" weapons. It held "That any person carrying on or about his person, saddle, or in his saddle bags, any [enumerated deadly weapon]…, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing" would be guilty of a misdemeanor.[71] Idaho Territory took the same approach of prohibiting the carrying of deadly weapons generally, but the law also mimicked those of other Mountain West jurisdictions in that it applied only "within the limits or confines of any city, town or village or in any public assembly."[72]

41.    State-level public carry laws did not remain static across the nineteenth century, and the laws previously described or cited were in some instances modified, superseded, and supplemented. The example of Tennessee, with its separate statutes from 1801, 1821, and 1838, shows lawmakers choosing to adopt overlapping and seemingly contradictory weapon policies. Georgia's first deadly weapon law was poorly written and confusing. After the state's high court struck down certain portions of the law, the state code adopted in 1860 provided a clearer concealed-carry regulation that fell in line with what many other states were doing.[73] In Kentucky, the 1813 concealed-carry law was quite the trail-blazer in terms of weapon policy, but the high

---

[70] 1882 West Virginia ch. 135, § 1.

[71] 1871 Texas 34, § 1.

[72] 1888 Idaho Territory 23.

[73] R. H. Cobb, et al, *Code of the State of Georgia* (Atlanta: J. H. Seals, 1861), 859, § 15. The section read: Any person having or carrying about his person, unless in an open manner and fully exposed to view, any pistol (except horseman's pistols), dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence, shall be guilty of a misdemeanor… ."). This section fell within Part 4, Title 1, which the prefatory pages of the code described as "for the Trial and Punishment of white persons." See Cobb, *Code of Georgia*, iv.

court also took on the role of trail-blazer by striking it down in 1822, in one of the first recorded appellate public-carry cases.[74] As caselaw on the subject developed elsewhere in the nation, Kentucky's anti-regulation policy turned it into a national outlier.[75] When state leaders gathered to draft a new constitution in 1850, they shut the door on the court's way of thinking by expressly authorizing the legislature to "pass laws to prevent persons from carrying concealed arms."[76] Freed from the regulatory shackles imposed by the 1822 decision, Kentucky lawmakers of the 1850s enacted new weapon regulations, including a concealed-carry law.[77] Arizona Territory's first law pertaining to weapons only punished the improper exhibiting and discharging of firearms, but a new enactment in 1889 prohibited arms at social gatherings while also criminalizing open- and concealed-carry within town limits.[78]

42.    Sometimes, state-level public carry restrictions coexisted with similar municipal ordinances. In Texas, some cities moved to suppress the carrying of weapons years before state lawmakers did. Galveston was a leader in that effort, prohibiting concealed-carry in 1866 amid a tumultuous and violent period that followed the Civil War.[79] Such a policy had been out of bounds before the war, but the branches of state government changed their minds in the face of the rampant lawlessness that made Texas one of the most dangerous places in the country. Other cities took

---

[74] *Bliss v. Commonwealth*, 12 Ky. 90 (1822).

[75] Charles, "Fugazi Second Amendment," 646-647 (explaining the *Bliss* decision and stating that "Subsequent Antebellum courts that examined the authority of legislatures to regulate armed carriage felt compared to square their analysis with that of *Bliss*… .").

[76] Third Constitution of Kentucky (1850), Article XIII, Sec. 25 "That the rights of the citizens to bear arms in defense of themselves and the State shall not be questioned; but the General Assembly may pass laws to prevent persons from carrying concealed arms."

[77] 1854 Kentucky ch. 1020 (punishing anyone who would "carry concealed any deadly weapons, other than an ordinary pocket knife," unless having reasonable cause to fear an attack, being a peace officer, or at night by persons "required by their business or occupation to travel during the night.").

[78] 1867 Arizona Territory 21; updated in 1883 Arizona Territory 65; 1889 Arizona Territory 30.

[79] Ordinance printed in "Proceedings of City Council," *Flake's Bulletin* (Galveston, Texas), December 28, 1865. ("…it shall not be lawful for any person or persons (United States military and civil officers of the city and county of Galveston excepted,) to carry about his or their person or body, any concealed deadly weapon—under whatever name or character the same may be designated and called… .").

similar action, and soon enough the state legislature issued new municipal charters that explicitly protected their authority to regulate weapon-carrying within city limits.[80] These municipal carry ordinances coexisted with the state's public carry law after it was passed in 1871.[81] The municipal-state overlap occurred in many places, including California. In 1863, that state enacted a concealed-carry law (which was subsequently repealed in 1870).[82] The City of Los Angeles, meanwhile, enacted its own ordinance in 1866 that prohibited the wearing and carrying of deadly weapons "concealed or otherwise, within the corporate limits of said city."[83] Other cities large and small across the country adopted public carry laws, and municipal charters from the mid- and late-nineteenth century vested local governments with such power.

*Other Weapon Restrictions*

43.     Nineteenth-century Americans employed regulatory methods other than public-carry laws. Notable policy approaches included locational restrictions, personal and occupation taxes, and point-of-sale restrictions. These laws often coexisted with public-carry laws, adding another regulatory layer to Americans' relationships to their weapons and their communities. These policies were designed to protect the public by discouraging people from being armed in public spaces, or established standards for dealers in firearms that could appropriately regulate the trade in and access to deadly weapons within American communities.

44.     Regulations disarming certain sensitive places—like polling places, court buildings, and even universities—are longstanding in American history. But escalating gun violence after the mid-nineteenth century prompted an expansion of that policy to meet the needs

---

[80] For example, see "Ordinances Passed," *Goliad Intelligencer* (Goliad, Texas), March 17, 1866 ("That the carrying of deadly weapons, by civilians, within the limits of the Town proper, except in passing through the corporation, is hereby prohibited.").
[81] 1871 Texas ch. 34.
[82] 1863 California ch. 484.
[83] Ordinance printed in *Los Angeles Tri-Weekly News* (Los Angeles, California), July 22, 1865, 2. Also available in the Duke Repository of Historical Gun Laws.

of the day. Where historical laws had protected polling places and court buildings (which were the major occasions for public gatherings in rural early America—not just sites of government activity), updated laws added theaters, open-air presentations, and even private parties to the assemblies protected through disarmament.

45.    In 1869, Tennessee lawmakers prohibited the carrying of deadly weapons "concealed or otherwise" at elections or "any fair, race course, or other public assembly of the people."[84] Similarly in 1870, Georgia lawmakers prohibited the carrying of deadly weapons "to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds."[85] A law from Texas prohibited all deadly weapons, including "fire-arms, wither known as a six shooter, gun or pistol of any kind" at a host of events ranging from churches to polling places "or other social gathering composed of ladies and gentlemen."[86] Laws in effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to it.[87] Vermont and Mississippi both prohibited weapons inside schools, with the Mississippi legislature prohibiting students at colleges from possessing deadly weapons on campuses or within two miles of them (effectively disarming college students within the limits of college towns).[88] Other laws prohibited the carrying of weapons within the general vicinity of

---

[84] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act to Amend the Criminal Laws of the State," § 2. The section read in full: "That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The following section (§ 3) stated: "That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court."

[85] Act No. 285, 1870 Ga. Laws 421 (Ex. N). The list of prohibited weapons included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon." There was also no implicit or explicit exception for open carry. Violators convicted received a fine ($20–50), imprisonment (10–20 days), or both.

[86] 1870 Tex. Gen. Laws 63, ch. 46 § 1.

[87] *Revised Statutes of the State of Missouri* (1879), ch. 24 § 1274; 1890 Okla. Stat. 495–96.

[88] *Annotated Code of the General Statute Laws of the State of Mississippi* (1892), "Crimes and Misdemeanors," § 1030. "A student at any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought,

31

polling places, churches, and parks.[89] In New Mexico, an 1852 sensitive-place restriction prohibited weapons at all "balls and fandangos," and held hosts accountable to "maintain good order" at their parties.[90] This policy preceded a public-carry law, which followed in 1859 and disallowed the open or concealed carrying of deadly weapons within town limits.[91]

46.      Another mode of regulating weapons during the nineteenth century involved taxation. The taxing power exists to raise revenue, but it has also historically been exercised as part of the police power. Some taxes are more about discouraging certain behaviors, such as modern day taxes on tobacco and alcohol, deemed harmful to society rather than simply to raise revenue.[92] Americans living in the antebellum period sometimes turned to taxes upon the sale, possession, and use of deadly weapons as a mode of regulating them. In the latter nineteenth and early twentieth centuries, taxes relating to deadly weapons were more likely to take the form of occupation or sales taxes.

---

received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both." *Laws of Vermont*, Special Session (1891), No. 85 § 2. "A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars." It is worth noting that disarmament laws and policies had been in effect at both public and private colleges long before this time. For example, *see* The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810); University of Virginia Board of Visitors Minutes, 6–7 (October 4–5, 1824); Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina, Laws for the Government of the University, at 15 Chapter V (1838). This is not an exhaustive list.

[89] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317–1318 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (no carry by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 § 1 (no carry by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace § 21 (no weapons in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (no one save city police officers shall carry weapons into public parks).

[90] 1852 New Mexico Territory 67.

[91] 1859 New Mexico Territory 94.

[92] For historical understandings of the taxing power, see Thomas M. Cooley, *A Treatise on the Law of Taxation: Including the Law of Local Assessments* (Chicago: Callaghan, 1876), 396; Ernst Freund, *The Police Power: Public Policy and Private Rights* (Chicago: University of Chicago Press, 1904), 33–34.

47.     In the antebellum period, taxes could be straightforward attempts to prohibit the carrying of weapons without saying so explicitly. This approach was practiced in Florida during its territorial phase and remained a policy option for much of the nineteenth century.[93] In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for "carrying arms openly, outside of all their clothes[.]".[94] Unsatisfied with the public carry law, leaders established a new series of prohibitive taxes designed to further reduce the presence of deadly weapons in public. This 1838 enactment held that anyone who chose "to vend dirks, pocket-pistols, sword-canes, or bowie-knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay . . . a tax of ten dollars per annum[.]".[95] In 2023 dollars, the annual occupation tax would amount to approximately $6,300, and the annual open carry tax would amount to approximately $320.[96] In a sparsely populated, rural environment, these taxes were clearly designed to discourage trade in and public carry of deadly weapons. The architects of the statute saw it as intrinsically connected to the previously enacted concealed carry restriction—as a way of more effectively reducing the number of weapons carried in public spaces.[97]

---

[93] In some ways, possession taxes came close to being carry taxes or even proto-licensing policies. Taxation as a form of public carry regulation was considered in Texas in 1866 as well as in Tennessee in 1893. *See* Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PdD diss. (Texas Christian University, 2019), 50-52; "Tennessee State News," *Bolivar Bulletin* (Bolivar, Tennessee) February 10, 1893, 1. https://chroniclingamerica.loc.gov/lccn/sn89058007/1893-02-10/ed-1/seq-1/.

[94] John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources.

[95] *Id.*; 1838 Fla., ch. 24. This tax is not included within the Duke Repository, indicating that that database captures only a portion of the occupation and personal taxes in force, even at the state/territorial level, during the nineteenth century. More research remains to be done on the subject.

[96]    The amounts reach $319.14 and $6,382.73. *See:* https://www.in2013dollars.com/us/inflation/1838?amount=200.

[97] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly."

48.     Some southern states also placed annual taxes upon the owners of deadly weapons. Prior to the Civil War, taxation of property was the primary vehicle for states to raise revenue. In the South, taxes upon slave property made up the lion's share of contributions, with other ad valorem taxes or poll taxes making up the difference.[98] Real property exceeding certain thresholds would be taxed, "intangible" property like investments were taxed, and moveable property (especially luxury goods or items associated with vices) could be taxed at standard rates as well.[99] Bowie knives, dirks, and pistols sometimes made their way into the lists of taxable items.[100] Municipal charters from the postbellum era indicate that weapons or their value remained taxable throughout the rest of the nineteenth century.[101]

49.     Occupation taxes and sales taxes formed another avenue of weapon regulation during the nineteenth century. As previously described, during the 1830s, lawmakers from Florida Territory levied a high tax upon weapon dealers that was clearly prohibitive in nature. Around the same, time, Alabama lawmakers taxed the sale or gift of bowie knives and the like at $100 per instance (equivalent to approximately $3,195.27 today).[102] It appears as though occupation taxes became more widespread over the course of the nineteenth century. Sticking with the example of Alabama, occupation taxes emerged in the 1870s and continued to be in force through at least the

---

[98] Robin Einhorn, *American Taxation, American Slavery* (Chicago: University of Chicago Press, 2006); Peter Wallenstein, "Rich Man's War, Rich Man's Fight: Civil War and the Transformation of Public Finance in Georgia," *Journal of Southern History* 50, no. 1 (February 1984), 15–42.

[99] Brian Sawers, "The Poll Tax before Jim Crow," *American Journal of Legal History* 57, no. 2 (June 2017), 175–78.

[100] For example, *see* 1850 NC, ch. 121; 1856 NC, ch. 34; 1866 NC ch 21; Anderson Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848, Page 182, Image 182 (1848) available at The Making of Modern Law: Primary Sources. This is not an exhaustive list. Mississippi repealed its tax upon "Bowie-knives, Sword-canes and Dirk-knifes" during the first year of fighting the Civil War. 1861 Miss. Ch. 125.

[101] For example, see 1888 Georgia 245-262 at 261, Act No. 103, "Amending Charter of Jesup," Sec 46.30 (requiring all owners of personal property in the city to make an annual return that answers a series of questions, including "What is the value of your guns, pistols, bowie knives and such articles?").

[102] 1837 Ala. 11, § 2 ("That for every such weapon [knife or weapon, known as Bowie Knives or Arkansaw Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie Knife or Arkansaw Tooth-pick], sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury[.]").

end of the century. The initial tax rate upon "dealers in pistols, bowie-knives and dirk-knives," was $50, but thereafter was raised to $300 through 1897.[103] This annual licensing fee of $300 amounts to nearly $10,000 today.[104] Georgia also pursued occupation taxes in the post-Civil War period, beginning with $25 per place of business in 1882, which was quickly raised to $100 per place of business in 1884.[105] Between 1886 and 1894, the rate fluctuated between $100 (equivalent to upwards $3,000.00 today) and $25 (equivalent to approximately $850.00 today).[106] Meanwhile, large hunting knives that might be deemed similar to a bowie knife or dirk (8-10 inches) cost anywhere from $3-4 in the 1880s.[107] For this tax to be money well spent, a dealer would have to sell upwards of 250 bowie knives to reach $1,000 of business. When an occupation tax also licensed the sale of pistols, the threshold of profitability could be more easily reached because

---

[103] Wade Keyes, et al., *Code of Alabama 1876* (Montgomery: Barrett & Brown, printers for the State, 1877), 292, § 494.15 ("For dealers in pistols, bowie-knives and dirk-knives, whether the principal stock in trade or not, fifty dollars."); 1886 Ala. ch. 4, § 5.17 ("For dealers in pistols or pistol cartridges, or bowie knives, or dirk knives, whether principal stock in trade or not, three hundred dollars."); Robert C. Brickell, et al., *Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887* (Nashville: Marshall & Bruce, 1887), ch. 9, Art. I § 629.28 ("For dealers in pistols or pistol cartridges, or bowie knives, or dirk knives, whether principal stock in trade or not, three hundred dollars."); William L. Martin, *Code of Alabama* (Atlanta: Foote & Davies, 1897), 1137, § 4122.27 ("For dealers in pistols or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars."). The rate was lowered to $100 in 1898. *See* 1898 Ala. ch. 903, 190, § 16.66 ("For dealers in pistol [sic], bowie or dirk knives, whether principal stock in trade or not, one hundred dollars.").

[104] *See* 1892 Alabama ch. 95, 183; Robert C. Brickell, et al., *Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887* (Nashville: Marshall & Bruce, 1887), ch. 9, Art. I § 629. The $300 licensing fee was in effect some time prior to 1887, and an 1892 amendment closed a loophole for dealers in "pistol cartridges." The subsequent Article specifies that all licenses expire annually; *see* ch. 9, Art. II § 634.

[105] 1882 Ga. ch. 18, 37, § 2.18 ("And upon all dealers in pistols, revolvers, dirk or Bowie knives, the sum of twenty-five dollars for each place of business in each county where the same are sold, and said tax shall be for educational purposes. The tax provided by this paragraph shall be assessed against all dealers in the articles herein enumerated, on and after the first day of April., 1883, and such dealer shall not be liable for said tax of twenty-five dollars prior to the first of April, 1883."); 1884 Ga. ch. 52, 23, § 2.18 ("And upon all dealers in pistols, toy pistols, revolvers, pistol or revolver cartridges, dirks or bowie knives, the sum of one hundred dollars for each place of business in each county where the same are sold.").

[106] For inflation calculations, *see* https://www.in2013dollars.com/us/inflation/1890?amount=25 and https://www.in2013dollars.com/us/inflation/1890?amount=100.

[107] J. Palmer O'Neil & Company, *Illustrated Catalogue* (J. Palmer O'Neil & Co.), 40 (Showing 8-inch hunting knife listed at $3.00 each; publication date is estimated to be the 1880s, and hunting season dates make reference to 1882); Lester C. Dole and Company, *Catalogue and Price-List, 1883* (New Haven: Lester C. Dole and Co., 1883), 27 (Showing 8-inch hunting knives listed at $3.00, 9-inch at $3.50, and 10-inch at $4.00).

well-made pistols cost upwards of $5.00.[108] These high taxes likely fell upon buyers of deadly weapons, further raising their retail price; high taxes also forced retailers to weigh the cost of selling knives and pistols, potentially narrowing the pool of sellers to those who specialized in hardware or hunting equipment.

50.     Occupation taxes and personal taxes on deadly weapons carried into the twentieth century. Louisiana levied a licensing tax upon weapon dealers in 1904, and in 1912 Mississippi created a special tax of $250.00 on pawnbrokers who sold fighting knives, sword canes, and metal knuckles.[109] One North Carolina county taxed possession of pistols at rates equal to the 1915 poll tax and made "failure to list [a pistol] for taxes" a misdemeanor crime.[110] In the early twentieth century, members of the Texas legislature put in place a 50% tax on the gross receipts from the sale of pistols. All dealers had to report quarterly the number sold along with payment, which functioned as an occupation tax for them to remain in business.[111] The intention of the measure was to make pistols prohibitively expensive, and a constitutional challenge upheld the law. The court described the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society."[112] As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[113]

---

[108] The same catalogues include prices for certain pistols, which generally ranged from $5.00-10.00 each.

[109] 1904 Louisiana ch. 65, § 2 (Taxing dealers with gross sales of $5,000 or more in the amount of $200, gross sales of $2,000-5,000 in the amount of $150, and gross sales less than $2,000 in the amount of $100.); 1912 Mississippi ch. 98 (assessing $250.00 "On each pawnbroker or firm of such", plus $250.00 "On each pawnbroker who may receive in pawn any dirk, knife, sword, cane, brass or metallic knucks or pistol," plus $250.00 "on each person, firm or corporation who may sell or dispose of any second-hand dirk, knife, sword-cane, brass or metallic knucks or pistol" along with "the privilege tax paid by such person or firm as a pawnbroker.").

[110] This law applied to Pitt County, North Carolina. *See* 1915 N.C. ch. 51.

[111] 1907 Texas ch. 18, "An Act providing for the levy and collection of an occupation tax . . .[]" 485 § 12.

[112] *Caswell & Smith v. State*, 148 S.W. 1159 (Tex. App. 1912).

[113] *Id.*

51.     Nineteenth-century lawmakers placed additional restrictions upon dealers in deadly weapons beyond occupation taxes. It was quite common for states to prohibit the sale of certain weapons to persons under a state-specified minimum age—often applying to legal minors, or persons under twenty-one years of age. The age of legal majority has historically been twenty-one years, and any male under that age was considered an "infant" by law and subject to his father or guardian.[114] In 1836, Alabama declared it unlawful to "sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol[.]".[115] Violators, including dealers in dry goods, weapons, and hardware, were fined anywhere from $300 to $1,000, which amounts to approximately $10,000 to $35,000 in 2023 dollars.[116] The same year, Tennessee adopted a similar measure that prohibited selling, loaning, or giving to "any minor" a "pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife[.]".[117] The minimum fine was dramatically lower—only $25, or about $800 today—and there was a proviso allowing the sale, loan, and gift of hunting firearms to minors.[118] The town of Harrodsburg, Kentucky, also adopted a minors law during the antebellum era. It prohibited "any person, other than the parent or guardian" to "sell, give, or loan, any pistol, dirk, bowie-knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any

---

[114] Saul Cornell, "'Infants' and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record," *Yale Law and Policy Review: Inter Alia*, October 26, 2021, https://ylpr.yale.edu/inter_alia/infants-and-arms-bearing-era-second-amendment-making-sense-historical-record. The rules for women were quite different, with them never achieving the kind of legal emancipation that men obtained at age twenty-one. According to the law of coverture, unmarried women fell under the authority of their fathers or guardians, and married women fell under the authority of their husbands. *See* Linda K. Kerber, *No Constitutional Right to Be Ladies: Women and the Obligations of Citizenship* (New York: Farrar, Straus & Giroux, 1999).

[115] 1856 Alabama ch. 26, "An Act to amend the criminal law," 17.

[116] The current value of $300 in 1856 is $10,653.04, and $1,000 is $35,510.12. *See* https://www.in2013dollars.com/us/inflation/1856?amount=300 and https://www.in2013dollars.com/us/inflation/1856?amount=1000.

[117] 1856 Tennessee ch.81, "An Act to amend the Criminal Laws of this State," 92 § 2.

[118] The Tennessee fine of $25 (1856) amounts to $887.75 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1856?amount=25.

minor, or slave, or free negro[.]"[119] The penalty was a fine of $50, or about $1,800 today.[120] The movement to restrict the sale of deadly weapons to minors began in the antebellum period and accelerated in later decades, with no fewer than 22 states adopting such laws between the Civil War and the close of the century.[121]

52.     Some jurisdictions also required firearm dealers to register and track their sales. The aforementioned Texas tax upon pistols functioned to some extent as a registry by tracking the quantity of pistol sales, but it did not mandate a registry of purchaser names or pistol types.[122] Illinois, however, adopted such a policy in 1881 by requiring every dealer to keep a register of all sales of deadly weapons—which included "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person[.]"[123] The law went so far as to specify the form of the register and require the serial number of the weapon.[124] The District of Columbia had a similar registration requirement, which was approved by the United

---

[119] 1859 Kentucky ch. 33, "An Act to amend an act, entitled 'An act to reduce into one the several acts in relation to the town of Harrodsburg,'" 245 § 23. The text of this local law underscores the degree to which "deadly weapons" like knives and pistols were associated with concealment and concealed carry. If the popular interpretation of concealed carry laws (that they de facto protected open carry) were applied to this particular statute, it would be read to prohibit only the sale of weapons intended for concealed carry on the part of minors, slaves, and free Blacks while implicitly protecting the sale of weapons to be openly carried by them. Of course, that is not what the statute meant. Its purpose was to prohibit the sale to minors, slaves, and free Blacks the kinds of deadly weapons that were designed for and conducive to being carried concealed.

[120] The $50 fine from 1859 would amount to $1,818.29 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1859?amount=50.

[121] Alab. 1856 ch. 26 p. 17; Tenn. 1856 ch. 81 p. 92 § 2; Ind. 1875 ch. 40 p. 59; Geo. 1876 ch. 128 p. 112; Miss. 1878 ch. 46 p. 175; Ohio 1880 S.B. 80 p. 79; Penn. 1881 ch. 124 p. 111; Dela. 1881 ch. 548 p. 716; Flor. 1881 ch. 3285 p. 87; Ill. 1881 "Criminal Code" § 2 p. 73; Mary. 1882 ch. 424 p. 656; W. V. 1882 ch. 135 § 7 p. 421; Kan. 1883 ch. 105 p. 159; MO 1883 p. 76 "An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled 'Of Crimes and Criminal Procedure,'"; Wisc. 1883 ch. 329 p. 290; Iowa 1884 ch. 78 p. 86; Okla. 1890 ch. 25 art. 47 § 3 p. 496; Lou. 1890 ch. 46 p. 39; Va. 1890 ch. 152 p. 118; Wyo. 1890 ch. 73 § 97 p. 140; N.C. 1893 ch. 514 p. 468; Tex. 1897 ch. 154 p. 221.

[122] 1907 Texas ch. 18, § 12.

[123] *Illinois, 32nd General Assembly, 1st Session* (1881), "Criminal Code–Deadly Weapons: Regulates Traffic and Prevents Sale to Minors," 73–74 § 2–3. *Illinois, 32nd General Assembly, 1st Session* (1881), "Criminal Code–Deadly Weapons: Regulates Traffic and Prevents Sale to Minors," 73–74 § 2–3. There was some critique of the law as insufficiently effective, at least in part due to the fact that dealers were not required to verify the identity of the buyer and some deadly weapons were not manufactured with serial numbers. *See* "Sale of Pistols," *Chicago Daily Tribune* (Chicago, Illinois), July 7, 1881, 8.

[124] *See id.*

38

States Congress in 1892. Among other things, the law required all dealers in deadly weapons to be properly licensed, and to "keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon . . . ."[125]

53.     At times, nineteenth-century lawmakers restricted the sale of certain problematic weapons. As bowie knives, revolvers, and other deadly weapons were becoming more popular and more prevalent, Tennessee and Georgia prohibited their sale. In 1837, Georgia passed a statute combining a public carry law with a sales restriction. It was unlawful "for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense[.]"[126] The statute further held that "pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols[.]"[127] The following year (1838), Tennessee lawmakers did much the same with an updated public carry law that included a section prohibiting "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or knives, or Arkansas tooth pick."[128] In 1849, Vermont lawmakers prohibited the manufacture and sale of slung shots, which were makeshift weapons associated with

---

[125] "To Punish the Carrying or Selling of Deadly or Dangerous Weapons within the District of Columbia, and for other Purposes," ch.159, 52 Congress, Public Law 52-159, 27 Stat. 116 (1892), 117 § 5.
[126] Ga. 1837 ch. 90.
[127] *Id.*
[128] Tenn. 1838 ch. 137. This law was temporarily suspended during part of the Civil War. *See* Tenn. 1862 ch. 23.

organized crime and street gangs.[129] Numerous other jurisdictions did the same.[130] Kentucky lawmakers enacted a law that prohibited "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung shot, or any imitation or substitute therefor,"— essentially adopting the policies of all these states into one catch-all statute.[131] In the post-Civil War period, Tennessee pursued a range of deadly weapon policies, ultimately adopting an extremely strict public carry law that worked in conjunction with a ban upon the sale of pocket

---

[129] 1849 Vermont ch.36, 26 § 1. Slung shots were not like slingshots as we understand the term today. The *Oxford English Dictionary* identifies this as a nineteenth-century American phrase referring to "[a] shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon."

[130] 1849 N.Y. ch. 278 § 1 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, or expose, or keep for sale or gift, or part with any instrument or weapon the kind usually known as slung shot, or of any similar kinds,"); 1850 Mass. ch. 194 § 2 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose for sale, any instrument or weapon of the kind usually known as slung shot,"); *Laws of Florida – First Session* (1868), Ch. VII, § 11 ("Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles,"); *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative Assembly* (1883), ch. 38, § 455 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor." Repeated during statehood, *see Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1899), ch. 40, "Crimes against the Public Health and Safety," 1461 § 7311); *Penal Code of the State of Minnesota to Take Effect January 1, A.D. 1886* (St. Paul: Pioneer Press Co., 1885), § 333 ("A person who manufactures or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles,"); *Oklahoma, 1st Regular Session*, (1890), ch. 25, 475–76 § 18 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor."). This is not an exhaustive list. Political scientist Robert J. Spitzer identifies 71 state laws enacted during the nineteenth century related to slung shots, an as-yet undetermined number of which addressed manufacture. Declaration of Robert Spitzer filed in *Chavez v. Bonta*, Case No. 19-cv-1226-L-AHG (S.D. Cal.) (ECF No. 111-3) ¶ 51. Beyond that, municipal ordinances have not been preserved and digitized with the degree of comprehensiveness that state laws have, so there may be additional local regulations pertaining to the manufacture and sale of slung shots.

[131] Kentucky 1855 ch.636, 96 § 1.

pistols.[132] Lawmakers in nearby Arkansas implemented a nearly identical policy but went one step further by also prohibiting the sale of "any kind of cartridge[] for any pistol[.]"[133]

54.    When sales restrictions were challenged during the nineteenth century, they were generally upheld. The 1837 Georgia public carry law included a proscription against selling certain deadly weapons. A well-known case, *State v. Nunn*, challenged the public carry law and resulted in a defense of open-carry in Georgia. But the case did not address the accompanying sales restriction.[134] Postbellum sales restrictions in Arkansas and Tennessee were challenged, and in each case the state's high court affirmed the law as a reasonable exercise of police power. For the Tennessee court, the intent of the statewide sales restriction was to "put down the pernicious habit of going armed"[135] by declining to issue licenses to firearm dealers. In Arkansas, the sales restriction "was enacted as a measure of precaution for the prevention of crimes and calamities," and was "leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person."[136] Sales restrictions did not disappear at the turn of the century, and continued to coexist with indirect forms of regulation like licensing laws and tax requirements. For example, a 1911 Michigan law prohibited the sale of "any dirk, dagger, stiletto, metallic-knuckles, sand-bag or skull cracker" and made specific exception for "the selling or keeping for sale of hunting and fishing knives."[137]

---

[132] Between 1871 and 1879, Tennessee lawmakers made substantial changes to their state weapons policy, of which the 1879 sales restriction forms only a part. An 1870 statute prohibited "publicly or privately" carrying "a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver." When the state Supreme Court struck the measure down as unconstitutional for prohibiting the open carrying of militia arms known as "repeaters" (referring to army-sized revolvers), lawmakers quickly added an exception for army/navy pistols carried "openly in his hands." In 1879, lawmakers prohibited the sale of "belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol[s.]" *See* 1870 Tenn. 13, pp. 28-29; 1871 Tenn. 90, pp.81-82; *Andrews v. State*, 50 Tenn. 165 (1871); 1879 Tenn. 96 pp.135-136.

[133] Ark. 1881 ch. 96 § 3.

[134] *Nunn v. State*, 1 Ga. 243 (1846).

[135] *State v. Burgoyne*, 75 Tenn. 173 (1881).

[136] *Dabbs v. State*, 39 Ark. 353 (1882).

[137] 1911 Michigan ch. 274, § 2. This law also laid out terms and conditions for obtaining a license to carry pistols.

55.     Overall, sales restrictions, taxes, and locational restrictions, along with public carry laws, were important avenues for regulating deadly weapons that posed a danger to American communities. These policies emerged in the antebellum era and grew significantly after the Civil War. Postbellum regulatory strategies built upon policies that had gone before and harnessed the police power of the state government to address an unprecedented problem of gun violence and gun-toting in the United States.

## EMERGENCE OF LICENSING LAWS

56.     As structural forces like industrialization and urbanization propelled the growth of more sophisticated governmental administration in the United States, gun policies evolved in ways that increased official oversight of weapon sales and carrying. The sales registries enumerated above placed special requirements on dealers, but the intention behind them was to empower police and other officials to solve crimes by providing them with information. In a similar vein, laws that empowered police, mayors, or other officials to issue licenses for the carrying of weapons grew out of American traditions of regulating deadly weapons. In fact, licensing promised to resolve nettlesome problems posed by public carry laws that went before.

57.     There were two serious obstacles posed by public carry laws. The first was their lack of protection for people who had legitimate reason to fear an attack. Laws provided exceptions to people in imminent danger, but left it up to a jury to determine whether a defendant's decision to carry was reasonable. Allowing for an "apprehended danger" defense at trial was likely cold comfort for people whose work required them to travel with large sums of money or valuable goods. The willingness of the criminally-inclined to violate weapon laws was a constant concern, with nineteenth-century Americans voicing their frustration that weapon laws could render the law-abiding vulnerable to abuse. A second problem was the difficulty in enforcing them. Asking

42

police or civilians to see and report weapons that were purposefully hidden from view could be challenging. Did a lump in one's pocket justify a complaint? Were police empowered to search suspected weapon-carriers, and by what criteria were they allowed to identify someone as a "suspected" gun-carrier? Licensing offered a way of resolving these problems. Instead of arguing self-defense at trial, legitimate weapon-carriers could obtain permission beforehand. And anyone seen carrying or found with a revolver could reasonably be asked to show their license.

58.     One of the earliest proponents of licensing as a way of regulating the carrying of pistols was California. The state had enacted a public carry law that prohibited concealed deadly weapons, but residents grew frustrated that it did not seem to be effective. In 1866, members of the state legislature divided over what to do about the problem.[138] One camp proposed issuing licenses to people who needed a pistol for personal protection. The state did not adopt this proposal and instead repealed the public carry law. In the aftermath of that decision, California municipal governments began passing ordinances that provided for licensing in order to carry a pistol in public.[139] The policy proved popular, and by the turn of the twentieth century a majority of California residents lived in municipalities that had implemented a permitting process for the public carry of concealed weapons.[140] Municipalities elsewhere during the nineteenth century

---

[138] Theodore Henry Hittell, *The General Laws of the State of California, from 1850 to 1864, Inclusive* (1868), "An Act to prohibit the carrying of concealed weapons," 261 § 1–2. On frustration among the public, see "Concealed Weapons," *Morning Union* (Grass Valley, California), February 20, 1869 ("The object was to prevent indiscriminate shooting among a class about whose welfare there need not have been any extraordinary solicitude; but the result has been to place the law-abiding portion of the community at the mercy of night-prowlers, footpods, and garroters.").

[139] For example, *see* Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, reprinted in R. M. Clarken, editor, *Charter and Ordinances of the City of Sacramento* (1896), 173; Prohibiting the Carrying of Concealed Deadly Weapons, Sep. 17, 1880, reprinted in *General Orders of the Board of Supervisors Providing Regulations for the Government of the City and County of San Francisco* (1884), 8; "Concealed Weapons," *Napa Daily Register* (Napa, California), November 10, 1880, 2. This is not an exhaustive list. See also Patrick J. Charles, "The Fugazi Second Amendment: *Bruen*'s Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2023), 660 ("Although it is impossible to state with historical precision when and where the first armed carriage licensing law was enacted, based on the historical evidence available, it appears that California was at the forefront.").

[140] Saul Cornell, "The Right to Regulate Arms in the Era of the Fourteenth Amendment," *UC Davis Law Review Online* 55 (September 2021), 84.

implemented licensing policies: Jersey City, New Jersey did so in 1873 and the District of Columbia in 1892.[141]

59.    Nineteenth-century licensing laws tended to be discretionary in the sense that public officials exercised judgment in determining who might obtain a license. The procedures involved varied tremendously from one jurisdiction to another. For instance, Sacramento's 1876 law required a written permit from the Police Commissioners, and specified that those commissioners "may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night… ."[142] Applicants had to pass a two-part test: first, be "peaceable"—an attribute open to interpretation and likely a matter of personal history, demeanor, and reputation; and second, be required by employment to be out late at night. In other words, not all "peaceable" people were eligible for a license at all, such as a clerk whose employer did not require him to work at night; and not all nighttime workers could be considered "peaceable." In fact, a large portion of people whose occupations kept them out late at night were the very ones who appeared to threaten the physical safety of the "peaceable" people seeking concealed-carry permits in the first place.

60.    Several cities in New York, including New York City and Brooklyn, which were among the most populous cities in the country in the late-nineteenth century, also required some showing of good character from the permit applicant. A person over twenty-one (21) years "who has occasion to carry a pistol for his protection" could apply to local police, who, "if satisfied that the applicant is a proper and law-abiding person," could recommend the applicant to yet higher

---

[141] *Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871* (1874), "An Ordinance in Relation to the Carrying of Dangerous Weapons," § 3; "To Punish the Carrying or Selling of Deadly or Dangerous Weapons within the District of Columbia, and for other Purposes," ch. 159, 52 Congress, Public Law 52–159, 27 Stat. 116 (1892), § 2.

[142] Ordinance No. 84, Prohibiting the Carrying of Concealed Weapons, April 24, 1876, reprinted in R. M. Clarken, ed., *Charter and Ordinances of the City of Sacramento* (1896), 173. Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 2-3, *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022).

police authorities for a permit "allowing him [the applicant] to carry a pistol of any description." [143] Assessing whether a person was "proper and law-abiding" was a matter of official determination, seemingly based upon an applicant's criminal history in addition to his/her reputation for or appearance of propriety.

61.    Other jurisdictions had different rules, like Lincoln, Nebraska, whose law prohibited concealed carry except for officers of the law, "persons whose business or occupation may seem to require the carrying of weapons for their protection," and licensees. There was some discretion for people to assess their personal safety and carry weapons *based upon their business or occupation*, not their individual preferences. Other than being good for a term of one year and requiring a fee of $0.50, the procedure for obtaining a license was completely open-ended. The law held that "The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all such licenses at his pleasure." [144] Wide discretion for officials was common among licensing laws. Consider Coffeyville, Kansas, for example, whose 1890 deadly weapon law prohibited open- and concealed-carry "without first having obtained permission from the Mayor" without identifying any specific permitting procedure or requirements. [145]

---

[143] Pistols—Carrying Of: Ordinance to Regulate the Carrying of Pistols, October 25, 1880, reprinted in *Brooklyn Daily Eagle* (Brooklyn, New York), October 26, 1880, 1; Article XXVII: Carrying of Pistols, reprinted in Elliott F. Shepard et al, eds., *Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881* (1881), 214-216. Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 21-24, *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022).

[144] Article XVI: Concealed Weapons, An Ordinance Regulating the Carrying of Concealed Weapons in the City of Lincoln, August 26, 1895, reprinted in *Revised Ordinances of Lincoln Nebraska* (1895), 209-210. Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 40-42, *New York Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

[145] Ordinance No. 201: To Prohibit the Carrying of Firearms or Deadly Weapons, and Providing Penalties Therefore, February 5, 1890, reprinted in *Coffeyville Weekly Journal* (Coffeyville, Kansas), February 7, 1890, 2. Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 16-17, *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022). The omission of specific guidance for license-issuing officials was not uncommon. See "Ordinance No. 6," reprinted in *Fresno Weekly Republican* (Fresno, California), November 7, 1885, 3; "Ordinance No. 49: To Prohibit the Carrying of Concealed Weapons, January 5, 1892," reprinted in *The Ordinances and Charter of the City of Monterey* (Monterey, California: 1913), 112; "Ordinance No. 6," reprinted in *Delphos Carrier* (Delphos, Kansas), August 1, 1884, 2; M. J. Sullivan, ed., "Article II: Offenses Against Public Morals and Decency, undated," reprinted

## NINETEENTH-CENTURY ATTITUDES TOWARD WEAPON-CARRYING

62.    The fact that nineteenth-century Americans discussed *concealed* weapons and at times legislated specifically against *concealing* weapons has invited some modern readers to interpret them as de facto protecting the open carrying of pistols, knives, and other deadly weapons. This "manner-of-carry" argument arises in large measure from the fact that most historical jurisprudence surrounding public carry laws originated in southern states where concealed-carry statutes were the norm, and where appellate judges endeavored to harmonize their opinions with a foundational case out of Kentucky (*Bliss v. Commonwealth*) that cast all weapon regulation as an affront to the right to bear arms.[146] The "going armed" statutes rooted in the Massachusetts code of 1836, and the jurisdictions that statutorily restricted open-carry as well as concealed (like Texas and West Virginia) did not generate as substantial a body of antebellum caselaw.[147] Focusing on southern, concealed-carry cases without exploring the larger context of social attitudes toward weapon-carrying has led to an emphasis on judges' protection of open-carry without considering the socio-cultural factors limiting such behavior.

*63*.    Weapon-carriers of the nineteenth century (much like those today) were likely to hide their pistols and bowie knives. A commentator writing in 1877 said, "The very fact that men are careful to conceal their revolvers argues that they are doubtful as to the propriety of carrying of them," and that if a young man were to walk along the street "with his silver-mounted deringer

---

in *The Revised Ordinance of the City of St. Louis* (St. Louis: 1881), 611-612; "Offenses, April 12, 1881," reprinted in *Laws and Ordinances for the Government of the City of Wheeling, West Virginia* (Wheeling, WV: 1891), 204, 206; "Amendment de Ordinance de Carrying of Concealed Weapons, July 21, 1886," reprinted in *Morning Journal-Courier* (New Haven, Connecticut), July 27, 1886, 4. All quote in Ibid., 8-30. This is not an exhaustive list.

[146] Charles, "The Fugazi Second Amendment," 646-647.

[147] Of these states, Texas generated a robust body of postbellum caselaw, including two cases that upheld the constitutionality of its open-and-concealed carry restriction on Second Amendment and state analogue grounds. See *English v. State*, 35 Tex. 473 (1871); *State v. Duke*, 42 Tex. 455 (1875).

46

hanging from his waist belt, he would expose himself to unlimited ridicule."[148] The tendency toward concealing deadly weapons rather than carrying them openly was in fact so strong that in the latter nineteenth century, men's trousers were often sold with a *pistol pocket* sewn into the rear hip.[149] Southerners were at times forthright about their sectional proclivity toward carrying weapons—but they generally did so in defiance of the law, not under its protection.[150] For instance, Frederick Law Olmsted's famous description of his travels in the South featured a Tennessean explaining that young southern men quite frequently hid pistols and bowie knives under their coats and clothing.[151] Westward migrants similarly enter the twenty-first century imagination loaded down with pistols and bowie knives; but accounts from the period show that armed men tended to conceal their weapons, and when their revolvers were openly visible, it was

---

[148] "Carrying Concealed Weapons: True Comment on an Almost Universal American Custom," *Daily Constitution* (Atlanta, Georgia), May 23, 1877, 1. Reprinted from *Baltimore American*. Some of the manners and etiquette books of the nineteenth century also addressed the impropriety of carrying deadly weapons. For example, see William A. Alcott, *Advice to a Young Gentleman on Entering Society* (Philadelphia: Lea and Blanchard, 1839), 147-149. https://books.google.com/books?id=430_rAHEPn8C&newbks=1&newbks_redir=0&source=gbs_navlinks_s. See also "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2 ("Would the men who carry bowie-knives concealed at their backs, pistols on their hips, or sword canes in their hands, dare to walk abroad with these weapons openly displayed? Why, then, should the law not treat them as intending criminals, if it finds them menacing their fellow-citizens by wearing concealed weapons?").

[149] Scott Way, "A Few Random Remarks about Pockets," *Puck* 16 (January 1885), 294 ("We will merely glance at the pistol-pocket, in which a concealed deadly weapon is often carried, especially in Prohibition districts, and then pass on to the coat-tail pocket."); "The Pistol Pocket," *Chicago Daily Tribune* (Chicago, Illinois), February 11, 1885, 3 ("An important step toward securing an abolition of the practice of pistol-carrying, a Galveston (Tex.) paper suggests that the pistol-pocket should be prohibited by law."); "The Hygiene of Pockets," *Phrenological Journal and Science of Health* (March 1886), 176 ("It is common now-a-days for trousers to be made with a pocket placed little below the band in the back part of the garment. It is commonly termed the hip or pistol pocket.").

[150] For example, see "Wearing Concealed Weapons," *Prairie News* (Okolona, Mississippi), May 26, 1859, 1 (reprinted from *Nashville Banner*), ("…almost every second man one meets upon the streets, or, in public by-ways, is literally a 'walking magazine,' belted with pistols… . It is useless to attempt a denial of these facts when palpable proofs are daily presented. We stand for a moment upon a street corner, in conversation with a young man, and the first breath of wind that lifts the lapel of his coat exposes the mounting of a pistol in his waist band.").

[151] Charles E. Beveridge and Charles Capen McLaughlin, *The Papers of Frederick Law Olmsted*, 3 vols. (Baltimore: Johns Hopkins University Press, 1981), II: 232-233.

a result of their not wearing coats (a coat being a marker of social respectability during the nineteenth century). [152]

64.     It was much easier then (as it is now) to hide a weapon in a pocket, or in a waistband covered by a coat, than to attach it visibly to the outside of one's clothes. This was especially true of nineteenth-century men, who wore coats on an everyday basis not just for warmth but as an indication of politeness and respectability. Prior to the widespread availability of ready-made clothing in the post-Civil War era, men's clothes were custom tailored and often fitted closely for style. A bowie knife or revolver did not belong strapped to the outside of a frock coat, and trousers might not even have pockets. Bearing in mind nineteenth-century notions of propriety and fashion, it is safe to say that middle- and upper-class men did not openly wear deadly weapons on a daily basis unless they adjusted their clothing to purposefully render a revolver butt or knife handle plainly visible. In Georgia, for instance, where there is some caselaw on partially concealed weapons, a man's wearing a revolver inserted in his waistband, at the front of his trousers, with his coat unbuttoned, and without wearing a vest, counted as carrying "openly." [153] But in Louisiana, where the law mandated that deadly weapons had to be carried "in full open view," such partial concealment was out of bounds. [154]

65.     The everyday carrying of weapons—especially concealed in one's clothing—was widespread during the nineteenth century, even as Americans opposed the practice and considered

---

[152] For example, see Mark Twain, *Roughing It* (1871), II: 4, I: 25 (Describing men who visibly carried holstered pistols as "coatless" or wearing "no coat."); and J. D. Borthwick, *Three Years in California* (Edinburgh: W. Blackwood and Sons, 1857), 77-78 (Describing men removing weapons from areas of their bodies and clothing that were concealed).

[153] *Stockdale v. State*, 32 Ga. 225 (1861) (Prior history of case states: "…they saw the defendant…have a pistol sticking in his breeches waistband, nearly in front, about the suspender button; that the butt and cock of the pistol could be plainly seen, the barrel being inserted beneath the pantaloons, and that the defendant had on no vest," and that "the barrel was inserted beneath the pantaloons in front, whilst his coat was unbuttoned, and he had on no vest at the time.").

[154] *State v. Smith*, 11 La. Ann. 633 (1856) (Defendant is described as carrying "a pistol in the pocket, under the clothes, although partially exposed.").

it a significant societal problem. Nineteenth-century Americans (North and South) criticized the *everyday*, or *habitual* carrying of deadly weapons. Even though they were particularly opposed to the concealment of them beneath one's clothes, there was an overarching opposition to having weapons in public at all—even when carried openly. The habitual carrying of deadly weapons on one's person (openly or concealed) was the behavior of "ruffians"—bullies who imposed their will on others through force or intimidation, and who engaged in unforgivably brutal behavior in order to do so. Ruffians carried bowie knives and used them to stab someone who insulted them, and ruffians turned a minor conflict into a melee by drawing a pocket revolver and shooting their opponents.[155] To be armed was to be deemed a dangerous person, too. A Georgia judge described the protection of open-carry within the state as a way "to compel persons who carried those weapons to so wear them…that others…might see that they were armed, and dangerous persons, who were to be avoided in consequence."[156] To carry weapons was also described as a relic of barbarism—"that most barbarous of all customs, the habit of wearing concealed weapons."[157] Commentators later in the century described pistol-toting as a "relic of barbarism"[158] and rallied to the cry, "The revolver must go!"[159] Denunciations of carrying deadly weapons were

---

[155] For example, see *The 'Science of Defence,'* Public Ledger (Philadelphia, PA) August 5, 1840 (carrying swords as "refined ruffianism."); *The Ruffian Foote*, Barre Patriot (Boston, MA) April 26, 1846 (Sen. Henry S. Foote of Mississippi as a "ruffian" for being armed in the Senate chamber, bullying an enemy, and pulling a knife on him in the presence of the full Senate); *Shocking Outrage*, The Miners' Express (Dubuque, Iowa) September 24, 1851, at 2 ("some ruffian or ruffians unknown" stabbed a pair of stabled horses, killing one). *See* https://chroniclingamerica.loc.gov/lccn/sn86083363/1851-09-24/ed-1/seq-2/.

[156] *Stockdale v. State*, 32 Ga. 225 (1861).

[157] *Concealed Weapons*, Daily Picayune (New Orleans, Louisiana) February 28, 1845, at 2.

[158] *The Cattlemen*, Fort Worth Daily Democrat, March 5, 1883. *See also Brenham Daily Banner* (Texas), March 7, 1883.

[159] *See* "The Revolver Must Go," *Clarksville Weekly Chronicle* (Tennessee) May 24, 1884, at 1 (reprinted from *Gainesville Register* (Texas)): https://chroniclingamerica.loc. gov/lccn/sn88061082/1884-05-24/ed-1/seq-1/ ; *Personals*, Chicago Daily Tribune, March 29, 1879, at 5 (mocking the movement developing in the South by saying, "Southern papers say the revolver must go—go off?"), https://chroniclingamerica.loc.gov/lccn/sn84031492/1879-03-29/ed-1/seq-5/; *Current Opinion*, Rocky Mountain News (Colorado) March 26, 1879 ("If the west and south would rally around the sentiment, 'The revolver must go,' it would be one more step in the interests of civilization.").

widespread, with critics comparing the practice to "barbarism" and evil intent.[160] Notably, when commentators lamented the pervasive carrying of concealed weapons, they did not describe open-carry as a solution; instead, they exhorted their community members to stop carrying weapons and asked for existing laws to be more stringently enforced..[161]

66.     There were times and occasions when Americans believed that carrying a weapon was acceptable, and the exceptions to public carry laws tell us something about them. For instance, several states exempted travelers from the dictates of their laws, while the silence of others on the subject indicates that travelers who would carry deadly weapons had to do so openly rather than concealed.[162] Another common exception was for peace officers and civilians actively assisting them..[163] Potentially the most important and contentious exception to public carry restrictions, though, involved carrying weapons for defensive purposes. Several states carved out explicit

---

[160] For example, see "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2; "Carrying Deadly Weapons," *The Independent* (New York, New York), August 18, 1881, 17, ("The man who arms himself with a concealed weapon and carries it with him as he mingles with others assumes a quasi-belligerent position toward human society. He prepares himself for a combat beforehand.").

[161] For examples, see "Concealed Deadly Weapons," *The National Police Gazette* (New York, New York), March 26, 1881. ("These affrays generally occur in the heat of passion and often without any justification a human life is lost through the hasty use of a weapon, the possession of which is a violation of law….The carrying of concealed weapons is not only cowardly and debasing but absolutely dangerous to peacefully-disposed citizens and injurious to the interests and welfare of the city. The practice ought to be suppressed by the strict enforcement of existing laws, and if their previsions are not stringent enough the Legislature should immediately enact additional measures for the safety of the lives and limbs of the people."); "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2; "Carrying Deadly Weapons," *The Independent* (New York, New York), August 18, 1881, 17. ("It is simply inexcusable for men in civilized communities, and where they have police authorities, courts and juries, and intercourse with newspapers and railroads and telegraphs—where they are under no compulsion to go to bed with their spurs on—to wear pistols or bowie-knives as part of their daily raiment. To wear them concealed is moreover cowardly in the last degree."); "Carrying Concealed Weapons," *The Daily Picayune* (New Orleans, Louisiana), July 25, 1840, 2. ("Why brave men—citizens whose duty it is to cultivate the arts of peace, should go habitually armed, making an arsenal of their persons, has always appeared to us an inscrutable mystery—we could never divine it."); "That Hip Pocket Nerve," *The Pascagoula Democrat-Star* (Pascagoula, Mississippi) November 2, 1888 (After a concealed weapon is used in a shooting, "Now the question arises, would this tragedy have happened had this young desperado been as he ought, in the habit of going constantly unarmed? We say not.").

[162] For example of explicit permission for travelers to carry *concealed* weapons otherwise prohibited, see 1875 Mississippi ch. 46 ("That any person…traveling (not being a tramp) or setting out on a journey…who carries concealed, in whole or in part, any [enumerated deadly weapon]…shall be deemed guilty of a misdemeanor… ."); 1819 Indiana ch. 23 ("Provided however, that this act shall not be so construed as to affect travellers.").

[163] For example, see 1871 Texas 34 (Public carry restriction "shall not be so construed as to…prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties.").

exceptions, and it is plausible that public-carry defendants anywhere would have been able to argue self-defense at trial. [164] But the adjudication and interpretation of this exception highlights the ways in which nineteenth-century Americans distinguished between lawful weapon-carrying for self-defense during an emergency on the one hand, versus everyday weapon-carrying as a preemptive self-defense against unforeseen threats on the other.

67.     Not only did nineteenth-century Americans carry pistols and large knives in the manner familiar to us (concealed), but they also carried them for reasons familiar to twenty-first century Americans—in preparation for an unforeseen, potential emergency. While weapon-carriers might describe their decision to conceal a pocket pistol as one undertaken for self-defense, popular opinion more broadly condemned such *preemptive* arming that was divorced from a known, articulable threat. A writer in the *Washington Post* described it as "the vicious custom of going armed so as to be 'ready for an emergency'." [165] In the words of a Georgia resident: "The habitual carrying of deadly weapons on the ground of self-defense in a peaceful and enlightened community of the nineteenth century is simply nonsense. The thousands who do not choose to load themselves down with weapons need protection on the other hand from the few who are at once a terror, a disgrace and a nuisance to the community." [166] To the retort that the right to bear arms protected such behavior, the response was that "it is certain that in no sense was that provision [the Second Amendment] intended to authorize a wanton disregard of the sacredness of human life and defiance of the laws and peacefulness of an orderly and well-disposed community," and that "such

---

[164] "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 413 (reviewing cases related to weapon-carriers who "apprehended attack.").

[165] "Carrying Deadly Weapons," *Washington Post* (Washington, D.C.) January 20, 1887, 2.

[166] "Carrying Deadly Weapons," *Daily Constitution* (Atlanta, Georgia) February 13, 1879, 2. The author associates weapon carrying with barbarism saying, "Let the cowardly barbaric practice be stamped out."

a construction of the necessary right to bear arms in defense of home and country should not be tolerated."[167]

68.    There was some acceptance of the idea that a true emergency situation might justify the carrying of a deadly weapon temporarily. What counted as a sufficient emergency, though, could be ambiguous. Much of the literature about the invocation of this emergency (or self-defense) exception centers upon male interpersonal disputes. Known as "difficulties," these contests could have their origin in anything from economic or workplace conflicts to rivalries over women, but they all fundamentally threatened the perceived manliness of one or both parties. Difficulties represented an evolution in America's honor culture that, despite being more deeply entrenched in southern areas, also existed in northern and urban locales.[168] But whatever the emergency, the honest, brave, and forthright man was presumably  willing to carry his weapons openly and show the world what he was doing. In Texas, where a strict public carry law offered protection to people fearing an attack that was both "immediate and pressing, and was of such a nature as to alarm a person of ordinary courage," the weapon had to be worn openly.[169] When an Alabaman defendant argued that he needed to conceal a weapon in order to defend himself from an attack, the court disagreed, stating that, "If the emergency is pressing, there can be no necessity for concealing the weapon, and if the threatened violence, will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail."[170] In Arkansas and Tennessee, postbellum weapon laws permitted the carrying of army and navy model revolvers

---

[167] "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2. This writer also stated that: "It is simply inexcusable for men in civilized communities, and where they have police authorities, courts and juries, and intercourse with newspapers and railroads and telegraphs . . . to wear pistols or bowie-knives as part of their daily raiment."
[168] On male interpersonal violence as a symptom of a growing women's rights movement, see Hendrik Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law' in Nineteenth-Century America," *Journal of American History* 84, no. 1 (June 1997), 67-96.
[169] 1871 Texas ch. 34, § 2.
[170] *State v. Reid*, 1 Ala. 612 (1840).

52

so long as they were carried "openly in the hand" or "uncovered, and in his hand"—the way a person experiencing an immediate emergency would carry one. [171]

69.    Nineteenth-century Americans understood their public carry laws to coexist with the right of self-defense. These laws were designed to stop individuals from preemptively going armed on a habitual basis, not foreclose people in deadly emergencies from defending themselves. Where gun-toters were convicted despite a plea of self-defense, it typically resulted from a failure to demonstrate that they had actually engaged in lawful self-defense—such as occasions where personal conflicts and wounded pride led to violence.

70.    Courts today invoke a "manner-of-carry" argument that takes historical concealed-carry laws to justify current analogous regulations that proscribe one way of wearing or carrying deadly weapons in favor of another. But historical context shows us that lawful public carry in the nineteenth century was much more circumscribed than this "manner-of-carry" argument suggests. The nationwide consensus about the constitutionality of concealed-carry restrictions was essentially a nationwide consensus about the efficacy of prohibiting the most convenient and most popular manner of carrying deadly weapons. These laws defied Americans who wanted to be preemptively armed to do so openly and face the legal and personal consequences that followed, including being stopped by or reported to police, being ostracized, being denied entry into mercantile establishments, and being presumed to be a dangerous person or a ruffian. Within organized community settings (i.e., not in isolated or rural areas, or on one's own property) the open carrying of weapons was neither common nor socially acceptable. To do so evinced reactions from passersby or pointed toward an imminent emergency.

## CONCLUSIONS

---

[171] 1879 Tennessee ch. 186; 1881 Arkansas ch. 96, § 2.

71.     Americans have historically distinguished arms suitable to militia service and hunting from deadly weapons suited for concealment and associated with interpersonal violence. During a period of American history when rates of homicide and crime were on the rise, so too were the number of weapons available to consumers and the lethality of firearms. More weapons and more crime produced regulations aimed at protecting the people and their peace, of which public carry regulations formed a foundational part. Americans attempted to reduce the number of weapons circulating in public by prohibiting "going armed" without good cause and outlawing the concealment of weapons that were inherently concealable and frequently concealed by their owners. Public carry laws coexisted with similar municipal ordinances and worked in harmony with other weapon regulations like minimum-age requirements, sales restrictions, weapon taxes, and locational restrictions. Licensing laws—which generally provided wide discretion to authorities—emerged during the country's epidemic of gun violence and aimed to resolve the problems posed by preexisting public carry laws. Where regulations forced lawful weapon-carriers acting in self-defense to still be arrested and defend their actions at trial; and where governmental incapacity to protect the peace led to widespread fear of armed criminal behavior; licensing provided an avenue for peaceable, law-abiding persons to make their case to administrators ahead of time and carry weapons as prescribed with assurance that they would not be arrested and tried for simply possessing a revolver or bowie knife. Public carry laws, including licensing laws, were understood to operate in harmony with both the Second Amendment and the natural right of self-defense. In the event that a man had a legitimate need to carry a weapon, he was expected to carry openly or prove the reasonability of his actions to a jury of his peers at trial. The larger historical context shows us that Americans of the nineteenth century generally disdained the habitual

54

carrying of deadly weapons and considered it a significant societal problem that deserved the attention of lawmakers and police.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June  26  , 2024, at Fort Worth, Texas.

_____

Dr. Brennan Rivas