1  laws showing us lawmakers wrestling with the question
2  of intent, and how to assess intent when someone is
3  carrying a weapon, and implementing different
4  strategies for adjudicating a person's intent.  In the
5  case of New York, it looks to me like they are taking
6  an older common law, an older Anglo-American tradition
7  with, you know, laws about burglar's tools, it looks to
8  me like they are taking that kind of framework and then
9  applying it to concealed weapons, like pistols, which
10 is more of -- it's maybe a newer problem, but they are
11 adopting an older framework in order to accommodate
12 regulations on that new problem.
13     Q. Going down to paragraph 40 -- and this may be
14 one of the parts you referred to earlier that would
15 answer a question I was asking earlier -- you
16 identified Idaho, the territory of Idaho, the states of
17 West Virginia and Texas as having statutes that
18 restricted open-carry, as well as conceal-carry; is
19 that right?
20     A. Yes.
21     Q. Are you aware of any other states, other than
22 those three, or territories, that restricted open
23 carry?
24     A. I am aware that there are some municipal
25 ordinances that applied themselves to open-carry, and



1  there -- level ones that --
2        MR. LYONS: You froze up again.
3     Q. My understanding is that the territory of Idaho
4  and the states of West Virginia and Texas are the
5  states of which you were aware that, who had statutes
6  restricting open-carry, and what you are saying is you
7  are aware of municipal or other lower governmental-
8  level restrictions on open-carry?
9     A. Yes. So if we are talking about states and
10 territories, those are three that I know, and the three
11 that I wrote about here. There may be others that I
12 didn't include, but I can't think of them off the top
13 of my head. I'm not sure.
14    Q. Okay. Have you compiled, or do you know of
15 anyone who has compiled a list, municipal or other
16 lower governmental-level laws that restricted public
17 carry -- open-carry? Open-carry.
18    A. Oh, generally speaking, it's a challenge to find
19 municipal laws. They have not been digitized and put
20 into these sort of aggregate and searchable databases
21 the way that state laws have, and for that reason, they
22 are just harder to find. So I am not aware of any
23 master list. The Repository has some examples of
24 municipal laws, and I think we already -- I think we
25 already talked about Patrick Charles's appendix, which



1  includes a number of municipal-level license to carry
2  laws and others.  There is no -- there is no database
3  that even approaches being authoritative when it comes
4  to local ordinances.
5       MR. ARGUIN:  Mr. Lyons, we have been going for
6  another hour and a half, and I wonder if Dr. Rivas
7  would like a break.
8       MR. LYONS:  Yes, yes.  This is not a death
9  march, Doctor.  So we can take a break whatever you
10 would like, or whatever counsel would like, if that's
11 also what he is hinting.  Those of us of a certain age,
12 unlike the witness, sometimes may want to take a break
13 more frequently.  So why don't we go ahead and do that.
14 We will take a short break, another five- or ten-minute
15 break, and then we will proceed.
16      THE WITNESS:  That's great with me.
17      (A break was taken from 1:56 to 2:02 p.m.
18       Att. Meosky not present after break.)
19      Q.  (By Mr. Lyons) Dr. Rivas, in paragraph 41 of
20 your declaration, you discuss changes in state statutes
21 respecting firearms regulation; and in that, you
22 discuss how some statutes were amended or some were
23 struck down by courts.  Would you agree with that?
24      A.  Yes, that's the purpose of that paragraph, to
25 show that, yes, sometimes they were struck down and



1  A. I know that the Bruen decision was specifically
2  about laws in New York, which began with the 1911 --
3  beginning with the 1911 Sullivan law, that was their
4  first big licensing law statewide. I know that the
5  Bruen decision has things to say about assessing
6  licensing programs that require, "Showing of proof for
7  probable cause," quote/unquote, yeah.
8      THE WITNESS: I am going to be honest with you
9  and say I am also -- I think I am fading a little bit
10 for you; I am trying to give you the best answers I
11 can, but I do feel like I am wearing a little thin.
12     MR. LYONS: That's all right. Well, I think the
13 good news is I am getting close to the end. Okay?
14     THE WITNESS: Okay.
15  Q. But let me ask you this: As you sit here, do
16 you recall any state statutes that required a license
17 to engage in the open carry of firearms?
18  A. You know, if I read through the laws, maybe even
19 some of the citations within this section, they may
20 include some of that. So, okay -- so the licensing,
21 the carry licensing laws from the nineteenth century
22 were generally local. Statewide licensing was more of
23 a later thing. Although, like, I do think that some
24 states had state laws that authorized or empowered
25 local jurisdictions to create their own permit



1  programs.  So most of these examples are going to be
2  local, just because that's the level of government that
3  was capable of carrying out these processes of, you
4  know, reviewing applications and things like that.  It
5  was something that the local police administration was
6  more in a position to do, so the laws, themselves, are
7  more likely to be local.  They are uneven in terms of
8  whether they specifically say openly carrying weapons
9  or concealed carrying of weapons.  I don't have a chart
10 or firm numbers on that right now, but I wouldn't be
11 surprised if some of them applied to open-carry.  I
12 also wouldn't be surprised if most of them were
13 confined to conceal-carry.  I'm just not sure.
14         MR. LYONS:  Okay.  So I think this is the
15 last -- well, we are getting to the last section of
16 your declaration, anyway.  So it will be the last
17 section that I have any questions on, then I will have
18 a couple of other topics after that.
19       Q.  But beginning in paragraph 62, you talk about
20 what you call nineteenth century attitudes toward
21 weapon-carry, and I think that takes you through the
22 rest of your declaration up to the conclusions; is that
23 right?
24       A.  Yes, that sounds right.
25       Q.  Okay.  In the first paragraph, 62, you identify



1  three specific states that statutorily restricted
2  open-carry, as well as conceal-carry, I think that's
3  Massachusetts, Texas, and West Virginia.  Do you recall
4  that, or do you see that?
5      A. Yes, I see that sentence.
6      Q. Okay.  Are you aware of any states, besides
7  Massachusetts, Texas, and West Virginia, that
8  statutorily restricted open-carry?
9      A. Well, like the sentence indicates, I said, "The
10 'going armed' statutes rooted in the Massachusetts Code
11 of 1836," so that would include the Massachusetts one,
12 as well as that list of several other states that we
13 went over earlier, like, Michigan and Wisconsin and
14 Oregon.  So there are other states that had going-armed
15 statutes that were identical or very, very similar to
16 the Massachusetts one; then later on I talked about
17 Texas, West Virginia, as well as Idaho, which was
18 territorial at the time.
19     Q. Okay.  Just so we are clear, it's your
20 understanding that those states you previously
21 identified that had statutes like Massachusetts, also
22 restricted open-carry as well as conceal-carry?
23     A. If you read the going-armed statutes,
24 themselves, they don't restrict themselves to concealed
25 carrying; they say that you should not go armed.  So



1  you say, "The everyday carrying of weapons, especially
2  concealed in one's clothing, was widespread during the
3  nineteenth century, even as Americans opposed the
4  practice and considered it a significant societal
5  problem."
6      A. Yes, I see that.
7      Q. With respect to the part about Americans
8  opposing the practice and considering it a significant
9  societal problem, what is your basis for that
10 statement?
11     A. Well, let's see, this is an opening sentence of
12 the paragraph, so beneath it; but the research, as a
13 whole, itself, as a body, everything that goes into
14 this section, and everything that I have encountered in
15 my work on this, that's the conclusion that follows
16 from the evidence, from, you know, the laws and the
17 newspaper articles and thinking about, you know, the
18 size of weapons, and just all of the work points in the
19 direction of this conclusion, which is that carrying
20 weapons, especially concealed, was happening, people
21 were doing it, even though it was often illegal.  I
22 think of it kind of like speeding, a lot of us bemoan
23 speeding, but then do it ourselves.  The most dangerous
24 thing I do every day is get in a car.  Yes, I am very
25 opposed to speeding; but, yes, I speed, too.  To some



```
 1   extent, I believe there is a little bit of that going
 2   on; but as far as specific proof, the body of work,
 3   itself, supports that conclusion.
 4        Q. Okay.  So in this section, you referred to some
 5   decisions and some statutes; okay.  Are there any other
 6   decisions or statutes, other than what you have set
 7   forth in this section or in prior sections, which you
 8   think supports your statement that Americans opposed
 9   the practice of carrying, the everyday carrying of
10   weapons, and considered it a societal problem?
11        A. I have hundreds of newspaper articles, and I
12   have only cited a handful here.  So there is also a
13   combing through of materials and, you know, pulling out
14   the best examples or the clearest examples.  So there
15   is a lot of material, there is an abundance of social
16   history sources from the nineteenth century showing
17   that Americans were opposed to the carrying of weapons.
18   You see it all over the newspapers; you see it
19   discussed by legislative bodies.  So I would say there
20   is a whole host of evidence that is not cited here that
21   this is just a way of illustrating that, and using a
22   collection of sources to do so.
23        Q. Okay.  I was making a distinction, and perhaps I
24   wasn't clear enough when I did it.  For the moment, I
25   am setting aside the newspaper articles.
```



1  things go into choosing them.  It would be great to
2  make a giant database some day, but I will need some
3  administrative help with that.
4      Q.  Okay.  On page 49, lower down in that paragraph,
5  you have a sentence which reads, "A Georgia judge
6  described the protection of open-carry within the state
7  as a way, 'to compel persons who carry those weapons to
8  so wear them ... that others ... might see they are
9  armed, and dangerous persons, who were to be avoided in
10 consequence,'" end quote.  Do you see that?
11     A.  Yes.
12     Q.  You actually cite an 1861 Georgia statute for
13 that.
14     A.  I cite the case.
15     Q.  The case; I'm sorry, yes, yes.  Are you aware
16 that, generally speaking, or do you think that,
17 generally speaking, open-carry was protected by states
18 for that reason?
19     A.  My thought process and my conclusions about
20 open-carry very much move in that direction, that the
21 protection to open-carry is for emergency situations,
22 and that people were not on a regular, habitual, daily
23 basis openly carrying their weapons, that wasn't seen
24 as a social problem.  The weapons that are posing a
25 problem to American communities are the ones that are



1  so much easier, they are very easier to put in one's
2  pocket, and some of them are even designed or made with
3  that purpose in mind.  So, also, like I said before,
4  that especially in cities and town, it was just not so
5  common to see a person openly carrying a gun, and this
6  quote is a really excellent one for showing, giving
7  some kind of insight into what a normal person might
8  conclude when they saw someone openly carrying a pistol
9  or something in a town.  It's a great source for trying
10 to get at that.
11     Q. The way the paragraph 67, the first sentence
12 says, quote, "Not only did nineteenth century Americans
13 carry pistols and large knives in the manner familiar
14 to us (concealed), but they also carried them for
15 reasons familiar to twenty-first century Americans, in
16 preparation for an unforeseen, potential emergency."
17 Do you see that?
18     A. I do, yes.
19     Q. What is your basis for saying that?
20     A. Well, again, building on everything that had
21 gone on before, and then pivoting to talk about the
22 next section, this is a transitional statement.  It's a
23 sort of topic sentence for the paragraph.  So I have
24 already established that Americans who were carrying
25 pistols and knives, especially on a regular, everyday,



1  habitual kind of manner, that they were doing so
2  concealed. I am also introducing the assertion that
3  they were doing so as an act of preemptive
4  self-defense, so that's where the section pivots after
5  this.
6       Q. Okay. Then at the end of paragraph 68, you say,
7  "In Arkansas and Tennessee, postbellum weapon laws
8  permitted the carrying of Army and Navy model
9  revolvers, as long as they were carried, 'openly in the
10 hand,' or 'uncovered and in his hand,' the way a person
11 experiencing an immediate emergency would carry one."
12 Do you see that?
13      A. Yes.
14      Q. For that, you cite to the two statutes?
15      A. Yes; that's correct.
16      Q. Is that -- is that the same kind of thing you
17 were just talking about in the previous sentence we
18 discussed?
19      A. Where -- so this is not like -- I'm sorry. Go
20 ahead.
21      Q. No. We talked about the sentence at the
22 beginning of paragraph 67.
23      A. Uh-huh, yes.
24      Q. What I am saying is, is the paragraph at the end
25 of page 68 that I just read a specific example of the



1  same, many of the statutes that allowed the same sort
2  of carrying of -- no; I'm sorry.  This is for
3  open-carry; is that right?
4       A. Yeah.  So, yes.
5       Q. So I withdraw my question.  Okay.  The sentence
6  at the end of paragraph 68 refers to open-carry;
7  correct?
8       A. Yes, the purpose is to show -- let's look at the
9  beginning of the sentence.  The beginning of the
10 paragraph says that there was some exception.  This is
11 paragraph 68, the beginning of the paragraph says,
12 "There was some acceptance of the idea that a true
13 emergency situation might justify the carrying of a
14 deadly weapon temporarily."  It goes on to say, "What
15 counted as a sufficient emergency, though, could be
16 ambiguous."  So I end up talking a little bit about
17 that, and then an example of that, that in their law,
18 they crafted a way of allowing open-carry that was a
19 very narrow needle to thread, and that the only people
20 who were going to thread that needle were the ones who
21 were carrying their gun in preparation to shoot it in
22 self-defense, that it didn't protect any other kind of
23 open-carry strapped on to a belt, or anything like
24 that.  It was only in one's hand, and that they crafted
25 the law that way on purpose to minimize open-carry as

