ROBERT J. SPITZER, PH.D.                           September 10, 2024
O'NEIL V. NERONHA                                                  34

1            and restrictions on any weapons carrying, I also

2            gathered information about old brandishing and

3            display laws and old licensing, weapons

4            licensing laws.

5    Q.   Okay.  You said licensing laws, and what was the

6            category before that?

7            A.  Brandishing and display.

8    Q.   Okay.

9            A.  Weapons brandishing and display.

10   Q.   Okay.  And what do you mean by "brandishing"?

11           A.  Well, brandishing is to display a weapon in

12           public in the presence of others in a

13           threatening or menacing way.

14   Q.   Okay.  Is it your understanding that any of the

15           plaintiffs in this case have done any

16           brandishing of weapons?

17           A.  That I do not know.

18   Q.   Okay.  To your knowledge, are the plaintiffs all

19           law-abiding citizens?

20           A.  I could not say.

21   Q.   Okay.  Do you have any contrary information?

22           A.  Not that I know of.

23   Q.   Okay.  So why did you research brandishing?

24           A.  Well, all of this, all of these cluster of

25           laws pertain to what happens when individuals



ROBERT J. SPITZER, PH.D.                          September 10, 2024
O'NEIL V. NERONHA                                                  35

```
 1          bring weapons into the public sphere.  And so
 2          the question is, in the 1600s, 1700s, 1800s, did
 3          public policymakers pay any attention to these
 4          matters; if so, did they legislate on these
 5          matters; and if so, what was the nature of that
 6          legislation, that is, what was the public policy
 7          regarding that.  And I would say the brandishing
 8          and display laws as one category is indicative
 9          of the idea that our ancestors were keenly
10          cognizant that there was, let's call it a public
11          policy problem, whenever individuals carried
12          guns in a public setting.
13                      And it's important to remember
14          that there's two parts, there's brandishing, but
15          there are also display laws, which do not
16          incorporate sort of menacing threatening
17          behavior, but are laws that punish the mere
18          display of a weapon in public, that is, the mere
19          presentation of a weapon in public.
20          So you have really those two types of laws
21          existing as kind of one category of here is the
22          public policy of what happens when you bring a
23          weapon into a public space when other people are
24          around.
25     Q.   Well, would you agree with me that, if a person
```



ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                          36

1        is engaged in concealed carry, that they're not

2        brandishing a weapon?

3        A.  Yes.

4   Q.   Okay.  And would you agree with me that you can

5        engage in open carry without brandishing a

6        weapon?

7        A.  Yes.  But it could run afoul of display laws.

8   Q.   Okay.  So is it your understanding that display

9        laws omit open carry of firearms?

10       A.  Well, I treat these two categories separately

11       because they're separately -- they're separate

12       typically in the law, that is, there are --

13       there were states and localities that had laws

14       saying essentially you could not carry weapons

15       openly, but the display category is treated

16       somewhat differently, and so I treat them

17       differently.

18                   And again, my main purpose here

19       is to present this information.  And obviously,

20       it's up to a judge or magistrate to decide the

21       degree of relevancy of these sorts of laws with

22       respect to making analogies between the old laws

23       and the current Rhode Island law.

24   Q.  Okay.  So setting aside the brandishing laws for

25       now and focusing just on the display laws.  Is



1    it your understanding that the display laws

2    would bar open carry of firearms or could you

3    engage in open carry without violating display

4    laws?

5    A.   Depends on the state, depends on the

6    ordinance, depends on the circumstances, but

7    certainly the -- you can readily imagine

8    display -- persons carrying firearms without

9    running afoul of display laws.  Remember, it's

10    one sort of subcategory of a larger universe.

11  Q.   Okay.  So depending on the specifics of the

12    statute, you could engage in open carry without

13    violating a display law.

14    A.   I think that is possible.  Sure.

15  Q.   And I know you have a -- What was produced as

16    Exhibit B to me yesterday -- Let me see if I can

17    pull that up.  Let me pull up what was labeled

18    as Exhibit B and provided to me yesterday, the

19    first page of which just say Exhibit B and then

20    there's two pages after that which consists of a

21    table that is labeled Types of Carry

22    Restrictions (Years of Enactment).  Do you see

23    that?

24    A.   Yes, I do.

25  Q.   Okay.  And is this the Exhibit B to which you



ROBERT J. SPITZER, PH.D.                              September 10, 2024
O'NEIL V. NERONHA                                                    38

1        refer in your declaration?

2        A.  Yes, it is.

3   Q.   Okay.  With respect to the display laws that you

4        were describing generally, would they be listed

5        on this table under one of the categories?

6        A.  Not necessarily, no.  And I think it's

7        important to keep these categories distinct.

8   Q.   Okay.  All right.  Well, then, we'll get --

9        We'll come back to this and get into this

10       separately, then.

11                        Do you have -- Have you

12       compiled a list of display laws that you believe

13       would prohibit open carry?

14       A.  Well, display laws by their nature would

15       pertain to open carry.  I should add, though,

16       that with -- for all of the information I've

17       presented in my deposition -- in my declaration,

18       the category of brandishing and display, unlike

19       the other stuff that I presented, I did not

20       present and include all of the laws because that

21       was from other sources, so it's sort of a

22       summary coming from other sources, whereas for

23       the rest that I present, that's where the

24       respective exhibits come into play.  So I did

25       not include an exhibit of all of the laws


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                          39

1          pertaining to brandishing and display, although

2          there is overlap, because that was drawn from

3          other sources, and I was simply referencing

4          those other sources to present the information

5          in my document.

6    Q.    Okay.  In other words, it would be fair to say

7          that the brandishing and display laws you have

8          considered as part of your work are not included

9          in the table that is identified as Exhibit B.

10   A.    There may be some overlap.  I have not

11         compared them to see, to see if there is

12         overlap.  There may well be.

13   Q.    Okay.  Who prepared this table?

14   A.    I did.

15   Q.    Okay.  And how did you go about doing this?

16   A.    This is a sort of digest summary of what I

17         believe is Exhibit C, which is a lengthy exhibit

18         that lists the texts organized by state and

19         chronologically of all kinds of laws, including

20         laws pertaining to the carrying of weapons.

21   Q.    Okay.  Well, let me close this up for now.

22         Let me pull up Exhibit C, then.  Let me show you

23         what has been produced as Exhibit C, which is a

24         multi-page document entitled Dangerous Weapons

25         Laws.  All right.  Is this what you're referring



ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                          40

1         to as Exhibit C?

2         A.  Yes.

3    Q.   Okay.  And did you compile Exhibit C?

4         A.  Yes, I did.

5    Q.   Okay.  And you compiled Exhibit B based on the

6         information that you put in Exhibit C.

7         A.  Yes.

8    Q.   Okay.  Exhibit B referred to the Duke

9         repository.

10        A.  Yes.

11   Q.   Okay.  Is that where you got the information

12        that you used to prepare Exhibit C?

13        A.  It is where I obtained most of the

14        information from.  I think I included in a

15        footnote at the end that I also obtained

16        information sometimes from an online source

17        called HeinOnline.  Sometimes from a simple

18        Google search.  And if I did that, I generally

19        included a link, a direct link to those sorts of

20        sources.  But most of these laws come from the

21        Duke repository.

22   Q.   Okay.  Now, when you found something in the

23        Duke repository, did you rely upon that as

24        accurate?

25        A.  Yes.



ROBERT J. SPITZER, PH.D.                        September 10, 2024
O'NEIL V. NERONHA                                              52

```
1          permit law, was about that question, and I can't
2          speak here and now as to the extent to which
3          they talked about concealed carry versus
4          open carry --
5    Q.    Okay.
6          A.  -- versus simple carry.
7    Q.    That's fair enough.
8          Do you have an understanding as to whether or
9          not the New York regulatory scheme restricted
10         open carry of firearms?
11                         MR. ARGUIN:  Again, objection.
12         Calls for a legal conclusion.
13                         But Professor Spitzer, to the
14         extent you can answer, please answer.
15         A.  Yeah.  I, I would need to go back and look at
16         the law, frankly, --
17   Q.    Okay.
18         A.  -- to provide a useful answer.
19   Q.    Is part of your opinion in this case whether or
20         not Rhode Island's regulatory scheme is
21         consistent with a historical tradition of open
22         carry regulations?
23         A.  Well, that is a question that I did not
24         specifically address in my declaration.
25   Q.    Have you been asked to render an opinion on
```



ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                          53

1       that?

2       A.  Not specifically, no.

3   Q.  Okay.  Were you involved in the Bruen case as an

4       expert of some sort?

5       A.  No.  Let me see.  No.

6   Q.  All right.  Have you rendered an opinion -- and

7       I apologize if I asked you this already, but I

8       don't recall.  -- in any other litigation as to

9       whether or not a restriction on open carry was

10      either consistent or inconsistent with a

11      historical tradition of firearms regulation?

12      A.  That question might have come up in some

13      manner with one or more of the cases I've been

14      involved with, but I can't, I cannot say here

15      and now.

16  Q.  Okay.  Since the Bruen decision, have you been

17      involved in any cases in which you rendered an

18      opinion as to whether or not a restriction on

19      concealed carry was consistent with the

20      historical tradition of regulation?

21      A.  I'm sure it must have come up in some manner.

22      But here, again, I cannot say the extent to

23      which I've addressed that specific question in a

24      given case or cases.

25  Q.  Okay.  Well, then, let me do this.  Let me



ROBERT J. SPITZER, PH.D.                                September 10, 2024
O'NEIL V. NERONHA                                                     54

1    backtrack and say, can you describe for me,

2    generally speaking, what these approximately

3    50 other cases you've been involved in did

4    concern?

5    A.  Well, it concerned a variety of questions,

6    a variety of weapons related laws, including

7    restrictions on assault weapons, large-capacity

8    magazines, a few of them have involved the

9    existing laws saying that, if you're a felon,

10   you're not allowed to have firearms, I was

11   involved in a switchblade, challenge for

12   switchblade law in California.  There have been

13   a great many.  I'm sure there have been weapons

14   carrying laws that have been at play as well.  I

15   have not categorized --

16   Q.  Okay.  As you sit here today, you can't

17   specifically recall one that involved either

18   concealed carry or open carry.

19   A.  No.

20   Q.  Okay.  Now, have you heard the phrase "long

21   guns"?

22   A.  Yes.

23   Q.  Okay.  What's your understanding of what that

24   means?

25   A.  Well, the long gun is generally understood as



1       A.  Yes.

2   Q.  And then have you a category which says

3       No Open/Any Carry Laws.  What do you mean by

4       that?

5       A.  Well, those are laws that impose restrictions

6       on the any carrying of weapons.  So, for

7       example, there are laws that said, if you

8       carried a pistol, whether concealed or openly,

9       it would fall under that category.

10  Q.  Okay.  But that category would not include long

11      guns; is that -- or would it?

12      A.  It would not.

13  Q.  Okay.  All right.  I'm going to pull Exhibit B

14      back up in just a minute.  But let me ask you a

15      couple more questions just about the

16      Duke repository and the information that's in

17      Exhibit B.

18                      Of the information that's in

19      Exhibit B, do you recall whether you, yourself,

20      went and confirmed that the statute cited in the

21      Duke repository in fact said what the repository

22      said they said?

23      A.  Well, again, I've been using and culling that

24      information for over a decade.  And from the

25      beginning of that time up to the present, I



1        maybe for dueling.  And if you have a firearm,

2        the sensible firearm would have been a musket, a

3        fowling piece, that sort of thing.

4    Q.  And so this part of the act does not prohibit

5        the public carry of long guns.

6        A.  That would be the implication.  I wouldn't

7        say definitively, but that would be the

8        implication.

9    Q.  Do you know if the Bruen decision made any

10       reference to this act?

11       A.  Offhand, I don't.

12   Q.  If we go back to your disclosure, on Page 6, the

13       first full sentence says, quote, Massachusetts

14       followed in 1751.  Do you see that?

15       A.  It's not on the screen, but I remember

16       writing it.

17   Q.  Oh, I'm sorry.  My mistake.

18       All right.  Can you see it now?

19       A.  Yes, I can.

20   Q.  All right.  And I'm referring to the first full

21       sentence on Page 6 which says, Massachusetts

22       followed in 1751.  What do you mean by

23       "Massachusetts followed"?

24       A.  Well, it enacted a similar sort of law,

25       different in particulars, but -- and also in the



ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                         81

1    Q.    Okay.  Have you read this statute itself or did
2          you rely upon the Duke repository in citing it?
3          A.  Either or both.  I certainly have -- Either
4          or both.  I can't say with certainty whether I
5          did either or both.
6    Q.    Okay.
7          A.  I think it's in the Duke compendium.
8    Q.    Would you agree with me that this act prohibits
9          groups of people of 12 or more from being armed
10         with weapons and unlawfully assembling?
11         A.  Well, there's two parts here.  Right?  The
12         first part says, if any persons, just as you're
13         referencing it, if any persons to the number of
14         12 or more, being armed with clubs or other
15         weapons, or -- there's the second part -- if any
16         persons 50 or more, whether armed or not, shall
17         be unlawfully, riotously, or tumultuously, et
18         cetera, behavior.
19                   So the first part is the
20         critical part for my point of view, that is to
21         say it's the mere presence of 12 or more people
22         armed with other -- armed with clubs or other
23         weapons.  And that, that particular element is
24         what I was alluding to, although the rest of it
25         is relevant as well.



ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                          82

1    Q.    Okay.  Would you agree with me that this act --

2          and we can scroll through it, if you would

3          like.  -- does not prohibit an individual from

4          either open or concealed carry of a firearm?

5    A.    I would have to read through the whole thing

6          to be certain, but it is certainly correct that

7          it talks about two categories of persons, being

8          multiple persons, not a single person.

9    Q.    Okay.  Well, if you'd like more time to read it,

10         I can leave it up on the screen, if you'd like.

11   A.    Well, I -- You tell me how important it is.

12   Q.    Okay.  Well, my question was, whether or not you

13         would agree with me that this does not outlaw an

14         individual from either the concealed or open

15         carry of a firearm, any public carry of a

16         firearm, and you indicated you would want to

17         read it more before you responded.  So I'm just

18         offering you the opportunity to do that.

19   A.    Okay.  If you can scroll to the second page.

20   Q.    Sure.

21                      (PAUSE)

22   A.    It does call for individual punishments, but

23         I believe your assertion is -- your question is

24         correctly stated, that there is no provision, at

25         least through Section 2, that refers to single



ROBERT J. SPITZER, PH.D.                                September 10, 2024
O'NEIL V. NERONHA                                                    83

```
 1        individuals.
 2   Q.   Okay.  Are you aware whether or not there's any
 3        other section to this act?
 4        A.  I don't know offhand.
 5   Q.   Okay.  In Paragraph 12 of your declaration --
 6        which should be back up on your screen.  Do you
 7        see that?
 8        A.  Yes, I do.
 9   Q.   Okay.  And you refer from the early 1800s up
10        until 1860, at least five states, including
11        D.C., enacted laws barring or restricting the
12        carrying of named weapons, whether concealed or
13        open.  Then you go on to say, Georgia enacted a
14        law in 1837 restricting both the carrying and
15        sale of named weapons.  Do you see that?
16        A.  Yes.
17   Q.   Okay.  And then you quote the statute in your
18        declaration.
19        A.  Yes.
20   Q.   Okay.  Do you recall if you took the quote from
21        the Duke repository or did you find the original
22        statutory material and quote from that?
23        A.  I believe it came from the Duke repository.
24   Q.   Okay.  And do you know whether this statute
25        prohibited the open carry of the weapons listed?
```



ROBERT J. SPITZER, PH.D.                          September 10, 2024
O'NEIL V. NERONHA                                              84

1        A.  It included an open carry provision, yes.

2   Q.   Okay.  So it was your understanding that this

3        prohibited the open carry of weapons?

4        A.  As it says, yes, whether concealed or open.

5   Q.   Okay.  And let me show you -- Well, actually --

6        I'm sorry.  I don't have a section to show you.

7        But do you know whether or not there was another

8        portion of this act which also said, provided --

9        quote, provided, also, that no person or persons

10       shall be found guilty of violating the before

11       cited act who shall openly wear externally Bowie

12       knives dirks, toothpicks, spheres, and what

13       shall be exposed plainly to view?

14       A.  Well, you have me at a disadvantage because

15       I'm not seeing the full text of the law.

16  Q.   Yup.  Nope.  I understand that.

17       Do you know whether or not the Georgia

18       Supreme Court struck down this act?

19       A.  They did not strike down the entire law, no.

20  Q.   Okay.  And what was it that you understood that

21       they struck down?

22       A.  Well, the court was upset with -- Well, there

23       were a couple of problems in the case.  One was

24       that the man was charged with the crime.  Those

25       who arrested him never indicated whether the



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                            85

1          weapon he was carrying was being carried openly

2          or concealed.  Particular problem.  More

3          generally, the court was unhappy with the

4          incongruity of the wording pertaining to what

5          weapons were covered under the concealed carry

6          portion versus what weapons were covered under

7          the open carry portion, and they found that

8          inconsistent.  And they were particularly

9          concerned about maintaining greater protections

10         on open -- on avoiding open carry restrictions

11         so as not to impede the ability of Georgia to

12         establish and maintain its militia for military

13         purposes.

14    Q.   Okay.  Is that decision the Nunn versus State

15         decision?

16         A.  Yes.

17    Q.   Okay.  Which was decided in 1946?

18         A.  Sounds right.

19    Q.   Okay.  And generally speaking, what the court

20         said in part was that the prohibition on open

21         carry violated the Georgia constitution?

22         A.  I think the phrase is something like that

23         part which is inconsistent with blah, blah.  I

24         mean, they worded it a very particular way.  But

25         yeah.  They were more dubious about restrictions



ROBERT J. SPITZER, PH.D.                                September 10, 2024
O'NEIL V. NERONHA                                                      86

1           on open carry as compared to concealed carry.

2   Q.      Okay.  And going back to your declaration.  Can

3           you see that on the screen?

4   A.      Yes.

5   Q.      Okay.  Going down to Paragraph 15.

6   A.      Yup.

7   Q.      There is a -- I'm sorry.  Paragraph 14.  You

8           refer to an 1851 Pennsylvania law for the

9           borough of York.  Do you see that?

10  A.      Yes.

11  Q.      And it said it defined as a felony the willing

12          and malicious carrying of any pistol, among

13          other weapons, guns.  Do you see that?

14  A.      Yes.

15  Q.      Okay.  What did they mean by -- or what's your

16          understanding of what they meant by willful and

17          malicious?

18  A.      I will say that it contemplates criminality.

19          But beyond that, I would be reluctant to delve

20          into exactly what those terms meant in

21          Pennsylvania law in 1851.

22  Q.      Okay.  In other words, it may not have

23          criminalized the carry of pistols or other

24          firearms for some purpose which was not willful

25          or malicious.



ROBERT J. SPITZER, PH.D.                                September 10, 2024
O'NEIL V. NERONHA                                                      87

```
 1        A.   Yes.  And let me make clear that these types
 2        of laws, not always, but almost always made
 3        exceptions for travelers, if you're carrying a
 4        gun just traveling through an area, for law
 5        enforcement, for militias, people serving in
 6        militias, and often for cases of justifiable
 7        self-defense.  And so those kinds of exceptions
 8        were invariably included in these laws precisely
 9        to protect people who, you know, were just
10        traveling through to go somewhere and they were
11        bringing their gun along or similar things.
12   Q.   Okay.  But with respect to the Pennsylvania law,
13        my understanding is, you do not have an
14        understanding as to what was meant by the
15        willful and malicious carrying.
16        A.   At the least, I would want to go back and
17        look at the full law.  And even then, there
18        might not be a clear answer to that question.
19        It was within the discretion of law enforcement
20        and the judicial authorities to make a
21        determination about what constituted willful and
22        malicious activity.  Those are pretty broad
23        terms.
24   Q.   And then in Paragraph 15 you refer to a Hawaii
25        law.  Do you see that?
```



ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                           88

 1        A.   Sorry.   Refer to a what?

 2   Q.   Hawaii law.

 3        A.   Oh, yeah.   Right, right.

 4   Q.   1852 Hawaii law.

 5        A.   Yup.

 6   Q.   Was Hawaii independent from the United States in

 7        1852?

 8        A.   Yes.

 9   Q.   Okay.   Why is that law then relevant to the

10        American historical tradition?

11        A.   Well, for two reasons.   One is, because

12        Hawaii is today a state.   And as is the case

13        with territories that eventually become states,

14        they don't obliterate all of their laws at the

15        point in which or the day after they join the

16        union.   They carry forward historically every

17        territory, every state did this, and that is,

18        they would carry forward their, you might call

19        it common law tradition, just as in the way

20        early Americans brought within the British

21        common law tradition.   And while laws are

22        changed, amended, et cetera, over time, a great

23        deal of law carries forward.   And this is a --

24        was small, but notable additional example of the

25        same thinking that existed in other territories



ROBERT J. SPITZER, PH.D.                                September 10, 2024
O'NEIL V. NERONHA                                                      89

```
 1        and states within what is -- what then and

 2        later -- you know, what was the United States.

 3   Q.   In Paragraph 16, beginning at the bottom of

 4        Page 8 and going on to Page 9, you refer to

 5        states which enacted anti-carry laws from either

 6        1860 to 1900 or even thereafter.

 7   A.   Yes.

 8   Q.   Okay.  My understanding from our earlier

 9        discussion is that you understood the

10        Supreme Court to be saying that the limits -- or

11        that the end period for consideration of the

12        historical tradition would be 1868 when the

13        Fourteenth Amendment was adopted.

14   A.   No.

15                  MR. ARGUIN:  Objection.  Calls

16        for a legal conclusion and I think misstates the

17        testimony.

18   Q.   Okay.

19                  MR. ARGUIN:  Dr. Spitzer, would

20        you like to answer?

21   A.   Well, I would just say no.

22   Q.   Okay.

23   A.   That's not what I said and it's not what the

24        court said.

25   Q.   Oh, okay.  So is it your understanding that the
```

