```
 1         as well.
 2  Q.  Okay.
 3     A.  Aside from those, I think those are my only
 4         such experiences.
 5  Q.  Okay.  And where did you shoot the musket, the
 6         colonial era musket?
 7     A.  It was at a shooting range someplace on the
 8         Colonial Williamsburg property.
 9  Q.  Okay.
10     A.  It's a very large property.
11  Q.  Okay.  All right.  Have you ever been the victim
12         of a crime?
13     A.  No.
14  Q.  Have any family members ever been a victim of a
15         crime?
16     A.  Not that I know of, no.
17  Q.  How about any close friends?
18     A.  Not that I can think of offhand.
19  Q.  Okay.  Now, at some point in time I gather you
20         got into studying the regulation of firearms.
21     A.  Yes.
22  Q.  Okay.  When was that?
23     A.  2013.
24  Q.  Okay.  And why did you do that?
25     A.  Duke University Law School began a project
```



```
 1      where they started to compile digitized copies
 2      of old gun laws, and I had studied a little bit
 3      and read a little bit about old laws.  But the
 4      Duke archive was established and made available
 5      beginning a little over 10 years ago, and it
 6      simply sounded like an interesting database to
 7      me, and I had access to it, and I started
 8      reading old laws and was frankly dumbstruck by
 9      the number, variety, and nature of these old
10      laws, and I have studied these old gun laws
11      continuously for now the last 10 or 11 years,
12      and of course it's only been since the Bruen
13      decision in 2022 where there's been much greater
14      interest and heightened awareness about the
15      nature, types, consequences of old gun laws.
16   Q. Would you say that there was not -- I mean, are
17      you saying that -- Well, let me withdraw the
18      question.  You recall the Supreme Court rendered
19      a pair of decisions back around 2010 and 2012
20      beginning with the Heller decision on the
21      Second Amendment.
22   A. Yes.  The Heller was 2008 and the McDonald
23      case was 2010.
24   Q. All right.  And would you say that those
25      decisions increased an interest in the history
```



```
 1        of gun or firearms regulation?
 2        A.   Yes.
 3   Q.   Okay.  Do you know, is that what prompted
 4        Duke University to begin compiling this
 5        repository?
 6        A.   That I --
 7                  MR. ARGUIN:  Objection.
 8                  THE WITNESS:  Okay.
 9                  MR. ARGUIN:  Sorry.
10                  Objection.  Calls for
11        speculation.
12                  But Professor, you can proceed
13        to answer.
14        A.   I don't know.
15   Q.   Okay.  Do you know who runs the Duke repository?
16        A.   They've had a change in personnel.  I'm not
17        sure who the person at the top is.  Offhand, I'm
18        not sure, no.
19   Q.   Okay.
20        A.   I know some of the names of people
21        affiliated.
22   Q.   Were you, yourself, ever personally involved in
23        helping compile the Duke repository?
24        A.   No.
25   Q.   Do you know anybody who was?
```



1      A.   Yes.
2   Q.   Okay.  Who do you know who was?
3      A.   Well, there were several faculty members that
4      had connections to it.  I can't speak to exactly
5      to what degree or what nature.  But
6      Jacob Charles, Darrell Miller, Joseph Blocher,
7      more recently Andrew Willinger, Willinger, have
8      all been involved in one way or another, and
9      they're faculty members.
10  Q.   Okay.
11     A.   Well, some of them have left Duke.
12  Q.   All right.  Do you know if any of those faculty
13     members have ever given any testimony either in
14     deposition or in court about how the repository
15     was created?
16     A.   I do not know.
17  Q.   Okay.  Do you know if anybody connected with the
18     repository has given any testimony in court
19     about how the repository was created?
20     A.   I do not know.
21  Q.   Okay.  When were you first retained as an expert
22     witness in any kind of weapons litigation?
23     A.   The first time was for a case in 2017 in
24     Massachusetts, and that I believe was the first
25     time.



```
 1          to as Exhibit C?
 2      A.  Yes.
 3  Q.  Okay.  And did you compile Exhibit C?
 4      A.  Yes, I did.
 5  Q.  Okay.  And you compiled Exhibit B based on the
 6          information that you put in Exhibit C.
 7      A.  Yes.
 8  Q.  Okay.  Exhibit B referred to the Duke
 9          repository.
10      A.  Yes.
11  Q.  Okay.  Is that where you got the information
12          that you used to prepare Exhibit C?
13      A.  It is where I obtained most of the
14          information from.  I think I included in a
15          footnote at the end that I also obtained
16          information sometimes from an online source
17          called HeinOnline.  Sometimes from a simple
18          Google search.  And if I did that, I generally
19          included a link, a direct link to those sorts of
20          sources.  But most of these laws come from the
21          Duke repository.
22  Q.  Okay.  Now, when you found something in the
23          Duke repository, did you rely upon that as
24          accurate?
25      A.  Yes.
```



ROBERT J. SPITZER, PH.D.  
O'NEIL V. NERONHA

September 10, 2024  
42

```
 1        a single document so that anybody can look at it
 2        and see what these old laws actually said.
 3   Q.   Okay.  So you considered the Duke repository to
 4        be a primary source.
 5   A.   To be a digest of primary sources, plural.
 6   Q.   Okay.
 7   A.   Because each law is a discrete thing and it
 8        compiles these many discrete things.
 9   Q.   When you included these laws in Exhibit C, the
10        Dangerous Weapons Laws, did you check to see
11        whether the information included in the
12        Duke repository was accurate?
13   A.   Over the space of 10 years, I have had
14        occasion to sometimes look back to find an
15        original -- to find actual, you know, the actual
16        law in a PDF version, let's say.  I've never
17        found any problems with the Duke repository and
18        I think it is generally regarded as a highly
19        reliable, extremely scrupulous compendium of old
20        laws, and of course, each and every law, as you
21        can see, begins with a citation, and that
22        citation can then take you back to a PDF or the
23        actual printed law in an old book.
24   Q.   When you say that you've done this on occasion,
25        can you estimate how many times?
```



ROBERT J. SPITZER, PH.D.  
O'NEIL V. NERONHA

September 10, 2024  
43

```
 1        A.   Oh, I -- Not offhand, no.  I certainly have
 2             not checked most of these because I found it to
 3             be utterly scrupulous, completely reliable, and
 4             excellent research work.
 5   Q.   Have you ever found that what was included in
 6             the Duke repository was inaccurate?
 7        A.   I have found the odd typographical error.
 8             There also are sometimes disputes about how
 9             exactly to cite or what exactly the citation of
10             a law is.  So, for example, I have referenced a
11             few laws where the only date is saying something
12             like this law was enacted in the thirteenth year
13             of the reign of his royal majesty King George,
14             II.  No other date appearing.  And so one may
15             then engage in a computation, well, what was,
16             what year was the, you know, the thirteenth year
17             of the reign of George, II, who was king in the
18             early 1800s -- 1700s.  But then that raises the
19             question of, do you count the first year or do
20             you -- There are sort of ambiguities in how
21             dating was done with some of these old laws.  In
22             addition, old laws are also being discovered in
23             old reference works, et cetera.
24                     So you do find glitches of that
25             nature that raise questions about the proper --
```



800.211.DEPO (3376)  
EsquireSolutions.com

```
 1           about, you know, where the law comes from and
 2           when.  And sometimes there are different
 3           publications of old laws, so you might encounter
 4           a book online off Massachusetts laws from 1652
 5           to 1740, let's say, and then you're faced with
 6           the question of, well, the actual law you're
 7           looking at, what year was that law enacted, and
 8           also comparing when the laws was enacted versus
 9           when was the law implemented, because sometimes
10           there are discrepancies there, and do you cite
11           the year that it was passed by the relevant
12           legislature or do you cite the year or the date
13           when it says this law shall go into effect on
14           such and such a date.
15                   So you have all these kinds of
16           old questions that sometimes are cause for
17           confusion.  But in terms of existence of these
18           laws, I've always been able to find them.  I've
19           always found the Duke repository to be
20           scrupulously done and accurate to the extent
21           that human beings can be.
22   Q.      Do you know if any court of law has ever cited
23           to the Duke repository as authoritative?
24   A.      I do not know that question specifically.
25   Q.      So if I understand correctly, you had some body
```



ROBERT J. SPITZER, PH.D.  September 10, 2024
O'NEIL V. NERONHA  57

```
 1      A.  Yes.
 2  Q.  And then have you a category which says
 3      No Open/Any Carry Laws.  What do you mean by
 4      that?
 5      A.  Well, those are laws that impose restrictions
 6      on the any carrying of weapons.  So, for
 7      example, there are laws that said, if you
 8      carried a pistol, whether concealed or openly,
 9      it would fall under that category.
10  Q.  Okay.  But that category would not include long
11      guns; is that -- or would it?
12      A.  It would not.
13  Q.  Okay.  All right.  I'm going to pull Exhibit B
14      back up in just a minute.  But let me ask you a
15      couple more questions just about the
16      Duke repository and the information that's in
17      Exhibit B.
18                  Of the information that's in
19      Exhibit B, do you recall whether you, yourself,
20      went and confirmed that the statute cited in the
21      Duke repository in fact said what the repository
22      said they said?
23      A.  Well, again, I've been using and culling that
24      information for over a decade.  And from the
25      beginning of that time up to the present, I
```


800.211.DEPO (3376)
EsquireSolutions.com

```
 1         found it to be entirely scrupulous and reliable.
 2         There may be a scattering of laws in Exhibits B
 3         and C that I obtained from other sources other
 4         than the Duke repository or where I wound up
 5         coming up with a law by different means and then
 6         found out it was in the Duke repository later.
 7         But virtually all of those laws came from the
 8         Duke repository.  Did I trace -- I did not
 9         however trace back most of the laws that I
10         reference in those two exhibits to their
11         ancestral, you know, sort of original PDF from X
12         sources.
13    Q.   Okay.  Would you agree with me that some of the
14         statutes included in the Duke repository do not
15         include all of the language in the original
16         statute?
17    A.   That is true.
18    Q.   Okay.  Would you agree with me that the
19         Duke repository -- Well, let me withdraw the
20         question.  Does the Duke repository note when a
21         statute was repealed or amended?
22    A.   Generally speaking, I believe the answer is
23         no, because it's not the purpose of the
24         repository.
25    Q.   Okay.  Does the Duke repository note when a
```



1    court decision was made with respect to a
2    particular statute?
3    A.   Not that I recall, no.
4    Q.   Okay.  So, for example, if a court were to hold
5    any particular statute in the repository had
6    been overturned as unconstitutional, that is not
7    noted in the repository.
8    A.   I do not believe so, no.  But again, that's
9    not the purpose of the repository.
10   Q.   Okay.  Well, then why don't you tell me what you
11   understand the purpose of it to be.
12   A.   Well, the purpose of it is to present the
13   public policy enactments of legislatures
14   contemporaneously, that is, in this year they
15   enacted such and such a law.  The question of
16   what happened to that law 10 years, 50 years, a
17   hundred years down the line is beyond the reach
18   of the repository and it's also beyond the reach
19   of a historical moment when the law was enacted.
20   Because the key question is, what did lawmakers
21   intend in 1820 when they passed the law about,
22   you know, penalizing concealed carry of weapons,
23   let's say, or whatever it might be.  That is
24   certainly an interesting question, but that kind
25   of historical genealogy is a separate question

```
 1        from what was the public policy intention of
 2        lawmakers at the time that they enacted these
 3        given laws.
 4   Q.   Are you aware of whether the Duke repository
 5        places any caveat or cautionary warning on its
 6        materials with respect to its use?
 7   A.   Oh.  I can't recall offhand.  Seems to me
 8        there is introductory material about -- you
 9        know, that describes that says where they got
10        their information.  I mean, I think there's some
11        kind of prefatory information somewhere on the
12        website, but I can't quote it to you offhand.
13   Q.   Okay.  Do you recall if the repository includes
14        the statement, and I quote, Conscientious users
15        of this repository should supplement their
16        results with further legal historical research?
17   A.   I do not recall that.  But if you say that it
18        is there, then I believe you.
19   Q.   Okay.  If I were to ask you to identify which
20        statutes you have personally, you know,
21        identified in the Duke repository and then gone
22        and located the original statutory material,
23        could you do so?
24   A.   Have I done that, you're asking?
25   Q.   Yeah.  No.  My understanding is, you have said
```



| ROBERT J. SPITZER, PH.D. | September 10, 2024 |
|---|---|
| O'NEIL V. NERONHA | 61 |

```
 1   that you have found some material in Duke
 2   repository and then subsequently checked the
 3   original source of --
 4              MR. LYONS:  My speaker just
 5   died.  Can you hear me?
 6              THE WITNESS:  Yes, I can.
 7              MR. LYONS:  Okay.
 8   Unfortunately, I cannot hear you --
 9              THE WITNESS:  Oh.
10              MR. LYONS:  -- right now.  And
11   my computer is warning me that my speaker is not
12   working.  So I'm going to sign out and sign back
13   in.  Okay?  I'll be right back.
14              (PAUSE)
15              MR. ARGUIN:  We've been going
16   for an hour and a half, so perhaps there's a
17   time for a break coming up.
18              MR. LYONS:  Okay.
19              MR. ARGUIN:  I don't want to
20   interrupt, but just factor it in.
21              MR. LYONS:  Yes.  No.  Why
22   don't we go ahead and take the break now, since
23   we essentially took a small break anyway.  And
24   we'll resume in, what, like five, 10 minutes?
25   Is that fine?  Or do you want something longer
```



```
 1      than that?
 2                      MR. ARGUIN:  Professor, it's up
 3      to you.
 4                      THE WITNESS:  That is fine.
 5                      MR. ARGUIN:  Okay.  All right.
 6      Five, 10 minutes.
 7                      MR. LYONS:  Okay.  Five or
 8      10 minutes.  We'll be right back.
 9                      (Recess taken at 11:37 a.m.
10                      (Deposition resumed at
11                      11:44 a.m.)
12  Q.  Professor, if I was to ask you which of the
13      statutes that you have listed in either
14      Exhibit B or Exhibit C you have personally
15      verified, would you be able to do so?
16  A.  No.
17  Q.  Okay.  We also received a document identified as
18      Exhibit D, which is entitled Table of Weapons
19      Licensing Laws.  Can you see that on the screen?
20  A.  Yes, I can.
21  Q.  Is this a table that you created?
22  A.  Yes.
23                      MR. LYONS:  Okay.  Why don't we
24      mark this as Exhibit 26, then.
25  Q.  Why did you create this?
```



ROBERT J. SPITZER, PH.D.  September 10, 2024
O'NEIL V. NERONHA
74

```
 1        A.   I did.  Although, I have, also, in this
 2   instance, I might have looked back at some point
 3   to find, you know, this sort of PDF copy.
 4   Q.   Okay.
 5        A.   But I did rely on the Duke repository, yes.
 6   Q.   Okay.  Do you recall specifically whether you in
 7   fact looked back at a PDF copy for this statute?
 8        A.   I may have.  I look at a great many, great
 9   many old laws.
10   Q.   Okay.  I don't want to be too pedantic about it,
11   but you can't confirm whether or not this was
12   one of the ones you specifically looked at.
13        A.   I cannot say absolutely, no.
14   Q.   Okay.  And which is the part of the act that you
15   believe states that -- Well, let me withdraw the
16   question.  Is it your understanding of this act
17   that it prohibits any kind of carry of weapons,
18   including firearms?
19        A.   Yes.  Under the circumstances that it lists.
20   Q.   Okay.  And what are those circumstances?
21        A.   Well, there are at least three parts, key
22   parts to this law.  The first -- that's
23   identified by the various be it therefore
24   enacted or further enacted.  So at the top
25   you've got the -- it's addressing persons
```



800.211.DEPO (3376)
EsquireSolutions.com

1  Q.   Okay.  Have you read this statute itself or did
2       you rely upon the Duke repository in citing it?
3  A.   Either or both.  I certainly have -- Either
4       or both.  I can't say with certainty whether I
5       did either or both.
6  Q.   Okay.
7  A.   I think it's in the Duke compendium.
8  Q.   Would you agree with me that this act prohibits
9       groups of people of 12 or more from being armed
10      with weapons and unlawfully assembling?
11 A.   Well, there's two parts here.  Right?  The
12      first part says, if any persons, just as you're
13      referencing it, if any persons to the number of
14      12 or more, being armed with clubs or other
15      weapons, or -- there's the second part -- if any
16      persons 50 or more, whether armed or not, shall
17      be unlawfully, riotously, or tumultuously, et
18      cetera, behavior.
19           So the first part is the
20      critical part for my point of view, that is to
21      say it's the mere presence of 12 or more people
22      armed with other -- armed with clubs or other
23      weapons.  And that, that particular element is
24      what I was alluding to, although the rest of it
25      is relevant as well.

```
 1        individuals.
 2   Q.   Okay.  Are you aware whether or not there's any
 3        other section to this act?
 4   A.   I don't know offhand.
 5   Q.   Okay.  In Paragraph 12 of your declaration --
 6        which should be back up on your screen.  Do you
 7        see that?
 8   A.   Yes, I do.
 9   Q.   Okay.  And you refer from the early 1800s up
10        until 1860, at least five states, including
11        D.C., enacted laws barring or restricting the
12        carrying of named weapons, whether concealed or
13        open.  Then you go on to say, Georgia enacted a
14        law in 1837 restricting both the carrying and
15        sale of named weapons.  Do you see that?
16   A.   Yes.
17   Q.   Okay.  And then you quote the statute in your
18        declaration.
19   A.   Yes.
20   Q.   Okay.  Do you recall if you took the quote from
21        the Duke repository or did you find the original
22        statutory material and quote from that?
23   A.   I believe it came from the Duke repository.
24   Q.   Okay.  And do you know whether this statute
25        prohibited the open carry of the weapons listed?
```



ROBERT J. SPITZER, PH.D.  September 10, 2024
O'NEIL V. NERONHA  
93

```
 1      A.  Yes.
 2  Q.  Okay.  Did you confirm that there was such a
 3      Virginia statute or did you rely upon the
 4      Duke repository?
 5      A.  I confirmed that there was such a statute.
 6  Q.  Okay.
 7      A.  I think in this instance the citation from
 8      the Virginia repository was incorrect.
 9      Although, I think they've corrected it.  That
10      is, my citation in the footnote might be from --
11      might be the incorrect one, which I think has
12      been subsequently corrected on the Duke site,
13      and I have the 1786 Virginia law.
14  Q.  Okay.  And can you provide me with a copy of
15      that?
16      A.  Yes, I can.
17  Q.  Okay.
18              MR. ARGUIN:  Tom, just to
19      interject.  I believe it's been updated in the
20      disclosures that were provided the list of
21      authorities with the correct citation.
22              MR. MEOSKY:  Yesterday.
23              MR. ARGUIN:  In yesterday's --
24              MR. LYONS:  Then let me take a
25      look.
```

