1    (Interruption, pause, discussion off the record.)
2        MR. LYONS:  All right.  Can everyone hear me?
3        MR. ARGUIN:  Yes.
4        THE WITNESS:  Yes.
5        MR. LYONS:  Okay.  I'm sorry; I did not hear an
6    answer to my previous question.
7        A. Oh, I believe that you -- well, my answer was,
8    yes, I believe.
9        Q. When you saw a law in the Duke Repository that
10   you wanted to cite, did you rely upon what was in the
11   repository, or did you attempt to go locate the law,
12   itself?
13       A. I always want to go and find the law, itself.
14       Q. Okay.  Were there any occasions in which you
15   found that the law, itself, was different in some way
16   from what was in the Duke Repository?
17       A. The only differences -- the only differences I
18   would say is at times the, I guess HTML on the
19   repository will have ellipses, and they will be sort of
20   highlighting the most relevant sections of a law; and
21   so one of the benefits of finding the original one is
22   that you can see the other sections, and see, you know,
23   what that -- what it's a part of.  The differences are
24   kind of like that, where I haven't seen -- I haven't
25   seen instances of, you know, there being major errors



```
 1   in the transcription or anything like that, not that I
 2   am familiar with.
 3       Q.  If I understand correctly, what you are saying
 4   is that sometimes the Duke Repository does not contain
 5   all of the language that is in the original statute?
 6       A.  Yes; that's correct.
 7       Q.  Okay.  In other words, somebody made a decision
 8   as to what they thought was most relevant, and put that
 9   in the Duke Repository, and left out some other
10   language?
11       A.  Yes.
12       Q.  Okay.  Did you ever find that the links to the
13   original statute were to something different than what
14   was in the Duke Repository?
15       A.  No, I have never seen that.
16       Q.  Okay.  Would you consider the Duke Repository a
17   primary or secondary source?
18       A.  Well, I would consider the laws within the
19   repository to be primary sources, because they are laws
20   and at times excerpts from laws that were written at
21   the time.
22       Q.  Are you aware of any cautions or caveats that
23   are on the Duke Repository with respect to use of the
24   information?
25       A.  I'm not sure.  They recently redesigned the
```



```
 1   website, and I probably -- I only -- I go in and just
 2   use it to use it.  I don't know that I, you know, read
 3   things like that with tremendous care.  You know, I am
 4   mostly just going in to try to get quick access to
 5   something or refresh my memory about something, so ...
 6        Q.  Do you recall if you have ever seen this
 7   statement on the repository, quote, "Conscientious
 8   users of this repository should supplement their
 9   results with further legal and historical research,"
10   end quote?
11        A.  I don't know if I have read that or noticed it
12   before or not.
13        Q.  Okay.  Is that something you would do anyway?
14        A.  Well, yes, like I said, I think it's best to go
15   and hunt down your own copy, if you can.  I will also
16   say that depending on one's knowledge and familiarity
17   with online databases and their institutional access to
18   them, at times actually finding them can be difficult,
19   if not impossible.  So I can understand how some users,
20   you know, might have to rely on the repository more so
21   than I do, because I have access to a whole suite of
22   databases where finding the pdf is not all that
23   challenging for me.
24        Q.  Is part of your work on this case, or any of
25   your research on weapons legislation use any other
```



```
 1   databases other than the Duke Repository?
 2        A.  Yes, I use several other databases.
 3        Q.  Did you similarly confirm the information you
 4   saw on those other databases by going and attempting to
 5   locate the original statute or law?
 6        A.  Well, I guess when I am saying database, I mean
 7   databases that contain historical statutes, so I use a
 8   series of, you know, databases through the university
 9   libraries, where you can include a key word search, or
10   you can browse and pull up historical statutes.
11                    (Interruption.)
12        THE WITNESS:  I, for some reason, can't hear
13   you.
14                    (Discussion off the record.)
15        MR. LYONS:  I am back.  Can you hear me now?
16        THE WITNESS:  Yes.
17        MR. LYONS:  I apologize for that.  Obviously, I
18   am going to have somebody more, technically more
19   proficient than I am take a look at this, and figure
20   out what the issue is.  I did not hear your answer to
21   the question about whether you own any firearms.  I
22   will re-ask the question.
23        Q.  Do you own any firearms?
24        A.  Yeah, there is a firearm in my house.  I did not
25   buy it myself, though.
```



1   Q. Okay. Do you know if you're scheduled to be,
2   have your deposition taken in any of those cases?
3       A. At the moment, I am not aware of any other
4   depositions scheduled or looming on the horizon for me.
5       Q. Are you aware of whether or not you are going to
6   be testifying in court in any of those cases?
7       A. I would say the same answer, not that I am aware
8   of. I don't have any reason to believe I have any sort
9   of oral testimony coming up.
10      Q. Okay. Going back to the Duke Repository for a
11  moment, do you know whether anybody -- let me withdraw
12  the question. Do you have any familiarity with how the
13  Duke Repository was compiled?
14      A. I don't have any direct knowledge of that, no.
15      Q. Okay. Have you spoken to anybody who did that
16  work, who told you about it?
17      A. Not that I know of.
18      Q. Are you aware of whether or not anybody has
19  testified in court on behalf of the Duke Repository, as
20  to how it was prepared or compiled?
21      A. I don't know anything about that.
22      Q. Okay. Are you aware of whether any Court has
23  recognized the Duke Repository as being authoritative
24  or reliable?
25      A. I don't know.



1   Q. Okay.  Would you agree with me that the Duke
2  Repository does not necessarily indicate when a statute
3  that it contains has been either amended or repealed or
4  struck down by a Court?
5   A. Yes, I agree; it does not contain that
6  information generally.
7   Q. I received copies of the invoices that I
8  understand you have submitted to the Rhode Island
9  Attorney General's Office, and they indicate that you
10  charge either $225 an hour or $250 an hour; is that
11  correct?
12   A. Yes; that sounds correct.
13   Q. Why do you charge $225 an hour for some things
14  and $250 an hour for other things?
15   A. Well, when I was first brought on as an expert,
16  it was for a client who had all these different
17  categories, and they wanted prices for them.  So I
18  started, I mean, I didn't know what I was doing, so I
19  just sort of filled out amounts.  But I do often
20  distinguish between, like, consultations or record
21  reviews and research versus writing.  So I usually bill
22  less for activities like reading complaints, or having
23  a meeting; and I often bill less for research than I do
24  for actually writing and editing.
25   Q. Let me see if I can pull those up.



1  scholarship on it that has been published, and for that
2  reason, I see it as salient to understanding the laws,
3  what they meant, what they were designed with the hope
4  to do; right?
5      Q.  In this section, you cite to a book by Randolph
6  Roth called, American Homicide; is that right?
7      A.  Yes.
8      Q.  Was he your primary source of information for
9  the facts you set forth in this section?
10     A.  Yes, this section is very much influenced by
11 Dr. Roth's research, and his book, American Homicide,
12 as well as the various tables and charts and things
13 that are a part of it.
14     Q.  Okay.  Did you confirm any of the facts that
15 Mr. Roth has in his book, or did you rely on the book,
16 itself?
17     A.  Well, I did rely on the book, itself, but to
18 confirm those facts, myself, would take decades.  He
19 spent decades on this book, that is not something that
20 was feasible, like, you know, confirming something
21 that's in the Duke Repository.
22     Q.  If I understand correctly, part of what you say
23 in this section is that the ownership and use of
24 concealable handguns was widespread in the post-Civil
25 War period?

