UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

**MICHAEL O'NEIL, et al.**

*Plaintiffs*

**v.**                                                                        C.A. No. 23-cv-00070-WES-PAS

**PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island, and THE STATE OF RHODE ISLAND**

*Defendants*

MEMORANDUM OF REASONS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

When the Supreme Court announced its framework for reviewing Second Amendment claims in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), it emphasized that the "'right secured by the Second Amendment is not unlimited'"—it is not "'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id.* at 21 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Instead, the Second Amendment protects the right to keep and "bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 70. Those "reasonable regulation[s]" include restrictions placed on the "manner of public carry" of firearms, including restrictions preventing individuals from carrying "deadly weapons in a manner likely to terrorize others." *Id.* at 59 (emphasis omitted). And the Court emphasized that *"*nothing*"* in its Second Amendment jurisprudence "should be

interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes." *Id.* at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring).

Rhode Island has one of the "shall issue" licensing regimes the Supreme Court recognized as constitutional. *Id.* Under the Rhode Island law, an applicant for a public carry permit has two avenues to obtain a concealed carry permit. An applicant may obtain a permit from any city or town in which he or she is a bona fide resident or has a place of business. R.I. Gen. Laws § 11-47-11. If an applicant satisfies the criteria listed in § 11-47-11(a), the municipal licensing authority *shall* issue a concealed carry permit. *Id*; *see also Mosby v. Devine*, 851 A.2d 1031, 1047 (R.I. 2004). An applicant may also apply to obtain a concealed or open carry permit from the Attorney General. The Attorney General retains the discretion to issue concealed or open carry permits upon a "proper showing of need." R.I. Gen. Laws § 11-47-18. An individual with either permit may public carry a concealed handgun in the State of Rhode Island.

Plaintiffs challenge this licensing regime, contending that R.I. Gen. Laws § 11-47-18's requirement that they make a "proper showing of need" deprives them of their constitutional right to public carry handguns for self-defense. A faithful application of *Bruen* establishes that Rhode Island's licensing regime does not burden plaintiffs' Second Amendment rights. Ordinary, law-abiding applicants like plaintiffs may public carry handguns in a concealed manner with the municipal licenses they hold pursuant to § 11-47-11. The Second Amendment requires no more. *See Bruen*, 597 U.S. at 76 ("the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense"). There is no Second Amendment right to carry handguns openly when concealed carry is available. As the Supreme Court made clear, "States could lawfully eliminate one kind of public carry" so long as another public carry option remains available. *Id.* at 59.

In *Bruen*, the licensing regime under review effectively prohibited *all* forms of public carry because open carry was illegal and concealed carry permissible only where an applicant "demonstrate[d] a special need for self-protection distinguishable from that of the general community." *Id.* at 12 and 93-94 (describing New York licensing regime for open and concealed carry) (Breyer, J. dissenting). Rhode Island's licensing regime is far less restrictive than the regime at issue in *Bruen*. It does not "operate[] to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 60. Instead, it allows public carry with a concealed carry permit that local authorities "shall" issue without any showing of need. *Mosby*, 851 A.2d at 1047. The Attorney General, however, retains discretion as the state's chief law enforcement officer to issue an additional open or concealed carry permit for applicants who make a "proper showing of need" beyond those of the ordinary, law-abiding citizen. *See* R.I. Gen. Laws §§ 11-47-11(a) and 11-47-18(a).

Even if § 11-47-18's "proper showing of need" requirement imposed some minimal burden on plaintiffs' expressed preference to open carry, that requirement is consistent with our Nation's long tradition of enforcing licensing regimes and regulating the "manner of public carry" of firearms. *Bruen*, 597 U.S. at 59. It also does not constitute any unconstitutional deprivation of a liberty or property interest protected by the due process clauses of the state and federal constitutions.

For all of these reasons, the State of Rhode Island and its Attorney General (collectively, "the State") are entitled to summary judgment on plaintiffs' Second Amended Complaint. A declaration should issue stating that the State's dual-licensing regime for the public carry of handguns is constitutionally permissible.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Relevant Law and Guidelines

Rhode Island law recognizes two different methods by which individuals may publicly carry firearms in the State—"concealed" carry and "open" carry. *See* R.I. Gen. Laws §§ 11-47-11 (concealed carry) and 11-47-18 (concealed and open carry). "Concealed" carry broadly means that the firearm is carried in such a manner that it is not visible to others (*e.g.,* hidden under a shirt), while "open" carry refers to the carrying of a firearm such that it is "exposed" to public view (e.g., visible in a holster on a person's hip). *See* Appendix to Defendants' Statement of Undisputed Facts ("Appx."), Ex. HH (Cramer Deposition) at 11:23-12:4. As a general matter, it is unlawful under Rhode Island law to publicly carry a firearm—whether the firearm is carried concealed or openly—without a license to do so. R.I. Gen. Laws § 11-47-8(a).

The Attorney General and municipalities share dual licensing authority for the issuance of public carry permits. These "[t]wo separate and distinct licensing procedures are set forth in the Firearms Act[.]" *Mosby*, 851 A.2d at 1047. Rhode Island General Laws § 11-47-18—the Attorney General licensing statute—"provides for the discretionary grant of a firearms license" by the Attorney General "upon a proper showing of need." *Id.* That provision provides, in relevant part, "[t]he attorney general may issue a license or permit to any person twenty-one (21) years of age or over to carry a pistol or revolver, *whether concealed or not*, upon his or her person upon a proper showing of need[.]" R.I. Gen. Laws § 11-47-18 (emphasis added).

In contrast, R.I. Gen. Laws § 11-47-11 provides a "mandatory licensing provision" for municipal authorities. *Mosby*, 851 A.2d at 1047. That provision provides:

> [t]he licensing authorities of any city or town *shall*, upon application of any person twenty-one (21) years of age or over having a bona fide residence or place of business within the city or town, or of any person twenty-one (21) years of age or over having a bona fide residence within the United States and a license or permit

4

> to carry a pistol or revolver concealed upon his or her person issued by the authorities of any other state or subdivision of the United States, *issue a license or permit to the person to carry concealed* upon his or her person a pistol or revolver everywhere within this state for four (4) years from date of issue, if it appears that the applicant has good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, and that he or she is a suitable person to be so licensed.

R.I. Gen. Laws, § 11-47-11 (emphases added).

The Rhode Island Supreme Court has held that, unlike § 11-47-18, "§ 11-47-11 is mandatory—an applicant who meets the criteria set forth in § 11-47-11 is entitled to a gun permit."[1] *Mosby*, 851 A.2d at 1047. The fact that state has an "additional licensing provision" by which the Attorney General retains discretion to issue a gun permit where a "proper showing of need" is made does not, the Rhode Island Supreme Court held, interfere with an applicant's right to bear arms in the state. *Id.*

The Rhode Island Supreme Court further explained how the state legislature broadly implemented certain requirements for a public carry permit, such as requiring that the applicant is a suitable person, but entrusted the relevant administrative entity, here the Office of the Attorney General, to use its expertise to evaluate if the applicant satisfies that standard:

> the Legislature provided that an applicant for a license must show, for example, that he has a 'need' or 'proper reason' for carrying such a weapon, that he is qualified to use it, and that he is an otherwise 'suitable person.' But to make those determinations, calls for an exercise of the fact-finding function which the Legislature obviously is in no position to supply. Hence, to give operative effect to the law and to prevent it from becoming a nullity required a delegation of authority which, in this instance, the Legislature made to those who by reason of their training and experience and the facilities at their command were probably more competent than any others to exercise the delegated power.

---

[1] A permit issued under either licensing provision is valid for a period of four years, unless earlier revoked. R.I. Gen. Laws §§ 11-47-11 and 11-47-12.

*Id.* (quoting *State v. Storms*, 308 A.2d 463, 464 (R.I. 1973)).

To help guide applicants seeking a permit under § 11-47-18, the Attorney General has published Guidelines outlining the factors considered in establishing a "proper showing of need." These factors include:

1. Has the applicant demonstrated a specific articulable risk to life, limb or property? If so, has the applicant demonstrated how a pistol permit will decrease the risk?

2. Can the applicant readily alter his or her conduct, or undertake reasonable measures other than carrying a loaded firearm, to decrease the danger to life, limb or property?

3. Are there means of protection available to the applicant other than the possession of a loaded firearm that will alleviate the risk to his or her person or property?

The Office of the Attorney General published these factors in 2001, continues to publish them on the Attorney General's website, and includes them in the application form for a public carry permit. *See* Appx., Ex. A (Weapons Carry Permit Packet) at 17, http://www.riag.ri.gov/documents/pistol_permit_packet_2021.pdf.

When the Attorney General denies a § 11-47-18 permit application, the applicant is "entitled to know the evidence upon which the [office] based its decision and the rationale for the denial." *Mosby*, 851 A.2d at 1051. The Rhode Island Supreme Court emphasized that it "will not countenance any system of permitting . . . that would be committed to the unfettered discretion of an executive agency." *Id.* at 1050. Thus, any denial by the Attorney General is subject to judicial review by way of a writ of certiorari to the Rhode Island Supreme Court. *Id.* at 1048, 1050-51. Judicial review is intended to ensure that the office's "findings are supported by any legally competent evidence." *Id.* at 1050-51.

6

## II.    The Attorney General's Denial of O'Neil's Public Carry Permit Application

Plaintiffs each submitted § 11-47-18 public carry permit applications to the Attorney General.  The Attorney General denied their applications because plaintiffs already held active § 11-47-11 public carry permits issued by local authorities.  Because plaintiffs already had active public carry permits in Rhode Island, the Attorney General found no need to issue an additional or "duplicative" permit.

Plaintiff O'Neil's case is representative of all plaintiffs.  O'Neil filed an application dated October 25, 2020, to the Attorney General's Office for a license to carry a pistol or revolver.  Appx., Ex. D (O'Neil Denial Letter) at 1.  In a letter accompanying his application, O'Neil represented that he carried firearms, targets, and ammunition while traveling to different "clubs," which statement the Attorney General's Office interpreted as the basis for Mr. O'Neil's alleged need for the permit.  *Id.*  A preliminary review of O'Neil's application revealed that he already held a concealed carry permit from the City of Warwick, valid through November 26, 2023, and allowing O'Neil to carry a pistol or revolver throughout Rhode Island.  *Id.*  O'Neil did not identify any other reasons why he needed an additional public carry permit from the Attorney General.[2] *Id.*

On January 25, 2021, the Attorney General informed O'Neil by letter that his application was denied.  *See* Appx., Ex. D at 1.  In that letter, the Attorney General cited the relevant Rhode Island statutes, which provide "two avenues to apply for a permit to carry a firearm" through either

---

[2] The Attorney General's public carry permit application includes an "Authorization for Release of Information" form for applicants to sign granting the Attorney General the "authority to conduct a comprehensive investigation of my background, including but not limited to, oral discussions with any persons concerning my background."  *See* Appx., Ex. A (Weapons Carry Permit Packet).  Unlike the other plaintiffs, O'Neil refused to sign this Authorization.  *See* Appx., Ex. E (O'Neil Denial Review Letter) at 2.  This refusal was "not a factor" in the Attorney General's denial of O'Neil's public carry permit application. *Id.*

the Attorney General or a municipality, and noted that the statutes were also outlined in the Attorney General's Guidelines. *Id.* The letter noted how the Attorney General's public carry application packet included "a section which addresses some of the factors considered by this office in assessing a proper showing of need" and noted that the factors "are also listed on the Attorney General's official website. *See* http://www.riag.ri.gov/documents/PERMIT%20APPLICATION%202020.pdf (page 4-5)." *Id.* The letter further noted that "[t]hese guidelines and the requirement for a proper showing of need apply to all applicants, whether or not you currently or previously have held a license to carry, issued by this Office." *Id.*

After noting the relevant guidelines, the Attorney General's letter went on to explain why O'Neil's application was denied based on those guidelines. The letter recounted to O'Neil how "[i]n a letter submitted with your application, you reference the fact that, while traveling to different 'clubs', you '. . . carry firearms, targets and ammunition.' You make no other statements in your letter which can be reasonably interpreted as a statement of your need to carry a concealed firearm." *Id.* The letter also noted how "while conducting a preliminary review of your application, it was discovered that you currently hold an active permit to carry a concealed weapon issued by the City of Warwick, which does not expire until November 26, 2023." *Id.* The Attorney General's letter explained how O'Neil failed to demonstrate a need for a public carry permit from the Attorney General in light of the fact that O'Neil already had an active permit in Rhode Island that was not set to expire for several more years:

> As outlined above, by statute, a permit to carry a concealed weapon issued by a municipality, provides you with the same lawful authority as a permit issued by this Office to carry a pistol or revolver anywhere within this State. *Since the City of Warwick permit you currently hold already provides you with the ability to lawfully carry a pistol or revolver in the State of Rhode Island, your application does not*

> *demonstrate a proper showing of need for the Office of Attorney General to issue*
> *another permit.*  Doing so, would be duplicative of the permit you already hold.

*Id.* at 2 (emphasis added).

The Attorney General's letter concluded by stating that O'Neil's application was denied "[i]n consideration of the aforementioned circumstances."  *See id.*  The letter further advised O'Neil that he could request an opportunity to meet with representatives of the Attorney General to present any additional information warranting reconsideration of his application.  *See id.*

O'Neil then requested and received an appointment, held on March 10, 2021, to appeal the denial of his application.  *See* Appx., Ex. E (O'Neil Denial Review Letter) at 1.  On April 1, 2021, the Attorney General sent O'Neil a letter documenting what occurred during that meeting and informing O'Neil that his appeal was denied.  *See id*.  As recounted in the April 1, 2021, letter, during the meeting, O'Neil's legal counsel "stated that the additional reason [O'Neil] believed a permit should be issued to [him] was that [his legal counsel] believes [him] to be a 'public figure,' due to [his] position as vice-president of the Rhode Island Second Amendment Coalition" which subjects him to "risk of harm from gun control advocates."  *Id.*  O'Neil's legal counsel "also affirmed that [O'Neil] currently hold[s] an active permit to carry a pistol or revolver in the State of Rhode Island, issued by the Town of Warwick."  *Id.*

During the appeal meeting, the Attorney General's staff informed O'Neil's counsel "that this Office believes the permit he already holds addresses this risk as he articulated it."  *See id.*  O'Neil's legal counsel then identified the following reasons why he still believed a public carry permit from the Attorney General was needed: "the AG permit allows for reciprocity to carry a handgun in certain other states; having a second permit as a backup in case the other permit expires prior to renewal; and having both permits allows a town issued permit holder to bypass the waiting period and background check imposed by State law."  *Id.*  O'Neil's counsel "further stated that a

9

denial of [Petitioner's] application would need to be disclosed on future applications for a permit to carry in other states." *Id.*

By letter dated April 1, 2021, the Attorney General reaffirmed the denial of O'Neil's application, addressing each of his additional arguments in turn:

- "Your desire to carry a loaded handgun on your person in other states is not a consideration for this Office evaluating whether you have a need to carry a handgun in this State." *Id.*

- "The Attorney General's decision-making process cannot be governed by how his decision may influence, positively or negatively, another State's license to carry application process." *Id.*

- "You also have presented no evidence that you are seeking to obtain a license in any state that would honor an Attorney General issued license, nor have you identified that you are seeking to obtain a license in any state that would honor an Attorney General issued license, but not a town issued license." *Id.* at 1-2.

- "Having a second permit in case the first is not renewed on time is a circumstance controlled by you, and therefore, also does not constitute a proper showing of need. Expiration dates are well known to a license holder and a complete, accurate application, submitted well in advance of a permit expiration date, would easily alleviate this issue." *Id.* at 2.

- "Similarly, having a State issued permit so that you can avoid the State's mandatory background check and waiting period, is not a need it is a desire. Moreover, the Town of Warwick permit which you currently possess allows for this exception (i.e., to avoid the State's mandatory background check and waiting period) under R.I. Gen. Laws § 11-47-35.1, a permit issued by this Office would not. As such, this circumstance does not demonstrate a need or even a benefit for you." *Id.*

The Attorney General's April 1, 2021, letter again noted that O'Neil had already been provided with the § 11-47-18 application packet, which identified the factors considered by the Attorney General in determining whether there was a proper showing of need. *Id.* The letter explained how O'Neil had not made a proper showing of need based on those factors and the considerations identified in the letter:

As delineated in this list of factors contained in your application packet, which are considered by the Attorney General for a proper showing of need, this office takes into account, among others, whether: the applicant has demonstrated a specific articulable risk to life, limb or property; the applicant can readily alter his or her conduct or undertake reasonable measures other than carrying a loaded firearm, to decrease the danger to life limb or property; and if there are means of protection available to the applicant other than the possession of a loaded firearm that will alleviate the risk to his or her person or property. These factors clearly articulate this Office's general authority to issue a permit only upon a proper showing of need. The additional concerns raised by you and [your legal counsel] do not rise to this level.

*Id.*

On July 8, 2021, O'Neil submitted a "Motion to Reconsider" noting that he "secured and maintained a permit from the Rhode Island Department of the Attorney General for approximately 12 years" and "[t]hat there was no substantial and/or material changes in his circumstances since his last application." *See* Appx., Ex. F (O'Neil Motion to Reconsider) at 1. O'Neil's Motion also claimed "[t]hat a 'denial' from the AG will negatively affect him in his renewal applications from the Commonwealth of Massachusetts, the State of Connecticut and other state(s) from which Mr. O'Neil has [Concealed Carry Weapons (CCW)] permits." *Id.*

The Attorney General responded by letter dated July 21, 2021, noting that the issue of how the denial might impact licenses in other states "was addressed in the Office of Attorney General's April 1, 2021 letter and your July 8, 2021 letter provides no basis to [re]consider this decision." Appx., Ex. G (O'Neil Motion to Reconsider Denial Letter) at 1. The Attorney General's July 21, 2021, letter also noted that "[t]he remaining two issues that serve as the basis for your motion to reconsider also provide no basis to reconsider this Office's determination that [O'Neil's] application did not demonstrate a proper showing of need." *Id*.

Thereafter, O'Neil sought certiorari review of the Attorney General's denial of his § 11-47-18 permit application through a petition filed with the Rhode Island Supreme Court. *See* Appx.,

Ex. H (Docket in *O'Neil v. Rhode Island Department of the Attorney General*). The Rhode Island Supreme Court denied the petition. *Id.*

### III.     Additional Arguments Raised by Other Plaintiffs

The factual and procedural paths of the remaining defendants were substantively identical to the path followed by O'Neil, apart from slight variations in their individual submissions. Plaintiffs Richard Laporte, Daniel Patterson, Peter Trementozzi, Joseph Patton, Donald Labriole, and Richard Cook, for instance, each raised additional arguments to challenge the Attorney General's denial of their renewal applications, including those listed below:

- "the Office of the Attorney General does not specify anywhere the criteria used for evaluating an application and specifically that an applicant who holds a town permit will not be approved for a permit issued by the Attorney General;"

- "a denial by the Attorney General could result in a loss of unemployment [sic] and the inability to collect unemployment compensation;" and

- "an AG permit has a barcode on it that can be scanned to verify the validity of the permit."

Appx., Ex. O (Labriole Denial Review Letter) at 1; Ex. R (Laporte Denial Review Letter) at 1-2; Ex. U (Patterson Denial Review Letter) at 1-2; Ex. Y (Patton Denial Review Letter) at 1-2; Ex. CC (Trementozzi Denial Review Letter) at 1-2.

The Attorney General responded to these additional arguments by noting that the factors it considers in assessing a proper showing of need were referenced in the initial letter denying plaintiffs' applications and are posted on the Attorney General's official website.  The Attorney General further explained:

> This Office does not have a policy that an individual issued a CCW permit from a town under § 11-47-11, will not be approved for a license to carry a handgun by this office. Therefore, no such guidance is or would be provided to applicants.  A decision to issue an additional [License to Carry (LTC)] from this Office would be based upon an additional, specific *need.*

Appx., Exs. O, R, U, Y, CC.

Turning to plaintiffs' arguments relating to the impact on employment or unemployment compensation, the Attorney General noted that plaintiffs were not required to carry a handgun for employment purposes and, thus, a "denial of [plaintiffs'] application[s] would have no effect on [their] employment or [their] ability to collect unemployment benefits." Appx., Exs. R, U, Y, CC. Lastly, the Attorney General addressed plaintiff's barcode argument, responding, "[t]he fact that an AG permit has a barcode, and a municipal permit may or may not have one, has no relevance to an assessment of [plaintiffs'] need to carry a handgun." Appx., Exs. R, Y, CC.

Plaintiff Cook added another argument not raised by the other plaintiffs. He observed that, unlike a public carry permit issued by a municipality, a public carry permit issued by the Attorney General would allow him to open carry of a handgun in addition to concealed carry. Appx., Ex. K (Cook Denial Review Letter) at 1. Cook, however, failed to provide any "information or justification for [his] need to" open carry in addition to his existing public carry permit allowing concealed carry throughout the state. *See id*. at 2. Accordingly, the Attorney General declined to reconsider his denial of Cook's § 11-47-18 public carry permit application. The Rhode Island Supreme Court subsequently denied Cook's petition for certiorari review, as it did with substantively similar petitions filed by the other plaintiffs. *See* Appx., Ex. L (Cook Docket); Ex. P (Labriole Docket); Ex. S (Laporte Docket); Ex. V (Patterson Docket); Ex. Z (Patton Docket); Ex. DD (Trementozzi Docket).

## IV.    Plaintiffs' Preference for Open Versus Concealed Carry

Plaintiffs all express a desire to open carry handguns in public. But apart from this general desire, plaintiffs fail to articulate how their right to self-defense is adversely impacted by the Attorney General's denial of their § 11-47-18 applications when they already hold concealed carry permits issued by municipal authorities under § 11-47-11.

At their depositions, several plaintiffs could not identify a single reason for carrying openly or admitted that they probably wouldn't carry openly even if they had the option. Asked what he would do with an open carry permit, Cook responded "I'm not sure," Appx., Ex. I (Cook Deposition) at 22:7, Laporte admitted that he "probably would not use it," Appx., Ex. EE (Laporte Deposition) at 33:22-23, and Patton admitted a preference for concealed carry "so you're not advertising you have a gun," Appx., Ex. W (Patton Deposition) at 25:3-4.

Patterson mentioned a vague "worry about breaking a law if my gun is being seen" while carrying in public, citing a general concern with his gun being visible when his shirt rides up in the summer. Appx., Ex. FF (Patterson Deposition) at 52:25-53:1, 13:11-13. But he failed to explain how this concern could not be resolved simply by changing his manner of dress. *See Baird v. Bonta*, 709 F. Supp. 3d 1091, 1140 (E.D. Cal. 2023) (dismissing similar concerns, finding no explanation "why those who wish to defend themselves with handguns cannot choose not to wear tight clothing" and thus keep their firearms concealed), *appeal filed,* (9th Cir. Feb. 1, 2024).

Trementozzi and O'Neil merely gestured towards the possibility that they might, one day, apply for a job that requires open carry, though neither had concrete plans to do so. Appx., Ex. GG (O'Neil Deposition) at 52:12-53:6; Ex. AA (Trementozzi Deposition) at 32:5-33:25. Of course, both men could reapply for an Attorney General's permit if and when they decide to change careers.

Finally, Labriole testified that he might open carry at various worksites because "if the gun is exposed, it stops things from happening," though he's never been in a situation where exposing his gun would have been helpful, Appx., Ex. M (Labriole Deposition) at 18:12-19, and he further admits that he would still carry concealed if carrying open would make others uncomfortable, *id.* at 9:18-10:2.

## V.    Plaintiffs' Federal Lawsuit

Following the Attorney General's denial of his § 11-47-18 public carry permit application, O'Neil commenced this action in federal court.  ECF No. 1.  On June 28, 2023, the Court denied in part the State's motion to dismiss. ECF No. 9.  In relevant part, the Court held that O'Neil's allegations that "he may be impacted in his ability to obtain a permit from another state because of the Attorney General's denial of his application" and that his "municipal permit may lapse" were "speculative and lack[ed] the concrete and particularized character needed for standing." June 28, 2023, Text Order.  The Court, however, granted leave to amend to add a challenge to the State's "open carry" regulation based on O'Neil's assertion that the "State's dual-permitting system violates his Second Amendment right to 'open carry' both facially and as-applied."[3]  *Id.*

O'Neil's Second Amended Complaint was joined by the additional named plaintiffs.  It asserts that the Attorney General's denial of their § 11-47-18 permit applications violated their right to keep and carry arms for self-defense as secured by the Second Amendment of the United States Constitution.  ECF No. 18 at 10-12.  Additionally, plaintiffs claim that the statutory requirement for a "proper showing of need" violates their rights to due process under the Fourteenth Amendment and Article 1, § 2 of the Rhode Island Constitution. *Id.* at 13-14.  Plaintiffs request a permanent injunction requiring the Attorney General to issue them public carry permits pursuant to § 11-47-18, as well as declarations that the statutory scheme violates the Second Amendment, and the due process clauses of the Fourteenth Amendment and Rhode Island Constitution. *Id.* at 14.

---

[3] In the same order, the Court allowed the State's motion to dismiss any claim for compensatory or money damages but denied its motion to dismiss based on Rooker-Feldman, claim preclusion, and abstention principles.  The State respectfully reserves all rights of appeal from these earlier interlocutory rulings. *See SEC v. Gastauer*, 93 F.4th 1, 8 (1st Cir. 2024) ("this circuit has made clear that as a general rule, we do not grant interlocutory appeals from a denial of a motion to dismiss") (internal quotations omitted).

## ARGUMENT

### I.     Summary Judgment Standard

Summary judgment is warranted when "there is no genuine issue as to any material fact and [the movant] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if a rational factfinder, viewing the evidence "in the light most flattering to the party opposing" summary judgment, could resolve the dispute in that party's favor. *See National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995).

Although the "nonmovant enjoys a favorable presumption for the evidence it adduces, it still must point to evidence that a reasonable factfinder could employ to" find in its favor. *Burt v. Bd. of Trustees of Univ. of Rhode Island,* 84 F.4th 42, 59 (1st Cir. 2023) (citing *Kearney v. Town of Wareham*, 316 F.3d 18, 22 (1st Cir. 2002)). "[C]onclusory allegations, improbable inferences, and unsupported speculation," *Cherkaui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017), are inadequate to show that a genuine dispute of material fact exists. *See Burt*, 84 F.4th at 59. The evidence, in short, must be adequate to sustain a judgment in favor of the nonmoving parties here plaintiffs. *Anderson,* 477 U.S. at 250-57.

### II.     Plaintiffs' Facial and As-Applied Challenges

In ruling on the State's motion to dismiss, the Court interpreted plaintiffs' complaint as bringing both a facial and as-applied challenge to the state's public carry licensing regime. June 28, 2023, Text Order. The First Circuit recently reiterated that a "facial challenge is the 'most difficult challenge to mount successfully.'" *Satanic Temple, Inc. v. City of Boston*, 111 F.4th 156, 168 (1st Cir. 2024) (citing *United States v. Rahimi*, 602 U.S. __, 144 S. Ct. 1889, 1898 (2024)).

16

Such a challenge "fails if the law is constitutional in at least some of its applications." *Id.* at 1903 n.2 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Furthermore, "in evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered." *McGuire v. Reilly,* 386 F.3d 45, 58 (1st Cir. 2004) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 795-96 (1989)). This approach reflects the Supreme Court's admonition that "'when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict.'" *Rahimi*, 144 S. Ct. at 1903 (quoting *United States v. Hansen*, 599 U.S. 762, 782 (2023)).

Here the circumstances surrounding plaintiffs' § 11-47-18 public carry applications establish that the statutory scheme is constitutional in "at least some of its applications." Under Rhode Island's dual licensing regime, plaintiffs each obtained § 11-47-11 concealed carry permits without any showing of need and, thus, are able to publicly carry handguns for self-defense. The Second Amendment secures no broader right to publicly carry handguns in the particular manner plaintiffs prefer. Thus, for the reasons detailed more fully in the following sections, the State is entitled to summary judgment on both the facial and as-applied aspects of plaintiffs' challenge. *See id.* at 1898 ("the provision is constitutional as applied to the facts of Rahimi's own case").

### III.   There Is No Second Amendment Right to Open Carry of Handguns in Public When Concealed Carry Is Already Permitted

Plaintiffs' Second Amendment claim is premised on a right to public carry handguns openly for self-defense. No such right exists where the state permitting system already enables plaintiffs to public carry handguns in a concealed manner. Accordingly, the State is entitled to summary judgment on Count I of the Second Amended Complaint.

In *Bruen*, the Supreme Court announced a framework for evaluating Second Amendment claims that is "centered on constitutional text and history." 597 U.S. at 22. Under the *Bruen*

framework, the initial inquiry considers whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If the plain text covers the proposed conduct, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 17, 24. "[I]f a firearm regulation is consistent with the Nation's historical tradition," it is constitutional. *Id.* at 17.

The threshold inquiry under *Bruen* is whether plaintiffs carried their burden of establishing that the Second Amendment presumptively protects their proposed conduct. They have not carried that burden. Plaintiffs each hold public carry permits allowing them to carry handguns in a concealed manner throughout the state.[4] They do not have any right to an additional permit allowing them to also carry openly.

As the Supreme Court explained in *Bruen*, "shall-issue" licensing regimes like Rhode Island's are constitutionally permissible because they do not burden the right of the people to carry firearms in public. *Id.* at 38 n.9. Instead, they vindicate that right by ensuring that those carrying firearms publicly are among "the people" that the right was meant to protect. *See id.*

Rhode Island's licensing regime also is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. From the colonial period through the ratification of the Fourteenth Amendment and beyond, governments have sought to preserve public safety by imposing licensing and permitting requirements on firearms and other weapons and by restricting (or sometimes prohibiting outright) a particular means of carrying such weapons

---

[4] The public carry of firearms is not authorized in places deemed to be sensitive, like schools. *See* R.I. Gen. Laws 11-47-60; *Bruen*, 597 U.S. at 30-31 (discussing "longstanding" prohibitions on carrying firearms in "sensitive places such as schools and government buildings"). Plaintiffs do not challenge in this litigation Rhode Island's sensitive-places restrictions on the public carry of firearms.

in public.  Because Rhode Island's dual-licensing regime imposes a comparable burden on the right to bear arms that is comparably justified, it passes constitutional muster.

A.  Rhode Island's dual-licensing regime does not burden conduct presumptively protected by the Second Amendment

The threshold question under the *Bruen* framework is whether plaintiffs have met their burden to establish that "the Constitution presumptively protects" their proposed course of conduct—*i.e.*, to carry a firearm openly in public when they already possess the right to carry a firearm concealed in public.  *Bruen,* 597 U.S. at 17.  To answer that question, the Court must address whether "the Second Amendment's plain text covers [the proposed] conduct."  *Id.* at 24.  That inquiry considers the conduct not only by "the normal and ordinary meaning of the Second Amendment" but also the Amendment's "historical background."  *Id.* at 20 (internal quotation marks omitted); *see also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43 (1st Cir. 2024) (courts first consider whether the "Second Amendment's plaint text covers" plaintiff's conduct).

Plaintiffs cannot meet their threshold burden.  The plain text of the Second Amendment does not protect any right to open carry in addition to concealed carry.  The Constitution protects "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  The Supreme Court has described that right as belonging to "law abiding, responsible citizens."  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).  *Bruen* reiterated that limitation numerous times in describing the Second Amendment's scope.  *See* 597 U.S. at 9, 15, 26, 29-31, 34, 38, 60, 70-71 & nn.8-9. And the Constitution's text guarantees such people "the right to 'bear arms,'" which "refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 32 (some internal quotation marks omitted).

19

Examining the text of the Second Amendment, the Supreme Court repeatedly has cautioned that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. And thus the Court repeatedly has explained that the Second Amendment "does not imperil every law regulating firearms," *McDonald v. City of Chicago*, 561 U.S. 742, 786 (plurality opinion). To the contrary, many "regulatory measures" concerning firearms are, in fact, "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26.

Applying those principles, the Supreme Court explained in *Bruen* that states remain free under the Second Amendment to enact and enforce "'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a permit,'" and there is no requirement for "applicants to show an atypical need for armed self-defense." *Bruen*, 597 U.S. at 38 n.9. The Court reasoned that such licensing regimes "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* On the contrary, the Court held that such regimes are consistent with the Second Amendment because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* And in joining the opinion, Justice Kavanaugh and the Chief Justice observed that the Second Amendment "does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense," *id.* at 79 (Kavanaugh, J., concurring); that the Court's Second Amendment jurisprudence "does not affect the existing licensing regimes . . . that are employed in 43 States," including Rhode Island, *id.*; and that "[g]oing forward, . . . the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so," *id.* at 80. Courts therefore have understood *Bruen* and *Heller* to indicate that "shall-issue" licensing schemes "are presumptively constitutional." *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024); *see also Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023)

(the Supreme Court "seemed to find no constitutional fault with a state requiring a criminal background check before issuing a public carry permit").

Notably, the Supreme Court cited with approval the "shall-issue" licensing schemes of 43 States, including the schemes in effect at the time in Florida and Illinois. *See Bruen*, 597 U.S. at 14 n.1, 38 n.9. In Florida, qualifying citizens in 2022 could obtain a license "to carry concealed weapons or concealed firearms" in public, but those licenses did "not authorize any person to openly carry a handgun." Fla. Stat. §§ 790.06(1), (12)(a) (effective June 29, 2021 to June 30, 2022). The same was true in Illinois. *See Sinnissippi Rod & Gun Club, Inc. v. Raoul*, __ N.E.3d __, 2024 WL 886651, at *1 (Ill. Ct. App., Mar. 1, 2024) (explaining that Illinois has a "concealed carry licensing regime" that "does not allow an individual to openly carry a firearm in public"). Florida and Illinois enforced those limitations through criminal penalties. *See* Fla. Stat. § 790.01 (effective May 21, 2015 to June 30, 2023); *id.* § 790.053 (effective June 17, 2011 to June 30, 2023); Ill. Comp. Stat. 720 §§ 5/24-1(a)(10), 5/24-1.6(a).

The New York licensing regime at issue in *Bruen* similarly prohibited open carry of firearms in public and allowed concealed carry only upon a showing of need. The Court struck down this licensing provision because it granted "open-ended discretion to licensing officials and authorize[d] licenses *only* for those applicants who [could] show some special need apart from self-defense." *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring). This was problematic because it effectively foreclosed *all* forms of public carry of firearms for self-defense. *Id.* at 59-60.

Governments, the Supreme Court held, "could lawfully eliminate one kind of public carry . . . so long as they left open" another option. *Id.* The critical determination is whether the state licensing regime operates to "prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 60 and 80 ("individual self-defense is 'the central

component' of the Second Amendment right") (Kavanaugh, J., concurring) (citations omitted). The Second Amendment does not, however, prevent states from regulating the manner in which the right to public carry of a handgun for self-defense may be effectuated. *Id.* at 38 n.9. Thus, it is constitutionally permissible for a state to entirely prohibit one form of public carry so long as another form of public carry remains accessible. *Id.* at 59.

Rhode Island's dual-licensing regime satisfies this constitutional requirement because it allows for the mandatory issuance of concealed carry permits by municipal authorities under § 11-47-11 and also leaves open the discretionary issuance of an additional permit for open carry under § 11-47-18. This dual-licensing regime ensures that the right to public carry a handgun for self-defense is not infringed.

B. <u>Rhode Island's open carry licensing regime is consistent with the nation's tradition of firearms regulation</u>

Rhode Island's dual licensing regime also is constitutionally sound because regulations governing the manner of public carry are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S at 19. The historical analysis required by *Bruen* does not impose "a regulatory straitjacket." 597 U.S. at 30. Instead, the state must justify a regulation by establishing that it falls within a historical tradition of laws that are "relevantly similar," in the sense that they "impose a comparable burden on the right of armed self-defense" that "is comparably justified." *Id.* at 29. The state therefore need only "identify a well-established and representative historical analogue"—not a "historical twin" or "dead ringer"—to the challenged law. *Id.* at 30; *see Ocean State Tactical,* LLC, 95 F.4th at 44-45 ("We must employ 'analogical reasoning' to determine whether historical analogues are 'relevantly similar').

1.  *Governments have long regulated the public carry of weapons—including requiring licenses and imposing "manner of carry" restrictions*

Historical analogues confirm that Rhode Island's public carry licensing regime comports with the Second Amendment. Plaintiffs seek a right to open carry of handguns for self-defense in public. But the record establishes that "licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons" and "that the manner of public carry [of firearms] was subject to reasonable regulation." *Bruen*, 597 U.S. at 59.

a.  *Licensing requirements*

As an initial matter, governments have identified classes of persons who were ineligible to possess or carry arms since before the Founding. At the start of the Revolutionary War, for example, the Continental Congress recommended the disarmament of loyalists and those "notoriously disaffected to the cause of America." 4 Journals of the Continental Congress 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906), available at https://www.loc.gov/resource/llscdam.lljc004/sp=205&st=image&r=-0.365,-0.163,1.846,1.634,0 (last accessed Nov. 25, 2024); *see also United States v. Goins*, 118 F.4th 794, 799 (6th Cir. 2024) (citing the Continental Congress's disarmament provision); *United States v. Perez-Gar*cia, 96 F.4th 1166, 1186-1189 (9th Cir. 2024) (concluding that "legislatures have long disarmed groups or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others"). Many colonies followed suit and enacted similar disarmament provisions. *Goins*, 118 F.4th at 800 (summarizing colonial disarmament legislation).

To carry out those measures, Rhode Island and other colonial legislatures enacted regulatory requirements that were designed to determine whether individuals were prohibited from possessing arms. In 1777, for example, Pennsylvania required all "male white inhabitants" to "take and subscribe" to a loyalty oath before a justice of the peace. Act of June 13, 1777, ch. 756,

in 9 The Statutes at Large of Pennsylvania from 1682 to 1801, at 111 (1903), available at https://www.palrb.gov/Preservation/Statutes-at-Large/ViewDocument/17001799/1777/0/act/0756.pdf (last accessed Nov. 25, 2024). The justices were also required to "keep fair registers of the names and surnames of the person so sworn or affirmed," and those who "refus[ed] or neglecte[d] to take and subscribe the said oath" were to be "disarmed by the lieutenant or sub-lieutenants of the cities or counties respectively." 9 Statutes at Large of Pennsylvania at 112-113. Connecticut, Massachusetts, Rhode Island, North Carolina, New Jersey, and Virginia all required similar oaths and several provided for similar registration lists.[5]

In addition to loyalty oaths, eighteenth- and early-nineteenth-century governments, including in Rhode Island, established licensing regimes aimed at regulating activities that posed a danger to the public—including the possession (or use) of firearms and other dangerous items. In 1713, for example, Philadelphia penalized "'firing a Gun without a license,'" and other colonial laws from 1750 imposed criminal penalties on "'shooting . . . guns' or setting off fireworks" without "a 'governor's special license.'" Spitzer Decl. at 32. Moreover, gunpowder—an item

---

[5] *See, e.g.,* Act of Dec. 1775, The Public Records of the Colony of Connecticut from May, 1775 to June, 1776 inclusive 193 (Charles J. Hoadly ed., 1890) (disarming any person "duly convicted" of "libel or defam[ation]" of "the resolves of the Honorable Congress of the United Colonies, or the acts and proceedings of the General Assembly of this Colony"), available at https://hdl.handle.net/2027/njp.32101067880268 (last accessed Nov. 25, 2024); Act of Mar. 14, 1776, Acts and Resolves passed by the General Court (1775-76), ch. 21 (Boston: Secretary of the Commonwealth), available at https://archives.lib.state.ma.us/items/f38df282-fe69-4a6f-b33f-838780de6e2d (last accessed Nov. 25, 2024); Act of Sept. 20, 1777, ch. 40 § 20, Acts of the General Assembly of the State of New Jersey 90 (1777) (New Jersey statute authorized officials to seize "all of the Arms, Accoutrements, and Ammunition which they own or possess" from "Persons as they shall judge disaffected"), available at https://njlaw.rutgers.edu/cgi-bin/diglib.cgi?collect=njleg&file=001&page=0084&zoom=100 (last accessed Nov. 25, 2024); Act of 1776, 7 Records of the Colony of Rhode Island & Province Plantations in New England 567 (Bartlett ed., 1862) (Rhode Island law authorized confiscation of "all arms, ammunition, and war like stores" from loyalists), available at https://hdl.handle.net/2027/uc1.31210009900836 (last accessed Nov. 25, 2024).

essential to the use of firearms for purposes of self-defense or otherwise—was extensively regulated through licensing. "In fact, with one exception, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century," and at least 22 states enacted gunpowder licensing regimes from the 1700s through the 1900s. *Id.* at 34; Spitzer Decl., Ex. E (License and Licensing Laws).

Licensing regimes increased in popularity following the Civil War. Rivas Decl. at 42-45; Spitzer Decl. at 21. That development was spurred in part by the "dramatic rise in the availability" of revolvers, which coincided with "a horrific period of violence, turmoil, and political instability" in American communities. *Id.* at 13-14, 17. *See also Baird,* 709 F. Supp. 3d at 1134 (reviewing the historical evidence and concluding that "gun violence grew more prevalent and weapons grew more dangerous" in the mid-nineteenth century, which led to increased restrictions on public carry). Throughout this period, State and local legislatures required residents to acquire licenses subject to the review of various criteria at the discretion of local officials. Spitzer Decl. at 21; Rivas Decl. at 44.

Typically, jurisdictions required licenses if individuals wanted to carry firearms in a concealed manner—a policy choice that reflected the fact that nineteenth-century "deadly weapons" like Bowie knives and pocket pistols that "were designed for and conducive to being carried concealed."[6] Rivas Decl. at 38 n.119. For example, Missouri enacted a measure in 1871 that required "written permission from the Mayor" to carry handguns and other weapons concealed in St. Louis. Spitzer Decl. at 22-23. Lincoln, Nebraska, Coffeyville, Kansas, and Sacramento and

---

[6] During this same period, many jurisdictions also adopted surety laws "that required certain individuals to post bond before carrying weapons in public" as a method of insurance for any ensuing breaches of the peace. *Bruen,* 597 U.S. at 55; *see id.* at 55-60 & n.23 (collecting examples).

Oakland, California adopted similar laws in the following years.  Spitzer Decl. at 23, 26; Rivas Decl. at 44-45.  An 1881 New York City ordinance criminalized the concealed carry of pistols, but it also authorized the issuance of licenses to carry such pistols—if the individual presented himself to a local officer for examination and the local officer was "satisfied that the applicant is a proper and law abiding person."  Spitzer Decl., Ex. E at 69-70.  And Congress likewise passed a law in 1892 that criminalized the concealed carry of "'any deadly or dangerous weapons'" in the District of Columbia, unless the holder had a permit that would last "'for a period of not more than one month at any one time,'" and that would issue only "'upon satisfactory proof to [a judge of the District's police court] of the necessity for the granting thereof.'"  *Id*. at 19-20.

Not all licensing schemes during the late nineteenth century were limited to the concealed carry of weapons.  For example, Montana adopted a licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor."  *Id.* at 57.  And in 1893, Florida adopted a law that made it unlawful for any person "to carry around with him on his person and in his manual possession [a] Winchester rifle or other repeating rifle" "without first taking out a license from the County Commissioner of the respective counties."  *Id*. at 22.

The number and geographic scope of licensing requirements only accelerated in the early twentieth century.  Spitzer Decl. at 28.  Although many of these schemes continued to target the concealed carry of firearms, *see, e.g*., *id.* at 29 (describing Virginia's 1908 scheme for the concealed carry of dangerous weapons), some applied more broadly.  In 1906, for example, Massachusetts enacted a scheme that required a license for any person carrying "a loaded pistol or revolver," and violators were subject to imprisonment, a fine, or both.  *Id.*  And in 1910, Georgia

26

adopted a similar permitting scheme for the public carry of pistols. *Id*. The scheme broadly made it "unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the" licensing authority where the person resides. Spitzer Decl, Ex. E at 24. A range of concealed or public-carry licensing schemes thus became ubiquitous during this time period. Spitzer Decl. at 31 (citing licensing laws from Hawaii, Indiana, Michigan, New Hampshire, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, and South Carolina).

The widespread adoption of such licensing regimes is particularly notable because the record contains no evidence that these regimes were ever determined to be unconstitutional—or were even challenged on constitutional grounds. *See Antonyuk v. Chiumento*, 89 F.4th 271, 320 (2d Cir. 2023) (concluding that licensing schemes "appear to have existed without constitutional qualms or challenges"), *cert. granted, judgment vacated, remanding for further consideration in light of Rahimi sub nom. Antonyuk v. James*, 144 S. Ct. 2709 (July 2, 2024).[7] This is strong evidence that licensing regimes are "part of the nation's tradition of firearm regulation" and thus constitutionally sound. *Id.* (emphasis omitted); *see Bruen*, 597 U.S. at 36 ("[W]here a governmental practice has been open, widespread, and unchallenged since the early days of the

---

[7] The First Circuit has explained that the "GVR" is "an acronym commonly used to describe the steps of granting certiorari, vacating the judgment below, and remanding a case to the lower court for further consideration. . . . It is important to remember, however, that a GVR order is neither an outright reversal nor an invitation to reverse; it is merely a device that allows a lower court that had rendered its decision without the benefit of an intervening clarification to have an opportunity to reconsider that decision and, if warranted, to revise or correct it." *Gonzalez v. Justs. of Mun. Ct. of Bos.*, 420 F.3d 5, 7–8 (1st Cir. 2005) (internal citations omitted). As such, a "GVR order itself does not constitute a final determination on the merits; it does not even carry precedential weight." *Id.*; *see also Communities for Equity v. Mich. High Sch. Athletic Ass'n,* 459 F.3d 676, 680 (6th Cir.2006) (GVR orders do not "indicate, nor even suggest, that the lower court's decision was erroneous"). Thus, notwithstanding the GVR order, *Antonyuk* retains persuasive value. *Wolford v. Lopez,* 116 F.4th 959, 979 n.1 (9th Cir. 2024).

Republic, the practice should guide our interpretation of an ambiguous constitutional provision." (internal quotation marks omitted)).

### b.  *"Manner of carry" restrictions*

Rhode Island's dual licensing scheme—which broadly authorizes the issuance of concealed-carry licenses while imposing additional restrictions on open-carry licenses—also has substantial historical support.  Indeed, the Supreme Court has concluded that such "manner of public carry" restrictions have deep roots in the Nation's tradition of firearm regulation:  not only did historical regulators place restrictions on particular methods of public carry, they often "eliminate[d] one kind of public carry" altogether.  *Bruen*, 597 U.S. at 59 (emphasis omitted).

The relevant historical tradition relevant predates the Founding.  In ratifying the Second Amendment, the founding generation "codified a right inherited from our English ancestors."  *Id.* at 20 (internal quotation marks omitted).  That "'pre-existing right'" was "'not unlimited.'"  *Id.* at 20, 21 (quoting *Heller*, 554 U.S. at 626).  As Blackstone described it, the right was understood as "a public allowance"—subject to "due restrictions" necessary to protect the peace.  1 Blackstone, Commentaries on the Laws of England 139 (1765).  The Founders would not have understood the right "as preventing them from exercising what they saw as an inherited common law right to organize and regulate their own health and safety," including through restricting the public carry of firearms.  *Baird*, 709 F. Supp. 3d at 1129; *see also id.* at 1136 ("Consistently, over many years, American governments recognized the right to bear arms but circumscribed that right in recognition of the need to preserve peace and public safety.").

The English tradition of placing limits on public carry continued in Colonial America and the Early Republic.  *See Bruen*, 597 U.S. at 46 (identifying these periods as relevant to the Second Amendment analysis).  For example, a 1642 provision in the colony of New Netherland (later New

York) prohibited the drawing or displaying of knives.  Spitzer Decl. at 12.  A 1686 New Jersey law adopted "An Act Against Wearing Swords" and prohibited the wearing of "pistols" and other specified weapons "privately"—though it also levied penalties for the open carrying of weapons. *Id.* at 13.  And several colonial governments adopted laws that "mirrored the British Statute of Northampton, where the very fact of carrying a firearm was considered to be in terror of the people and was therefore prohibited by that statute."[8]  *Id*. at 12-13 (internal quotation marks and brackets omitted); Rivas Decl. at 21.  Those colonial statutes outlawed "go[ing] armed offensively" in public places such as fairs or markets and in "the presence of the King's Justices.'"  Spitzer Decl. at 14 (quoting a 1694 Massachusetts law, a 1701 New Hampshire law, and a North Carolina 1792 collection of statutes).

As the Supreme Court has recognized, "public-carry restrictions proliferate[d]" in the period "after the ratification of the Second Amendment in 1791."  *Bruen*, 597 U.S. at 50.  Those restrictions most often "proscribed the concealed carry of pistols and other small weapons," *id.* at 52, but certain jurisdictions also imposed restrictions on open carry, *see id.* at 52 n.16; Spitzer Decl. at 7.  In 1801, for example, Tennessee adopted a law that prohibited the carrying of "any dirk, large knife, pistol or any other dangerous weapon" both privately and publicly.  Rivas Decl. at 24.  *See also* Rivas Decl. p. 25 n.6 (citing 1821 Tenn. ch. 13 for five-dollar fine for same).  Georgia enacted a similar law in 1837.  Spitzer Decl. at 7-8.  In 1838, Florida passed a "law that criminalized the concealed carry of certain named weapons, but also added that 'all persons

---

[8] The Supreme Court in *Bruen* gave little weight to the Statute of Northampton and its colonial-era progeny because those laws did not support the idea that governments could ban public carry altogether.  Instead, the Court read such statutes as merely proscribing a particular manner of public carry.  *See Bruen*, 597 U.S. at 50.  Those statutes thus remain helpful for the question at issue here, which concerns whether the Second Amendment is amenable to reasonable "manner of carry" restrictions.

carrying said weapons openly shall pay' a then-considerable regulatory tax of 'ten dollars per annum.'" *Id*. at 8. And in the 1850s, Pennsylvania, Hawaii, and the District of Columbia criminalized the carrying of firearms or other specified deadly weapons, whether they were carried in a concealed manner or openly. *See id*.

States and territories during this post-ratification period also adopted less direct methods for discouraging the public carry of certain firearms. For example, an 1850 North Carolina measure imposed a one-dollar tax on all pistols and other weapons "'worn or carried about the person of the owner.'" Spitzer Decl., Ex. C at 97. To avoid that tax, the owner of such weapons need only leave them at home rather than carry them habitually. *See id*. And as described above, the territorial government of Florida likewise sought to reduce the presence of firearms in public places, enacting an 1838 law that imposed an annual tax of ten dollars on "'all persons carrying [dirks, pocket pistols, sword canes, or bowie knives] openly.'" *Id*. at 28.

Public-carry restrictions increased in frequency during the Reconstruction era and through the early twentieth century. For example, in 1871, Texas enacted a law making it a crime to "'carry[] on or about [one's] person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, [or] bowie-knife,' unless for provable self-defense or in service to the government." Spitzer Decl. at 9. Many other States, territories, and cities followed suit, adopting broad prohibitions on the public carry of weapons—including open carry. *See, e.g.*, Spitzer Decl. at 8-9. Examples include Arkansas' 1875 statute, which said that "'any person who shall wear or carry any pistol of any kind whatever . . . shall be adjudged guilty of a misdemeanor.'" *Id*. at 9. Likewise, a Nebraska City, Nebraska law from 1872 made it "'unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, . . . or any other dangerous or deadly weapons." *Id*.

State courts occasionally reviewed the constitutionality of these broad public carry restrictions. The Georgia Supreme Court's decision in *Nunn v. State*, 1 Ga. 243 (1846), is "particularly instructive." *Bruen*, 597 U.S. at 54. There, the state court weighed a challenge to the 1837 law mentioned above, which "broadly prohibited 'wearing' or 'carrying' pistols . . . without distinguishing between concealed and open carry." *Id.* The court held that "[a] law which merely inhibits the wearing of certain weapons in a concealed manner is valid," "[b]ut so far as it cuts off the exercise of the right of the citizen altogether to bear arms, or, under the color of prescribing the mode, renders the right itself useless," "it is in conflict with the Constitution, and void." *Nunn*, 1 Ga. at 243. Other state courts reached similar conclusions. *See State v. Jumel*, 13 La. Ann. 399, 399-400 (1858) ("The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society."); *State v. Reid*, 1 Ala. 612, 616 (1840) (holding that the right to bear arms did not deny "the Legislature[] the right to enact laws in regard to the manner in which arms shall be borne"). The lesson the Supreme Court took from these and other state-court decisions is that—although "the manner of public carry was subject to reasonable regulation"—"it was considered beyond the constitutional pale . . . to altogether prohibit public carry." *Bruen*, 597 U.S. at 54, 59.

### 2. *Rhode Island's dual-licensing regime is relevantly similar to this historical tradition*

The operative inquiry at *Bruen*'s second step is whether Rhode Island's licensing regime is "relevantly similar" to the Nation's historical tradition of arms regulation. *Bruen*, 597 U.S. at 29. *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." *Id.* Instead, it explained that the "central considerations" in making historical comparisons are "whether modern and historical regulations impose a

comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Id.* (internal quotation marks omitted). In both respects, Rhode Island's licensing regime is "relevantly similar" to the historical traditions described above. *See id.*

To start, Rhode Island's licensing regime imposes only a minimal burden on plaintiffs' Second Amendment right. As the Supreme Court observed in *Bruen*, "shall-issue" regimes "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." 597 U.S. at 38 n.9. And in reaching that conclusion, the Court cited with approval licensing regimes that—like Rhode Island's regime—favored concealed-carry licenses over open-carry licenses. *See id.*; *see also id.* at 13 n.1 (citing Fla. Stat. § 790.06 (which allowed for concealed-carry licenses, but did "not authorize any person to openly carry a handgun"), and Ill. Comp. Stat. 430 § 66/10 (establishing a "concealed carry licensing regime" that "does not allow an individual to openly carry a firearm in public," *Sinnissippi Rod & Gun Club, Inc.,* 2024 WL 886651, at *1)).

While *Heller* prohibits states from completely banning carrying a firearm in public for self-defense, it leaves states room to choose what manner of carry is allowed. States may choose how to accommodate the right by allowing only open carry, only concealed carry, or some combination of both. The Supreme Court has *never* dictated how states must accommodate a right to bear arms. To the contrary, the cases cited by the Supreme Court in *Heller* and subsequent Second Amendment cases make this point clear. *See, e.g.*, *Reid*, 1 Ala. at 616–17 ("We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."); *Nunn*, 1 Ga.

32

at 243 ("A law which merely inhibits the wearing of certain weapons in a concealed manner is valid.  But so far as it cuts off the exercise of the right of the citizen altogether to bear arms, or, under the color of prescribing the mode, renders the right itself useless—it is in conflict with the Constitution, and void.").  Thus, the Second Amendment does not require states to accommodate plaintiffs' expressed preference to public carry handguns in both a concealed and open manner.

The "manner of carry" restrictions found in Rhode Island's licensing regime compare favorably to historical precursors.  *See Baird v. Bonta,* 81 F.4th 1036, 1047 (9th Cir. 2023) (directing district court on remand from preliminary injunction ruling to look for analogues for California's scheme that burden the open carry of firearms "to a comparable degree, with a comparable severity, and with a comparable blanket enforcement").  Many of those historical precursors eliminated one form of public carry for all individuals—typically concealed carry.  *See Bruen*, 597 U.S. at 52–55; *Baird*, 709 F. Supp. 3d at 1139 ("California has proven the burden of [historical] laws was heavy, including outright bans on specific types of weapons and weapons carrying.").  But Rhode Island has taken a more modest approach to its firearm regulations.  Its licensing scheme provides that concealed-carry licenses "shall" issue, enabling ordinary, law-abiding applicants to publicly carry handguns statewide.  Open carry is restricted to those who demonstrate an additional need that cannot be met by concealed carry.  This is less burdensome than the outright bans on open carry that other states have enacted.  *See, e.g.,* Cal. Penal Code § 26350 (West) (open carry allowed only in certain counties with relatively low populations); Conn. Gen. Stat. Ann. § 29-35 (West); Fla. Stat. Ann. § 790.053 (West); 430 Ill. Comp. Stat. Ann. 66/10 (issuing concealed carry permits only); N.J. Stat. Ann. § 2C:58-4 (West); D.C. Official Code §§ 22-4504.04-4506 (issuing concealed carry permits only); N.Y. Penal Code § 400.00 (West) (issuing concealed carry permits only).

The minimal burden imposed by Rhode Island's licensing regime is also comparably justified when held next to its historical precursors. Historically, jurisdictions adopted licensing regimes for reasons of public safety—the licensing authorities sought to restrict possession of arms by individuals deemed to be dangerous or irresponsible or sought to curtail activities that were unusually dangerous (like firing weapons in cities or storing gunpowder in populated areas). *Supra* at 22-27; Spitzer Decl. at 7-8, 20, 38-39 (describing public safety concerns); Rivas Decl. at 49 (describing concerns about dangerous persons). Similar concerns animated early Americans' decisions to impose "manner of carry" restrictions. Governments hoping to mitigate the risk of "interpersonal violence" tended to focus their regulatory efforts on "deadly weapons," which were "associat[ed] with crime and needless bloodshed," and which generally were synonymous with "'concealed weapons' for the straightforward reason that they were designed to be carried concealed." Rivas Decl. at 8; *supra* at 28-30. Lawmakers therefore adopted restrictions or outright bans on concealed carry, because it was "a particular mode of bearing arms which [was] found dangerous to the peace of society." *Jumel*, 13 La. Ann. at 400.

As the Supreme Court observed in *Bruen*, "[t]he historical evidence from antebellum America" establishes "that the manner of public carry was subject to reasonable regulation." 597 U.S. at 59; *see also Heller*, 554 U.S. at 626 ("[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to keep and bear arms] was not a right to keep and carry any weapon whatsoever *in any manner whatsoever*") (emphasis added). Those regulations included "[s]tatutory [p]rohibitions" that "proscribed the concealed carry of pistols and other small weapons." *Bruen*, 597 U.S. at 52. And those statutory prohibitions focused entirely on the modality of public carry—*e.g.*, if the firearm was concealed, it was illegal—and did not turn on whether the firearm was carried peacefully or in some "criminal" manner. *See id*. at 52-

55 & n.16.  The Supreme Court reasoned from these and other sources that States could "lawfully eliminate one kind of public carry," so long as they did not "ban public carry altogether."[9]  *Id.* at 53, 59.

The post-*Bruen* courts that have examined similar public-carry restrictions have uniformly concluded that the Second Amendment allows open-carry restrictions, so long as concealed carry is authorized.  *See Baird*, 709 F. Supp. 3d at 1091 ("Now, as in the founding era, the government imposes restrictions on how people carry those weapons, and those restrictions are categorical and based on widely accepted social norms.").  In *Frey v. Nigrelli*, for example, the district court considered a challenge to New York's statewide prohibition on the open carry of firearms, whereby "individuals may public carry" in the State, but only if "they carry their firearm in a concealed manner and if they have a valid gun permit." 661 F. Supp. 3d 176, 198 (S.D.N.Y.), *appeal docketed sub nom. Frey v. Bruen*, No. 23-365 (2d Cir. Mar. 16, 2023).  The plaintiffs in that case argued that it was unconstitutional for New York to "criminaliz[e]" the open carry of firearms in public.  *Id.* After reviewing *Bruen*, the court rejected that argument, explaining that:  "[b]ecause New York does allow concealed carry so long as the individual has a proper license, Plaintiffs cannot properly argue, as they try to do, that New York has no way to allow people to public carry."  *Id.* at 199. Merely that the "manner in which New York allows public carry—concealed rather than open—is not to Plaintiffs' liking does not mean that enforcement against open carry is unconstitutional." *Id.*

The Appellate Court of Illinois reached a similar conclusion in *Sinnissippi Rod & Gun Club*, 2024 WL 886651, at *7.  Plaintiffs there argued that Illinois' prohibition of open carry was

_____

[9] Even plaintiffs' expert admits that "laws that prohibited concealed carry were considered permissible, because they left open carry available as a method of carrying weapons for self-defense." Cramer Depo. at 196:4-7 (Oct. 17).

contrary to the historical tradition of allowing open carry in lieu of concealed carry.  *Id.* at *6.  The court rejected that argument, reasoning as follows:

> a review of the cases considering those laws demonstrates that *allowing open carry* while *prohibiting concealed carry* was not the crucial factor in determining whether the restrictions passed constitutional muster.  In the vast majority of those cases, courts struck down statutes that categorically prohibited the public carriage of firearms, both open and concealed, and ruled that the second amendment permitted limited restriction but not a complete ban.  Courts concluded that the government could lawfully eliminate one kind of public carry to protect and ensure the safety of its citizens, so long as the people were permitted to carry weapons in another manner that allowed self-defense.  The constitutional emphasis in those cases was the nature of the restriction—categorical (unconstitutional) versus limited (constitutional)—rather than open versus concealed.

*Id.*  Thus, "laws prohibiting one manner of carriage while allowing another" are consistent with the Second Amendment.  *Id.* at *7 (collecting cases from "ratification of the second amendment" through the "late nineteenth century").

Other courts have likewise held or suggested that open-carry restrictions are constitutional, so long as concealed carry remains available.  *See Baird,* 709 F. Supp. 3d at 1139 (no Second Amendment violation where California law allowed concealed carry throughout the state but restricted open carry only to counties with lower populations and other limited circumstances); *National Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 92 (D. Conn. 2023) (discussing *Bruen* and reasoning that "the government . . . can ban different types of carry so long as others are left available"); *Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. 2022) ("[N]othing in the [*Bruen*] opinion implies that a State must allow open carry," so long as it does not "broadly prohibit concealed carry."); *Norman v. State*, 215 So.3d 18, 27-28, 41 (Fla. 2017) (holding in a pre-*Bruen* case that Florida's open-carry prohibition is constitutional because the law "does not diminish an individual's ability to carry a firearm for self-defense, so long as the firearm is carried in a

concealed manner and the individual has received a concealed-carry license"). No persuasive reason exists for this Court to reach a different conclusion here.

Furthermore, the Rhode Island General Assembly's apparent preference for concealed versus open carry reflects the practical reality that, "weapons carried openly in public can risk fright, intimidation and violence." *Baird*, 709 F. Supp. 3d at 1137. These public policy concerns likewise have historical analogues. As the Tennessee Appellate Court recently observed:

> the history of the colonies and the early Republic demonstrate common practices of regulating public carry by the general public to prevent "fear" and "terror." *See* 1692 Mass. Acts and Laws no. 6, pp. 11-12; 1699 N.H. Laws ch. 1 ("all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively ... by Night or by Day, in Fear or Affray of Their Majesties Liege People"); *see also* Collection of All Such Acts of the General Assembly of Virginia, ch. 21, p. 33 (1794) ("no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the County"). Moreover, during the 1800s, states commonly regulated the manner in which individuals carried a firearm in public to reduce violence and protect the public. *See generally Chandler*, 5 La. Ann. at 489-90 (law restricting manner of carriage was "absolutely necessary to . . . prevent bloodshed and assassinations"); *Carroll v. State*, 28 Ark. 99, 101 (1872) (holding that it was "not unreasonable" for the legislature to restrict the manner of public carriage based on public safety concerns); *State v. Speller*, 86 N.C. 697, 700 (1882) (finding public carry restriction constitutional because it did not impose a complete ban and its goal was to promote the "peace and safety of the public").

*Sinnissippi Rod & Gun Club, Inc.*, 2024 IL App (3d) 210073, at *7. Thus, the "general societal problem" that "Americans faced in 1791" as now is that "weapons carried openly in public can risk fright, intimidation and violence." *Baird*, 709 F. Supp. 3d at 1137; *see also id.* at 1138-39 ("the open carrying of firearms by those who are not law enforcement is threatening or intimidating, especially in more heavily populated places").

Indeed, all three proffered experts in this case agree that openly carrying weapons in public likely caused alarm throughout history. Dr. Brennan Rivas reports that "[t]o be *seen* carrying weapons invited suspicion, judgment, or even the intervention of local officials" since "the

everyday open carrying of deadly weapons was a divergent behavior, noteworthy according to the travelers, adventurers, and commentators who encountered it." Rivas Decl. at 6. Professor Robert Spitzer similarly opined that openly carrying in public places "caused great alarm, fear, what we might call disruption of public order," leading state and local authorities "to regulate this practice." Spitzer Depo. at 78:5-8. Even plaintiffs' expert, Mr. Clayton Cramer, wrote in his book "that the open carrying of deadly weapons was subject to sufficient social stigma to guarantee that a ban on concealed carry was, effectively, a ban on all carrying." Appx., Ex. II (*Concealed Weapon Laws* excerpts) at 9. At his deposition, Mr. Cramer confirmed that "[t]here might well have been some social stigma" against carrying deadly weapons openly in the Early Republic, Appx., Ex. HH (Cramer Deposition) at 142:13-15, and he further observed that such stigma continues to this day, *id*. at 140:16-22 (admitting that "A lot of people" continue to feel "disturb[ed]" by open carry, amounting to a "certain level of disapproval where people are clearly uncomfortable").

In sum, by leaving open carry subject to a "proper showing of need," the Rhode Island legislature was attempting to address a longstanding concern relating to the public's peace of mind. While other state legislatures may have made a different assessment about whether concealed versus open carry is preferable, the critical point remains that Rhode Island has not "ban[ned] public carry altogether." *Bruen*, 597 U.S. at 53. All ordinary, law-abiding Rhode Islanders may obtain a concealed-carry license that authorizes the public carry of firearms. Indeed, each plaintiff holds such a concealed-carry license, which generally allows them to publicly carry handguns throughout the State for self-defense purposes. The Second Amendment requires nothing more.

Plaintiffs, therefore, fail to demonstrate a Second Amendment violation merely because they would prefer another method of public carry (open) in addition to the one they already possess (concealed) under the State's dual licensing regime. This result is particularly compelling given

plaintiffs' inability to articulate how their right to self-defense is adversely affected by being licensed for concealed carry but not open carry.  *Supra* at 12-13.

## IV.    Plaintiffs Fail to Establish Any Violation of the Fourteenth Amendment's Due Process Clause

Plaintiffs next claim that the Attorney General's denial of their § 11-47-18 permit applications deprived them of due process under the Fourteenth Amendment.  The Due Process Clause prohibits deprivations of liberty or property by a state without due process of law.  U.S. Const. amend. XIV.  Evaluating whether a law violates this prohibition requires a two-prong analysis.  First, the Court must ask whether there is a protected liberty or property interest at stake. Second, if a protected interest exists, the Court must decide whether the procedures afforded amount to "due process of law."  *Board of Regents v. Roth*, 408 U.S. 564, 569-72 (1972).

### A.    Plaintiffs do not have a protected liberty or property interest

Plaintiffs' claim fails on the first prong as there is no fundamental right to open carry of a handgun so long as other forms of public carry are permissible.  The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  But the "range of interests protected by procedural due process is not infinite."  *Roth*, 408 U.S. at 570.  The interests asserted require "careful description" together with a demonstration that those interests are "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Glucksberg*, 521 U.S. at 720-21.

Plaintiffs' constitutional claims are unavailing because, as shown above, the Supreme Court has recognized a right to publicly carry but not necessarily openly carry handguns for self-

defense.  So long as one form of public carry is made available, a state may constitutionally restrict, or even prohibit, the other form of public carry.  *Supra* at Section III.  Thus, the right to open carry a handgun in public for self-defense is not "deeply rooted in this Nation's history and tradition" so long as a state allows an alternative form of public carry.  *Id.*  Here, plaintiffs each hold concealed carry permits issued pursuant to § 11-47-11 and may lawfully carry their handguns in public for self-defense throughout the state.  Thus, plaintiffs' substantive due process claims fail for the same reasons as their Second Amendment claims.  *See Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) ("We need reach the question of what process is due only if the [plaintiffs] establish a constitutionally protected liberty interest.").

To the extent plaintiffs seek to establish a protected property interest in the renewal of their expired § 11-47-18 permits, their claims likewise fail.  To have a property interest under the Fourteenth Amendment, a person must have a "legitimate claim of entitlement" to the property under state law.  *Roth*, 408 U.S. at 577.  The Rhode Island Supreme Court already has determined that no such legitimate claim of entitlement exists in a § 11-47-18 permit, which by its terms automatically expires four years after issuance.  *Mosby*, 851 A.2d at 1048 (holding that denial of a § 11-47-18 permit "has no impact on any constitutionally protected liberty interest.").  There likewise is no legitimate claim of entitlement to reissuance of an expired § 11-47-18 permit absent a showing of need, which is a matter committed to the Attorney General's discretion.  *See id.*  An application for a permit that can be granted or denied in the exercise of a government official's discretion creates no protected property interest.  *Clukey v. Town of Camden,* 717 F.3d 52, 56 (1st Cir. 2013) ("a benefit is not a protected entitlement if government officials may grant or deny it in their discretion") (quoting *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 756 (2005)).

B.       Plaintiffs received due process and the "proper showing of need" standard is not impermissibly vague

Furthermore, even if plaintiffs could establish a protected liberty or property interest in obtaining § 11-47-18 permits in addition to the § 11-47-11 permits they already hold, the statutory procedures relating to the Attorney General's denial of their § 11-47-18 applications satisfied procedural due process.  When a protected interest is implicated, the Supreme Court has held that the Due Process Clause "grants the aggrieved party the opportunity to present his case and have its merits fairly judged." *Logan v. Zimmerman*, 455 U.S. 422, 434 (1982).  However, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Logan*, 455 U.S. at 434 (the "timing and the nature of the required hearing will depend on appropriate accommodation of the competing interests involved"). "The essence of due process is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it."  *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (internal citation and quotations marks omitted).

Plaintiffs' complaint establishes that each of them was given notice of the factors that would be relied upon in evaluating their § 11-47-18 applications.  Indeed, those criteria are posted on the Attorney General's website and were communicated to each of them as part of the application process.  *Supra* at pp. 3-13.  Additionally, the Attorney General identified the precise grounds on which he denied plaintiffs' applications in written decisions.  *Id.*  He also provided plaintiffs, represented by their counsel, with an opportunity to respond to those grounds and present additional arguments in support of their applications.  *Id.*  Once again, the reasons relating to the Attorney General's rejection of these additional grounds were specified in writing.  *Id.* Thereafter, plaintiffs exercised their opportunity to challenge the Attorney General's decision via writs of certiorari to the Rhode Island Supreme Court, *id.*, the administrative review mechanism

allowed by state practice to ensure that the Attorney General's decision was supported by "legally competent evidence." *Mosby*, 851 A.2d at 1050-51.  This opportunity for judicial review serves as a meaningful check against any allegedly unreasoned exercise of administrative decision-making.  *See Montaquila v. Nerhona*, 289 A.3d 568, 574 (R.I. 2023) (setting aside § 11-47-18 permit denial where decision was not supported by "legally competent evidence").  Procedural due process required nothing more.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.").

To the extent plaintiffs raise a vagueness challenge to the statutory "proper showing of need" standard, their claim is likewise foreclosed.  A statute implicating a protected liberty or property interest violates the Due Process Clause only when it is "so vague that it does not provide fair notice" of what is required and "creates a risk of arbitrary enforcement."  *See Doe v. Hopkinton Pub. Sch.*, 19 F.4th 493, 509 (1st Cir. 2021).  Merely that a statute "requires interpretation does not make it vague."  *Ridley v. Massachusetts Bay Transp. Auth.,* 390 F.3d 65, 93 (1st Cir. 2004).

As already demonstrated, the Attorney General's denial of plaintiffs' § 11-47-18 applications implicated no protected interest as plaintiffs already hold § 11-47-11 public carry permits.  Thus, there is no infringement of any protected Second Amendment right to public carry of handguns for self-defense.  Additionally, the statute provided notice of the requirement for applicants to demonstrate "need," and the Attorney General published on a public website the criteria on which the office bases such a determination.  Plaintiffs also received advance individual notice of those criteria, along with tailored explanations of the Attorney General's reasoning in support of his decisions denying their applications, which was itself subject to judicial review.  Plaintiffs, in short, received notice of the statutory requirements and an explanation of the grounds

42

on which the Attorney General based his denials. Accordingly, the state administrative process provided plaintiffs with fair notice of the statutory requirements and created no risk of arbitrary or standardless enforcement, and even if it had, the Rhode Island Supreme Court would have corrected the error. *See Mosby*, 851 A.2d at 1051 (emphasizing that the Rhode Island Supreme Court "will not countenance any system of permitting . . . that would be committed to the unfettered discretion of an executive agency"); *Montaquila*, 289 A.3d at 574 (reversing § 11-47-18 permit denial). Any vagueness challenge based on the Due Process Clause is therefore foreclosed.

## V.    There Is No Direct Cause of Action Under Article 1, § 2 of the Rhode Island Constitution

This leaves only plaintiffs' due process claim based on Article 1, § 2 of the Rhode Island Constitution. ECF No. 18 at Count II. The Attorney General is entitled to summary judgment on this claim because no direct cause of action exists under the state constitution. *See Bandoni v. State*, 715 A.2d 580, 595 (R.I. 1998) (holding that "constitutional provisions are not self-executing, and require legislative assistance").

In *Doe v. Brown Univ.*, 253 A.3d 389, 401 (R.I. 2021), the Rhode Island Supreme Court expressed "its reluctance to 'create a new cause of action' by judicial interpretation rather than legislative enactment." *Ricci v. Rhode Island*, No. 120CV00543MSMPAS, 2023 WL 4686025, at *12 (D.R.I. July 21, 2023). Plaintiff there sued Brown University for a violation of the equal protection provision of Article 1, § 2 of the Rhode Island Constitution—the same Article and section on which plaintiffs due process claim is based. The Rhode Island Supreme Court declined to recognize a direct cause of action under Article 1, § 2's equal protection provision and there is no reason to believe it would reach any different conclusion under Article 1, § 2's due process provision. *Ricci*, 2023 WL 4686025, at *12 ("The due process clause and equal protection clause are twin branches of the same tree and there is no reason to believe the Rhode Island Supreme

43

Court would recognize a direct cause of action under the former after having rejected the same claim under the latter."); *Kurland v. City of Providence*, 711 F. Supp. 3d 57, 77 (D.R.I. 2024) (holding that due process claims under Article 1, § 2 of the Rhode Island Constitution "are not actionable"); *Fosu v. University of Rhode Island,* 590 F. Supp. 3d 451, 457, 460 (D.R.I. 2022) (same). This Court reached the same conclusion only a few months ago. *See Murray v. Community College of Rhode Island*, No. 23-469WES, 2024 WL 1214569, at *3 (D.R.I. March 21, 2024) ("The Court finds that the Rhode Island Supreme Court would likely hold that the due process clause is not self-executing and does not support a direct cause of action.").

Although some cases addressing whether a direct cause of action under Article 1, § 2 arose in the context of money damages claims, not requests for injunctive or declaratory relief, the result is the same. *See id.* at *4 n.4 (noting that the Rhode Island Supreme Court and federal districts courts have dismissed purported direct causes of action under Article 1, § 2 where plaintiff sought declaratory and injunctive relief). Article 1, § 2 provides no direct cause of action and, therefore, there is no legal claim upon which an injunction or a declaration in plaintiffs' favor could be based.

Even putting aside that substantive defect, *Pullman* abstention principles counsel against federal court adjudication of arguably open questions of state constitutional law. *R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496 (1941); *see also Harrison v. NAACP*, 360 U.S. 167, 176 (1950) (under *Pullman* "federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass on them"); *Batterman v. Leahy*, 544 F.3d 370, 373 (1st Cir. 2008) ("*Pullman* abstention serves to 'avoid federal-court error in deciding state law-questions antecedent to federal constitutional issues.'"). The Rhode Island Supreme Court, not a federal court, should first adjudicate whether

the absence of any direct cause of action under Article 1, § 2 of the Rhode Island Constitution extends to actions for declaratory or injunctive relief, as well as monetary damages.

Accordingly, the Attorney General is entitled to summary judgment on plaintiffs' due process claim under Article 1, § 2 of the Rhode Island Constitution.

## CONCLUSION

For all of these reasons, the Court should grant the Attorney General and State's motion for summary judgment. A declaration should be issued stating that Rhode Island's dual licensing regime, as specified in R.I. Gen. Laws §§ 11-47-11 and 11-47-18, is constitutionally permissible both facially and as applied.

Respectfully Submitted,

DEFENDANTS PETER F. NERONHA
and THE STATE OF RHODE ISLAND,

By their Attorneys,

*/s/ James J. Arguin*
James J. Arguin (#10972)

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (#10742)

Special Assistant Attorneys General
Office of the Attorney General
150 South Main Street
Providence, R.I. 02903
(401) 274-4400 exts. 2078/2074
(401) 222-2995 (Fax)
jarguin@riag.ri.gov/pmeosky@riag.ri.gov

Dated: November 27, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2024, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


*/s/ James J. Arguin*