## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **MICHAEL O'NEIL, et al.**<br><br>*Plaintiffs*<br><br><br>**v.**<br><br><br><br>**PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island, and THE STATE OF RHODE ISLAND**<br><br>*Defendants.* | **C.A. No. 23-cv-00070-WES-PAS** |

## <u>DEFENDANTS' MEMORANDUM IN OPPOSITON TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs seek summary judgment on their claims for declaratory and injunctive relief against the State of Rhode Island and its Attorney General (collectively, "the State") based on a purported right under the Second Amendment to openly carry firearms in public. Their motion should be denied because no such right exists where another form of public carry is allowed.

As detailed in the State's motion for summary judgment and supporting memorandum (ECF No. 34 and 34-1), Rhode Island law allows Plaintiffs and any other ordinary, law-abiding resident to obtain a permit for concealed carry of firearms in public. Rhode Island's dual permitting system provides that local officials "shall" issue concealed carry permits pursuant to their authority under R.I. Gen. Laws § 11-47-11. It is undisputed that each Plaintiff holds a valid concealed carry permit. They have no constitutional right to obtain an additional open carry permit simply because that is their preferred or alternative method of public carry.

The constitutionality of the State's dual licensing regime is confirmed by the Supreme Court's observation that a "shall issue" regime—like Rhode Island's—is constitutionally permissible and further demonstrated by the text-and-history analysis set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *Id.* at 38, n.9 and 80 (Kavanaugh, J., concurring). Under the textual prong of the analysis, the Second Amendment does not encompass a right to open carry firearms in public. *Bruen* itself confirms that States may regulate the manner of public carry, so long as they provide some means for individuals to carry firearms for self-defense outside the home. *Id.* at 59. Rhode Island law does precisely this by allowing ordinary, law-abiding residents to obtain a permit for concealed carry throughout the State. Plaintiffs do not and cannot claim that they have been denied this right.

Further, Rhode Island's discretionary review of applications to open carry firearms in public is "consistent with the Nation's historical tradition of firearm regulation." *Id.* Contrary to Plaintiffs' contentions, state and local governments have long regulated and sometimes outright prohibited the open carry of firearms and other dangerous weapons, continuing a legal tradition that includes laws in effect when the Second and Fourteenth Amendments were ratified. Thus, history demonstrates how state and local governments have long regulated the public carry of firearms through licensing and analogous regimes.

With respect to open carry specifically, the State has identified numerous laws in effect in 1791 and 1868 that provide relevant historical analogues and demonstrate that Rhode Island's differentiation between concealed versus open carry is consistent with longstanding tradition. Many of the laws cited placed burdens on the open carry of firearms similar to those imposed by R.I. Gen. Laws § 11-47-18 and for the same public safety reasons. *See id.* at 29 (historical analogues must be "relevantly similar" to "how and why the [challenged] regulations burden a

law-abiding citizen's right to armed self-defense"). These historical analogues show that there is no longstanding tradition of allowing an unfettered right to open carry of firearms in public, as Plaintiffs suggest.

Moreover, as the State's experts attest, for much of the Nation's history the open carry of firearms was not a common practice due to technological limitations and societal norms. These considerations determine how this Court applies the Second Amendment analysis, requiring a more nuanced approach that considers a wider range of laws as historical analogues. There need be no "dead ringer" or "historical twin" for the challenged law. *Id.* at 29-30; *see also United States v. Rahimi*, 602 U.S. 680, 691 (2024) (the Court's "precedents were not meant to suggest a law trapped in amber").

Plaintiffs challenge some aspects of the State's expert opinions but provide no credible or admissible evidence to refute the substance of State's expert opinions or the historical laws on which those opinions are based.[1] Despite this failure, Plaintiffs seek sweeping injunctive and declaratory relief directing the Attorney General to issue an additional public carry permit that would enable them to not only carry in a concealed manner but in an open manner as well. This same relief was denied by the Rhode Island Supreme Court and, thus, barred by the *Rooker-Feldman* doctrine. In all events, Plaintiffs' request for injunctive or declaratory relief fails because there is no constitutional right to publicly carry firearms in any manner Plaintiffs may desire. Plaintiffs' motion for summary judgment should accordingly be denied, and the State's parallel motion should be granted on all claims.

---

[1] The State has contemporaneously filed a memorandum in opposition to Plaintiffs' motion in limine (ECF No. 33-1), as well as a motion for judicial notice of various historical laws on which the State relies. Copies of those historical laws are attached to the motion for judicial notice.

## FACTUAL AND PROCEDURAL BACKGROUND

The State incorporates the factual and procedural background set forth in its Memorandum in Support of its Motion for Summary Judgment.  ECF No. 34-1.

Plaintiffs include in their "Statement of Facts" a summary of the opinion of their proffered expert, Mr. Clayton Cramer.  ECF No. 31-1 at 5-17.  As detailed in the State's accompanying objections and response to Plaintiffs' Statement of Undisputed Facts (ECF No. 32), most of the assertions contained in this section are not facts at all.  Instead, they are Mr. Cramer's opinion based largely on his review and interpretation of historical laws and court decisions.  Opinions are not factual evidence, particularly when those opinions tread on the court's role in interpreting the law.  *See Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997) ("[I]t is for the judge, not the lawyers or the witnesses, . . . to decide any purely legal issue."); *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 79 (1st Cir. 2006) ("Generally, an expert may not offer an opinion concerning a legal question.").  Furthermore, as demonstrated below, Mr. Cramer's opinions fail to demonstrate any genuine issue of material fact in relation to the Nation's historical tradition of regulating the public carry of firearms for self-defense.

## ARGUMENT

### I.    There Is No Second Amendment Right To Open Carry Handguns In Public When Concealed Carry Is Permitted

States can regulate the manner of carry so long as one form of public carry of firearms for self-defense is allowed.  *Bruen*, 597 U.S. at 59-60.  Not all forms of public carry are required.  *Bruen* recognized that it is constitutionally permissible for states to restrict some forms of public carry if they allow others.  *Id.* at 59 ("States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.").  What states cannot do is "ban public carry altogether."  *Id.* at 50 ("there is no historical basis for concluding that the pre-

existing right enshrined in the Second Amendment permitted broad prohibitions on *all forms* of public carry"); and 53 ("history reveals a consensus that States could not ban public carry *altogether*") (emphasis added).

Plaintiffs' memorandum contains multiple examples where they acknowledge this principle: so long as one form of public carry is allowed, no additional form of carry is constitutionally required. *See, e.g.,* ECF No. 31-1 at 5 ("As long as one or the other [form of carry] remained lawful, the right to armed self-defense was preserved."), 6 ("When the courts have upheld [prohibitions] on concealed carry, they usually have done so because open carry remained lawful."), 13 (state may regulate the mode of carrying firearms so long as it does not "nullify the right"), 15 (state may "regulate the exercise" of right to public carry firearms "but may not prohibit it"), 19 ("restrictions on concealed carry [are] constitutional so long as they did not prohibit open carry"). They also concede—as they must—that states may regulate the manner in which the right to public carry may be effectuated. *See id.* at 19 ("the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing . . . the manner of carry. . . .") (quoting *Bruen*, 597 U.S. at 38).

Notwithstanding these concessions, Plaintiffs make the remarkable assertion that *Bruen* "demonstrates that the constitutional right of open carry of firearms is <u>more</u> protected than concealed carry," which is plainly wrong. ECF No. 31-1 at 19 (emphasis in original). Plaintiffs candidly admit that *Bruen* did not even discuss this issue. *Id.* at 18. Their efforts to infer such a right from the Supreme Court's citation to decisions upholding prohibitions on concealed carry when open carry was allowed merely demonstrate the general principle that states must allow some form of public carry. *See id.* (citing *State v. Reid*, 1 Ala. 612 (1840); *State v. Chandler*, 5 La. 489 (1850); *Nunn v. State*, 1 Ga. 243 (1846); *Andrews v. State*, 50 Tenn. 165, 187 (1871)). Indeed, as

noted in the State's motion for summary judgment, the Supreme Court also cited with approval licensing schemes in Florida and Illinois that prohibited open carry entirely and allowed concealed carry only.  *See Bruen*, 597 U.S. at 14 n.1, 38 n. 9; ECF No 34-1 at 21.  The Supreme Court never suggested—let alone held—that one form of public carry is "more" protected than another form.

There likewise is no constitutional right to publicly carry a firearm in any particular manner.  *See, e.g., Frey v. Nigrelli*, 661 F. Supp. 3d 176, 198 (S.D.N.Y.), *appeal docketed sub nom. Frey v. Bruen*, No. 23-365 (2d Cir. Mar. 16, 2023) (merely that the "manner in which New York allows public carry—concealed rather than open—is not to Plaintiffs' liking does not mean that enforcement against open carry is unconstitutional"); *Sinnissippi Rod & Gun Club, Inc. v. Raoul*, __ N.E.3d __, 2024 WL 886651, at *6 (Ill. Ct. App., Mar. 1, 2024) (the critical factor is not the method of carry, concealed versus open, but rather whether the law "categorically prohibited the public carriage of firearms, both open and concealed"), *appeal pending* (Sept. 2024).  And, as shown in the State's Memorandum in Support of its Summary Judgment Motion (ECF No. 34-1 at 35-36), other courts have likewise held or suggested that open-carry restrictions are constitutional, so long as concealed carry remains available.  *See Baird v. Bonta*, 709 F. Supp. 3d 1091, 1139 (E.D. Cal. 2023) (no Second Amendment violation where California law allowed concealed carry throughout the state but restricted open carry only to counties with lower populations and other limited circumstances), *appeal filed,* (9th Cir. Feb. 1, 2024); *National Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 92 (D. Conn. 2023) (discussing *Bruen* and reasoning that "the government cannot ban individuals from carrying firearms, *but it can ban different types of carry so long as others are left available*") (emphasis added); *Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. 2022) ("[N]othing in the [*Bruen*] opinion implies that a State must allow open carry," so long as it does not "broadly prohibit concealed carry."); *Norman v. State*, 215 So.3d 18, 27-28,

41 (Fla. 2017) (holding pre-*Bruen* that Florida's open-carry prohibition is constitutional because the law "does not diminish an individual's ability to carry a firearm for self-defense, so long as the firearm is carried in a concealed manner and the individual has received a concealed-carry license").

No persuasive reason exists for this Court to reach a different conclusion here.  The critical consideration is not whether a state licensing regime permits open or concealed carry but whether it operates to "prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."  *Bruen*, 597 U.S. at 60 and 80 ("individual self-defense is 'the central component' of the Second Amendment right") (Kavanaugh, J., concurring) (citations omitted). Rhode Island's dual-licensing regime satisfies this constitutional requirement because it requires the issuance of concealed carry permits by municipal authorities under § 11-47-11 while allowing for a separate permit for open carry at the Attorney General's discretion under § 11-47-18.  This dual-licensing regime ensures that the right to publicly carry a handgun for self-defense is not infringed.  Indeed, Rhode Island's dual licensing scheme was among the examples the Supreme Court found to be presumptively constitutional.  *Bruen*, 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring).

Plaintiffs' contention that there is a further constitutional right to publicly carry firearms in any manner they may prefer has been categorically rejected by every court to consider it.  *See Sinnissippi Rod & Gun Club, Inc.*, 2024 WL 886651, at *6 ("Courts concluded that the government could lawfully eliminate one kind of public carry to protect and ensure the safety of its citizens, so long as the people were permitted to carry weapons in another manner that allowed self-defense."). Simply stated, the "'right secured by the Second Amendment is not unlimited'"—it is not "'a right

to keep and carry any weapon whatsoever in any manner whatsoever . . .'" *Bruen*, 597 U.S. at 21 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).

## II. Rhode Island's Dual Licensing Scheme Is Consistent With The Nation's Tradition Of Regulating Public Carry Of Firearms And Other Dangerous Weapons

The State's motion for summary judgment identified numerous laws in effect in 1791 and 1868 that serve as relevant historical analogues and that demonstrate that Rhode Island's dual licensing regime is consistent with longstanding historical tradition. ECF No. 34-1 at 22-39. Those historical analogues show that "licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons" and "that the manner of public carry [of firearms] was subject to reasonable regulation." *Bruen*, 597 U.S. at 59. The Supreme Court recently reiterated that "[a]t the founding, the bearing of arms was subject to regulations," including outright "ban[s] [on] the carrying of 'dangerous and unusual weapons' . . . [and] concealed firearms." *Rahimi*, 602 U.S. at 691.

That many of these laws restricted the public carry of all weapons, whether concealed or open, does not make them inapplicable to the court's analysis, as Plaintiffs suggest. *See* ECF No. 31-1 at 25-28. Rather, these laws demonstrate a longstanding historical tradition of regulating and restricting the public carry of weapons, including the open carry of handguns (even when open carry was not prevalent, as shown below).

### A. Many historical laws restricted the open carry of weapons

Laws described by Dr. Brennan Rivas and Professor Rober Spitzer in their declarations and further discussed in the State's Memorandum in Support of Summary Judgment (ECF No. 34-1, 34-2, and 34-3) are attached to the State's accompanying motion for judicial notice. These laws show that regulations restricting the open carry of weapons were in effect when the Second or Fourteenth Amendment were ratified. Those laws include the following:

**Table 1: Historical Laws Regulating the Open Carry of Firearms**

| Enactment Date | Jurisdiction | Title/Citation | Summary | Available/ Discussed |
|---|---|---|---|---|
| 1686 | New Jersey | Grants, Concessions and Original Constitutions of the Province of New Jersey 289-90 (1881) | Prohibited the carrying "privately" of any pocket pistol, skeines, stillettoes, daggers or dirks, or other unusual or unlawful weapons. | State's Motion for Judicial Notice (MJN) Ex. 20; Spitzer Decl. 13, ECF No. 34-3; Spitzer Ex. C p.84, ECF No. 34-4. |
| 1692 | Massachusetts | An Act for the Punishment of Criminal Offenders, 1692-1694 Massachusetts Acts & Resolves ch. 18 | Prohibited riding or going "armed Offensively" before colonial authorities. | MJN Ex. 2; Spitzer Decl. 14, ECF No. 34-3; Spitzer Ex. C pp. 58-59, ECF No. 34-4. |
| 1750 | Massachusetts | 1750 Mass. Acts 544, ch. 17, § 1 | Prohibited 12 or more persons from carrying a club or other weapon while unlawfully, riotously, tumultuously assembling. | MJN Ex. 21; *see also* Spitzer Decl. 6, ECF No. 34-3 (citing 1749-51 Mass. Acts 339); Spitzer Ex. C p. 60, ECF No. 34-4 (same). |
| 1771 | New Hampshire | Acts and Laws of His Majesty's Province of New Hampshire, 9-10 (1771), ch. 6, § 2 | Prohibited any persons numbering 12 or more being armed with "clubs or other weapons" or any group numbering 30 or more from unlawfully, riotously, or tumultuously assembling. | MJN Ex. 22; Spitzer Ex. C pp.79-80, ECF No. 34-4 (citing earlier versions of the law). |
| 1786 | Virginia | 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays, ch. 17, § 1 | Prohibited any person from doing the following: "go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison." | MJN Ex. 1; Spitzer Decl. 6, 14, ECF No. 34-3; Spitzer Ex. C p. 124, ECF No. 34-4. |

| Enactment Date | Jurisdiction | Title/Citation | Summary | Available/ Discussed |
|---|---|---|---|---|
| 1801 | Tennessee | 1801 Tenn. Laws 259-60, ch. 22, § 6 | Prohibited the private carrying of "any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person," unless a surety is posted. | MJN Ex. 24; *see also* Rivas Decl. 24-25, ECF No. 34-2. |
| 1820 | Indiana | 1820 Ind. Acts 39, ch. 23, § 1 | Prohibited any person, except a traveler, from carrying concealed "any dirk, pistol, sword in a cane, or other dangerous weapon." | MJN Ex. 25; *see also* Spitzer Ex. C p.43, ECF No. 34-4 (citing "1819 Ind. Acts 39, An Act to Prohibit the Wearing of Concealed Weapons. 1820."). |
| 1821 | Maine | 1821 Maine Ch. 76, 285, § 1 | Prohibition against those who "ride or go armed offensively to the fear and terror of the good citizens of this State." | MJN Ex. 26; Rivas Decl. 23, ECF No. 34-2. |
| 1821 | Tennessee | Act of 1821, A Compilation of the Statutes of Tennessee (Caruthers 1836) ch. 13, p.100 | Prohibited carrying "dirk, sword cane, Spanish stiletto, belt or pocket pistol, either public or private" and ordering fine. | MJN Ex. 27; Rivas Decl. 24-25, ECF No. 34-2. |
| 1835 | Massachusetts | Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 (Dutton & Wentworth 1836), ch. 134, § 16, p. 750 | Prohibited the carrying of a "dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. . . ." | MJN Ex. 28; Rivas Decl. 22-23, ECF No. 34-2. |

| Enactment Date | Jurisdiction | Title/Citation | Summary | Available/ Discussed |
|---|---|---|---|---|
| 1837 | Mississippi | 1837 Miss. Laws 290-92, § 9 | Prohibited the use of any rifle, shotgun, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon in a fight or quarrel, and the exhibition of any dirk, dirk knife, bowie knife, sword, sword cane, or other deadly weapon in a rude or threatening manner that was not in necessary self-defense. | MJN Ex. 29; Spitzer Ex. C p.69, ECF No. 34-4; *see also* Spitzer Decl. 7-8, ECF No. 34-3 (citing 1840 version). |
| 1840 | Maine | Revised Statutes of Maine, Passed October 22, 1840, 709 (1847), tit. 12, ch. 169, § 16 | Prohibited the carrying of a "dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault." | MJN Ex. 31; Spitzer Ex. C, pp. 53-54, ECF No. 34-4. |
| 1852 | Hawaii | 1852 Hawaii Session Laws p. 19 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, bowie knife, or other dangerous weapon.[2] | MJN Ex. 32; Spitzer, Ex. C, p. 33, ECF No. 34-4. |
| 1854 | Washington (Territory) | 1854 Wash. Sess. Law 80, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, bowie knife, or other dangerous weapon. | MJN, Ex. 33; Spitzer, Ex. C. p. 127 |

---

[2] While Hawaii was not annexed as an American territory until after 1852, its laws remained in effect and, thus, form part of the American historical tradition. Spitzer Depo. (Ex. A to Defendants' Statement of Disputed Facts) at 88-89.

| Enactment Date | Jurisdiction | Title/Citation | Summary | Available/ Discussed |
|---|---|---|---|---|
| 1855 | California | Chapter 25: Crimes and Punishments, art. 1904, Digest of the Laws of California (Wood 1857) p. 334 | Prohibited the display of any dirk, dirk knife, bowie knife, sword, sword cane, pistol, gun, or other deadly weapon in a threatening manner, or use of such weapon in a fight. | MJN Ex. 34; Spitzer Ex. C p. 13, ECF No. 34-4. |
| 1858 | D.C. | 1 Laws of the Corporation of Washington Digested and Arranged under Appropriate Heads in Accordance with a Joint Resolution of the City Councils (Webb 1868) | Prohibited "any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles." | MJN Ex. 35; Spitzer Ex. C p.20, ECF No. 34-4. |
| 1859 | Washington (Territory) | 1859 Wash. Sess. Laws 109 ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, bowie knife, or other dangerous weapon. | MJN Ex. 36; Spitzer Ex. C p. 127-28. ECF No. 34-4. |
| 1867 | Arizona | The Compiled Laws of the Territory of Arizona (Bashford 1871) at 96, ch. 10, div. 14 | Prohibited drawing or exhibiting any deadly weapon in presence of two or more persons "in a rude, angry or threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel." | MJN Ex. 37; Spitzer Ex. C p. 6-7, ECF No. 34-4. |
| 1868 | Alabama | Code of Alabama (Barrett & Brown 1877) at 883, pt. 5, tit. 1, ch. 3, § 4111 | Prohibited the carrying of any rifle or "shot-gun walking cane." | MJN Ex. 38; Spitzer Ex. C, p.5, ECF No. 34-4. |

| Enactment Date | Jurisdiction | Title/Citation | Summary | Available/ Discussed |
|---|---|---|---|---|
| 1868 | Florida | Digest of the Laws of the State of Florida (Floridian Book & Job Office 1881) at 403, ch. 70, § 13 | Prohibited the carrying "secretly, on or about their person" any dirk, pistol or other arm or weapon except a "common pocket knife." | MJN Ex. 39; Spitzer Ex. C p. 29, ECF No. 34-4. |
| 1868 | Kansas | The General Statutes of the State of Kansas (Speer 1868) at 378, ch. 31, art. 9 | Any person who is "not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon" is subject to arrest and fine or imprisonment. | MJN Ex. 40; Spitzer Ex. C p. 47, ECF No. 34-4. |

This chart is only a sampling of the many historic laws that regulated the manner of public carry of firearms, including open carry, enacted in the years before 1791 and up to 1868. While some of these laws may not be a "dead ringer" or "historical twin" for Rhode Island's licensing laws, the historical analysis required by *Bruen* does not require such precision and is not intended to impose "a regulatory straitjacket." 597 U.S. at 30. Laws, as the Supreme Court recently explained, are not "trapped in amber." *Rahimi*, 602 U.S. at 691. States are permitted to enact a wide range of firearm regulations. *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations."). To satisfy the historical analysis step of the *Bruen* inquiry, a state must show that a challenged regulation

13

falls within a historical tradition of laws that are "relevantly similar," in the sense that they "impose a comparable burden on the right of armed self-defense" that "is comparably justified." *Id.* at 29-30; *Rahimi*, 602 U.S. at 692 (same); *see also Ocean State Tactical,* LLC, 95 F.4th 38, 44-45 (1st Cir. 2024) ("We must . . . employ 'analogical reasoning' to determine whether historical analogues are 'relevantly similar.'").

Rhode Island's dual licensing regime is "relevantly similar" to these historical analogues. Those analogues establish a long tradition of regulating dangerous weapons, including the manner in which such weapons could be carried in public. Many of the analogues restricted or prohibited one form of public carry—sometimes concealed, sometimes open—altogether. Rhode Island's licensing regime is less burdensome than most of these analogues because it provides for mandatory issuance of concealed carry licenses to ordinary, law-abiding citizens while limiting the issuance of an additional, open carry permit to those who demonstrate a need beyond that of an ordinary, law-abiding resident.

Plaintiffs' attempts to rebut this historical evidence are unpersuasive. They suggest that the State has improperly conflated handguns with other dangerous weapons and that historical laws restricting dangerous weapons are not analogues for present-day laws restricting the open carry of handguns. ECF No. 31-1 at 23. But as Dr. Rivas explained, the pistols that were widely regulated were those that were in major circulation at the time the laws restricting their usage were passed. Rivas Decl. at 11-14, 54, ECF No. 34-2. And, as demonstrated in the list cited above, pistols were among the dangerous weapons that were regularly restricted. *Id.*

Plaintiffs also argue that some of the historical analogues on which the State's experts rely are inapposite because they restricted the brandishing and display of weapons, as opposed to the peaceable carriage of handguns. ECF No. 31-1 at 27-28. Plaintiffs are wrong. As Professor

Spitzer explained, brandishing laws involve the display of weapons in a threatening or menacing manner while in the presence of others.  Spitzer Depo. (Ex. A to Defendants' Statement of Disputed Facts) at 34.  Display laws, in contrast, punish the mere presentation of weapons in public.  *Id.* at 35.  Although brandishing laws are different from display laws and other open carry restrictions, both categories of laws are related and part of a single historical tradition of regulating the public carry of firearms and other dangerous weapons.[3] *Id.*

In sum, there is a long tradition of restricting and prohibiting the open carry of firearms in the United States.  Plaintiffs fail to raise any genuine issue of material fact on this fundamental point, and their assertion that the Second Amendment establishes a preference for open carry over concealed carry is simply wrong.

B.  Plaintiffs ignore relevant historic analogues and misinterpret *Bruen*'s historical analysis

The State's licensing regime is also consistent with laws enacted after 1868, when changing social mores and technological advancements made the public carry of handguns more prevalent.  Rivas Decl. 13, ECF No. 34-2.  "As gun violence grew more prevalent and weapons grew more dangerous, Americans began to change their opinions about what types of weapons and what types of weapons carrying were frightening or dangerous."  *Baird,* 709 F. Supp. 3d at 1135.  States reacted to these societal changes by imposing more restrictions on open carry of firearms, which was generally perceived as posing a threat to peace and public safety.  *Id.* at 1135-36, 1138-39.

---

[3] Plaintiffs also suggest that Dr. Spitzer failed to acknowledge the outcome of a subsequent court decision invalidating a Georgia firearms law.  ECF No. 31-1 at 27.  But as Dr. Spitzer explained, his research focused on the public policy choices motivating enactment of the statute, which he found reflected the same concerns about public carry as those reflected in statutes enacted across the country at this time.  He did not address events that took place after the statute was enacted because those events were not relevant to his historical analysis.  *See* Spitzer Depo. (Ex. A to Defendants' Statement of Disputed Facts) at 58-60 (discussing Duke Repository).  Other aspects of Plaintiffs' challenge to Dr. Spitzer's declaration are addressed in the State's accompanying opposition to Plaintiffs' motion in limine.

Plaintiffs largely ignore this historical record. They contend that the "most relevant history" is from 1791 to 1868, and that laws enacted after 1868 are "outside the constitutionally relevant time period." ECF No. 31-1 at 21-25. Plaintiffs' rigid approach to historical analysis is precisely the sort of "regulatory straitjacket" the Supreme Court warned against. *Bruen,* 597 U.S. at 30. Laws are not meant to be "trapped in amber" but rather intended to evolve over time to respond to emerging societal needs. *See Rahimi*, 602 U.S. at 691; *see also Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024) (en banc) ("[t]he [Second] Amendment has not disabled the ability of representative democracy to respond to an urgent public safety crisis").

Plaintiffs' rigid approach to historical analysis also finds no support in *Bruen* or any other Supreme Court precedent. *Bruen* observed that that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." 597 U.S. at 39. This observation does not mean, as Plaintiffs suggest, that laws in effect in 1868 are invalid if they contradict laws in effect in 1791. Rather, with respect to public carry, laws from both periods of history may inform the analysis. The Supreme Court confirmed that evidence "'through the end of the 19th century' represented a 'critical tool of constitutional interpretation.'" *Id.* at 35 (quoting *Heller*, 554 U.S. at 605). And the Court left open the possibility that "'20th-century historical evidence' may have probative value if it does not 'contradict[ ] earlier evidence.'" *Ocean State Tactical, LLC*, 95 F.4th at 51 (quoting *Bruen*, 597 U.S. at 66 n.28)).

This practical approach reflects the Supreme Court's direction that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35) (emphasis added in *Bruen*). Because the Second Amendment was not incorporated against the states until ratification of the Fourteenth Amendment in 1868, it is appropriate for this court to consider public carry restrictions enacted

after 1868.  *See Antonyuk v. James,* 120 F.4th 941, 970 (2d Cir. 2024) ("The Second Amendment 'permits more than just those regulations identical to ones that could be found in 1791'; 'holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.'") (quoting *Rahimi*, 602 U.S. at 692)); *id.* at 966, n.36 ("the period of relevance extends past 1868").  Indeed, the plurality opinion in *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010), rested on the understanding of the Second Amendment held by "the Framers and ratifiers of the Fourteenth Amendment" during the Reconstruction era, and even the NRA lawyer in *Bruen* took the position, during oral arguments, that "there would be a decent argument for looking at the time of Reconstruction . . . and giving preference to that over the founding."  Tr. Oral Arg. at 8:2-17, *Bruen* (No. 20-843).  Since it is "implausible that the public understanding of a fundamental liberty would . . . promptly dissipate whenever that era gave way to another," laws and regulations enacted after 1868 still "illuminate the understanding of those steeped in the contemporary understanding of a constitutional provision."  *Antonyuk,* 120 F.4th at 973 (citation omitted).

As the State's experts have shown, the concept of public carry evolved over time.  Dr. Rivas explained that nineteenth-century public carry laws typically prohibited concealed carry because the primary manner of carrying deadly weapons at that time was to conceal them in one's pocket.  Rivas Decl. 53, ECF No. 34-2.  But the existence of these laws does not mean that Americans have historically approved of open carry.  To the contrary, openly carrying firearms was not a prevalent practice when the Second and Fourteenth Amendments were ratified, and so the longstanding tradition of regulating concealed carry simply represents "a nationwide consensus about the efficacy of prohibiting the most convenient and most popular manner of carrying deadly weapons."  *Id.*  Open carry also was not widely practiced because of existing societal norms and technological limitations that made firearms, which "usually were loaded through the muzzle one shot at a time"

and often "quite large," impractical to carry for self-defense. *Baird*, 709 F. Supp. 3d at 1130. Since open carry was not a significant societal problem, there was little reason to prohibit it. [4] Rivas Depo. (Ex. B to Defendants' Statement of Disputed Facts) at 111 (concealed carry was posing a greater problem because "it just was not so common to see a person openly carrying a gun"); *see also Ocean State Tactical, LLC*, 95 F.4th at 50 ("Law advances more slowly than the technology it regulates, but must nonetheless be able to respond when the ramifications of a technological development become more apparent over time."); *Antonyuk,* 120 F.4th at 970 ("lawmakers are not often moved to forbid behavior that is governed by custom, universal practice, or private warning").

As the commercial availability of handguns for private sale increased and guns became more technologically advanced, open-carry restrictions increased in frequency during the Reconstruction era and through the early twentieth century. *See* Rivas Decl. 19, 48-50, ECF No. 34-2. For example, in 1871, Texas enacted a law making it a crime to "'carry[] on or about [one's] person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, [or] bowie-knife,' unless for provable self-defense or in service to the government." Spitzer Decl. 9, ECF No. 34-3. Many other states, territories, and cities followed suit, adopting broad prohibitions on the public carry of weapons—including open carry. *See, e.g.*, *id.* at 7-9. Examples include Arkansas's 1875 statute, which said that "any person who shall wear or carry any pistol of any kind whatever . . . shall be adjudged guilty of a misdemeanor." *Id*. at 9. Likewise, a Nebraska City, Nebraska law from 1872 made it "unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, . . . or any other dangerous or deadly weapons." *Id*.

---

[4] This is also why laws restricting or prohibiting concealed carry of weapons are relevant historical analogues in analyzing whether open carry restrictions are constitutional.

State courts occasionally reviewed the constitutionality of these broad public carry restrictions. The Georgia Supreme Court's decision in *Nunn v. State*, 1 Ga. 243 (1846), is "particularly instructive." *Bruen*, 597 U.S. at 54. There, the state court weighed a challenge to the 1837 law mentioned above, which "broadly prohibited 'wearing' or 'carrying' pistols . . . without distinguishing between concealed and open carry." *Id.* The court held that "[a] law which merely inhibits the wearing of certain weapons in a concealed manner is valid," "[b]ut so far as it cuts off the exercise of the right of the citizen altogether to bear arms, or, under the color of prescribing the mode, renders the right itself useless," "it is in conflict with the Constitution, and void." *Nunn*, 1 Ga. at 243. Other state courts reached similar conclusions. *See State v. Jumel*, 13 La. Ann. 399, 399-400 (1858) ("The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society."); *State v. Reid*, 1 Ala. 612, 616 (1840) (holding that the right to bear arms did not deny "the Legislature[] the right to enact laws in regard to the manner in which arms shall be borne"). The lesson the Supreme Court took from these and other state-court decisions is that—although "the manner of public carry was subject to reasonable regulation"— "it was considered beyond the constitutional pale . . . to altogether prohibit public carry." *Bruen*, 597 U.S. at 54, 59.

Like many of the analogues, the distinction Rhode Island law draws between open versus concealed carry reflects longstanding concerns that "weapons carried openly in public can risk fright, intimidation and violence." *Baird*, 709 F. Supp. 3d at 1137. These public policy concerns likewise have historical analogues. As the Tennessee Appellate Court recently observed:

> the history of the colonies and the early Republic demonstrate common practices of regulating public carry by the general public to prevent "fear" and "terror." . . . Moreover, during the 1800s, states commonly regulated the manner in which individuals carried a firearm in public to reduce violence and protect the public.

19

*Sinnissippi Rod & Gun Club, Inc.*, 2024 WL 886651 at *7 (collecting cases); *see also Baird*, 709 F. Supp. 3d at 1138-39 ("the open carrying of firearms by those who are not law enforcement officers is threatening or intimidating, especially in more heavily populated places").

Indeed, as shown in the State's motion for summary judgment (ECF No. 31-1 at 30-31), all three proffered experts in this case agree that openly carrying weapons in public likely caused alarm throughout history. Dr. Rivas reports that "[t]o be *seen* carrying weapons invited suspicion, judgment, or even the intervention of local officials" since "the everyday open carrying of deadly weapons was a divergent behavior, noteworthy according to the travelers, adventurers, and commentators who encountered it." Rivas Decl. 6, ECF No. 34-2. Professor Spitzer similarly opined that openly carrying in public places "caused great alarm, fear, what we might call disruption of public order," leading state and local authorities "to regulate this practice." Spitzer Depo. (Ex. A to Defendants' Statement of Disputed Facts) at 78:5-8. Even Plaintiffs' expert, Mr. Clayton Cramer, wrote in his book "that the open carrying of deadly weapons was subject to sufficient social stigma to guarantee that a ban on concealed carry was, effectively, a ban on all carrying." Clayton Cramer, *Concealed Weapon Laws* (Ex. A) at 86 (with Cramer Depo. (Oct. 11, 2024) at 136:6-17 authenticating excerpts of *Concealed Weapon Laws* as Exhibit 9 to his deposition). At his deposition, Mr. Cramer confirmed that "[t]here might well have been some social stigma" against carrying deadly weapons openly in the Early Republic, Cramer Depo. (Ex. A) at 142:13-15, and he further observed that such stigma continues to this day, *id*. at 140:16-22 (admitting that "[a] lot of people" continue to feel "disturb[ed]" by open carry, amounting to a "certain level of disapproval where people are clearly uncomfortable").

In short, "laws and regulations passed after the Fourteenth Amendment's adoption changed, but did not contradict laws passed in the colonies and early in the nineteenth century.

Consistently, over many years, American governments recognized the right to bear arms but circumscribed that right in recognition of the need to preserve the peace and public safety." *Baird,* 709 F. Supp. 3d at 1136. The Rhode Island General Assembly made the legislative judgment that directing local authorities to issue concealed carry permits but restricting open carry permits to a "proper showing of need" was the best way to preserve the peace and public safety.

In *Bruen,* in contrast, the licensing regime under review effectively prohibited *all* forms of public carry because open carry was illegal and concealed carry permissible only where an applicant "demonstrate[d] a special need for self-protection distinguishable from that of the general community." *Bruen,* 597 U.S. at 12, 93-94 (describing New York licensing regime for open and concealed carry) (Breyer, J. dissenting). Rhode Island's licensing regime is far less restrictive than the regime at issue in *Bruen.* It does not "operate[] to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 60. Instead, it allows public carry with a concealed carry permit that local authorities "shall" issue without any showing of need. *Mosby v. Devine*, 851 A.2d 1031, 1047 (R.I. 2004). The Attorney General, however, retains discretion as the state's chief law enforcement officer to issue an additional open or concealed carry permit for applicants who make a "proper showing of need" beyond those of the ordinary, law-abiding citizen. *See* R.I. Gen. Laws §§ 11-47-11(a) and 11-47-18(a). Because Rhode Island law does not prohibit public carry altogether, Plaintiffs fail to establish any violation of the Second Amendment merely because they desire an additional form of public carry (open) in addition to the form (concealed) they already hold.

### III.    Plaintiffs' Due Process Argument Lacks Merit And Is Refuted by the Record

Plaintiffs mistakenly draw on First Amendment prior restraint jurisprudence to contend that § 11-47-18 violates their Fourteenth Amendment rights to due process.[5]  As already shown, however, Plaintiffs fail to demonstrate any fundamental right to open carry of a handgun so long as other forms of public carry are allowed.  ECF No. 34-1 at 39-40.  Additionally, Plaintiffs have no protected liberty or property interest in the renewal of their expired § 11-47-18 permit applications.  *Id.*  And, even if such a fundamental right were implicated, the record shows that Plaintiffs received all the process that was due in relation to the denial of their § 11-47-18 applications, including notice of the statutory standard, an opportunity to be heard, a detailed explanation of the reasons for the Attorney General's decision, and an opportunity for judicial review to ensure that the "findings are supported by any legally competent evidence."  *See id.* at 6, 41-43 (quoting *Mosby*, 851 A.2d at 1050-51).  As such, the statutory scheme provides constitutionally sufficient notice and guards against the possibility of arbitrary enforcement.  Due process requires nothing more.  *See Beckles v. United States*, 580 U.S. 256, 265 (2017) ("providing notice and preventing arbitrary enforcement" are the "twin concerns" underlying Due Process Clause's "void for vagueness" standard); *Grayned v. City of Rockford,* 408 U.S. 104, 108–09 (1972) (same).

Plaintiffs' attempt to import First Amendment analysis into their Second Amendment challenge ignores binding First Circuit precedent.  *See* ECF No. 31-1 at 33-36, n.25.  In *Hightower v. City of Boston*, 693 F.3d 61, 80-81 (1st Cir. 2012), the First Circuit considered whether the First

---

[5] Plaintiffs' complaint also includes a due process claim under Article 1, § 2 of the Rhode Island Constitution that is not addressed in Plaintiffs' motion for summary judgment.  ECF No. 18 at Count II; ECF No. 31-1 at 32-37.  As shown in the State's motion, no direct cause of action exists under this provision.  ECF No. 34-1 at 43-45.  Accordingly, at a minimum, the State is entitled to summary judgment on Plaintiffs' due process claims brought under the Rhode Island Constitution.

Amendment's prior restraint doctrine, including principles of vagueness and overbreadth, applied to facial challenges alleging the denial of Second Amendment rights.  The court held that the doctrine is "specific to the First Amendment" and "is not a label that may be attached to any facial challenge, whatever the constitutional ground." *Id.*  Plaintiffs' overbreadth challenge likewise fails because the Supreme Court has "not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."  *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also United States v. Decastro*, 682 F.3d 160, 169 (2d Cir. 2012) ("There is no overbreadth argument that [defendant] can make in the Second Amendment context.").

This leaves only a potential as-applied due process challenge to the State's permitting scheme.  *See Draper v. Healy,* 827 F.3d 1, 3 (1st Cir. 2016) (vagueness claims outside the First Amendment context may only be made on an as-applied basis).  Where, as here, a due process violation is premised on an alleged right established by another constitutional provision "that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v Oliver*, 510 U.S. 266, 273 (1994).  This Court may, therefore, refer to the Second Amendment analysis above to dispose of any substantive due process claim Plaintiffs may raise.  To the extent Plaintiffs raise a procedural due process claim, it fails for the reasons stated in the State's motion for summary judgment.  ECF No. 34-1 at 39-43.

Furthermore, even if the First Amendment's analytical framework applied, Plaintiffs cannot demonstrate that § 11-47-18 is unconstitutionally vague or overbroad.  The First Amendment's prior restraint doctrine requires consideration of "any limiting construction that a state court or enforcement agency has proffered."  *Ward v. Rock Against Racism,* 491 U.S. 781, 796 (1989); *see also City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 770, n.11 (1988) ("[W]hen a state law has been authoritatively construed so as to render it constitutional, or

a well-understood and uniformly applied practice has developed . . . the state law is read in light of those limits."). Such limits on discretion may be made explicit by "textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood,* 486 U.S. at 770.

Section 11-47-18's requirement for a "proper showing of need" is not a secret standard; it is set forth in the permitting statute itself and clarified through guidelines issued by the Attorney General. *See* R.I. Gen. Laws § 11-47-18; *Ridley v. Massachusetts Bay Transp. Auth.,* 390 F.3d 65, 93 (1st Cir. 2004) (merely that a statute "requires interpretation does not make it vague"). Thus, contrary to Plaintiffs' assertion, neither they nor any other applicant is left to guess as to the law's meaning. ECF No. 31-1 at 33. The Attorney General's guidance is posted on the Office's official website and was shared with each individual Plaintiff during the permitting process. *See* Weapons Carry Permit Packet, ECF No. 35-1 (Ex. A). The Attorney General's initial denial letters further invited Plaintiffs to identify whether they had "any special circumstances" to show why they needed a § 11-47-18 public carry permit in addition to the § 11-47-11 concealed carry permits they already held. ECF No. 35-1 (Exs. D (O'Neil), J (Cook), N (Labriole), Q (Laporte), T (Patterson), X (Patton), BB (Trementozzi)). As such, notwithstanding the fact that Plaintiffs already held public carry permits issued by local authorities, they were afforded an opportunity to identify any additional factors relevant to showing why they needed an additional permit from the Attorney General. *Id.* The Attorney General addressed all of the factors raised by Plaintiffs and explained why those reasons were not sufficient to establish a "proper showing of need." *See id.* (Exs. E (O'Neil), K (Cook), O (Labriole), R (Laporte), U (Patterson), Y (Patton), CC (Trementozzi)).

Plaintiffs also had access to judicial review by the Rhode Island Supreme Court through the filing of petitions for certiorari review, which is the administrative review mechanism specified

by state law.  *Mosby*, 851 A.2d at 1050.  That opportunity for judicial review ensured that there was no unbridled exercise of discretion, and that any denial was supported by "legally competent evidence."  *Id.* at 1050-51.  Contrary to Plaintiffs' suggestion that the statute is open to "arbitrary and discriminatory enforcement," ECF No. 31-1 at 34, the Rhode Island Supreme Court explicitly held in relation to § 11-47-18 that it "will not countenance any system of permitting under the Firearms Act that would be committed to the unfettered discretion of an executive agency."  *Id.*  at 1050.  And in appropriate cases, the Rhode Island Supreme Court has set aside permitting decisions that it found were not supported by "legally competent evidence."  *See Montaquila v. Neronha*, 289 A.3d 568, 574 (R.I. 2023) (setting aside § 11-47-18 permit denial where decision was not supported by "legally competent evidence").

Thus, whether viewed through the lens of the First Amendment or the Due Process Clause, Plaintiffs fail to establish that § 11-47-18's permitting standard is unconstitutionally vague or overbroad, either facially or as applied.  The statute, as construed by the Attorney General and Rhode Island Supreme Court, provides adequate notice of the permitting requirements and guards against the possibility of arbitrary or discriminatory enforcement.  *See Beckles*, 580 U.S. at 265; *Grayned,* 408 U.S. at 108–09.  Plaintiffs' own cases demonstrate that the statute is constitutional as applied to them.  It follows that any facial challenge must likewise fail.  *Salerno*, 481 U.S. at 745 (facial challenge fails if the law is "constitutional in at least some of its applications"); *Rahimi*, 602 U.S. at 693 (rejecting facial challenge where "the provision is constitutional as applied to the facts of Rahimi's own case").

IV.    **Plaintiffs' Request For A Permanent Injunction Is Barred by *Rooker-Feldman* And Otherwise Precluded**

Plaintiffs request a permanent injunction requiring the Attorney General to issue their § 11-47-18 permits.  ECF No. 31-1 at 1, 39.  This is precisely the relief that they requested from the Rhode Island Supreme Court in their failed petitions for certiorari from the Attorney General's challenged permit decisions.  As more fully explained in the State's motion to dismiss (ECF No. 9), this relief is barred by the *Rooker-Feldman* doctrine.

The *Rooker-Feldman* doctrine arose from the Supreme Court's decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  *Rooker–Feldman* directs federal courts to abstain from considering claims "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005).  All of those circumstances exist here.  *See* ECF No. 9 at 11-13.

This Court denied the State's earlier motion to dismiss based on *Rooker-Feldman* and claim preclusion because it found that plaintiffs were "not trying to undo the adverse state court decision itself."  June 28, 2023 Text Order.  Plaintiffs' motion for summary judgment and accompanying request for entry of a permanent injunction, however, demonstrate that this is precisely the relief they seek: an order undoing the adverse state-court decision.  This type of end-run on a state-court decision is foreclosed by *Rooker-Feldman* and the principles of claim preclusion set forth in the State's motion to dismiss, which is incorporated herein.  ECF No. 9 at 11-15.

Plaintiffs cannot "avoid the impact of the *Rooker-Feldman* doctrine simply by recasting [their] claims in federal court as arising under the United States Constitution, where adjudicating these claims would 'necessarily require reviewing the merits of the Rhode Island Supreme Court's

decision.'" *Sinapi v. Rhode Island Bd. of Bar Examiners,* 910 F.3d 544, 549 (1st Cir. 2018) (quoting *Mckenna v. Curtin*, 869 F.3d 44, 48 (1st Cir. 2017)). As the Supreme Court held in *Feldman*, even a constitutional claim pled as a general attack on a statute may be so "inextricably intertwined" with a state-court decision that "the district court is in essence being called upon to review the state court decision.'" *Feldman*, 460 U.S. at 482, n.16 and 486. By seeking entry of a permanent injunction to obtain the same relief the Rhode Island Supreme Court already rejected (*i.e.*, vacating the Attorney General's permit denial and directing the issuance of permits under § 11-47-18) and doing so on the same constitutional grounds plaintiffs raised or could have raised in state court, Plaintiffs impermissibly invite federal review and rejection of the Rhode Island Supreme Court's decisions in their individual cases. *Cf. id.* at 482, n.16 (federal court had no jurisdiction to review constitutional claims "inextricably intertwined" with state-court decision denying application for admission to state bar). Plaintiffs' current federal suit, therefore, is "precisely the 'functional equivalent of an appeal' that the *Rooker-Feldman* doctrine forbids." *Curtin*, 869 F.3d at 48 (citing *Badillo-Santiago v. Naveira-Merly*, 378 F.3d 1, 6 (1st Cir. 2004)).

In all events, as already shown, Plaintiffs fail to establish any violation of their federal constitutional rights under the Second Amendment or Fourteenth Amendment's Due Process Clause. *Supra* at Sections I-III. Injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs have the burden of showing that injunctive relief is warranted. *Nieves-Marquz v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). They cannot meet that burden because, as shown above, Plaintiffs fail to establish any constitutional violation, which is the sole basis upon which they base their claim of irreparable harm. *See Ocean State Tactical*, *LLC*, 95 F.4th at 42 (a "movant's likelihood of success on the merits is the 'main bearing wall'" for granting injunctive relief) (quoting *W. Holding Co. V. AIG*

27

*Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014)).  Absent any constitutional violation or showing of irreparable harm, the public interest weighs heavily against any injunction that would prevent the State from enforcing its dual licensing regime for public carry of handguns, particularly where Plaintiffs' challenges to the denial of permit applications in their own cases have been considered and rejected by the Rhode Island Supreme Court.  *See R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 500–01 (1941) (holding that federal courts must "exercis[e] a wise discretion" in administering equitable relief to "avoid[ ] ... needless friction with state policies"); *Industria Lechera De Puerto Rico, Inc. v. Beiro*, 989 F.3d 116, 123 (1st Cir. 2021) (instructing district court on remand to consider impact injunction could have on state sovereign interests).

## CONCLUSION

For these reasons, Plaintiffs fail to establish any constitutional violation, and the Court should grant the Attorney General and State's parallel motion for summary judgment.  A declaration should be issued stating that Rhode Island's dual licensing regime, as specified in R.I. Gen. Laws §§ 11-47-11 and 11-47-18, is constitutionally permissible both facially and as applied.

Dated:  January 6, 2025

Respectfully Submitted,

PETER F. NERONHA
and THE STATE OF RHODE ISLAND,

By their Attorneys,

*/s/ James J. Arguin*
James J. Arguin (#10972)

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (#10742)

Special Assistant Attorneys General
Office of the Attorney General
150 South Main Street
Providence, R.I. 02903
(401) 274-4400 exts. 2078/2074
(401) 222-2995 (Fax)
jarguin@riag.ri.gov/pmeosky@riag.ri.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2025, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ James J. Arguin*