# Concealed Weapon Laws of the Early Republic

## *Dueling, Southern Violence, and Moral Reform*

Clayton E. Cramer

PRAEGER

Westport, Connecticut
London

Library of Congress Cataloging-in-Publication Data

Cramer, Clayton E.
  Concealed weapon laws of the early republic : dueling, southern violence, and moral reform / Clayton E. Cramer.
    p.  cm.
  Includes bibliographical references and index.
  ISBN 0–275–96615–1 (alk. paper)
  1.  Firearms—Law and legislation—Southern States—History—19th century.  2.  Southern States—Social life and customs—1775–1865.
  I. Title.
  KF3941.C729   1999
  344.75'0533—dc21        99–18014

Copyright © 1999 by Clayton E. Cramer

All rights reserved. No portion of this book may be reproduced, by any process or technique, without the express written consent of the publisher.

Library of Congress Catalog Card Number: 99–18014
ISBN: 0–275–96615–1

First published in 1999

Praeger Publishers, 88 Post Road West, Westport, CT 06881
An imprint of Greenwood Publishing Group, Inc.
www.praeger.com

Printed in the United States of America



The paper used in this book complies with the Permanent Paper Standard issued by the National Information Standards Organization (Z39.48–1984).

10 9 8 7 6 5 4 3 2 1

# Contents

|  | *Acknowledgments* | vii |
| 1. | What Is the Mystery? | 1 |
| 2. | Social Control of Free Blacks | 9 |
| 3. | The Back Country Culture of Violence | 17 |
| 4. | Kentucky | 47 |
| 5. | Louisiana | 67 |
| 6. | Indiana | 77 |
| 7. | Arkansas | 85 |
| 8. | Georgia | 97 |
| 9. | Tennessee | 105 |
| 10. | Virginia | 113 |
| 11. | Alabama | 117 |
| 12. | "That Dog Won't Hunt" | 127 |

important and arbitrary ones, which can be violated with ease and impunity, and which, if strictly obeyed, would put an end to personal liberty—so dear to men, so dear to the enlightened legislator—and subject innocent persons to all the vexations that the guilty alone ought to suffer? *Such laws make things worse for the assaulted and better for the assailants; they serve rather to encourage than to prevent homicides, for an unarmed man may be attacked with greater confidence than an armed man* [emphasis added].[23]

Beccaria was a significant influence on the fledgling American Republic and its leading men, in his general view of criminology and specifically his notion of the counterproductive effects of laws regulating the carrying of arms.[24] Many aspects of modern America would surprise a traveler visiting us today from 1790. Our apparent return to medieval and Renaissance practice—where the law allowed only aristocrats, knights, and a few other privileged commoners to carry deadly weapons[25]—would be startling indeed.

This subject carries enormous public policy implications for today and, for that reason, carries considerable emotional baggage. Many interpretive hazards await the historian who studies the origin of laws regulating the concealed carrying of deadly weapons, but perhaps the most important risk is overgeneralization. Eight states passed concealed weapon laws in the early Republic (1776-1846), going upstream against the current of American tradition. There is no reason to presume that every state passed its law with

the same motivation. As is often the case when a state legislature passes a law, we may find a mixture of purposes within one state, or even within one statute. We must also accept the troubling possibility that because of a lack of records, we may not be able to determine *why* a particular state passed its first concealed weapon law.

Another hazard is that we must distinguish the proximate cause of these laws from the underlying cause. As we will see when we examine the statutes themselves and the newspaper coverage of their passage, the stated intent was always to reduce unnecessary bloodshed. But why did some states have enough deadly violence—or believe that they had enough deadly violence—to justify passing such laws, while other states did not? Why did some states pass laws banning concealed carrying of deadly weapons instead of some other strategy for dealing with their misuse? In the following chapters, we will explore why this culture of violence developed and why concealed weapon laws seemed like a solution to this problem—contrary to Beccaria's logic.

It would appear that the reason that Beccaria's powerful theory was ignored is that concealed weapon laws in the early Republic were not intended as a solution to a general problem of violence. Instead, concealed weapon laws were a solution to one very specific type of violence—and that category of violence was in turn a side effect of a well-intentioned effort at reforming American society.

---

23. Cesare Beccaria, *On Crimes And Punishments*, trans. by Henry Paolucci (New York: Bobbs-Merrill Co., 1963), 87-88.

24. Marcello Maestro, *Cesare Beccaria and the Origins of Penal Reform* (Philadelphia: Temple University Press, 1973), 3, 134-138, 141-142; John Adams, *Legal Papers of John Adams*, edited by L. Kinvin Wroth and Hiller B. Zobel (Cambridge, Mass.: Harvard University Press, 1965), 3:248; Stephen P. Halbrook, *That Every Man Be Armed* (Albuquerque: University of New Mexico Press, 1984; reprinted Oakland, Calif.: The Independent Institute, 1984), 35, 209.

25. Lee Kennett and James LaVerne Anderson, *The Gun in America: The Origins of a National Dilemma* (Westport, Conn.: Greenwood Press, 1975), 10-16; Richard W. Kaeuper, *War, Justice, and Public Order: England and France in the Later Middle Ages* (Oxford: Clarendon Press, 1988), 17, 244-245; John H. Mundy, *Europe in the High Middle Ages: 1150-1309*, 2nd ed. (New York: Longman Group, 1991), 94; James G. Leyburn, *The Scotch-Irish: A Social History* (Chapel Hill, N.C.: University of North Carolina Press, 1962), 10.

Pgs. 9-11

# Chapter 2

# Social Control of Free Blacks

There are a number of hypotheses for why concealed weapon laws appear in the United States in the period before the Mexican War. Much of the published research argues that concealed weapon statutes have a curious connection to the institution of slavery. The slave states led the rest of the nation in adopting laws regulating concealed carry, usually forty years in advance of the North and West.[1] The combination of time and place suggests that these laws could have been part of the system for social control of free blacks. ("Social control" in this context means the collection of laws and attitudes that restrain behavior through punishment, the threat of punishment, and social pressure.)

It is easier to draw a causal connection between race-specific[2] arms laws and slavery than between the race-neutral concealed weapon laws and slavery. The slave states lived in dread of free blacks with weapons, terrified that these free blacks might assist

---

1. Cramer, *For the Defense of Themselves and the State*, 92-95; Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80:2 [December 1991]:331-338. These two works are the originators of this theory—and the recent date of both works should give some indication of how little historical research has been done on the topic of concealed weapon laws.

2. For the purposes of this work, a *race-specific* law is a statute that explicitly applies to a particular race or ethnic group; a *race-neutral* law is, as written, equally applicable to all races and ethnic groups, though it may be race-specific in its application, intent, or effects.

slaves in rebellion.[3] Several slave states considered dogs to be
weapons. Both Virginia and Maryland prohibited free blacks from
owning dogs without a license, and Maryland authorized any white
to kill an unlicensed dog owned by a free black. Mississippi went
further and prohibited *any* ownership of a dog by a black person,
without even a provision for licensed ownership.[4]

However, the southern states often passed extreme measures in
response to slave rebellions, but enforced them sporadically or se-
lectively. In a *New York Daily Times* article published July 8, 1853,
Frederick Law Olmsted described a conversation with an Alabama
lawyer who believed that Alabama would never enforce its recent
ban on slave ownership of dogs.[5] Something of the laxity of en-
forcement of Mississippi's black codes with respect to arms may be
deduced from a complaint from the Chickasaw, Mississippi, *Union*
reprinted in the *North Alabamian* that, "And many of our ne-
groes . . . fancy that, in defence of their *honors* [sic], they must
carry loaded pistols and long knives! We do things on a magnicent
[sic] scale here in Pontotoc!—Negroes going armed. . . . It was but
last week that a negro gave a very fashionable stab in the side to a
*gem'man* of the same color, who had won his clothes at cards!"[6]

If concealed weapon laws were intended to control free blacks,
the overwhelming lead of the slave states in concealed weapon laws
would then make considerable sense, for the slave states also con-
tained the highest percentages of free blacks.[7] Surprisingly, after
Nat Turner's Rebellion in 1831, free blacks in the South were usu-

---

3. Marina Wikramanayke, *A World in Shadow: The Free Black in An-
tebellum South Carolina* (Columbia: University of South Carolina
Press, 1973), 151; Peter Kolchin, *American Slavery: 1619-1877* (New
York: Hill & Wang, 1993), 85; Cramer, *Black Demographic Data*, 27-28.

4. Theodore Brantner Wilson, *The Black Codes of the South*
(University: University of Alabama Press, 1965), 26-30; June Purcell
Guild, *Black Laws of Virginia* (Richmond, Va.: Whittet and Shepper-
son, 1936; reprinted New York: Negro Universities Press, 1969), 118.
For an examination of race and arms control laws (not just those regu-
lating the carrying of concealed weapons) covering a broader period of
history, see Clayton E. Cramer, "The Racist Roots of Gun Control,"
*Kansas Journal of Law & Public Policy* 4:2 [Winter 1995]:17-25.

5. Frederick Law Olmsted, *The Papers of Frederick Law Olmsted*, ed-
ited by Charles E. Beveridge and Charles Capen McLaughlin
(Baltimore: Johns Hopkins University Press, 1981), 2:183.

6. "Our Town," (Tuscumbia) *North Alabamian*, February 24, 1837, 2.

7. Cramer, *Black Demographic Data*, 96.

---

ally subject to *more* severe arms restrictions than slaves. Southern
legislatures apparently believed that a master could and would
closely supervise a slave's use of arms for hunting, while free blacks
were, in effect, slaves without masters, and therefore more danger-
ous than slaves.[8] Even where it was illegal, masters occasionally
allowed slaves access to firearms. Olmsted described his surprise at
finding slaves in Georgia who owned guns, "which they kept in
their cabins" with the knowledge of their master, and apparently in
violation of Georgia law.[9]

Even Indiana, the one free state in the group, is less an anomaly
than might first appear. Southerners played a prominent role in
settling Indiana.[10] Indiana was one of a small number of free states
during the early Republic that passed statutes regulating immigra-
tion of free blacks,[11] and as late as 1820, the year that Indiana
passed its first concealed weapon law, Indianans still kept slaves in
violation of the Northwest Ordinance of 1787.[12]

Five of the eight early concealed weapon laws appeared in the
1830s after Turner's Rebellion. Turner's Rebellion provoked enor-
mous fear among white southerners,[13] and unleashed a barrage of

---

8. Cottrol and Diamond, "The Second Amendment," 335-337; Guild,
*Black Laws of Virginia*, 96, 107, lists 1806 as the year that free blacks
in Virginia were forbidden to carry firearms without a license, and
1832 as the year that they were forbidden to carry firearms under any
conditions.

9. Olmsted, *The Papers of Frederick Law Olmsted*, 2:184-185.

10. Andrew R. L. Cayton, *Frontier Indiana* (Indianapolis: Indiana
University Press, 1996), 294; Bruce Catton, *Glory Road* (Garden City,
N.J.: Doubleday & Co., 1952), 115.

11. See Cramer, *Black Demographic Data*, 31-49, for a discussion of
internal immigration restrictions, "slave-dumping," and its part in cre-
ating the 1831 Indiana black immigration bond requirement. Eugene
Berwanger, *The Frontier Against Slavery: Western Anti-Negro Prejudice
and the Slavery Extension Controversy* (Urbana: University of Illinois
Press, 1967), 7-59, discusses Indiana hostility towards blacks, both free
and slave.

12. Cramer, *Black Demographic Data*, 14-15, 111; Northwest Ordi-
nance (1787), Art. VI; Berwanger, *The Frontier Against Slavery*, 7-12;
Emma Lou Thornbrough, *The Negro in Indiana: A Study of a Minority*
(Indianapolis: Indiana Historical Bureau, 1957), 1-14.

13. Stanley M. Elkins, *Slavery* (Chicago: University of Chicago Press,
1968), 209, 220; Harriet Jacobs [Linda Brant], *Incidents in the Life of a
Slave Girl* (Boston: n.p., 1861), in Henry Louis Gates, Jr., ed., *The Clas-
sic Slave Narratives* (New York: Penguin Books, 1987), 395-396; Eric

cided that the Fourteenth Amendment protected only those rights associated with national citizenship. Therefore, because a group of Klansmen had broken up a freedmen's political rally associated with a *state* election, not a federal election, the First Amendment's guarantee of freedom of assembly did not apply to this case, nor did the Second Amendment guarantee of a right to keep and bear arms.[23]

In this century, the U.S. Supreme Court, as part of an emerging civil libertarian consensus that state governments had too much power, did a dramatic about-face regarding the protections of the Fourteenth Amendment. Using the Fourteenth Amendment's due process clause, and the wonderfully elastic notion that some rights were "implicit in the concept of ordered liberty," the U.S. Supreme Court began to selectively incorporate bits and pieces of the Bill of Rights into the Fourteenth Amendment, protecting some individual liberties from state laws. The Second Amendment is one of the few guarantees of the Bill of Rights still not incorporated.[24]

While this concern about the Fourteenth Amendment explains the race-neutral immediate postbellum weapon laws, why would these concealed weapon statutes, passed at a time when the Fourteenth Amendment did not yet exist, need to be race-neutral? In the case of Louisiana, to be discussed later in this work, there are some interesting acknowledgments of the important political role that free blacks played that might have restrained racially discriminatory laws.

Another possible explanation for why concealed weapon laws might be written in a race-neutral form, and yet be intended for selective enforcement, is the sometimes confused view of the state

23. *U.S.* v. *Cruikshank*, 92 U.S. 542, 552, 553 (1876); Forrest McDonald, *A Constitutional History of the United States* (New York: F. Watts, 1982; reprinted Malabar, Fla.: Robert E. Krieger, 1986), 144. See also *Presser* v. *Illinois*, 116 U.S. 252, 265 (1886) and *Miller* v. *Texas*, 153 U.S. 535, 538 (1894) for other examples of the U.S. Supreme Court's refusal to recognize full incorporation with respect to the Second Amendment.

24. Sanford Levinson, "The Embarrassing Second Amendment," *Yale Law Journal* 99 [December 1989]:652-655; Cottrol and Diamond, "The Second Amendment," 346-349; Cramer, *For the Defense of Themselves and the State*, 124-131, 142, 188-193; Page Smith, *The Constitution: A Documentary and Narrative History* (New York: William Morrow & Co., 1978), 448-462, 468-469, 508-523; McDonald, *A Constitutional History*, 190-193, 210-224.

supreme courts concerning the rights of free blacks. In spite of the widespread belief that "free persons of color are not parties to our social compact,"[25] state supreme courts, even in slave states, occasionally recognized that free blacks had constitutional rights that the legislature could not violate.[26]

Another problem with the "social control of free blacks" theory is that there is no hint of it in the surviving legislative history of these laws or in the decisions of the state supreme courts. Unlike the postbellum weapons statutes, where both supporters and opponents occasionally allude to race or ethnicity as motivations,[27] the antebellum decisions repeatedly discuss crimes of passion, with no indication that race plays any part.

Of course, the courts may not have had a perfect understanding of why the legislature passed a law, especially if decades separated enactment and the court's decision. Legislators may have also intentionally "covered their tracks" for political reasons, knowing that a law violated the state constitution. In the absence of any contradictory evidence, however, and if it fits the historical context, a historian should accept the stated legislative intent as the most likely motivation. To do otherwise turns history into polemic or conspiracy theory. (For an examination of the problems of sources in the early Republic, see Appendix B.)

25. *Rhody Ely* alias *Holly* v. *Matthew Thompson et al.*, 10 Ky. 981, 985 (1820).

26. *Rhody Ely* alias *Holly* v. *Matthew Thompson et al.*, 10 Ky. 981, 984, 985 (1820) struck down a law providing for summary lashing of a free black for "raising his hand in opposition to a white person" because it violated the Kentucky Constitution's guarantees concerning "cruel and unusual punishment" and due process.

27. *English v. State*, 35 Tex. 473, 479, 480 (1872); *Watson v. Stone*, 4 So.2d 700, 703 (J. Buford concurring) (Fla. 1941); *State v. Nieto*, 101 Ohio St. 409, 430, 130 N.E. 663 (J. Wanamaker dissenting) (1920).

sentence or acquittal. Acquittals encouraged aggrieved parties to engage in lynch law.[68]

Thomas Cather, an Ulster Scot traveler to America in the 1830s, commented on the reluctance of the criminal justice system in the South and West to interfere in violence: "Everyone goes armed with dagger, Boey [Bowie] knife, or pistols, and sometimes with all three, and in a society where the passions are so little under control it is not to be wondered . . . that murderous affrays should so often take place in the streets." Cather gave an example of political argument that advanced to stabbing that he witnessed at Frankfort, Kentucky.[69]

Occasionally—but only occasionally, and thus showing how valuable outsiders' accounts are in seeing what the inhabitants of the society could not see—the weakness of the criminal justice system became a point of complaint from newspapers of the area. An 1837 Helena, Arkansas, newspaper related the story of an Alabama man who had been arrested locally, then returned to Alabama for trial where he was convicted of manslaughter. The jury sentenced him to a $500 fine and twelve months imprisonment. The newspaper lamented, "Rather a slim punishment for homicide!"[70]

This tradition of personal violence to resolve insults and minor disputes, rather than relying on the government, appears to have persisted in the South to the present. Richard E. Nisbett and Dov Cohen demonstrated that white non-Hispanic southerners into the 1970s regarded violence as an acceptable response for personal insults, suppressing dissenting opinions, and for self-defense, at a much higher rate than white non-Hispanic northerners.[71] Even more impressive than public opinion survey results are the laboratory experiments in which southern male college students were measurably and significantly different in physiological response to insults than comparable northern male college students.[72]

One consequence of this back country tradition of personal vengeance was widespread carrying of arms for self-defense. Ken-

68. Ingraham, *The South-West*, 2:186-189.

69. Thomas Cather, *Voyage to America: The Journals of Thomas Cather*, edited by Thomas Yoseloff (New York: Thomas Yoseloff, 1961; reprinted Westport, Conn.: Greenwood Press, 1973), 143-144.

70. "Wm. P. McGrew, who was arrested in this State last fall . . . ," (Helena, Ark.) *Constitutional Journal*, December 14, 1837, 2.

71. Nisbett and Cohen, *Culture of Honor*, 26-32.

72. Nisbett and Cohen, *Culture of Honor*, 41-50.

Pg. 36

tucky lawyer Ben Hardin told a jury in 1839 that the carrying of deadly weapons was a rare thing in the northern states, yet as you went south, "though you would be a peaceable man," the carrying of deadly weapons became much more acceptable. *The New Englander* magazine in 1844 appears to have shared Hardin's belief in the geographic concentration of the carrying of deadly weapons.[73]

In 1882, well after the period under examination, the Louisville *Courier-Journal* observed that the failure of the criminal justice system to punish murder encouraged people to carry concealed weapons (in violation of the law) for their own safety. Like so many of the other sociological phenomena in this matter, it is difficult to distinguish the cause from the symptom. Supporters of concealed weapon regulation argued that the widespread practice contributed to the problem of murder; but high rates of murder and a criminal justice system that took a relaxed view of killing created a powerful reason to carry deadly weapons for self-defense.[74]

Indeed, the two practices appeared to build upon each other. While southern culture emphasized politeness in an attempt to restrain boisterous passions,[75] the widespread carrying of concealed weapons created an excuse for firing on an enemy during an argument, with the killer "professing that he had acted in self-defense because he believed the victim was armed."[76] Who could prove that belief was in error?

Significant with respect to the development of early Republic concealed weapon laws, "startlingly few antebellum Southern murders occurred among people closely related by blood or matrimony. . . . [T]he Southern killer was inclined to wreak vengeance upon some stranger or acquaintance who insulted him. . . ."[77] Restricting concealed weapons would make sense for protecting someone other than a family member; domestic violence seems unlikely to be influenced by regulating concealed weapons.

While many modern historians have tended to identify this violent back country culture as a consequence of Scots-Irish origins, others explain this culture of violence as having economic and class struggle origins. Elliott J. Gorn's *American Historical Review* essay on "rough-and-tumble" fighting in the antebellum South is well

---

73. Robert M. Ireland, "Homicide in Nineteenth Century Kentucky," *Register of the Kentucky Historical Society* 81:2 [1983]:136-137.

74. Ireland, "Homicide in Nineteenth Century Kentucky," 139.

75. Nisbett and Cohen, *Culture of Honor*, 38.

76. McWhiney, *Cracker Culture*, 163.

77. Wyatt-Brown, *Southern Honor*, 381.

pg. 8ce

istrates administer our good wholesome laws with some of Gov. Tacon's decisions.[2]

Another example of this increasing concern—or at least awareness—of an increasing level of concealed carrying of weapons appears in the *Clarke County* (Ala.) *Post*, that reported, "No dirk has been seen in the Ohio Legislature since a member appeared there with a wooden one stuck in his bosom, and a long corn-cob handle attached to it."[3] The symbolism of the corn-cob handle is obscure, but that it was intended as ridicule of the practice of carrying deadly weapons is clear.

As the Louisiana statute's preamble showed, and will be seen with some of the Alabama editorials, banning of concealed carrying of deadly weapons was often carelessly equated with a ban on *any* form of wearing deadly weapons. This suggests (but does not prove) that the open carrying of deadly weapons was subject to sufficient social stigma to guarantee that a ban on concealed carry was, effectively, a ban on all carrying.

If any state typified the back country culture of violence better than Kentucky, it may well have been Arkansas. The same year that Arkansas became a territory, the commander of the territorial militia was killed in a duel. One superior court judge killed another in 1824 over a card game. In 1827, "the territorial secretary killed a territorial delegate in an affair of honor. To a greater degree than in other territories, violence in Arkansas involved some of the leading public officeholders."[4] Malcolm J. Rohrbough observed, "Arkansas had more than its share of bloodshed. Almost everyone went armed. The columns of the *Arkansas Gazette* carried numerous accounts of the violence and mayhem that human beings committed against one another, much of it in the name of personal honor."[5]

Many of the statutes adopted in the period 1837-1839 identified two specific weapons that were banned for concealed carry. One was the Bowie knife, first developed in Arkansas. The other was the Arkansas toothpick. These two weapons themselves have a story to tell, and it is a reminder that although terror is not a rational reaction, it often plays a part in the making of laws.

---

2. "Wearing deadly Weapons," (Tuscumbia) *North Alabamian*, June 23, 1837, 2.
3. "The force of Ridicule," *Clarke County* (Ala.) *Post*, June 16, 1837, 1.
4. Rohrbough, *The Trans-Appalachian Frontier*, 273-274.
5. Rohrbough, *The Trans-Appalachian Frontier*, 284.

P5. 101

bill has passed the House, not without opposition, to guard and pro-
tect the citizens of this State, against the too frequent use of deadly
weapons—yeas 64, nays 90."[16]  (Since the bill did pass the House,
the yeas and nays count appears to be impossible.)  Final passage of
the law was reported as, "An act to protect the citizens against the
use of weapons."[17]  A detailed examination of the Savannah *Daily
Georgian* for December 1837 reveals even less coverage of the con-
cealed weapons law.[18]

The statute as passed was wordy, vague, and internally inconsis-
tent.  The law's title explained its goal as, "to guard and protect the
citizens of this State, against the unwarrantable and too prevalent
use of deadly weapons."  To that end, it prohibited sale, offering for
sale, or possession "about their person or elsewhere, any of the
hereinafter described weapons, to wit: Bowie, or any other kind of
knives, manufactured and sold for the purpose of wearing, or car-
rying the same as arms of offence or defence, pistols, dirks, sword
canes, spears, &c., shall also be contemplated in this act, save such
pistols as are known and used, as horseman's pistols, &c."  Along
with being a crime against grammar, this first section prohibited
both concealed and open carrying of arms.

The second section of the law specified a fine of $100 to $500 for
a first offense, and $500 to $1000 for a second offense.  These are
enormous fines for the period, indicative of a very serious crime in-
deed.  Yet there is no provision for imprisonment.

The third section provides a clue that the legislators were wor-
ried that the law might not be enforced: "*And be it further enacted
by the authority aforesaid,* That it shall be the duty of all civil offi-
cers, to be vigilent [sic] in carrying the provisions of this act into
full effect, as well also as Grand Jurors, to make presentments of
each and every offence under this act, which shall come under their
knowledge [emphasis in original]."

The fourth section, in addition to identifying who was to receive
fines under this act, contained two exemptions that appear to con-
tradict the first section, by exempting both law enforcement officers
"in actual discharge of their respective duties, but not otherwise"

---

16. "Georgia Legislature," *Brunswick* (Ga.) *Advocate*, November 30,
1837, 3.
17. (Milledgeville, Ga.) *Federal Union*, January 2, 1838, 3; "List of
Acts," (Milledgeville) *Georgia Journal*, January 2, 1838, 2; "Acts
Passed," *Brunswick* (Ga.) *Advocate*, January 18, 1838, 2.
18. (Savannah) *Daily Georgian*, December 1837.

Pg. 102

and "Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view."[19] This law did not so much ban concealed carrying of deadly weapons as much as it banned *all* carrying of deadly weapons except the very large "horseman's pistols," and exempted a number of edged weapons while openly carried.

Considering the severity of the law and the apparently hurried, careless manner in which it was drafted, the absence of news coverage concerning concealed weapons and violence is somewhat surprising.  The only indication of opinion on the subject of carrying concealed weapons was a January 16, 1838, account in the *Southern Recorder* quoting another paper, apparently the Columbia, South Carolina, *Times and Gazette*, which reported a drunken brawl that ended with a serious injury to an innocent bystander:

> Mr. B. D. Boyd, a highly respectable and correct young man, and an officer in the Commercial Bank, together with an [sic] another young man in the room, interfered to prevent further aggressions by either party.  Stewart, however, drew a pistol, and, in mistake we presume, shot Boyd in the lower part of the abdomen.  Stewart is said to be from Mississippi, and about 17 years of age.

> We regret the necessity that calls for the publication of these facts, but public opinion must be made to bear upon the common practice among our young men of carrying deadly weapons in a peaceably [sic] community.[20]

Yet in spite of the supposed generality of such deaths caused by concealed weapons, coverage of homicides in the Georgia newspapers of the period was astonishingly sparse.  The only homicide covered in the Milledgeville *Georgia Journal* for the four months October 1837 through January 1838 was the death of a member of the Savannah City Watch, apparently the result of someone breaking his neck—with a single blow to the jaw.[21]  An Alabama paper from

---

19. *Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837*, 90-91.

20. "More of the Effects of Carrying Concealed Weapons," (Milledgeville, Ga.) *Southern Recorder*, January 16, 1838, 3. The same article appears as "More of the Effects of Carrying Concealed Weapons," (Milledgeville) *Georgia Journal*, January 9, 1838, 2.

21. "Probable Murder," (Milledgeville) *Georgia Journal*, January 2, 1838, 3.

Pg. 113

# Chapter 10

# Virginia

Virginia is one of those states where two different British cultures met: Virginia cavaliers in the lowlands, and Scots-Irish in the back country. Elliot Gorn argued that the back country culture of violence rolled down slope towards the Virginia tidewater aristocrats in the years around the Revolution and, along with the decline in rigid social stratification, committed mayhem on cavalier traditions of dueling.[1] After the Revolution, even among aristocrats, brawling began to replace dueling. The back country culture is one explanation for this change; so is the democratization of Virginia culture. But there is one other possible explanation why brawling and murder replaced the genteel aristocratic practice of dueling, and one consistent with the evidence from other states: Virginia passed a statute prohibiting dueling in 1810, in response to the 1809 dueling death of a Revolutionary War veteran named Pope.[2]

As in other states that adopted concealed weapon laws in the early Republic, observers noted a connection between restrictions on dueling, the carrying of concealed weapons, and brawling. Elias Pim Fordham was one of the many Englishmen who came to America in the aftermath of the Napoleonic Wars, when economic

---

1. Gorn, " 'Gouge and Bite . . . ,' " 19.
2. Stevens, *Pistols at Ten Paces*, 42, 46.

*pg. 114*

hardships in rural Britain turned many liberal eyes towards America.[3] Fordham's description of Virginians indicates that:

> They used to be great duellists; but since the laws against duelling are enforced with rigour, the young men, I am told, carry dirks and decide their quarrels upon the spot. This, I am assured, is a common practice. One young man was cut in the hand by a dirk at the tavern we slept at, soon after we went to bed. . . . It seems there is something in the influence of the fervid sun, under which they live, or probably in their education; for now duelling is prevented, they do not quarrel less frequently; but they (that is the young men) draw the dirks, which they usually wear, and stab one another upon very slight provocations.[4]

The editor's note on this entry quotes a contemporary British traveler, Birkbeck, that, "A dirk is said to be a common appendage to the dress of a planter in this part of Virginia." That a dirk "is said to be" suggests that such weapons were commonly carried, but not openly.

In spite of Virginia's long history and many early newspapers, determining the legislative history of Virginia's 1838 concealed weapon statute is quite difficult. The only Virginia newspaper available to this historian was the *Alexandria* (D.C.) *Gazette*. Unfortunately, Alexandria was still part of the District of Columbia in 1837-1838, and the *Alexandria Gazette*'s coverage of Virginia news was very limited, with so little discussion of Virginia politics as to be useless for determining the motives behind the concealed weapon statute.[5]

Virginia's 1838 statute, while sharing some common features with other laws of the period, had some interesting differences as well. The first section of the statute, rather than prohibiting concealed carrying of deadly weapons under all conditions, with a few limited exceptions, prohibited the practice only for those who "habitually or generally" carried concealed "any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which

---

3. Frederic Austin Ogg, "Editor's Introduction," in Fordham, *Personal Narrative*, 13-16.

4. Fordham, *Personal Narrative*, 49, 56.

5. *Alexandria* (D.C.) *Gazette*, December 1837.

pgs. 140-141

the method for resolving insults. Without dueling as a choice, especially among those who sought positions of honor and respect in state government, homicide and the risk of trial for it were preferable to dishonor. The reformers now found it necessary to take a second step against the popular culture—they banned what had been a lawful practice throughout the United States, and in the southern states a common practice—carrying concealed deadly weapons.

The reformers understood when they developed dueling oaths that this was an attempt to circumvent popular tolerance of dueling, hence their extrajudicial nature. Similarly, their attempts to suppress the accepted practice of carrying concealed deadly weapons included: very substantial bounties for turning in violators; allowing private parties to act as prosecutors; orders to judges and grand juries to remind them of their responsibility to enforce the new laws; and, in the case of Virginia, double jeopardy for concealed carrying of deadly weapons. The reformers were taking no chances on the people subverting the concealed weapon laws, as they had subverted the dueling laws.

An editorial in the Tuscumbia *North Alabamian* in 1837, while written concerning dueling, appears to have been true for the carrying of concealed weapons as well. The reformers might have saved themselves considerable wasted effort had they considered the hazards of passing laws contrary to public opinion. While lauding Mississippi's August 4, 1837, statute to suppress dueling, the editorial writer admitted there were limits to what such laws could do in the face of public opinion:

We view this attempt at reform by the Mississippi Legislature, as an experiment, the success of which is doubtful, being dependant [sic] entirely on the energy and moral state of public sentiment, to carry it into execution. In itself, the law is certainly very good. It is a most laudable effort to prevent bloodshed and crime, and reflects the very highest credit on the character of its framers, but there is much reason to doubt whether it is not too far in advance of public morality in Mississippi, to be strictly regarded. . . . So long as men are in the habit of considering the practice of dueling an *honorable* and *just* mode of settling personal differences, so long, of course, they will look on the observance of the laws enacted for its suppression, as *dishonorable* and *unjust*, and consequently, unworthy their regard. The only remedy which will ultimately

prove effectual, must be looked for in an improved state of the moral sense of the people [emphasis in original].[2]

These laws were contrary to the "moral state of public sentiment," and most probably ineffective. A concealed weapon, by its very definition, is unlikely to come to the attention of a criminal justice system unless the weapon is used, either criminally or in self-defense. Until public sentiment changed at the time of the Civil War, the choice was dueling or hot-blooded homicide. Once killing over minor insults became disreputable, the laws that completely banned the carrying of concealed deadly weapons became an anachronism. As the twentieth century began, these complete prohibitions were replaced by laws that granted licenses (in an often abusively discretionary manner) to carry deadly weapons concealed.[3]

In the last few years, a number of states have experimented with laws that take away nearly all discretion in the issuing of licenses, such that most adults without felony convictions can obtain a license. As of this date, every early concealed weapon law state has either by legislative or judicial action adopted such laws—and to the great surprise of opponents, the expected bloodbath has failed to appear. The culture of honor has substantially abated among the general population, and the background checks required for concealed weapon licenses have effectively excluded the fraction of the population that seems like it might fit well into the 1830s back country.

Each of these states might benefit from more detailed historical examination with respect to the passage of their concealed weapon laws, but at first examination, the evidence seems fairly clear: reformers tried to use laws to improve the morals of the masses, and it did not work.

2. "Worthy of Imitation," (Tuscumbia) *North Alabamian*, August 11, 1837, 2.

3. See Cramer, *For the Defense of Themselves and the State*, 153-157, for an examination of how the judiciary dealt with challenges to such laws.



# Appendix B

# Limitations of Sources

Determining the motives for the concealed weapon laws of the early Republic is quite a challenge because of the absence of documents. The historian who researches federal laws of the same period, no matter how far back, has an advantage of extraordinary value: he has access to the official journals of Congress mandated by the U.S. Constitution,[1] and carefully preserved. When it comes to the state legislatures, the historian is much less fortunate. Legislative journals, especially for the laws passed in the period 1813-1820, are seldom available. Even when they have been preserved, they usually contain little more than a list of votes and actions taken on a bill.

Newspapers are also a struggle. Only some newspapers of this period survived into the modern period to be copied, and even those that have survived are sometimes not intact. The microfilmed newspapers of the period faithfully reproduce the cigarette burns, coffee cup rings, and oxidation damage inflicted on the originals in the decades between publication and preservation. Even where the microfilm provides a readable copy, most local newspapers of the South up through the 1830s provide very limited legislative coverage other than reprinting the official legislative journals.

While the absence of newspapers is a problem, the presence of newspapers can also be a hazard. For some of the early Republic concealed weapon law states, there are *no* surviving newspapers that cover the period of interest. For others, there is only one newspaper, and there is always the hazard that this one source pre-

---

1. U.S. Constitution, Art. I, § 5, cl. 3.

sents a very inaccurate or biased perspective on the legislature's actions. This is especially a problem in an era when newspapers were fiercely partisan, pretensions of journalistic objectivity did not exist, and most newspapers relied upon other, similarly trustworthy newspapers for coverage of events in other cities and states.

But while legislative actions and intentions are sometimes hard to document, there is a wealth of information about society in these states—and as previous chapters showed, there was often a significant division between what the government mandated and what the people did. A stream of travelers toured America in the period 1800-1860, and from the volume of their published works it would appear that a few of these travelers did *not* write an account of their experiences. Like the problem of trusting one newspaper, a single traveler's account of society in the states of interest might be highly biased. Fortunately, there are so many of these accounts that agree with each other or with other sources on questions relating to concealed weapons law, in spite of sometimes wildly differing ideologies, that their accuracy seems likely.

It is tempting, as statistical analysis is often applied (and misapplied) to the problems of violence in the modern era, to attempt the same approach with these concealed weapon laws. This historian recognizes his limitations when it comes to statistics, and unfortunately, the method commonly used by criminologists to isolate causative factors—logistic regression analysis of large data sets—is inapplicable to this historical problem because of the absence of adequately reliable data for this period. Nearly all statistics compiled during the antebellum period should be regarded with skepticism. The federal government possessed both limited authority and limited interest in gathering useful social statistics until late in the antebellum period. Even the dramatic expansion of data gathering associated with the 1850 census should be regarded with considerable skepticism (as it was, even then); the 1850 census mortality data gives an illusion of precision that is not warranted by the methods used to gather it.

A study of southern violence would be an interesting problem for someone with the right skills in statistical analysis and the resources to devote to gathering the necessary data. Unfortunately, there is no comprehensive and trustworthy data base that would allow for regional or state comparisons of violence in the antebellum period, though such projects are now under way, such as the one

under Professor Randy Roth's direction at Ohio State University.[2] Vital statistics registration programs started in some states in the 1840s and 1850s, too late to provide us with direct evidence, and even these programs are concentrated in Northeastern states where the concealed weapon laws were entirely absent.[3]

The 1850 census gathered mortality statistics, but these numbers were acquired by asking each household about deaths in the preceding year. The inaccuracy of this mortality data was immediately recognized by Congress. The noted statistician Edward Jarvis believed that not only were these figures inaccurate as absolute numbers, but that regional variations in collecting the data made even relative mortality rates between the states untrustworthy.[4] More recent analyses give different conclusions as to the accuracy of the 1850 mortality data, with some historians claiming that deaths were undercounted by as much as 40 percent,[5] while others suggest that the undercounting was somewhat less dramatic.[6] The problems associated with this methodology lead most historians of the census to the conclusion that "the results are subject to a very wide margin of error."[7]

Homicides then and now are a tiny fraction of all deaths, and there are reasons to suspect that this subset of the 1850 mortality data is even less reliable and more prone to undercounting. Especially with respect to deaths from honor violence, we should expect that shame might lead to underreporting.

There is general agreement that single young men were the most likely to be both murderers and murder victims. Since single

2. E-mail to the author from Professor Randy Roth, Ohio University, November 26, 1997.

3. James H. Cassedy, *Medicine and American Growth, 1800-1860* (Madison: University of Wisconsin Press, 1986), 83; Gretchen A. Condran and Eileen Crimmins, "A Description and Evaluation of Mortality Data in the Federal Census: 1850-1900," *Historical Methods* 12:1 [Winter 1979]:1-3.

4. Margo J. Anderson, *The American Census: A Social History* (New Haven, Conn.: Yale University Press, 1988), 47; Condran and Crimmins, "Description and Evaluation," 5.

5. Cassedy, *Medicine*, 191, 261 n. 10.

6. Condran and Crimmins, "Description and Evaluation," 6-7.

7. Laurence F. Schmeckbier, *The Statistical Work of the National Government* (Baltimore: Johns Hopkins Press, 1925), 118.



young men are more likely than others to not be part of a household, death reporting by households seems likely to underreport deaths of the group most at risk. It is also not clear whether this underreporting would be consistent from region to region, making reliance on the 1850 mortality statistics foolish.

The time may come when sufficient statistical information has been gathered for these states during this period to engage in statistically significant analysis. That time, however, does not seem to have arrived—yet. The absence of trustworthy violent crime statistics for the period and the deficiencies of surviving records mean that the most effective strategy for determining the motives of the early Republic concealed weapon laws must be a traditional historiographical strategy.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   DISTRICT OF RHODE ISLAND

 3

 4    MICHAEL O'NEIL, ET AL.,

 5          Plaintiffs,

 6

 7      vs.                    Case No. 23-CV-00070-WES-PAS

 8

 9    PETER F. NERONHA, IN HIS OFFICIAL CAPACITY AS ATTORNEY

10    GENERAL OF THE STATE OF RHODE ISLAND, AND THE STATE OF

11    RHODE ISLAND,

12          Defendant.

13                  ~~~~~~~~~~~~~~~~~~~~

14                        VOLUME 1

15              Videoconference Deposition of
                        CLAYTON CRAMER
16
                        October 11, 2024
17                        10:02 a.m.

18                  Taken via Zoom at:
                      Caldwell, Idaho
19

20

21

22

23

24

25    Court Reporter - Michele A. Durig, RPR
```



```
 1   APPEARANCES:

 2

 3   On behalf of the Plaintiffs:

 4
         Frank Saccoccio, Esq.
 5       Saccoccio Law Office
         928 Atwood Avenue
 6       Johnston, Rhode Island 02919
         Phone:  (401) 944-1600
 7       Email:  frank.cslawoffice@gmail.com

 8
         Thomas W. Lyons
 9       Strauss, Factor, Laing & Lyons
         One Davol Square, Suite 305
10       Providence, RI 02903
         Phone:  (401) 456-0700
11       Email:  tlyons@straussfactor.com

12

13   On behalf of the Defendant:

14
         James J. Arguin, Esq.
15       Paul Meosky, Esq.
         Rhode Island Office of the Attorney General
16       150 South Main Street
         Providence, RI 02903
17       Phone:  (401) 274-4400
         Email:  jarguin@riag.ri.gov
18

19

20

21

22

23

24

25
```



CLAYTON CRAMER                                    October 11, 2024
O'NEIL vs NERONHA                                              3

```
 1                    I N D E X

 2
                      WITNESS
 3
                                                 Page
 4
                  CLAYTON CRAMER
 5

 6   Examination By Attorney Arguin                5

 7

 8                    EXHIBITS

 9   Exhibit     Description                      Page

10
     Exhibit 1   Clayton Cramer's CV               16
11   Exhibit 2   Clayton Cramer's Declaration      41
     Exhibit 3   Book Review by Sally Hadden       70
12   Exhibit 4   Deposition testimony in New       75
                 Jersey Rifle & Pistol Clubs
13               V. Platkin
     Exhibit 5   Deposition testimony in           85
14               Oregon Firearms Federation,
                 Inc. versus Kate Brown
15   Exhibit 6   Deposition testimony of           89
                 Clayton Cramer in Oregon v.
16               Kotek
     Exhibit 7   1686 New Jersey Act Entitled     114
17               An Act against wearing Swords,
                 et cetera
18   Exhibit 8   1795 Massschusetts Act entitled 118
                 An Act for punishing Criminal
19               Offenders

20
     Exhibit 9   Excerpts of book "Concealed      136
21               Weapon Laws of the Early
                 Republic" by Clayton E. Cramer
22   Exhibit 10  1821 Tennessee Act on            148
                 preventing the wearing of
23               dangerous and unlawful weapons

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

1          ATTORNEY ARGUIN:  Mr. Cramer, do you have a

2   driver's license on you?

3          THE WITNESS:  Yes.

4          ATTORNEY ARGUIN:  Michele, can you see that?

5          THE REPORTER:  Yes, I can see it.  Thank you.

6   (Court reporter requests introductions and

7   stipulations.)

8          ATTORNEY ARGUIN:  I'm James Arguin.  And I'm

9   with the Rhode Island Attorney General's office.  And

10  we're representing this -- the Attorney General in

11  this matter.

12         Maybe Paul, you're from the same side.

13         ATTORNEY MEOSKY:  Sure.  Do we need to say

14  anything for the stipulation as well?

15         ATTORNEY ARGUIN:  Oh, yeah, thank you.  I

16  meant to say that.  Thanks, Paul.  We also -- in terms

17  of the remote deposition that's taking place for

18  Mr. Cramer, the State, on behalf of the Attorney

19  General, stipulates that the deposition is being taken

20  in a county other than where the witness is located.

21         ATTORNEY LYONS:  Thomas Lyons.  I represent

22  the plaintiffs in this case.  And we also agree to the

23  same stipulation.

24         ATTORNEY SACCOCCIO:  Attorney Frank Saccoccio,

25  representing the -- co-counsel with Tom Lyons,



```
 1   representing the plaintiffs.  And, yes, we stipulate

 2   to the deposition.

 3          ATTORNEY MEOSKY:  And then Paul Meosky for the

 4   State.  Also stipulating to the same.

 5                         *   *   *

 6                    CLAYTON CRAMER,

 7   having been duly sworn, was examined and testified as

 8   follows:

 9                       EXAMINATION

10   BY ATTORNEY ARGUIN:

11      Q.  All right.  Mr. Cramer, let me reintroduce

12   myself to you directly.  Thank you for joining us.

13   I'm sure it's very early there in Idaho.

14          I'm James Arguin.  I'm representing the

15   Attorney General in this matter with my colleague Paul

16   Meosky, who is also on the call.

17          Now, I understand you've been deposed before;

18   is that correct?

19      A.  Yes, I have.

20      Q.  Okay.  So I won't go through the whole

21   rigamarole, but let me just confirm a few basic ground

22   rules before we begin so we're all on the same page.

23      A.  Right.

24      Q.  Is that okay?

25      A.  Yes.
```



1          this -- I'd like to mark this as Exhibit 9.

2                      (Exhibit 9, marked)

3          Q.     (By Attorney Arquin)  And, Mr. Cramer, is

4    this the title page of your book on Concealed Weapon

5    Laws of the Early Republic?

6          A.     Yes.

7          Q.     Okay.  I'd like to go to one of the

8    discussions you have and ask you about this particular

9    quote.  Let me increase the font here.  This is on

10   page 86.  You see this?  Is that clear to you, page

11   86?

12         A.     Yes.

13         Q.     I'm referring particularly to this

14   passage on the second full paragraph, As the Louisiana

15   -- starting with, As the Louisiana statute's preamble

16   showed, do you see that?

17         A.     Yes.

18         Q.     What I was wondering, you go on to say,

19   As the Louisiana statute's preamble showed, and will

20   be seen with some of the Alabama editorials, banning

21   of concealed carrying of deadly weapons was often

22   carelessly equated with a ban on any form of wearing

23   deadly weapons.

24                And then you proceed, the next sentence



 1  says, This suggests, but does not prove, that the open

 2  carrying of deadly weapons was subject to sufficient

 3  social stigma to guarantee that a ban on concealed

 4  carry was, effectively, a ban on all carrying.

 5          Do you see that passage from your book?

 6      A.    Yes.

 7      Q.    And my question is, what social stigma

 8  are you referring to in this passage?

 9      A.    Well, it's certainly the case that if you

10  were carrying a Bowie knife, it would certainly mark

11  you as a potentially pretty dangerous person, and

12  because Bowie knives weren't often used in these sort

13  of sudden combats where someone felt insulted and felt

14  they had to do something about it.  Although the fact

15  that the laws in question only banned concealed carry,

16  as I pointed out, suggests, but does not prove, the

17  fact is that -- the fact that various State and

18  Supreme courts recognized open carry was protected

19  suggests that this could not have been a -- it's just

20  carelessness on the part of the people writing these

21  editorials.

22      Q.    But could it also not reflect the fact

23  that because of the, what you say is the stigma, the

24  social stigma, that open carry wasn't really a problem



1  back then?

2      A.    Well, it might not have been a problem in

3  the sense that people were not afraid of it.  I mean,

4  one of the things that I did find in the research I've

5  done is that the number of times that there is a

6  distinction made between concealed carry which is

7  regarded as the act of a ruffian and open carry which

8  seems not to have generated the same sort of general

9  hostility or hatred.

10          Concealed carry receives an enormous

11  amount of review from a lot of these court cases where

12  State Supreme courts are having to decide whether

13  concealed carry laws are Constitutional or not.

14      Q.    And let me -- why do you -- what's the

15  distinction you draw, because here in the book, this

16  paragraph in the book, you are talking about all

17  open -- open carrying of all weapons.  So, how -- it

18  seems like earlier you were drawing a distinction

19  between, you know, carrying a Bowie knife and carrying

20  other forms of deadly weapons, is that a distinction

21  you would draw or not?

22      A.    I would say that Bowie knives, there is a

23  panic over Bowie knives that takes place in the 1830s.

24  I think the problem was there was already an issue



1   they were concerned about.  There was a specific

2   incident in the Arkansas legislature, 1837, I think it

3   also played a role in this, two members of the

4   legislature got into argument on the floor of the

5   Arkansas House of Legislature, State House.  Both of

6   them drew concealed Bowie knives, which was already

7   illegal there, and they proceeded to get into a fight.

8   One of them died, and the survivor, who was the

9   Speaker of the House, was expelled by the House for

10  conduct unbecoming of a member.  And shortly -- within

11  a few months of that incident, which was widely

12  reported, there are these laws passed almost

13  everywhere in the southern states regulating concealed

14  carry and often just -- in the case of Tennessee, just

15  Bowie knives.

16       Q.    My point is, this statement in your book

17  refers to open carrying of all deadly weapons, not

18  just Bowie knives, correct?

19       A.    I don't quite understand what you asked.

20       Q.    I'm just pointing out, the quote from

21  your book is that this -- the suggestion is that the

22  open carrying of deadly weapons in all forms was

23  subject to sufficient social stigma that it wasn't

24  done?



CLAYTON CRAMER                                    October 11, 2024
O'NEIL vs NERONHA                                              140

1          A.     As I pointed out, suggests, does not

2     prove.  The fact is that there are certain level of --

3     if you're in Idaho, as I think I mentioned previously,

4     open carry is lawful.  For the most part, people do

5     not do it very often.  I've seen people do it, but it

6     seems pretty rare.

7          Q.     Let me --

8          A.     It's bad manners.

9          Q.     I'm sorry.  Were you finished?

10         A.     It's sort of bad manners, as far as I'm

11    concerned, and a lot of other people in Idaho feel

12    much the same way.

13         Q.     Yeah.

14         A.     We allow concealed carry without licenses

15    here.  And that's one of the reasons that open carry

16    seems to be coming less common.  A lot of people, like

17    my daughter, for example, she feels, it sort of

18    disturbs her when she sees an open carry.  It doesn't

19    disturb her that she knows a lot of people are

20    carrying concealed.  That's an example of social

21    stigma, there's certain level of disapproval where

22    people are clearly uncomfortable.

23         Q.     Well, I wonder if this, to your point

24    there, I'm moving within Exhibit 9 to page 114 of your



```
 1  book on Concealed Weapon Laws in the Early Republic,

 2  and I want to direct your attention to this quote

 3  here, Birkbeck, do you see that, The editor's note?

 4       A.    I'm not seeing it, no.

 5                ATTORNEY LYONS:  It's not up on the

 6       screen, Jim.

 7                ATTORNEY ARQUIN:  Oh, I'm going to

 8       stop sharing there.  Hold on.  Let me put it

 9       back up.  Let me reload that.  I don't know.

10       It stopped for some reason.

11       Q.    (By Attorney Arquin)  Do you see that

12  now?  This is again Exhibit 9, Concealed Weapon Laws

13  of the Early Republic, page 114, and I was directing

14  your attention to the full paragraph here beginning

15  with, The editor's note?

16       A.    Yes.

17       Q.    What I'm referring to is this quote from

18  Birkbeck.  I'm wondering if you can expand upon it

19  where you wrote that, A dirk is said to be a common

20  appendage to the dress of a planter in this part of

21  Virginia.

22                And then it goes on, That a dirk is said

23  to be suggests that such weapons were commonly

24  carried, but not openly.
```



1                     And can you expand on what you mean in

2      this portion of your book?

3           A.     Well, Birkbeck says, is said to be, what

4      that means is this is what people think.  Doesn't

5      necessarily mean it's true.  I mean, it could be that,

6      in fact, a lot of people were carrying dirks concealed

7      in that part of Virginia, but there's a lot of things

8      where people say or people think but it isn't

9      necessarily true.

10          Q.     But it still suggests, does it not, that

11     there were social stigma against carrying deadly

12     weapons openly during the Early Republic?

13          A.     Might well be.  There might well have

14     been some social stigma to it, but that doesn't

15     necessarily -- there's no laws about it.

16          Q.     Okay.

17          A.     And of course, Bruen is looking at what

18     laws existed.

19          Q.     But, again, going back to our early

20     conversation, legislators often act in response to

21     social problems?

22          A.     People --

23          Q.     If the culture was, this wasn't a

24     problem, why would there be a law?



CLAYTON CRAMER                                              October 11, 2024
O'NEIL vs NERONHA                                                        143

1       A.      Legislators respond to perceived social

2   problems, not necessarily actual problems.

3       Q.      Let me go to another section of your

4   book.  Let me go back.  I'm referring now to Exhibit

5   9, again, your book on Concealed Carry, page 101,

6   where you're discussing, you see, a Georgia law from

7   1837?

8       A.      Right.

9       Q.      Do you recollect that law that you

10  discussed here?

11      A.      Yes.

12      Q.      Here's the page.

13      A.      Yes, I see it.

14      Q.      And I'll scroll through to see if you can

15  refresh your recollection on this.  I know you've

16  looked at it before.

17      A.      Yes.  It is a law that was

18  extraordinarily poorly written.  It talks about

19  carrying of deadly weapons, but it then exempts

20  carrying certain categories of deadly weapons which

21  shall be exposed plainly to view.

22      Q.      Yeah.  So, this Georgia law from 1837

23  banned carrying of all types of -- banned all carrying

24  of deadly weapons, does it not?



1    A.    No, it did not.  That's what's

2  interesting is, it bans the sale of certain categories

3  of weapons and it bans concealed carry, but it

4  specifically exempts certain categories of deadly

5  weapons being carried openly, which should be --

6    Q.    Are those -- the two categories exempted,

7  are those mentioned here the top of page 102,

8  horseman's pistols and edged weapons?

9    A.    Yeah.  There are certain things that are

10 allowed to be carried.  It's interesting that pistols,

11 horseman's pistols, which were very large, remained

12 lawful to carry.

13    Q.    But apart from those two exemptions,

14 though, all other forms of deadly weapons were banned?

15    A.    I think you can go back and take a look

16 at the section on that previous page, it identifies

17 categories of weapons which were prohibited from sale.

18 Prohibited sale, offering for sale, or possession.

19    Q.    I see it, prohibited sale, offering for

20 sale, or possession?

21    A.    About their person or elsewhere.

22    Q.    Yeah.  Any of the hereinafter described

23 weapons, to wit: a Bowie knife, any other kind of

24 knives, manufactured and sold for the purpose of



1  wearing, or carrying the same as arms of offense or

2  defense, pistols, dirks, sword canes, spears, et

3  cetera.

4           So, isn't this law a prohibition on

5  carrying all of these types of weapons, all these

6  types of deadly weapons?

7      A.    Well, the language is somewhat

8  inconsistent in that it prohibits the carrying of

9  these weapons, but elsewhere, it says they're okay to

10  carry if they're carried openly.  This is one of the

11  reasons that the Georgia Supreme Court struck this law

12  down because it was inconsistent.  Different sections

13  of it seemed to apply to different things.

14      Q.    But we just went through in here, the

15  only exceptions seemed to be for horseman's pistols

16  and edged weapons.  It does seem to prohibit all of

17  the others, does it not?

18      A.    As I said, it does, and that's the

19  problem, that's why the Georgia Supreme Court struck

20  the law down, because it made no sense.

21      Q.    But at the time, just on the face of the

22  statute, though, it bans concealed carrying as much as

23  it banned all carrying of deadly weapons with two

24  exceptions, horseman's pistol and edged weapons, while



CLAYTON CRAMER                                          October 11, 2024
O'NEIL vs NERONHA                                                    146

1  those two exceptions were carried openly, is that

2  correct?

3       A.     However, it also exempts Bowie knives,

4  dirks, tooth picks, spears, and which will be exposed

5  plainly to view.  So, the exception obviously is

6  horseman's pistols.

7       Q.     That's where I'm missing you.  How does

8  this act of 1837 in Georgia exempt those other forms

9  of weapons?

10      A.     Because it says directly, Bowie, dirks,

11 tooth picks, spears, and which shall be exposed

12 plainly to view are not subject to prohibition.

13      Q.     Okay.  One other thing I noticed about

14 the way this law is drafted is it seems to refer in

15 the section here on page 101 where the quoting is

16 that, the sentence beginning, To that end, it

17 prohibited sale, offering for sale, and then it

18 describes certain weapons, Bowie, or any other kind of

19 knives, pistols, dirks, sword canes, spears.  So,

20 there it defines all of the acts subject to it with

21 specificity as including pistols, do you see that

22 here?

23      A.     I see that.

24      Q.     Then in later sections, like the one we



1    were just looking at, at the bottom of page 101, and

2    going on to the top of 102, it defines them

3    differently as Bowie knives, dirks, tooth picks,

4    spears, and which shall be exposed plainly to view.

5    Is that a correct reading?

6         A.    It has different lists in different parts

7    of the law.

8         Q.    Yeah.  So, I'm wondering, I mean, is your

9    view of this that pistols are included in the scope of

10   the law on deadly weapons?

11        A.    In terms of what's prohibited on sale or

12   offering for sale, pistols other than horseman's

13   pistols were subject to this ban on sale.

14        Q.    But then when you go down to this section

15   about where it says, plainly to view, it doesn't

16   mention pistols in that section?

17        A.    No, it does not.  As I said earlier, it's

18   a contradictory and poorly worded law.  It's unclear

19   exactly what the intention of the law is.  It's sort

20   of clear.  I mean, they're trying to ban concealed

21   carry and they're trying to discourage the sale of

22   these deadly concealable weapons.

23        Q.    Thank you for that.  Let me show you

24   another exhibit.  Are you familiar -- before I do



1              REPORTER'S CERTIFICATE

2

3              I, Michele A. Durig, a Notary Public within

4    and for the State of Ohio, duly commissioned and

5    qualified, the officer before whom the foregoing

6    proceedings were taken, do hereby certify that the

7    foregoing transcript is a true and correct record of

8    the proceedings; that said proceedings were taken by

9    me stenographically and thereafter reduced to

10   typewriting under my supervision; and that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to this case and have no interest,

13   financial or otherwise, in its outcome.

14              Certified by me this 22nd day of October,

15   2024.

16

17

18   _____

19

20   Michele A. Durig, RPR, Court Reporter
     My notary commission expires July 5, 2028

21

22

23

24



1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF RHODE ISLAND

3

4        I, ROXANNE C. COSTIGAN, do certify that
    pursuant to notice, there came before me on
5   October 11, 2024, VIA ZOOM PLATFORM, the following
    named person, to wit:  CLAYTON E. CRAMER, who was by
6   me duly sworn to testify to the truth and nothing but
    the truth as to his knowledge touching and concerning
7   the matters in controversy in this cause; that h3 was
    thereupon examined upon his oath and said examination
8   reduced to writing by me; and that the deposition is
    a true record of the testimony given by the witness,
9   to the best of my knowledge and ability.

10       I further certify that I am not a relative or
    employee of counsel or attorney for any of the
11  parties, or a relative or employee of such parties,
    nor am I financially interested in the outcome of the
12  action.

13       WITNESS MY HAND, this 17th day of October,
    2024.
14
15   _____
          Roxanne C. Costigan
16

17
    My Commission expires:  June 19, 2031
18

19

20

21

22

23

24

