## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **MICHAEL O'NEIL, et al.**          ) | |
|     **Plaintiffs**          ) | |
|                        ) | |
| **Vs.**          ) | **C.A. 23-cv-70** |
|                        ) | |
| **PETER F. NERONHA, in his official capacity as**          ) | |
| **Attorney General of the State of Rhode Island, and**          ) | |
| **THE STATE OF RHODE ISLAND**          ) | |
|          **Defendants**          ) | |

## PLAINTIFFS' OBJECTION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Defendants' argument that Plaintiffs do not have a constitutional right to open carry is both ahistorical and vague, arbitrary and capricious. The argument is ahistorical under the Second Amendment because Defendants do not cite any historical tradition during the relevant period between 1791 and 1868 of any state that barred open carry while permitting concealed carry. To the contrary, the history indicates that, if anything, state legislatures and state courts permitted open carry or upheld restrictions on concealed carry because open carry generally was not and could not be restricted.

Defendants' position is vague, arbitrary and capricious under the Fourteenth Amendment because Defendants say for the <u>first</u> time that Plaintiffs could obtain State RIAG permits that allow for open and concealed carry if they did <u>not</u> have municipal concealed carry (CCW) permits.  In other words, because Plaintiffs have the municipal CCW permits (that require them to show they are suitable persons for concealed carry), Defendants <u>now</u> take the position that Plaintiffs have no "need" for RIAG permits which are the only permits that allow them to engage in open carry. There is no reasonable basis for this position. By contrast, Plaintiffs have a rational reason to want

both permits: Having both allows them to avoid a felony prosecution for concealed carry if they inadvertently let one permit lapse.

## STANDARD OF REVIEW

Defendants do not address the applicable standard of review. They discuss whether Plaintiffs' lawsuit is a facial or as-applied challenge to the constitutionality of R.I.Gen.L § 11-47-18. In case there was any doubt, it is an as-applied challenge which moots some of Defendants' arguments. Defendants do not discuss what level of scrutiny applies, i.e., strict, intermediate, or rational basis.  With respect to Plaintiffs' Second Amendment challenge, the decision in  New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 19 (2022), makes clear that none of them apply. The issue is whether the challenged regulation fits within the historical tradition of gun regulation for the relevant time period, i.e., 1791 to 1868.

Plaintiffs have also asserted a Fourteenth Amendment challenge, arguing Defendants' application of the statute is unconstitutionally vague and overbroad. This is an argument to which the level of scrutiny is usually relevant. Prior to Bruen, the First Circuit and this Court have applied intermediate scrutiny to this kind of challenge. O'Neil v. Neronha, 594 F.Supp.3d 463, 477 (D.R.I. 2022), citing Worman v. Healey, 922 F.3d 26, 38 (1st Cir. 2019).

> "To survive intermediate scrutiny, a statute 'must be substantially related to an important governmental objective.' [citation omitted]. 'To achieve this substantial relationship there must be a 'reasonable fit' between the restrictions imposed by law and the government's valid objectives. 'such that the law does not burden more conduct than reasonably necessary.'"

Id., quoting Worman, 922 F.3d at 38. Following District of Columbia v. Keller, 554 U.S. 570 (2008), but before Bruen, the First Circuit indicated that a firearms licensing authority's  exercise of discretion cannot be arbitrary or capricious.  Hightower v. City of Boston, 693 F.3d 61, 79 (1st Cir. 2012).

2

## DISPUTED FACTS AND ADDITIONAL UNDISPUTED FACTS

Plaintiffs dispute certain facts set forth in Defendants' Statement of Undisputed Facts (SUF). Specifically, they state that their most recent efforts to get RIAG CCW permits were attempts to renew their permits which had been previously issued by the Office of the Attorney General. Defendants' SUF implies that these were first-time applications. Plaintiffs also dispute the reasons they offered for the renewal of their permits, which included open carry.

In addition, Plaintiffs dispute certain facts set forth in Defendants' Memorandum in Support of their Motion for Summary judgment. These are "facts" asserting that certain laws existed at certain periods of time.[1] Plaintiffs' disputes with these facts are set forth in the Declaration of Clayton Cramer filed in support of this Objection and in this. Plaintiffs will summarize those disputes here and set forth some Additional Undisputed Facts also included in Cramer's Declaration.

On pages 28-29, Defendants' Memorandum states: "For example, a 1642 provision in the colony of New Netherland (later New York) prohibited the drawing or displaying of knives. Spitzer Decl. at 12." However, the American historical tradition of gun regulation derives from the British, not the Dutch. Further, the law did not prohibit the <u>carrying</u> of knives, just the <u>drawing</u> of them.

On page 29, Defendants' Memorandum states: "A 1686 New Jersey law adopted 'An Act Against Wearing Swords' and prohibited the wearing of 'pistols' and other specified weapons 'privately'—though it also levied penalties for the open carrying of weapons." However, <u>Bruen</u> specifically rejected the relevance of this law. 597 U.S. at 47-49.

---

[1] Plaintiffs are uncertain whether the historical existence of these supposed laws is a question of fact or law, but they have treated them as questions of fact out of an abundance of caution.

On that same page, Defendants argue what they assert are American copies of the Statute of Northampton, including that: "[S]everal colonial governments adopted laws that 'mirrored the British Statute of Northampton, where the very fact of carrying a firearm was considered to be in terror of the people and was therefore prohibited by that statute.'" Again, <u>Bruen</u> specifically rejected the relevance of these statutes. <u>Id.</u> at 46-48.

Also on page 29, Defendants' Memorandum states: "'In 1801, for example, Tennessee adopted a law that prohibited the carrying of 'any dirk, large knife, pistol or any other dangerous weapon' both privately and publicly. Rivas Decl. At 24." As Cramer says, the selectively quoted statute reuses the language of the Statute of Northampton already rejected by <u>Bruen</u>. Moreover, the entire statute was a vagrancy law. It was not aimed at the general population, but a particularly disreputable group.

Also on page 29, Defendants' Memorandum states: "Georgia enacted a similar law in 1837." Georgia's law was actually very different. Among other differences, it banned open carry. However, the Georgia Supreme Court later held that broad statutory restrictions on open carry were unconstitutional, <u>Nunn v. State</u>, 1 Ga. 243 (1845), as <u>Bruen</u> noted. 597 U.S. at 52, n.16.

Again on p. 29, Defendants' Memorandum cites: "Spitzer Decl. at 14 (quoting a 1694 Massachusetts law, a 1701 New Hampshire law, and an North Carolina 1792 collection of statutes)." But, as Cramer says, Spitzer cites a 1694 Massachusetts law that does not exist, at least in the published version. Similarly, the New Hampshire law does not exist. That 1792 collection was of English statutes, not North Carolina laws, including the <u>Bruen</u>-rejected Statute of Northampton.

On page 30, again citing Spitzer, Defendants' Memorandum states: "And in the 1850s, Pennsylvania, Hawaii, and the District of Columbia criminalized the carrying of firearms or other

specified deadly weapons, whether they were carried in a concealed manner or openly." However, the *Kingdom* of Hawaii has nothing to do with American legal tradition. The District of Columbia ordinance is less clear than Spitzer indicates. The title is, "An act to prevent the carrying of concealed *and* dangerous weapons in the City of Washington." [emphasis added]  The text of the law might be read as banning all carry of a list of deadly weapons, but the title can be equally read as banning the carrying of weapons that are both concealed *and* dangerous. Certainly, people were carrying concealed pistols in D.C. at the time.

Also on page 30, Defendants' Memorandum states: "For example, an 1850 North Carolina measure imposed a one-dollar tax on all pistols and other weapons "'worn or carried about the person of the owner.' Spitzer Decl., Ex. C at 97."  Cramer notes it is on p. 91 of Exhibit C. Regardless, Spitzer lists three North Carolina laws adopted between 1856 and 1859, all identified as "An Act Entitled 'Revenue.'"  The 1866 version was also explicitly a tax measure. It was not legislation aimed at public safety.

Plaintiffs set forth the following additional undisputed facts as described in Cramer's Declaration. Defendants point to a sentence in Cramer's book *Concealed Weapon Laws of the Early Republic*: "This suggests (but does not prove) that the open carrying of deadly weapons was subject to sufficient social stigma to guarantee that a ban on concealed carry was, effectively, a ban on all carrying."  However, Cramer quotes another excerpt in his book showing that despite any social stigma, open carrying was still common.

Cramer goes on to discuss historical reports demonstrating open carry was common even though these reports are difficult to find because it was considered a commonplace occurrence. He cites examples where pistols are mentioned because of the other newsworthy aspects. A Dr. James Reynolds was tried in Philadelphia for riot and "assault… with an intent to kill."  Dr.

Reynolds drew a pistol when surrounded by a threatening mob. His counsel defended him against a claim of premeditation because of his possession of a pistol on the grounds that no Pennsylvania law prevented it and "every man has a right to carry arms who apprehends himself to be in danger."

The news coverage of the death of Charles Arndt, a member of the Wisconsin Territorial Legislature apparently at the hands of another member, James R. Vineyard, suggest that Vineyard's carrying of a revolver was sufficiently normal that he felt comfortable showing his recently acquired revolver to other members of the legislature some minutes before the shooting.

Newspapers also reported the carrying of pistols as a sign of how bad the street crime situation had become. The carrying of a pistol was considered a rational response to a bad situation. A Methodist preacher and newspaper editor gives insights into the carrying of pistols in 1843:

> The lying editor of the Sentinel has now repeated between fifty and one hundred times, in five weeks, that we own and carry a pistol having six barrels.-- What will the public think, when we solemnly declare that we own no such pistol, nor have we during the *past few years*. We own but two in the world, each of which has *one barrel* --one we carry, and the other we loaned to Mr. Jones, the day after the second fight with Crouch. One of these pistols we bought in the spring of 1840, and have owned it ever since. The one we keep constantly about us cost thirty-five dollars; the one we let Mr. Jones have cost ten dollars. Neither has nor ever had more than one barrel.

Another newspaper account tells us that having a loaded pistol in a San Francisco saloon was not startling. The near miss of an accidental death was the "man bites dog" aspect:

> Narrow Escape.— On Sunday last as a Dr. Hunter was examining a pistol, and, handling it carelessly in the bar-room at the corner of Merchant and Kearny streets the pistol exploded, the ball passed through the wall into Mr. Marshall's saloon, within a few inches of the head of Mr. Ketcher, the city marshal's clerk, who was in there, and passed through the opposite wall over a vacant lot and struck a brick wall. It was very fortunate that no one was killed.

Newspapers reported another carrying of a pistol because of an accident with fortunately no lethal consequences that happened on the floor of the U.S. House of Representatives in 1860, when a pistol fell to the floor and discharged:

> The gentleman from Virginia had alluded to fact that a firearm had fallen on the floor. It was due to truth to say that, about the time he was talking somewhat excitedly in reference to the harsh and unjust remark by his colleague, a pistol in his breast-pocket accidentally fell to the floor. No man who knew him believed that he would use a pistol except in an honorable way. He regretted that this accident had occurred. He put the pistol in his pocket last night about twelve o'clock, to protect himself, if necessary, for he resided in the neighborhood of English Hill, where out rages have been committed, and wanted to feel secure in going home. Until he came to Washington, he had never thought it necessary to be armed. He did not carry a pistol for any purpose here, but for his protection while passing through this sometimes violent city. He had seen occasions when, to protect one's self from insult, it was necessary to carry firearms.

Cramer states these were in the first 20 matches of an internet search for the words "pistol" and "carry" within five words of each other for newspapers 1756-1860.

Cramer also identifies historical "visitor accounts" of encounters with firearms. J.D. Borthwick described how Gold Rush San Francisco was awash in places of entertainment with signs that announced, "No weapons admitted." While Borthwick thought little of the entertainments available, he described why it was nonetheless worth going:

> if only to watch the company arrive, and to see the practical enforcement of the weapon clause in the announcements. Several doorkeepers were in attendance, to whom each man as he entered delivered up his knife or his pistol, receiving a check for it, just as one does for his cane or umbrella at the door of a picture-gallery. Most men draw a pistol from behind their back, and very often a knife along with it; some carried their bowie-knife down the back of their neck, or in their breast; demure, pious-looking men, in white neckcloths, lifted up the bottom of their waistcoat, and revealed the butt of a revolver; others, after having already disgorged a pistol, pulled up the leg of their trousers, and abstracted a huge bowie-knife from their boot; and there were men, terrible fellows, no doubt, but who were more likely to frighten themselves than any one else, who produced a revolver from each trouser-pocket, and a bowie-knife from their belt. If any man declared that he had no weapon, the statement was so incredible that he had to submit to be searched; an operation which was performed by the doorkeepers, who, I observed, were occasionally rewarded for their diligence by the discovery of a pistol secreted in some unusual part of the dress.

Isaac Weld's account of travels between 1795 and 1797 discussed how in the backcountry, "The people all travel on horseback, with pistols and swords…." Pim Fordham, while staying at

Princeton, Indiana, in 1817-18, reported that, "Yesterday 8 men on foot armed with pistols and rifles came into the town from Harmony. They had been in pursuit of an absconded debtor from Vincennes." It was no problem to persuade eight men armed with pistols and rifles to pursue a mere debtor, and Fordham found nothing surprising about them being so armed. Fordham described an associate judge as carrying "a pair of pistols at his saddle bow; and altogether [he] looks more like a Dragoon Officer in plain clothes, than a Judge." The pistols themselves were not remarkable; what was remarkable, at least to a transplanted Englishman, was that a *judge* was carrying them.

Fordham also described a party in the Illinois Territory that had excluded some "vulgar" party-crashers. Some of Fordham's party "armed themselves with Dirks (poignards [daggers] worn under the clothes)" to resist another such attempt, but later, "In going away some of the gentlemen were insulted by the rabble, but the rumour that they were armed with dirks and pistols prevented serious mischief." While the antecedent of "they were armed" is unclear, that it prevented serious mischief by "the rabble" suggests that members of Fordham's party were the ones armed; pistols were weapons commonly enough carried to be a realistic deterrent to "the rabble." According to Fordham (and many other travelers), the flatboat men who worked the Mississippi River were a wild and dangerous population. Fordham warned, "But I would advise all travellers going alone down the river, to get one man at least that they can depend upon, and to wear a dagger or *a brace of pistols*; for there are no desperadoes more savage in their anger than these men." [emphasis added].

Francis Baily's *Journal of a Tour in Unsettled Parts of North America in 1796 & 1797* is awash in hunting and guns. (He came to America from Britain at least in part to hunt.). Washington, D.C., was still largely woods when Baily visited it. To emphasize how far the new capital had to

go before it would be a large city, Baily reported, "Game is plenty in these parts, and, what perhaps may appear to you remarkable, I saw some boys who were out a shooting, actually kill several brace of partridges in what will be one of the most public streets of the city."  It was not boys out shooting that was remarkable to Baily; what was significant is that they were shooting in what would be one of the main boulevards of America's capital.

Robert Baird's *View of the Valley of the Mississippi* reads like a real estate promotional guide, emphasizing the enormous benefits from moving to these largely unsettled states—but still admits some unsavory aspects of the frontier.  A few instances of violence appear in Baird's promotional work, such as St. Louis and its dueling problem, but they are usually in conjunction with a positive statement such as, "A great moral change is, however, going forward here."  Baird also reported a dispute at cards aboard a steamboat, "Pistols and dirks were drawn!"

As Plaintiffs pointed out in their summary judgment memorandum, Defendants have two experts regarding the historical tradition of firearms regulations, Dr. Brennan Rivas and Dr. Michael Spitzer. Their expert declarations are attached to Plaintiffs' SUF as Exhibits 9 and 10, respectively. Rivas testified that she has found three states, Massachusetts, West Virginia and Texas, and one territory, Idaho, that passed statutes barring the open carry of firearms.  (Plaintiffs' SUF # 41). Rivas said that she was aware of some municipal restrictions on open carry but added that there was no authoritative, searchable database of such regulations. (Id. # 42).  Rivas found that licensing requirements for open carrying were "generally local."  (Id. # 43).

Rivas found that in Tennessee and Arkansas, open carry was statutorily less restricted than concealed carry as it was thought that open carry was less dangerous than concealed carry because other people could see who had a weapon and avoid them. (Id. # 44).  Rivas found that people engaged in public carry "in preparation for an unforeseen potential emergency."  (Id. # 45).

Rivas found in her research that the most common constraint on public carry was social disapproval of the practice. She cited newspaper articles calling on people to restrain from public carry. As a result, people more frequently engaged in concealed carry. (Id. # 46).

Rivas found in her research that long arms, such as rifles and shotguns, were not considered deadly weapons and generally not included in regulations of such weapons, unlike concealable weapons, such as pistols and knives.  (Rivas depo., pp. 64-68, Exhibit 21).

Defendants' other expert, Robert Spitzer, testified that he did not specifically address in his expert declaration whether or not Rhode Island's regulatory scheme is consistent with a historical tradition of open carry regulations.  (Plaintiffs' SUF, # 47). Spitzer said he has not been asked to render an opinion on that. (Id. # 48).

For the period from the early 1800s up to 1860, Spitzer's Declaration identifies the District of Columbia and what he says are four states that enacted laws restricting the carrying of named weapons, whether open or concealed, Georgia, Florida, the borough of York, Pennsylvania, and Hawaii. (Id. # 50). Spitzer acknowledged that the Georgia Supreme Court struck down the statute's restriction on open carry as unconstitutional. (Id. # 51). Spitzer agrees that the Massachusetts act passed in 1751 did not prohibit an individual from engaging in either open or concealed carry.  (Id. # 52). Most of the statutes that Spitzer identifies as purportedly restricting public carry of firearms were promulgated after 1868. (Id., # 53-55). Some of the statutes Spitzer identifies for the period 1791 to 1868 are surety laws. (Id., # 56). Some of the statutes Spitzer identifies were promulgated by territories or a foreign country (Hawaii).  (Id. # 55).

Plaintiffs also assert other additional undisputed facts as set forth in their Statement of Additional Undisputed Facts, as follows. Plaintiffs' RIAG permit applications that Defendants denied were all applications to renew those permits that Defendants had previously issued.

(Plaintiffs' Declarations, Exhibits 1-7). Defendants denied Plaintiffs' applications because Plaintiffs had municipal CCW permits and did not "need" the RIAG permits. (Id.; Troiano Depo., p. 35, Exhibit 15). Plaintiffs had municipal permits when their prior RIAG permits were issued. (Exhibits 1-7). Defendants' written factors for determining "need" had not changed. (Troiano Depo., p. 31-32). Whether an applicant has a municipal CCW permit is not one of the specific written factors Defendants have identified as relevant when determining need. (Defendants' Exhibit A, p. 4).

Pursuant to a federal firearms license, Plaintiff O'Neil operates a business out of his home engaged in the transfer of firearms from one person to another. (O'Neil depo., pp. 12-15, Exhibit 17). He stores the firearms in his house. He provides the security for his home and those firearms. (Id., pp. 15-16). He would like the option of open carry for purposes of securing those transfers of firearms. (Id. pp. 19-20, 52).

Plaintiff Trementozzi works part-time as a firearms salesman at Big Bear Hunting and Fishing in Gloucester, Rhode Island. (Trementozzi depo., p. 12, Exhibit 18). The owner of the business has conveyed to Trementozzi the expectation that he will be armed when he works there. (Id., pp. 12-16). Trementozzi also operates his own business that manufactures ammunition, and he sells the ammunition to Big Bear. (Id., pp. 16, 18). When he is in his shop, he carries his weapon openly. (Id., p. 18). Trementozzi has previously worked as a security guard and would like the ability to engage in open carry so he could return to that work if he wanted. (Id., p. 32). When Trementozzi testified at his deposition that his municipal CCW permit was not renewed, Defendants' counsel told him he could apply for the RIAG permit. (Trementozzi depo., p. 25).

Plaintiff Patterson runs a construction business that uses explosives. (Patterson depo., p. 12, Exhibit 19). When he is engaged in that business, he carries a firearm for self-defense. (Id., p.

13, 16). Patterson also operates a gun shop. (<u>Id.</u>, p. 20). He has between 250 and 300 firearms in his inventory. (<u>Id.</u>). Patterson takes delivery of 3-5 firearms a week. (Id., p. 21). He engages in open carry when he works at the gun shop. (<u>Id.</u>, p. 22). He has had about eight attempted break-ins at the gun shop since 2005. (<u>Id.</u> p. 31). Patterson wants the option of open carry because he does not want to worry about whether his weapon is concealed when he is carrying for his businesses or responding to a break-in. (<u>Id.</u>, pp. 52-53). He would also be able to get the firearm out of its holster faster if it was not concealed.  (<u>Id.</u>, p. 19).

Plaintiff Laporte would like an open-carry license because he is applying for positions in the private security business.  (Laporte depo., p. 19-20, Exhibit 20).

Plaintiff Labriole would like the option to engage in open carry. (Labriole depo., p. 9, Exhibit 22). He is in the construction business working outside and he believes open carry discourages crime. (<u>Id.</u>, p. 18). He collects payments and sometimes receives payments unexpectedly.  (<u>Id.</u>, p. 9).

Plaintiff Cook would like the option to engage in open carry because it is his constitutional right. (Cook Declaration, ¶ 8, Exhibit 7).

Plaintiff Patton would like the option to engage in open carry because he is a National Rifle Association instructor and he travels with guns and ammunition. (Patton Declaration, ¶ 8, Exhibit 6).

## ARGUMENT

### I.    CONTRARY TO DEFENDANTS' ARGUMENTS, <u>BRUEN</u> DID NOT DECIDE THAT STATES COULD RESTRICT OPEN CARRY IF THEY PERMITTED CONCEALED CARRY.

Defendants incorrectly argue that <u>Bruen</u> held that the States could restrict open carry so long as they permitted concealed carry. Defendants are wrong for several reasons. First, that was

not the issue the Court decided. Rather, the issue before the Court was whether the State of New York could condition a concealed carry permit on a special showing of "need" other than just a general desire for self-defense. The constitutionality of New York's restriction on open carry was <u>not</u> addressed. Second, the <u>Bruen</u> majority opinion makes clear that the most relevant time period when considering the historical tradition of gun regulation is 1791 to 1868 but the Florida and Illinois statutes cited in <u>Bruen</u> upon which Defendants rely were both promulgated in the Twenty-First Century, well outside the relevant time period.  Third, Defendants mostly rely on Justice Kavanaugh's concurring opinion for their argument. Only one other justice joined in that opinion, so it hardly represents the views of the Court's majority.

With respect to the first point, the Court clearly said:

> In 43 States, the government issues licenses to carry based on objective criteria. But in six states, including New York, the government further conditions issuance of a license to carry on a citizen's showing of some special need.  Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution.

<u>Bruen</u>, 597 U.S. at 11. That is what the Court decided. It most certainly did not decide that New York's licensing regime or any State's regime would be constitutional if it permitted concealed carry but denied open carry.

Second, while the Court noted the statutes of Florida and Illinois in footnotes, the Court did <u>not</u> "cite with approval" their restrictions on open carry. Rather, the Court commented that: "[T]he vast majority of States—43 by our count—are 'shall issue' jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability."  <u>Id</u>. at 13. The Court listed those 43 states and their statutes in a footnote.  <u>Id.</u>, n. 1. It then identified six States and the District of Columbia as jurisdictions in which authorities have

the discretion to deny CCW permits "even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." Id. at 14-15. The Court did so simply to clarify on which States' statutes it was ruling, not to uphold the other States' statutes.

This is confirmed in the Court's subsequent analysis which makes clear that the most relevant time period for the promulgations of state statutes when determining the relevant historical tradition of firearms regulation is 1791 to 1868.   Id. at 34-38. As Defendants' memorandum indicates, the Florida and Illinois statutes were promulgated in this century making them of doubtful relevance to this issue. Even so, the statutes of two states, out of fifty, hardly indicate a historical tradition.

Further, the Court's comments in footnote 9 undermine Defendants' argument.  First, the Court says with respect to the 43 States, "…it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens.'" Id., p. 38, n. 9. Here, there is no dispute that Plaintiffs are law-abiding responsible citizens nor are Defendants denying their RIAG applications on the grounds that they are not. Rather, Defendants are denying their applications because Plaintiffs already have municipal CCW licenses (which require a showing that the applicant is a "suitable person"). In reality, Defendants' licensing scheme penalizes Plaintiffs for being law-abiding citizens.

Moreover, the Court's footnote goes on to say: "That said, because any permitting scheme can be put to abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny

ordinary citizens their right to public carry." Id. That is the situation here; Defendants are putting the RIAG licensing scheme to abusive ends by using it to deny Plaintiffs their right to open carry.

Finally, Defendants rely heavily on Justice Kavanaugh's concurring opinion—which was joined only by the Chief Justice—rather than on the Court's opinion. See Defendants' Memorandum, pp. 20-21. Specifically:

- "[T]he Second Amendment 'does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense,' id. at 79 (Kavanaugh, J. concurring)." (Defendants' Memorandum, p. 20). This point is irrelevant because Plaintiffs are not challenging Rhode Island's licensing requirement, *per se*. They are challenging the Defendants' new interpretation that they cannot get a State license if they have a municipal one.

- "[T]hat the Court's Second Amendment jurisprudence 'does not affect the existing licensing regimes that are employed in 43 States,' including Rhode Island, id.; and that '[g]oing forward,…the 43 States that employ shall-issue licensing regimes for carrying handguns for self-defense may continue to do so,' id. at 80." (Defendants' Memorandum, p. 20). This quote is again from Justice Kavanaugh's concurrence. However, the majority opinion makes clear it was addressing only the licensing schemes in the six States and the District of Columbia and nothing in the majority opinion upholds the specific licensing schemes in the 43 states identified.

- "The New York licensing scheme at issue in Bruen similarly prohibited open carry of firearms in public and allowed concealed carry only upon a showing of need. The Court struck down this licensing provision because it granted 'open-ended discretion to licensing officials and authorize[d] license *only* for those applicants who [could] show

some special need apart from self-defense.' 597 U.S. at 80 (Kavanaugh, J., concurring)."
(Defendants' Memorandum, p. 21). However, the Court was apparently not asked to rule
on New York's restriction on open carry and the majority certainly did not address that
restriction.

- "This was problematic because it effectively foreclosed *all* forms of public carry of
  firearms for self-defense. *Id.* at 59-60" (Defendants' Memorandum, p. 21). While the
  Memorandum cites to the majority opinion for this proposition, nothing on those pages—
  or anywhere else in the majority opinion—supports the assertion that the Court struck
  down the New York statute specifically for that reason or that the Court would uphold a
  regulatory scheme that permitted concealed carry while barring open carry.

- "Governments, the Supreme Court held, 'could lawfully eliminate one kind of public
  carry…so long as they left open' another option. *Id.*" (Defendants' Memorandum, p. 21).
  Here, Defendants again cite the majority opinion, but their ellipses are critical because
  the Court's full sentence says: "Finally, States could lawfully eliminate one kind of public
  carry—concealed carry—so long as they left open the option to carry openly."  597 U.S.
  at 59. In short, the full sentence supports Plaintiffs' position.

- "The critical determination is whether the state licensing scheme operates to 'prevent
  law-abiding citizens with ordinary self-defense needs from carrying arms in public for
  that purpose.' *Id.* at 60 and 80 ('individual self-defense is 'the central component' of the
  Second Amendment right.') (Kavanaugh, J. concurring)." (Defendants' Memorandum,
  pp. 21-22). While the part of the quote from the majority opinion is accurate, it
  immediately follows the sentence in which the Court said: "States could lawfully

16

eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly."  597 U.S. at 59. That is precisely contrary to Defendants' position.

Further, Defendants' argument ignores the Court's extensive analysis of the history of firearms regulation in Keller upon which the Bruen decision relies. There, the Court repeatedly discussed with approval the various state court decisions which had struck down bans on open carry of firearms, sometimes while leaving intact bans on concealed carry.  554 U.S. at 612-14, 629, citing, Nunn v. State, 1 Ga. 243, 251 (1846) ("[T]he Georgia Supreme Court construed the Second Amendment as protecting the 'natural right of self-defense' and therefore struck down a ban on carrying pistols openly.") (emphasis original); State v. Chandler, 5 La.Ann. 489, 490 (1850) ("[L]ikewise, the Louisiana Supreme Court held that citizens had a right to carry arms openly…"); Aymette v. State, 21 Tenn. 154 (1840) ("The court then adopted a sort of middle position, whereby citizens were permitted to carry arms openly, unconnected with any service in a formal militia…"); Andrews v. State, 50 Tenn. 165, 187 (1871) ("[T]he Tennessee Supreme Court likewise held that a statute that likewise forbade openly carrying a pistol…violated the state constitutional provision."); State v. Reid, 1 Ala. 612, 616-17 (1840).  Conversely, the Court commented that "the majority of the 19th century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  554 U.S. at 626. Accordingly, it makes no sense to think that the Court would have said in Bruen that a state can ban open carry so long as it permits concealed carry.

## II.     THERE IS A HISTORICAL TRADITION SHOWING THAT OPEN CARRY IS CONSTITUTIONALLY PROTECTED AND NO HISTORICAL TRADITION OF RESTRICTING IT.

Plaintiffs have already identified numerous facts in their summary judgment motion showing there is a historical tradition that open carry is constitutionally protected. Indeed, even

17

Defendants' expert Brendan Rives provided facts and testimony supporting this position. (Plaintiff's Exhibit 11, Rivas depo., pp. 110-11). Defendants' expert Robert Spitzer said he was not retained to provide an opinion on that topic. (Plaintiff's Exhibit 12, Spitzer depo., pp. 52-53). Regardless, the few examples he cites purporting to show restrictions on open carry were either not that at all, or were based on the unreliable Duke Repository,[2] or were outside the most relevant time period of 1791 to 1868.  That leaves the facts and opinions provided by Plaintiffs' expert, Clayton Cramer, as largely unopposed. Plaintiffs will elaborate on these points here.

But, first, Plaintiffs will moot the part of Defendants' argument that seeks to support licensing requirements. (Defendants' Memorandum, pp. 23-28). Plaintiffs are <u>not</u> challenging Rhode Island's licensing requirements, *per se*. To the contrary, in the past, they have applied for and obtained both RIAG and municipal CCW permits.  They filed this lawsuit because they applied to renew their RIAG permits and were denied. They challenge the RIAG's application of its <u>new</u> policy that Plaintiffs cannot obtain a RIAG permit if they have a municipal permit because that new policy violates the Second and Fourteenth Amendments as applied to them. Nothing more and nothing less.

With respect to whether there is a historical tradition respecting open carry, Plaintiffs incorporate by reference their discussion in their summary judgment motion of what history is most relevant. (Plaintiffs' Summary Judgment Memorandum, pp. 20-22, 24-25, 26). To summarize, the most relevant time period is from the ratification of the Constitution including the Second Amendment in 1791 to the ratification of the Fourteenth Amendment which incorporated the Second Amendment against the States in 1868.  <u>Bruen</u>, 597 U.S. at 34-38. So-called surety

---

[2] The unreliability of the Duke Repository and Spitzer's opinions are the subject of Plaintiffs' motion in limine. Plaintiffs submit that Clayton Cramer's Declaration in support of this Objection provides additional support for that motion.

laws actually assume a right of open carry, not a presumptive restriction on that right. Id., at 55-59. Legislation from the Territories is less relevant than from the States. Id., at 66-68. Plaintiffs preliminarily point out that Defendants cite no legislation by a State between 1791 and 1868 actually imposing a ban on open carry that was not either amended or overturned by State courts. Similarly, Defendants cite no court decision during that time period upholding a legislative prohibition on open carry of firearms.

The historical legislation cited by Defendants' experts in their declarations is  not what it seems as plaintiffs' expert, Clayton Cramer discusses in his accompanying declaration.  On pages 28-29, Defendants' Memorandum states: "For example, a 1642 provision in the colony of New Netherland (later New York) prohibited the drawing or displaying of knives. Spitzer Decl. at 12." Plaintiffs first respond that American traditions about arms bearing derive from the English, not the Dutch. Second, the law, read in full, shows it was aimed at a different problem:

> Whereas we hear daily, God help us, of many accidents, caused for most part by quarrels, drawing of knives and fighting… Therefore, we hereby ordain, decree and enact, agreeably to the ordinance made last year in Holland by the High and Mighty Lords States General, that no one shall presume to draw a knife much less wound any person…

This did not prohibit open carry but the drawing of a knife, apparently as a threat. As Cramer says: "*Drawing* a weapon is fundamentally different from *carrying* a weapon."  (Cramer Declaration, ¶ 5-6).

On page 29, Defendants' Memorandum states: "A 1686 New Jersey law adopted 'An Act Against Wearing Swords' and prohibited the wearing of 'pistols' and other specified weapons 'privately'—though it also levied penalties for the open carrying of weapons." However, Bruen specifically rejected the relevance of this law. 597 U.S. at 47-49. (Cramer Declaration, ¶ 8). Plaintiffs add that the Court commented:  "[T]he law prohibited only the *concealed* carry of pocket

pistols; it presumably did not by its terms touch the open carry of larger, presumably more common pistols, except as to 'planters.'" (emphasis original). Id. at 48. Thus, this citation supports Plaintiffs' position that open carry was more protected than concealed carry.

Similarly on that same page, Defendants argue what they assert are American copies of the Statute of Northampton, including: "[S]everal colonial governments adopted laws that 'mirrored the British Statute of Northampton, where the very fact of carrying a firearm was considered to be in terror of the people and was therefore prohibited by that statute.'" Again, Bruen specifically rejected the relevance of these statutes. Id. at 46-48. The Court said:

> Respondents, their amici, and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself. See supra, at 2140 - 2143. For instance, the Massachusetts statute proscribed "go[ing] armed Offensively ... in Fear or Affray" of the people, indicating that these laws were modeled after the Statute of Northampton to the extent that the statute would have been understood to limit public carry in the late 1600s. Moreover, it makes very little sense to read these statutes as banning the public carry of all firearms just a few years after Chief Justice Herbert in *Sir John Knight's Case* indicated that the English common law did not do so.

Id. at 47. (Cramer Declaration, ¶ 9).

Also, on page 29, Defendants' Memorandum states: "'In 1801, for example, Tennessee adopted a law that prohibited the carrying of 'any dirk, large knife, pistol or any other dangerous weapon' both privately and publicly. Rivas Decl. At 24." As Cramer says, the selectively quoted statute reuses the language of the Statute of Northampton already rejected by Bruen. He continues: "Worse, quoting only section 6 missed the larger purpose and narrow focus of the law. This was 'An Act for the restraint of idle and disorderly persons… Whereas it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons… endeavoring to maintain himself by gaming or other undue means…' Tennessee passed a vagrancy law for

'persons of ill fame or suspicious character.'  This was not aimed at the general population, but a particularly disreputable group."  (Cramer Declaration, ¶ 10).

Moreover, the Supreme Court specifically considered and rejected the relevance of this statute:

> A by-now-familiar thread runs through these three statutes: They prohibit bearing arms in a way that spreads "fear" or "terror" among the people. As we have already explained, Chief Justice Herbert in *Sir John Knight's Case* interpreted this *in Terrorem Populi* element to require something more than merely carrying a firearm in public. [citation omitted]. Respondents give us no reason to think that the founding generation held a different view. Thus, all told, in the century leading up to the Second Amendment and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry.

Id. at 50.

Also on page 29, Defendants' Memorandum states: "Georgia enacted a similar law in 1837." Cramer responds; "In no way was the 1837 Georgia law similar. It was not narrowly focused on a particular disreputable group, nor did it use the Statute of Northampton language. It also banned the sale of many types of weapons." (Cramer Declaration, ¶ 11). Regardless, the Georgia Supreme Court later held that broad statutory restrictions on open carry were unconstitutional, Nunn v. State, 1 Ga. 243 (1845), as Bruen noted. 597 U.S at 52, n. 16.

Also on page 29, Defendants' Memorandum cites: "Spitzer Decl. at 14 (quoting a 1694 Massachusetts law, a 1701 New Hampshire law, and an North Carolina 1792 collection of statutes)."  However, as Cramer says, "Spitzer cites a 1694 Massachusetts law that does not exist, at least in the published version. '1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders.'  It is unclear if Spitzer means ch. 12, or ch. 6.  Ch. 6: 'An Act For Highwayes' or Ch. 12: 'An Act For A New Establishment And Regulation Of The Chancery.'" (Cramer Declaration, ¶ 12-13).  Similarly, Spitzer cites a 1701 New Hampshire law that does not exist:  "'1701 N.H.

Acts and Laws 15.'  The session laws do not have chapter numbers so we must assume he means p. 15: which has laws prohibiting rape, willful burning, and adultery." (Cramer Declaration, ¶ 14). Spitzer cites a book as purportedly collecting North Carolina statutes. Cramer responds that "the 1792 collection was of English statutes, not North Carolina laws, including the <u>Bruen</u>-rejected Statute of Northampton. Spitzer has frequently misrepresented this as a North Carolina session law. Rephrasing this as 'North Carolina 1792 collection of statutes' does nothing to save this." (Cramer Declaration, ¶ 15).

On page 30, Defendants' Memorandum states: "And in the 1850s, Pennsylvania, Hawaii, and the District of Columbia criminalized the carrying of firearms or other specified deadly weapons, whether they were carried in a concealed manner or openly." First, the *Kingdom* of Hawaii has nothing to do with American legal tradition. (Cramer Declaration, ¶ 16). Second, Cramer says: "The District of Columbia ordinance is less clear than Spitzer would like. The title is, 'An act to prevent the carrying of concealed *and* dangerous weapons in the City of Washington.' [emphasis added]. The text of the law might be read as banning all carry of a list of deadly weapons, but the title can be equally read as banning the carrying of weapons that are both concealed *and* dangerous." (<u>Id.</u>). Cramer observes that people were carrying concealed pistols in D.C. at the time. An accidental discharge on the floor of the House of Representatives in 1860 shows this:

> The gentleman from Virginia had alluded to fact that a firearm had fallen on the floor. It was due to truth to say that, about the time he was talking somewhat excitedly in reference to the harsh and unjust remark by his colleague, a pistol in his breast-pocket accidentally fell to the floor. No man who knew him believed that he would use a pistol except in an honorable way. He regretted that this accident had occurred. He put the pistol in his pocket last night about twelve o'clock, to protect himself, if necessary, for he resided in the neighborhood of English Hill, where out rages have been committed, and wanted to feel secure in going home. Until he came to Washington, he bad never thought it necessary to be armed. He did not carry a pistol for any purpose here, but for his protection while passing

through this sometimes violent city. He had seen occasions when, to protect one's self from insult, it was necessary to carry firearms.[3]

(Cramer Declaration, ¶ 17).

On page 30, Defendants' Memorandum states: "For example, an 1850 North Carolina measure imposed a one-dollar tax on all pistols and other weapons "'worn or carried about the person of the owner.' Spitzer Decl., Ex. C at 97." Cramer observes that the citation should be to page 91 of Exhibit C. (Cramer Declaration, ¶ 18). More importantly, Spitzer lists three North Carolina laws adopted between 1856 and 1859, all identified as "An Act Entitled 'Revenue.'" The 1866 version was also explicitly a revenue measure: "That for the support of the State Government, and to meet appropriations made by law, a tax shall be levied upon the subjects embraced in the following schedule, to be listed and paid as shall be directed by law." It taxed harps, pianos and carrying a "dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle-cane…" (Id.). It was not a law intended to regulate open carry.

Defendants cite a few recent cases that support their argument that they can bar open carry of firearms because municipal permits allow for concealed carry. Other cases they cite are easily distinguishable. With respect to the latter, Defendants cite Baird v. Bonta, 709 F.Supp.3d 1091, 1129 (E.D.Cal. 2023), for the proposition that the Founders understood they could restrict the public carry of firearms. (Defendants' Memorandum, p. 28). However, that case dealt with whether the State of California could impose a licensing requirement for open carry. Plaintiffs do not challenge Rhode Island's licensing requirements, per se. But, they note that a decision upholding

---

[3] An Excitement, *Holmes County* [Ohio] *Republican*, Jan. 26, 1860, 1, https://chroniclingamerica.loc.gov/lccn/sn84028820/1860-01-26/ed-1/seq-1/, last accessed December 11, 2024.

a licensing requirement for open carry implicitly assumes a right to open carry; otherwise, there would be no need to reach the constitutionality of the licensing requirement.

In <u>National Association for Gun Rights v. Lamont</u>, 685 F.Supp.3d 63 (D.Conn. 2023), plaintiffs challenged Connecticut statutes restricting the right to own, purchase, and use so-called assault weapons and large capacity magazines. Here, Plaintiffs raise no such challenges.  In <u>Abed v. United States</u>, 278 A.3d 114 (D.C.App. 2022), a police officer in Maryland appealed his conviction in the District of Columbia for openly carrying a handgun without a license. He did not make a Second Amendment argument but asserted only that his conduct was permissible under certain statutes. The court rejected those statutory arguments and mentioned <u>Bruen</u> only in a footnote. <u>Id</u>. at 129, n. 27. Curiously, it first quotes from <u>Bruen</u> that "States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly,"  and then comments that "nothing in the opinion implies that a State must allow open carry."  <u>Id.</u>

As Defendants acknowledge, <u>Norman v. State</u>, 215 So.3d 18 (Fla. 2017), is a pre-<u>Bruen</u>, decision that engages in the kind of interest-weighing analysis, <u>id</u>. at 37-41, that <u>Bruen</u> expressly rejects. <u>Bruen</u>, 597 U.S. at 18 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's tradition of firearms regulation."). This decision fails to consider the historical tradition of firearms regulation that <u>Bruen</u> mandates.

By contrast, the dissent does analyze the historical tradition of open carry and concludes: "the 'most specific tradition'…in this context is the tradition—exemplified in <u>Nunn [v. State</u>, 1 Ga. 243 (1845)] and [<u>State v.] Chandler</u>, [5 La.Ann. 489 (1850)—vindicating the right to open

carry firearms." 215 So.2d at 44.    The dissent anticipates Defendants' argument that their restriction on open carry is justified by public apprehension of open carry:

> This truth should be acknowledged: opposition to open carry stems not from concrete public safety concerns but from the fact that many people "are (sensibly or not) made uncomfortable by the visible presence of a deadly weapon." [citation omitted]. Of course, many people are made uncomfortable by the fact that others are permitted to keep and bear arms at all. But contemporary sensibilities cannot be the test.  Such sensibilities are no more a basis for defeating the historic right to open carrying than for defeating the understanding that the Second Amendment recognizes the right of individuals to keep and bear arms.

215 So.3d at 46.

Similarly, in Sinnissippi v. Rod & Gun Club, Inc., 2024 WL 886651 (Ill.App. 2024), an Illinois appellate court stated that "[n]o constitutional right is absolute," id. at *8, and simply concluded that under Bruen a state could ban open carry so long as it permits concealed carry.  Id. at *9. The court did not consider the historical tradition of open carry. But the dissent did, at length, id. at *12-23, and concludes: "…the second amendment forecloses the categorical ban on open carry adopted in Illinois." Id. at *23. Likewise, in Frey v. Nigrelli, 661 F.Supp.3d 176 (S.D.N.Y. 2024), the district court essentially presumes under Bruen that so long as the State permitted one form of public carry, i.e., concealed, it could ban open carry.  Id. at 199. The court did not consider the historical tradition of open carry.

Defendants claim in a footnote that the "Supreme Court gave little weight to the English Statute of Northampton and its colonial era progeny because those laws did not support the idea that governments could ban public carry altogether."  (Defendants' Memorandum, p. 29, n. 8). While it is absolutely correct that the Court gave little weight to that Statute and its progeny, it was for a variety of reasons including that the Statute was passed in 1328, nearly 450 years before the ratification of the Constitution, and that it was "centrally concerned with the wearing of armor." Bruen, 597 U.S. at 40-44. Moreover, in 1689, Parliament included in the English Bill of Rights a

25

"predecessor to our Second Amendment," although it was limited to Protestants. Id. at 44, quoting Heller, 554 U.S. at 593.

Defendants argue that "[o]pen carry is restricted to those who demonstrate an additional need that cannot be met by concealed carry," (Defendants' Memorandum, p. 33), but cite no facts to support this position. Defendants provide no affidavit and identify no testimony or documents indicating that this was their position when Plaintiffs attempted to renew their RIAG permits. Rather, the applicable statute, R.I.Gen.L.§ 11-47-18, does not distinguish between open and concealed carry nor does Defendants' list of factors to be considered. (Defendants' Exhibit A, p. 4). To the contrary, during the deposition of Plaintiff Trementozzi, when he testified that his municipal permit had lapsed, Defendants' counsel said he could now apply for the RIAG permit, which would permit open carry. (Exhibit 18, Trementozzi depo., p. 25).

In his Declaration, Cramer sets forth numerous reports in newspapers and books describing how open carry was relatively common. (Exhibit 22). Defendants' expert, Brennan Rivas, states that open carry was considered less dangerous than concealed carry because the public could see who was carrying weapons and act accordingly. (Exhibit 11, pp. 110-11). She describes in her expert report and deposition testimony that the main constraint on open carry was social disapproval, not legislation. (Exhibits 9 and 11). In this sense, the Second Amendment functions like the First Amendment which generally bars governmental interference with offensive speech but social conventions often constrain such speech.  Nonetheless, there is abundant historical evidence that open carry was relatively common and generally unregulated.

Plaintiffs add that Defendants' position also bars citizens with a municipal permit from carrying long arms, such as rifles or shotguns, for self-defense because long arms are generally not concealable.  In other words, Defendants' position requires that a citizen who already has a

municipal permit <u>must</u> have a concealable weapon to exercise his or her Second Amendment right to public carry. As set forth in Plaintiffs' motion for summary judgment and elaborated herein, that position is contrary to the historical tradition of firearms regulation. Indeed, even Defendants' expert Brennan Rivas acknowledged that long arms were considered less dangerous than concealable weapons and that the historical regulations focused on concealable weapons. (Exhibit 24, Rivas depo., pp. 64-68). All the more reason why Defendants' argument that they can ban open carry if they permit concealed carry makes no sense in light of the historical tradition.

**III.   DEFENDANTS' ARGUMENT THAT PLAINTIFFS CAN OBTAIN A RIAG CCW PERMIT IF THEY DO NOT HAVE MUNICIPAL CCW PERMITS BUT CANNOT OBTAIN THE RIAG PERMIT IF THEY DO IS UNCONSTITUTIONALLY VAGUE AS WELL AS ARBITRARY AND CAPRICIOUS.**

Defendants argue incorrectly that Plaintiffs are not entitled to due process because they have no liberty interest in their RIAG permits. However, under the Second Amendment, Plaintiffs do have a liberty interest in those permits, and, accordingly, are entitled to due process under the Fourteenth Amendment in the renewal of their RIAG permits. Here, <u>Bruen</u> and <u>Keller</u> show that Plaintiffs have a constitutional right to keep and bear arms without a special showing of need. That right establishes a liberty interest protected by due process. <u>U.S. v. Rehlander</u>, 666 F.3d 45, 48 (1st Cir. 2012); <u>Kuck v. Danaher</u>, 600 F.3d 159, 167 (2nd Cir. 2010); <u>McKinney v. Fresno County Sheriff's Office</u>, 2022 WL 17822069 at *4 (E.D.Cal. Dec. 20, 2022); <u>Caba v. Weaknecht</u>, 64 A.2d 39, 60 (Pa.Comm. 2013); see also, <u>U.S. v. Quiroz</u>, 629 F.Supp.3d 511, 525 (W.D.Tex. 2022) ("If the right to keep and bear arms inside and outside the home is so clear, removing that right would likely require the same constitutional procedural safeguards that the Supreme Court has bestowed on other rights."); <u>Doe I v. Evanchick</u>, 355 F.Supp.3d 197, 217 (E.D.Penn. 2019) ("From <u>Heller</u> and <u>McDonald</u>, it is clear that the right to bear arms is a protected liberty interest."). In <u>Rehlander</u>,

the First Circuit held that the State of Maine could not permanently revoke the rights of a person to possess arms based on a temporary mental health commitment without an adjudicatory hearing. 666 F.3d at 48.

In <u>Kuck</u>, plaintiff applied for and received a firearms permit from the Connecticut Department of Public Safety (DPS) in 1982. As part of that application, plaintiff provided proof of his citizenship. His permit was subsequently renewed without having to provide proof of citizenship again. In March 2007, plaintiff applied to renew his permit. This time, DPS requested that he provide a U.S. passport, birth certificate, or voter registration to prove his citizenship. Plaintiff refused to provide the proof and DPS denied his application for renewal. Plaintiff filed an administrative appeal, but the hearing was scheduled 18 months away during which time he was deprived of the permit. Plaintiff filed a class action lawsuit. During the pendency of the suit and shortly before the administrative hearing, plaintiff provided DPS with proof of citizenship and his renewal application was granted. Plaintiff argued that the 18-month delay in granting the renewal violated his due process rights. The district court granted defendants' motion to dismiss for failure to state a claim.

On appeal, the Second Circuit said its due process analysis was governed by the three-factor balancing test set forth in <u>Matthews v. Elbridge</u>, 424 U.S. 319, 355 (1976): (1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probably value of alternative procedures; and (3) the government's interest including the possible burdens of alternative procedures.  600 F.3d at 163. The court said "Kuck's stake in the firearms license is a liberty interest tied to the right to bear arms recognized by state law."  <u>Id.</u> at 164, citing Conn.Const. art. I, § 15. The Second Circuit added: "Contrary to defendants' suggestion, the state's ability to regulate firearms does not extinguish the liberty interest at stake

or eliminate the need to afford due process." Id. at 165. The court concluded that Connecticut had violated plaintiff's procedural due process rights. Id. at 166.

Due process requires that statutes, especially criminal statutes, not be vague. Sessions v. Dimaya, 584 U.S. 148, 156 (2018).  Justice Kagan wrote:

> The void-for-vagueness doctrine, as we have called it, guarantees that people have "fair notice" of the conduct a statute proscribes.  [citation omitted]. And the doctrine guards against arbitrary and discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges.  [citation omitted]. In that sense, the doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or legislative branch, define what conduct is sanctionable and what is not.

Id. Admittedly, the Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."  Id., quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99 (1981). Nonetheless, another judge of this district has held the doctrine applies where a police policy would deprive an officer of his constitutional right of free speech. Brady v. Tamburini, F.Supp.3d 570, 587 (D.R.I. 2021) (McElroy, J.), citing, Grayned v. City of Rockford, 408 U.S. 104, 108 (1972); see also, Karem v. Trump, 960 F.3d 656, 665 (D.C.Cir. 2020), quoting Hoffman, ("Where such penalties 'threaten[ ] to inhibit the exercise of constitutionally protected rights[,]…a more stringent vagueness [and fair-notice] test should apply.").

Here, Defendants' determination of what constitutes "need" is unconstitutionally vague, as well as overbroad. Section 11-47-18 does not define "need" nor does the Firearms Act of which the section is a part. R.I.Gen.L. § 11-47-1, et seq. Defendants have not promulgated any regulation that defines need. Defendants have issued a Weapons Carry Permit Handbook that lists ten specific factors they will consider when determining need but none of the factors is that an applicant has a municipal CCW permit. Prior Rhode Island Attorneys General have issued RIAG permits when

29

the applicants had a municipal permit, and Plaintiffs obtained RIAG permits in those circumstances. Defendants' new, unwritten factor is unconstitutionally vague because it was not promulgated by the General Assembly but by the Rhode Island Attorney General's office after years of a consistently different practice.

Moreover, the State's application of Section 11-47-18 cannot be arbitrary or capricious. Hightower v. City of Boston, 693 F.3d at 79.  An agency decision is arbitrary and capricious when it is unreasonable.  Public Service Comm'n of Puerto Rico v. Havemeyer, 296 U.S. 506, 518 (1936) ("'Reasonable,' as employed here, means not 'capricious,' 'arbitrary,' or 'confiscatory.'"). An agency's unilateral attempt to change the plain meaning of a term, as shown by prior interpretations, without a justification, is arbitrary and capricious.  Taunton Municipal Lighting Plant v. Quincy Oil, Inc., 498 F.Supp. 396, 400 (D.Mass. 1980) ("[T]he FEA's attempt in Ruling 1977-5 to retroactively alter the plain meaning of the transaction definition was arbitrary, capricious and without support in the price regulations.").

Because Defendants' position changes years of prior interpretations, it is arbitrary and capricious. See, Matrix Distributors, Inc. v. National Ass'n of Boards of Pharmacy, 34 F.4th 190, 198-99 (3d Cir. 2022) (holding under New Jersey law that plaintiffs plausibly alleged defendant violated their due process rights by arbitrarily and capriciously applying defendant's accreditation criteria); see also, Encino Motors, LLC v. Navarro, 579 U.S. 211, 221-22 (2016) (Agency violated arbitrary and capricious standard under the Administrative Procedure Act  where it changed its existing policy without a reasoned explanation). Plaintiffs allege that their due process rights were violated because Defendants applied a new, unwritten, and unsubstantiated definition of "need" when it denied their applications to renew their RIAG licenses. Plaintiffs had all previously obtained or had renewed their RIAG licenses at times when they also had municipal licenses. On

those occasions, it was not an issue that they also had municipal licenses. Now, the state statute, § 11-47-18, remains the same. The applicable factors set forth in Defendants' Weapons Carry Permit Handbook for determining "need" remain the same. The only thing that has changed is the person holding the position of Attorney General and the Defendants' new application of a new, unwritten "factor," i.e., that a person with a municipal CCW permit does not "need" a RIAG permit. This violates the Due Process Clause of the Fourteenth Amendment.

By contrast, Plaintiffs have a very rational reason why they would want both permits.  If one permit lapses, they are not committing a felony by engaging in concealed carry based on the other permit.

## IV.    THE RHODE ISLAND CONSTITUTION PROVIDES PLAINTIFFS WITH DUE PROCESS PROTECTIONS.

Contrary to Defendants' arguments, the Rhode Island Constitution provides Plaintiffs with due process protections that they can assert in court. Article 1, Section 2 states: "No person shall be deprived of life, liberty or property without due process of law…" The Rhode Island Supreme Court has said in numerous cases, including civil cases, that litigants can invoke Art. 1, § 2 as a claim or defense against the State or a local government. See, e.g., Moreau v. Flanders, 15 A.3d 565, 587-88 (R.I. 2011), quoting State v. Germane, 971 A.2d 555, 574 (R.I. 2009) (citing Cleveland Board of Education v. Loudermill, 470 U.S. 532, 541 (1985) ("Under the Rhode Island Constitution, procedural due process protections are grounded in article 1, section 2, which states that '[n]o person shall be deprived of life, liberty, or property without due process of law***.' Procedural due process ensures that notice and an opportunity to be heard precede any deprivation of a person's life, liberty, or property."); State v. Germane, 971 A.2d 555, 574 (R.I. 2009) (analyzing plaintiff's claims that the State Sex Offender Board of Review's classification of him as a sex offender violated the due process clause of Art. 1, § 2); Ruggiero v. City of Providence,

31

889 A.2d 691, 697 (R.I. 2005) (analyzing whether plaintiff's claim that the denial of her request to discontinue workers compensation benefits violated Art. 1, § 2); Gem Plumbing & Heating Co., Inc. v. Rossi, 867 A.2d 796, 818 (R.I. 2005) (analyzing whether the Rhode Island Mechanics Lien Law violates the due process clause of Art. 1, § 2); In re Stephanie B., 826 A.2d 985, 995 (R.I. 2003) (holding that a Family Court order compelling a mental health facility to accept a placement violated the facilities' due process rights under Art. 1, § 2); Theta Properties v. Ronci Realty Co., Inc., 814 A.2d 907, 916-17 (R.I. 2003) (holding that a retroactive application of a statute of repose to a dissolved corporation would violate Art. 1, § 2); Kelly v. Marcantonio, 678 A.2d 873, 883 (R.I. 1996) (holding that the due process clause of Art. 1, § 2 applies to civil cases and bars the retroactive extension of a statute of limitations to a claim otherwise time-barred); Rhode Island Depositors Economic Protection Corp. v. Brown, 659 A.2d 95, 101-02 (R.I. 1995), quoting Landsgraf v. USI Film Products, 511 U.S. 244, 245 (1994) ("Due process prohibits legislation that would retroactively unreasonably impair substantive rights, or 'impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."); Avanzo v. R.I. Dept. of Human Services, 625 A.2d 208, 211 (R.I. 1993) (affirming a Superior Court judgment that state procedures for terminating public assistance violated Art. 1, § 2). In none of these cases did the Rhode Island Supreme Court even hint that it might hold that Art. 1, § 2 fails to provide specific due process protections that civil litigants can assert in court.[4]

---

[4] Plaintiffs note there are also Rhode Island Supreme Court decisions holding Art. 1, § 2 protects criminal defendants, including those accused of violating the state Firearms Act, specifically R.I.Gen.L. § 11-47-51.1. State v. Hazard, 745 A.2d 748, 751 (R.I. 2000) ("The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Art. 1, § 2 of the Rhode Island Constitution deny the state the power to deprive the accused of liberty unless the state proves every element necessary to constitute the crime charged beyond a reasonable doubt.").

The single Rhode Island Supreme Court case Defendants cite, Doe v. Brown University, 253 A.3d 389 (R.I. 2021), is distinguishable. In that case, a Providence College student alleged that she had been sexually assaulted by three Brown University football players. She filed a complaint with Brown against the students alleging violations of the University's Code of Student Conduct and requesting relief under Title IX, 20 U.S.C. § 1681, et seq. Brown informed her it was proceeding with an investigation only under its Code of Conduct. Plaintiff filed a complaint against Brown with the Office of Civil Rights of the U.S. Department of Education alleging that the Code of Conduct did not comply with Title IX and that Brown had failed to provide a prompt, equitable, and effective response to her sexual assault. Brown subsequently abandoned its investigation against its students. Plaintiff filed suit against Brown and two of its administrators in federal district court alleging violations of Title IX and the Rhode Island Civil Rights Act (RICRA) based on defendants' response to her allegations.  The federal district court held plaintiff did not have a cause of action under Title IX because she was not a student at Brown, and it declined to exercise supplemental jurisdiction over her state law claim. The First Circuit affirmed.

Plaintiff then filed suit in Superior Court against the same defendants alleging, *inter alia*, violations of RICRA and the anti-discrimination provision of Art. 1, § 2 which reads: "No otherwise qualified person shall, solely by reason of race, gender or handicap be subject to discrimination by the state, its agents or any person or entity doing business with the state."  The Superior Court held that because plaintiff's RICRA claim was based on the alleged violation of Title IX, the claim was precluded by the federal court decisions. The Superior Court also held there was no private right of action under the anti-discrimination provision of Art. 1, § 2.

On appeal, the Supreme Court first affirmed that plaintiff's RICRA claim was barred by the adverse decisions of the federal courts. Id. at 397. With respect to the claim under the anti-

discrimination provision, the court said the initial question was whether the provision was self-executing, i.e. did it "'supply 'a sufficient rule by means of which the right may be enjoyed and protected, or the duty imposed be enforced or does it merely indicated principles, without laying down rules by means of which those principles may be given the force of law?'" Id. at 399, quoting Bandoni v. State, 715 A.2d 580, 586 (R.I. 1998). (In Bandoni, the court held that a constitutional provision saying that victims of crime should get restitution was not self-executing and did not entitle the plaintiff to damages from the state). The Doe court concluded:

> "This Court, however, has never held that violating a recognized right requires monetary damages. Bandoni, 715 A.2d at 594. "Furthermore, even if we were to conclude that [this provision [respecting victim's restitution]] is self-executing, this fact alone would not necessarily support a claim for damages." Id. at 594-95. We have repeatedly said that "[t]he judiciary may not properly create a new cause of action in order to deal with a particular perceived wrong." Cullen v. Lincoln Town Council, 960 A.2d 246, 249 (R.I. 2008).

253 A.3d at 401.

Several distinctions from Doe are apparent. First, Plaintiffs are not seeking monetary damages in this lawsuit; just equitable relief respecting their RIAG permits. Second, this is not a claim against a private party; it is a claim against the State. Third, this situation is unlike discrimination, where the Rhode Island General Assembly recognized the need for an enforcement mechanism and has provided statutory claims against discrimination. By contrast, the General Assembly is clearly aware that the Rhode Island Supreme Court has been applying the Due Process Clause of Art. 1, § 2 for years so there is no need to create a statutory remedy. See, Jacobs v. National Drug Intelligence Center, 548 F.3d 375, 378 (5th Cir. 2008) ("Congress is presumed to be aware of court decisions construing statutes and may, of course, amend a statute as a result."); Greenwich Wine & Spirits v. Racine, 1995 WL 941393 at *4 (R.I.Super. Feb. 7, 1995) (Savage, J.) (The General Assembly is presumed to be aware of the Rhode Island Supreme Court's

interpretations of statutes and deemed to have acquiesced in them if it takes no action). Fourth, nothing in this decision remotely indicates that the Rhode Island Supreme Court would consider overturning decades of precedent respecting the availability of due process claims against State and local governments. To the contrary, since <u>Bandoni</u>, it has repeatedly affirmed the existence of such claims.

Plaintiffs recognize the recent decisions of this Court and other judges of this district to the contrary. With all due respect, Plaintiffs submit they are wrongly decided. The Rhode Island Supreme Court is the final authority as to the meaning of the Rhode Island Constitution, including Art. 1, § 2, see, <u>Gurley v. Rhoden</u>, 421 U.S. 200, 208 (1975), and it has consistently held that the Due Process Clause of that Section provides individual, enforceable rights.

Finally, Plaintiffs submit that <u>Pullman</u> abstention is not appropriate where Defendants have not identified any pending state court litigation that will address the issue in a timely manner nor have Defendants asked this Court to refer the issue or the parties to the state courts for resolution. <u>Donald J. Trump for President, Inc. v. Bullock</u>, 491 F.Supp.3d 814, 830 (D.Mont. 2020), quoting, <u>Potrero Hills Landfill v. County of Solano</u>, 657 F.3d 876, 889-90 (9th Cir. 2011).

## CONCLUSION

The Court should deny Defendants' motion for summary judgment.

Respectfully submitted,
**PLAINTIFFS,**
By their attorneys,

<u>/s/ Thomas W. Lyons</u>
Thomas W. Lyons        #2946
Strauss, Factor, Laing & Lyons
One Davol Square, Suite 305
Providence, RI 02903
(401) 456-0700
tlyons@straussfactor.com

<u>/s/ Frank R. Saccoccio</u>
Frank R. Saccoccio Esq. #5949
Saccoccio Law Office
928 Atwood Avenue
Johnston, Rhode Island 02919
(401) 944-1600 * 942-8921 Fax
Frank.CSLawOffice@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2025, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Thomas W. Lyons