UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MICHAEL O'NEIL, et al.        )<br>    Plaintiffs                            )<br>                                              )<br>Vs.                                        )<br>                                              )<br>PETER F. NERONHA, in his official capacity as )<br>Attorney General of the State of Rhode Island, and )<br>THE STATE OF RHODE ISLAND   )<br>    Defendants                          ) | C.A. 23-cv-70 |

**PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

Pursuant to LR Cv 56, Plaintiffs set forth the following additional undisputed facts in response to Defendants' Motion for Summary Judgment:

1. Plaintiffs' RIAG CCW permit applications that Defendants denied were all applications to renew CCW permits that Defendants had previously issued. (Plaintiffs' Declarations filed in support of Plaintiffs' Motion for Summary Judgment, Exhibits 1-7)).

2. Defendants denied Plaintiffs' applications because Plaintiffs had municipal CCW permits and did not "need" the RIAG permits.  (Id.). (Troiano Depo., p. 35, excerpts attached as Exhibit 15; Saccoccio Affidavit attached as Exhibit 16, ¶ 2). [1]

3. Plaintiffs had municipal permits when their prior RIAG permits were issued.  (Exhibits 1-7).

4. Defendants' written factors for determining "need" had not changed.  (Troiano Depo., p. 31-32).

5. Attorney Frank Saccoccio represented each of the Plaintiffs in their departmental appeals of the denials of their renewal applications.  (Exhibit 16, ¶ 1).

---

[1] To avoid confusion, Plaintiffs will identify their exhibits filed in support of their Motion for Summary Judgment and their Objection to Defendants' Motion *seriatim*, beginning here with Exhibit 15).

6. Plaintiffs collectively presented a number of reasons for the renewal of their RIAG CCW permits, including, but not limited to, reciprocity with other states, securing a secondary permit in the event the AG LTC renewal was delayed and/or denied, the lack of any written or published standards for approval, the removal of any waiting period on additional firearm purchases, and the ability to open carry or carry concealed. (Id., ¶ 9).

7. The RIAG again denied each of the Plaintiffs' renewal applications the meeting / appeal hearing based on the failure to provide a proper showing of need, based on the broad discretion of the Rhode Island Department of Attorney General, because they each had a municipal CCW permit. (Id., ¶ 10; Exhibit 15, p. 35).

8. Whether an applicant has a municipal CCW permit is not one of the specific written factors Defendants have identified as relevant when determining need. (Defendants' Exhibit A, p. 4).

9. Plaintiff O'Neil operates a business out of his home engaged in the transfer of firearms from one person to another pursuant to a federal firearms license (FFL). (O'Neil depo., pp. 12-15, excerpts attached as Exhibit 17). He stores the firearms in his house. He provides the security for his home and those firearms. (Id., pp. 15-16). He would like the option of open carry for purposes of securing those transfers of firearms. (Id. pp. 19-20, 52).

10. Plaintiff Trementozzi works part-time as a firearms salesman at Big Bear Hunting and Fishing in Gloucester, Rhode Island. (Trementozzi depo., p. 12, excerpts attached as Exhibit 18). The owner of the business has conveyed to Trementozzi the expectation that he will be armed when he works there. (Id., pp. 12-16). Trementozzi also operates his own business that manufactures ammunition, and he sells the ammunition to Big Bear. (Id., pp.

16, 18). When he is in his shop he carries his weapon openly. (Id., p. 18). Trementozzi has previously worked as a security guard and would like the ability to engage in open carry so he could return that that work if he wanted. (Id., p. 32).

11. When Plaintiff Trementozzi testified at his deposition that his municipal CCW permit was not renewed, Defendants' counsel told him he could apply for the RIAG CCW permit. (Id., p. 25).

12. Plaintiff Patterson runs a construction business that uses explosives. (Patterson depo., p. 12, excerpts attached as Exhibit 19). When he is engaged in that business, he carries a firearm for self-defense. (Id., p. 13, 16). He would like the option to engage in open carry so he does not have to worry about whether his firearm is concealed. (Id.). He would be able to get the firearm out of its holster faster if it was not concealed. (Id., p. 19). Patterson also operates a gun shop. (Id., p. 20). He has between 250 and 300 firearms in his inventory. (Id.). Patterson takes delivery of 3-5 firearms a week. (Id., p. 21). He engages in open carry when he works at the gun shop. (Id., p. 22). He has had about eight attempted break-ins at the gun shop since 2005. (Id. p. 31). Patterson wants the open of open carry because he does not want to worry about whether his weapon is concealed when he is carrying for his businesses or responding to a break-in. (Id., pp. 52-53).

13. Plaintiff Laporte would like an open-carry license because he is applying for positions in the private security business. (Labporte depo., p. 19-20, excerpts attached as Exhibit 20).

14. Plaintiff Labriole would like the option to engage in open carry. (Labriole depo. p. 9, excerpts attached as Exhibit 21). He is in the construction business working outside and he believes open carry discourages crime. (Id., p. 18). He collects payments and sometimes receives payments unexpectedly. (Id., p. 9).

15. Plaintiff Cook would like the option to engage in open carry because it is his constitutional right. (Cook Declaration, ¶ 8, Exhibit 7).

16. Defendants point to a sentence in Clayton Cramer's book *Concealed Weapon Laws of the Early Republic*: "This suggests (but does not prove) that the open carrying of deadly weapons was subject to sufficient social stigma to guarantee that a ban on concealed carry was, effectively, a ban on all carrying."

17. It helps to read the whole book, including p. 63:

    > Francis Law Olmsted's description of a not completely concealed Colt revolver on a Kentucky railroad in 1853 strongly suggested that concealed carrying of handguns was at least common, if not widespread:
    >
    > *In the cars in Kentucky a modest young man was walking through with the hand[le] of a Colt out of his pocket-skirt be-hind. It made some laugh & a gentleman with us called out, "You'll lose your Colt, Sir." The man turned and after a mo-ment joined the laugh and pushed the handle into the pocket.*
    > *John said, "There might be danger in laughing at him." "Oh no," replied our companion, evidently supposing him serious, "he would not mind a laugh." "It's the best place to carry your pistol, after all," said he. "It's less in your way than anywhere else. And as good a place for your knife as anywhere else is down your back, so you can draw over your shoulder."*
    > *"Are pistols generally carried here?"*
    > *"Yes, very generally."*
    > *Allison said* commonly*, but he thought not generally [emphasis in original].*[2]

    (Cramer Declaration in Support of Plaintiffs' Objection to Summary Judgment, Exhibit 22, ¶ 19)

18. Cramer states that for historians, one of the more difficult questions to answer about an historical period is: How common was a behavior? Personal diaries and diaries may be good sources; they suffer the problem that an ordinary activity may not merit any attention simply because it *is* ordinary. (Id., ¶ 20).

---

[2] Frederick Law Olmsted, Olmsted, 2 The Papers of Frederick Law Olmsted 232-233 (1981).

19. Newspapers suffer an additional problem. When the carrying of firearms appears in newspapers of the antebellum period, we can assume that it was because of some other aspect of its carriage: its place, or how it is subsequently used. (Id., ¶ 21-22).

20. Here are a few examples where the pistol appears because of the newsworthy aspects. Dr. James Reynolds was tried in Philadelphia for riot and "assault… with an intent to kill." Dr. Reynolds drew a pistol when surrounded by a threatening mob.[3] His counsel defended him against a claim of premeditation because of his possession of a pistol:

> The times are altered, or party violence has become less serious; we see, indeed, that the spirit of party yet preserves a disposition to assassination, in the threats against Dr. R's. life, and that he at the present time has occasion to act on the defensive as every one did at these periods; there is no danger to be apprehended from a man who carries a sword-cane or other weapon of defence; there is no law in Pennsylvania to prevent it; every man has a right to carry arms who apprehends himself to be in danger. If every man has a right, was not this gentleman justifiable in putting arms in his pocket, when so special an occasion commanded him?[4]

(Id., ¶ 23).

21. The news coverage of the death of Charles Arndt, a member of the Wisconsin Territorial Legislature apparently at the hands of another member, James R. Vineyard, suggest that Vineyard's carrying of a revolver was sufficiently normal that he felt comfortable showing his recently acquired revolver to other members of the legislature some minutes before:

> Richard H. M'Goon testified, that he came to the American hotel some time previous. That he had a pistol with six barrels. [The pistol was produced in court. It had six barrels joined in one common cylinder, the barrels from four to five inches long It was so constructed that by pressing on the trigger it was cocked and fired immediately, the cylinder revolving at the same time, so that the whole six loads could be discharged as rapidly as the triggers could be pressed]. M'Goon testified that he was in Vineyard's room on the same day of his arrival. *Several were present, among them Vineyard—and the conversation turned upon pistols. He took his out*

---

[3] Francis Wharton, 7 STATE TRIALS OF THE UNITED STATES DURING THE ADMINISTRATIONS OF WASHINGTON AND ADAMS 345-7 (1849).

[4] *Id.* at 376.

> *of his over-coat pocket, and it was passed from hand to hand for inspection. He returned it to his over-coat pocket.*[5] [emphasis added].

(Id., ¶ 24).

22. Some references suggest that the carrying of a pistol was common enough that *some* people should not do so:

> Curiosity. The very last curiosity we have seen spoken of in the papers, is a wheel that came off a dog's tail when it was a wagging -- The individual who perpetrated that should not carry a pistol.[6]

(Id., ¶ 25).

23. Newspapers also report the carrying of pistols as a sign of how bad the street crime situation had become. The carrying of a pistol was considered a rational response to a bad situation:

> Our readers at a distance may judge of the state of affairs in this city, when we inform them that we actually knew a printer, who deems it necessary to carry a pistol to protect himself from highway robbers? When our trade has to resort to such means for protection, surely no one is safe. *Pittsburgh Dispatch*.[7]

(Id., ¶ 26).

24. A Methodist preacher and newspaper editor gives insights into the carrying of pistols in 1843:

> A CLERICO-POLITICO CURIOSITY.

---

[5] Abstact [Sic] Of Testimony Taken Before The Justice's Court In The Case Of Vineyard, *Southport* now Kenosha [Wisc. Terr.] *Telegraph*, 22 Feb. 22, 1842, 2, https://chroniclingamerica.loc.gov/lccn/sn85040303/1842-02-22/ed-1/seq-2/, last accessed January 6, 2025.

[6] Curiosity, *Hillsdale* [Mich.] *Standard,* Mar. 13, 1855, 1, https://chroniclingamerica.loc.gov/lccn/sn85033637/1855-03-13/ed-1/seq-1/, last accessed January 6, 2025.

[7] Our Readers…, *The Portsmouth* [Ohio] *Inquirer,* Feb. 17, 1851, 1, https://chroniclingamerica.loc.gov/lccn/sn85026203/1851-02-17/ed-1/seq-1/, , last accessed January 6, 2025.

> The Jonesboro' (Tenn.) Whig, with Mr. Clay's name, in tremendous letters, at its mast, is edited by a Methodist preacher. The following is the leading editorial in the last number received at this office:
>
> A SIX BARREL PISTOL.
>
> The lying editor of the Sentinel has now repeated between fifty and one hundred times, in five weeks, that we own and carry a pistol having six barrels.-- What will the public think, when we solemnly declare that we own no such pistol, nor have we during the *past few years*. We own but two in the world, each of which has *one barrel* --one we carry, and the other we loaned to Mr. Jones, the day after the second fight with Crouch. One of these pistols we; bought in the spring of 1840, and have owned it ever since. The one we keep constantly about us, cost thirty-five dollars; the one we let Mr. Jones have cost ten dollars. Neither has nor ever had more than one barrel.
>
> We have had, during the last three years, some three different pistols sent to our care, by friends in adjoining counties--one to be handed to a certain gentleman, and the other two to be repaired; all which was attended to, and, so far as we know, are now in the possession of their proper owners. The pistol with which Jones shot Crouch was not ours, *nor did he receive it from us*. Still, as said heretofore, if he had applied to us for one of our pistols before, instead of after the fight, he should have had it. And if we had been at home, instead of eight miles from town, as we were, the probability is he would have had our fine pistol, in which event Mr. Crouch's skull would not have turned out bullet-proof as it did!
>
> We have now given a true detail of the character, cost, and origin of our arms, and of the facts relating to Jones' pistol. For the want of this information, Haynes has lied frequently and egregiously. He can make any use of this knowledge he may choose. Meanwhile, if it will cause him to tell the truth hereafter, our object, in furnishing it, will have been accomplished.
>
> Now, our readers, doubtless, would like to know in whose district this paper is published. It is *Mr. Arnold's*, of course. [8]

(Id., ¶ 27).

25. This account tells us that having a loaded pistol in a San Francisco saloon was not startling.

The near miss of an accidental death was the "man bites dog" aspect:

---

[8] A CLERICO-POLITICO CURIOSITY, [Washington, D.C.] The *Daily Madisonian,* Feb. 24, 1843, 2, https://chroniclingamerica.loc.gov/lccn/sn84020074/1843-02-24/ed-1/seq-2/,, last accessed January 6, 2025.

> Narrow Escape.— On Sunday last as a Dr. Hunter was examining a pistol, and, handling it carelessly in the bar-room at the corner of Merchant and Kearny streets the pistol exploded, the ball passed through the wall into Mr. Marshall's saloon, within a few inches of the head of Mr. Ketcher, the city marshal's clerk, who was in there, and passed through the opposite wall over a vacant lot and struck a brick wall. It was very fortunate that no one was killed.— S. F. Trans.[9]

(Id., ¶ 28).

26. Newspapers reported another carrying of a pistol because of an accident with fortunately no lethal consequences that happened on the floor of the U.S. House of Representatives in 1860, when a pistol fell to the floor and discharged:

> The gentleman from Virginia had alluded to fact that a firearm had fallen on the floor. It was due to truth to say that, about the time he was talking somewhat excitedly in reference to the harsh and unjust remark by his colleague, a pistol in his breast-pocket accidentally fell to the floor. No man who knew him believed that he would use a pistol except in an honorable way. He regretted that this accident had occurred. He put the pistol in his pocket last night about twelve o'clock, to protect himself, if necessary, for he resided in the neighborhood of English Hill, where out rages have been committed, and wanted to feel secure in going home. Until he came to Washington, he bad never thought it necessary to be armed. He did not carry a pistol for any purpose here, but for his protection while passing through this sometimes violent city. He had seen occasions when, to protect one's self from insult, it was necessary to carry firearms.[10]

(Id., ¶ 29).

27. These were in the first 20 matches of an internet search for the words "pistol" and "carry" within five words of each other for newspapers 1756-1860.[11]

---

[9] Narrow Escape, [Nevada City, Cal.] *Nevada Journal*, Feb. 17, 1854, 1, https://chroniclingamerica.loc.gov/lccn/sn84026884/1854-02-17/ed-1/seq-1/, last accessed January 6, 2025.

[10] An Excitement, *Holmes County* [Ohio] *Republican*, Jan. 26, 1860, 1, https://chroniclingamerica.loc.gov/lccn/sn84028820/1860-01-26/ed-1/seq-1/, last accessed December 11, 2024.

[11] Chronicling America, https://chroniclingamerica.loc.gov/search/pages/results/?date1=1756&index=19&date2=1860&searchType=advanced&language=&sequence=0&dateFilterType=yearRange&proxdistance=5&r

(Id., ¶ 30).

28. J.D. Borthwick described how Gold Rush San Francisco was awash in places of entertainment with signs that announced, "No weapons admitted." While Borthwick thought little of the entertainments available, he did describe why it was nonetheless worth going:

> if only to watch the company arrive, and to see the practical enforcement of the weapon clause in the announcements. Several doorkeepers were in attendance, to whom each man as he entered delivered up his knife or his pistol, receiving a check for it, just as one does for his cane or umbrella at the door of a picture-gallery. Most men draw a pistol from behind their back, and very often a knife along with it; some carried their bowie-knife down the back of their neck, or in their breast; demure, pious-looking men, in white neckcloths, lifted up the bottom of their waistcoat, and revealed the butt of a revolver; others, after having already disgorged a pistol, pulled up the leg of their trousers, and abstracted a huge bowie-knife from their boot; and there were men, terrible fellows, no doubt, but who were more likely to frighten themselves than any one else, who produced a revolver from each trouser-pocket, and a bowie-knife from their belt. If any man declared that he had no weapon, the statement was so incredible that he had to submit to be searched; an operation which was performed by the doorkeepers, who, I observed, were occasionally rewarded for their diligence by the discovery of a pistol secreted in some unusual part of the dress.[12]

(Id., ¶ 31).

29. Isaac Weld's account of travels between 1795 and 1797 discussed how in the backcountry,

> "The people all travel on horseback, with pistols and swords…."[13] Pim Fordham, while staying at Princeton, Indiana, in 1817-18, reported that, "Yesterday 8 men on

---

ows=20&ortext=&proxtext=carry+pistol&phrasetext=&andtext=&page=1, last accessed January 6, 2025.

[12] J.D. Borthwick, The Gold Hunters 84 (1917), https://babel.hathitrust.org/cgi/pt?id=uva.x000333875&seq=12&q1=if+only+to+watch+the+company+arrive,+and+to+see+the+practical+enforcement+of+the+weapon+clause+in+the+announcements, last accessed January 6, 2025.

[13] Isaac Weld, 1 *Travels Through the States of North America, and the Provinces of Upper and Lower Canada, During the Years 1795, 1796, and 1797* 234 (1807),

9

> foot armed with pistols and rifles came into the town from Harmony. They had been in pursuit of an absconded debtor from Vincennes." It was no problem to persuade eight men armed with pistols and rifles to pursue a mere debtor, and Fordham found nothing surprising about them being so armed. Fordham described an associate judge as carrying "a pair of pistols at his saddle bow; and altogether [he] looks more like a Dragoon Officer in plain clothes, than a Judge." The pistols themselves were not remarkable; what was remarkable, at least to a transplanted Englishman, was that a *judge* was carrying them.[14]

(Id., ¶ 32).

30. Fordham also described a party in the Illinois Territory that had excluded some "vulgar" party-crashers. Some of Fordham's party "armed themselves with Dirks (poignards [daggers] worn under the clothes)" to resist another such attempt, but later, "In going away some of the gentlemen were insulted by the rabble, but the rumour that they were armed with dirks and pistols prevented serious mischief." While the antecedent of "they were armed" is unclear, that it prevented serious mischief by "the rabble" suggests that members of Fordham's party were the ones armed; pistols were weapons commonly enough carried to be a realistic deterrent to "the rabble."[15] According to Fordham (and many other travelers), the flatboat men who worked the Mississippi River were a wild and dangerous population. Fordham warned, "But I would advise all travellers going alone down the river, to get one man at least that they can depend upon, and to wear a dagger or *a brace of pistols*;

---

https://babel.hathitrust.org/cgi/pt?id=nyp.33433081710810&seq=288&q1=The+people+all+travel+on+horseback,+with+pistols+and+swords, last accessed January 6, 2025.

[14] Elias Pym Fordham, Frederic Austin Ogg, ed., *Personal Narrative Of Travels In Virginia, Maryland, Pennsylvania, Ohio, Indiana, Kentucky; And Of A Residence In The Illinois Territory: 1817-1818* 137 (1906), https://babel.hathitrust.org/cgi/pt?id=uc2.ark:/13960/t5k939t24&seq=7&q1=Yesterday+8+men+on+foot+armed+with+pistols+and+rifles+came+into+the+town+from+Harmony, last accessed January 6, 2025.

[15] Id., at 219, https://babel.hathitrust.org/cgi/pt?id=uc2.ark:/13960/t5k939t24&seq=222&q1=armed+themselves+with+Dirks, last accessed January 6, 2025.

for there are no desperadoes more savage in their anger than these men." [emphasis added].[16]

(Id., ¶ 33).

31. Francis Baily's *Journal of a Tour in Unsettled Parts of North America in 1796 & 1797* is awash in hunting and guns. (He came to America from Britain at least in part to hunt.).

(Id., ¶ 34).

32. Washington, D.C. was still largely woods when Baily visited it. To emphasize how far the new capital had to go before it would be a large city, Baily reported, "Game is plenty in these parts, and, what perhaps may appear to you remarkable, I saw some boys who were out a shooting, actually kill several brace of partridges in what will be one of the most public streets of the city." It was not boys out shooting that was remarkable to Baily; what was significant is that they were shooting in what would be one of the main boulevards of America's capital.[17]

(Id., ¶ 35).

33. Robert Baird's *View of the Valley of the Mississippi* reads like a real estate promotional guide, emphasizing the enormous benefits from moving to these largely unsettled states—but still admits some unsavory aspects of the frontier. A few instances of violence appear in Baird's promotional work, such as St. Louis and its dueling problem, but they are usually in conjunction with a positive statement such as, "A great moral change is, however, going

---

[16] Id., at 195-196, https://babel.hathitrust.org/cgi/pt?id=uc2.ark:/13960/t5k939t24&seq=200&q1=desperadoes, last accessed January 6, 2025.

[17] Francis Baily, Jack D.L. Holmes, ed., *Journal of a Tour in Unsettled Parts of North America in 1796 & 1797* 26, 35, 39-41, 43, 62, 70, 91, 93, 97-98, 115, 139 (1969).

forward here." Baird also reported a dispute at cards aboard a steamboat, "Pistols and dirks were drawn!"[18]

(Id., ¶ 36).

34. Defendants have two experts with respect to the historical tradition of firearms regulations, Dr. Brennan Rivas and Dr. Michael Spitzer. (Their expert declarations are attached to Plaintiffs' Statement of Undisputed Facts in Support of their Motion for Summary Judgment as Exhibits 9 and 10, respectively). Rivas testified that she has found three states, Massachusetts, West Virginia and Texas, and one territory, Idaho, that passed statutes barring the open carry of firearms. (Plaintiffs' SUF # 41). Rivas said that she was aware of some municipal restrictions on open carry but added that there was no authoritative, searchable database of such regulations. (Id. # 42). Rivas found that licensing requirements for open carrying were "generally local." (Id. # 43).

35. Rivas found that in Tennessee and Arkansas, open carry was statutorily less restricted than concealed carry as it was thought that open carry was less dangerous than concealed carry because other people could see who had a weapon and avoid them. (Id. # 44). Rivas found that people engaged in public carry "in preparation for an unforeseen potential emergency." (Id. # 45).

36. Rivas found in her research that the most common constraint on public carry was social disapproval of the practice. She cited newspaper articles calling on people to restrain from public carry. As a result, people more frequently engaged in concealed carry. (Id. # 46).

---

[18] Baird, *A View of the Valley of the Mississippi...* 325-7 (1832), https://archive.org/details/viewvalleymissi00bairgoog/page/n372/mode/2up?q=%22Pistols+and+dirks+were+drawn%21%22, last accessed January 6, 2025..

12

37. Rivas also found that long arms, such as rifles and shotguns, were not considered deadly weapons and generally not included in the regulations of such weapons, unlike concealable weapons, such as pistols and knives. (Rivas depo., pp. 64-68, excerpts attached as Exhibit 21).

38. Defendants' other expert, Robert Spitzer, testified that he did not specifically address in his expert declaration whether or not Rhode Island's regulatory scheme is consistent with a historical tradition of open carry regulations. (PSUF, # 47). Spitzer said he has not been asked to render an opinion on that. (Id. # 48). Spitzer testified he could not specifically recall a previous case in which he has previously been retained as an expert that involved either concealed carry or open carry. (Id., p. 49).

39. For the period from the early 1800s up to 1860, Spitzer's Declaration identifies the District of Columbia and what he says are four states that enacted laws restricting the carrying of named weapons, whether open or concealed, Georgia, Florida, the borough of York, Pennsylvania, and Hawaii. (Id. # 50). Spitzer acknowledged that the Georgia Supreme Court struck down the statute's restriction on open carry as unconstitutional. (Id. # 51). Spitzer agrees that the Massachusetts act passed in 1751 did not prohibit an individual from engaging in either open or concealed carry. (Id. # 52). Most of the statutes that Spitzer identifies as purportedly restricting public carry of firearms were promulgated after 1868. (Id., # 53-55). Some of the statutes Spitzer identifies for the period 1791 to 1868 are surety laws. (Id., # 56). Some of the statutes Spitzer identifies were promulgated by territories or a foreign country (Hawaii). (Id. # 55).

40. At his deposition, Plaintiffs' expert Clayton Cramer testified that in his research he had not come across any laws that prohibited open carry but allowed concealed carry. (Cramer depo., p. 196, excerpt attached as Exhibit 23).

41. At her deposition, Defendants' expert Brennan Rivas testified that long arms (such as rifles and shotguns) were considered less dangerous than concealable weapons which were considered "deadly weapons" and that the historical regulations focused on concealable weapons. (Rivas depo., pp. 64-68, excerpt attached as Exhibit 24).

Respectfully submitted,

**PLAINTIFFS,**
By their attorneys,

/s/ *Thomas W. Lyons*
Thomas W. Lyons         #2946
Strauss, Factor, Laing & Lyons
One Davol Square, Suite 305
Providence, RI 02903
(401) 456-0700
tlyons@straussfactor.com

/s/ *Frank R. Saccoccio*
Frank R. Saccoccio Esq. #5949
Saccoccio Law Office
928 Atwood Avenue
Johnston, Rhode Island 02919
(401) 944-1600 * 942-8921 Fax
Frank.CSLawOffice@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2025, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Thomas W. Lyons