1   academy.  That's about it.  That's all I can recall.
2       Q.   What academy was that?
3       A.   The Federal Law Enforcement Training Academy
4   is where we're trained.  ATF, all federal agencies,
5   with the exception of the FBI, train there.  Their
6   academy is run, ATF's academy is run at that location.
7   It's in Georgia.
8       Q.   All right.  Where were you stationed in the
9   ATF?
10      A.   Stationed one year in northern Virginia,
11  Falls Church, four years in Washington, DC, and the
12  final 20 in Providence, Rhode Island.
13      Q.   Okay.  Where are you from originally?
14      A.   Connecticut.
15      Q.   When did you join the Attorney General's
16  Office?
17      A.   2019.
18      Q.   Have you been with the Attorney General's
19  Office continuously since 2019?
20      A.   I have.
21      Q.   Have you held any other employment since
22  joining the Attorney General's Office?
23      A.   I have not.
24      Q.   What position or positions have you held
25  since joining the Attorney General's Office?



1  A. Just my current position as chief.
2  Q. Okay. What are you chief of?
3  A. The Bureau of Criminal Identification and
4  Investigation.
5  Q. What do you do in that capacity?
6  A. A variety of different tasks, but generally
7  speaking I'm in charge of the facility that you're in,
8  which has a customer service and licensing
9  responsibility. Then I also serve as the super of all
10 our investigative capacities, as well as the security
11 of our facilities and the AG.
12 Q. Okay. You raised a point I should probably
13 clarify, which is, where are we?
14 A. We are in the Attorney General's Office at
15 4 Howard Avenue in Cranston, Rhode Island.
16 Q. How long has this facility existed?
17 A. I believe it was opened in June or July of
18 2018.
19 Q. Okay. Before that, where did you work?
20 A. I was, I started employment in 2019.
21 Q. You're right. I'm sorry. Now it's my math
22 that's off. Have you held the same position since
23 2019?
24 A. I have.
25 Q. Has there been any change in your



```
 1   responsibilities since 2019?
 2        A.   No substantial change, no.
 3        Q.   Do you carry a firearm as part of your
 4   current duties?
 5        A.   I do.
 6        Q.   What kind of firearm?
 7        A.   I have two firearms issued to me.
 8        Q.   Okay.
 9        A.   One is a Glock 40 caliber pistol.
10        Q.   Okay.
11        A.   One is a Smith & Wesson 380 caliber pistol.
12        Q.   Okay.  Do you have any permits, licenses for
13   those?
14        A.   I do not.
15        Q.   So no state or federal agency has issued a
16   license or permit authorizing you to carry those?
17        A.   Well, so that depends on your definition.
18   Under LEOSA, under the federal government, retired
19   federal officers and other law enforcement officers
20   for that matter are permitted to carry a concealed
21   firearm.
22        Q.   Okay.
23        A.   So it's not a permit, per se.
24        Q.   All right.  You don't actually have to file
25   an application and get a permit that says you're
```



1   authorized to carry the firearm?
2       A.  You do not.
3       Q.  Okay.
4       A.  You simply have to have a card from your
5   original employing agency.
6       Q.  To clarify something that you alluded to, do
7   you conceal those when you carry them, or do you carry
8   them openly, or does it depend?
9       A.  Concealed.
10      Q.  Do you ever carry them openly?
11      A.  Not in a personal capacity, no.
12      Q.  You ever do it in an official capacity?
13      A.  Yes.
14      Q.  What are the circumstances in which you carry
15  one of those handguns in an open manner?
16      A.  So if I'm here in the building, it would
17  generally be carried openly.
18      Q.  Okay.
19      A.  Or outside the building if we are doing
20  something operationally, in other words, like
21  executing an arrest warrant, something along those
22  lines.
23      Q.  So would it be fair to say that if you're
24  operating in your capacity as an employee of the
25  Attorney General's Office you carry one of the



```
 1   handguns, or either one of the handguns openly, but if
 2   you're acting as a private citizen you would carry
 3   concealed?
 4       A.   I wouldn't say that is entirely accurate.
 5   Because if I was just walking down the street, for
 6   instance, in the City of Providence, while, during my
 7   normal business hours, I wouldn't be carrying it
 8   openly.  I would have a jacket on, concealing it.
 9       Q.   Okay.  In other words, if you went down the
10   street to get a sandwich for lunch, you would not be
11   carrying openly?
12       A.   Correct.
13       Q.   Okay.  The Glock has a magazine in it, right?
14   In other words, it's not a revolver?
15       A.   Correct, I have a magazine.
16       Q.   How big is the magazine?
17       A.   I believe that, I believe that one has a 10
18   or 12 round capacity.
19       Q.   10 to 12?
20       A.   No, 10 or 12.  I don't recall.
21       Q.   Okay.  Does the size depend on what kind of
22   bullets you put in the magazine?
23       A.   Well, that particular gun will accept a
24   larger magazine.
25       Q.   Okay.  What you're saying is you don't recall
```



```
 1   as you sit here what size you have?
 2        A.   Correct.
 3        Q.   Okay.  How about the Smith & Wesson; does it
 4   have a magazine?
 5        A.   It does.
 6        Q.   What size is that?
 7        A.   8 rounds.
 8        Q.   Okay.  Have you ever held a federal or state
 9   permit to carry firearms?
10        A.   I have not.
11        Q.   Is open carry a deterrent to crime?
12             MR. ARGUIN:  Objection.  He is not here
13   as an expert witness, but to the extent you know.
14        A.   I don't have any data.
15        Q.   Is open carry more accessible to the person
16   who is carrying the firearm?
17             MR. ARGUIN:  Same objection.  You can
18   answer.
19        A.   I could not answer that.
20        Q.   Okay.  Why would you engage in open carry as
21   opposed to concealed carry?
22        A.   Well, I guess that would be one, one
23   determining factor.  Usually in a tactical situation
24   if I was outside the building, I wouldn't want to have
25   to retrieve it from a concealed position.
```



```
 1      Q.  Okay.  Are there any other advantages or
 2   differences between open carry and concealed carry,
 3   besides accessibility?
 4              THE WITNESS:  Advantages or differences?
 5              MR. LYONS:  Either one.
 6      A.  Well, I think there's certainly an
 7   interaction with the public with a concealed versus an
 8   open carry.
 9      Q.  What is that difference?
10      A.  I think there can be a certain level of
11   intimidation or fear generally by the public when they
12   see an open firearm, open carried firearm.
13      Q.  Is it more intimidating to a potential
14   criminal?
15      A.  I can't answer that.
16      Q.  Have you ever attempted to get a concealed
17   carry permit from any state or from the federal
18   government?
19      A.  I have not.
20      Q.  When you joined the Attorney General's Office
21   in 2019, did you then -- first of all, who was the
22   Attorney General then?
23      A.  Peter Neronha.
24      Q.  Neronha.  When you joined the Attorney
25   General's Office in 2019, did you begin to have
```



EDWARD TROIANO                                                                          March 22, 2024
MICHAEL ONEIL V. PETER F. NERONHA                                                          25

```
 1        A.   No.
 2        Q.   Does the Attorney General ever contact you to
 3   ask why you're recommending approval or disapproval?
 4        A.   He has in the past.
 5        Q.   With respect to the Plaintiffs in this case,
 6   do you recall if you had any discussion with the
 7   Attorney General about whether their applications
 8   should be approved or disapproved?
 9        A.   I don't recall having any conversations with
10   him about these particular Plaintiffs.
11        Q.   Okay.  Do you recall with respect to these
12   Plaintiffs what recommendations you made to the
13   Attorney General with respect to their applications?
14        A.   Yes.  I recommended that they be denied.
15        Q.   Okay.  That's true for all of them?
16        A.   Yes.
17        Q.   Okay.  We have letters, which we can talk
18   about in the future of this deposition, that were sent
19   from the Attorney General's Office to the applicants
20   setting forth reasons why the applications were
21   denied.  Is there any other material in their files
22   which indicate why the applications were denied?
23        A.   I don't think so.
24        Q.   Okay.  Are there, for example, written notes
25   or typed notes of someone's review of an application
```



800.211.DEPO (3376)
EsquireSolutions.com

1  the municipalities may be accessing information as
2  part of a background check for a concealed carry
3  permit without any human being from your office being
4  involved?
5       A.  Yes, sir.
6       Q.  Okay.  Is there any other source, besides the
7  BCI database, that municipalities could use to access
8  background criminal information for a concealed carry
9  permit?
10      A.  Yes.  They would be able to access NCIC, III
11 inquiry.
12      Q.  What is NCIC?
13      A.  The National Criminal Information Center, I
14 believe.
15      Q.  Who operates that?
16      A.  Department of Justice, FBI.
17      Q.  You refer to III; is that like capital letter
18 I?
19      A.  Interstate Identification Index.
20      Q.  Okay.
21      A.  Those are both federal databases.
22      Q.  Who operates the III database?
23      A.  The FBI.
24      Q.  Okay.  Do you have any knowledge as to how
25 concealed carry applications were reviewed prior to



1   joining the Attorney General's Office?
2        A.   I do not.
3        Q.   Okay.  Is there anybody in the Attorney
4   General's Office now who has any knowledge of how
5   those applications were handled?
6             MR. ARGUIN:  Objection, calls for
7   speculation.  You can answer, if you know.
8        A.   Not that I'm aware of.
9        Q.   Okay.  Is there anybody employed by the BCI
10  office now who was employed in the BCI office Before
11  Attorney General Neronha took office?
12       A.   Yes.
13       Q.   Okay.  Were any of those people, to your
14  knowledge, involved in reviewing concealed carry
15  permit applications?
16       A.   Not that I'm aware of.
17       Q.   To your knowledge, who did those reviews
18  before you?
19       A.   The previous chief was William Correlas.
20       Q.   Do you know for how long he was the chief of
21  the BCI unit?
22       A.   I don't know.
23       Q.   Did you discuss concealed carry permit
24  applications with Chief Correlas when you took over?
25       A.   Not in detail, no.



```
 1       Q.   Did you review the prior handling of
 2   applications with anybody when you took over?
 3       A.   So the discussion, to the extent I had with
 4   Mr. Correlas, was the procedure.
 5       Q.   What did he tell you about the procedure?
 6       A.   He had the application package, a copy of the
 7   application package for CCW permitting.  I believe he
 8   showed me, you know, an example of one of the files
 9   that we have for an applicant.  We kind of went
10   through that file.
11       He showed me, you know, what would normally be
12   received by the office, what the application package
13   looked like, and we also briefly discussed the
14   opportunity, the appeals opportunities for applicants
15   who were initially denied.
16       Q.   Did he discuss with you the grounds or
17   factors that were, that would be considered in
18   granting or denying an application?
19       A.   He did not.
20       Q.   Okay.  To your knowledge, have any of those
21   procedures changed since you took office?
22       A.   I don't think so, no.
23       Q.   Have any of the factors or grounds for
24   granting or denying an application for concealed carry
25   permit changed since you took office?
```



```
 1        A.   No.
 2        Q.   Did Mr. Correlas, Chief Correlas, tell you on
 3   what grounds he would recommend -- well, let me
 4   withdraw a question.  I'm making an assumption.  Did
 5   Chief Correlas tell you that when he was handling
 6   concealed carry permit applications, again, it was the
 7   Attorney General who was then in office who would
 8   grant or deny them?
 9             MR. ARGUIN:  Objection.
10        Q.   Let me withdraw the question.  As I
11   understand it, you told me that the procedures since
12   you have taken over with respect to concealed carry
13   permit applications is you make a recommendation to
14   the Attorney General, and the Attorney General makes
15   the final decision on granting or denying an
16   application?
17        A.   Correct.
18        Q.   Was that the procedure, to your knowledge,
19   before you took over when Chief Correlas was running
20   the BCI office?
21        A.   Yes.
22        Q.   Okay.  Do the applicants' file have a history
23   of their prior applications, including whether their
24   prior applications were granted or denied?
25        A.   They do.
```



EDWARD TROIANO  
MICHAEL ONEIL V. PETER F. NERONHA

March 22, 2024  
33

1    Q.  They do.  Are you aware that the Plaintiffs
2  in this case previously had, I'll call it state issued
3  concealed carry permits?
4    A.  I am aware that certainly some of them did.
5  I don't know or recall on a case-by-case basis which
6  ones did and which ones didn't.
7    Q.  Do you have any specific knowledge or
8  recollection as you sit here today that the
9  applications which were denied, which are the subject
10  of this lawsuit, that any of those applicants were a
11  fist-time applicant?
12    A.  I do not believe any of them were first-time
13  applicants.
14    Q.  So each of them was seeking a renewal of a
15  prior permit that had been issued by the Attorney
16  General's Office?
17    A.  Yes, sir.
18    Q.  Okay.  Do you know whether any of those
19  applicants previously had a permit issued by a
20  Rhode Island municipality at the time they applied for
21  renewal of their Attorney General's permit?
22    A.  As we sit here today, no, I don't recall.
23    Q.  Does the file that you have for any of the
24  applicants indicate whether they previously had a
25  concealed carry permit issued by a municipality?



800.211.DEPO (3376)  
EsquireSolutions.com

1    A.   I believe it would.
2    Q.   It would, okay.  Prior to you taking your
3  position, do you know whether or not the Attorney
4  General's Office ever denied a concealed carry
5  application on the grounds that an applicant had the
6  same, at the time of the application, a permit issued
7  by a municipality?
8    A.   I do not have that knowledge.
9    Q.   Okay.  Do you know whether or not the
10 decision to deny an application based on the fact that
11 a permit had, that the applicant held a permit issued
12 by a municipality was something that started with the
13 current Attorney General, Mr. Neronha?
14   A.   I do not have that knowledge, either.
15   Q.   Okay.  Have you ever heard that prior to your
16 taking office and Mr. Neronha becoming the Attorney
17 General that any person's application for an Attorney
18 General issued concealed carry permit had been denied
19 on the grounds that they already had a municipally
20 issued concealed carry permit?
21           THE WITNESS:  Have I heard from just
22 any --
23           MR. LYONS:  Yes.
24   A.   I don't recall the topic ever came up, so I
25 would say that would be no.



800.211.DEPO (3376)
EsquireSolutions.com

EDWARD TROIANO  
MICHAEL ONEIL V. PETER F. NERONHA

March 22, 2024  
35

```
 1       Q.   Okay.  You would agree with me that each of
 2   these applicants had their application for concealed
 3   carry permit denied, in part, at least for one reason,
 4   being that they already had a municipally concealed
 5   carry permit?
 6       A.   I think that's fair to say, yes.
 7       Q.   Okay.  Do you know whether that represents a
 8   change in policy or practice at the Attorney General's
 9   Office?
10       A.   I do not know.
11       Q.   Okay.  Do you know how that came about, that
12   that became the, a reason to deny an Attorney
13   General's issued permit?
14       A.   Well, I wouldn't -- well, first of all, no, I
15   don't know how it came about.  I think that's a factor
16   in reviewing the application process.
17       Q.   Okay.  When you make a recommendation to the
18   Attorney General to deny or grant an application for a
19   concealed carry permit, do you convey to him the
20   information that the applicant has a permit issued by
21   a municipality?
22       A.   Well, that information is in the application.
23       Q.   Okay.
24       A.   That is filled out, and the Attorney General
25   has access to that file and that information.
```



800.211.DEPO (3376)  
EsquireSolutions.com