1   Rhode Island Army National Guard?
2       A.  Yes, sir.
3       Q.  Okay.  Getting back to your current
4   employment with American Airlines, does American
5   Airlines make it a condition of your employment to
6   carry a handgun to work?
7       A.  No.
8       Q.  Does American Airlines or your supervisors at
9   American Airlines, do they, have they ever asked you
10  to carry a handgun to work?
11      A.  No.
12      Q.  Have your supervisors at American Airlines
13  ever told you that it's okay to bring a handgun to
14  work?
15      A.  No.
16      Q.  Do you currently operate any kind of firearms
17  business?
18      A.  Yes.
19      Q.  When did you open that business?
20      A.  January of -- October.  I'm not sure.  It was
21  either October of 2022 or possibly 2023 January.  I'm
22  not sure.
23      Q.  Are you the sole owner of the business?
24      A.  No.
25      Q.  Who else is in business with you?



```
 1         A.   Frank Saccoccio.
 2         Q.   What is the nature of that business?
 3         A.   To sell firearms and transfer firearms.
 4         Q.   Where is the business located?
 5         A.   255 Warner Brook Drive, Warwick,
 6    Rhode Island.
 7         Q.   I'm sorry, that was Warner Book?
 8         A.   Warner Brook Drive, Warwick, Rhode Island.
 9    It's my residence.
10         Q.   Is your business open to the public, retail
11    shop?
12         A.   Yes.
13         Q.   What kind of weapons do you stock?
14         A.   As of right now, I don't have anything in
15    stock.
16         Q.   No firearms in stock?
17         A.   I have firearms in stock, but they're not for
18    sale.
19         Q.   I got you.
20         A.   They're for transfer.
21         Q.   How many firearms do you have currently in
22    stock for transfer?
23         A.   I'm not sure.
24         Q.   If you had to estimate, how many would you
25    say; is it under a hundred, or more than a hundred?
```



```
 1       A.   It's under a hundred.
 2       Q.   Okay.  Since you opened the business, how
 3   many firearms would you estimate you sold?
 4       A.   I haven't sold any.
 5       Q.   Haven't sold any.  Since the business started
 6   in October '22 --
 7       A.   Yes, because, right, because my FFL license
 8   didn't come into effect until January.
 9       Q.   Okay.  January 2023?
10       A.   Yes.
11            MR. LYONS:  Or '24?  '23 or '24?
12            THE WITNESS:  '23.
13       Q.   '23.  So since January 2023, have you sold
14   any firearms?
15       A.   No.  Just transfers.
16       Q.   Just transfers, okay.  How often do you take
17   restock or delivery of new firearms?
18       A.   I haven't done any of that yet.
19       Q.   Okay.  Well, how did you get your initial
20   inventory then?
21       A.   I haven't sold anything.  I don't have an
22   initial inventory.  I still have my website being
23   built.  I've been getting a lot of transfers.
24            If somebody buys something from out of state,
25   they transfer it to me.  I do the background check.
```



```
 1   They fill out the paperwork.  Once the background
 2   check clears, state and federally, then they retrieve
 3   the firearm.
 4       Q.   Okay.  Do you have any firearms physically
 5   present at your shop, your retail shop?
 6       A.   Yes.
 7       Q.   How many of those are physically present at
 8   the shop?
 9       A.   It could be three; it could be four.  I'm not
10   sure.
11       Q.   Do you have any security at your shop?
12       A.   Yes.
13       Q.   What types of security do you have at your
14   shop?
15       A.   I have an alarm system.
16       Q.   What type of an alarm system?
17       A.   It's a wired alarm system.  It's hooked up to
18   the Ring.
19       Q.   Hooked up to what?
20       A.   Ring.  So it's monitored.  I have cameras.
21       Q.   How many cameras do you have?
22       A.   Six.
23       Q.   Are they located inside or outside?
24       A.   Outside and in.
25       Q.   Both, okay.  Any additional security measures
```



```
 1   in place there to protect the weapons?
 2        A.   They're in a safe.
 3        Q.   They're in a safe, so they're in a locked
 4   safe?
 5        A.   Yes.
 6        Q.   In addition, are there any bolts on the doors
 7   or anything like that?
 8        A.   Yes.  There is a lock on the doors.  It's in
 9   a separate room.
10        Q.   Do you have any private security company that
11   patrols your property?
12        A.   No.  I have a German Shepherd.  I patrol as
13   well.
14        Q.   Good.  Has there been any, any security
15   incidents that took place at the gun shop where
16   someone tried to break in or anything?
17        A.   No, no.
18        Q.   Apart from your current employment with
19   American Airlines and your past employment with the
20   Air Force and the Rhode Island National Guard, is
21   there any other employment you're currently engaged
22   in -- well, your firearms business, too?
23        A.   Right.
24        Q.   Apart from the firearms business, American
25   Airlines, your former service with the Air National
```



```
 1        A.   I think I've done at least seven
 2   qualifications.
 3        Q.   Which area?  Well, you teach three different
 4   courses?
 5        A.   So it would be for their qualification.
 6        Q.   Just basic qualification?
 7        A.   Yes.
 8        Q.   Apart from the -- well, let me just ask you
 9   this:  Have you ever held any position with a law
10   enforcement agency, meaning state or local police?
11        A.   No.
12        Q.   Do you currently provide any security-related
13   services?
14        A.   No.
15        Q.   Do you have any plans to provide
16   security-related services?
17        A.   Talked about it.
18        Q.   What type of services would you be interested
19   in engaging in?
20        A.   More like transfer.
21        Q.   Transfer of what?
22        A.   Firearms.  If I have to transfer firearms, I
23   have to pick up firearms for a, which I've done in the
24   past, for a, when someone passes away, the estate.
25   I've had attorneys call me and ask me to.
```



```
 1   Guard and the Air Force, anything else, any other
 2   employment?
 3        A.   I'm an NRA instructor.
 4        Q.   Okay.  Is that a paid position?
 5        A.   If I want it to be, if I charge somebody.
 6        Q.   Okay.  Do you charge for that?
 7        A.   No.
 8        Q.   What is your, what are you qualified to
 9   instruct in?
10        A.   So basic pistol course, chief range safety
11   officer, second run large ranges.
12        Q.   Any others?
13        A.   That's it.
14        Q.   How long have you been, how long have you
15   served as an NRA instructor?
16        A.   Almost ten years.
17        Q.   How many people do you think you've
18   instructed or trained over the years?
19        A.   I could not even give you a guess.  I've
20   qualified a lot of people.  I've trained a lot of
21   people.
22        Q.   More than ten, more than --
23        A.   Oh, yes.
24        Q.   More than fifty?
25        A.   Yes.
```



```
 1         Q.   More than a hundred?
 2         A.   I'm not sure on that.
 3         Q.   Okay.  So somewhere between 100 and 50; is
 4    that fair?
 5         A.   Sure.
 6         Q.   I mean, you said you could charge for that,
 7    but you haven't currently charged for that?
 8         A.   No.
 9         Q.   So is that more of a volunteer position?
10         A.   No, no.  It's something that I do, you know,
11    as a job.
12         Q.   How often do you provide these training
13    courses?
14         A.   If I get phone calls, people needing to get
15    qualified, or a business will call me and say, Hey, I
16    need some of my people trained, I'll do that.
17         Q.   Okay.  How frequently do you think that
18    happens?
19         A.   It comes in spurts.  So sometimes I'm busy
20    every week.  Sometimes I just, I take the summer off
21    and not do anything.  But if somebody needs a
22    qualification, then I will spend, you know, the day,
23    and take care of their qualification.
24         Q.   How about just this year, from the beginning
25    of the year until now, 2024?
```



1    Q.  Okay.  You're not yet engaged in that type of
2    business?
3    A.  Well, I have done some estate work for
4    people, yes.
5    Q.  When was the last time you worked with an
6    estate to, I guess, collect firearms from a decedent?
7    A.  About a year and-a-half ago.
8    Q.  How many firearms were involved?
9    A.  Ten, maybe.
10   Q.  How does that work; what do you do with them
11   once you recover them?
12   A.  I take all the information down, what model,
13   make, caliber, serial number, do an inventory.
14   Q.  Then how do you dispose of them?
15   A.  When the attorney is ready for me to turn
16   them over, either to a person that is receiving them
17   from the estate, then they would go, at that time they
18   would go through a licensed FFL dealer.  I would turn
19   them over with the attorney, and then the licensed FFL
20   at the time would do all the background checks and
21   everything.
22   Q.  So this is something different than the gun
23   shop that you're running?
24   A.  Yes.  Well, now that I'm a gun shop, I would
25   handle the background checks.



1      A.   Yes, I am.
2      Q.   What is your affiliation?
3      A.   I am the vice president.
4      Q.   How long have you been a member of the
5  Rhode Island Second Amendment Coalition?
6      A.   Since it formed in 2013.
7      Q.   What is your role as vice president?
8      A.   Legislation, communications.
9      Q.   What type of communications are you focused
10 in?
11     A.   So I'm basically the communicator between the
12 gun clubs.  You know, I travel through the state to
13 their meetings, let them know legislatively what we're
14 facing.  I talk to them about lawsuits that we have
15 pending.  Also, when we have to have everybody come up
16 to the State House, I coordinate different events at
17 the State House during House and Senate hearings.
18     Q.   What type of legislation is the organization
19 focused on or interested in?
20     A.   Pro firearm, anti firearms, security in
21 schools.
22     Q.   Have you ever been threatened because of your
23 affiliation with these kinds of gun groups?
24     A.   Define like a threat?  There are some things
25 that I don't, you know, things get heated.  I don't



```
 1   consider it as a threat, but you may consider it as a
 2   threat.
 3       Q.  Has anyone ever tried to intimidate you
 4   because of your stand on guns?
 5       A.  Yes.
 6       Q.  How many times has that happened?
 7       A.  Probably 20.
 8       Q.  Okay.  Starting when, how far back does this
 9   go?
10       A.  2013 to present day.
11       Q.  Okay.
12       A.  I'm guessing about 20.
13       Q.  Well, about 20 times you've had instances --
14       A.  That I recall, yes.
15       Q.  What is the -- let's start most recently.  Do
16   you recall a most recent incident where you felt
17   intimidated because of your stand on guns?
18       A.  I don't feel intimidated on my stance on
19   guns, but I am a target because of who I am and what I
20   believe in.  I've been cursed at; I've been sworn at.
21   People have almost tried to get physical.
22       Q.  What's the most recent one from today when
23   this kind of an incident happened?
24       A.  I don't recall.  Because last year, you know,
25   we're up there twice a year as far as when there's
```



1  hearings.  Sometimes three times.  So that's when we
2  have, you know, massive groups on both sides.  So
3  that's where it gets a little, people get tense and
4  stuff like that.  As far as, I could not tell you.
5       Q.  But you said when you're up there; do you
6  mean Capitol Hill?
7       A.  Sorry, yes, Capitol Hill.
8            MR. LYONS:  The State House?
9            THE WITNESS:  The State House, yes.
10      Q.  Over here at the State House in Rhode Island?
11      A.  Yes.
12      Q.  Just what are the circumstances?
13      A.  There is legislation afoot and you're
14 protesting at the State House.  We have rallies.  We
15 do not, what we do is we have everybody come in, sign
16 up and testify.  Our position is they don't really
17 care for us.
18      Q.  This is happening inside or outside?
19      A.  Both.
20      Q.  The Capitol?
21      A.  Both.
22      Q.  Were these comments, you know, being cussed
23 at and sworn at, as you described, were they directed
24 at you personally, or at the whole group?
25      A.  Me, personally, and the whole group.



```
 1        Q.   Focussing on the ones that were directed at
 2   you personally, what do you recall about what they
 3   were saying to you?  How were they trying to
 4   intimidate?  Whether or not you were intimidated, how
 5   did they try to intimidate you?
 6        A.   Basically they scream at you, You're killing
 7   babies.  You don't have any rules on gun safety, stuff
 8   like that.
 9        Q.   Can you estimate when the last time was this
10   kind of, this happened to you?
11        A.   I'm not sure, because we didn't, we did have
12   COVID where we didn't really go in and testify.  Last
13   year, I don't recall.
14        Q.   So it happened before COVID?
15        A.   It definitely happened before COVID.  As far
16   as like last year, I don't know.  Honestly, like I, I
17   know how to handle it.  I just kind of shake it off.
18   If it gets really, really ugly, I have a good rapport
19   with the Capitol Police.  I call them.  I have them
20   come up, and they'll handle it.
21        Whether it's my side, or their side, or both
22   sides getting a little edgy, you know, I call Capitol
23   Police and have them come down and throw them out.
24        Q.   Just to get a time frame, when you say before
25   COVID, what years are you talking about there?
```



```
 1      Q.  Well, have you applied?
 2      A.  I don't have to apply.  If you read the law,
 3  it states whether you can carry or not.  If they
 4  accept, like in North Carolina it says that they will
 5  accept an out-of-state permit to carry, because there
 6  is no, there is no nonresident permit.
 7      Q.  Okay.  So that's your understanding of
 8  Tennessee; that it would, your permit from the, the
 9  one you have from Warwick would be sufficient to carry
10  in Tennessee?
11      A.  I believe it's, it's constitutional.
12      Q.  Okay.  What do you see as the primary
13  difference between a permit that allows you to carry a
14  concealed weapon and a permit that allows you to open
15  carry?
16      A.  Okay.  So you're talking about from a town
17  permit to an Attorney General permit, right?
18      Q.  Yes, just in general, what's the difference;
19  what do you get from an open carry that you cannot get
20  from a concealed carry?
21      A.  Concealed carry permit, they are, for a town
22  permit in the State of Rhode Island, you can purchase
23  a firearm, have the federal background check, and
24  there is no seven-day wait.  The Attorney General's
25  permit, you're allowed to open carry.  You cannot open
```



```
 1   carry with a town permit.
 2         Also, it gives you overlap.  Overlap is when you
 3   have one town that doesn't issue, one Attorney General
 4   that doesn't issue.  So if you have a town permit and
 5   the Attorney General permit, and one decides not to
 6   issue when Attorney Generals change, like in this
 7   instance, this is why I'm here.  It covers you to
 8   still have a permit while you're trying to get your
 9   permit back from the Attorney General or the town.
10         Q.   Okay.  What's the benefit of open carry?  Why
11   do you need open carry versus concealed carry?
12         A.   Open carry, for security jobs.  Open carry
13   for anything that you would want to be employed by.
14   If you wanted to pick up part-time work, you would
15   have to go through the whole process if you have the
16   permit already.
17         Q.   But none of your current jobs require this?
18         A.   No.
19         Q.   Open carry, right?
20         A.   No.
21         Q.   So in terms of future jobs, there is
22   potential for you providing security services like you
23   mentioned for transfers, gun transfers?
24         A.   Right, yes.
25         Q.   Is there, apart from the transfer of guns,
```



```
 1   any other current plans, or any other prospects for
 2   providing that kind of security service?
 3       A.   Like I said, I just started this business.
 4   When this is up and running, then I've been thinking
 5   about the security aspect of it, and that's something
 6   for the future.
 7       Q.   Okay.  Just to be clear, that kind of
 8   transfer that you were talking about of the firearms,
 9   is that limited to the estates or people who die and
10   leave their guns, or is it something else?
11       A.   No, it's something else.  Like I could work
12   for, say, like D&L.
13       Q.   Sorry, what is D --
14       A.   D&L is a firearms store.  It's one of the
15   biggest in the state.  I could, you know, I could be a
16   runner, and if he has firearms that need to go to
17   Massachusetts or Connecticut and there is a number of
18   them, then, you know, he has runners that would allow
19   you to, you transfer from one state to the other.  So
20   I would still need to have my Massachusetts permit or
21   my Connecticut permit and my Rhode Island permit.
22       Q.   Are there any open positions with D&L?
23       A.   I don't know.
24       Q.   You haven't seen any job advertisements for
25   this kind of work?
```



```
 1        A.   No.  I talked to them about it in the past,
 2   so...
 3        Q.   Do you know whether D&L requires their -- is
 4   it called a runner; is that the position you're
 5   describing?
 6        A.   I'm just saying it's a runner.
 7        Q.   Does D&L require those people as a condition
 8   of employment to carry a weapon, carry a firearm?
 9        A.   I could not tell you.  I don't want to speak
10   for him.
11             MR. ARGUIN:  Okay.  I think that's all I
12   have.
13                  EXAMINATION BY MR. SACCOCCIO
14        A.   I have a couple of clarification questions.
15   Mr. O'Neil, you were asked to look at a copy of what
16   they marked as Exhibit A, your application from 2020;
17   is that correct?
18        A.   Yes.
19        Q.   This isn't your first application to the
20   Attorney General's Office; is that correct?
21        A.   No.
22        Q.   In the past you've done multiple actual
23   renewals through the Attorney General, correct?
24        A.   Two renewals.
25        Q.   On those renewals you actually included
```



1   letters that fully explained the statement over here,
2   have you ever been cited or summoned for any
3   violation; is that correct?
4        A.   Yes.
5        Q.   You fully explained what happened in
6   Massachusetts?
7        A.   Yes.
8        Q.   In addition to that, according to the denial
9   which caused the complaint in this case, you received
10  not only one but two letters from the Attorney General
11  detailing why you were denied your renewal, correct?
12       A.   Yes.
13       Q.   Do you remember at all the Attorney General
14  ever saying we're returning your application because
15  it was incomplete?
16       A.   No.
17       Q.   In fact, they actually cited specific
18  reasons, stating that you were not a suitable person,
19  did not have a demonstrated need, and other reasons,
20  correct?
21       A.   Yes.
22       Q.   Again, they never stated that your
23  application wasn't renewed for being incomplete?
24       A.   No, sir.
25       Q.   In your renewal applications for



MICHAEL PAUL O'NEIL  
O'NEIL vs NERONHA

February 26, 2024  
56

```
 1  Massachusetts and other states, you regularly let,
 2  regularly included a letter specifically outlining why
 3  your renewal for the Attorney General's Office was
 4  denied, correct?
 5       A.  Yes.
 6       Q.  You stated specifically it was, you had been
 7  appealing or suing them for that, correct?
 8       A.  Yes.
 9           MR. SACCOCCIO:  Thank you.  Nothing
10  further.
11           MR. ARGUIN:  Anything further?  That's
12  all we have.
13           MR. LYONS:  I'll take the transcripts.
14           (DEPOSITION CLOSED AT 5:00 P.M.)
15
16
17
18
19
20
21
22
23
24
25
```



800.211.DEPO (3376)  
EsquireSolutions.com