UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL P. O'NEIL, DANIEL PATTERSON, DONALD LABRIOLE JOSEPH PATTON, RICHARD COOK RICHARD LAPORTE and PETER TREMEENTOZZI<br>    Plaintiffs | : : : : : : : | |
| v. | : : | C.A. No. 23-cv-70 |
| PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island, and THE STATE OF RHODE ISLAND<br>    Defendants | : : : : : | |

DECLARATION OF CLAYTON CRAMER

Pursuant to 28 U.S.C. §1746, Clayton Cramer states:

I have been tasked with examining laws adopted before the 14th Amendment that regulated the open carrying of arms, specifically those cited in the "*'Manner of carry' restrictions*" section of Rhode Island's Motion for Summary Judgement on pp. 28-31. I previously provided a declaration in support of Plaintiffs' Motion for Summary Judgment that addressed the American historical tradition of open carry.

## I. Background and Qualifications

1. My M.A. in History is from Sonoma State University in California. I teach history at the College of Western Idaho. I have nine published books, mostly scholarly histories of weapons ownership and regulation. My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) vacated by *Jones v. Bonta*, 47 F.4th 1124 (9th Cir.

1

2022)(remanded to the district court for further proceedings consistent with *Bruen*); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) cert. granted by *Young v. Hawaii*, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State v. Sieyes*, 168 Wash.2d 276 (Wash. 2010); *Senna v. Florimont*, 196 N.J. 469 (N.J. 2008); *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2. In several cases, my work has been cited in defense of laws limiting firearms ownership: *State v. Roundtree* (Wisc. 2021), *State v. Christen* (Wisc. 2021), *King v. Sessions* (E.D.Penn. 2018). My work was also cited in the *McDonald v. Chicago* (2010) dissent.[1] I reside in Caldwell, Idaho.

3. I have submitted expert declarations in *Association Of New Jersey Rifle & Pistol Clubs, Inc. v. Platkin* (D.N.J. 2023); *Arizona v. Bolin* (Ariz.Sup. 2023); *Arizona v. Coleman* (Ariz.Sup. 2023); *Baird v. Bonta* (E.D.Cal. 2023); *Boland v. Bonta* (C.D.Cal. 2023); *Brumbeck v. Ferguson* (E.D.Wash. 2024); *Gates v. Polis* (D.Colo. 2023); *City of Columbus v. Ohio* (O.Ct.Com.Pleas 2023); *California Rifle & Pistol Association, Inc. v. Los Angeles County Sheriff's Department* (C.D.Cal. 2024); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security* (D.Del. 2023); *Georgia v. Nichols* (Ga.Sup. 2023); *National Association For Gun Rights v. Lopez* (D.Haw. 2023); *Wolford v. Lopez* (D.Haw. 2023); *National Association For Gun Rights v. City of Highland Park* (E.D.Ill. 2023); *Herrera v. Raoul* (N.D. Ill. 2023); *May v. Bonta* (S.D.Cal. 2024); *New York v. Sullivan* (N.Y.Sup. 2023); *National Association For Gun Rights v. City Of Naperville* (E.D.Ill. 2023); *State of Ohio v. City of Columbus* (Ct.Com.Pleas 2023); *Oregon Firearms Federation v. Kotek*

---

[1] *McDonald v. Chicago*, 130 S.Ct. 3022, 3132 (Breyer, J. diss.)

(D.Ore. 2023); *Palmer* v. *Dept. of Environmental Management* (R.I.Sup. 2023); *Rhode Island* v. *Ortiz* (R.I.Sup. 2023); *Rhode* v. *Bonta* (S.D.Cal. 2024); *Rocky Mountain Gun Owners* v. *Polis* (D.Colo. 2023); *Rupp* v. *Bonta* (C.D.Cal. 2022); *Siegel* v. *Platkin* (D.N.J. 2023); *U.S.* v. *Ayala* (M.D.Fla. 2023); *U.S.* v. *Fowler* (E.D.Va. 2023); *U.S.* v. *Bailey* (E.D.Tenn. 2023); *U.S.A.* v. *Kazmende* (N.D.Ga. 2023).

4. My published books include: *For The Defense Of Themselves And The State: The Original Intent and Judicial Interpretation of the Right To Keep And Bear Arms* (1994); *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (1999); *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie* (2007); *Lock, Stock, and Barrel: The Origins of American Gun Culture* (2018).

I.   1642 New Netherlands law

5. Defendants' Memorandum states: "For example, a 1642 provision in the colony of New Netherland (later New York) prohibited the drawing or displaying of knives. Spitzer Decl. at 12." First, the American traditions about arms bearing are English, not Dutch.

6. Second, reading the law in full, instead of a carefully selected quote shows a larger issue. After discussing the underlying problem: "Whereas we hear daily, God help us, of many accidents, caused for most part by quarrels, drawing of knives and fighting… Therefore, we hereby ordain, decree and enact, agreeably to the ordinance made last year in Holland by the High and Mighty Lords States General, that no one shall presume to draw a knife much less wound any person…"[2] This did not prohibit open carry but the drawing of a knife, apparently as a threat.

---

[2] New York State, LAWS AND ORDINANCES OF NEW NETHERLAND, 1638-1674 33 (1868), https://babel.hathitrust.org/cgi/pt?id=coo1.ark:/13960/t83j4269t&seq=71, last accessed December 29, 2024.

3

*Drawing* a weapon is fundamentally different from *carrying* a weapon. If drawing a weapon is not brandishing, it is certainly "assault with a deadly weapon."

## II. 1686 New Jersey Law

7. Defendants' Memorandum states: "1686 New Jersey law adopted "An Act Against Wearing Swords" and prohibited the wearing of 'pistols' and other specified weapons 'privately'— though it also levied penalties for the open carrying of weapons."

8. *Bruen* rejected the relevance of this law:

> In any event, we cannot put meaningful weight on this solitary statute. First, although the "planter" restriction may have prohibited the public carry of pistols, it did not prohibit planters from carrying long guns for self-defense —including the popular musket and carbine…. Second, it does not appear that the statute survived for very long. By 1694, East New Jersey provided that no slave "be permitted to carry any gun or pistol ... into the woods, or plantations" unless their owner accompanied them. Grants and Concessions 341. If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence. Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey. See 1 Nevill, Acts of the General Assembly of the Province of New-Jersey (1752).[3]

9. Defendants argue what they assert are American copies of the Statute of Northampton, including: "And several colonial governments adopted laws that 'mirrored the British Statute of Northampton, where the very fact of carrying a firearm was considered to be in terror of the people and was therefore prohibited by that statute.'" *Bruen* specifically rejected the relevance of these statutes:

> Respondents, their *amici*, and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself. See *supra*, at 2140 - 2143. For instance, the Massachusetts statute proscribed "go[ing] armed Offensively ... in Fear or Affray" of the people, indicating that these laws were modeled after the Statute of Northampton to the

---

[3] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2145 (2022).

4

extent that the statute would have been understood to limit public carry *in the late 1600s*. Moreover, it makes very little sense to read these statutes as banning the public carry of all firearms just a few years after Chief Justice Herbert in *Sir John Knight's Case* indicated that the English common law did not do so. [4]

### III. 1801 Tennessee Law

10. Defendants' Memorandum states: "'In 1801, for example, Tennessee adopted a law that prohibited the carrying of quote any dirk, large knife, pistol or any other dangerous weapon' both privately and publicly. Rivas Decl. At 24." The selectively quoted statute reuses the language of the Statute of Northampton already rejected by *Bruen*. Worse, quoting only section 6 missed the larger purpose and narrow focus of the law. This was "An Act for the restraint of idle and disorderly persons… Whereas it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons… endeavoring to maintain himself by gaming or other undue means…"[5] Tennessee passed a vagrancy law for "persons of ill fame or suspicious character." This was not aimed at the general population, but a particularly disreputable group.

### IV. 1837 Georgia Law

11. Defendants' Memorandum states: "Georgia enacted a similar law in 1837." In no way was the 1837 Georgia law similar. It was not narrowly focused on a particular disreputable group, nor did it use the Statute of Northampton language. It also banned the sale of many types of weapons.[6] Regardless, the Georgia Supreme Court later held that broad statutory restrictions on open carry were unconstitutional. Nunn v. State, 1 Ga. 243 (1845).

---

[4] *Id.* at 2144.
[5] 1801 Tenn. Laws 259, 260-261, ch. 22, § 2.
6 2 A Digest Of The Statute Laws Of The State Of Georgia : In Force Prior To The Session Of The General Assembly Of 1851 / Compiled And Published Under The Authority Of The General Assembly By Thomas R.R. Cobb 848.

## V. 1792 North Carolina Law

12. Defendants' Memorandum states: "Spitzer Decl. at 14 (quoting a 1694 Massachusetts law, a 1701 New Hampshire law, and an North Carolina 1792 collection of statutes)."

13. Spitzer cites a 1694 Massachusetts law that does not exist, at least in the published version. "1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders." It is unclear if Spitzer means ch. 12, or ch. 6. Ch. 6: "An Act For Highwayes,"[7] or Ch. 12: "An Act For A New Establishment And Regulation Of The Chancery."[8]

14. Spitzer cites a 1701 New Hampshire law that does not exist. "1701 N.H. Acts and Laws 15." The session laws do not have chapter numbers so we must assume he means p. 15: which has laws prohibiting rape, willful burning, and adultery.[9]

15. Spitzer cites a book as purportedly collecting North Carolina Statutes. That 1792 collection was of English statutes not North Carolina laws, including the *Bruen*-rejected Statute of Northampton. Spitzer has frequently misrepresented this as a North Carolina session law. Rephrasing this as "North Carolina 1792 collection of statutes" does nothing to save this.

---

(1851), https://babel.hathitrust.org/cgi/pt?id=njp.32101044496683&seq=200&q1=%22manufactured+and+sold+for+the+purpose+of+wearing,+or%22, , last accessed December 29, 2024.

[7] Id. at 136, https://books.google.com/books?id=ouEwYQ-FKtUC&newbks=1&newbks_redir=0&dq=For%20the%20better%20amending%20and%20keeping%20in%20repair%20and%20clear%20the%20highways%20and%20common%20roads%20acts%20and%20resolves%20of%20the%20province%20of%20massachusetts&pg=PA136#v=onepage&q=For%20the%20better%20amending%20and%20keeping%20in%20repair%20and%20clear%20the%20highways%20and%20common%20roads%20acts%20and%20resolves%20of%20the%20province%20of%20massachusetts&f=false, last accessed December 29, 2024.

[8] Id. at 144, https://books.google.com/books?id=ouEwYQ-FKtUC&newbks=1&newbks_redir=0&dq=%22%E2%80%9CAn%20Act%20For%20A%20New%20Establishment%20And%20Regulation%20Of%20The%20Chancery.%E2%80%9D%20massachusetts&pg=PA144#v=onepage&q=%22%E2%80%9CAn%20Act%20For%20A%20New%20Establishment%20And%20Regulation%20Of%20The%20Chancery.%E2%80%9D%20massachusetts&f=false, last accessed December 29, 2024.

[9] 1 LAWS OF NEW HAMPSHIRE 15 (1904), https://babel.hathitrust.org/cgi/pt?id=mdp.39015047789402&seq=121, last accessed December 29, 2024.

6

## VI.   Hawaii

16. Defendants' Memorandum states: "And the 1850s, Pennsylvania, Hawaii, and the District of Columbia criminalized the carrying of firearms or other specified deadly weapons, whether they were carried in a concealed manner or openly." The *Kingdom* of Hawaii has nothing to do with American legal tradition.[10]

17. The District of Columbia ordinance is less clear than Spitzer would like. The title is, "An act to prevent the carrying of concealed *and* dangerous weapons in the City of Washington." [emphasis added] The text of the law might be read as banning all carry of a list of deadly weapons, but the title can be equally read as banning the carrying of weapons that are both concealed *and* dangerous. Certainly, people were carrying concealed pistols in D.C. at the time. An accidental discharge on the floor of the House in 1860 shows this:

> The gentleman from Virginia had alluded to fact that a firearm had fallen on the floor. It was due to truth to say that, about the time he was talking somewhat excitedly in reference to the harsh and unjust remark by his colleague, a pistol in his breast-pocket accidentally fell to the floor. No man who knew him believed that he would use a pistol except in an honorable way. He regretted that this accident had occurred. He put the pistol in his pocket last night about twelve o'clock, to protect himself, if necessary, for he resided in the neighborhood of English Hill, where out rages have been committed, and wanted to feel secure in going home. Until he came to Washington, he bad never thought it necessary to be armed. He did not carry a pistol for any purpose here, but for his protection while passing

---

[10] Kingdom of Hawaii, THE CIVIL CODE OF THE HAWAIIAN ISLANDS, ch. 1 (1859), https://books.google.com/books?id=eNxIAQAAMAAJ&pg=PA5&dq=%22The+King,+The+Nobles,+And+The+Representatives+Of+The+Hawaiian+Islands+%22&hl=en&newbks=1&newbks_redir=0&sa=X&ved=2ahUKEwjdmoecn8OHAxUYEjQIHfwUBXIQ6AF6BAgJEAI#v=onepage&q=%22The%20King%2C%20The%20Nobles%2C%20And%20The%20Representatives%20Of%20The%20Hawaiian%20Islands%20%22&f=false, last accessed December 29, 2024.

through this sometimes violent city. He had seen occasions when, to protect one's self from insult, it was necessary to carry firearms.[11]

## VII. 1850 North Carolina

18. Defendants' Memorandum states: "For example, an 1850 North Carolina measure imposed a one-dollar tax on all pistols and other weapons "'worn or carried about the person of the owner.' Spitzer Decl., Ex. C at 97." Not on p. 97 in Spitzer Exhibit C, and not from 1850. It is on p. 91 of Exhibit C. Spitzer lists three North Carolina laws adopted between 1856 and 1859, all identified as "An Act Entitled 'Revenue.'" The 1866 version was also explicitly a revenue measure: "That for the support of the State Government, and to meet appropriations made by law, a tax shall be levied upon the subjects embraced in the following schedule, to be listed and paid as shall be directed by law." It taxed harps, pianos and carrying a "dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle-cane…" It seems an odd public safety law to include musical instruments.

## VIII. Was Carrying of Firearms Common?

19. Defendants point to a sentence in my book *Concealed Weapon Laws of the Early Republic*: "This suggests (but does not prove) that the open carrying of deadly weapons was subject to sufficient social stigma to guarantee that a ban on concealed carry was, effectively, a ban on all carrying." It helps to read the whole book, including p. 63:

> Francis Law Olmsted's description of a not completely concealed Colt revolver on a Kentucky railroad in 1853 strongly suggested that concealed carrying of handguns was at least common, if not widespread:
>
> *In the cars in Kentucky a modest young man was walking through with the hand[le] of a Colt out of his pocket-skirt be-hind. It made some laugh & a gentleman with*

---

[11] An Excitement, *Holmes County* [Ohio] *Republican*, Jan. 26, 1860, 1, https://chroniclingamerica.loc.gov/lccn/sn84028820/1860-01-26/ed-1/seq-1/, last accessed December 11, 2024.

> us called out, "You'll lose your Colt, Sir." The man turned and after a mo-ment joined the laugh and pushed the handle into the pocket.
> John said, "There might be danger in laughing at him." "Oh no," replied our companion, evidently supposing him serious, "he would not mind a laugh." "It's the best place to carry your pistol, after all," said he. "It's less in your way than anywhere else. And as good a place for your knife as anywhere else is down your back, so you can draw over your shoulder."
> "Are pistols generally carried here?"
> "Yes, very generally."
> Allison said commonly, *but he thought not generally [emphasis in original].*[12]

Newspaper Accounts

20. For historians, one of the more difficult questions to answer about an historical period is: How common was a behavior? Personal diaries and diaries may be good sources; they suffer the problem that an ordinary activity may not merit any attention simply because it *is* ordinary. Except for a few very *detailed* diaries, people seldom report what they ate, and at what times. Even Samuel Pepys' million-word very detailed seventeenth century diaries are surprisingly sparse on details such as what time he ate supper or what he ate.[13]

21. Newspapers suffer an additional problem: "'dog bites man' is not news, 'man bites dog' is." As a modern example, would a deer in Cougar, Washington (and a fine hamlet it is) elicit a diary entry or newspaper report? Perhaps if it caused a ten-car pileup. But if a deer appeared in New York City's Central Park, it would likely show up in diaries, newspaper articles and broadcast news. Which is the norm?

22. No newspaper today reports, "Suzie Smith walked to school today, studied for six hours, and returned home without incident." If a mass murderer went to her school, murdered

---

[12] Frederick Law Olmsted, Olmsted, 2 The Papers of Frederick Law Olmsted 232-233 (1981).

[13] For examples search Samuel Pepys' diary for "supper," https://babel.hathitrust.org/cgi/pt?id=wu.89094711538&seq=51&q1=supper, and "roast" https://babel.hathitrust.org/cgi/pt?id=wu.89094711538&seq=51&q1=roast, last accessed December 29, 2024. Samuel Pepys' Diary, Willis L. Parker, ed. (1932).

9

Suzie and five of her classmates, this would be news covered across the nation for days or weeks. Which is the normal activity? When the carrying of firearms appears in newspapers of the antebellum period, we can assume that it was because of some other aspect of its carriage: its place, or how it is subsequently used.

23. Here are a few examples where the pistol appears because of the newsworthy aspects. Dr. James Reynolds was tried in Philadelphia for riot and "assault… with an intent to kill." Dr. Reynolds drew a pistol when surrounded by a threatening mob.[14] His counsel defended him against a claim of premeditation because of his possession of a pistol:

> The times are altered, or party violence has become less serious; we see, indeed, that the spirit of party yet preserves a disposition to assassination, in the threats against Dr. R's. life, and that he at the present time has occasion to act on the defensive as every one did at these periods; there is no danger to be apprehended from a man who carries a sword-cane or other weapon of defence; there is no law in Pennsylvania to prevent it; every man has a right to carry arms who apprehends himself to be in danger. If every man has a right, was not this gentleman justifiable in putting arms in his pocket, when so special an occasion commanded him?[15]

24. The news coverage of the death of Chales Arndt, a member of the Wisconsin Territorial Legislature apparently at the hands of another member, James R. Vineyard, suggest that Vineyard's carrying of a revolver was sufficiently normal that he felt comfortable showing his recently acquired revolver to other members of the legislature some minutes before:

> Richard H. M'Goon testified, that he came to the American hotel some time previous. That he had a pistol with six barrels. [The pistol was produced in court. It had six barrels joined in one common cylinder, the barrels from four to five inches long It was so constructed that by pressing on the trigger it was cocked and fired immediately, the cylinder revolving at the same time, so that the whole six loads could be discharged as rapidly as the triggers could be pressed]. M'Goon testified that he was in Vineyard's room on the same day of his arrival. *Several were present, among them Vineyard—and the conversation turned upon pistols. He took his out*

---

[14] Francis Wharton, 7 STATE TRIALS OF THE UNITED STATES DURING THE ADMINISTRATIONS OF WASHINGTON AND ADAMS 345-7 (1849).

[15] *Id.* at 376.

> *of his over-coat pocket, and it was passed from hand to hand for inspection. He returned it to his over-coat pocket.*[16] [emphasis added].

25. Some references suggest that the carrying of a pistol was common enough that *some* people should not do so:

> Curiosity. The very last curiosity we have seen spoken of in the papers, is a wheel that came off a dog's tail when it was a wagging -- The individual who perpetrated that should not carry a pistol.[17]

26. Newspapers also report the carrying of pistols as a sign of how bad the street crime situation had become. The carrying of a pistol was considered a rational response to a bad situation:

> Our readers at a distance may judge of the state of affairs in this city, when we inform them that we actually knew a printer, who deems it necessary to carry a pistol to protect himself from highway robbers? When our trade has to resort to such means for protection, surely no one is safe. *Pittsburgh Dispatch.*[18]

27. A Methodist preacher and newspaper editor gives insights into the carrying of pistols in 1843:

> A CLERICO-POLITICO CURIOSITY.
>
> The Jonesboro' (Tenn.) Whig, with Mr. Clay's name, in tremendous letters, at its mast, is edited by a Methodist preacher. The following is the leading editorial in the last number received at this office:
>
> A SIX BARREL PISTOL.
>
> The lying editor of the Sentinel has now repeated between fifty and one hundred times, in five weeks, that we own and carry a pistol having six barrels.-- What will

---

[16] Abstact [Sic] Of Testimony Taken Before The Justice's Court In The Case Of Vineyard, *Southport* now Kenosha [Wisc. Terr.] *Telegraph*, 22 Feb. 22, 1842, 2, https://chroniclingamerica.loc.gov/lccn/sn85040303/1842-02-22/ed-1/seq-2/, last accessed December 29, 2024.

[17] Curiosity, *Hillsdale* [Mich.] *Standard,* Mar. 13, 1855, 1, https://chroniclingamerica.loc.gov/lccn/sn85033637/1855-03-13/ed-1/seq-1/, last accessed December 29, 2024.

[18] Our Readers…, *The Portsmouth* [Ohio] *Inquirer,* Feb. 17, 1851, 1, https://chroniclingamerica.loc.gov/lccn/sn85026203/1851-02-17/ed-1/seq-1/, , last accessed December 29, 2024.

11

the public think, when we solemnly declare that we own no such pistol, nor have we during the *past few years*. We own but two in the world, each of which has *one barrel* --one we carry, and the other we loaned to Mr. Jones, the day after the second fight with Crouch. One of these pistols we; bought in the spring of 1840, and have owned it ever since. The one we keep constantly about us, cost thirty-five dollars; the one we let Mr. Jones have cost ten dollars. Neither has nor ever had more than one barrel.

We have had, during the last three years, some three different pistols sent to our care, by friends in adjoining counties--one to be handed to a certain gentleman, and the other two to be repaired; all which was attended to, and, so far as we know, are now in the possession of their proper owners. The pistol with which Jones shot Crouch was not ours, *nor did he receive it from us*. Still, as said heretofore, if he had applied to us for one of our pistols before, instead of after the fight, he should have had it. And if we had been at home, instead of eight miles from town, as we were, the probability is he would have had our fine pistol, in which event Mr. Crouch's skull would not have turned out bullet-proof as it did!

We have now given a true detail of the character, cost, and origin of our arms, and of the facts relating to Jones' pistol. For the want of this information, Haynes has lied frequently and egregiously. He can make any use of this knowledge he may choose. Meanwhile, if it will cause him to tell the truth hereafter, our object, in furnishing it, will have been accomplished.

Now, our readers, doubtless, would like to know in whose district this paper is published. It is *Mr. Arnold's*, of course. [19]

28. This account tells us that having a loaded pistol in a San Francisco saloon was not startling.

The near miss of an accidental death was the "man bites dog" aspect:

Narrow Escape.— On Sunday last as a Dr. Hunter was examining a pistol, and, handling it carelessly in the bar-room at the corner of Merchant and Kearny streets the pistol exploded, the ball passed through the wall into Mr. Marshall's saloon, within a few inches of the head of Mr. Ketcher, the city marshal's clerk, who was in there, and passed through the opposite wall over a vacant lot and struck a brick wall. It was very fortunate that no one was killed.— S. F. Trans.[20]

---

[19] A CLERICO-POLITICO CURIOSITY, [Washington, D.C.] The *Daily Madisonian,* Feb. 24, 1843, 2, https://chroniclingamerica.loc.gov/lccn/sn84020074/1843-02-24/ed-1/seq-2/,, last accessed December 29, 2024.

[20] Narrow Escape, [Nevada City, Cal.] *Nevada Journal*, Feb. 17, 1854, 1, https://chroniclingamerica.loc.gov/lccn/sn84026884/1854-02-17/ed-1/seq-1/, last accessed December 29, 2024.

29. Newspapers reported another carrying of a pistol because of an accident with fortunately no lethal consequences that happened on the floor of the U.S. House of Representatives in 1860, when a pistol fell to the floor and discharged:

> The gentleman from Virginia had alluded to fact that a firearm had fallen on the floor. It was due to truth to say that, about the time he was talking somewhat excitedly in reference to the harsh and unjust remark by his colleague, a pistol in his breast-pocket accidentally fell to the floor. No man who knew him believed that he would use a pistol except in an honorable way. He regretted that this accident had occurred. He put the pistol in his pocket last night about twelve o'clock, to protect himself, if necessary, for he resided in the neighborhood of English Hill, where out rages have been committed, and wanted to feel secure in going home. Until he came to Washington, he bad never thought it necessary to be armed. He did not carry a pistol for any purpose here, but for his protection while passing through this sometimes violent city. He had seen occasions when, to protect one's self from insult, it was necessary to carry firearms.[21]

30. These were in the first 20 matches for the words "pistol" and "carry" within five words of each other for newspapers 1756-1860.[22]

Traveler Accounts

31. Visitor J.D. Borthwick described how Gold Rush San Francisco was awash in places of entertainment with signs that announced, "No weapons admitted." While Borthwick thought little of the entertainments available, he did describe why it was nonetheless worth going:

> if only to watch the company arrive, and to see the practical enforcement of the weapon clause in the announcements. Several doorkeepers were in attendance, to whom each man as he entered delivered up his knife or his pistol, receiving a check for it, just as one does for his cane or umbrella at the door of a picture-gallery. Most

---

[21] An Excitement, *Holmes County* [Ohio] *Republican*, Jan. 26, 1860, 1, https://chroniclingamerica.loc.gov/lccn/sn84028820/1860-01-26/ed-1/seq-1/, last accessed December 11, 2024.

[22] Chronicling America, https://chroniclingamerica.loc.gov/search/pages/results/?date1=1756&index=19&date2=1860&searchType=advanced&language=&sequence=0&dateFilterType=yearRange&proxdistance=5&rows=20&ortext=&proxtext=carry+pistol&phrasetext=&andtext=&page=1, last accessed December 29, 2024.

men draw a pistol from behind their back, and very often a knife along with it; some carried their bowie-knife down the back of their neck, or in their breast; demure, pious-looking men, in white neckcloths, lifted up the bottom of their waistcoat, and revealed the butt of a revolver; others, after having already disgorged a pistol, pulled up the leg of their trousers, and abstracted a huge bowie-knife from their boot; and there were men, terrible fellows, no doubt, but who were more likely to frighten themselves than any one else, who produced a revolver from each trouser-pocket, and a bowie-knife from their belt. If any man declared that he had no weapon, the statement was so incredible that he had to submit to be searched; an operation which was performed by the doorkeepers, who, I observed, were occasionally rewarded for their diligence by the discovery of a pistol secreted in some unusual part of the dress.[23]

32. Isaac Weld's account of travels between 1795 and 1797 discussed how in the backcountry,

"The people all travel on horseback, with pistols and swords…."[24] Pim Fordham, while staying at Princeton, Indiana, in 1817-18, reported that, "Yesterday 8 men on foot armed with pistols and rifles came into the town from Harmony. They had been in pursuit of an absconded debtor from Vincennes." It was no problem to persuade eight men armed with pistols and rifles to pursue a mere debtor, and Fordham found nothing surprising about them being so armed. Fordham described an associate judge as carrying "a pair of pistols at his saddle bow; and altogether [he] looks more like a Dragoon Officer in plain clothes, than a Judge." The pistols themselves were not remarkable; what was remarkable, at least to a transplanted Englishman, was that a *judge* was carrying them.[25]

---

[23] J.D. Borthwick, The Gold Hunters 84 (1917), https://babel.hathitrust.org/cgi/pt?id=uva.x000333875&seq=12&q1=if+only+to+watch+the+company+arrive,+and+to+see+the+practical+enforcement+of+the+weapon+clause+in+the+announcements, last accessed December 29, 2024.

[24] Isaac Weld, 1 *Travels Through the States of North America, and the Provinces of Upper and Lower Canada, During the Years 1795, 1796, and 1797* 234 (1807), https://babel.hathitrust.org/cgi/pt?id=nyp.33433081710810&seq=288&q1=The+people+all+travel+on+horseback,+with+pistols+and+swords, last accessed December 29, 2024.

[25] Elias Pym Fordham, Frederic Austin Ogg, ed., *Personal Narrative Of Travels In Virginia, Maryland, Pennsylvania, Ohio, Indiana, Kentucky; And Of A Residence In The Illinois Territory: 1817-1818* 137 (1906), https://babel.hathitrust.org/cgi/pt?id=uc2.ark:/13960/t5k939t24&seq=7&q1=Yesterday+8+men+on+foot+armed+with+pistols+and+rifles+came+into+the+town+from+Harmony, last accessed December 29, 2024.

33. Fordham also described a party in the Illinois Territory that had excluded some "vulgar" party-crashers. Some of Fordham's party "armed themselves with Dirks (poignards [daggers] worn under the clothes)" to resist another such attempt, but later, "In going away some of the gentlemen were insulted by the rabble, but the rumour that they were armed with dirks and pistols prevented serious mischief." While the antecedent of "they were armed" is unclear, that it prevented serious mischief by "the rabble" suggests that members of Fordham's party were the ones armed; pistols were weapons commonly enough carried to be a realistic deterrent to "the rabble."[26] According to Fordham (and many other travelers), the flatboat men who worked the Mississippi River were a wild and dangerous population. Fordham warned, "But I would advise all travellers going alone down the river, to get one man at least that they can depend upon, and to wear a dagger or *a brace of pistols*; for there are no desperadoes more savage in their anger than these men." [emphasis added][27]

34. Francis Baily's *Journal of a Tour in Unsettled Parts of North America in 1796 & 1797* is awash in hunting and guns. (He came to America from Britain at least in part to hunt.)

35. Washington, D.C. was still largely woods when Baily visited it. To emphasize how far the new capital had to go before it would be a large city, Baily reported, "Game is plenty in these parts, and, what perhaps may appear to you remarkable, I saw some boys who were out a shooting, actually kill several brace of partridges in what will be one of the most

---

[26] Id., at 219, https://babel.hathitrust.org/cgi/pt?id=uc2.ark:/13960/t5k939t24&seq=222&q1=armed+themselves+with+Dirks, last accessed December 29, 2024.

[27] Id., at 195-196, https://babel.hathitrust.org/cgi/pt?id=uc2.ark:/13960/t5k939t24&seq=200&q1=desperadoes, last accessed December 29, 2024.

public streets of the city." It was not boys out shooting that was remarkable to Baily; what was significant is that they were shooting in what would be one of the main boulevards of America's capital.[28]

36. Robert Baird's *View of the Valley of the Mississippi* reads like a real estate promotional guide, emphasizing the enormous benefits from moving to these largely unsettled states—but still admits some unsavory aspects of the frontier. A few instances of violence appear in Baird's promotional work, such as St. Louis and its dueling problem, but they are usually in conjunction with a positive statement such as, "A great moral change is, however, going forward here." Baird also reported a dispute at cards aboard a steamboat, "Pistols and dirks were drawn!"[29]

IX. Summary

37. Rhode Island's Motion for Summary Judgment relies on laws that do not exist; have been specifically rejected by *Bruen* as irrelevant for understanding the meaning of the Second Amendment; misreading laws that banned brandishing as bans on open carry, laws from independent kingdoms far outside the traditions to which *Bruen* refers; and laws that were not about public safety but gathering revenue.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on December __, 2024.

_____
Clayton Cramer

---

[28] Francis Baily, Jack D.L. Holmes, ed., *Journal of a Tour in Unsettled Parts of North America in 1796 & 1797* 26, 35, 39-41, 43, 62, 70, 91, 93, 97-98, 115, 139 (1969).

[29] Baird, *A View of the Valley of the Mississippi...* 325-7 (1832), https://archive.org/details/viewvalleymissi00bairgoog/page/n372/mode/2up?q=%22Pistols+and+dirks+were+drawn%21%22, last accessed December 13, 2024..