1  A. All right.

2  Q. Have you heard the term long gun used before?

3  A. Yes, I have.

4  Q. What is your understanding of what long gun
5  means?

6  A. That those are rifles, shotguns, muskets, as
7  opposed to short arms, like, pistols.

8  Q. Are you aware of any states which have
9  prohibited the carry of long arms within that
10 historical period you discussed?

11 A. There are examples of historical restrictions
12 that pertain to long arms, as well.

13 Q. Okay. Are they also in your declaration?

14 A. They are, although, I don't know that -- I would
15 not say that they are indexed or organized in the way
16 that you have described it, as the regulation of long
17 arms. I think that I would say I brought them up for
18 other reasons, and the fact that I brought them up to
19 illustrate some other regulatory method, and probably
20 did not highlight the fact that they applied to long
21 guns, as well as to things like revolvers and Bowie
22 knives, and stuff like that.

23 Q. All right. Well, then we may get into that more
24 specifically as we go through your declaration.

25 A. Okay.



```
 1        A. Paragraph six through --
 2        Q. Ten.
 3        A. -- you said, "Ten," yeah, that's what that looks
 4   like to me.
 5        Q. Okay.  Is that because in the subsequent parts
 6   of your report or declaration, you return to those
 7   opinions and do provide the factual support that you
 8   have?
 9        A. Yes; that's correct.
10           MR. LYONS:  Okay.  I just want to make sure that
11   I don't have to go through the summary and ask you what
12   the factual support is for various statements if it's
13   elsewhere in the declaration.  That's what I am getting
14   at.
15           THE WITNESS:  Yes.
16        Q. Okay.  Starting on paragraph 11, you have a
17   first sentence, it says, "Americans living in the
18   nineteenth century generally distinguished between two
19   types of weapons," you have a colon there, "Arms
20   suitable for militia service or hunting, and
21   concealable weapons associated with interpersonal
22   violence and known as deadly weapons."  Why did you
23   make that distinction?
24        A. Well, most of the work that I have done on this
25   topic, when you look at the regulations, themselves,
```



BRENNAN N. RIVAS, PH.D.
MICHAEL O'NEIL vs PETER F. NERONHA

September 12, 2024
65

```
 1   most of the time the regulations apply themselves to
 2   concealable weapons, such as pistols, Bowie knives,
 3   brass knuckles, things like that, as opposed to
 4   regulating or restricting long guns like you were
 5   describing earlier, so muskets, rifles, and shotguns.
 6       Q. Have you specifically done any research on
 7   regulation of long guns, or have you, to the extent you
 8   focused on firearms, focused on concealable weapons?
 9       A. So I guess I take your question to mean, is it
10   possible that there are long gun regulations out there
11   that I didn't look for?
12       Q. That's part of it, yes.
13       A. Okay.  I have tried, as a historian, to find all
14   of the regulations I can find, whether they applied to
15   concealable weapons or all firearms, or whether they
16   applied to weapons other than firearms.  So I have
17   tried to cast a very broad net to let the historical
18   record speak for itself.  So I have not gone -- I have
19   found regulations that affected long guns, but I
20   haven't written or composed anything that might be
21   called a history of long arm regulation in the United
22   States, because the sources, themselves, the
23   overwhelming number of them are focused on taxing or
24   restricting in some ways to perform, concealable
25   weapons.
```



BRENNAN N. RIVAS, PH.D.
MICHAEL O'NEIL vs PETER F. NERONHA

September 12, 2024
66

1  Q. When you say, "The sources, themselves," you
2  mean the law?
3  A. The laws, also, you know, social history,
4  sources from the times, such as, you know, the kind of
5  things you might find in newspapers or periodicals, or
6  you know, publications or statements that people made
7  at the time.  Also, when they were talking about
8  regulation of weapons or problematic weapons, they were
9  usually talking about pistols and Bowie knives and
10 other concealable, smaller weapons, as opposed to
11 rifles, muskets, and shotguns.
12 Q. Is that why you refer to concealable weapons as
13 deadly weapons, or is that a term that you got from
14 your research?
15 A. I started using that phrase because the laws,
16 themselves, used it.  The one thing that the various
17 weapons included under the laws that I was finding, the
18 one thing that they all had in common was that they
19 were deemed to be deadly weapons, and they were being
20 regulated for that reason.  So often, not always, but
21 often, in these regulations, you find a list, so, you
22 know, it will be, like, any dirk, Bowie knife, Arkansas
23 toothpick, pistol, or brass knuckles, it will give a
24 long list, then it will say, "Or any other deadly
25 weapon."  The fact that they often used that language,



800.211.DEPO (3376)
EsquireSolutions.com

```
 1   I would -- that's an indication that that's what they
 2   all have in common, is that they are all deadly
 3   weapons, and they are being regulated on that basis.
 4   That's why I started using that phrase.  It also avoids
 5   the frustrations of talking about pistol laws or
 6   revolver laws or Bowie knife laws, because often these
 7   laws addressed a number of weapons beyond just
 8   firearms, and also even just beyond firearms and Bowie
 9   knives.
10        Q. Would it be fair to say that you concluded that
11   when these statutes refer to deadly weapons, in that
12   sense, they are not including long arms?
13        A. Oh, right; that has been my general take on the
14   laws, themselves.  If they wanted to prohibit carrying
15   a concealed rifle, they would have said so, but I don't
16   think they needed to say that.
17        Q. Okay.  So, for example, if you go to paragraph
18   13 -- well, actually, let's go to paragraph 12 first.
19   There is a sentence on page 8 that starts on the fourth
20   line, which says, quote, "These regulations tended to
21   focus upon readily concealable 'deadly weapons' like
22   knives and pistols rather than the firearms used for
23   militia and hunting purposes."  Do you see that
24   sentence?
25        A. Yes, I do.
```



```
 1      Q. Does that say what you just explained to me?
 2      A. Yes.
 3      Q. So, in other words, concealable weapons were the
 4  ones that were considered to be deadly by the
 5  legislators who passed these statutes; would that be
 6  fair to say?
 7      A. Yes, that would.
 8      Q. Okay.  That's, essentially, what you also say
 9  down in the first sentence of paragraph 13; is that
10  fair it say?
11      A. Yes, that's sort of a little concluding segment
12  to sort of button up that section before moving on.
13      Q. Then in paragraphs 14 through 17, you discuss
14  large knives; do you see that?
15      A. Yes.
16      Q. Why do you include that in this report?
17      A. Well, before -- I think it's really easy today
18  to take it for granted that we have easy access to
19  firearms and repeat-fire pistols, but, historically,
20  that has not been the case.  So when we want to look at
21  America's history of regulating firearms, we need to
22  zoom out a little bit, cast a little wider net, and
23  also look at regulations of other kinds of weapons,
24  because prior to the period when pistols were more
25  readily available to Americans, and especially when
```

