**In the Matter Of:**

O'NEIL V. NERONHA

23-cv-70

**ROBERT J. SPITZER, PH.D.**

*September 10, 2024*



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                          1

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF RHODE ISLAND

3

4   MICHAEL O'NEIL, et al.

5                Plaintiffs

6   VS.                              C.A. NO.: 23-cv-70

7   PETER F. NERONHA, in his
    official capacity as
8   Attorney General of the
    State of Rhode Island and
9   THE STATE OF RHODE ISLAND

10               Defendants

11

12

13

14

15               DEPOSITION OF

16          ROBERT JAMES SPITZER, Ph.D.

17             SEPTEMBER 10, 2024

18               10:00 A.M.

19

20             Via Zoom Remotely

21

22

23          Lisa L. Crompton, CSR, RPR

24

25



ROBERT J. SPITZER, PH.D.                                September 10, 2024
O'NEIL V. NERONHA                                                      2

```
 1   APPEARANCES:

 2   For Plaintiffs

 3   Strauss, Factor, Laing & Lyons
     BY:  THOMAS W. LYONS, ESQ.
 4   One Davol Square
     Suite 305
 5   Providence, Rhode Island 02903
     401-456-0700
 6   tlyons@straussfactor.com

 7

 8   For Defendants

 9   Office of the Attorney General
     BY:  JAMES J. ARGUIN, ESQ.
10   150 South Main Street
     Providence, Rhode Island 02903
11   401-274-4400
     jarguin@riag.ri.gov.com
12

13
     ALSO PRESENT:  Paul Meosky
14

15

16

17

18

19

20

21

22

23

24

25
```



1          MR. ARGUIN:  Sorry to jump in,

2     Tom.  But maybe, before we get started, do you

3     want to just do the usual stipulations for

4     Federal Court, all objections, except as to

5     form, are reserved?

6                    MR. LYONS:  Sure.

7                    MR. ARGUIN:  Okay.

8               ROBERT JAMES SPITZER, Ph.D.,

9     the witness, having been duly cautioned and

10    sworn, testified upon his oath as follows:

11                    EXAMINATION BY MR. LYONS:

12  Q.   Doctor, can you please state your full name.

13    A.   Robert James Spitzer.

14  Q.   Okay.  And have you been -- Has your deposition

15    been taken previously?

16    A.   For this case, you mean?

17  Q.   No, no.  For -- At any time.

18    A.   I have been deposed in the past, yes.

19  Q.   Okay.  Approximately how many times?

20    A.   Oh.  Three or four.

21  Q.   Okay.  And in each of those cases, was it with

22    respect to your providing expert testimony in a

23    case involving firearms litigation?

24    A.   Yes.

25  Q.   Okay.  Well, anyway, you're familiar with the



1    and restrictions on any weapons carrying, I also

2    gathered information about old brandishing and

3    display laws and old licensing, weapons

4    licensing laws.

5  Q.   Okay.  You said licensing laws, and what was the

6    category before that?

7    A.  Brandishing and display.

8  Q.   Okay.

9    A.  Weapons brandishing and display.

10  Q.   Okay.  And what do you mean by "brandishing"?

11    A.  Well, brandishing is to display a weapon in

12    public in the presence of others in a

13    threatening or menacing way.

14  Q.   Okay.  Is it your understanding that any of the

15    plaintiffs in this case have done any

16    brandishing of weapons?

17    A.  That I do not know.

18  Q.   Okay.  To your knowledge, are the plaintiffs all

19    law-abiding citizens?

20    A.  I could not say.

21  Q.   Okay.  Do you have any contrary information?

22    A.  Not that I know of.

23  Q.   Okay.  So why did you research brandishing?

24    A.  Well, all of this, all of these cluster of

25    laws pertain to what happens when individuals



ROBERT J. SPITZER, PH.D.                                September 10, 2024
O'NEIL V. NERONHA                                                      35

1    bring weapons into the public sphere.  And so

2    the question is, in the 1600s, 1700s, 1800s, did

3    public policymakers pay any attention to these

4    matters; if so, did they legislate on these

5    matters; and if so, what was the nature of that

6    legislation, that is, what was the public policy

7    regarding that.  And I would say the brandishing

8    and display laws as one category is indicative

9    of the idea that our ancestors were keenly

10   cognizant that there was, let's call it a public

11   policy problem, whenever individuals carried

12   guns in a public setting.

13              And it's important to remember

14   that there's two parts, there's brandishing, but

15   there are also display laws, which do not

16   incorporate sort of menacing threatening

17   behavior, but are laws that punish the mere

18   display of a weapon in public, that is, the mere

19   presentation of a weapon in public.

20   So you have really those two types of laws

21   existing as kind of one category of here is the

22   public policy of what happens when you bring a

23   weapon into a public space when other people are

24   around.

25 Q.  Well, would you agree with me that, if a person



1       ·is engaged in concealed carry, that they're not

2       brandishing a weapon?

3       A.   Yes.

4  Q.   Okay.  And would you agree with me that you can

5       engage in open carry without brandishing a

6       weapon?

7       A.   Yes.  But it could run afoul of display laws.

8  Q.   Okay.  So is it your understanding that display

9       laws omit open carry of firearms?

10      A.   Well, I treat these two categories separately

11      because they're separately -- they're separate

12      typically in the law, that is, there are --

13      there were states and localities that had laws

14      saying essentially you could not carry weapons

15      openly, but the display category is treated

16      somewhat differently, and so I treat them

17      differently.

18              And again, my main purpose here

19      is to present this information.  And obviously,

20      it's up to a judge or magistrate to decide the

21      degree of relevancy of these sorts of laws with

22      respect to making analogies between the old laws

23      and the current Rhode Island law.

24  Q.   Okay.  So setting aside the brandishing laws for

25      now and focusing just on the display laws.  Is



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
37

```
1        it your understanding that the display laws
2        would bar open carry of firearms or could you
3        engage in open carry without violating display
4        laws?
5        A.   Depends on the state, depends on the
6        ordinance, depends on the circumstances, but
7        certainly the -- you can readily imagine
8        display -- persons carrying firearms without
9        running afoul of display laws.  Remember, it's
10       one sort of subcategory of a larger universe.
11  Q.   Okay.  So depending on the specifics of the
12       statute, you could engage in open carry without
13       violating a display law.
14       A.   I think that is possible.  Sure.
15  Q.   And I know you have a -- What was produced as
16       Exhibit B to me yesterday -- Let me see if I can
17       pull that up.  Let me pull up what was labeled
18       as Exhibit B and provided to me yesterday, the
19       first page of which just say Exhibit B and then
20       there's two pages after that which consists of a
21       table that is labeled Types of Carry
22       Restrictions (Years of Enactment).  Do you see
23       that?
24       A.   Yes, I do.
25  Q.   Okay.  And is this the Exhibit B to which you
```



ROBERT J. SPITZER, PH.D.                                September 10, 2024
O'NEIL V. NERONHA                                                      53

1        that?

2        A.  Not specifically, no.

3    Q.  Okay.  Were you involved in the Bruen case as an

4        expert of some sort?

5        A.  No.  Let me see.  No.

6    Q.  All right.  Have you rendered an opinion -- and

7        I apologize if I asked you this already, but I

8        don't recall.  -- in any other litigation as to

9        whether or not a restriction on open carry was

10       either consistent or inconsistent with a

11       historical tradition of firearms regulation?

12       A.  That question might have come up in some

13       manner with one or more of the cases I've been

14       involved with, but I can't, I cannot say here

15       and now.

16   Q.  Okay.  Since the Bruen decision, have you been

17       involved in any cases in which you rendered an

18       opinion as to whether or not a restriction on

19       concealed carry was consistent with the

20       historical tradition of regulation?

21       A.  I'm sure it must have come up in some manner.

22       But here, again, I cannot say the extent to

23       which I've addressed that specific question in a

24       given case or cases.

25   Q.  Okay.  Well, then, let me do this.  Let me



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
54

```
 1        backtrack and say, can you describe for me,
 2        generally speaking, what these approximately
 3        50 other cases you've been involved in did
 4        concern?
 5        A.   Well, it concerned a variety of questions,
 6        a variety of weapons related laws, including
 7        restrictions on assault weapons, large-capacity
 8        magazines, a few of them have involved the
 9        existing laws saying that, if you're a felon,
10        you're not allowed to have firearms, I was
11        involved in a switchblade, challenge for
12        switchblade law in California.  There have been
13        a great many.  I'm sure there have been weapons
14        carrying laws that have been at play as well.  I
15        have not categorized --
16   Q.   Okay.  As you sit here today, you can't
17        specifically recall one that involved either
18        concealed carry or open carry.
19        A.   No.
20   Q.   Okay.  Now, have you heard the phrase "long
21        guns"?
22        A.   Yes.
23   Q.   Okay.  What's your understanding of what that
24        means?
25        A.   Well, the long gun is generally understood as
```



ROBERT J. SPITZER, PH.D.                              September 10, 2024
O'NEIL V. NERONHA                                                        57

1         A.   Yes.

2    Q.   And then have you a category which says

3         No Open/Any Carry Laws.   What do you mean by

4         that?

5         A.   Well, those are laws that impose restrictions

6         on the any carrying of weapons.   So, for

7         example, there are laws that said, if you

8         carried a pistol, whether concealed or openly,

9         it would fall under that category.

10   Q.   Okay.   But that category would not include long

11        guns; is that -- or would it?

12        A.   It would not.

13   Q.   Okay.   All right.   I'm going to pull Exhibit B

14        back up in just a minute.   But let me ask you a

15        couple more questions just about the

16        Duke repository and the information that's in

17        Exhibit B.

18                       Of the information that's in

19        Exhibit B, do you recall whether you, yourself,

20        went and confirmed that the statute cited in the

21        Duke repository in fact said what the repository

22        said they said?

23        A.   Well, again, I've been using and culling that

24        information for over a decade.   And from the

25        beginning of that time up to the present, I



1    found it to be entirely scrupulous and reliable.

2    There may be a scattering of laws in Exhibits B

3    and C that I obtained from other sources other

4    than the Duke repository or where I wound up

5    coming up with a law by different means and then

6    found out it was in the Duke repository later.

7    But virtually all of those laws came from the

8    Duke repository.  Did I trace -- I did not

9    however trace back most of the laws that I

10   reference in those two exhibits to their

11   ancestral, you know, sort of original PDF from X

12   sources.

13   Q.   Okay.  Would you agree with me that some of the

14   statutes included in the Duke repository do not

15   include all of the language in the original

16   statute?

17   A.   That is true.

18   Q.   Okay.  Would you agree with me that the

19   Duke repository -- Well, let me withdraw the

20   question.  Does the Duke repository note when a

21   statute was repealed or amended?

22   A.   Generally speaking, I believe the answer is

23   no, because it's not the purpose of the

24   repository.

25   Q.   Okay.  Does the Duke repository note when a



1          court decision was made with respect to a

2          particular statute?

3          A.   Not that I recall, no.

4     Q.   Okay.  So, for example, if a court were to hold

5          any particular statute in the repository had

6          been overturned as unconstitutional, that is not

7          noted in the repository.

8          A.   I do not believe so, no.  But again, that's

9          not the purpose of the repository.

10    Q.   Okay.  Well, then why don't you tell me what you

11         understand the purpose of it to be.

12         A.   Well, the purpose of it is to present the

13         public policy enactments of legislatures

14         contemporaneously, that is, in this year they

15         enacted such and such a law.  The question of

16         what happened to that law 10 years, 50 years, a

17         hundred years down the line is beyond the reach

18         of the repository and it's also beyond the reach

19         of a historical moment when the law was enacted.

20         Because the key question is, what did lawmakers

21         intend in 1820 when they passed the law about,

22         you know, penalizing concealed carry of weapons,

23         let's say, or whatever it might be.  That is

24         certainly an interesting question, but that kind

25         of historical genealogy is a separate question



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

```
 1          from what was the public policy intention of
 2          lawmakers at the time that they enacted these
 3          given laws.
 4     Q.   Are you aware of whether the Duke repository
 5          places any caveat or cautionary warning on its
 6          materials with respect to its use?
 7     A.   Oh.  I can't recall offhand.  Seems to me
 8          there is introductory material about -- you
 9          know, that describes that says where they got
10          their information.  I mean, I think there's some
11          kind of prefatory information somewhere on the
12          website, but I can't quote it to you offhand.
13     Q.   Okay.  Do you recall if the repository includes
14          the statement, and I quote, Conscientious users
15          of this repository should supplement their
16          results with further legal historical research?
17     A.   I do not recall that.  But if you say that it
18          is there, then I believe you.
19     Q.   Okay.  If I were to ask you to identify which
20          statutes you have personally, you know,
21          identified in the Duke repository and then gone
22          and located the original statutory material,
23          could you do so?
24     A.   Have I done that, you're asking?
25     Q.   Yeah.  No.  My understanding is, you have said
```



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                            61

1    that you have found some material in Duke
2    repository and then subsequently checked the
3    original source of --
4                       MR. LYONS:  My speaker just
5    died.  Can you hear me?
6                       THE WITNESS:  Yes, I can.
7                       MR. LYONS:  Okay.
8    Unfortunately, I cannot hear you --
9                       THE WITNESS:  Oh.
10                      MR. LYONS:  -- right now.  And
11   my computer is warning me that my speaker is not
12   working.  So I'm going to sign out and sign back
13   in.  Okay?  I'll be right back.
14                      (PAUSE)
15                      MR. ARGUIN:  We've been going
16   for an hour and a half, so perhaps there's a
17   time for a break coming up.
18                      MR. LYONS:  Okay.
19                      MR. ARGUIN:  I don't want to
20   interrupt, but just factor it in.
21                      MR. LYONS:  Yes.  No.  Why
22   don't we go ahead and take the break now, since
23   we essentially took a small break anyway.  And
24   we'll resume in, what, like five, 10 minutes?
25   Is that fine?  Or do you want something longer



ROBERT J. SPITZER, PH.D.                     September 10, 2024
O'NEIL V. NERONHA                                          77

1          A.  Not only, no.  It would seem to include
2     dueling, but it -- the language is quite broad
3     and would contemplate actions beyond dueling.
4  Q.   Okay.  Well, like what other kinds of actions?
5          A.  Well, anything where persons are carrying
6     these types of weapons and others in a -- who
7     are within sight of these individuals are
8     feeling fear that this is antithetical to public
9     order and safety.  So this language is very
10    broad in its construction.  It certainly
11    includes dueling, but I would not say that it is
12    only dueling, no.
13 Q.   Okay.  The reference in the fourth line to any
14    other unusual or unlawful weapons used -- Do you
15    see that?
16         A.  Yup.
17 Q.   Is it your understanding that this act was
18    considering pistols generally to be an unusual
19    or unlawful weapon?
20         A.  The wording would suggest that, yes, because
21    it says, any other unusual, as in the prior
22    weapons being listed suggests a reference to
23    unusual or, unusual or unlawful.
24 Q.   Okay.  So is it your understanding that this
25    part of the act prohibits any public carry of



1      any kind of pistol?

2      A.   Well, it doesn't exactly say that.  I mean,

3      that's not what the wording says.

4   Q.  Okay.

5      A.   It says that this practice has caused great

6      alarm, fear, what we might call disruption of

7      public order, and therefore, we're jumping in

8      here to regulate this practice, these practices.

9   Q.  Okay.  So then what then -- Well, let me

10     withdraw the question.  Does this first part of

11     the act in your understanding permit any kind of

12     public carry of a pistol?

13     A.   Well, presumably it would be allowable for

14     usual and lawful weapons.

15  Q.  Okay.  So some pistols could be usual and

16     lawful?

17     A.   That would not seem to be the implication of

18     the wording because it simply says pistols.  So

19     it would seem to suggest that a pistol would not

20     be a lawful or usual weapon.  And we certainly

21     know historically that, despite impressions to

22     the contrary, very few firearms in circulation

23     in society, especially in 1600s, were pistols.

24     They were expensive, they were unreliable, they

25     were not useful, except for aristocracy and



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                          79

1          maybe for dueling.  And if you have a firearm,

2          the sensible firearm would have been a musket, a

3          fowling piece, that sort of thing.

4    Q.    And so this part of the act does not prohibit

5          the public carry of long guns.

6          A.  That would be the implication.  I wouldn't

7          say definitively, but that would be the

8          implication.

9    Q.    Do you know if the Bruen decision made any

10         reference to this act?

11         A.  Offhand, I don't.

12   Q.    If we go back to your disclosure, on Page 6, the

13         first full sentence says, quote, Massachusetts

14         followed in 1751.  Do you see that?

15         A.  It's not on the screen, but I remember

16         writing it.

17   Q.    Oh, I'm sorry.  My mistake.

18         All right.  Can you see it now?

19         A.  Yes, I can.

20   Q.    All right.  And I'm referring to the first full

21         sentence on Page 6 which says, Massachusetts

22         followed in 1751.  What do you mean by

23         "Massachusetts followed"?

24         A.  Well, it enacted a similar sort of law,

25         different in particulars, but -- and also in the



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
80

1        passage of 70 years, but same type of law.

2    Q.  Let me show you an act on the screen.

3        A.  I see it.

4    Q.  Oh, you do?

5        A.  Yes, yes.  Section 1, be it enacted by the

6        lieutenant governor.

7    Q.  All right.  I wasn't sure if I had brought it

8        up.

9        A.  Oh.  Yes, you did.

10   Q.  Okay.  Good.

11       So is this the Massachusetts statute to which

12       you refer?

13       A.  I do not see a year or an identifying state

14       on here, but it looks like it.

15   Q.  Okay.

16       A.  Okay.  There we are.  1751.

17   Q.  Okay.  Referring to the second page, it says

18       A.D. 1751, on the upper right-hand side?

19       A.  Yes, it does.

20   Q.  Is that correct?

21       A.  Yes, it does.

22   Q.  Okay.  And then on the other side, there's in

23       brackets Geo.II.24, which would appear to be a

24       reference to King George, II.

25       A.  Yes.



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
81

1   Q.   Okay.  Have you read this statute itself or did
2        you rely upon the Duke repository in citing it?
3        A.  Either or both.  I certainly have -- Either
4        or both.  I can't say with certainty whether I
5        did either or both.
6   Q.   Okay.
7        A.  I think it's in the Duke compendium.
8   Q.   Would you agree with me that this act prohibits
9        groups of people of 12 or more from being armed
10       with weapons and unlawfully assembling?
11       A.  Well, there's two parts here.  Right?  The
12       first part says, if any persons, just as you're
13       referencing it, if any persons to the number of
14       12 or more, being armed with clubs or other
15       weapons, or -- there's the second part -- if any
16       persons 50 or more, whether armed or not, shall
17       be unlawfully, riotously, or tumultuously, et
18       cetera, behavior.
19                So the first part is the
20       critical part for my point of view, that is to
21       say it's the mere presence of 12 or more people
22       armed with other -- armed with clubs or other
23       weapons.  And that, that particular element is
24       what I was alluding to, although the rest of it
25       is relevant as well.



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
82

```
1   Q.   Okay.  Would you agree with me that this act --
2        and we can scroll through it, if you would
3        like.  -- does not prohibit an individual from
4        either open or concealed carry of a firearm?
5   A.   I would have to read through the whole thing
6        to be certain, but it is certainly correct that
7        it talks about two categories of persons, being
8        multiple persons, not a single person.
9   Q.   Okay.  Well, if you'd like more time to read it,
10       I can leave it up on the screen, if you'd like.
11  A.   Well, I -- You tell me how important it is.
12  Q.   Okay.  Well, my question was, whether or not you
13       would agree with me that this does not outlaw an
14       individual from either the concealed or open
15       carry of a firearm, any public carry of a
16       firearm, and you indicated you would want to
17       read it more before you responded.  So I'm just
18       offering you the opportunity to do that.
19  A.   Okay.  If you can scroll to the second page.
20  Q.   Sure.
21                    (PAUSE)
22  A.   It does call for individual punishments, but
23       I believe your assertion is -- your question is
24       correctly stated, that there is no provision, at
25       least through Section 2, that refers to single
```



ROBERT J. SPITZER, PH.D.                          September 10, 2024
O'NEIL V. NERONHA                                              83

1       individuals.
2   Q.  Okay.  Are you aware whether or not there's any
3       other section to this act?
4   A.  I don't know offhand.
5   Q.  Okay.  In Paragraph 12 of your declaration --
6       which should be back up on your screen.  Do you
7       see that?
8   A.  Yes, I do.
9   Q.  Okay.  And you refer from the early 1800s up
10      until 1860, at least five states, including
11      D.C., enacted laws barring or restricting the
12      carrying of named weapons, whether concealed or
13      open.  Then you go on to say, Georgia enacted a
14      law in 1837 restricting both the carrying and
15      sale of named weapons.  Do you see that?
16  A.  Yes.
17  Q.  Okay.  And then you quote the statute in your
18      declaration.
19  A.  Yes.
20  Q.  Okay.  Do you recall if you took the quote from
21      the Duke repository or did you find the original
22      statutory material and quote from that?
23  A.  I believe it came from the Duke repository.
24  Q.  Okay.  And do you know whether this statute
25      prohibited the open carry of the weapons listed?



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                              84

```
 1        A.  It included an open carry provision, yes.
 2   Q.   Okay.  So it was your understanding that this
 3        prohibited the open carry of weapons?
 4        A.  As it says, yes, whether concealed or open.
 5   Q.   Okay.  And let me show you -- Well, actually --
 6        I'm sorry.  I don't have a section to show you.
 7        But do you know whether or not there was another
 8        portion of this act which also said, provided --
 9        quote, provided, also, that no person or persons
10        shall be found guilty of violating the before
11        cited act who shall openly wear externally Bowie
12        knives dirks, toothpicks, spheres, and what
13        shall be exposed plainly to view?
14        A.  Well, you have me at a disadvantage because
15        I'm not seeing the full text of the law.
16   Q.   Yup.  Nope.  I understand that.
17        Do you know whether or not the Georgia
18        Supreme Court struck down this act?
19        A.  They did not strike down the entire law, no.
20   Q.   Okay.  And what was it that you understood that
21        they struck down?
22        A.  Well, the court was upset with -- Well, there
23        were a couple of problems in the case.  One was
24        that the man was charged with the crime.  Those
25        who arrested him never indicated whether the
```



ROBERT J. SPITZER, PH.D.                 September 10, 2024
O'NEIL V. NERONHA                                        85

```
 1        weapon he was carrying was being carried openly

 2        or concealed.  Particular problem.  More

 3        generally, the court was unhappy with the

 4        incongruity of the wording pertaining to what

 5        weapons were covered under the concealed carry

 6        portion versus what weapons were covered under

 7        the open carry portion, and they found that

 8        inconsistent.  And they were particularly

 9        concerned about maintaining greater protections

10        on open -- on avoiding open carry restrictions

11        so as not to impede the ability of Georgia to

12        establish and maintain its militia for military

13        purposes.

14   Q.   Okay.  Is that decision the Nunn versus State

15        decision?

16        A.  Yes.

17   Q.   Okay.  Which was decided in 1946?

18        A.  Sounds right.

19   Q.   Okay.  And generally speaking, what the court

20        said in part was that the prohibition on open

21        carry violated the Georgia constitution?

22        A.  I think the phrase is something like that

23        part which is inconsistent with blah, blah.  I

24        mean, they worded it a very particular way.  But

25        yeah.  They were more dubious about restrictions
```



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
86

1          on open carry as compared to concealed carry.

2     Q.   Okay.  And going back to your declaration.  Can

3          you see that on the screen?

4     A.   Yes.

5     Q.   Okay.  Going down to Paragraph 15.

6     A.   Yup.

7     Q.   There is a -- I'm sorry.  Paragraph 14.  You

8          refer to an 1851 Pennsylvania law for the

9          borough of York.  Do you see that?

10    A.   Yes.

11    Q.   And it said it defined as a felony the willing

12         and malicious carrying of any pistol, among

13         other weapons, guns.  Do you see that?

14    A.   Yes.

15    Q.   Okay.  What did they mean by -- or what's your

16         understanding of what they meant by willful and

17         malicious?

18    A.   I will say that it contemplates criminality.

19         But beyond that, I would be reluctant to delve

20         into exactly what those terms meant in

21         Pennsylvania law in 1851.

22    Q.   Okay.  In other words, it may not have

23         criminalized the carry of pistols or other

24         firearms for some purpose which was not willful

25         or malicious.



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
87

1      A.   Yes.   And let me make clear that these types

2      of laws, not always, but almost always made

3      exceptions for travelers, if you're carrying a

4      gun just traveling through an area, for law

5      enforcement, for militias, people serving in

6      militias, and often for cases of justifiable

7      self-defense.   And so those kinds of exceptions

8      were invariably included in these laws precisely

9      to protect people who, you know, were just

10     traveling through to go somewhere and they were

11     bringing their gun along or similar things.

12  Q.   Okay.   But with respect to the Pennsylvania law,

13     my understanding is, you do not have an

14     understanding as to what was meant by the

15     willful and malicious carrying.

16     A.   At the least, I would want to go back and

17     look at the full law.   And even then, there

18     might not be a clear answer to that question.

19     It was within the discretion of law enforcement

20     and the judicial authorities to make a

21     determination about what constituted willful and

22     malicious activity.   Those are pretty broad

23     terms.

24  Q.   And then in Paragraph 15 you refer to a Hawaii

25     law.   Do you see that?



ROBERT J. SPITZER, PH.D.                           September 10, 2024
O'NEIL V. NERONHA                                                  88

```
 1        A.   Sorry.   Refer to a what?
 2   Q.   Hawaii law.
 3        A.   Oh, yeah.   Right, right.
 4   Q.   1852 Hawaii law.
 5        A.   Yup.
 6   Q.   Was Hawaii independent from the United States in
 7        1852?
 8        A.   Yes.
 9   Q.   Okay.   Why is that law then relevant to the
10        American historical tradition?
11        A.   Well, for two reasons.   One is, because
12        Hawaii is today a state.   And as is the case
13        with territories that eventually become states,
14        they don't obliterate all of their laws at the
15        point in which or the day after they join the
16        union.   They carry forward historically every
17        territory, every state did this, and that is,
18        they would carry forward their, you might call
19        it common law tradition, just as in the way
20        early Americans brought within the British
21        common law tradition.   And while laws are
22        changed, amended, et cetera, over time, a great
23        deal of law carries forward.   And this is a --
24        was small, but notable additional example of the
25        same thinking that existed in other territories
```



1       and states within what is -- what then and

2       later -- you know, what was the United States.

3  Q.   In Paragraph 16, beginning at the bottom of

4       Page 8 and going on to Page 9, you refer to

5       states which enacted anti-carry laws from either

6       1860 to 1900 or even thereafter.

7  A.   Yes.

8  Q.   Okay.  My understanding from our earlier

9       discussion is that you understood the

10      Supreme Court to be saying that the limits -- or

11      that the end period for consideration of the

12      historical tradition would be 1868 when the

13      Fourteenth Amendment was adopted.

14  A.  No.

15             MR. ARGUIN:  Objection.  Calls

16      for a legal conclusion and I think misstates the

17      testimony.

18  Q.  Okay.

19             MR. ARGUIN:  Dr. Spitzer, would

20      you like to answer?

21  A.  Well, I would just say no.

22  Q.  Okay.

23  A.  That's not what I said and it's not what the

24      court said.

25  Q.  Oh, okay.  So is it your understanding that the



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

1 statutes passed after 1868 are relevant for

2 considering the historical tradition of firearms

3 regulation?

4 A.  I would say that the Bruen decision did not

5 preclude that.  It did not say you cannot

6 consider 1869, 1870, 1871, 1872, let's say.  And

7 I would say it's essential -- As someone

8 presenting a historical record, that is me, it's

9 essential to understand that history didn't end

10 in 1868 or 1874.  So in other words, if my

11 narrative about concealed carry laws ended, you

12 know, at some arbitrary year, let's say 1876,

13 the reader might wonder, well, did anything

14 happen with respect to restrictions on concealed

15 carry after 1876, which is a perfectly fair

16 historical question, because history doesn't

17 stop.  And so my job is to present a full story

18 of the narrative of concealed carry

19 restrictions.

20            Now, if someone -- if a

21 magistrate or a judge says, well, I don't think

22 we should pay attention to laws enacted after

23 1900, that's the judge's decision.  That's not

24 my decision -- I mean, it's not my judgment.  So

25 the reader is welcome to make those sorts of



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
95

```
 1          other little quirky ones like that, but I do
 2          have the laws.
 3     Q.   Okay.
 4          A.  And this was one.  And you'll notice in that
 5          previous law there was a link to the Duke
 6          repository, which is an indication that they
 7          have indeed corrected the earlier site, which I
 8          should have corrected in the footnote but, you
 9          know, that's my mistake.  I did not correct my
10          footnote.
11     Q.   Do you have an opinion as to whether or not a
12          statute that requires a showing of good cause to
13          engage in either concealed or open carry of a
14          firearm is within the historical tradition?
15          A.  It seems to me the answer would be yes.
16     Q.   Okay.  And what would you cite for that?
17          A.  Well, there are all kinds of laws that
18          criminalize, you know, concealed carry, open
19          carry, et cetera.  But the laws, as we were
20          talking about earlier, often had wording,
21          typically had wording saying justifiable
22          self-defense is okay, you're a traveler just
23          passing through, you're law enforcement, you're
24          in the militia, things of that sort.  So that
25          would be good cause.  Right?  In other words,
```



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
96

1       you're carrying a weapon concealed, but you were

2       doing it because someone was out to kill you and

3       you, you know, had the weapon and you were

4       arrested, you've got the weapon, but look, I've

5       got good cause, I was defending myself because

6       this guy threatened me and my family.  So that

7       would be a, certainly a good cause kind of

8       provision.  And there were many such exemptions

9       listed in these carry laws.

10 Q.   Have you researched or considered whether or not

11      good cause would include a general concern for

12      self-defense regardless of whether or not there

13      was a specific identifiable threat against a

14      person?

15 A.   I don't think -- Well, two answers.  One is

16      that, that -- to the extent I've studied it,

17      that under such circumstances of self-defense,

18      it would not be enough to say, look, I just want

19      this for my protection because I want it.  That

20      would not have carried particular weight,

21      depending on existing state laws at the time.

22      And that, secondly, if you were, you know, you

23      were carrying a weapon and you're arrested,

24      let's say, because you're violating the carry

25      law, you would have to then demonstrate or



1          wanted to ask, Professor, if I could.

2                          And for the stenographer,

3          James Arguin, representing the state.

4                          EXAMINATION BY MR. ARGUIN:

5    Q.    At some point in your testimony you

6          distinguished between brandishing and display.

7          Do you recall that line of questioning?

8          A.  Yes.

9    Q.    And at point you said, with regard to display

10         laws, it was -- if I understood your testimony

11         correctly, it was possible one could engage in

12         open carry without violating a display law.  And

13         my question -- Do you recall that --

14         A.  Yes.

15   Q.    -- testimony?  My question is, what do you mean

16         by that?  What were the circumstances where that

17         would occur?

18         A.  Well, depending on the circumstance and the

19         law, display laws contemplates several things.

20         One is, you have a weapon; secondly, it's

21         visible; third, you're out in public; fourth,

22         there are other people around, you're not out in

23         the woods by yourself.  And you are seen in

24         public carrying these things, and people respond

25         to this with concern, dismay, intimidation, or



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

1    the like.  So if you're just traveling through,

2    no, that wouldn't apply.  If you're law

3    enforcement, no, that wouldn't apply.  If you're

4    going about daily activities, presumably it

5    wouldn't apply.  I mean, again, it would depend

6    on the circumstance, it would depend on how the

7    law was enforced, it would depend on the wording

8    of you law.  But generally speaking, the point

9    about display laws is that it is possible for

10   public, for the public to be -- to feel

11   threatened, to feel a threat, to feel fear by

12   the mere presence of a weapon being held by a

13   person in a public setting.  And sometimes those

14   public settings were stipulated in the law, like

15   in a polling place, in a school, at a social

16   gathering, at a fair, at a market, and those

17   would be examples of places where a law like

18   this could come into play, a display law.

19 Q.  All right.  Thank you for that.

20      And one other area of clarification related to

21      the questioning around the Georgia 1837 law.  Do

22      you recall that line of questioning?

23 A.  Yes.

24 Q.  And at some point you acknowledged that the

25      Georgia Supreme Court struck down some portion



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
102

```
 1        of that law.  Do you recall that testimony?
 2        A.  Yes.
 3   Q.   And you indicated at some point that the court
 4        seemed to be more dubious about restrictions or
 5        open carry than a concealed carry.  Do you
 6        recall that question --
 7        A.  Yes.
 8   Q.   -- that answer?
 9        A.  Yes.
10   Q.   And what I'd like to get is further
11        clarification.  Why, why, to your understanding,
12        was the court more dubious about open carry
13        versus concealed carry?
14        A.  Well, without having the case in front -- the
15        case judgment in front of me, the court
16        expressed great concern about any laws that
17        would impinge on the ability to formulate,
18        organize, and maintain a properly regulated
19        militia or military force, bearing in mind that
20        in the 1830s and 1840s states in particular
21        still organize militia, still relied on militias
22        as opposed to a professional military force.  So
23        militias were very much a part of life at the
24        time.
25                      MR. ARGUIN:  Okay.  Thank you.
```



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
105

1          C E R T I F I C A T E

2       I, LISA L. CROMPTON, a Commissioner in and
for the State of Rhode Island, duly commissioned

3 and qualified to administer oaths, do hereby
certify that the foregoing Deposition of

4 Robert James Spitzer, Ph.D., a witness in the
above-titled cause, was taken before me on behalf

5 of the Plaintiffs Via Zoom Remotely on
September 10, 2024, at 10:00 a.m.; that previous

6 to examination of said witness who was of lawful
age, he was first sworn by me and duly cautioned

7 to testify to the truth, the whole truth, and
nothing but the truth, and that he thereupon

8 testified in the foregoing manner as set out in
the aforesaid transcript.

9

10       I further certify that the foregoing
Deposition was taken down by me in machine

11 shorthand and transcribed by computer, and that
the foregoing Deposition is a true and accurate

12 record of the testimony of said deponent.

13       Pursuant to Rules 5(d) and 30(f) of the
Federal Rules of Civil Procedure, original

14 transcripts shall not be filed in Court;
therefore, the original is delivered to and

15 retained by Plaintiffs' Attorney,
Thomas W. Lyons, Esq.

16       Reading and signing of the transcript was
not requested by the witness or by any parties

17 involved upon completion of the deposition.

18       IN WITNESS WHEREOF, I have hereunto set my
hand and seal this 20th day of September, 2024.

19

20

21 

22

23           LISA L. CROMPTON
      REGISTERED PROFESSIONAL REPORTER

24       MY COMMISSION EXPIRES 1/28/2028

25