In the Matter Of:

## MICHAEL O'NEIL vs PETER F. NERONHA

23-cv-00070

---

## BRENNAN N. RIVAS, PH.D.

*September 12, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF RHODE ISLAND

3

4   MICHAEL O'NEIL, et al.,
            Plaintiffs,
5
        vs.                              C.A. NO. 23-cv-00070
6
    PETER F. NERONHA, in his official
7   capacity as Attorney General of
    the State of Rhode Island, and
8   THE STATE OF RHODE ISLAND,
            Defendants.
9   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

10

11          WEB CONFERENCE DEPOSITION OF EXPERT

12              BRENNAN NICOLE RIVAS, Ph.D.

13

14

15                 September 12, 2024

16                   11:00 a.m.

17

18

19              Middletown, Connecticut

20

21

22

23

24

25              Nancy S. Caron, CSR



```
 1                    APPEARANCES OF COUNSEL

 2

 3    On Behalf of the Plaintiffs, Michael O'Neil, et al.:

 4                  Thomas W. Lyons, Esquire
                    STRAUSS, FACTOR, LAING & LYONS
 5                  One Davol Square, Suite 305
                    Providence, RI  02903
 6                  (401) 456-0700
                    tlyons@straussfactor.com
 7

 8    On Behalf of the Defendants, Peter F. Neronha, et al.:

 9                  James Arguin, Esquire
                    Special Assistant Attorney General
10                  Paul Meosky, Esquire
                    Special Assistant Attorney General
11                  STATE OF RHODE ISLAND
                    OFFICE OF THE ATTORNEY GENERAL
12                  150 South Main Street
                    Providence, RI  02903
13                  (401) 274-4400
                    jarguin@riag.ri.gov
14                  pmeosky@riag.ri.gov

15

16

17

18

19

20

21

22

23

24

25
```



1          DEPOSITION OF BRENNAN NICOLE RIVAS, Ph.D.

2                September 12, 2024

3

4          COURT REPORTER:  My name is Nancy Caron; I am

5    the stenographer today.  For the record, and to ensure

6    a valid notary and certified court reporter is present

7    at this proceeding, I am a Certified Shorthand

8    Reporter, and a notary public in Rhode Island, and my

9    notary number is 18102.  I am going to read a

10   stipulation for remote proceedings; and if at the end,

11   the parties could agree:

12       It is hereby stipulated and agreed by all counsel

13   present that this Web-based remote proceeding is being

14   conducted by parties in separate locations; that the

15   oath shall be administered upon the witness providing a

16   valid form of identification; that this remote

17   proceeding will not be recorded by video or audio means

18   without prior consent of all parties; that exhibits may

19   be marked by counsel and provided to all parties; that

20   the court reporter is a Rhode Island notary public

21   swearing in a witness who is not located in Rhode

22   Island.  All parties shall bear their own costs for

23   this proceeding unless otherwise agreed upon.

24       Do the parties agree?

25         MR. LYONS:  Yes.



```
 1          MR. ARGUIN:  Yes, the State agrees, as well.

 2

 3          BRENNAN NICOLE RIVAS, Ph.D.,

 4  having been first duly sworn, testified as follows:

 5          COURT REPORTER:  State your full name and your

 6  present location for the record.

 7          THE WITNESS:  My name is Brennan Nicole Rivas; I

 8  am currently in Middletown, Connecticut.

 9

10                        EXAMINATION

11  BY MR. LYONS:

12          MR. LYONS:  Hi, I am Tom Lyons.  I represent the

13  Plaintiffs in a lawsuit pending in Federal District

14  Court with the caption, Michael O'Neil, et al. v. Peter

15  Neronha, et al.

16     Q. My first question, which I think you may have

17  just answered, is the correct pronunciation of your

18  last name, which is Rivas; is that correct?

19     A. Yes; that's correct.

20     Q. Okay.  The CV and other information I have

21  received identified you as Brennan Gardner Rivas, but I

22  think you just gave a different name.  Can you explain

23  that?

24     A. Yes, Rivas is my married name.  When I changed

25  my name to Rivas, I wanted to change my middle name to
```



1    there is a statute or something; but as you sit here

2    right now, are you aware of any states, I will start

3    with states, that passed any laws prohibiting the open

4    carry of firearms?

5        A. So I am not terribly familiar.  In fact, I would

6    say that current gun regulations, that's a complicated

7    field, and I am not abreast of what is going on in each

8    different state.  I try to stay on top of things that

9    pertain to me at my home, but I am much more

10   comfortable talking about laws in the, you know, in

11   American history, especially the nineteenth century, or

12   eighteenth, nineteenth, and early twentieth.  So most

13   of my answers are going to sort of fall back onto my

14   research, not anything that I know or would pretend to

15   know about current policies today.

16       Q. Fair enough.  So let's do that, within that

17   period of time you just identified, are you aware of

18   any states that passed laws prohibiting the open carry

19   of firearms?

20       A. Yes, there are examples of state-level laws, and

21   there are also some municipal ordinances that

22   restricted or regulated open-carry in some way, and

23   those are in the declaration.

24       Q. Okay.  Well, then we will talk about them as we

25   go through.



1    A. All right.

2    Q. Have you heard the term long gun used before?

3    A. Yes, I have.

4    Q. What is your understanding of what long gun

5    means?

6    A. That those are rifles, shotguns, muskets, as

7    opposed to short arms, like, pistols.

8    Q. Are you aware of any states which have

9    prohibited the carry of long arms within that

10   historical period you discussed?

11   A. There are examples of historical restrictions

12   that pertain to long arms, as well.

13   Q. Okay.  Are they also in your declaration?

14   A. They are, although, I don't know that -- I would

15   not say that they are indexed or organized in the way

16   that you have described it, as the regulation of long

17   arms.  I think that I would say I brought them up for

18   other reasons, and the fact that I brought them up to

19   illustrate some other regulatory method, and probably

20   did not highlight the fact that they applied to long

21   guns, as well as to things like revolvers and Bowie

22   knives, and stuff like that.

23   Q. All right.  Well, then we may get into that more

24   specifically as we go through your declaration.

25   A. Okay.



1    Northampton in this section?

2        A. Yes.

3        Q. Is it your understanding that the surety

4    statutes were based on the Statute of Northampton?

5        A. As far as the surety part, I'm not sure; but the

6    reasoning that was employed and the kind of legal

7    lineage of those laws does trace back to the language,

8    the verbiage of the Statute of Northampton.

9        Q. Do you recall whether in the Bruen decision, the

10   Supreme Court discussed the Statute of Northampton

11   and/or surety statutes?

12       A. From my recollection, the Court, in that case,

13   did talk about the Statute of Northampton and surety

14   laws, yes.

15       Q. Do you recall what the Court had to say about

16   them?

17       A. If memory serves, the Court decided that the

18   Statute of Northampton was too old to fall within a

19   relevant time frame, and I don't remember the specifics

20   about the surety laws.  I would want to go back and

21   revisit that; I don't remember what specifically they

22   said about it.

23       Q. Okay.  Then you have a discussion in this

24   section of some statutes, if I understand correctly,

25   that prohibited the concealed carry of certain weapons,



1  including pistols; is that correct?

2     A. Yes.  So, yes, transitioned into talking about

3  what we might call conceal-carry laws.

4     Q. Did any of those laws, to your knowledge,

5  prohibit the open carry of pistols or other firearms?

6     A. I divided them up in a way that I put the ones

7  that specifically said concealed or seemed to have

8  applied to concealed weapons in a section; and then in

9  a later paragraph, I talked about the laws of a

10  similar -- of a similar nature.  Right?  They had a

11  similar kind of format; right, but that also applied

12  themselves to openly-carried weapons.  I talked about

13  them later.  In this immediately following section, I

14  tried to confine myself to talking about laws that

15  applied to concealed carrying of weapons.

16     Q. In paragraph 35, you referred to the states that

17  adopted the penal code version of the Massachusetts

18  public-carry law.  You list Wisconsin, Maine, Michigan,

19  Virginia, Minnesota, and Oregon; do you see that?

20     A. I do, yes.

21     Q. Are you aware of any other states that adopted

22  the Massachusetts public-carry law?

23     A. No, not off the top of my head.  I went through

24  and made that list and made the footnote, so that

25  certainly represents everything that I had at the time



1    of this writing.  I am also one of those that, it's

2    nice to write it down, then you can always refer to

3    what you wrote.  So if there are more saved on my

4    laptop somewhere or out in, you know, historical codes

5    somewhere, I am not aware of them at the moment.

6         Q. Okay.  My American history is failing me at the

7    moment, so maybe you can educate me, but was Oregon a

8    state in 1853?

9         A. Oh, man, I'm not sure.  I do -- I'm not sure.

10        Q. Okay.  Do you recall if the Supreme Court in

11   Bruen made any comment about whether laws in the

12   western territories, or how they factored into their

13   analysis of Second Amendment rights?

14        A. To my recollection, yes, the Bruen opinion kind

15   of -- if we want to use the word downplayed the

16   relevance of territorial laws.

17        Q. Okay.  At the bottom of that page, in paragraph

18   36, you refer to an 1838 Virginia law; do you see that?

19        A. Yes.

20        Q. You indicate that that law explicitly prohibited

21   the carrying of concealed weapons and other such

22   behavior by fine or jail time; do you see that?

23        A. Yes.

24        Q. Your sentence goes on to the next page, on to

25   24.



1      A. Yes, I see it.

2      Q. My question is similar to what I asked earlier,

3   but do you recall any other statutes -- we will just

4   address pre-Civil War time period -- from other states

5   that prohibited the carrying of concealable weapons or

6   concealed weapons?

7      A. There were many.  So I don't have them written

8   up in this report in a chronological list.  I can say

9   some that I know off the top of my head, but I will say

10  if we scroll further down -- if we scroll further down,

11  I think there is a big footnote that has a lot of them

12  in some sort of chronological order, perhaps.

13     Q. Sure.  Why don't you show me that footnote.

14     A. Okay.

15     Q. Let me direct your attention maybe to page 26 of

16  your --

17     A. Yes, that's where; that's the one.  So that, at

18  least, has a good list.  Now, it's not strictly

19  antebellum, but they do seem to be moving in

20  chronological order.

21     Q. You refer to a Tennessee 1838 law, but then you

22  list, as I said, in chronological order, other states

23  which had a list of, as you put it, prohibited deadly

24  weapons that could not be concealed on the person,

25  which is how you described them, and penalized



1  laws showing us lawmakers wrestling with the question

2  of intent, and how to assess intent when someone is

3  carrying a weapon, and implementing different

4  strategies for adjudicating a person's intent.  In the

5  case of New York, it looks to me like they are taking

6  an older common law, an older Anglo-American tradition

7  with, you know, laws about burglar's tools, it looks to

8  me like they are taking that kind of framework and then

9  applying it to concealed weapons, like pistols, which

10  is more of -- it's maybe a newer problem, but they are

11  adopting an older framework in order to accommodate

12  regulations on that new problem.

13      Q. Going down to paragraph 40 -- and this may be

14  one of the parts you referred to earlier that would

15  answer a question I was asking earlier -- you

16  identified Idaho, the territory of Idaho, the states of

17  West Virginia and Texas as having statutes that

18  restricted open-carry, as well as conceal-carry; is

19  that right?

20      A. Yes.

21      Q. Are you aware of any other states, other than

22  those three, or territories, that restricted open

23  carry?

24      A. I am aware that there are some municipal

25  ordinances that applied themselves to open-carry, and



1    there -- level ones that --

2         MR. LYONS:  You froze up again.

3    Q. My understanding is that the territory of Idaho

4    and the states of West Virginia and Texas are the

5    states of which you were aware that, who had statutes

6    restricting open-carry, and what you are saying is you

7    are aware of municipal or other lower governmental-

8    level restrictions on open-carry?

9    A. Yes.  So if we are talking about states and

10   territories, those are three that I know, and the three

11   that I wrote about here.  There may be others that I

12   didn't include, but I can't think of them off the top

13   of my head.  I'm not sure.

14   Q. Okay.  Have you compiled, or do you know of

15   anyone who has compiled a list, municipal or other

16   lower governmental-level laws that restricted public

17   carry -- open-carry?  Open-carry.

18   A. Oh, generally speaking, it's a challenge to find

19   municipal laws.  They have not been digitized and put

20   into these sort of aggregate and searchable databases

21   the way that state laws have, and for that reason, they

22   are just harder to find.  So I am not aware of any

23   master list.  The Repository has some examples of

24   municipal laws, and I think we already -- I think we

25   already talked about Patrick Charles's appendix, which



1    includes a number of municipal-level license to carry

2    laws and others.  There is no -- there is no database

3    that even approaches being authoritative when it comes

4    to local ordinances.

5        MR. ARGUIN:  Mr. Lyons, we have been going for

6    another hour and a half, and I wonder if Dr. Rivas

7    would like a break.

8        MR. LYONS:  Yes, yes.  This is not a death

9    march, Doctor.  So we can take a break whatever you

10   would like, or whatever counsel would like, if that's

11   also what he is hinting.  Those of us of a certain age,

12   unlike the witness, sometimes may want to take a break

13   more frequently.  So why don't we go ahead and do that.

14   We will take a short break, another five- or ten-minute

15   break, and then we will proceed.

16       THE WITNESS:  That's great with me.

17       (A break was taken from 1:56 to 2:02 p.m.

18        Att. Meosky not present after break.)

19   Q. (By Mr. Lyons) Dr. Rivas, in paragraph 41 of

20   your declaration, you discuss changes in state statutes

21   respecting firearms regulation; and in that, you

22   discuss how some statutes were amended or some were

23   struck down by courts.  Would you agree with that?

24   A. Yes, that's the purpose of that paragraph, to

25   show that, yes, sometimes they were struck down and



BRENNAN N. RIVAS, PH.D.                                    September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                                      96

```
 1   modified or amended or, like that Tennessee example,
 2   there is overlapping statutes that co-existed at the
 3   same time.  Trying to show the variability and richness
 4   of the record, as opposed to envisioning it as sort of
 5   a flat, each state had more or less identical law that
 6   stood on its own.
 7       Q. Okay.  Do you know, or were you able to
 8   determine whether or not any of the other state laws
 9   that you have referred to in, for example, paragraphs
10   38 or 39, were subsequently revised by legislatures or
11   struck down by the courts?
12       A. I am sure they were all revised, and the Idaho
13   one was, I think, that or portions of it may have been
14   struck down later, but it's very common for the public
15   carry laws to be amended over time, even if it's just
16   something as simple as changing what the penalty is or,
17   you know, specifying that brass knuckles includes all,
18   they will change it from brass knuckles to metal
19   knuckles, but modifications were pretty common.
20       Q. Was it part of your research to determine
21   whether or not any of these statutes were either
22   modified or struck down with respect to restrictions on
23   public carry of firearms?
24       A. So I get what you are saying, that find a law
25   and see what happened with it.  That's an excellent
```



1    section, because my understanding is that this is one

2    of two or multiple avenues for obtaining a license, and

3    that there are other avenues for obtaining one.  So as

4    I recall, that was an important element of the case

5    that, as I am thinking about coming onboard with it and

6    everything.

7         Q. Okay.  Well, what is your understanding about

8    what the law has been in the United States, the

9    historical tradition with respect to government

10   officials' discretion to grant or deny a license to

11   engage in either concealed or open carry of firearms?

12        A. That's what this section is really about, and a

13   major takeaway is that the laws, themselves, often did

14   not include much in the way of guidance on deciding who

15   should get a license and why.  That, in fact, many of

16   the examples that I found provided no guidance at all.

17   You know, there are several examples at least, but

18   there is no guidance; it's just by authorization of the

19   mayor, and that's it.  So the laws, themselves, don't

20   speak to what the criteria were; and that, in fact, it

21   was very much discretionary on the part of either the

22   police commissioners or the mayor or whatever entity

23   was responsible for issuing the licenses.

24        Q. Do you have an understanding as to whether the

25   Bruen decision addressed those kind of statutes?



1    A. I know that the Bruen decision was specifically

2    about laws in New York, which began with the 1911 --

3    beginning with the 1911 Sullivan law, that was their

4    first big licensing law statewide.  I know that the

5    Bruen decision has things to say about assessing

6    licensing programs that require, "Showing of proof for

7    probable cause," quote/unquote, yeah.

8         THE WITNESS:  I am going to be honest with you

9    and say I am also -- I think I am fading a little bit

10   for you; I am trying to give you the best answers I

11   can, but I do feel like I am wearing a little thin.

12        MR. LYONS:  That's all right.  Well, I think the

13   good news is I am getting close to the end.  Okay?

14        THE WITNESS:  Okay.

15    Q. But let me ask you this:  As you sit here, do

16   you recall any state statutes that required a license

17   to engage in the open carry of firearms?

18    A. You know, if I read through the laws, maybe even

19   some of the citations within this section, they may

20   include some of that.  So, okay -- so the licensing,

21   the carry licensing laws from the nineteenth century

22   were generally local.  Statewide licensing was more of

23   a later thing.  Although, like, I do think that some

24   states had state laws that authorized or empowered

25   local jurisdictions to create their own permit



1    programs.  So most of these examples are going to be

2    local, just because that's the level of government that

3    was capable of carrying out these processes of, you

4    know, reviewing applications and things like that.  It

5    was something that the local police administration was

6    more in a position to do, so the laws, themselves, are

7    more likely to be local.  They are uneven in terms of

8    whether they specifically say openly carrying weapons

9    or concealed carrying of weapons.  I don't have a chart

10   or firm numbers on that right now, but I wouldn't be

11   surprised if some of them applied to open-carry.  I

12   also wouldn't be surprised if most of them were

13   confined to conceal-carry.  I'm just not sure.

14        MR. LYONS:  Okay.  So I think this is the

15   last -- well, we are getting to the last section of

16   your declaration, anyway.  So it will be the last

17   section that I have any questions on, then I will have

18   a couple of other topics after that.

19        Q. But beginning in paragraph 62, you talk about

20   what you call nineteenth century attitudes toward

21   weapon-carry, and I think that takes you through the

22   rest of your declaration up to the conclusions; is that

23   right?

24        A. Yes, that sounds right.

25        Q. Okay.  In the first paragraph, 62, you identify



1  three specific states that statutorily restricted

2  open-carry, as well as conceal-carry, I think that's

3  Massachusetts, Texas, and West Virginia.  Do you recall

4  that, or do you see that?

5      A. Yes, I see that sentence.

6      Q. Okay.  Are you aware of any states, besides

7  Massachusetts, Texas, and West Virginia, that

8  statutorily restricted open-carry?

9      A. Well, like the sentence indicates, I said, "The

10 'going armed' statutes rooted in the Massachusetts Code

11 of 1836," so that would include the Massachusetts one,

12 as well as that list of several other states that we

13 went over earlier, like, Michigan and Wisconsin and

14 Oregon.  So there are other states that had going-armed

15 statutes that were identical or very, very similar to

16 the Massachusetts one; then later on I talked about

17 Texas, West Virginia, as well as Idaho, which was

18 territorial at the time.

19     Q. Okay.  Just so we are clear, it's your

20 understanding that those states you previously

21 identified that had statutes like Massachusetts, also

22 restricted open-carry as well as conceal-carry?

23     A. If you read the going-armed statutes,

24 themselves, they don't restrict themselves to concealed

25 carrying; they say that you should not go armed.  So



1    they don't specifically confine themselves to carrying

2    concealed weapons.

3        Q. Now, beginning in paragraph 63, and in

4    subsequent paragraphs, you talk about -- I am going to

5    summarize this, so feel free to correct me if I do it

6    incorrectly -- that there was often a general practice

7    of people, I guess, men, carrying concealed or open

8    weapons, and that based on articles that you saw in

9    newspapers, you believe that that practice was frowned

10   upon; is that fair to say?

11       A. Generally, yes.  The section, the point I try to

12   make is that open carrying, the open carrying of deadly

13   weapons, the kind that are enumerated in these carry

14   laws, that especially in town or city or what we might

15   think of as urban or even proto-urban settings, men

16   were not openly carrying those.  If they were carrying

17   them in those spaces, they are carrying them concealed,

18   under their coats, in their pockets.  When men were

19   openly carrying weapons, it was more likely to be in a

20   rural setting, on their own property, while they are

21   traveling over land distances and exposed to certain

22   dangers on the roads.  So that's kind of the purpose of

23   this section.

24       Q. Okay.  Well, looking at paragraph 65, which

25   starts at the bottom of page 48, goes on to page 49,



1    you say, "The everyday carrying of weapons, especially

2    concealed in one's clothing, was widespread during the

3    nineteenth century, even as Americans opposed the

4    practice and considered it a significant societal

5    problem."

6        A. Yes, I see that.

7        Q. With respect to the part about Americans

8    opposing the practice and considering it a significant

9    societal problem, what is your basis for that

10   statement?

11       A. Well, let's see, this is an opening sentence of

12   the paragraph, so beneath it; but the research, as a

13   whole, itself, as a body, everything that goes into

14   this section, and everything that I have encountered in

15   my work on this, that's the conclusion that follows

16   from the evidence, from, you know, the laws and the

17   newspaper articles and thinking about, you know, the

18   size of weapons, and just all of the work points in the

19   direction of this conclusion, which is that carrying

20   weapons, especially concealed, was happening, people

21   were doing it, even though it was often illegal.  I

22   think of it kind of like speeding, a lot of us bemoan

23   speeding, but then do it ourselves.  The most dangerous

24   thing I do every day is get in a car.  Yes, I am very

25   opposed to speeding; but, yes, I speed, too.  To some



1  extent, I believe there is a little bit of that going

2  on; but as far as specific proof, the body of work,

3  itself, supports that conclusion.

4      Q. Okay.  So in this section, you referred to some

5  decisions and some statutes; okay.  Are there any other

6  decisions or statutes, other than what you have set

7  forth in this section or in prior sections, which you

8  think supports your statement that Americans opposed

9  the practice of carrying, the everyday carrying of

10 weapons, and considered it a societal problem?

11     A. I have hundreds of newspaper articles, and I

12 have only cited a handful here.  So there is also a

13 combing through of materials and, you know, pulling out

14 the best examples or the clearest examples.  So there

15 is a lot of material, there is an abundance of social

16 history sources from the nineteenth century showing

17 that Americans were opposed to the carrying of weapons.

18 You see it all over the newspapers; you see it

19 discussed by legislative bodies.  So I would say there

20 is a whole host of evidence that is not cited here that

21 this is just a way of illustrating that, and using a

22 collection of sources to do so.

23     Q. Okay.  I was making a distinction, and perhaps I

24 wasn't clear enough when I did it.  For the moment, I

25 am setting aside the newspaper articles.



1       A. Oh, okay.

2       Q. What I am referring to are either statutes or

3    case law, which indicated that Americans were opposed

4    the practice of the everyday carrying of weapons, and

5    considered it a societal problem.  Okay?  Just with

6    respect to statutes or case law, are all of the ones of

7    which you are aware identified in your declaration?

8       A. Oh, I would say, no, because, for instance,

9    there is a law from Virginia, the 1838 one, that even

10   used the word, "Habitual," and I haven't cited it in

11   this paragraph.  It was a conceal-carry law, but they

12   used the word Habitual.  So the problem was to be

13   habitual; in other words, you get ready for the day,

14   and you put your gun under your coat or in your pocket,

15   and that was the problem.  It was the doing it on an

16   everyday basis, apart from a discreet threat.  So I

17   think there are examples and case law out there that I

18   have not included.  I would have to think -- I would

19   have to think about it in a space where I have eaten,

20   and I am not burning hot, you know, have a clear head.

21   I'm sorry to be less than a full version of myself here

22   at this point in the deposition.

23      Q. Do you know whether that Virginia statute that

24   referred to the habitual carrying, was it concealed

25   weapons or just any public carry?



1    things go into choosing them.  It would be great to

2    make a giant database some day, but I will need some

3    administrative help with that.

4       Q. Okay.  On page 49, lower down in that paragraph,

5    you have a sentence which reads, "A Georgia judge

6    described the protection of open-carry within the state

7    as a way, 'to compel persons who carry those weapons to

8    so wear them ... that others ... might see they are

9    armed, and dangerous persons, who were to be avoided in

10   consequence,'" end quote.  Do you see that?

11      A. Yes.

12      Q. You actually cite an 1861 Georgia statute for

13   that.

14      A. I cite the case.

15      Q. The case; I'm sorry, yes, yes.  Are you aware

16   that, generally speaking, or do you think that,

17   generally speaking, open-carry was protected by states

18   for that reason?

19      A. My thought process and my conclusions about

20   open-carry very much move in that direction, that the

21   protection to open-carry is for emergency situations,

22   and that people were not on a regular, habitual, daily

23   basis openly carrying their weapons, that wasn't seen

24   as a social problem.  The weapons that are posing a

25   problem to American communities are the ones that are



BRENNAN N. RIVAS, PH.D.                                September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                                   111

1   so much easier, they are very easier to put in one's

2   pocket, and some of them are even designed or made with

3   that purpose in mind.  So, also, like I said before,

4   that especially in cities and town, it was just not so

5   common to see a person openly carrying a gun, and this

6   quote is a really excellent one for showing, giving

7   some kind of insight into what a normal person might

8   conclude when they saw someone openly carrying a pistol

9   or something in a town.  It's a great source for trying

10  to get at that.

11      Q. The way the paragraph 67, the first sentence

12  says, quote, "Not only did nineteenth century Americans

13  carry pistols and large knives in the manner familiar

14  to us (concealed), but they also carried them for

15  reasons familiar to twenty-first century Americans, in

16  preparation for an unforeseen, potential emergency."

17  Do you see that?

18      A. I do, yes.

19      Q. What is your basis for saying that?

20      A. Well, again, building on everything that had

21  gone on before, and then pivoting to talk about the

22  next section, this is a transitional statement.  It's a

23  sort of topic sentence for the paragraph.  So I have

24  already established that Americans who were carrying

25  pistols and knives, especially on a regular, everyday,



1  habitual kind of manner, that they were doing so

2  concealed.  I am also introducing the assertion that

3  they were doing so as an act of preemptive

4  self-defense, so that's where the section pivots after

5  this.

6      Q. Okay.  Then at the end of paragraph 68, you say,

7  "In Arkansas and Tennessee, postbellum weapon laws

8  permitted the carrying of Army and Navy model

9  revolvers, as long as they were carried, 'openly in the

10 hand,' or 'uncovered and in his hand,' the way a person

11 experiencing an immediate emergency would carry one."

12 Do you see that?

13     A. Yes.

14     Q. For that, you cite to the two statutes?

15     A. Yes; that's correct.

16     Q. Is that -- is that the same kind of thing you

17 were just talking about in the previous sentence we

18 discussed?

19     A. Where -- so this is not like -- I'm sorry.  Go

20 ahead.

21     Q. No.  We talked about the sentence at the

22 beginning of paragraph 67.

23     A. Uh-huh, yes.

24     Q. What I am saying is, is the paragraph at the end

25 of page 68 that I just read a specific example of the



1    same, many of the statutes that allowed the same sort

2    of carrying of -- no; I'm sorry.  This is for

3    open-carry; is that right?

4        A. Yeah.  So, yes.

5        Q. So I withdraw my question.  Okay.  The sentence

6    at the end of paragraph 68 refers to open-carry;

7    correct?

8        A. Yes, the purpose is to show -- let's look at the

9    beginning of the sentence.  The beginning of the

10   paragraph says that there was some exception.  This is

11   paragraph 68, the beginning of the paragraph says,

12   "There was some acceptance of the idea that a true

13   emergency situation might justify the carrying of a

14   deadly weapon temporarily."  It goes on to say, "What

15   counted as a sufficient emergency, though, could be

16   ambiguous."  So I end up talking a little bit about

17   that, and then an example of that, that in their law,

18   they crafted a way of allowing open-carry that was a

19   very narrow needle to thread, and that the only people

20   who were going to thread that needle were the ones who

21   were carrying their gun in preparation to shoot it in

22   self-defense, that it didn't protect any other kind of

23   open-carry strapped on to a belt, or anything like

24   that.  It was only in one's hand, and that they crafted

25   the law that way on purpose to minimize open-carry as



 1    much as possible.

 2        Q. Besides Tennessee and Arkansas, are you aware of

 3    any other statutes that were drafted in that manner?

 4        A. I am not aware of others that used the

 5    mechanism, not off the top of my head; but earlier in

 6    the paragraph, there is other examples that support

 7    that opening paragraph assertion about these laws

 8    co-existing with notions of self-defense or appropriate

 9    self-defense at that time, and how nineteenth century

10    Americans understood these laws to co-exist or

11    harmonize with how they understood self-defense.

12        Q. Do you know anything about the people who are

13    the Plaintiffs in this case, my clients?

14        A. I know that I read the Complaint; but as far as

15    knowing anything that has stuck with me, no.

16        Q. Do you know whether they are all law-abiding

17    citizens?

18        A. I don't know.  I have no idea.

19        Q. Do you know of any personal or character trait

20    that would disqualify them from having a conceal-carry

21    permit issued by the Rhode Island Attorney General?

22        A. I do not know them, so no.

23        MR. LYONS:  All right.  We are almost there.

24    One more Exhibit.  I am going to show you a four-page

25    document, at least in this Exhibit, which we will mark



```
 1              C E R T I F I C A T E

 2       I, Nancy S. Caron, C.S.R., a Notary Public in and for
    the State of Rhode Island, duly commissioned and
 3  qualified to administer oaths, do hereby certify that
    the foregoing deposition of Brennan Nicole Rivas, Ph.D.,
 4  expert witness, in the above-entitled cause, was taken
    by me at via web conference from Middletown,
 5  Connecticut, commencing at 11:00 A.M., on September 12,
    2024, that previous to the testimony of said witness,
 6  who was of lawful age, said witness was sworn by me; and
    that said witness thereupon testified as in the
 7  foregoing-annexed transcript.

 8       I further certify that the foregoing deposition was
    taken down by me in stenotype and was later reduced to
 9  typewriting and that the foregoing is a true and
    accurate record of the testimony of said witness.
10
         Pursuant to Rules 5(d) and 30(f) of the Federal Rules
11  of Civil Procedure, original transcripts shall not be
    filed in court.  Therefore, original is delivered and
12  retained by Thomas W. Lyons, Esquire, Straus, Factor,
    Laing & Lyons, One Davol Square, Providence, Rhode
13  Island.

14       IN WITNESS WHEREOF, I have hereupon set my

15  hand this 20th day of September, 2024.

16

17

18

19
         NANCY S. CARON, C.S.R., NOTARY PUBLIC
20          MY COMMISSION EXPIRES 07/30/2025

21

22

23

24

25
```

Nancy S Caron
NOTARY PUBLIC
STATE OF RHODE ISLAND

