1               IN THE UNITED STATES DISTRICT COURT

2                     DISTRICT OF RHODE ISLAND

3

4    MICHAEL O'NEIL, ET AL.,

5          Plaintiffs,

6

7      vs.                    Case No. 23-CV-00070-WES-PAS

8

9    PETER F. NERONHA, IN HIS OFFICIAL CAPACITY AS ATTORNEY

10   GENERAL OF THE STATE OF RHODE ISLAND, AND THE STATE OF

11   RHODE ISLAND,

12          Defendant.

13                  ~~~~~~~~~~~~~~~~~~~~

14                        VOLUME 1

15             Videoconference Deposition of
                     CLAYTON CRAMER
16
                     October 11, 2024
17                     10:02 a.m.

18             Taken via Zoom at:
                    Caldwell, Idaho
19

20

21

22

23

24

25   Court Reporter - Michele A. Durig, RPR



1    APPEARANCES:

2

3    On behalf of the Plaintiffs:

4
         Frank Saccoccio, Esq.
5        Saccoccio Law Office
         928 Atwood Avenue
6        Johnston, Rhode Island 02919
         Phone:  (401) 944-1600
7        Email:  frank.cslawoffice@gmail.com

8
         Thomas W. Lyons
9        Strauss, Factor, Laing & Lyons
         One Davol Square, Suite 305
10       Providence, RI 02903
         Phone:  (401) 456-0700
11       Email:  tlyons@straussfactor.com

12

13   On behalf of the Defendant:

14
         James J. Arguin, Esq.
15       Paul Meosky, Esq.
         Rhode Island Office of the Attorney General
16       150 South Main Street
         Providence, RI 02903
17       Phone:  (401) 274-4400
         Email:  jarguin@riag.ri.gov

18

19

20

21

22

23

24

25



1          ATTORNEY ARGUIN:  Mr. Cramer, do you have a

2   driver's license on you?

3          THE WITNESS:  Yes.

4          ATTORNEY ARGUIN:  Michele, can you see that?

5          THE REPORTER:  Yes, I can see it.  Thank you.

6   (Court reporter requests introductions and

7   stipulations.)

8          ATTORNEY ARGUIN:  I'm James Arguin.  And I'm

9   with the Rhode Island Attorney General's office.  And

10  we're representing this -- the Attorney General in

11  this matter.

12         Maybe Paul, you're from the same side.

13         ATTORNEY MEOSKY:  Sure.  Do we need to say

14  anything for the stipulation as well?

15         ATTORNEY ARGUIN:  Oh, yeah, thank you.  I

16  meant to say that.  Thanks, Paul.  We also -- in terms

17  of the remote deposition that's taking place for

18  Mr. Cramer, the State, on behalf of the Attorney

19  General, stipulates that the deposition is being taken

20  in a county other than where the witness is located.

21         ATTORNEY LYONS:  Thomas Lyons.  I represent

22  the plaintiffs in this case.  And we also agree to the

23  same stipulation.

24         ATTORNEY SACCOCCIO:  Attorney Frank Saccoccio,

25  representing the -- co-counsel with Tom Lyons,



 1   representing the plaintiffs.  And, yes, we stipulate

 2   to the deposition.

 3          ATTORNEY MEOSKY:  And then Paul Meosky for the

 4   State.  Also stipulating to the same.

 5                        *   *   *

 6                  CLAYTON CRAMER,

 7   having been duly sworn, was examined and testified as

 8   follows:

 9                      EXAMINATION

10   BY ATTORNEY ARGUIN:

11      Q.  All right.  Mr. Cramer, let me reintroduce

12   myself to you directly.  Thank you for joining us.

13   I'm sure it's very early there in Idaho.

14          I'm James Arguin.  I'm representing the

15   Attorney General in this matter with my colleague Paul

16   Meosky, who is also on the call.

17          Now, I understand you've been deposed before;

18   is that correct?

19      A.  Yes, I have.

20      Q.  Okay.  So I won't go through the whole

21   rigamarole, but let me just confirm a few basic ground

22   rules before we begin so we're all on the same page.

23      A.  Right.

24      Q.  Is that okay?

25      A.  Yes.



1  actions with respect to prohibiting Mexicans from

2  purchasing handguns.

3        And also, the 1923 law where the guy that

4  persuaded the governor to sign this bill banning

5  noncitizens from possessing firearms.  The guy

6  admitted that it was probably -- it might be

7  unconstitutional, but if it would disarm Chinese and

8  Mexicans, that was a good thing.

9     Q.  Now, you mentioned you relied on some

10  secondary sources in preparing your declaration in

11  this case.  Is that correct?

12     A.  That is correct.

13     Q.  Okay.  So you don't have -- there's nothing

14  improper for an historian to rely on a secondary

15  source in conducting their research, is there?

16     A.  It's not improper to make use of them.  It's

17  certainly questionable if you rely primarily on

18  secondary sources or if you use secondary sources and

19  claim that you actually used primary sources.  That is

20  improper.

21        For historians, the proper practice, if you're

22  making use of a secondary source, is to say

23  such-and-such in, and then primary source, and then

24  identify the secondary source from which you took it.

25  If you say that I looked up this law and identified



1  just that law, without saying that you actually found

2  it somewhere else, that is not proper.

3         Something that was pounded into us as history

4  majors was that if you were using something which

5  appears in some other source, you need to identify,

6  this was found in -- and then you identify the

7  secondary source.  You never say, oh, I looked up this

8  primary source when you haven't actually looked it up.

9  The potential to get this wrong because a secondary

10  source is either misquoted or quoted out of context,

11  the primary source is very substantial.

12         And, in fact, when you look at my rebuttal to

13  Professor Spitzer's work, you'll find there's an awful

14  lot -- he's got an awful lot of places where he says,

15  "Well, I looked at this source" and, in fact, he did

16  not look at that source.  He looked up a summary of it

17  that appeared on the Duke University firearms law

18  repository website.  And, in some cases, those are out

19  of context.  Or, in some cases, they do not even

20  exist.  That is not proper behavior for an historian.

21     Q.  Well, let me ask you about that, because isn't

22  one of the purposes of the secondary source is to

23  collect information so that future historians can also

24  rely on that information?

25     A.  If they rely on that to the exclusion of



 1 | looking for a primary source, they're going to produce
 2 | fairly sloppy work.
 3 |         The fact is, an awful lot of work that has
 4 | been published over the last 20 years on the history
 5 | of slavery, for example, an awful lot of the work done
 6 | the last 20 years has gotten involved going back to
 7 | primary sources, court records, for example, that have
 8 | frequently been ignored or simply not looked at.  And
 9 | results have often been pretty interesting.  They've
10 | often -- they're beginning to revise a lot of our
11 | knowledge of the development of slavery in the
12 | American colonies, as we discover that some of the
13 | early slave owners in Virginia were actually Africans
14 | that had been brought in in 1619.
15 |         So relying on secondary sources is a struggle
16 | which to build any sort of significant argument.  You
17 | need to actually look for the primary source and
18 | verify if this was the secondary source, the claims it
19 | contains.
20 |     Q.  Are you familiar with the USA Today database
21 | for mass killings?
22 |     A.  Yes, I am.
23 |     Q.  And is that the database that's curated by
24 | Professor James Fox?
25 |     A.  Yes, it is.



1        Q.   And is Professor Fox's database a primary or a

2   secondary source?

3        A.   I would call it a secondary source.

4        Q.   And have you consulted Professor Fox's

5   database in other research projects you've done?

6        A.   Yes, I have.

7        Q.   Did you consult it in connection with this

8   case?

9        A.   No.

10       Q.   When you consulted Professor Fox's database,

11   did you undertake to duplicate the work that Professor

12   Fox had done?

13       A.   No, I did not.

14       Q.   Okay.  But why -- why did you not do that?

15       A.   Because the conclusions he was drawing were

16   interesting.  And to have actually gone back and gone

17   through all of the newspaper articles and local

18   news -- TV news accounts that went into that database

19   would have been prohibitively expensive in terms of

20   invested time.

21       Q.   But how, then, did you confirm the accuracy of

22   the primary sources on which Professor Fox relied in

23   his database?

24       A.   Well, if I was going to rely upon the contents

25   of that for anything authoritative, I would go and



1  look those up.  But, as I said, secondary sources have

2  their place.  But you should not rely primarily on a

3  secondary source to figure out what happened in the

4  past.  They are useful as an aid, but they are not a

5  replacement for looking at the primary source.

6  Especially if you make a claim about what a primary

7  source says, you better actually have gone and looked

8  it up.

9      Q.  But isn't it true when you used Professor

10 Fox's database in the past, you checked some of his

11 sources, but then found them to be generally reliable,

12 so relied on the source?

13     A.  Right.

14     Q.  Isn't that correct?

15     A.  Yes.

16     Q.  Okay.

17     A.  Some years ago, one of the things that made me

18 familiar to a lot of historians was -- I think I

19 mentioned this earlier -- a book by Professor Michael

20 Bellesiles from Emory University that made some fairly

21 amazing claims that guns were rare in America before

22 the Mexican War and that guns were tightly regulated

23 in the colonial period.  What I found is that I can

24 pick pretty much any page at random and just start

25 going through and checking his footnotes and looking



1   up the sources and finding them.  Most of the time,

2   they were not correct.  They were misrepresentations

3   of the sources.  They were often -- quotes changed in

4   their content.  And so one of the things that I found

5   from that was that so many of his claims turned out to

6   be false that he was not a credible secondary source.

7        Q.  But can I ask -- but it doesn't sound like you

8   followed that same process when relying on Professor

9   Fox's database on mass murders -- or mass killings.

10       A.  No, because, for the most part, I have not

11  made any claims, I don't think, in this declaration

12  relating to the question of mass killings.

13       Q.  But in terms of your general approach, when

14  you've spoken about Professor Fox's database in the

15  past, you've said that you've -- you checked some of

16  his sources, but not all of them.

17       A.  No.  Enough of them I did not find any that

18  were -- I can tell you, there was one case recently,

19  Guardian Arms versus Washington State, where I did

20  look up every mass murder that took place in

21  Washington state to verify its accuracy.  And I found

22  that one of them, which was the only one identified as

23  an assault weapon, was, in fact, inaccurate.

24            The primary source made it very clear that

25  there was no assault weapon used in the case at all.



1   So that was a case where I identified an erroneous

2   primary source.  And this affected the declaration

3   that I produced.  I was able to say, this is the

4   number of mass killings that took place in Washington

5   state over this period of time.  None of them involved

6   the weapons that Washington state is attempting to

7   regulate here.

8           So that is an example where I did, in fact,

9   check his primary sources for a particular range of

10  years and particular jurisdiction.

11      Q.  When you relied on that database in the past,

12  though, you testified that you checked only a few and

13  that there was no point in duplicating Professor Fox's

14  efforts.  Do you recall that testimony?

15      A.  Yes.

16      Q.  Okay.  And so I'm just trying to reconcile

17  what you've said in the past with your testimony

18  today, that you checked all of the sources?

19      A.  No, I didn't say I checked all of the sources.

20  I checked some of his sources.  And for one particular

21  state and set of years I checked the sources that he

22  identified as his primary sources and found one error.

23      Q.  Okay.  Are you familiar with a Professor Sally

24  Hadden from Florida State University?

25      A.  No, I'm not.



 1  an advantage.  You could actually go look them up.
 2  There are a few cases.  The 1801 Tennessee law, they
 3  actually did have a link to the actual image, which if
 4  you had gone ahead and looked it up, you would have
 5  seen the larger context.  But all they had in the text
 6  on the web page was this one section.  And, as I said,
 7  most of the time, they do not have a link to the
 8  source for you to actually read it yourself.  And if
 9  they did, it would show the quality of the work they
10  do.
11      Q.  And, I mean, it's not -- historians make
12  errors.  Is that fair to say?  Sometimes things are
13  miscited, misquoted?
14      A.  I've been known to make errors myself.
15      Q.  Okay.  I mean, in your -- I understand in your
16  book Armed America, for instance, you stated that
17  until the late 18th century, pistols, like almost all
18  other firearms of the period, could fire only one shot
19  before reloading.  Do you recall that?
20      A.  Yes.
21      Q.  From your book?
22      A.  I was not aware of the -- Pepperbox pistols
23  were available by the end of the 18th century.
24      Q.  So you've subsequently revised your opinion on
25  that topic; is that correct?



CLAYTON CRAMER                                          October 11, 2024
O'NEIL vs NERONHA                                                    85

1        A.  I revised my opinion because I obtained new

2    information on the subject.  I'm open enough to

3    consider the possibility that there were things I did

4    not know.

5        Q.  And you've also testified in -- I think you

6    mentioned it earlier about the Oregon firearms case

7    about mass killings, weapons -- using weapons and data

8    on mass murders.  Do you recall testifying in the

9    Oregon case?

10       A.  You mean Guardian Arms versus Washington?

11       Q.  Let me just show you your testimony and ask

12   you.  Probably easier.  Let's see.  Yeah, I'm

13   referring to your testimony in Oregon versus Brown.

14       A.  Yes, I see it.

15       Q.  Let me put it up on the screen so you can see

16   it.  So here it is.  All right.  Can you see this

17   screen with the caption Oregon Firearms Federation,

18   Inc. versus Kate Brown?

19       A.  Yes.

20       Q.  Okay.  Let me -- if we could mark this as

21   Exhibit 5.

22            (Exhibit 5, Deposition testimony in Oregon

23   Firearms Federation, Inc. versus Kate Brown, was

24   marked for identification.)

25   BY ATTORNEY ARGUIN:



1    Q.  And do you recall giving a deposition in this

2  case?

3    A.  Yes.

4    Q.  And this is a, I'll represent to you, a

5  transcript of your deposition.  Do you see the first

6  page here, "Videotaped deposition upon oral

7  examination of expert Clayton Cramer"?

8    A.  Yes.

9    Q.  Okay.  And what I wanted to point you to was

10  one aspect of your testimony in this case.  Beginning

11  on, I think it's page 86.  I think -- yes.  I think

12  it's a relevant discussion here on 87.  But it mainly

13  starts on 86.  I'm sorry.  We're talking about the

14  database you collected about the numbers on mass

15  murders.

16    A.  Yes.

17    Q.  And I'll just give you a chance to review it.

18    A.  Yes.  I'm aware there was a --

19    Q.  There was an error in the data, do you agree?

20  Was there some error in your data that you relied upon

21  in the report submitted in this case?

22    A.  There was error in the database query that I

23  was using to gather information out of a database.

24  And I ended up issuing a revised version of that,

25  which led to a later deposition.



1      Q.  And what was the nature of the error?  There
2  was some error in the calculation of mass murders?
3      A.  Yes.  There were two issues.  One of them was
4  that the query, which is written in a language called
5  SQL, it's a fairly complicated method of -- a sytem
6  for querying data out of a relational database to
7  gather information that describes the total number of
8  various incidents.  And one of the attorneys for the
9  State of Oregon was able to point out some
10  inconsistencies which were useful to me, and they
11  enabled me to go back and revise the query to actually
12  produce the correct data.
13         The other issue here was that I had included
14  in my original query all the incidents involving mass
15  murder where there was more than one person involved
16  in the mass murders.  And so I went through and
17  revised that to produce data for the number of
18  incidents that involved a single person engaged in
19  mass murder.  Because especially in the early 19th
20  century, a lot of mass murders were actually group
21  activities where several people or large groups are
22  involved in a mass murder.  Example, a lot of
23  lynchings are events where there are -- dozens of
24  people are involved in the crime.
25      Q.  So did that contribute to some duplicated



1  data?

2      A.  Yes, it caused a number of errors of that

3  nature.  I've since managed -- I've since put a person

4  to work for me on the creation of these SQL queries

5  who is an expert on this sort of thing to produce a

6  higher quality, more certain set of results.

7          There was a time ten years ago when I wrote

8  SQL on a daily basis as part of my day job.  And,

9  unfortunately, some of the -- those capabilities have

10  sort of declined over the last ten years from lack of

11  use, and I did not produce a particularly accurate SQL

12  query.

13     Q.  In addition to the issues with data, were

14  there any other errors you submitted in this Oregon

15  case?

16     A.  I think there may have been another error

17  associated with the data that was coming out of my

18  database, although --

19     Q.  Were there any issues with the hyperlinks that

20  were provided?

21     A.  I do not remember any issue about link errors.

22  I mean, you'd have to point me to the section that was

23  discussed.

24     Q.  Yep.  Let me -- let's see here.  I think it

25  might not be in this transcript, but let me just



```
 1   double-check.  Let me show you another -- I think it

 2   might be a different case.  I'll share this screen

 3   with you.  This is -- let me just mark this as

 4   Exhibit 6.

 5              (Exhibit 6, Deposition testimony of Clayton

 6   Cramer in Oregon v. Kotek, was marked for

 7   identification.)

 8   BY ATTORNEY ARGUIN:

 9       Q.  And do you recall testifying in Oregon

10   Firearms Federation versus Tina Kotek?  Does that ring

11   a bell with you?

12       A.  It does, yes.

13       Q.  Okay.

14       A.  We're challenging the same law.

15       Q.  Okay.  And this, again, is if you see on

16   page 1 of this -- what I've marked as Exhibit 6, it's

17   again a transcript of the videotaped deposition of you

18   in that case.  Do you see that on page 1?

19              And what I was referring to earlier -- let me

20   direct you to this testimony that appears here.  I

21   think the relevant discussion here starts on page 230.

22   I'll just let you read there.  Talking about the minor

23   errors in the report you submitted.

24       A.  Yes, I see.  Yeah.  In the process of building

25   this database -- in some cases, I lost or got the
```



CLAYTON CRAMER                                    October 11, 2024
O'NEIL vs NERONHA                                              90

 1  wrong links put into the database identifying the

 2  source.  And so I put someone to work who went through

 3  and verified the accuracy of the links that were there

 4  and also, in many cases, was able to successfully find

 5  the correct link to the primary source.

 6      Q.  Okay.  So this testimony that appears on

 7  page 230 starting at line 13 where you're talking

 8  about your assistant's wife going back through the

 9  data and found a few minor errors, some entries that

10  appeared -- an entry that appeared twice, and then in

11  other instances she found that the link that I have in

12  there does not actually take you to the article.  And

13  then so you had -- you fixed these errors in your

14  revised report; is that correct?

15      A.  Yes.  There was another set of errors that was

16  found in another case where one particular column had

17  some fives where it should have had ones.

18      Q.  Okay.  But putting these errors aside, is it

19  your belief that the declaration you submitted in

20  these Oregon cases was reliable?

21      A.  Yes, I do.

22      Q.  Okay.  So these errors, in your view, did not

23  detract from the accuracy of your overall report?

24      A.  I would say in the case of the first

25  deposition I did, yes, it did detract from its



1  accuracy.

2          And because of the really well-done

3  questioning by the attorney from the other side, it

4  enabled me to see that -- some mistakes that had to be

5  resolved.

6      Q.  Okay.  And those mistakes in the case that

7  needed -- related to the data compilations; correct?

8      A.  One of them was the processing of the data

9  that had been accumulated.

10     Q.  Okay.

11     A.  The book links were not -- were not

12 indications of the primary sources were wrong.  The

13 primary sources were just fine.  Just did not have the

14 right link to them.

15     Q.  Okay.  I'm conscious that we're about one hour

16 in.  So I'm going to defer to you on -- and whether

17 you want to take a break or not.

18     A.  I can go on a little longer.

19     Q.  Okay.  Let me then ask you about

20 some -- another aspect of your earlier testimony in

21 other cases.  Do you agree there's a political divide

22 among those who support and oppose gun bans?

23     A.  Yes, I would say there's definitely a

24 political divide.

25     Q.  And what do you regard as a gun ban?



```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, Michele A. Durig, a Notary Public within

 4    and for the State of Ohio, duly commissioned and

 5    qualified, the officer before whom the foregoing

 6    proceedings were taken, do hereby certify that the

 7    foregoing transcript is a true and correct record of

 8    the proceedings; that said proceedings were taken by

 9    me stenographically and thereafter reduced to

10    typewriting under my supervision; and that I am

11    neither counsel for, related to, nor employed by any

12    of the parties to this case and have no interest,

13    financial or otherwise, in its outcome.

14              Certified by me this 22nd day of October,

15    2024.

16

17

18

19    _____

20    Michele A. Durig, RPR, Court Reporter
      My notary commission expires July 5, 2028
21

22

23

24
```



1  | UNITED STATES DISTRICT COURT

2  | FOR THE DISTRICT OF RHODE ISLAND

3  |

4  |       I, ROXANNE C. COSTIGAN, do certify that
   | pursuant to notice, there came before me on
5  | October 11, 2024, VIA ZOOM PLATFORM, the following
   | named person, to wit:  CLAYTON E. CRAMER, who was by
6  | me duly sworn to testify to the truth and nothing but
   | the truth as to his knowledge touching and concerning
7  | the matters in controversy in this cause; that h3 was
   | thereupon examined upon his oath and said examination
8  | reduced to writing by me; and that the deposition is
   | a true record of the testimony given by the witness,
9  | to the best of my knowledge and ability.

10 |       I further certify that I am not a relative or
   | employee of counsel or attorney for any of the
11 | parties, or a relative or employee of such parties,
   | nor am I financially interested in the outcome of the
12 | action.

13 |       WITNESS MY HAND, this 17th day of October,
   | 2024.
14 |
15 |                  _____
16 |                      Roxanne C. Costigan
17 |
   | My Commission expires:  June 19, 2031
18 |
19 |
20 |
21 |
22 |
23 |
24 |

