# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Alexandria Division

| | |
|---|---|
| UNITED STATES ) | |
| ) | Case No. 1:23-cr-165 |
| v. ) | |
| ) | Hon. Leonie M. Brinkema |
| SEQUAN ANTHONY FOWLER, ) | |
| ) | |

## DECLARATION OF CLAYTON E. CRAMER

I, Clayton E. Cramer, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have been retained in this matter as an expert historian in the area of firearms regulation.

2. My work as a historian has been cited approvingly in two significant Supreme Court opinions on the Second Amendment: *District of Columbia v. Heller*, 554 U.S. 570, 588 (2008) (majority opinion); and *McDonald v. Chicago*, 561 U.S. 742, 780, 933 (2010) (majority opinion and dissent). I have nine published books, mostly scholarly histories of weapons regulation, and 18 published articles, mostly in law reviews.[1] I teach history at the College of Western Idaho, and have an M.A. in History is from Sonoma State University in California. My published work regarding the history of firearms regulation has also been cited in a number of lower court decisions, including *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) *vacated by Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022) (remanded to the district court for further proceedings consistent with *Bruen*); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021), cert. granted by *Young v. Hawaii*, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State v. Sieyes*, 168 Wash.2d 276 (Wash. 2010); *Senna v. Florimont*, 196 N.J. 469 (N.J.

---

[1] A comprehensive list of my scholarly works can be found at https://claytoncramer.com/scholarly/journals.htm.

2008); and *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004). My qualifications as an expert historian are more fully set forth in my curriculum vitae, which is attached to this Declaration as Exhibit 1.

3. My work regarding the history of firearms regulation has been cited both in support of extending the Second Amendment (for example, in the majority opinions in *Heller* and *McDonald*), and in defense of laws limiting firearms ownership (for example, in *State v. Roundtree* (Wisc. 2021), *State v. Christen* (Wisc. 2021), *King v. Sessions* (E.D.Penn. 2018) and in Justice Breyer's dissent in *McDonald*).

4. I have been asked to opine in this matter on the historical record regarding legal prohibitions on firearms possession to inform the meaning of the Second Amendment to the United States Constitution, particularly as it relates to prohibitions based on criminal convictions. This analysis focuses principally on the state of law as it existed in the American colonies at the time of the drafting of the Second Amendment, but also includes a review of firearm laws in England from the medieval age through the American founding era, and a review of the development of the law in the United States following adoption of the Second Amendment.

5. The initial question is whether laws existed before 1791 disqualifying felons from possessing firearms. The short answer is yes, but not many, and not lifetime disqualifiers.

6. Finding such firearms disqualifiers can be challenging not only due to the age of the underlying materials but because firearms prohibitions are usually freestanding laws not tied to the definition or punishment of a crime itself. To find such laws, I have searched the Duke Center for Firearms Law Repository of Historical Gun Laws. The Duke Center for Firearms Law is an academic institution affiliated with the Duke University School of Law which seeks to develop "reliable, original, and insightful scholarship, research, and programming on firearms law that will be useful to lawyers, policy makers, and the interested layperson." *See*

2

https://firearmslaw.duke.edu/. The Duke Repository is a searchable database of laws spanning the medieval age through 1776 in England and the colonial era through the mid-20th century in the United States. *See* https://firearmslaw.duke.edu/repository/search-the-repository/. For purposes of the instant research, I focused on the category in the Repository called "Felons, Foreigners and Others Deemed Dangerous by the State." This category identifies 100 such laws, which fit principally into several categories, none of which appear relevant today:

- medieval English laws;

- laws prohibiting Indians, Catholics, and Black Americans (slave or free) from receiving or possessing firearms or ammunition;

- Test Acts disarming those who refused to swear an oath of loyalty to the Revolutionary governments.

7. There is *one* criminal firearms disabler law in the Duke list. In response to Shays' Rebellion (1786), the Massachusetts legislature required these traitors to "deliver up their arms to, and take and subscribe the oath of allegiance, before some Justice of the Peace, within some County of this Commonwealth…" Several civil disabilities were imposed on them besides giving up their guns:

> That they shall keep the peace for the term of three years, from the time of passing this Act, and that during that term of time, they shall not serve as Jurors, be eligible to any Town-Office, or any other Office under the Government of this Commonwealth, and shall be disqualified from holding or exercising the employments of School masters, Innkeepers or retailers of Spirituous liquors, or either of them, or giving their votes for the same term of time…

> But after those three years: and it shall be the duty of such Major General or commanding Officer, to give such directions as he may think necessary, for the safe keeping such arms, in order that they may be returned to the person or persons who delivered the same, at the expiration of the said term of three years, *in case such person or persons shall have complied with the conditions above*

3

> *mentioned, and shall obtain an order for the re-delivery of such arms…*[2]
> [emphasis added]

8. This is the only law in the Duke Repository prior to 1868 which prohibits possession of a firearm as a result of a person's previous criminal behavior. In this case, the crime was treason, the most serious crime in the English law.

9. This law appears to have applied only to people accused of treason, and granted a pardon to participants in the rebellion as an alternative to trial and sentencing. Further, the law does not appear to prohibit those who accepted this pardon from buying firearms within those three years. It could be argued that such a purchase would violate the terms of this conditional pardon, opening them up to prosecution, but that is only a supposition; it is nowhere stated in the law. Moreover, the dispossession of firearms associated with the law was temporary, at least absent further misconduct violating the terms of the pardon.

10. A second category of laws in the Duke Repository are American laws which at various times prohibited Indians, Catholics, Black Americans (both free and slave) from arms possession. These laws were not premised on individual criminal conduct but on race or religion, and appear to have no bearing on the historical support, or lack thereof, for bans on firearm possession based on criminal convictions.

11. An example of such a law is discussed in an 1844 opinion from the North Carolina Supreme Court upholding a prohibition on Black Americans' possession of firearms:

> Self-preservation is the first law of nations, as it is of individuals; and while we acknowledge the solemn obligations to obey the Constitution, as well in spirit as in letter, we at the same time hold that nothing should be interpolated into that instrument which the people did not will. We are not at liberty to give an artificial and constrained interpretation to the language used, beyond its ordinary, popular, and obvious meaning. Before and at the time our Constitution was framed there was among us this class of people, and they were subjected to various disabilities from which the white population was exempt. It is

---

[2] Mass. Acts & Resolves ch. 56 at 176-178 (1786).

4

> impossible to suppose that the framers of the Bill of Rights did not have an eye to the existing state of things, and did not act with a full knowledge of the mixed population for whom they were legislating.[3]

12. A third category of laws in the Duke Repository involved the prohibition on firearm possession by those who refused to swear a loyalty oath to the Revolutionary colonial governments. These were not lifetime bans,[4] and in some cases exempted handguns.[5] But these prohibitions have no obvious analogy to ex-felon firearms disability.

13. In addition to a review of historical British and American firearm prohibitions, I have also reviewed the development of American firearms law in the early 20th century, specifically the Federal Firearms Act of 1938, which made it a crime "for any person who has been convicted of a crime of violence or is a fugitive from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce…"[6] This category—"convicted of a crime of violence or is a fugitive from justice"—is both less inclusive than a general firearm prohibition on felons (it covers only those convicted of *violent* felonies) and more inclusive (it covers fugitives who may not have been convicted of any crime).

14. The legislative history concerning underlying this statute is illuminating regarding the understanding of the Second Amendment at the time of its enactment. Hearings in the House

---

[3] *State v. Newsom*, 27 N.C. 250, 254 (N.C. 1844).
[4] 4 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789 205 (1906); 9 PENNSYLVANIA STATUTES AT LARGE 112-13; Id., 238-244; Id., 346-8; Id., 11-12; (repealed in 1789) 13 PENNSYLVANIA STATUTES AT LARGE 222-24; 24 STATE RECORDS OF NORTH CAROLINA ch. 6 at 89 (1905); 5 ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF THE MASSACHUSETTS BAY ch. 21 at 479 (1886); 19 ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF THE MASSACHUSETTS BAY 280 (1918).
[5] 203 ARCHIVES OF MARYLAND ch. 10 at 278 (1787).
[6] *See Tot v. United States*, 319 US 463, 464 (1943).

5

Ways & Means concerning the National Firearms Act included numerous exchanges explaining why the proposed National Firearms Act used a tax stamp approach to regulate automatic weapons:

15. Rep. Treadway questioned Assistant Attorney General Joseph B. Keenan:

Mr. TREADWAY. What benefit is there in allowing machine guns to be legally recognized at all? *Why not exclude them from manufacture?*

Mr. KEENAN. We have not the power to do that under the Constitution of the United States. Can the Congressman suggest under what theory we could prohibit the manufacture of machine guns?

Mr. TREADWAY. You could prohibit anybody from owning them.

Mr. KEENAN. I do not think we can prohibit anybody from owning them. *I do not think that power resides in Congress.*[7] [emphasis added]

16. Further, the Assistant Attorney General testified that Congress lacked authority to prohibit manufacture or possession of automatic weapons.

Mr. McCLINTIC. I would like to ask just one question. I am very much interested in this subject. What in your opinion would be the constitutionality of a provision added to this bill which would require registration, on the part of those who now own the type or class of weapons that are included in this bill?

Attorney General CUMMINGS. We were afraid of that, sir.

Mr. McCLINTIC. Afraid it would conflict with State laws?

Attorney General CUMMINGS. *I am afraid it would be unconstitutional.*[8] [emphasis added]

17. The Attorney General considered mandatory registration of automatic weapons unconstitutional, but believed that they could be regulated through taxation:

Mr. LEWIS. Now a very brief statement on this subject: Lawyer though I am, I have never quite understood how the laws of the various States have been reconciled with *the provision in our Constitution denying the privilege to the legislature to take away the right to carry arms*. Concealed-weapon laws, of

---

[7] *National Firearms Act*, HEARINGS BEFORE THE COMMITTEE ON WAYS AND MEANS HOUSE OF REPRESENTATIVES, 73rd Cong., 2nd sess. 100 (1934).

[8] *Id.* at 13.

6

course, are familiar in the various States; there is a legal theory upon which we prohibit the carrying of weapons-the smaller weapons.

Attorney General CUMMINGS. Of course we deal purely with concealable weapons. Machine guns, however, are not of that class. Do you have any doubt as to the power of the Government to deal with machine guns as they are transported in interstate commerce?

Mr. LEWIS. I hope the courts will find no doubt on as subject like this, General; but was curious to know how we escaped that provision in the Constitution.

Attorney General CUMMINGS. Oh, we do not attempt to escape it. We are dealing with another power, namely, the power of taxation, and of regulation under the interstate commerce clause. *You see, if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved.* But when you say "We will tax the machine gun" and when you say that "the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated', you are easily within the law.

Mr. LEWIS. In other words, it does not amount to prohibition, but allows of regulation.

Attorney General CUMMINGS. That is the idea. We have studied that very carefully.[9] [emphases added]

18. Finally, I have reviewed the United States' history regarding the impact of criminal convictions on other rights protected by the Constitution. Convicted felons, once they are no longer subject to probation, do not lose the right to free speech, freedom of religion, freedom from arbitrary search, or freedom from cruel and unusual punishment. While many states deny the vote to ex-felons, this is not a right guaranteed by the Constitution, except with respect to race (Fifteenth Amendment), sex (Nineteenth Amendment), and age (Twenty-Sixth Amendment).

19. Accordingly, it does not appear that there is support in the history of American civil rights law, other than recent history with respect to the Second Amendment, of permanently denying a constitutionally-protected right on the basis of a criminal conviction.

---

[9] *Id.* at 19.

20. In sum, there is no extant evidence that lifetime firearms prohibitions for previous crimes was part of the history or traditions of American law before 1791 *or* 1868. The one instance of firearms prohibition in that era involved a three-year impoundment of firearms, which were returned following the three-year term.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 27, 2023.

_____
Clayton E. Cramer

# EXHIBIT 1

Case: 1:23-cv-00065-MSM-PAS Document 4-12 Filed 11/28/23 Page 10 of 15 PageID #: 2194
Case 2:24-cv-00167-APG-EJY Document 31-1 Filed 11/06/25 Page 10 of 15 Page ID #:152

# Clayton E. Cramer

24408 Tombstone Ridge Ct.
Middleton, ID 83644
(208) 761-5916
clayton@claytoncramer.com
http://www.claytoncramer.com

## EDUCATION:

| | |
|---|---|
| | Sonoma State University, Rohnert Park, California |
| June, 1998 | M.A. in History |
| | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
| | *Honors*: *cum laude* and With Distinction |

## AWARDS:

| | |
|---|---|
| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
| | First Place, Undergraduate Division |

## TEACHING EXPERIENCE:

| Fall, 2020 - present | ***Adjunct Faculty***: College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
|---|---|
| Fall, 2014 – Spring, 2020 | Recovering from stroke. |
| Fall, 2009 – Summer, 2010 | ***Adjunct Faculty***: ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**. |

1

| | |
|---|---|
| Fall, 2003 | *Adjunct Faculty:* Boise State University, teaching **U.S. Constitutional History** |

# BOOKS:

Lock, Stock, and Barrel: The Origins of American Gun Culture
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor
Library Research Associates, Inc., 1990

2

## SELECTED PUBLICATIONS:

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:issue 1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

3

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241. Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997. "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002. "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v.

4

*Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

Baird v. Bonta (E.D.Cal. 2023)

Rocky Mountain Gun Owners v. Polis (D.Colo. 2023)

Boland v. Bonta (C.D.Cal. 2023)

National Association for Gun Rights v. Lopez (D.Haw. 2023)

Wolford v. Lopez (D.Haw. 2023)

Association of New Jersey Rifle & Pistol Clubs v. Platkin (D.N.J. 2023)

U.S. v. Kazmende (N.D.Ga. 2023)

**WORKS CITED IN COURT DECISIONS:**

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

"Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester,* 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien,* 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008). In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting);
*U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

# LANGUAGES:

Very basic reading competence in German.

# OTHER SKILLS:

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance.