# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **MICHAEL O'NEIL, et al.** | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **Vs.** | ) | **C.A. 23-cv-70** |
| | ) | |
| **PETER F. NERONHA, in his official capacity as** | ) | |
| **Attorney General of the State of Rhode Island, and** | ) | |
| **THE STATE OF RHODE ISLAND** | ) | |
| **Defendants** | ) | |

## PLAINTIFFS' REPLY RESPECTING THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiffs make three points in this Reply. First, Defendants have failed to show that a bar on open carry of firearms through denial of RIAG permits is within the Nation's historical tradition of firearms regulation. To the contrary, open carry was historically <u>less</u> restricted than concealed carry (CCW). Second, Defendants' new policy of barring open carry through denial of RIAG permits if a person has a municipal CCW permit is not set forth in the state statute or in Defendants' written factors, and is contrary to their prior practice of granting such permits in those circumstances. Accordingly, it violates the Due Process Clause of the Fourteenth Amendment. Third, Defendants' argument for <u>Rooker-Feldman</u> abstention is barred by law of the case.

## I.    DEFENDANTS HAVE FAILED TO SHOW THAT A BAR ON OPEN CARRY IS WITHIN THE NATION'S HISTORICAL TRADITION OF FIREARMS REGULATION.

Plaintiffs will preliminarily review the applicable Supreme Court decisions as they bear directly on the merits of Defendants' arguments in their Objection. In <u>New York State Rifle & Pistol Association, Inc. v. Bruen</u>, 597 U.S. 1 (2022), the Court said the first step of the analysis was whether "the government can prove that the regulated conduct falls beyond the [Second] Amendment's original scope, [if so] 'then the analysis can stop there, the regulated conduct is categorically unprotected.'" <u>Id.</u> at 18-19, quoting <u>United States v. Greeno</u>, 679 F.3d 510, 518 (6th

Cir. 2012). If the historical evidence at this step is either "'inconclusive or suggests the regulated activity is *not* categorically unprotected,'" (emphasis original), courts proceed to the next step. Id., quoting Kanter v. Barr, 919 F.3d 437, 441 (7th Cir. 2019). It was the next step where the Court said the lower courts had gotten the analysis wrong by engaging in an interest-balancing analysis. Id. at 17. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." Id.

The Court said the plain text of the Second Amendment protected the petitioners' right to carry handguns publicly for self-defense and the respondents conceded that. Id. at 32. The Court then analyzed the historical tradition to determine whether New York's discretionary concealed carry permitting regime was constitutional and concluded it was not. Id. at 69.

Plaintiffs in their summary judgment motion and their objection to Defendants' motion have previously addressed Defendants' argument that the Court's decision can be read as allowing a discretionary permitting regime for open carry. In sum, Plaintiffs vigorously disagree. Bruen clearly places the burden on Defendants, first to show that Plaintiffs' desire to engage in open carry falls beyond the scope of the Second Amendment. Second, if they cannot carry that burden, Defendants must show that their new policy effectively barring Plaintiffs from engaging in open carry if they have a municipal CCW permit falls within the Nation's historical tradition of firearms regulation. Clearly, open carry of handguns for self-defense is conduct within the scope of the Second Amendment.

Defendants' statement that every court that has addressed the issue of open carry has held there is no such right is simply wrong. Indeed, the Supreme Court cited with approval state supreme court decisions upholding open carry in District of Columbia v. Heller, 554 U.S. 570 (2008) and Bruen. See, Heller, 554 U.S. at 612, 629, citing, Nunn v. State, 1 Ga. 243, 251 (1846);

State v. Chandler, 5 La.Ann. 489, 490 (1850); Aymette v. State, 21 Tenn. 154 (1840); Andrews v. State, 50 Tenn. 165, 187 (1871); State v. Reid, 1 Ala. 612, 616-17 (1840); Bruen, 597 U.S. at 53-54, citing, State v. Reid; State v. Chandler; Nunn v. State; and Andrews v. State.

More recently, federal courts have so indicated, as well. See, Baird v. Bonta, 81 F.4th 1036, 1048 (9th Cir. 2023) (commenting that ''[a]n individual's right to carry a handgun for self-defense outside the home under the Second Amendment is [a] constitutional right" and reversing and remanding that district court's denial of plaintiffs' motion for a preliminary injunction against a California statute that imposed criminal penalties for unlicensed public carry);[1] Suarez v. Paris, 2024 WL 3521517 at *12 (M.D.Penn. July 24, 2024) ("We find that plaintiffs' desired conduct—carrying loaded, operable firearms on their person, 'whether concealed or openly,' in public for lawful purposes including self-defense…plainly is covered by the Second Amendment."); Koons v. Platkin, 673 F.Supp.3d 515, 655-66 (D.N.J. 2023); Culp v. Madigan, 270 F.Supp.3d 1038, 1053 (C.D.Ill. 2017), quoting Sutherland v. Escapa, 176 F.Supp.3d 786, 790 (C.D.Ill. 2016) ("finding that the acts criminalized by the Illinois statute, 'the ability to open carry any firearm, as well as the ability to carry a concealed firearm aside from pistols, revolvers, and handguns, is clearly within the scope of the Second Amendment.");[2] see also, Medrano v. Salazar, 2020 WL 589537

---

[1] On remand, the district court upheld California's requirement of a license to engage in open carry. Baird v. Bonta, 709 F.Supp.3d 1091, 1119 (E.D.Cal. 2023). The court also upheld California's law restricting open carry to about half of its (less populated) counties by rejecting historical tradition and relying on alleged contemporary standards: "In one sense, California's regulation might seem to be the reverse of the historical tradition. Rather than placing heavier restrictions on concealed and concealable weapons, California limits open handgun carrying more strictly than concealed carrying…Today, by contrast, the open carrying by those who are not law enforcement officers is threatening or intimidating, especially in more heavily populated places." Id. at 1138-39. The decision has been appealed to the Ninth Circuit.

[2] In both Culp and Sutherland, the courts applied the interest-weighing analysis that Bruen subsequently rejected and upheld the statute in question.

at *6 (W.D.Tex. Feb. 5, 2020) ("Applied to the states through the Fourteenth Amendment, the Second Amendment 'encompasses a right to carry firearms openly in public for self-defense.'").

In Koons, the court considered various New Jersey restrictions on both concealed and open carry. One restriction barred people from bringing firearms to public gatherings, demonstrations, or events requiring a government permit. The court considered evidence from the colonial period. "The colonial generation required the settlers to carry weapons during public assemblies to defend against hostilities from Native Americans, protect themselves from criminals and pirate raids, to curb slave rebellions, and to be ready for a potential foreign invasion." Id. at 628, citing, inter alia, Clayton E. Crammer [sic], Colonial Firearm Regulation, 16 J. on Firearms & Pub. Pol'y 1, 6-7 (2004). It noted: "Rhode Island, in 1639, likewise ordered that no 'man shall go two miles from the Towne unarmed, [either] with Gunn or Sword; and that none shall come to any public Meeting without his weapon.'" Id. at 629, quoting, 1 John R. Bartlett, Records of the Colony of Rhode Island and Providence Plantations, in New England, 94 (Providence, A.C. Greene & Bros. 1856). The court said the colonial history was relevant because the "Second Amendment…codified a pre-existing right." Id. at 628, quoting, Heller, 554 U.S. at 592. The court found that the plaintiffs had shown a reasonable likelihood of prevailing on their Second Amendment challenge to the prohibition on bringing firearms to public gatherings. Id. at 636.

It also held that New Jersey's restrictions on functional firearms in vehicles violated plaintiffs' rights to open carry. Id. at 655-56. It commented that: "As noted above and in Bruen, states that historically banned concealed carry of firearms did not similarly prohibit open carry." Id. at 656;[3] see also, Miller v. Bonta, 699 F.Supp.3d 656, 997 (S.D.Cal. 2023) ("Antebellum

---

[3] The Koons court specifically rejected the assertion of Brennan Rivas, Defendants' expert, that "individuals generally did not view concealed carry laws as giving permission to openly carry in populated places during a person's ordinary activities." Id. at 656, n. 74.

society was comfortable with seeing people openly armed with guns and uncomfortable with the knowledge that some people carried guns concealed.").

Plaintiffs mostly argue that their new policy of denying RIAG permits for open carry to persons who have municipal permits for concealed carry is within a historical tradition of firearms regulation. Defendants hang their argument on the Court's more recent decision, U.S. v. Rahimi, 602 U.S. 680 (2024). However, Rahimi cannot bear the weight Defendants place on it. In that case, Rahimi assaulted C.M., his girlfriend, who was also the mother of his child. He shot at her as she fled. He later called C.M. and threatened to shoot her if she reported the incident. Nonetheless, C.M. went to Texas state court, testified to Rahimi's conduct, including toward their son, and requested a restraining order. Rahimi had an opportunity to dispute her testimony but did not. The state court found that Rahimi had committed "family violence," that the violence "was likely to occur again," and that he posed "a credible threat" to the "physical safety" of C.M. and their son. The court prohibited Rahimi from threatening C.M. or her family for two years or contacting C.M. during that period except to discuss their son. The order suspended Rahimi's gun license for two years.

Rahimi subsequently violated the restraining order by approaching C.M.'s home at night and contacting her through social media. He also engaged in other crimes including additional shootings. The police obtained a warrant to search his residence and found a pistol, a rifle, ammunition, and a copy of the restraining order. He was indicted on a charge of violating 18 U.S.C. § 922(g)(8) which prohibits possessing a firearm while subject to a domestic violence restraining order. He moved to dismiss the indictment arguing that it violated his rights under the Second Amendment. The district court denied his motion, the circuit court affirmed, and Rahimi petitioned for rehearing *en banc*. While his petition was pending, the Supreme Court decided

5

Bruen. The circuit court withdrew its prior opinion and held that Section 922(g)(8) did not fit within the Nation's tradition of firearms regulation.

The Supreme Court granted certiorari. It said:

> When a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect. Since our founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms. As applied to the facts of this case, Section 922(g)(8) fits comfortably within this tradition.

Id. at 690. The Court then discussed how to analyze the history of firearms regulation:

> As we explained in Bruen, the appropriate analysis involves considering whether the challenged regulation is consistent with principles that underpin our regulatory tradition. [citation omitted]. A court must ascertain whether the new law is "relevantly similar to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." [citation omitted].

Id. at 692.

The Court then considered whether "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." Id. The Court noted that in England, "[f]rom the earliest days of the common law, firearms regulations have included provisions barring people from misusing weapons to harm or menace others." Id. at 693. Further, the English developed surety laws which authorized magistrates to require individuals suspected of future misbehavior to post a bond. American colonies and states promulgated surety laws. Also, there were the so-called "going armed" laws which prohibited "riding or going armed with dangerous or unusual weapons, [to] terrify[ ] the good people of the land." Id. at 697, quoting 4 W. Blackstone, Commentaries on the Laws of England, 149 (10th ed. 1787). "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." Id.

6

That was all the Court decided as it made clear in its final paragraph:

[W]e reject the Government's contention that Rahimi may be disarmed simply because he is not "responsible." [citation omitted]. "Responsible" is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law. In Heller and Bruen we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. [citations omitted]. But those decisions did not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.

Id. at 1902. Here, Plaintiffs are all law-abiding, responsible citizens "who undoubtedly enjoy the Second Amendment right." Id. Defendants did not deny the renewal of Plaintiffs' RIAG permits based on character issues or that they posed a threat of harm to others. Defendants did so, for the first time, solely because Plaintiffs also had municipal permits.

Defendants correctly state that Rahimi held that statutory analogs need not be exact for purposes of determining the historical tradition of firearms regulation. However, lower court decisions since Bruen have made clear that historical regulations upon which the government would rely must be "relevantly similar."  Bruen, 597 U.S. at 1898; see, Lara v. Commissioner Pennsylvania State Police, 2025 WL 86539 at *10-11 (3rd Cir. Jan. 13, 2025) (rejecting the government's argument that a 1721 statute barring hunting on others' land without permission was an analog for contemporary statutes that barred 18-20 year olds from concealed carry); Worth v. Jackson, 108 F.4th 677, 692-698 (8th Cir. 2024) (analyzing Minnesota's permit-to-carry statute which requires applicants to be 21 years old and finding that the state presented no analogous law from the Founding to justify denial of the Second Amendment right to carry to 18-20 year olds); U.S. v. Williams, 718 F.Supp.3d 651, 671-83 (E.D.Mich. 2024) (holding that the government failed to show "laws in the historical record that are 'relevantly similar'" to 18 U.S.C. § 922(g)(1) which bars felons from possessing firearms); U.S. v. Hale, 717 F.Supp.3d 704, 713 (N.D.Ill. 2024) (same).

Here, Defendants go far beyond historical analogies by citing numerous firearms regulations regardless of subject matter as evidence of a supposed historical tradition that permits them to deny Plaintiffs a right to open carry. The Court in <u>Rahimi</u> specifically tailored its analysis to whether there was a historical tradition of disarming individuals "who pose a clear threat of physical violence to another."  There were such specific regulations. Here, there are <u>no</u> historical statutes between 1791 and 1868 denying open carry because a person can engage in concealed carry. To the contrary, there are state supreme court decisions upholding the right of open carry.

The further problem is that Defendants recycle many statutes for their open carry argument that the Supreme Court has already rejected for purposes of concealed carry analysis. Defendants' Memorandum, pp. 9-13. These statutes are even less relevant here. Of the twenty-one statutes identified in Defendants' Memorandum, a number of them expressly address only concealed carry, such as:

- 1686 New Jersey-The Supreme Court specifically rejected the relevance of this statute. <u>Bruen</u>, 597 U.S. at 48 ("The law restricted only concealed carry, not all public carry, and its restrictions applied only to certain 'unusual or unlawful weapons,' including 'pocket pistol[s].'").

- 1801 Tennessee-<u>Bruen</u> specifically rejected the relevance of this statute. <u>Id.</u> at 50. ("As we have already explained, Chief Justice Herbert in *Sir John Knight's Case* interpreted this *in Terrorem Populi* element to require something more than merely carrying a firearm in public").

- 1820 Indiana. <u>Bruen</u> described this statute in a footnote as barring only concealed carry. <u>Id.</u> at 52, n. 16. In a subsequent footnote, the Court said: "With respect to Indiana's concealed-carry prohibition, the Indiana Supreme Court's reasons for upholding it are

8

unknown because the court issued a one-sentence *per curiam* order holding the law 'not unconstitutional.' *Mitchell*, 3 Blackf. at 229." Id. at 53, n. 20.

- 1868 Alabama-This statute is not mentioned in either Bruen or Heller by any justice. Regardless, it banned concealed carry, not open carry.

Obviously, if Bruen found these statutes did not demonstrate a historical tradition of concealed carry regulation, they certainly are not analogs to show a historical tradition of open carry regulation.

Other statutes prohibited going armed "offensively" or in "terror," such as:

- 1692 Massachusetts-The Supreme Court specifically rejected the relevance of this statute. Bruen, 597 U.S. at 46-47. ("Respondents, their *amici*, and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people…").

- 1786 Virginia. Bruen specifically rejected the relevance of this statute. Id. at 49-50. ("As we have already explained, Chief Justice Herbert in *Sir John Knight's Case* interpreted this *in Terrorem Populi* element to require something more than merely carrying a firearm in public").

- 1821 Maine-The Bruen majority did not specifically address this statute, but Justice Breyer's dissent said the Court lumped it in with other statutes modeled on the Statute of Northampton. Id. at 122. ("The Court discounts these laws primarily because they were modeled on the Statute of Northampton, which it believes prohibited only public carriage with the intent to terrify…").

Again, if Bruen found these statutes did not justify a ban on concealed carry, they certainly are not analogs to justify a ban on open carry by responsible, law-abiding citizens.

Other statutes prohibited exhibiting a weapon in a "rude or threatening manner," such as:

- 1837 Mississippi

- 1852 Hawaii (foreign country)

- 1854 Washington (Territory)

- 1855 California

- 1859 Washington (Territory)

- 1867 Arizona (Territory)

There are several problem with these statutes. First, the Court generally rejected statutes from the Territories as not indicative of the American tradition. Id. at 66-67. Second, Bruen did not mention Hawaii's 1852 statute, probably because it was not even part of the United States at the time so that statute could not be part of an American historical tradition. Moreover, Hawaii's contemporary "may issue" CCW permit statute was one of those specifically overturned by Bruen. Id. at 15. Third, threatening someone with a firearm was and remains a crime in all states, to Plaintiffs' knowledge. See, e.g., R.I.Gen.L. § 11-5-2(a).[4] That has no bearing on whether law-abiding citizens can engage in peaceful open carry for self-defense.

Two statutes prohibited twelve or more people from carrying weapons while rioting:

- 1750 Massachusetts

- 1771 New Hampshire

These statutes obviously have no relevance to whether individual, law-abiding citizens can peacefully engage in open carry.

Two of the statutes are so-called surety laws:

---

[4]"Every person who shall make an assault or battery, or both, with a dangerous weapon…shall be punished by imprisonment for not more than twenty (20) years."

- 1835 Massachusetts

- 1840 Maine

In <u>Bruen</u>, the Court said such laws assume a right of public carry.  <u>Id.</u> at 55-59. ("[T]he surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace.' Mass.Rev.Stat., ch. 134, § 16 (1836)") (emphasis original).

One statute Defendants cite prohibited public carry by any criminals, drunks, or persons who have borne arms against the United States, i.e., Kansas in 1868. That obviously is not an analog to Defendants' policy that persons cannot have a RIAG open-carry permit if they have a municipal concealed carry one.

That leaves two statutes as restricting open carry by law-abiding citizens:

- 1858 District of Columbia. This statute also banned concealed carry.

- 1868 Florida

Curiously, none of the opinions in either <u>Bruen</u> or <u>Heller</u> mention the Florida statute, nor did Plaintiffs' counsel find any reported cases mentioning it. This may indicate it was never enforced.

Notably, it was a District of Columbia statute that the Supreme Court struck down in <u>Heller</u>. That statute prohibited the possession of handguns whether in the home or outside (without a discretionary license) as well as other restrictions on the possession of handguns. Nothing in that opinion suggests that the Court would have ruled differently if the only issue was open carry. To the contrary, the Court relies on examples of open carry to support its decision. It quotes Senator Sumner's famous speech in 1856 about "Bleeding Kansas":

> The rifle has ever been the companion of the pioneer and, under God, his tutelary
> protector against the red man and the beast of the forest. Never was this efficient

weapon more needed in just self-defense, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to carry it in any way be impeached. And yet such is the madness of the hour, that, in defiance of the solemn guarantee, embodied in the Amendments to the Constitution, that 'the right of the people to keep and bear arms shall not be infringed,' the people of Kansas have been arraigned for keeping and bearing them…

Id. at 609, quoting "The Crime Against Kansas," May 19-20, 1856, in American Speeches: Political Oratory From the Revolution to the Civil War 533, 606-07 (T. Widmer ed. 2006). Clearly, the Court did not think that open carry was somehow less protected than concealed carry. In sum, Defendants have failed their burden of showing a historical tradition of banning open carry while permitting concealed carry.

Defendants offer up forty additional or correctly cited laws in their Motion for Judicial Notice.  However, none of them establish a historical tradition between 1791 and 1868 of restricting open carry while permitting concealed carry:

- Eight laws were Statute of Northampton analogs. (# 1, 4, 5, 6, 8, 19, 24, 26). This a category of laws that Bruen dismissed as irrelevant to the question of bearing arms: "Notwithstanding the ink the parties spill over this particular provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41, 46-48.

- Four laws were surety bond laws. (# 2, 18, 28, 31). Bruen said these laws actually supported the right to bear arms: "[T]he surety statutes *presumed* that individuals had a right to carry that could be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace." Id., at 55-59.

- Nine were laws Bruen specifically mentioned and dismissed as irrelevant. (# 1, 2, 4, 5, 11, 20, 24, 27, 28).

12

- At least five were laws that did not ban *individuals* carrying arms. (# 3, 7, 21, 22, 39). Some applied only to armed *groups*.

- Three laws made no mention of arms. (# 7, 17, 22).

- Ten laws prohibited brandishing of arms, or assault with a deadly weapon, or enhanced the penalty for committing a crime with a firearm. (# 9, 10, 11, 12, 13, 29, 33, 34, 36, 37). They did not prohibit carrying of arms.

- Five laws were adopted after 1868. (# 9, 10, 11, 12, 13). They are thus irrelevant by the standard adopted by Bruen. Id., at 34-38.

- Two laws were only grants by state legislature to cities to pass laws regulating carry of arms. (# 16, 30). Defendants have not provided evidence that cities in these states exercised this authority.

- Two laws were not passed in the United States: the North Carolina collection of old English statutes, including the Statute of Northampton that Bruen specifically rejected as irrelevant, and a law passed by the Kingdom of Hawaii. (# 16, 30).

- One law applied only to Blacks. (# 23).

- Four laws regulated only *concealed* carry of arms. (# 20, 25, 35, 38). Bruen specifically rejected the significance of one of these laws: "[T]he law prohibited only the *concealed* carry of pocket pistols; it presumably did not by its terms touch the open carry of larger, presumably more common pistols, except as to 'planters.'" (emphasis original). Id. at 48.

- Two laws prohibited discharge of firearms. (# 14, 15).

- One law was not a general ban on carrying; it applied only to criminals, drunks, and former Confederate soldiers. (# 40).

- *One* law actually banned carrying of firearms. (# 11). This was a frontier city ordinance of the type that Bruen rejected as outside the general American legal tradition: "[T]he bare existence of these localized restrictions cannot overcome the overwhelming evidence of an enduring American tradition permitting public carry." Id. at 67.

Thus, Defendants have failed to show any American historical tradition during the period of 1791 to 1868 of restricting open carry of firearms.

Defendants argue that post-1868 legislation is relevant to this analysis. They could be correct if the case concerned something not in existence until after 1868, such as stun guns. See, O'Neil v. Neronha, 594 F.Supp.3d 463 (R.I. 2022). However, citizens practiced open carry in 1791 and continued to do so through 1868. Those practices, as well as legislation, and judicial responses to that legislation, during that period, establish the relevant historical tradition. Bruen, 597 U.S. at 34-38.

## II. DEFENDANTS' NEW POLICY OF DENYING RIAG PERMITS TO THOSE WHO HAVE MUNICIPAL PERMITS VIOLATES DUE PROCESS.

Defendants argue incorrectly that Plaintiffs are not entitled to due process because they have no liberty interest in their RIAG permits.[5]   However, the Second Amendment provides Plaintiffs with a liberty interest in those permits, and, accordingly, they are entitled to due process under the Fourteenth Amendment in the renewal of their RIAG permits. Here, Bruen and Heller show that Plaintiffs have a constitutional right to keep and bear arms without a special showing of need. That right establishes a liberty interest protected by due process. U.S. v. Rehlander, 666 F.3d 45, 48 (1st Cir. 2012);  Kuck v. Danaher, 600 F.3d 159, 167 (2nd Cir. 2010); McKinney v. Fresno County Sheriff's Office, 2022 WL 17822069 at *4 (E.D.Cal. Dec. 20, 2022); Caba v. Weaknecht,

---

[5] Plaintiffs here reiterate arguments they made in their Objection to Defendants' Motion for Summary Judgment.

64 A.2d 39, 60 (Pa.Comm. 2013); see also, U.S. v. Quiroz, 629 F.Supp.3d 511, 525 (W.D.Tex. 2022) ("If the right to keep and bear arms inside and outside the home is so clear, removing that right would likely require the same constitutional procedural safeguards that the Supreme Court has bestowed on other rights."); Doe I v. Evanchick, 355 F.Supp.3d 197, 217 (E.D.Penn. 2019) ("From Heller and McDonald, it is clear that the right to bear arms is a protected liberty interest."). In Rehlander, the First Circuit held that the State of Maine could not permanently revoke the rights of a person to possess arms based on a temporary mental health commitment without an adjudicatory hearing. 666 F.3d at 48.

In Kuck, plaintiff applied for and received a firearms permit from the Connecticut Department of Public Safety (DPS) in 1982. As part of that application, plaintiff provided proof of his citizenship. His permit was subsequently renewed without having to provide proof of citizenship again. In March 2007, plaintiff applied to renew his permit. This time, DPS requested that he provide a U.S. passport, birth certificate, or voter registration to prove his citizenship. Plaintiff refused to provide the proof and DPS denied his application for renewal. Plaintiff filed an administrative appeal, but the hearing was scheduled 18 months away during which time he was deprived of the permit. Plaintiff filed a class action lawsuit. During the pendency of the suit and shortly before the administrative hearing, plaintiff provided DPS with proof of citizenship and his renewal application was granted. Plaintiff argued that the 18-month delay in granting the renewal violated his due process rights. The district court granted defendants' motion to dismiss for failure to state a claim.

On appeal, the Second Circuit said its due process analysis was governed by the three-factor balancing test set forth in Matthews v. Elbridge, 424 U.S. 319, 355 (1976): (1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures

used and the probably value of alternative procedures; and (3) the government's interest including the possible burdens of alternative procedures.  600 F.3d at 163. The court said "Kuck's stake in the firearms license is a liberty interest tied to the right to bear arms recognized by state law." Id. at 164, citing Conn.Const. art. I, § 15. The Second Circuit added: "Contrary to defendants' suggestion, the state's ability to regulate firearms does not extinguish the liberty interest at stake or eliminate the need to afford due process." Id. at 165. The court concluded that Connecticut had violated plaintiff's procedural due process rights. Id. at 166. Here, Heller and Bruen establish Plaintiffs' liberty interest in their firearms permits under the Second Amendment and, accordingly, their right to due process.

Due process requires that statutes, especially criminal statutes, not be vague. Sessions v. Dimaya, 584 U.S. 148, 156 (2018). Justice Kagan wrote:

> The void-for-vagueness  doctrine, as we have called it, guarantees that people have "fair notice" of the conduct a statute proscribes.  [citation omitted]. And the doctrine guards against arbitrary and discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges. [citation omitted]. In that sense, the doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or legislative branch, define what conduct is sanctionable and what is not. (emphasis added).

Id. Admittedly, the Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Id., quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99 (1981). Nonetheless, another judge of this district has held the doctrine applies where a police policy would deprive an officer of his constitutional right of free speech. Brady v. Tamburini, F.Supp.3d 570, 587 (D.R.I. 2021) (McElroy, J.), citing, Grayned v. City of Rockford, 408 U.S. 104, 108 (1972); see also, Karem v. Trump, 960 F.3d 656, 665 (D.C.Cir. 2020), quoting Hoffman, ("Where such

penalties 'threaten[ ] to inhibit the exercise of constitutionally protected rights[,]…a more stringent vagueness [and fair-notice] test should apply.").

Here, Defendants' determination of what constitutes "need" is unconstitutionally vague, as well as overbroad. Section 11-47-18 does not define "need" nor does the Firearms Act of which the section is a part. R.I.Gen.L. § 11-47-1, et seq. Defendants have not promulgated any regulation that defines need. Defendants have issued a Weapons Carry Permit Handbook that lists ten specific factors they will consider when determining need but <u>none</u> of the factors is that an applicant has a municipal CCW permit. Prior Rhode Island Attorneys General have issued RIAG permits when the applicants had a municipal permit, and Plaintiffs obtained RIAG permits in those circumstances. Defendants' new, unwritten factor is unconstitutionally vague because it was not promulgated by the General Assembly but adopted by the Rhode Island Attorney General's office after years of a consistently different practice.

Moreover, the State's application of Section 11-47-18 cannot be arbitrary or capricious. <u>Hightower v. City of Boston</u>, 693 F.3d 61, 79 (1st Cir. 2012). An agency's unilateral attempt to change the plain meaning of a term, as shown by prior interpretations, without a justification, is arbitrary and capricious. <u>Taunton Municipal Lighting Plant v. Quincy Oil, Inc.</u>, 498 F.Supp. 396, 400 (D.Mass. 1980) ("[T]he FEA's attempt in Ruling 1977-5 to retroactively alter the plain meaning of the transaction definition was arbitrary, capricious and without support in the price regulations.").

Because Defendants' position abruptly changes years of prior interpretations, it is arbitrary and capricious. See, <u>Matrix Distributors, Inc. v. National Ass'n of Boards of Pharmacy</u>, 34 F.4th 190, 198-99 (3d Cir. 2022) (holding under New Jersey law that plaintiffs plausibly alleged defendant violated their due process rights by arbitrarily and capriciously applying defendant's

17

accreditation criteria); see also, <u>Encino Motors, LLC v. Navarro</u>, 579 U.S. 211, 221-22 (2016) (Agency violated arbitrary and capricious standard under the Administrative Procedure Act where it changed its existing policy without a reasoned explanation). Plaintiffs allege that their due process rights were violated because Defendants applied a new, unwritten, and unsubstantiated definition of "need" when it denied their applications to renew their RIAG licenses. All Plaintiffs had previously obtained or had renewed their RIAG licenses at times when they also had municipal licenses. On those occasions, it was not an issue that they also had municipal licenses. Now, the state statute, § 11-47-18, remains the same. The applicable factors set forth in Defendants' Weapons Carry Permit Handbook for determining "need" remain the same. The only things that have changed are the person holding the position of Attorney General, the person reviewing the applications, and the Defendants' creating a new unwritten "factor," i.e., that a person with a municipal CCW permit does not "need" a RIAG permit. This violates the Due Process Clause of the Fourteenth Amendment.

An agency decision is also arbitrary and capricious when it is unreasonable. <u>Public Service Comm'n of Puerto Rico v. Havemeyer</u>, 296 U.S. 506, 518 (1936) ("'Reasonable,' as employed here, means not 'capricious,' 'arbitrary,' or 'confiscatory.'"). Here, Plaintiffs have good, practical reasons to want the option of open carry. For example, Plaintiff O'Neil transfers firearms from one person to another pursuant to a federal firearms license and he stores the firearms at his house. He provides the security for these transfers and would like the option of open carry for purposes of securing these transfers. (Plaintiffs' Exhibit 17, O'Neil depo., pp. 12-16, 19-20, 52). Plaintiff Patterson said he does not want to worry about whether his firearm is concealed when he engages in public carry. (Plaintiffs' Exhibit 19, Patterson depo., pp. 12-13, 16, 52-53). He said it is easier

to access an openly carried firearm than a concealed one. (Id. p. 16).[6]  Edward Troiano, Defendants' more recent Chief of the Bureau of Criminal Identification and Investigation, who made the recommendations to deny Plaintiffs' applications, agreed with this point. (Plaintiffs' Exhibit 15, Troiano depo., p. 22).[7] (Essentially, Defendants' policy favoring concealed carry over open carry puts citizens engaged in public carry at greater risk of harm). Plaintiff Labriole is in the construction business.  He collects payments and sometime receives payments unexpectedly. He believes open carry discourages crime. (Plaintiffs' Exhibit 22, pp. 9, 18). Moreover, Plaintiffs have a very rational reason why they would want both permits.  If one permit accidentally lapses, they are not committing a felony by engaging in concealed carry if they have the other permit. R.I.Gen.L. §§ 11-47-8, 11-47-26.

Further, Defendants now suggest in their Objection, without any factual support, that they can deny permits for open carry because of a perception that it makes other people uncomfortable. This requires those people who have a municipal permit and want to engage in public carry to do so only with concealable and concealed weapons. In other words, Defendants are adding yet another unwritten factor to their "need" analysis. However, Defendants can no more deny Plaintiffs their Second Amendment right because it makes others uncomfortable than they can deny Plaintiffs their First Amendment right for that reason. Moreover, this argument makes little sense because people could still obtain a RIAG permit and engage in open carry if they do not have a municipal CCW permit (as Defendants' counsel suggested to Plaintiff Trementozzi). (Plaintiffs' Exhibit 18, p. 25).

---

[6] "You can get the firearm out of the holster a lot faster without something covering it."

[7] "Usually in a tactical situation if I was outside the building, I wouldn't want to have to retrieve it from a concealed position."

Defendants complain that Plaintiffs analogize their Second Amendment rights to those under the First Amendment, citing Hightower v. City of Boston, 693 F.3d 61 (1ˢᵗ Cir. 2012). (Defendants' Memorandum, p. 22-23). However, Defendants' beef is with the Supreme Court which itself made the analogy in Heller and Bruen:

> Take, for instance, the freedom of speech in the First Amendment, to which Heller repeatedly compared the right to keep and bear arms. 554 U.S. at 582, 595, 606, 618, 634–635, 128 S.Ct. 2783. In that context, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." [citations omitted]. In some cases, that burden includes showing whether the expressive conduct falls outside of the category of protected speech. [citation omitted]. And to carry that burden, the government must generally point to *historical* evidence about the reach of the First Amendment's protections. (emphasis original). [citation omitted].

Bruen, 597 U.S. at 24-25.

Moreover, there should be nothing surprising about this analogy. After all, the whole point of an individual right, as set forth in the Bill of Rights, is to protect individuals against the power of the State and the majority. This is why Defendants' "popular disapproval" argument proves the opposite of their point. The fact that some disapproved of open carry does not establish it was not considered a right at the time of the Founding or even at the passage of the Fourteenth Amendment. To the contrary, the fact that people and publications expressed that disapproval shows it occurred frequently enough to prompt the expressions. Yet, legislatures rarely thought it appropriate to legislate against the practice, and when they did, state supreme courts struck down the legislation as unconstitutional.

In sum, Defendants' new policy of denying Plaintiffs' applications to renew their RIAG permits because they have municipal CCW permits does not pass even intermediate scrutiny, never mind strict scrutiny, because the new policy is not substantially related to an important government objective. O'Neil v. Neronha, 594 F.Supp.3d at 475-79.

### III.    THE ROOKER-FELDMAN DOCTRINE DOES NOT APPLY.

Plaintiffs have previously addressed Defendants' argument that their claims are barred by the <u>Rooker-Feldman</u> doctrine in their response to Defendants' first motion to dismiss. (ECF # 11, pp. 18-22). Plaintiffs incorporate their prior arguments by reference. In its June 28, 2023 text order, the Court rejected Defendants' argument. That order is law of the case. For these reasons, the Court should reject Defendants' restated arguments in Part IV of their Memorandum.

### CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment.

Respectfully submitted,
**PLAINTIFFS,**
By their attorneys,

<u>/s/ Thomas W. Lyons</u>                                    <u>/s/ Frank R. Saccoccio</u>
Thomas W. Lyons          #2946          Frank R. Saccoccio Esq. #5949
Strauss, Factor, Laing & Lyons          Saccoccio Law Office
One Davol Square, Suite 305          928 Atwood Avenue
Providence, RI 02903          Johnston, Rhode Island 02919
(401) 456-0700          (401) 944-1600 * 942-8921 Fax
tlyons@straussfactor.com          Frank.CSLawOffice@gmail.com

### CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2025, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

<u>/s/ Thomas W. Lyons</u>