## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

**MICHAEL O'NEIL, et al.**

    *Plaintiffs*

**v.**

                                                          **C.A. No. 23-cv-00070-WES-PAS**

**PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island, and THE STATE OF RHODE ISLAND**

    *Defendants.*

## REPLY TO PLAINTIFFS' OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The State already addressed the bulk of Plaintiffs' arguments in its motion for summary judgment (ECF No. 34) and opposition to Plaintiffs' parallel motion for summary judgment (ECF No. 38). Plaintiffs wrongly insist that there is a Second Amendment right to open carry, and in the process, demand that the State identify a historical twin—contrary to Supreme Court precedent as well as common sense.

Plaintiffs' assertion that there is a constitutional right to open carry is wrong. It is premised on the mistaken assertion that historical precedents support only prohibitions on concealed carry not open carry. But "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to keep and bear arms] [i]s not a right to keep and carry a[] weapon … in any manner whatsoever." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022). While "history reveals a consensus that States could not ban public carry

altogether," *id.* at 53 (emphasis omitted), the governing principle is clear that the "*manner* of public carry was subject to reasonable regulation." *Id.* at 59.

Rhode Island's dual licensing regime is fully in keeping with that tradition of firearms regulation. It allows law abiding, responsible citizens to carry a handgun for self-defense outside the home pursuant to a concealed-carry permit that local officials shall issue. *See* R.I. Gen. Laws § 11-47-11. It further provides for the discretionary issuance of an additional concealed or open carry permit by the Attorney General. R.I. Gen. Laws § 11-47-18. Allowing mandatory issuance of concealed-carry permits while retaining discretion to issue an additional open carry permit is a manner restriction that in no way impairs the right to "armed self-defense." *Id.*

Nonetheless, Plaintiffs claim that, under *Bruen*, § 11-47-18 is unconstitutional because no early American law specifically restricted open carry. But *Bruen* does not require "a historical *twin*." 597 U.S. at 30. As the Supreme Court affirmed in *Rahimi*, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," allowing States to address novel societal concerns, such as those around open carry, if and when they arise. *United States v. Rahimi*, 602 U.S. 680, 692 (2024). "Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Id.* Rather, courts must examine whether a modern law is consistent with the history of the right to keep and bear arms and the Nation's tradition of firearms regulation. *See id.* at 17. Section 11-47-18 satisfies that test because it is analogous to historical bans on concealed carry (as well as various other regulations of the manner of public carry). Like those regulations, Rhode Island's law regulates the manner of public carry, providing for a more liberal grant of permits for carrying in a concealed rather than open manner. Plaintiffs' attempts to nitpick inconsequential differences between historical and contemporary statutes cited by the State, *see* ECF No. 44, do not prove otherwise.

Simply put, there is no constitutional right to carry a firearm in any manner Plaintiffs may desire.  As several post-*Bruen* courts have concluded, a state may lawfully regulate the manner of public carry by allowing concealed or open carry.  What a state cannot do is absolutely prohibit both forms, which was the practical effect of the New York law at issue in *Bruen*.  Reasonable minds can and do differ on whether concealed or open carry is the better policy choice.  But nothing in the text or history of the Second Amendment compels a state legislature to choose one manner of public carry over another.

Finally, Plaintiffs' due process claims under the United States and Rhode Island Constitutions are also meritless.  Plaintiffs have no Second Amendment right to carry openly and no fundamental liberty interest in the renewal of permits that, by statute, expire after four years.  Nor can Plaintiffs bring a direct cause of action under the Rhode Island Due Process Clause because, as held by the Rhode Island Supreme Court and consistently recognized by federal district courts, that right is not self-executing.  Thus, all of Plaintiffs' claims must fail and this Court should grant summary judgment in the State's favor.

## STATEMENT OF FACTS

The State's motion for summary judgment (ECF No. 34-1) includes all historical facts relevant to Plaintiffs' underlying Complaint, which Plaintiffs now clarify presents only an as-applied challenge to Rhode Island's dual licensing regime.  ECF No. 39 at 2.  Plaintiffs' objection to the State's motion impermissibly relies on a supplemental expert opinion from Mr. Clayton Cramer that was not timely disclosed to the State.  *Id.* at 3-10.  For the reasons detailed in the State's accompanying Motion to Strike, Mr. Cramer's supplemental opinion should be disregarded in its entirety based on Plaintiffs' failure to comply with Fed. R. Civ. P. 26(a)(2)(D).

Additionally, most of the so-called additional facts on which Plaintiffs rely are not facts at all. Instead, they are opinions derived from Mr. Cramer's review of the historical record. Plaintiffs acknowledge their own confusion about whether those opinions present a "question of fact or law." ECF No. 39 n.1. To the extent Mr. Cramer cites historical laws those references are unquestionably legislative facts subject to judicial notice, as explained in the State's Motion for Judicial Notice, ECF No. 44. They need not be submitted as evidence. *Bruen* is instructive. The district court dismissed the case at the pleadings stage, so the case arrived at the Supreme Court without an evidentiary record, *Bruen*, 597 U.S. at 16, yet the Court considered the historical sources that the parties (and amici) cited in their briefs. *E.g.*, *id.* at 40 ("[R]espondents and their *amici* point to several medieval English regulations [.]"); *id.* at 46 ("Respondents next point us to the history of the Colonies and early Republic[.]"); *id.* at 58.

In all events, as shown below and as detailed in the State's accompanying Statement of Disputed Facts, most of Mr. Cramer's opinions are refuted by the historical record and, thus, raise no genuine issue of material fact precluding entry of summary judgment in the State's favor.

## ARGUMENT

### I.    There Is No Second Amendment Right to Open Carry in Public

The initial step in the *Bruen* inquiry requires a determination of whether Plaintiffs' proposed course of conduct falls under the plain text of the Second Amendment. 597 U.S. at 31. Here, the proposed course of conduct is openly carrying weapons that Plaintiffs can already carry concealed. Plaintiffs' conduct falls beyond any constitutionally accepted understanding of the right to "bear arms" and is not presumptively protected. A contrary holding would expand an individual's right to publicly carry a firearm in any manner that he or she chooses, contrary to

Supreme Court precedent, the historical record, and the natural meaning of the Second Amendment's text.

The definition of the right to "bear arms," as adopted in *Heller* and *Bruen*, does not presumptively protect a specific manner in which an individual is entitled to exercise his or her right of public carriage. The United States Supreme Court has adopted a natural meaning of the phrase to "bear arms," which denotes the right to "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsberg, J., dissenting, joined by Scalia, J., and Souter, J.) (*quoting* Black's Law Dictionary 214 (6th ed. 1990)). Utilizing this definition, the *Bruen* Court held that the term "bear" naturally encompasses public carry, and the Second Amendment's plain text presumptively covers the conduct of "'bear[ing]' arms in public for self-defense." *See Bruen*, 597 U.S. at 31-32. This does not mean, however, as the Plaintiffs suggest, that *any manner* of public carry is protected by the plain language of the Second Amendment.

The Court's adopted definition of "bear arms" reads disjunctively in defining the right. That is, an individual's right to "bear arms" may be exercised through the wearing, bearing, or carrying of a firearm either openly upon her person *or* concealed inside clothes or a pocket. *See id.* at 31. Nothing in this understanding suggests that an individual is entitled, based on the definition of "bear[ing] arms," to publicly carry openly *and* concealed. Both textually and historically, therefore, regulating one manner of public carriage while permitting another does not strip an individual of this constitutional guarantee.

Rhode Island's dual licensing regime is consistent with this principle. It is fundamentally different from the regulatory framework struck down in *Bruen*. Under New York's challenged law, the *only* lawful way to carry a handgun in public was to obtain a concealed carry license, an option that was effectively foreclosed to ordinary, law-abiding citizens. *Bruen*, 597 U.S. at 12 and 93-94 (Breyer, J., dissenting); *Kachalsky v. County of Westchester*, 701 F.3d 81, 86 (2d Cir. 2012) ("New York bans carrying handguns openly."), *abrogated by Bruen*, 597 U.S. at 17-19. Rhode Island, by contrast, generally permits public carry of firearms in a concealed manner pursuant to its "shall issue" licensing provision. *Bruen*, 597 U.S. at 13 n.1 and 38 n. 9; *see also id.* at 80 (Kavanaugh, J., concurring). The State's denial of Plaintiffs' applications for an additional open carry permit under R.I. Gen. Laws § 11-47-18 does not foreclose their ability to exercise core Second Amendment rights. *Cf. id*. at 53 (identifying historical consensus that states cannot "ban public carry *altogether*") (emphasis added); *Rahimi*, 144 S. Ct. at 1902 (noting that the New York law at issue in *Bruen* "effectively presumed that no citizen" had a right to public carry absent special need).

Confronted with multiple judicial decisions reaching the same conclusion both pre- and post-*Bruen*, *see* ECF No. 34-1 at 35-37, Plaintiffs' only retort is that those cases are "easily distinguishable." ECF No. 39 at 23-24. But none of Plaintiffs' hyper-technical criticisms detract from the core holdings reached in those cases: "Courts concluded that the government could lawfully eliminate one kind of public carry to protect and ensure the safety of its citizens, so long as the people were permitted to carry weapons in another manner that allowed self-defense." *Sinnissippi Rod & Gun Club v. Raoul*, __ N.E. 3d __, 2024 WL 886651, *7 (Ill. Ct. App. Mar. 1, 2024) (appeal pending Sept. 2024). Thus, merely that the "manner in which [a state] allows public carry—concealed rather than open—is not to Plaintiffs' liking does not mean that enforcement

against open carry is unconstitutional." *Frey v. Nigrelli*, 661 F. Supp. 3d 176, 198 (S.D.N.Y.), *appeal docketed sub nom. Frey v. Bruen*, No. 23-365 (2d Cir. Mar. 16, 2023).

## II.    The Nation's Historical Tradition Allows States to Regulate the Manner of Public Carry

Even if Plaintiffs satisfied the first step of the *Bruen* test, they fail to refute the State's demonstration that Rhode Island's dual licensing regime comports with the Nation's historical tradition of regulating the manner of public carry.  ECF No. 34-1 at 22-39; ECF No. 38 at 8-21. To determine whether a modern law is consistent with the Nation's historical tradition of firearms regulation, courts must reason by analogy.  *Bruen*, 597 U.S. at 27-30.  "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."  *Rahimi*, 144 S. Ct. at 1898.

One principle underpinning our tradition is that government regulation of the "*manner* of public carry" is a practice dating to antebellum America.  *See Bruen,* 597 U.S. at 59 (emphasis in original); *Sinnissippi Rod & Gun Club, Inc.,* 2024 Il. App. 210073 at 28 ("the historical record from the founding era to the ratification of the Fourteenth Amendment consistently demonstrates a tradition restricting the manner of public carriage").  Since the Founding, public carry has been regulated in various ways, from concealed-carry bans to restrictions on open carry to limitations on carrying in particular places.  *See Heller*, 554 U.S. at 605 (examining "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century"); Declaration of Dr. Brennan Rivas (Rivas Decl.) ¶ 6, ECF No. 34-2.  That tradition demonstrates that the Second Amendment permits states to regulate the manner of public carry where, as here, the state allows alternative means of publicly carrying firearms for self-defense.

This principle is reflected in the text of several early state constitutional provisions safeguarding the right to keep and bear arms.  Georgia's 1868 constitution tracked the Second

Amendment but added that "the General Assembly shall have power to prescribe by law the manner in which arms may be borne." Art. I, § 14, Ga. Const. (1868). Florida's 1885 constitution similarly qualified the right: "but the Legislature may prescribe the manner in which they may be borne." Decl. of Rights, § 20, Fla. Const. (1885). And the Tennessee and Texas constitutions provided that "the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime." Art I, § 26, Tenn. Const. (1870); Art. I, § 23, Tex. Const. (1876). The Rhode Island Supreme Court similarly interpreted Article 1, § 22 of its state constitution as providing "individuals with a right to keep and bear arms," subject to "reasonable regulation by the state in exercising its police power." *Mosby v. Devine*, 851 A.2d 1031, 1039 (R.I. 2004).

In sum, "historical evidence" demonstrates "that *the manner* of public carry was subject to reasonable regulation" in early America. *Bruen*, 597 U.S. at 59. Plaintiffs' attempts to refute this historical evidence are unavailing.

### A. The Constitution does not prefer one form of public carry over another

The Nation's historical tradition does not reflect a preference for one form of public carry over another. Plaintiffs' argument to the contrary relies on Mr. Cramer's distorted historical perspective on the Second Amendment's alleged preference for open carry over concealed carry. ECF No. 39 at 1, 17, 23-25.

The American history of public carry reveals two broad approaches to manner of carry restrictions, one adopted by Northern states and a second adopted by Southern states. Rivas Decl. ¶¶ 32-36, ECF No. 34-2. While the approaches varied, both traditions uniformly recognized the role of governments in regulating the manner of public carry. *Id.* at ¶ 32 ("Taken together, the two regulatory strategies tightly restricted the public carrying of weapons. . . .").

Northern states adopted the existing English model based on the Statute of Northampton, which broadly prohibited carrying weapons in populated public areas. *Id.* at ¶¶ 32-36 (*citing* 1786

Va. Laws ch. 49 and 1795 Mass. Laws ch. 2, 436).  This approach often created statutory exemptions for people who had a specific need to carry weapons in public, while broadly prohibiting most carry.  *See id.*  The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835 (Dutton & Wentworth 1836), ch. 134, § 16, illustrates this approach. *Id.* at ¶ 34.  This statute restricted the carrying of a "dirk, dagger, sword, pistol, or other offensive or dangerous weapon, without reasonable cause to fear an assault or other injury." *Id.*; *see also* ECF No. 44, Ex. 28.  "[N]umerous states adopted verbatim the penal code version of the Massachusetts public carry law."  Rivas Decl. at ¶ 35 (collecting examples from Wisconsin (1939), Maine (1840), Michigan (1846), Virginia (1847), Minnesota (1851), and Oregon (1853)).  All of these states restricted "going armed" in public without reasonable cause to fear harm.[1]  *Id.*

Southern states adopted a different approach by broadly prohibiting concealed carry but leaving open carry largely unregulated.  *See* Rivas Decl. ¶¶ 36-38, ECF No. 34-2.  These laws generally "provided a list of prohibited deadly weapons that could not be concealed on the person and penalized violators with a fine and/or jail time."  *Id.* at ¶ 38 (collecting examples from Indiana (1819), Florida Territory (1835), Georgia (1837), Arkansas (1837), Virginia (1838), Alabama (1839) and other states and territories).  Under this approach, prohibitions on concealed carry were regarded as necessary to "counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons."  *State v. Chandler*, 5 La. Ann. 489, 490 (1850).  Open carry, in contrast, was seen as

---

[1] These examples are just some of the restrictions on open carry that are part of our Nation's history.  Additional examples are discussed in the State's motion for summary judgment and opposition to Plaintiffs' motion for summary judgment.  ECF No. 34-1 at 28-39 and ECF No. 38 at 8-21.  *See also* Rivas Decl. ¶ 6 (summarizing manner of carry restrictions); Declaration of Professor Robert Spitzer, ECF No. 34-3, Ex. C (summarizing historical statutes that restricted open carry).

"calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations." *Id*.

Idaho (1888), West Virginia (1882), and Texas (1871) enacted laws that fell somewhere in between these two approaches. Like the Southern states' approach, these states broadly prohibited the carrying of enumerated weapons but, unlike the Southern states' approach, did not distinguish between the manner of carry. Rivas Decl. ¶ 40, ECF No. 34-2. Like the Northern states' approach, the restrictions enacted by these states generally applied to both open and concealed carry of enumerated weapons, and Texas provided an exception, like the Massachusetts law, for those with "reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." *Id.*

The variances in state approaches to regulating the manner of public carry does not mean, as Plaintiffs mistakenly contend, that there was a historical tradition of protecting open carry *more* than concealed carry. ECF No. 39 at 17-27. This assertion is based on a distorted view of history focused predominantly on the Southern states' approach to manner of carry restrictions. Rivas Decl. ¶ 62, ECF No. 34-2 ("Focusing on southern, concealed carry cases without exploring the larger context of social attitudes toward weapon-carrying has led to an emphasis on judges' protection of open-carry without considering socio-cultural factors limiting such behavior."). An objective review of the Nation's historical tradition shows that states retained broad authority to regulate the manner of public carry, regardless of whether the carry was open or concealed, provided states did not completely ban both forms. As shown in the next section, this principle was borne out by decisions across the country, including the Southern states on which Plaintiffs focus.

### B. Manner of carry restrictions are consistent with historical tradition

Courts in Southern states upheld prohibitions on concealed carry not because concealed carry was less important than open carry but because such prohibitions were consistent with the historical tradition of arms regulation. The Louisianna Supreme Court explained that the legislature's prohibition on concealed carry was a lawful "measure of police, prohibiting *only a particular mode of bearing arms* which is found dangerous to the peace of society." *State v. Jumel*, 13 La. Ann. 399, 400 (1858) (emphasis added). The Alabama Supreme Court expressed the same view in relation to its constitutional provision, holding that the "right guarantied to the citizen, is not to bear arms upon all occasions and in all places, but merely 'in defence of himself and the State.'" *State v. Reid*, 1 Ala. 612, 616 (1840). This phrasing, the Alabama Supreme Court held, necessarily left the state legislature with the "authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals." *Id.* Stated differently, the Southern approach reflects an alternative legislative balancing of the perceived threat to the "peace of society" posed by different manners of public carry. *See id.* It does not reflect a historical tradition of favoring one manner of public carry over another.[2]

This is confirmed by historical evidence establishing that the open carry of firearms was widely perceived as shocking and outrageous conduct. Rivas Decl. ¶¶ 62-70, ECF No. 34-2. Dr. Rivas summarized the historical context as follows:

> Weapons-carriers of the nineteen century (much like those today) were likely to hide their pistols and bowie knives. A commentator writing in 1877 said, 'The very fact that men are careful to conceal their revolvers argues that they are doubtful as to the propriety of carrying of them,' and that if a young man were to walk along the street 'with his silver-

---

[2] Plaintiffs assert that *Reid* and *Nunn v. State*, 1 Ga. 243 (Ga. 1846) establish that the Second Amendment guarantees a right to open carry. Not so. As the Court explained in *Bruen*, those cases show "that States could *not* ban public carry *altogether*." 597 U.S. at 53 (second emphasis added). *Reid* and *Nunn* held only that a State cannot prohibit *both* concealed and open carry; they did not hold, much less evince a consensus, that it is unconstitutional to regulate open carry. *See id.* at 53–54.

mounted deringer hanging from his waist belt, he would expose himself to unlimited ridicule.'

*Id.* at ¶ 63 (citations omitted). This "tendency toward concealing deadly weapons rather than carrying them openly was in fact so strong that in the latter nineteenth century, men's trousers were often sold with a *pistol pocket* sewn into the rear hip." *Id.* (emphasis in original).

Because open carry was not common, Southern state legislators focused attention on the societal problem of the time, concealed carry, which they regarded as a pressing threat to the peace of society. *Id.* at ¶¶ 65-67. The Louisiana Supreme Court's decision in *State v. Smith* illustrates this point. There, the court considered a jury instruction that a defendant could be convicted of carrying a concealed weapon if the weapon was "in the pocket, under the clothes, although partially exposed." 11 La. Ann. 633, 634 (1856). The court held that this instruction accurately reflected the statutory scope, which covered "weapons as ordinarily worn . . . where the partial exposure is the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon." *Id.* The court contrasted this manner of carry with the "*extremely unusual case of the carrying of such weapon in full open view*, and partially covered by the pocket or clothes." *Id.* (emphasis added); *see also Hill v. State*, 53 Ga. 472, 475 (1874) ("The practice of carrying arms at courts, elections and places of worship, etc., is a thing *so improper in itself, so shocking to all sense of propriety*, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee.") (emphasis added).

Similarly, in *Reid*, the Alabama Supreme Court observed that carrying weapons openly was not something a person would do except in exigent circumstances. 1 Ala. at 621-22. Thus, a defendant was not entitled to a jury instruction that his concealed carry of a weapon in violation of Alabama law was constitutionally protected because, if there were an "emergency [] pressing,"

defendant would have carried the firearm openly instead of concealing it. *Id.* Open carry was not a practical option because, as the North Carolina Supreme Court held, "[n]o man amongst us carries [a gun] about with him, as one of his every day accoutrements—as part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment." *State v. Huntly*, 25 N.C. 418, 422 (1843); *see also* Rivas Decl.at ¶ 65, ECF No. 34-2 ("The habitual carrying of deadly weapons on one's person (openly or concealed) was the behavior of 'ruffians'—bullies who imposed their will on others through force or intimidation, and who engaged in unforgivably brutal behavior in order to do so.").

Plaintiffs attempt to refute this historical record by relying on handful of ambiguous anecdotal newspaper reports collected by Mr. Cramer and submitted in his untimely supplemental declaration. ECF No. 39 at 5-9 and 26. Plaintiffs suggest that more newspaper reports are "difficult to find" because open carry was allegedly not newsworthy, unless the weapon was used in an assault or murder. *Id.* at 5. This type of circular reasoning, relying on the absence of evidence to establish a fact, is specious and fails to rebut the substantial historical record presented by the State, establishing that open carry was not at all common. *See* Rivas Dep. 110:19-111:10, ECF No. 42-2 (Ex. B).

Moreover, the few examples on which Plaintiffs rely involve press reports of people carrying a weapon when they had a reasonable basis for believing themselves to be in danger. This, as shown above, was a circumstance exempted from historical analogues generally prohibiting open carry. Other examples upon which Plaintiffs rely are entirely ambiguous as to whether the weapon was carried openly or in a concealed manner. Indeed, the Frederick Law Olmsted anecdote mentioned in Mr. Cramer's book has nothing to do with the open carry of

firearms but was clearly an example of the sort of concealed carry that Southern states prohibited. Pls.' Statement of Additional Undisputed Facts at ¶ 17, ECF No. 41; Rivas Decl. at ¶ 63, ECF 34-2 (citing the same example as demonstrating that "young southern men quite frequently hid pistols . . . under their coats and clothing").

In short, as *Smith*, *Reid*, and *Huntly* demonstrate, openly carrying firearms during the course of one's everyday activities was not a normal or acceptable practice under either the Northern or Southern states' approaches to regulating the manner of public carry. Rivas Decl. at ¶ 65, ECF 34-2 ("Nineteenth century Americans (North and South) criticized the everyday, or habitual carrying of deadly weapons."). Moreover, the courts interpreting restrictions on concealed carry, which was the predominant threat to public safety in the Southern states at the time, repeatedly reaffirmed the broad authority of state legislatures to regulate the manner of carry of firearms in public so long as the opportunity for self-defense was preserved. *See Bruen*, 597 U.S. at 54–55 ("antebellum state-court decisions evince a consensus view that States could" prohibit concealed carry but could not ban both concealed *and* open carry because doing so would "altogether prohibit the public carry of arms") (quotation omitted). The core principle recognized by these historical precedents, as endorsed by the Supreme Court, is that a prohibition against both open and concealed carry is different in kind, not merely in degree, from a restriction of only one type of public carry. *See id.* at 59 (manner restrictions "eliminat[ing] one kind of public carry" but leaving open another are constitutional). After all, if a state prohibits or restricts only one type of carry, the opportunity for the free exercise of Second Amendment rights still exists. That opportunity disappears only when the prohibition extends to both forms of carry. *Id.*

Rhode Island's dual licensing regime, as already shown, fits comfortably within this historical tradition. *See* ECF No. 34-1 at 28-39. It allows for the mandatory issuance of concealed-

14

carry permits and discretionary issuance of open-carry permits.  Plaintiffs fail to demonstrate that the State's allowance of their concealed-carry permits but denial of an additional permit for open carry in any way interfered with their rights to "armed self-defense" in public.[3]  *See Bruen*, 597 U.S. at 29; *Baird v. Bonta*, 709 F. Supp. 3d 1091, 1139-40 (E.D. Cal. 2023) (finding "no evidence to suggest handguns are ineffective for self-defense when concealed").  The record does not indicate, let alone prove, that Plaintiffs can only vindicate their right to "armed self-defense" through an additional open carry permit issued under § 11-47-18.  *See* ECF No. 34-1 at 13-14 (discussing Plaintiffs' testimony about their need for open carry).  At most, Plaintiffs express a preference or desire to obtain an open carry permit in addition to the concealed-carry permits they already hold under § 11-47-11.  *See id.; see also* ECF No. 39 at 11-12 (summarizing Plaintiffs' testimony about why they would "like the option" to open carry but offering no evidence demonstrating that their right to armed self-defense could only be met with open rather than concealed carry).[4]  No such constitutional right exists.  *See* ECF No. 34-1 at 35-38; ECF No. 38 at 6-7.

---

[3] Plaintiffs falsely contend that the State presented no evidence to show that permits for open carry are issued only to those who demonstrate a need beyond those that can be met with a municipal concealed-carry permit.  ECF No. 39 at 26.  But this is exactly what Edward Troiano, Chief of the Attorney General's Bureau of Criminal Identification and Investigation, testified.  *See* Dep. of Edward Troiano at 88:6-24 (Ex. A to Defs.' Statement of Disputed Facts in Response to (1) Pls. Statement of Additional Undisputed Facts and (2) Pls.' Statement of Disputed Facts) (Question:  "In other words, the person can still get a permit if they, and Attorney General permit even if they have a municipal permit if they show some other need beyond that, or some need?"  Answer:  "Correct".); *id.* at 72:25-73:5 ("So if you are applying to the Attorney General for a permit to carry a concealed firearm in the State of Rhode Island and you already had the legal authority to do so by means of a permit issued by the city, then there is . . . no need inherently for us to issue another permit.").

[4] Plaintiffs claim that they have a "rational reason to want both permits" because they may "inadvertently let one permit lapse."  ECF No. 39 at 1-2.  Putting aside the rationality of such a desire (there are no overlapping driver's licenses or seasonal hunting permits, for example), Plaintiffs have not shown that this possibility ever occurred.  *See id.*  And, even if it did, it would

### C.  Plaintiffs Fail to Establish Any Due Process Violation

The crux of Plaintiffs' due process argument is that the State's denial of their applications for renewal of their § 11-47-18 permits allegedly violated a protected liberty interest established by the Second Amendment.  ECF No. 39 at 27.  For the reasons already stated, there is no Second Amendment right to openly carry firearms in public when another form of public carry is allowed. As explained at length above, this alleged right is not "deeply rooted in this Nation's history and tradition," and thus is not entitled to any constitutional protection.  *See Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

Plaintiffs likewise fail to establish any "legitimate claim of entitlement" to renewal of their § 11-47-18 permits, which under state law are valid for only four years.  *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies."); *Ky. Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) ("[A]n individual claiming a protected interest must have a legitimate claim of entitlement to it.").  As already noted, ECF No. 34-1 at 40, there is no "legitimate claim of entitlement" to renewal of Plaintiffs' § 11-47-18 permits because there is no Second Amendment right to public carry in any manner Plaintiffs' may choose and no property right exists under state law.  Indeed, the Rhode Island Supreme Court has held that denial of a § 11-47-18 permit application implicates no constitutionally protected interest.  *Mosby*, 851 A.2d at 1048.

---

be a circumstance entirely within their control and, thus, not a reason for granting an additional permit under § 11-47-18.  *See* ECF No. 34-1 at 10.

Plaintiffs' remaining arguments based on vagueness and arbitrariness have been addressed in the State's initial motion, ECF No. 34-1 at 39-43, as well as in the State's Opposition to Plaintiffs' Motion for Summary Judgment.  ECF No. 38 at 22-25.  The State incorporates those arguments here.  It adds only that Plaintiffs' reliance on *Hightower v. City of Boston*, 693 F.3d 61, 87 (1st Cir 2012), for a run-of-the-mill arbitrary and capricious standard of review applicable to administrative proceedings is misplaced.  *Hightower* involved a challenge to the administrative revocation of an existing firearms permit, not a challenge to the denial of an application for renewal of a time-bound permit.  The court in *Hightower* assumed—without deciding—that plaintiff had a property interest in her revoked firearms license.  *Id.* at 84.  The same assumption cannot be made here.  Thus, the correct standard of review for a due process challenge to a firearm permit denial requires Plaintiffs to demonstrate that the State's conduct "shocks the conscience."  *See Cruz–Erazo v. Rivera–Montañez,* 212 F.3d 617, 622 (1st Cir. 2000).  This standard requires proof that the challenged state action "'must in and of itself be egregiously unacceptable, outrageous, or conscience shocking.'"  *Id.* (quoting *Amsden v. Moran*, 904 F.2d 748, 753-54 (1st Cir. 1990)).

Nothing in the record here demonstrates that denial of Plaintiffs' applications for renewal of their § 11-47-18 permits rose to this level, especially considering the absence of any constitutional violation or protected interest.  *Cf. Rosenfeld v. Egy*, 346 F.3d 11, 15 (1st Cir. 2003) (affirming summary judgment on due process challenge to police chief's denial of firearms renewal application where plaintiff "neither demonstrated a trialworthy issue" on whether the decision "shocks the conscience" nor infringed on any "protected property or liberty interest").  As the First Circuit has held, "with a regularity bordering on the monotonous," *Pagán v. Calderón,* 448 F.3d 16, 33 (1st Cir. 2006):  the "substantive due process doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or

local decision makers, whether those decisions are right or wrong." *Id.* Thus, although the "door [has been left] slightly ajar for . . . truly horrendous situations, any permit or license denial, no matter how unattractive, that falls short of being truly horrendous is unlikely to qualify as conscience-shocking." *Id.* No such "truly horrendous" behavior has been shown on the record here.

Merely that Plaintiffs previously held § 11-47-18 permits does not strengthen their claim. There remains no protected property or liberty interest in the discretionary renewal of § 11-47-18 permits that, by state law, are valid for only four years. *See* ECF No. 34-1 at 40. Plaintiffs also fail to present any evidence establishing that the circumstances under which they previously obtained § 11-47-18 permits from an earlier administration were identical to those presented in their most recent applications to the current administration.[5]

Lastly, even if Plaintiffs could demonstrate a "trialworthy issue" on whether their permit denials "shock the conscience" or infringed on any protected property or liberty interest, the record undisputedly demonstrates that the State provided all the procedural protections that were due. ECF No. 34-1 at 41-43; ECF No. 38 at 24-25. Plaintiffs each received individualized notice of the reasons for the denial of their § 11-47-18 permit applications together with an opportunity to rebut those reasons in meetings with permitting authorities. *Id.* The reasons for not reconsidering the initial permit denials were further explained to Plaintiffs both verbally and in writing. *Id.* Additionally, Plaintiffs had a full opportunity to test the lawfulness of those reasons through

---

[5] Plaintiffs submitted their renewal applications between 2020-2022. *See* ECF No. 18 at ¶¶ 28-29. Thus, any § 11-47-18 permits they previously held would have been issued before the current attorney general took office in January 2019. *See* https://riag.ecms.ri.gov/about-our-office/attorney-general-peter-f-neronha.

certiorari review before the Rhode Island Supreme Court. *Id.* The State, therefore, is entitled to summary judgment on Plaintiffs' due process claim.

### III.    There Is No Direct Action Under Article 1, Section 2 of the State Constitution

The Rhode Island Supreme Court has consistently held that state constitutional provisions, including article 1, section 2, are not self-executing and, thus, do not permit direct causes of action. ECF No. 34-1 at 43-44. Federal district courts, including this Court, have repeatedly held the same. *Id.*

Notwithstanding this precedent, Plaintiffs baldly proclaim that these cases were "wrongly decided." ECF No. 39 at 35. Their position is based on the flawed premise that the Rhode Island Supreme Court's holdings in *Doe v. Brown Univ.*, 253 A.3d 389, 401 (R.I. 2021) and *Bandoni v. State*, 715 A.2d 580, 595 (R.I. 1998) do not mean what they plainly say. *See* ECF No. 34-1 at 43-44 (discussing both). They posit that because the court generally referred to principles of due process in the context of other cases, it implicitly recognized a self-executing right to bring a direct cause of action under article 1, section 2 of the state constitution. ECF No. 39 at 31-32. This argument is baseless.

None of the cases on which Plaintiffs rely involved a purported direct cause of action under article 1, section 2. Instead, Plaintiffs in those cases relied on general principles of due process to support claims brought pursuant to recognized causes of action, not any alleged self-executing constitutional right maintained as a direct cause of action.[6] As the Rhode Island Supreme Court

---

[6] *See* ECF No. 39 at 31-32 citing the following cases: *Moreau v. Flanders*, 15 A.3d 565 (R.I. 2011) (challenge to constitutionality of a state statute); *State v. Germaine*, 971 A.2d 555 (R.I. 2009) (appeal from Superior Court decision upholding classification decision of Sex Offender Board of Review); *Ruggerio v. City of Providence*, 889 A.2d 691 (R.I. 2005) (petition for writ of certiorari from decision denying request to discontinue worker's compensation benefits); *Gem Plumbing & Heating Co. v. Rossi*, 867 A.2d 796 (2005) (statutory provision for enforcement of mechanic's lien); *In re Stephanie B*, 826 A.2d 985 (R.I. 2005) (petitions for certiorari review of

in *Doe* held: "we are of the opinion that article 1, section 2 expressed only general principles and does not supply a sufficient rule of law by which the rights under the clause may be enjoyed, protected, and enforced; and, thus, this clause is not self-executing." *Doe*, 253 A.3d at 400; *see also A.F. Lusi Constr., Inc. v. R.I. Convention Ctr. Auth.*, 934 A.2d 791, 798 (R.I. 2007) ("although article 3, section 7, articulates ethical principles that public officials and employees should adhere to, those provisions are aspirational in nature, and the constitutional provision does not set forth rules that give those principles the force of law"). Recognizing the general principles of due process does not, as Plaintiffs suggest, mean that the Rhode Island Supreme Court implicitly recognized a direct cause of action under article 1, section 2. Rather, it demonstrates only that, although the constitutional right is not self-executing, the principles underlying it may be relied upon in litigating recognized causes of action. *See Zab v. Rhode Island Dept. of Corrections*, 269 A.3d 741, 748 (R.I. 2022) (prisoners could maintain negligence claims based on the principle of access to the courts, which was not a self-executing right, in challenging constitutionality of civil death statute); *see also Binette v. Sabo*, 710 A.2d 688, 692 (Conn. 1998) (the principle underlying a constitutional provision "bears no direct relation to the much different question of whether the Plaintiffs are constitutionally entitled to bring a claim directly under the state constitution").[7]

---

Family Court orders); *Theta Properties v. Ronci Realty Co*., 814 A.2d 907 (R.I. 2003) (appeal from Superior Court decision denying motion to vacate default judgment); *State v. Hazard*, 745 A.2d 748 (R.I. 2000) (appeal from criminal conviction); *Kelly v. Marcantonio*, 678 A.2d 873 (R.I. 1996) (certified questions from state and federal courts pursuant to Rule 6 of the Supreme Court Rules of Appellate Procedure and statute); *Rhode Island Deposits Economic Protection Corp. v. Brown*, 659 A.2d 208 (R.I. 1993) (governor's request for court's written opinion pursuant to express constitutional provision); *Avanzo v. R.I. Dept. of Human Servs*., 625 A.2d 208 (R.I. 1993) (class action challenging eligibility determinations under government assistance program).

[7] The Rhode Island Supreme Court cited the *Binette* decision with approval in both *Zab,* 269 A.2d at 748 and *Smiler v. Napolitano*, 911 A.2d 688, 691-92 (1998).

Plaintiffs here do not rely on principles of due process to support arguments under recognized causes of action (like the negligence claim at issue in *Zab*). Instead, they purport to bring a direct cause of action under the Rhode Island Constitution—a cause of action the Rhode Island Supreme Court has found does not exist. *Doe*, 253 A.3d at 400-01. Recognition of a new cause of action based directly on article 1, section 2 is "a legislative responsibility rather than a judicial task." *Id.* at 401. Since no direct cause of action has been recognized by the Rhode Island General Assembly, the State is entitled to summary judgment on Plaintiffs' claim based on article 1, section 2 of the state constitution. *See id.* (affirming dismissal of discrimination claim because no private cause of action exists under article 1, section 2).

## CONCLUSION

For all of these reasons, Plaintiffs' objection to the State's Motion for Summary Judgment fails to raise any genuine issue of material fact. The Court should grant the State's Motion for Summary Judgment and deny Plaintiffs' parallel Motion for Summary Judgment. A declaration should be issued stating that Rhode Island's dual licensing regime, as specified in R.I. Gen. Laws §§ 11-47-11 and -18, is constitutionally permissible.

Dated:  January 27, 2025

Respectfully Submitted,

DEFENDANTS PETER F. NERONHA
and THE STATE OF RHODE ISLAND,

By their Attorneys,

*/s/ James J. Arguin*
James J. Arguin (#10972)

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (#10742)

Special Assistant Attorneys General
Office of the Attorney General

21

150 South Main Street
Providence, R.I. 02903
(401) 274-4400 exts. 2078/2064
(401) 222-2995 (Fax)
jarguin@riag.ri.gov/pmeosky@riag.ri.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2025, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ James J. Arguin*