```
 1            this -- I'd like to mark this as Exhibit 9.
 2                     (Exhibit 9, marked)
 3        Q.     (By Attorney Arquin)  And, Mr. Cramer, is
 4   this the title page of your book on Concealed Weapon
 5   Laws of the Early Republic?
 6        A.     Yes.
 7        Q.     Okay.  I'd like to go to one of the
 8   discussions you have and ask you about this particular
 9   quote.  Let me increase the font here.  This is on
10   page 86.  You see this?  Is that clear to you, page
11   86?
12        A.     Yes.
13        Q.     I'm referring particularly to this
14   passage on the second full paragraph, As the Louisiana
15   -- starting with, As the Louisiana statute's preamble
16   showed, do you see that?
17        A.     Yes.
18        Q.     What I was wondering, you go on to say,
19   As the Louisiana statute's preamble showed, and will
20   be seen with some of the Alabama editorials, banning
21   of concealed carrying of deadly weapons was often
22   carelessly equated with a ban on any form of wearing
23   deadly weapons.
24               And then you proceed, the next sentence
```



1    says, This suggests, but does not prove, that the open

2    carrying of deadly weapons was subject to sufficient

3    social stigma to guarantee that a ban on concealed

4    carry was, effectively, a ban on all carrying.

5              Do you see that passage from your book?

6        A.    Yes.

7        Q.    And my question is, what social stigma

8    are you referring to in this passage?

9        A.    Well, it's certainly the case that if you

10   were carrying a Bowie knife, it would certainly mark

11   you as a potentially pretty dangerous person, and

12   because Bowie knives weren't often used in these sort

13   of sudden combats where someone felt insulted and felt

14   they had to do something about it.  Although the fact

15   that the laws in question only banned concealed carry,

16   as I pointed out, suggests, but does not prove, the

17   fact is that -- the fact that various State and

18   Supreme courts recognized open carry was protected

19   suggests that this could not have been a -- it's just

20   carelessness on the part of the people writing these

21   editorials.

22       Q.    But could it also not reflect the fact

23   that because of the, what you say is the stigma, the

24   social stigma, that open carry wasn't really a problem



1  back then?

2       A.     Well, it might not have been a problem in

3  the sense that people were not afraid of it.  I mean,

4  one of the things that I did find in the research I've

5  done is that the number of times that there is a

6  distinction made between concealed carry which is

7  regarded as the act of a ruffian and open carry which

8  seems not to have generated the same sort of general

9  hostility or hatred.

10              Concealed carry receives an enormous

11 amount of review from a lot of these court cases where

12 State Supreme courts are having to decide whether

13 concealed carry laws are Constitutional or not.

14      Q.     And let me -- why do you -- what's the

15 distinction you draw, because here in the book, this

16 paragraph in the book, you are talking about all

17 open -- open carrying of all weapons.  So, how -- it

18 seems like earlier you were drawing a distinction

19 between, you know, carrying a Bowie knife and carrying

20 other forms of deadly weapons, is that a distinction

21 you would draw or not?

22      A.     I would say that Bowie knives, there is a

23 panic over Bowie knives that takes place in the 1830s.

24 I think the problem was there was already an issue



1    they were concerned about.  There was a specific

2    incident in the Arkansas legislature, 1837, I think it

3    also played a role in this, two members of the

4    legislature got into argument on the floor of the

5    Arkansas House of Legislature, State House.  Both of

6    them drew concealed Bowie knives, which was already

7    illegal there, and they proceeded to get into a fight.

8    One of them died, and the survivor, who was the

9    Speaker of the House, was expelled by the House for

10   conduct unbecoming of a member.  And shortly -- within

11   a few months of that incident, which was widely

12   reported, there are these laws passed almost

13   everywhere in the southern states regulating concealed

14   carry and often just -- in the case of Tennessee, just

15   Bowie knives.

16        Q.     My point is, this statement in your book

17   refers to open carrying of all deadly weapons, not

18   just Bowie knives, correct?

19        A.     I don't quite understand what you asked.

20        Q.     I'm just pointing out, the quote from

21   your book is that this -- the suggestion is that the

22   open carrying of deadly weapons in all forms was

23   subject to sufficient social stigma that it wasn't

24   done?



1          A.      As I pointed out, suggests, does not

2    prove.   The fact is that there are certain level of --

3    if you're in Idaho, as I think I mentioned previously,

4    open carry is lawful.   For the most part, people do

5    not do it very often.   I've seen people do it, but it

6    seems pretty rare.

7          Q.      Let me --

8          A.      It's bad manners.

9          Q.      I'm sorry.   Were you finished?

10         A.      It's sort of bad manners, as far as I'm

11   concerned, and a lot of other people in Idaho feel

12   much the same way.

13         Q.      Yeah.

14         A.      We allow concealed carry without licenses

15   here.   And that's one of the reasons that open carry

16   seems to be coming less common.   A lot of people, like

17   my daughter, for example, she feels, it sort of

18   disturbs her when she sees an open carry.   It doesn't

19   disturb her that she knows a lot of people are

20   carrying concealed.   That's an example of social

21   stigma, there's certain level of disapproval where

22   people are clearly uncomfortable.

23         Q.      Well, I wonder if this, to your point

24   there, I'm moving within Exhibit 9 to page 114 of your



1    book on Concealed Weapon Laws in the Early Republic,

2    and I want to direct your attention to this quote

3    here, Birkbeck, do you see that, The editor's note?

4        A.      I'm not seeing it, no.

5                    ATTORNEY LYONS:  It's not up on the

6        screen, Jim.

7                    ATTORNEY ARQUIN:  Oh, I'm going to

8        stop sharing there.  Hold on.  Let me put it

9        back up.  Let me reload that.  I don't know.

10       It stopped for some reason.

11       Q.      (By Attorney Arquin)  Do you see that

12   now?  This is again Exhibit 9, Concealed Weapon Laws

13   of the Early Republic, page 114, and I was directing

14   your attention to the full paragraph here beginning

15   with, The editor's note?

16       A.      Yes.

17       Q.      What I'm referring to is this quote from

18   Birkbeck.  I'm wondering if you can expand upon it

19   where you wrote that, A dirk is said to be a common

20   appendage to the dress of a planter in this part of

21   Virginia.

22                  And then it goes on, That a dirk is said

23   to be suggests that such weapons were commonly

24   carried, but not openly.



CLAYTON CRAMER                                              October 11, 2024
O'NEIL vs NERONHA                                                        142

1               And can you expand on what you mean in

2    this portion of your book?

3         A.     Well, Birkbeck says, is said to be, what

4    that means is this is what people think.  Doesn't

5    necessarily mean it's true.  I mean, it could be that,

6    in fact, a lot of people were carrying dirks concealed

7    in that part of Virginia, but there's a lot of things

8    where people say or people think but it isn't

9    necessarily true.

10        Q.     But it still suggests, does it not, that

11   there were social stigma against carrying deadly

12   weapons openly during the Early Republic?

13        A.     Might well be.  There might well have

14   been some social stigma to it, but that doesn't

15   necessarily -- there's no laws about it.

16        Q.     Okay.

17        A.     And of course, Bruen is looking at what

18   laws existed.

19        Q.     But, again, going back to our early

20   conversation, legislators often act in response to

21   social problems?

22        A.     People --

23        Q.     If the culture was, this wasn't a

24   problem, why would there be a law?



1      A.      Legislators respond to perceived social

2  problems, not necessarily actual problems.

3      Q.      Let me go to another section of your

4  book.  Let me go back.  I'm referring now to Exhibit

5  9, again, your book on Concealed Carry, page 101,

6  where you're discussing, you see, a Georgia law from

7  1837?

8      A.      Right.

9      Q.      Do you recollect that law that you

10  discussed here?

11      A.      Yes.

12      Q.      Here's the page.

13      A.      Yes, I see it.

14      Q.      And I'll scroll through to see if you can

15  refresh your recollection on this.  I know you've

16  looked at it before.

17      A.      Yes.  It is a law that was

18  extraordinarily poorly written.  It talks about

19  carrying of deadly weapons, but it then exempts

20  carrying certain categories of deadly weapons which

21  shall be exposed plainly to view.

22      Q.      Yeah.  So, this Georgia law from 1837

23  banned carrying of all types of -- banned all carrying

24  of deadly weapons, does it not?



1      A.     No, it did not.  That's what's

2  interesting is, it bans the sale of certain categories

3  of weapons and it bans concealed carry, but it

4  specifically exempts certain categories of deadly

5  weapons being carried openly, which should be --

6      Q.     Are those -- the two categories exempted,

7  are those mentioned here the top of page 102,

8  horseman's pistols and edged weapons?

9      A.     Yeah.  There are certain things that are

10 allowed to be carried.  It's interesting that pistols,

11 horseman's pistols, which were very large, remained

12 lawful to carry.

13     Q.     But apart from those two exemptions,

14 though, all other forms of deadly weapons were banned?

15     A.     I think you can go back and take a look

16 at the section on that previous page, it identifies

17 categories of weapons which were prohibited from sale.

18 Prohibited sale, offering for sale, or possession.

19     Q.     I see it, prohibited sale, offering for

20 sale, or possession?

21     A.     About their person or elsewhere.

22     Q.     Yeah.  Any of the hereinafter described

23 weapons, to wit: a Bowie knife, any other kind of

24 knives, manufactured and sold for the purpose of



CLAYTON CRAMER                                      October 11, 2024
O'NEIL vs NERONHA                                                145

1    wearing, or carrying the same as arms of offense or

2    defense, pistols, dirks, sword canes, spears, et

3    cetera.

4              So, isn't this law a prohibition on

5    carrying all of these types of weapons, all these

6    types of deadly weapons?

7       A.     Well, the language is somewhat

8    inconsistent in that it prohibits the carrying of

9    these weapons, but elsewhere, it says they're okay to

10   carry if they're carried openly.  This is one of the

11   reasons that the Georgia Supreme Court struck this law

12   down because it was inconsistent.  Different sections

13   of it seemed to apply to different things.

14      Q.     But we just went through in here, the

15   only exceptions seemed to be for horseman's pistols

16   and edged weapons.  It does seem to prohibit all of

17   the others, does it not?

18      A.     As I said, it does, and that's the

19   problem, that's why the Georgia Supreme Court struck

20   the law down, because it made no sense.

21      Q.     But at the time, just on the face of the

22   statute, though, it bans concealed carrying as much as

23   it banned all carrying of deadly weapons with two

24   exceptions, horseman's pistol and edged weapons, while



1   were just looking at, at the bottom of page 101, and

2   going on to the top of 102, it defines them

3   differently as Bowie knives, dirks, tooth picks,

4   spears, and which shall be exposed plainly to view.

5   Is that a correct reading?

6        A.     It has different lists in different parts

7   of the law.

8        Q.     Yeah.  So, I'm wondering, I mean, is your

9   view of this that pistols are included in the scope of

10  the law on deadly weapons?

11       A.     In terms of what's prohibited on sale or

12  offering for sale, pistols other than horseman's

13  pistols were subject to this ban on sale.

14       Q.     But then when you go down to this section

15  about where it says, plainly to view, it doesn't

16  mention pistols in that section?

17       A.     No, it does not.  As I said earlier, it's

18  a contradictory and poorly worded law.  It's unclear

19  exactly what the intention of the law is.  It's sort

20  of clear.  I mean, they're trying to ban concealed

21  carry and they're trying to discourage the sale of

22  these deadly concealable weapons.

23       Q.     Thank you for that.  Let me show you

24  another exhibit.  Are you familiar -- before I do

